1  DONALD W. SEARLES (Cal. Bar No. 135705)
   Email: searlesd@sec.gov
2  JANET MOSER (Cal. Bar No. 199171)
   Email: moserj@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12

13  SECURITIES AND EXCHANGE          Case No.
    COMMISSION,
14                                   COMPLAINT
                 Plaintiff,
15                                   **COMPLAINT**
           vs.
16
    STUART FROST and FROST
17  MANAGEMENT COMPANY, LLC,

18               Defendants.

19

20

21        Plaintiff Securities and Exchange Commission ("SEC") alleges:

22                 <u>**JURISDICTION AND VENUE**</u>

23        1.     The Court has jurisdiction over this action pursuant to Sections 209(d),

24  209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15

25  U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14].

26        2.     Defendants have, directly or indirectly, made use of the means or

27  instrumentalities of interstate commerce, of the mails, or of the facilities of a national

28  securities exchange in connection with the transactions, acts, practices and courses of

business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 214 of the Advisers Act [15 U.S.C. § 90b-14] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Stuart Frost resides in this district and Defendant Frost Management Company, LLC has its principal place of business in this district.

## SUMMARY

4.      From 2012 through 2016, Frost Management Company, LLC ("FMC"), an investment adviser to five private venture capital funds, and its sole owner, Stuart Frost ("Frost"), defrauded the funds and their investors of over $14 million by charging undisclosed and excessive incubator fees to start-up companies in which the funds invested, in violation of their fiduciary duties as investment advisers.

5.      During that five-year period, Defendants raised nearly $63 million for the funds, mostly from high net worth individuals and trusts.  The funds were invested in a portfolio of start-up companies ("portfolio companies"), using the so-called "Frost incubator model," in which a Frost-owned company, Frost Data Capital ("FDC"), purportedly provided operational support and other services to help "incubate" the portfolio companies in anticipation of those companies maturing and ultimately being sold or acquired by another company.  In return for those support services, the portfolio companies paid incubator fees to FDC.

6.      In reality, a significant portion of the incubator fees charged to the portfolio companies was used to cover FDC's overhead and to pay Frost's exorbitant salary and extravagant personal expenses.

7.      When Frost needed more cash to fund his lavish lifestyle, he created new portfolio companies and, after investing more fund capital into the new companies, FDC then extracted even more incubator fees.

8.      At the same time, Frost and FMC failed to disclose to the funds either

COMPLAINT                                  2

the existence of or the actual amount of incubator fees being paid by the portfolio companies, and also charged the funds undisclosed and improper management fees.

9.     By engaging in this conduct, Defendants have violated the antifraud provisions of Sections 206(1)-(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1),(2) and (4)], and Rule 206(4)-8(a)(1)-(2) thereunder [17 C.F.R. § 275.206(4)-8].

10.     The SEC seeks permanent injunctions, disgorgement with prejudgment interest on a joint and several basis, and civil penalties against Defendants.

## THE DEFENDANTS

11.     Defendant Stuart Frost, age 57 and a resident of Laguna Niguel, California, is the sole owner and sole manager of FMC and sole manager of FDC.

12.     Defendant Frost Management Company, LLC, a Delaware limited liability company, was an exempt reporting investment adviser formerly located in San Juan Capistrano, California.  As of December 31, 2018, FMC failed to renew its status as an exempt reporting adviser.  It was the adviser to the five private venture capital funds described below.    FMC had assets under management of $49.9 million at year-end 2016, the last year for which information is available.  The last Form ADV filed by FMC was dated February 8, 2017.

## RELATED PARTIES

13.     Frost Data Capital, LLC ("FDC"), formerly known as Frost Venture Partners, LLC, is a Delaware limited liability company located in Orange County, California.  Frost's family trust is the sole member, and Frost is the sole manager of FDC.

14.     Frost VP Seed, LLC ("Seed Fund") is a Delaware limited liability company formed in 2011.  During the relevant time period, its manager was FMC.

15.     Frost VP Seed International, LLC ("International Seed Fund") is a Delaware limited liability company formed in 2012.  Its manager is FMC.

16.     Frost VP Early Stage Fund II, LP ("Fund II") is a Delaware limited partnership formed in 2013.  During the relevant time period, its general partner was

Frost Venture Partners GP, LLC.  As of October 21, 2016, Frost was the sole member of the general partner (at inception in May 2013, Frost was a 62.5% member).

17.    FVP International Feeder Fund L.P. ("International Feeder Fund") is a Cayman Islands limited partnership formed in 2013.  Its general partner is FMC.

18.    Frost Fund III, L.P. ("Fund III") is a Delaware limited partnership formed in 2015.  During the relevant time period, its general partner was Frost Fund III, GP, LLC.  As of December 31, 2016, Frost was the sole member of the general partner (at inception in August 2015, Frost was an 81% member).

19.    Collectively, the Seed Fund, International Seed Fund, Fund II, International Feeder Fund, and Fund III are referred to herein as "the Funds."

20.    At all relevant times, each of the Funds was a "pooled investment vehicle" within the meaning of Rule 206(4)-8 of the Advisers Act [17 C.F.R. § 275.206(4)-8].

## THE ALLEGATIONS

21.    Frost formed both FMC and FDC in 2011.

22.    FMC was an exempt reporting investment adviser pursuant to Section 203(l) of the Advisers Act [15 U.S.C. §§ 80b-3(l)], which provides for exemption from registration to investment advisers who act solely as an adviser to venture capital funds.

23.    Frost, who had no prior experience as an investment adviser or a fund manager, owned and controlled both FMC and FDC.

### A.    FMC's and Frost's "Incubator Model"

24.    From 2012 through 2016, FMC raised nearly $63 million from high net worth individuals and trusts, who invested in the Funds  as follows:

(a)    The Seed Fund raised approximately $7,570,000 from roughly 30 investors in 2012.

(b)    The International Seed Fund raised approximately £412,750 ($636,798) from roughly 45 investors in 2012.

(c)     Fund II raised approximately $41,189,521 from roughly 74 investors in 2013-2014.

(d)     The International Feeder Fund raised approximately $5,250,000 from roughly two investors in 2013-2015, which was then invested in Fund II.

(e)     Fund III raised approximately $13,440,000 from roughly 11 investors in 2015-2016.

25.     FMC had no advisory clients aside from the Funds.

26.     The Funds invested in portfolio companies created by FDC that had a purported emphasis on big data analytics and cloud computing and later, the "internet of things."

27.     FDC started 24 portfolio companies between 2012 and 2016.

28.     In addition to the Funds, other investors in the portfolio companies included high net worth individuals, trusts, non-Frost funds, and affiliates of public companies.

29.     FDC started, incubated, and provided support and services to the portfolio companies.

30.     The portfolio companies, in turn, paid FDC monthly fees for those services.

31.     Frost never capitalized FDC and operated it on a break-even basis.

32.     FDC was financially dependent upon the incubator fees paid by the portfolio companies because these fees were FDC's only source of cash.  In turn, the portfolio companies were dependent upon the Funds and other investors to pay FDC's incubator fees.

33.     Frost's incubator model has not been successful.  There have been no returns to the Funds or their respective investors.  As of early 2018, only a few of the portfolio companies remained active.

1.     **The Funds' Investment Committees**

34.     The Seed Fund's operating agreement provided for the creation of an

investment committee, which generally consisted of no more than five (5) persons, selected by Frost in his capacity as manager of FMC.

35.     The Seed Fund's investment committee was responsible for approving all investments presented to it by Frost, in his capacity as manager of FMC.

36.     The Seed Fund's investment committee membership varied over time, but always consisted exclusively of FDC insiders, and always included Frost.

37.     Members of the Seed Fund's investment committee could be removed by Frost, in his capacity as manager of FMC, at his sole discretion.

38.      All actions of the Seed Fund's investment committee required at least a majority vote of its members, provided, however, in the event of a tie vote, the investment decision would be made by Frost, in his capacity as manager of FMC, in his sole discretion, and all members of the investment committee would be required to vote in accordance with the determination of the manager, *i.e.*, Frost.

39.     Fund II and Fund III also created investment committees.  Membership varied over time, but always consisted exclusively of FDC insiders, and always included Frost.

## 2.     The Funds' Advisory Committees

40.     The governing documents for each Fund also provided for the creation of an advisory committee, generally consisting of three (3) to five (5) members, appointed by Frost, in his capacity as manager of FMC, which was the manager of the Seed Fund, the International Seed Fund, and the general partner of the International Feeder Fund and in his capacity as the majority owner of the general partner of Fund II.  The governing document for Fund III provided that the limited partners, representing a majority interest, may appoint an advisory committee.

41.     According to the governing documents for the Funds, the duties of the advisory committees were substantially the same, and included: (a) consideration of any approvals sought by the manager or general partner; (b) advise regarding  matters pertaining to conflicts of interest between or among the manager or general partner,

any members of the manager or general partner; and (c) rendering such other advice and counsel as requested by the manager or general partner.

42.     Notwithstanding the duties of the advisory committees, Frost, in his capacity as manager of FMC, which was the manager of the Seed Fund, the International Seed Fund, and the general partner of the International Feeder Fund, or as the majority owner of the general partner of Fund II and Fund III, retained ultimate responsibility for making all investment decisions.

43.     While the Funds' governing documents called for the establishment of advisory committees, in reality, only Fund II established an advisory committee.  It met on only two or three occasions, but no conflicts of interest were presented to Fund II's Advisory Committee.

### 3.     Frost's Solicitation of Investors and Prospective Investors

44.     Frost solicited investors and prospective investors through the use of the Internet, wire and other electronic means of communication, and at in-person and group presentations.

45.     Frost also made and used PowerPoint marketing presentations in soliciting investors and prospective investors.  Frost's PowerPoint presentation for the Seed Fund touted the "no fee" "no carry" opportunity to invest in "big data" analytics, and specifically in start-up ideas and start-up companies, approved by a majority of a fund's investment committee, and then incubated by FDC, with exits projected from 2-5 years from startup by way of an acquisition by a "major player" in the computer industry.

46.     Investors in the Funds also signed operating and partnership agreements that were countersigned by Frost, on behalf of the Funds' manager or general partner.

47.     Frost also provided investor executive summaries to investors and prospective investors, which provided a high level summary of the Frost incubator model, the investment focus of the particular fund, the deal structure, Frost's background and qualifications, and a short description of some of the companies then

being incubated.

48.    Frost also provided Fund investors with quarterly status reports that generally described that quarter's acquisitions, the status or activities of the portfolio companies in which the Fund had invested, and a valuation of the investments then held.

49.    Frost represented to investors and prospective investors that he envisioned a highly-focused incubator model in which he would come up with ideas or identify the needs of big data companies and pass them through FDC, the incubator. FDC would then write up a business plan and pass that plan onto a newly created portfolio company, which would obtain seed investments from the Funds or other investors.  The portfolio company would then incubate ideas into software that, ideally, would eventually lead to an "exit," either through sale of the software or the company.

**B.    The Fraud**

50.    FMC and Frost defrauded the Funds and the investors in the Funds by: (1) charging the portfolio companies, in which the Funds invested, undisclosed and excessive incubator fees that were paid to Frost's company, FDC; (2) not disclosing the actual amount of incubator fees that the portfolio companies paid to FDC; (3) creating more portfolio companies to generate even more excessive fees; and (4) charging some Funds undisclosed management fees that were not earned and were paid to FMC and Frost.

**1.    Undisclosed and Excessive Incubator Fees**

51.    FDC charged the portfolio companies over $14 million in undisclosed and excessive incubator fees.

52.    Although the Funds did not directly pay these fees, because the Funds invested in the portfolio companies, the payment of these fees by the portfolio companies weakened their financial condition and prospects for success, which, in

1  turn, harmed the Funds' investments in those companies.

2      53.    FDC charged a monthly incubator fee for operational support provided

3  to the portfolio companies.

4      54.    However, in the Funds' operating and partnership agreements, and in the

5  executive summaries given to Fund investors, FMC and Frost either completely failed

6  to disclose the existence of the FDC incubator fees (in the case of certain Funds) or

7  misleadingly represented that FDC would charge incubator fees on a case-by-case

8  basis or at or below market rates (in the case of the remaining Funds).

9      55.    Similarly, none of the PowerPoint marketing presentations to investors

10  and prospective investors in the Funds disclosed the incubator fees.

11      56.    In particular, both the governing documents and the PowerPoint

12  disclosure for the Seed Fund were completely silent on and failed to disclose the

13  existence of FDC incubator fees.

14      57.    In addition, the executive summary for the Seed Fund stated:

15          *Note that the [Seed Fund] will not be expected to cover expenses and*

16          *salaries incurred by FDC, which is a completely separate corporate*

17          *entity.  It is expected that services provided from the incubator to the*

18          *startup companies will be agreed to between the boards of each*

19          *individual company and FDC on a case-by-case basis and expected to*

20          *be adjusted based on the individual needs of each company as their*

21          *business matures.  FDC's policy will be to only charge for services that*

22          *the startup companies would require in the normal course of business.*

23          *In general, this should mean that the startups receive higher quality*

24          *services at a lower price than they would otherwise be able to afford*

25          *(due to Frost VP's ability to provide economies of scale)."*

26      58.    This disclosure was false and misleading.  FDC did not charge the

27  portfolio companies in which the Seed Fund had invested incubator fees on an agreed,

28  case-by-case, individual needs basis, or at or below market rates.

COMPLAINT                                    9

59.     In addition, by charging incubator fees to the portfolio companies in which the Seed Fund had invested, the Seed Fund covered the expenses and salaries incurred by FDC, contrary to what had been represented in the executive summary.

60.     The governing documents for the International Seed Fund were also completely silent on and failed to disclose the existence of FDC incubator fees.

61.     The governing documents for Fund II disclosed that FDC "may" receive a monthly service fee from the companies in which the partnership holds an investment in exchange for certain shared advisory and support services provided by FDC.

62.     This partial disclosure was false and misleading, as the disclosure further provided that the service fee would not reduce the 2% management fee payable to the general partner so long as the fee does not exceed reasonable market rates.

63.     In fact, the so-called "service" fee was neither based on reasonable market rates, nor did it reduce the 2% management fees payable to the general partner.

64.     Also, the PowerPoint disclosure for Fund II was silent regarding incubator fees.

65.     In addition, the executive summary for Fund II contained the same misleading disclosure as the Seed Fund, quoted above in paragraph 57 above.

66.     The governing documents for the International Feeder Fund disclosed that FDC had been formed to provide an operating infrastructure to incubate and develop new business, but those documents were silent regarding incubator fees.

67.     Also, the PowerPoint disclosure for the International Feeder Fund was silent regarding incubator fees.

68.     In addition, the executive summary for the International Feeder Fund stated that the portfolio companies would be provided with a variety of services, the costs of which would be split between the various "ideas being incubated," thereby "lowering the cost to each incubated idea/company."

69.     This disclosure was false and misleading, as the manner in which the

1  incubator fees were charged did not lower the cost to each portfolio company.

2      70.    Finally, the governing documents for Fund III disclosed that the

3  portfolio companies in which the fund invested would enter into agreements with FDC

4  pursuant to which each of the companies would reimburse FDC a monthly amount for

5  its share of the cost of resources provided by FDC for shared facilities, shared

6  personnel, and other shared resources.

7      71.    This disclosure was false and misleading as fees charged to the portfolio

8  companies were not based on the company's share of the cost of resources provided

9  by FDC for shared facilities, shared personnel and other shared resources; and, in fact,

10  the fees were excessive.

11      72.    Both the PowerPoint and the executive summary for Fund III were silent

12  on incubator fees.

13      73.    Rather than charge for services that the portfolio companies would

14  require in the normal course of business, FDC charged incubator fees from the

15  moment a portfolio company was formed, even if the company had no employees.

16      74.    The fees also were not negotiated on a case-by-case basis.  Rather, they

17  were fixed at a flat rate, typically about $30,000 to $40,000 per month, regardless of

18  the level of development of a portfolio company.

19      75.    The incubator fees were not adjusted as the number of a portfolio

20  company's employees increased or decreased.  Portfolio companies that moved out of

21  FDC's offices paid the same as portfolio companies that used FDC's space.

22      76.    No effort was made to allocate the time FDC's staff spent working on

23  tasks for the different portfolio companies.

24      77.    In most instances, the service agreements providing for the payment of

25  the incubator fees were signed by Frost, as CEO of the portfolio company, and by

26  FDC's CFO, before the portfolio company was officially formed.

27      78.    Cancellation of the service agreements required 180 days' notice.  As a

28  result, once a CEO was hired for a new portfolio company, the company was burdened

1    with a non-negotiable, non-cancellable fee for at least six months.

2        79.    These fees caused the portfolio companies to burn through their cash

3    quickly, thereby shortening their "runway" and reducing the likelihood of a successful

4    exit.

5        80.    Several CEOs of the portfolio companies voiced their concern to Frost

6    and other members of FDC's management over the exorbitant incubator fees.

7        81.    Some of the CEOs of the portfolio companies attempted to negotiate the

8    amount of the incubator fees.

9        82.    Frost refused to negotiate the amount of the incubator fees, and

10   informed at least one CEO that the incubator fees were "prix fixe," not "a la carte."

11       83.    Frost also was part owner of a second incubator-related company, Snow

12   Data Capital ("SDC").

13       84.    SDC was created in 2014, ostensibly to provide marketing services to

14   the portfolio companies.

15       85.    In fact, SDC was created to provide employment to one of Frost's

16   friends who needed to qualify for a green card for immigration purposes.  Rather than

17   making his friend an employee of FDC, which already provided marketing services,

18   Frost created SDC, which then began charging the portfolio companies an additional

19   $5,100 per month for marketing.

20       86.    FDC's overall incubator fees included SDC's marketing fees.

21       87.    Frost never disclosed to the Funds or to the Funds' investors the

22   existence of SDC or its fees.

23       88.    Of the $21.69 million in incubator fees charged to the portfolio

24   companies in which the Funds had invested, over $14 million of FDC's fees exceeded

25   reasonable incubator fees and thus were excessive.

26                **2.    Undisclosed Incubator Fee Amounts**

27       89.    FMC and Frost failed to disclose the incubator fees paid by the portfolio

28

COMPLAINT                                    12

companies or their amounts in the Funds' quarterly status reports which were distributed to the Funds' investors.

90.     FMC and Frost also failed to disclose the incubator fees paid by the portfolio companies or their amounts to the Fund II advisory committee, the only fund that had an advisory committee.

91.     The Fund II advisory committee met on two or three occasions, and incubator fees were not disclosed, discussed, or consented to at any of those meetings.

### 3.     Generation of Additional Incubator Fees

92.     As Frost's and FDC's expenses grew, Frost created new portfolio companies to generate additional incubator fees.

93.     Although Frost disclosed to potential investors in the PowerPoint marketing materials that he contemplated starting only two to four portfolio companies per year, in fact, Frost created 12 of the 24 portfolio companies between April 2014 and February 2015, when Frost and his family temporarily moved to Italy and charged many personal expenses to FDC.

94.     Frost's apparent need for cash, as opposed to new start-up ideas, led to the creation of many of the new portfolio companies.

95.     One of the reasons FDC's costs kept growing was because Frost paid himself a generous salary (approximately $3.4 million from 2012 through 2016) and also charged extensive personal expenses to FDC (over $867,000 from 2012 through 2016).

96.     Personal expenses charged to FDC included Frost's personal chef, housekeeper, wine locker, archery range, boat payments and maintenance, beach club membership, lease payments for luxury cars, and payments of charges (averaging a total of $18,000 per month) made on three personal credit cards.

97.     In addition, emails show Frost and FDC's CFO discussing that new companies and the resultant incubator fees were needed to make ends meet.

98.     For example, in an email dated June 10, 2016, Frost told FDC's CFO that it was "critically important to get the incubator to break even ASAP." Frost also told FDC's CFO that "to achieve this we need to … start a few new companies ASAP" and also "move costs to the newcos [new portfolio companies] by assigning some of our incubator execs as CEO/CTO."

99.     Once Frost decided to start a new portfolio company, the matter would be submitted to a fund's investment committee, which determined how many portfolio companies would be created and how much a fund would invest in each newly created company.

100.    A fund's investment committee, which was controlled by Frost, would typically approve the creation of the company and the amount to be invested.

101.    In addition, Frost was the only member of Fund III's investment committee in late 2016, and was thus solely responsible for approving the fund's investment in the last two newly formed portfolio companies.

### 4.    Undisclosed and Unearned Management Fees

102.    FMC and Frost also collected undisclosed management fees from the Seed Fund and International Seed Fund.

103.    The governing documents for these two funds did not disclose or authorize the payment of management fees.

104.    Nevertheless, from 2012 to 2014, FMC charged the Seed Fund $378,000 in management fees and the International Seed Fund $24,875 in management fees.

105.    In addition, FMC and Frost collected unearned management fees from Fund II that should have been offset by incubator fees that exceeded market rates.

106.    Fund II's governing document allowed its general partner to collect a 2% management fee. The governing document also provided that incubator fees paid to FDC would not reduce the management fee "so long as such [incubator] fees [do] not exceed reasonable market rates."

107.    Fund II paid management fees of over $1.7 million. The excess

COMPLAINT                                     14

1   incubator fees charged to Fund II should have been used to offset those management
2   fees.

3   **C.    Materiality**

4          108.   The Funds and their investors and prospective investors would have
5   considered it important to know that the portfolio companies in which they had
6   invested were paying undisclosed and excessive incubator fees that depleted the
7   portfolio companies' assets.

8          109.   The Funds and their investors and prospective investors would also have
9   considered it important to know that some of the portfolio companies in which they
10  had  invested were created for the principal purpose of generating additional
11  incubator fees to cover Frost's extravagant personal expenses.

12         110.   The Seed Fund, the International Seed Fund, and their investors and
13  prospective investors would have considered it important to know that that these two
14  funds were paying undisclosed management fees that directly impacted the Funds'
15  assets.

16         111.   Fund II and its investors and prospective investors would have
17  considered it important to know that the fund had paid unearned management fees
18  that directly impacted the Fund's assets.

19  **D.    Frost Acted Knowingly or, at a Minimum, Negligently**

20         112.   Because Frost was FMC's sole owner and manager, majority or sole
21  owner of the Funds' managing members and general partners, and FDC's sole owner
22  and managing member, Frost knew, or was reckless in not knowing, that it was a
23  breach of his fiduciary duty to charge undisclosed and excessive incubator and
24  management fees.

25         113.   At a minimum, Frost acted negligently by falling below the standard of
26  care expected of an investment adviser by charging and not disclosing these
27  undisclosed and excessive fees.  For an investment adviser, the standard of care is
28  based on its fiduciary duty.  As a fiduciary, Frost owed his clients undivided loyalty

COMPLAINT                                        15

1   and should not have engaged in activity that conflicted with his clients' interest.

2       114.   Because Frost controlled FMC, his scienter and/or negligence can be

3   imputed to FMC.

4       **E.    Frost and FMC Acted as Investment Advisers**

5       115.   At all relevant times, both Frost and FMC were investment advisers

6   within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §§ 80b-

7   2(a)11)], as they both, for compensation, engaged in the business of advising others,

8   either directly or through publications and writings, as to the value of securities or as

9   to the advisability of investing in, purchasing or selling securities.

10      116.   FMC provided investment advice for compensation, and also filed

11  reports with the SEC as an exempt reporting adviser.

12      117.   Frost was the sole owner and manager of FMC, and he received

13  compensation for giving advice to the Funds.

14      118.   The limited partnership and membership interests in the Funds, as well

15  as the shares of stock of the portfolio in which the Funds invested, are securities.

16      **F.    Defendants' Tolling Agreements**

17      119.   Frost and FMC have each entered into tolling agreements with the SEC

18  to toll the running of any statute of limitations for an action or proceeding against

19  them which permits any sanctions or relief that may be sought or imposed in such

20  action or proceeding starting January 1, 2014.

21                      **<u>FIRST CLAIM FOR RELIEF</u>**

22                      **Fraud by an Investment Adviser**

23      **Violations of Sections 206(1) and 206(2) of the Advisers Act**

24                  **(against Defendants Frost and FMC)**

25      120.   The SEC realleges and incorporates by reference paragraphs 1 through

26  119 of this Complaint as if fully set forth herein.

27      121.   Defendants Frost and FMC, at all relevant times, were investment

28  advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §

COMPLAINT                          16

1 | 80b-2(a)(11)].

2 |     122.    Among other things, Frost and FMC made material misstatements and

3 | omissions, and breached their fiduciary duties to the Funds, by failing to disclose

4 | material information and conflicts of interest regarding the incubator fees charged by

5 | FDC, including:

6 |     (a)    failing to disclose to the Seed Fund, International Seed Fund, and

7 | International Feeder Fund that the portfolio companies in which they invested would

8 | be charged incubator fees;

9 |     (b)    failing to disclose to the Funds that the portfolio companies would

10 | be charged flat-rate incubator fees as opposed to incubator fees charged on a case-by-

11 | case basis, or at or below market rates;

12 |     (c)    failing to disclose the amount of incubator fees actually charged to

13 | the portfolio companies  in quarterly status reports provided to the Funds' investors;

14 |     (d)    failing to disclose the existence or the amount of incubator fees

15 | actually charged to the portfolio companies  to the Funds' advisory committees;

16 |     (e)    failing to disclose to the Funds that Frost created some of the new

17 | portfolio companies for the principal purpose of generating additional incubator fees

18 | to cover FDC's overhead and Frost's extravagant personal expenses; and

19 |     (f)    charging the portfolio companies in which the Funds invested

20 | over $14 million in excessive incubator fees.

21 |     123.    In addition, FMC and Frost charged the Seed Fund and International

22 | Seed Fund undisclosed management fees of $402,875 and improperly charged Fund II

23 | over $1.7 million in management fees that should have been offset by the excessive

24 | incubator fees charged.

25 |     124.    By engaging in the conduct described above, Frost and FMC, and each

26 | of them, directly or indirectly, by use of the mails or means and instrumentalities of

27 | interstate commerce, knowingly and/or recklessly: (a) employed or are employing

28 | devices, schemes or artifices to defraud clients or prospective clients; and knowingly,

COMPLAINT

17

1   recklessly and/or negligently (b) engaged in or are engaging in transactions, practices,
2   or courses of business which operated as a fraud or deceit upon clients or prospective
3   clients.

4        125.   By engaging in the conduct described above, Frost and FMC, and each
5   of them, have violated, and unless restrained and enjoined, are reasonably likely to
6   continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-
7   6(1) & 80b-6(2)].

8                           **<u>SECOND CLAIM FOR RELIEF</u>**
9                     **Fraud Involving a Pooled Investment Vehicle**
10   **Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8(a)(1)-(a)(2)**
11                        **(against Defendants Frost and FMC )**

12       126.   The SEC realleges and incorporates by reference paragraphs 1 through
13   119 above.

14       127.   FMC and Frost repeatedly defrauded investors in the Funds by failing to
15   disclose the existence of and/or the amount of incubator fees and management fees,
16   thus making the Funds' governing agreements, pitch materials, and quarterly status
17   reports misleading.

18       128.   FMC and Frost engaged in multiple years of deceptive conduct by
19   charging undisclosed, excessive and/or improper incubator and management fees and
20   by starting new portfolio companies to generate additional incubator fees to cover
21   FDC's overhead and Frost's personal expenses.

22       129.   By engaging in the conduct described above, Defendants Frost and
23   FMC, and each of them, directly or indirectly, by engaging in the conduct described
24   above, while acting as an investment adviser to a pooled investment vehicle, directly
25   or indirectly, by use of the mails or means or instrumentalities of interstate commerce,
26   knowingly, recklessly and/or negligently:  (a) made untrue statements of a material
27   fact or omitted to state a material fact necessary in order to make the statements made,
28   in the light of the circumstances under which there were made, not misleading, to any

COMPLAINT                                    18

investor or prospective investor in the pooled investment vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

130.    By engaging in the conduct described above, Defendants Frost and FMC, and each of them, have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Frost and FMC, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### III.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, on a joint and several basis.

### IV.

Order Defendants to pay civil penalties under Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 13, 2019

/s/ Donald W. Searles
DONALD W. SEARLES
Attorney for Plaintiff
Securities and Exchange Commission