DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
DOUGLAS M MILLER (Cal. Bar No. 240398)
Email: escalantek@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>STUART FROST AND FROST MANAGEMENT COMPANY, LLC,<br><br>Defendants. | Case No. 8:19-cv-01559-JLS-JDE<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST STUART FROST AND FROST MANAGEMENT COMPANY, LLC AS TO LIABILITY AND INJUNCTIVE RELIEF**<br><br>Date:        August 20, 2021<br>Time:        10:30 a.m.<br>Ctrm:        10A<br>Judge:       Hon. Josephine L/ Staton |

## I.    INTRODUCTION

Under Local Rule 56-1 of the U.S. Central District, plaintiff Securities and Exchange Commission ("SEC") submits this Statement of Uncontroverted Facts and Conclusions of Law in support of its motion for summary judgment against Defendants Stuart Frost ("Frost") and Frost Management Company, LLC ("FMC").

## II.    STATEMENT OF UNCONTROVERTED FACTS

### A.    The Admitted Allegations

#### 1.    The Defendants and Related Parties

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 1.    Defendant Stuart Frost is the sole owner and sole manager of FMC and sole manager of Frost Data Capital. | Frost and FMC's Answer to Complaint ("Answer"), Dkt. 16, ¶ 11. |
| 2.    Defendant Frost Management Company, LLC, a Delaware limited liability company, was an exempt reporting investment adviser formerly located in San Juan Capistrano, California.  As of December 31, 2018, FMC failed to renew its status as an exempt reporting adviser.  It was the adviser to the five private venture capital funds described below.   FMC had assets under management of $49.9 million at year-end 2016, the last year for which information is available.  The last Form ADV filed by FMC was dated February 8, 2017. | Answer, Dkt. 16, ¶ 12. |
| 3.    Frost Data Capital, LLC ("FDC"), formerly known as Frost Venture Partners, LLC, is a Delaware limited liability company located in Orange County, California.  Frost's family trust is | Answer, Dkt. 16, ¶ 13. |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| the sole member, and Frost is the sole manager of FDC. | |
| 4.      Frost VP Seed, LLC ("Seed Fund") is a Delaware limited liability company formed in 2011.  During the relevant time period, its manager was FMC. | Answer, Dkt. 16, ¶ 14. |
| 5.      Frost VP Seed International, LLC ("International Seed Fund") is a Delaware limited liability company formed in 2012.  During the relevant time period its manager is FMC . | Answer, Dkt. 16, ¶ 15. |
| 6.      Frost VP Early Stage Fund II, LP ("Fund II") is a Delaware limited partnership formed in 2013.  During the relevant time period, its general partner was Frost Venture Partners GP, LLC.  As of October 21, 2016, Frost was the sole member of the general partner (at inception in May 2013, Frost was a 62.5% member). | Answer, Dkt. 16, ¶ 16. |
| 7.      FVP International Feeder Fund L.P. ("International Feeder Fund") is a Cayman Islands limited partnership formed in 2013.  Its general partner is FMC. | Answer, Dkt. 16, ¶ 17. |
| 8.      Frost Fund III, L.P. ("Fund III") is a Delaware limited partnership formed in 2015.  During the relevant time period, its general partner was Frost Fund III, GP, LLC.  As of December 31, 2016, Frost was the sole member of the general | Answer, Dkt. 16, ¶ 18. |

2

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| partner (at inception in August 2015, Frost was an 81% member). | |

### 2.    General Allegations

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 9.    Frost formed both FMC and FDC in 2011 | Answer, Dkt. 16, ¶ 21. |
| 10.    FMC was an exempt reporting investment adviser pursuant to Section 203(l) of the Advisers Act [15 U.S.C. §§ 80b-3(l)], which provides for exemption from registration to investment advisers who act solely as an adviser to venture capital funds. | Answer, Dkt. 16, ¶ 22. |
| 11.    Frost, who had no prior experience as an investment adviser or a fund manager, owned and controlled both FMC and FDC. | Answer, Dkt. 16, ¶ 23. |

### 3.    FMC's and Frost's Incubator Model

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 12.    From 2012 through 2016, FMC raised nearly $63 million from high net worth individuals and trusts, who invested in the Funds  as follows:<br>    a.  The Seed Fund raised approximately $7,570,000 from roughly 30 investors in 2012.<br>    b.  The International Seed Fund raised approximately £412,750 ($636,798) from roughly 45 investors in 2012. | Answer, Dkt. 16, ¶ 24. |

3

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
|     c.  Fund II raised approximately $41,189,521 from roughly 74 investors in 2013-2014.<br><br>    d.  The International Feeder Fund raised approximately $5,250,000 from roughly two investors in 2013-2015, which was then invested in Fund II.<br><br>13. Fund III raised approximately $13,440,000 from roughly 11 investors in 2015-2016. | |
| 14.   FMC had no advisory clients aside from the Funds. | Answer, Dkt. 16, ¶ 25. |
| 15.   The Funds invested in portfolio companies created by FDC that had a purported emphasis on big data analytics and cloud computing and later, the "internet of things." | Answer, Dkt. 9, ¶ 26. |
| 16.   FDC started 24 portfolio companies between 2012 and 2016. | Answer, Dkt. 16, ¶ 27. |
| 17.   In addition to the Funds, other investors in the portfolio companies included high net worth individuals, trusts, non-Frost funds, and affiliates of public companies. | Answer, Dkt. 16, ¶ 28. |
| 18.   FDC started, incubated, and provided support and services to the portfolio companies. | Answer, Dkt. 16, ¶ 29. |
| 19.   The portfolio companies, in turn, paid FDC monthly fees for those services. | Answer, Dkt. 16, ¶ 29. |

4

### a.   The Funds' Investment Committees

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 20.   The Seed Fund's operating agreement provided for the creation of an investment committee, which generally consisted of no more than five (5) persons, selected by Frost in his capacity as manager of FMC. | Answer, Dkt. 16, ¶ 34. |
| 21.   The Seed Fund's investment committee was responsible for approving all investments presented to it by Frost, in his capacity as manager of FMC. | Answer, Dkt. 16, ¶ 35. |
| 22.   The Seed Fund's investment committee was responsible for approving all investments presented to it by Frost, in his capacity as manager of FMC. | Answer, Dkt. 16, ¶ 35. |
| 23.   The Seed Fund's investment committee membership varied over time, but always consisted exclusively of FDC insiders, and always included Frost. | Answer, Dkt. 16, ¶ 36. |
| 24.   Members of the Seed Fund's investment committee could be removed by Frost, in his capacity as manager of FMC, at his sole discretion. | Answer, Dkt. 16, ¶ 37. |
| 25.   All actions of the Seed Fund's investment committee required at least a majority vote of its members, provided, however, in the event of a tie vote, the investment decision would be made by | Answer, Dkt. 16, ¶ 38. |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| Frost, in his capacity as manager of FMC, in his sole discretion. | |
| 26.    Fund II and Fund III also created investment committees.  Membership varied over time, but always consisted exclusively of FDC insiders, and always included Frost. | Answer, Dkt. 16, ¶ 39. |

### 4.    The Funds' Advisory Committee's

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 27.    The governing documents for each Fund also provided for the creation of an advisory committee, generally consisting of three (3) to five (5) members, appointed by Frost, in his capacity as manager of FMC, which was the manager of the Seed Fund, the International Seed Fund, and the general partner of the International Feeder Fund and in his capacity as the majority owner of the general partner of Fund II.   The governing document for Fund III provided that the limited partners, representing a majority interest, may appoint an advisory committee. | Answer, Dkt. 16, ¶ 40. |
| 28.    According to the governing documents for the Funds, the duties of the advisory committees were substantially the same, and included: (a) consideration of any approvals sought by the manager or general partner; (b) advice regarding | Answer, Dkt. 16, ¶ 41. |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| matters pertaining to conflicts of interest between or among the manager or general partner, any members of the manager or general partner; and (c) rendering such other advice and counsel as requested by the manager or general partner. | |

### 5.   Frost's Solicitation of Investors and Prospective Investors

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 29.   Frost solicited investors and prospective investors through the use of the Internet, wire and other electronic means of communication, and at in-person and group presentations. | Answer, Dkt. 16, ¶ 44. |
| 30.   Frost also made and used PowerPoint marketing presentations in soliciting investors and prospective investors.  Frost's PowerPoint presentation for the Seed Fund touted the "no fee" "no carry" opportunity to invest in "big data" analytics, and specifically in start-up ideas and start-up companies, approved by a majority of a fund's investment committee, and then incubated by FDC, with exits projected from 2-5 years from startup by way of an acquisition by a "major player" in the computer industry. | Answer, Dkt. 16, ¶ 45. |
| 31.   Investors in the Funds also signed operating and partnership agreements that were countersigned by Frost, on behalf of the Funds' | Answer, Dkt. 16, ¶ 46. |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| manager or general partner. | |
| 32.    Frost also provided investor executive summaries to investors and prospective investors, which provided a high level summary of the Frost incubator model, the investment focus of the particular fund, the deal structure, Frost's background and qualifications, and a short description of some of the companies then being incubated. | Answer, Dkt. 16, ¶ 47. |
| 33.    Frost also provided Fund investors with quarterly status reports that generally described that quarter's acquisitions, the status or activities of the portfolio companies in which the Fund had invested, and a valuation of the investments then held. | Answer, Dkt. 16, ¶ 48. |
| 34.    Frost represented to investors and prospective investors that he envisioned a highly-oui incubator model in which he would come up with ideas or identify the needs of big data companies and pass them through FDC, the incubator.  FDC would then write up a business plan and pass that plan onto a newly created portfolio company, which would obtain seed investments from the Funds or other investors. The portfolio company would then incubate ideas into software that, ideally, would eventually lead | Answer, Dkt. 16, ¶ 49. |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| to an "exit," either through sale of the software or the company. | |

### 6.   Undisclosed and Excessive Incubator Fees

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 35.   FDC charged a monthly incubator fee for operational support provided to the portfolio companies. | Answer, Dkt. 16, ¶ 53. |
| 36.   The executive summary for the Seed Fund stated: *Note that the [Seed Fund] will not be expected to cover expenses and salaries incurred by FDC, which is a completely separate corporate entity.  It is expected that services provided from the incubator to the startup companies will be agreed to between the boards of each individual company and FDC on a case-by-case basis and expected to be adjusted based on the individual needs of each company as their business matures. FDC's policy will be to only charge for services that the startup companies would require in the normal course of business.  In general, this should mean that the startups receive higher quality services at a lower price than they would otherwise be able to afford (due to Frost VP's ability to provide economies of scale).* | Answer, Dkt. 16, ¶ 57. |
| 37.   The governing documents for Fund II disclosed that FDC "may" receive a monthly | Answer, Dkt. 16, ¶ 61. |

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| service fee from the companies in which the partnership holds an investment in exchange for certain shared advisory and support services provided by FDC. | |
| 38.    The PowerPoint disclosure for Fund II was silent regarding incubator fees. | Answer, Dkt. 16, ¶ 64. |
| 39.    The governing documents for the International Feeder Fund disclosed that FDC had been formed to provide an operating infrastructure to incubate and develop new business, but those documents were silent regarding incubator fees. | Answer, Dkt. 16, ¶ 66. |
| 40.    The PowerPoint disclosure for the International Feeder Fund was silent regarding incubator fees. | Answer, Dkt. 16, ¶ 66. |
| 41.    The governing documents for Fund III disclosed that the portfolio companies in which the fund invested would enter into agreements with FDC pursuant to which each of the companies would reimburse FDC a monthly amount for its share of the cost of resources provided by FDC for shared facilities, shared personnel, and other shared resources | Answer, Dkt. 16, ¶ 70. |
| 42.    No effort was made to allocate the time FDC's staff spent working on tasks for the different portfolio companies | Answer, Dkt. 16, ¶ 76. |
| 43.    Cancellation of the service agreements | Answer, Dkt. 16, ¶ 78. |

10

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| required 180 days' notice. | |
| 44. Several CEOs of the portfolio companies voiced their concern to Frost and other members of FDC's management over the amount of incubator fees. | Answer, Dkt. 16, ¶ 80. |
| 45. Some of the CEOs of the portfolio companies attempted to negotiate the amount of the incubator fees. | Answer, Dkt. 16, ¶ 81. |
| 46. Frost informed at least one CEO that the incubator fees were "prix fixe," not "a la carte." | Answer, Dkt. 16, ¶ 82. |
| 47. Frost also was part owner of a second incubator-related company, Snow Data Capital ("SDC"). | Answer, Dkt. 16, ¶ 83. |
| 48. SDC was created in 2014, ostensibly to provide marketing services to the portfolio companies. | Answer, Dkt. 16, ¶ 84. |
| 49. Frost created SDC, which then began charging the portfolio companies an additional $5,100 per month for marketing. | Answer, Dkt. 16, ¶ 85. |
| 50. FDC's overall incubator fees included SDC's marketing fees. | Answer, Dkt. 16, ¶ 86. |
| 51. Frost never disclosed to the Funds or to the Funds' investors the existence of SDC or its fees. | Answer, Dkt. 16, ¶ 87. |
| 52. FMC and Frost failed to disclose the incubator fees paid by the portfolio companies or their amounts in the Funds' quarterly status reports | Answer, Dkt. 16, ¶ 89. |

11

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| which were distributed to the Funds' investors. | |
| 53.     Although Frost disclosed to potential investors in the PowerPoint marketing materials that he contemplated starting only two to four portfolio companies per year, in fact, Frost created 12 of the 24 portfolio companies between April 2014 and February 2015, when Frost and his family temporarily moved to Italy. | Answer, Dkt. 16, ¶ 93. |
| 54.     Emails show Frost and FDC's CFO discussing that new companies and the resultant incubator fees were needed to make ends meet. | Answer, Dkt. 16, ¶ 93. |
| 55.     For example, in an email dated June 10, 2016, Frost told FDC's CFO that it was "critically important to get the incubator to break even ASAP."  Frost also told FDC's CFO that "to achieve this we need to … start a few new companies ASAP" and also "move costs to the newcos [new portfolio companies] by assigning some of our incubator execs as CEO/CTO." | Answer, Dkt. 16, ¶ 98. |
| 56.     Frost was the only member of Fund III's investment committee in late 2016, and was thus solely responsible for approving the fund's investment in the last two newly formed portfolio companies. | Answer, Dkt. 16, ¶ 101. |

### a.    Undisclosed and Unearned Management Fees

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 57.    Fund II's governing document allowed its general partner to collect a 2% management fee. The governing document also provided that incubator fees paid to FDC would not reduce the management fee "so long as such [incubator] fees [do] not exceed reasonable market rates." | Answer, Dkt. 16, ¶ 106. |
| 58.    Fund II paid management fees of over $1.7 million. | Answer, Dkt. 16, ¶ 107. |

### b.    Frost and FMC Acted as Investment Advisors

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 59.    FMC filed reports with the SEC as an exempt reporting adviser. | Answer, Dkt. 16, ¶ 116. |
| 60.    Frost was the sole owner and manager of FMC. | Answer, Dkt. 16, ¶ 117 |

### B.    The JAMS Arbitration

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 61.    On October 17, 2016, FMC (a member and the manager of the Seed Fund) and Frost Venture Partners GP, LLC ("FVP GP") (a member and the manager of Fund II), filed a demand for arbitration against Hollencrest Bayview Partners, L.P. ("Hollencrest"), Robert P. Wolford ("Wolford"), Larry Sheakley, and various trusts and other | Searles Decl., Ex. 1 (Arbitration Demand). |

13

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| entities, all of whom either investors and members of the Seed Fund or parties the Fund II limited partnership agreement, alleging among other things, that the named respondents have made false accusations against the claimants, that, among other things, FMC and FVP GP have mismanaged the Seed Fund and Fund II; have improperly used fund capital as part of a "Ponzi scheme;" have failed to disclose material information and conflicts of interest to Seed Fund members; have made investment decisions for purposes of self-dealing; and have breached their fiduciary obligations to respondents and the other Seed Fund and Fund II investors. | |
| 62. The Arbitration Demand stated that both FMC and FVP GP were formed for the purpose of investing in securities. | Searles Decl., Ex. 1 (Arbitration Demand). |
| 63. Attached as Exhibit A and Exhibit B to the Arbitration Demand were, respectively, the Seed Fund Operating Agreement and the Fund II Limited Partnership Agreement. Both the Seed Fund operating agreement and the Fund II limited partnership agreement contained choice of law provisions, providing that those agreements shall be governed by Delaware law. Both agreements contained binding arbitration provisions, in which | Searles Decl., Ex. 1 (Arbitration Demand). |

14

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| the parties understood they were waiving certain rights and protections that may otherwise be available to them by litigation in court, including the right to a jury trial, certain rights of appeals, and a right to invoke formal rules of procedure and evidence. The Seed Fund operating agreement further provided that "depositions may be taken and full discovery may be obtained in any arbitration commended under this provision."  The Seed Fund operating agreement further provided that "depositions may be taken and full discovery may be obtained in any arbitration commended under this provision."  The Seed Fund operating agreement further provided that "depositions may be taken and full discovery may be obtained in any arbitration commended under this provision." | |
| 64.    Exhibit A to the Demand For Arbitration was a draft of the Seed Fund Operating Agreement, and not the final version of the operating agreement signed by investors.  In the version attached as Exhibit A to the Demand for Arbitration, Article VI, Part 6.1 Company Expenses, stated: "(a) The Company shall bear all operating expenses reasonably incurred by the Manager, the Incubator or the Company in connection with the management of the Company, | Searles Decl., Ex. 1 (Arbitration Demand, Exhibit A); Ex. 57 (JAMS Ex. 840) (Seed Fund operating agreement signed by Robert Wolford). |

15

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| the Incubator and the Manager, including, but not limited to all out-of-pocket costs and expenses incurred in the holding, purchase, sale or exchange of securities…"  In the version actually signed by investors in the Seed Fund, Section 6.1(a) made no reference to the Incubator. | |
| 65.    On March 7, 2017, Hollencrest and Wolford, and the Wolford Family Trust, on behalf of themselves and derivatively on behalf of the Seed Fund and Fund II,  filed amended counterclaims agaisnt FMC, FVP GP, FDC and Frost individually, alleging seven claims for relief: (1) breach of fiduciary duty; (2) breach of the Seed Fund operating agreement; (3) breach of the Fund II limited partnership agreement; (4) fraud; (5) conversion; (6) accounting; and (7) declaratory relief. | Searled Decl., Ex. 4 (Amended Counterclaims) |
| 66.    Among other things, respondents and counter-claimants alleged that Frost: (a) made material misrepresentations concerning the performance of the Funds and the financial status of the Funds' investments in companies referred to as "Portfolio Companies;" (b) neglected the Funds at critical stages of execution of the Funds' investment strategy by taking long vacation in Italy; (c) by failing to disclose and charging | Searled Decl., Ex. 4 (Amended Counterclaims, ¶ 2). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| abusive and unconscionable fees and expenses, directly and indirectly, by the Frost entities to the Funds and the Portfolio Companies, all to pay for his lavish and extraordinary personal and family expenses, and (d) failed to appropriately consult with advisory committees contemplated by the Funds' governing agreements. | |
| 67.    As alleged in the amended counterclaims, and as demonstrated by the evidence introduced at the arbitration, in soliciting the Hollencrest Investors' investment, Frost represented that the costs for the services the Incubator was to provide to the portfolio companies would be kept to a minimum, and more specifically, (a) that the Funds "will not be expected to cover expenses and salaries incurred by" the Incubator; (b) that the fees charged by the Incubator to the Portfolio Companies would be determined on a "case-by-case basis, and are expected to be adjusted based on the individual needs of each company as their business matures;" (c) that the Incubator's "policy will be to charge for services that the [Portfolio Companies] would require in the normal course of business," and (d) that the Incubator would employ a consistent 'lean startup' process used across all companies."  Likewise, pursuant to the | Searles Decl., Ex. 2 (Amended Counterclaims, ¶ 24); Ex. 112 (JAMS Ex. 1078); Ex. 7 (JAMS Ex. 2). |

17

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| Fund II agreement, the fees charged to the Portfolio Companies would not exceed "reasonable market rates." | |
| 68. Frost selected the forum; that is, a JAMS arbitration, as opposed to filing suit in state or federal court. | Searles Decl., Ex. 1; Ex. 1(JAMS Ex. 1, §13:10); Ex. 7 (JAMS Ex. 2); Ex. 99 (Frost Depo. Tr. at 17:7-24:6). |
| 69. Under the terms of the arbitration clauses in both the Seed Fund operating agreement and the Fund II partnership agreement, Frost had the right to take depositions and to obtain full discovery. | Searles Decl., Ex. 1 (JAMS Ex. 1, § 13:10); Ex. 7 (JAMS Ex. 2, § 15.5(b)). |
| 70. Approximately thirty five (35) depositions were taken in the arbitration over the course of approximately ten (10) months. | Searles Decl., Ex. 104. |
| 71. The arbitration hearing took place over the course of 17 days, beginning on January 22, 2018, and concluding in mid-February 2018. | Searles Decl., Ex. 3 (Final Award). |
| 72. The sworn testimony of 29 witnesses, in person, by deposition, or electronically by Face-Time, was presented at the arbitration. | Searles Decl., Ex. 3 (Final Award). |
| 73. The arbitrator was the Hon. Stephen J. Sunvold (Ret.), a former California Superior Court judge with over 20 years of judicial experience. | Searles Decl., Ex. 3 (Final Award). |
| 74. On August 27, 2018, Judge Sunvold issued a Final Award, which incorporated by reference, | Searles Decl., Ex. 3 (Final Award). |

18

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| as Exhibit A, the Corrected Interim Award dated April 18, 2018, as Exhibit B, the Partial Final Award dated June 7, 2018, and as Exhibit C, the Order Appointing Replacement Manager, Establishing Oversight Committees and Reconfirming the Elimination of Voting Rights of FVP GP. | |
| 75.    Based on the evidence presented at the hearing, Judge Sunvold found that no capital was invested into the Incubator itself and the Incubator was financially dependent on fees charged to the Portfolio Companies to sustain itself.  As the number of incubator employees and their salaries went up, the need to increase the amounts coming into the Incubator increased.  The Incubator's payroll expense alone with from $672,514 in 2012 to $5,215,955 in 2015. | Searles Decl. Ex. 3 (Final Award at 3); Ex 83 (JAMS Ex. 1327); Ex. 100 (Weekly Power Point slide 18). |
| 76.    Based on the evidence presented at the hearing, Judge Sunvold found that the Seed Fund "pitch deck" stated that Seed Fund would have no management fee or carry cost, and that all investments would be approved by the "Investment Committee;" | Searles Decl., Ex. 3 (Final Award at 3); Ex 11 (JAMS Ex. 28). |
| 77.    Based on the evidence presented at the hearing, Judge Sunvold found that the Operating Agreement for the Seed Fund authorized the | Searles Decl., Ex. 3 (Final Award at 3); Ex. 57 (JAMS Ex. 840). |

19

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| manager to be reimbursed for "out of pocket" expenses.  It mentions in Paragraph 8.1(b) the formation of the Incubator, but does not authorize payments to it from the Portfolio Companies. | |
| 78.    Based on the evidence presented at the hearing, Judge Sunvold found that the Fund II operating [partnership] agreement is significantly different from the Seed Fund.  It authorizes the manager to be paid a management fee of 2%.  All "normal operating expenses" incurred in connection with the management of Fund II were to paid from the management fee. | Searles Decl., Ex. 3 (Final Award at 3); Ex. 7 (JAMS Ex. 2). |
| 79.    Based on the evidence presented at the hearing, Judge Sunvold found that the Fund II operating agreement addresses the payments for "shared advisory and support services" may be charged by the Incubator to the Portfolio Companies.  No method of calculation of those fees is identified.  Those fees collected would not reduce the 2% management fee, "so long as such Service Fee does not exceed reasonable market rates."  Any excess charge would reduce the management fee. | Searles Decl., Ex. 3 (Final Award at 3); Ex 7 (JAMS Ex. 2). |
| 80.    Based on the evidence presented at the hearing, Judge Sunvold found that Hollencrest was provided with the Frost Executive Summary dated | Searles Decl., Ex. 3 (Final Award at 4); Ex. 21 (JAMS Ex. 223). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| October 18, 2011.  At page 5 of that document, they were told that the services provided by the Incubator to the Portfolio Companies would be decided by their respective individual boards, on a case-by-case basis, and would be adjusted from time to time as needed.  The Portfolio Companies would only be charged for services that would be required in the normal course of business and they would receive higher quality services at a lower price than they would otherwise be able to afford. Frost would provide "economies of scale." | |
| 81.     Based on the evidence presented at the hearing, Judge Sunvold found that incubator fees were imposed on the Portfolio Companies from the moment of their creation. | Searles Decl., Ex. 3. (Final Award at 4); Ex. 70 (JAMS Ex. 1097). |
| 82.     Based on the evidence presented at the hearing, Judge Sunvold found that in most instances, the Service Agreements were signed on their behalf by Frost and Frost CFO William Guerry before the company was officially formed. | Searles Decl., Ex. 3 (Final Award at 4); Ex. 40 (JAMS Ex. 597); Ex. 59 (JAMS Ex. 853); Ex. 60 (JAMS Ex. 855);  Ex. 98 (excerpts of  arbitration testimony of William Guerry). |
| 83.     Based on the evidence presented at the hearing, Judge Sunvold found that cancellation of the Service Agreement required 180 days' notice. Once a CEO was chosen for the new company, he or she was saddled with up to a $40,000 per month | Searles Decl., Ex. 3 (Final Award at 4); Ex. 40 (JAMS Ex. 597); Ex. 59 (JAMS Ex. 853); Ex. 60 (JAMS Ex. 855). |

21

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| non-neogtiable, non-cancellable fee for six months. | |
| 84.    Based on the evidence presented at the hearing, Judge Sunvold found that fees were imposed even if no CEO had been hired. | Searles Decl., Ex. 3 (Final Award at 4); Ex 64 (JAMS Ex. 1011). |
| 85.    Based on the evidence presented at the hearing, Judge Sunvold found that the imposed incubator fee was a flat fee regardless of the level of development of the company, the existence of any employees or the number of them. | Searles Decl., Ex. 3 (Final Award at 4); Ex. 70 (JAMS Ex. 1097). |
| 86.    Based on the evidence presented at the hearing, Judge Sunvold found that with rare exceptions the service fees were not negotiable. | Searles Decl, Ex. 3 (Final Award at 4). |
| 87.    Based on the evidence presented at the hearing, Judge Sunvold found that Frost never did any analysis of the actual costs for the services included in the fees. | Searles Decl., Ex. 3 (Final Award at 4). |
| 88.    Based on the evidence presented at the hearing, Judge Sunvold found that some of the CEOs did the analysis as to value of the services and concluded they ranged from $8,000 to $12,000 per month. | Searles Decl. 3 (Final Award at 4); Ex. 88 (excerpts of arbitration testimony of Cary Breese); Ex. 90 (excerpts of arbitration testimony of Doug Lawson); Ex. 91 (excerpts of arbitration testimony of John Burke); Ex. 93 (excerpts of arbitration testimony of Mark Lelinski). |

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 89.    Based on the evidence presented at the hearing, Judge Sunvold found that the actual fees imposed ranged from approximately $30,000 to $40,000 per month. | Searles Decl., Ex. 3 (Final Award at 5); Ex. 83 (JAMS Ex. 1327). |
| 90.    Based on the evidence presented at the hearing, Judge Sunvold found that numerous CEO's for the Portfolio Companies complained about the excessive incubator fees, and that many tried, without success, to negotiate them down. | Searles Decl., Ex. 3 (Final Award at 4); Ex. 51 (JAMS Ex. 795); Ex. 70 (JAMS Ex. 1097). |
| 91.    Based on the evidence presented at the hearing, Judge Sunvold found that the incubator fees were to cover things like rent, human resources, mentoring, marketing, and payroll. There were not adjusted as the number of employees went up or down.  Companies that had moved physically out of the incubator offices were charged the same as companies who resided in the offices.  Frost CFO Guerry stated in his testimony that the rent allocations were done without any formula and were arbitrary. | Searles Decl., Ed. 3 (Final Award at 5); Ex. 83 (JAMS Ex. 1327); Ex. 98 (excerpts of arbitration testimony of William Guerry). |
| 92.    Based on the evidence presented at the hearing, Judge Sunvold found that the mandatory fixed fees were inconsistent with industry standards, and created a burn-rate for the invested funds that shortened the "runway" for these new companies to get off the ground. | Searles Decl., Ex. 3 (Final Award at 5-6); Ex. 81 (JAMS Ex. 1311) (Malecki expert report). |

23

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 93.    Based on the evidence presented at the hearing, Judge Sunvold found that the high fees discouraged investors and were often hidden from them. | Searles Decl., Ex. 3 (Final Award at 6); 74 (JAMS Ex. 1111); Ex. 62 (JAMS Ex. 936). |
| 94.    Based on the evidence presented at the hearing, Judge Sunvold found that the service fees were not reported to investors even after the company auditors told them they were related party transactions which were not arms-length and needed to be reported to investors. | Searles Decl., Ex. 3 (Final Award at 6); Ex. 44 (JAMS Ex. 766). |
| 95.    Based on the evidence presented at the hearing, Judge Sunvold found that that reasonable incubator charges to be $6,898,381, whereas the actual charges to the Portfolio Companies was $21,690,382, resulting in excess fees, paid by the Seed Fund and Fund II, of $11,846.575. | Searles Decl., Ex. 3 (Final Award at 6); Ex. 83 (JAMS Ex. 1327). |
| 96.    Based on the evidence presented at the hearing, Judge Sunvold found that the Incubator itself was undercapitalized and always insolvent. | Searles Decl., Ex. 3 (Final Award at 4); Ex. 83 (JAMS Ex. 1327). |
| 97.    Based on the evidence presented at the hearing, Judge Sunvold found that although the original pitch materials contemplated only 2-4 companies created per year, well over 20 were created, twelve in the period April 2014 to February 2015 alone. | Searles Decl., Ex. 3 (Final Award at 6); Ex. 11 (JAMS Ex. 28); Ex. 18 (JAMS Ex. 152); Ex. 20 (JAMS Ex. 178). |
| 98.    Based on the evidence presented at the | Searles Decl., Ed. 3 (Final Award |

24

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| hearing, Judge Sunvold found that the email record established that the "new ideas" did not create "new companies," rather it was the need to meet the cash flow need of the incubator. Numerous emails show CFO Guerry advising Frost that new companies and the resultant immediate incubator fees were needed to make ends meet. | at 6); Ex. 45 (JAMS Ex. 773); Ex. 46 (JAMS Ex.774); Ex. 49 (JAMS Ex, 780); Ex. 19 (JAMS Ex. 157); Ex. 69 (JAMS Ex. 1090). |
| 99.    Based on the evidence presented at the hearing, Judge Sunvold found that these fees were unreasonable in their amount and application. | Searles Decl., Ex. 3 (Final Award at 6). |
| 100.   Based on the evidence presented at the hearing, Judge Sunvold found that the fees were in violation of Frost's fiduciary obligations to the Funds. | Searles Decl., Ex. 3 (Final Award at 6). |
| 101.   Based on the evidence presented at the hearing, Judge Sunvold found that Snow Data Capital was created by Frost ostensibly to provide marketing services to the Portfolio Companies, but, in reality, was created to provide employment for his friend Anthony Howcroft who needed a job to qualify for a green card for immigration purposes.  Rather than pay Howcroft from the already excessive Incubator Fees which included marketing, Frost imposed an additional $5,100 per month on the Portfolio Companies.  No Portfolio | Searles Decl., Ex. 3 (Final Award at 6). |

25

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| company was asked if they wanted or needed additional marketing services. They had no voice in the decision.  The additional fees were imposed whether needed or not. | |
| 102.   Based on the evidence presented at the hearing, Judge Sunvold found that although the Seed Fund was not to be charged a management fee, Frost charged the Seed Fund $16,000 per month for his salary, which was called "management services," from June 2012 through September 2013 ($256,000 in total).  This charge stopped only when Frost began receiving the 2% management fee from Fund II in October of 2013.  The Seed Fund was also charged a management fee of $122, 330 in 2012.  The Seed Fund was represented to be "no management fee."  These charges were improper. | Searles Decl., Ex. 3 (Final Award at 6-7); Ex. 11 (JAMS Ex. 28); Ex. 42 (JAMS Ex. 748); Ex. 84 (JAMS Ex. 1372). |
| 103.   Based on the evidence presented at the hearing, Judge Sunvold found the general partner of Fund II, FVP GP, received management fees of $1,731,099 from 2013 through 2015.  The net to the individual general partners, after expenses of $615, 387, was $1,115,712.  The total excess Incubator Fees charged by the Incubator to the Portfolio Companies was $14,792,001.  The amount of excess Incubator Fees charged to Fund | Searles Decl., Ex. 3 (Final Award at 6); Ex. 43 (JAMS Ex. 754): Ex. 83 (JAMS Ex. 1327) (of the $14.79 million in excessive incubator fees, $11.85 million were charged to the portfolio companies in which the Seed Fund and Fund II invested.  The remaining $2.95 million in |

26

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| II were $9,355,042.  Those excess charged would accordingly reduce the GP's right to claim the 2% management fee by well of $7 million.  Accordingly, the GP was not entitled to any of the 25 management fee. | excessive fees were charged to portfolio companies in which Fund III, the International Seed Fund, and third parties invested.. |
| 104.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost held a 62.5% interest in the GP [FVP GP] of Fund II, and was entitled to receive 62.5% of the net 2% management fee, after expenses, which proceeds would arguably have been income to him.  Rather than receiving his income, Frost instructed CFO Guerry to pay hundreds of thousands of dollars of personal expenses ($788,712) from his 92.5 share of the management fee.  These expenses included villas in Italy, private schools in Florence, Italy for his children, chartered air travel, and vacation expenses.  When his expenses in 2014 exceeded his 62.5% share of the fees for that year, he instructed them to pay them from the share of the other GP members.  HI K-1 [partnership tax return] for 2014 was only $3,303.  His total for K-1's from 2013 through 2015 was $24,385. | Searles Decl., Ex. 3 (Final Award at 7): Ex. 83 (JAMS Ex. 1327). |
| 105.   Based on the evidence presented at the hearing, Judge Sunvold found that the payment of these personal expenses by the Incubator was | Searles Decl., Ex. 3 (Final Award at 7). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| improper.  There was no business purpose for them.  With the reduction of the management fee, due to the excessive incubator fees, there was no management fee from which these expenses could be paid. | |
| 106.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost received compensation and personal benefits totaling more than $5 million between 2012 and early 2015. | Searles Decl., Ex. 3 (Final Award at 7); Ex. 83 (JAMS Ex. 1327); Ex. 100 (Weekly Power Point slides 21-24). |
| 107.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost owed a duty of care and loyalty to the investors in the Seed Fund and Fund II, and that those obligations were not contracted away by the operating agreements for those entities. | Searles Decl. XX (Final Award at 8); Ex. 7 (JAMS Ex. 2); Ex. 100 (JAMS Ex. 840). |
| 108.   Based on the evidence presented at the hearing, Judge Sunvold found that is it was clear that Frost had breached his fiduciary obligations of care and loyalty to the investors in the Seed Fund and Fund II.  Frost imposed excessive incubator fees for his own benefit.  Those fees and the 2% management fee from Fund II were the only sources of funds to pay him the $5 million in salary and benefits he received. | Searles Decl., Ex. 3 (Final Award at 8). |
| 109.   Based on the evidence presented at the hearing, Judge Sunvold found that on April 8, | Searles Decl., Ex. 3 (Final Award at 8); Ex. 45 (JAMS Ex. 773). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 2014, Frost asked the CFO [Guerry], "just for kicks" to calculate the cash flow that would be generated from twelve new companies being started between April and July. | |
| 110.   Based on the evidence presented at the hearing, Judge Sunvold found that in June of 2014, just after starting five new companies, Frost moved his family to Italy for a year.  Being physically, and nine time zones, away for one year made it extremely difficult, if not impossible for him to mentor the Portfolio Companies. | Searles Decl., Ex. 3 (Final Award at 8): Ex. 18 (JAMS Ex. 152). |
| 111.   Based on the evidence presented at the hearing, Judge Sunvold found that on June 6, 2014, only two weeks before his departure to Italy, when investor Tome Turney asked him about a "rumor" that Frost was moving to Italy, Frost denied the move and indicated that his family was "spending time in Florence this summer."  Frost had already paid the enrollment fees for his children to be schooled in Italy for the following year. Frost knew that his physical absence from the Incubator would have an effect on the Portfolio Companies.  His ability to immediately respond was not a reality. | Searles Decl., Ex. 3 (Final Award at 8); Ex. 77 (JAMS Ex. 1135); Ex. 41 (JAMS Ex. 653): Ex. 39 (JAMS Ex. 525). |
| 112.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost was paid | Searles Decl., Ex. 3 (Final Award at 8); Ex. 83 (JAMS Ex. 1327); |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| gross wages by FDC of $1.2 million in 2014 and $1.118 million in 2015.  For one entire year of that time, June 23, 2014 until June 2015, he resided in various villas in Italy. | Ex. 89 (excerpts of arbitration testimony of David Weekly). |
| 113.   Based on the evidence presented at the hearing, Judge Sunvold found that the relationship with key investors suffered while Frost was in Italy. | Searles Decl., Ex. 3X (Final Award at 9); Ex. 37 (JAMS Ex. 499); Ex. 36 (JAMS Ex. 501). |
| 114.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost violated the requirements of the Seed Fund operating agreement and the Fund II partnership agreement, which set out specific deadlines for reporting. | Searles Decl., Ex. 3 (Final Award at 9); Ex. 9 (JAMS Ex. 2); Ex. 57 (JAMS Ex. 840); Ex. 25 (JAMS Ex. 349); Ex. XX (JAMS  Ex 351); Ex. 26 (JAMS Ex. 352); Ex. 12 (JAMS Ex. 78); Ex. 13 (JAMS Ex. 79). |
| 115.   Based on the evidence presented at the hearing, Judge Sunvold found that some Portfolio Companies were carried on the books long after they had been dissolved.  For example, Adaptive Well was dissolved in August 2016. On the year-end statements in December 2016 given to investors, it was still shown with a value of $1.3 million. | Searles Decl., Ex. 3 (Final Award at 9); Ex. 14 (JAMS Ex. 87). |
| 116.   Based on the evidence presented at the hearing, Judge Sunvold found that there have | Searles Decl., Ex. 3 (Final Award at 10). |

30

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| never been any successful "exits" that resulted in proceeds being distributed to investors. | |
| 117.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost was the alter ego for the Frost entities. | Searles Decl., Ex. 3 (Final Award at 11). |
| 118.   Based on the evidence presented at the hearing, Judge Sunvold found that the Incubator (FDC) imposed excessive incubator fees on the Portfolio Companies in violation of the Operating and Partnership Agreements.  The Seed Fund's share of the excessive fees is $2,491,532 and Fund II's share is $9,355,042. | Searles Decl., Ex. 3 (Final Award at 11). |
| 119.   Based on the evidence presented at the hearing, Judge Sunvold found that the Seed Fund was wrongfully charged $378,000 in fees for management and services of the fund. | Searles Decl., Ex. 3 (Final Award at 11). |
| 120.   Based on the evidence presented at the hearing, Judge Sunvold found that absent the return of the excessive incubator fees, the 2% management fee charged to Fund II | Searles Decl., Ex. 3 (Final Award at 11). |
| 121.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost violated his fiduciary duty of care and loyalty to the members of LLC and the limited partners of the funds, and is to be removed at the manager of the funds. | Searles Decl., Ex. 3 (Final Award at 11). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 122.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost was not entitled to use the Funds' money to pay his legal expenses, as his conduct "constitutes recklessness, gross negligence or willful misconduct." | Searles Decl., Ex. 3 (Final Award at 12). |
| 123.   Based on the evidence presented at the hearing, Judge Sunvold found that Frost's conduct was at least reckless. In breach of his fiduciary capacity, he acted with conscious indifference and/or reckless indifference to the consequences of his actions and the rights of investors.  At a minimum, Frost was willfully blind to or consciously disregarded the substantial and unjustifiable risk that his conduct would turn out to violate his fiduciary duties.  Therefore, the Judge Sunvold ordered punitive damages against Frost in the amount of $771,000, which approximates the expenses Frost incurred in connection with his move to Italy. | Searles Decl., Ex. 3 (Final Award at 12). |
| 124.   Based on the evidence presented at the hearing, Judge Sunvold found that FMC, FVP ZGP, FDC and Frost shall be jointly and severally liable for the damages, attorney fees, costs and expenses awarded. | Searles Decl., Ex. 3 (Final Award at 12). |
| 125.   On April 17, 2019, a corrected amended judgment confirming and entering the final | Searles Decl., Ex. 4 (Corrected Amended Judgment). |

32

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| arbitration award was entered in the Superior Court, County of Orange. | |
| 126.   Frost voluntarily dismissed his appeal of the amended judgment confirming and entering the final arbitration award. | Searles Decl., Ex. 5 (dismissal of appeal). |

### 1.    Frost's Sworn Admissions in the Arbitration

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 127.   Frost admitted that his personal housekeeper was an employee of the FDC, the incubator. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1750:4-22). |
| 128.   Frost admitted that when he lived in Italy, his expenses exceeded his allocable portion of the management fee, and Guerry covered those expenses by taking portions of the management fee owed to Vigouroux and Kreindler. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1755:1-1757:13). |
| 129.   Frost admitted that he had fiduciary duty to investors in Seed Fund and Fund II. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1769:24-1771:7). |
| 130.   Frost admitted that had no prior experience running any kind of fund before he started the Seed Fund. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8) at 1771:8-14.) |
| 131.   Frost admitted that no prior experience running an incubator. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1772:9-9) |
| 132.   Frost acknowledged that when Cary Breese | Searles Decl., Ex. 94 (excerpts of |

33

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| joined incubator as a CFO of one of the portfolio companies Breese was surprised it was already charging fees, and believed a reasonable fee would be $12,000 per month. | Frost Arbitration Tr. Day 8 at 1811:16-1814:21) |
| 133.  Frost acknowledged that the Fund II operating agreement stated the GP would invest $6.1 million, but had, in fact, only invested $50,000. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1818:7-1821:1). |
| 134.  Frost acknowledged the quarterly reports of Fund II did not disclose amount of incubator fees. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1836:17-21). |
| 135.  Frost acknowledged that the audited financial statements of the funds did not disclose amount of incubator fees. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1836:23-25). |
| 136.  Frost admitted that when Kramer, a fund investor wanted to know the amount of incubator fees, Frost followed the letter of the operating agreement and refused to provide the requested information. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8) at 1837:1-1838:11). |
| 137.  Frost admitted that he refused to provide the financial statements of the portfolio companies to Hollencrest. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1843:7-1844:8); *see also*, Ex. 101 Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) (Declaration of Purav |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
|  | Asher, ¶ 5). |
| 138. Frost admitted there have been no exits events resulting in returns to investors. | Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8 at 1860:24-1861:18). |
| 139. Frost did not keep track of time that employees devoted to the funds, the incubator, or to the portfolio companies. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1967:15-1968:21). |
| 140. Frost admitted that there is no specific language in the Seed Fund operating agreement that would inform the reader that the incubator is going to be charging incubator fees to the portfolio companies | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1974:18-1975:10). |
| 141. Frost agreed that the incubator fees had to be reasonable, but not necessarily equal to market rates, because, according to Frost, there is no comparable market. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1977:14-1978:25). |
| 142. Frost conducted no analysis or study to determine what other incubators were charging. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1978:14-16). |
| 143. Frost never analyzed or conducted a value accounting study of the value of the components of the incubator fee. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1980:2-14). |
| 144. Frost did not seek the advice of experts, auditors or attorneys in determining whether the amount of the incubator fees were reasonable. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1982:12-1983:19). |
| 145. Other than the portfolio company named | Searles Decl., Ex 95 (excerpts of |

35

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| Predixion, prior to 2016, Frost could not recall any other CEO's of the other portfolio companies who were able to negotiate a lower incubator fee. | Frost Arbitration Tr. Day 9 at 1991:23-1993:21). |
| 146.   The service agreements were routinely signed before a CEO was chosen for the portfolio company. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1994:10-1995:19). |
| 147.   Frost did not negotiate service fees with Guerry. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 1996:21-1998:13). |
| 148.   Frost could not recall ever using the term "fully burdened executive" in any meeting with Hollencrest. | Searles Decl., Ex. 95 (excerpts of Frost Arbitration Tr. Day 9 at 2049:10-23). |
| 149.   FDC charged incubator fees before a CEO or any employees were in place at the incubator company. | Searles Decl., Ex. 96 (excerpts of Frost Arbitration Tr. Day 12 at 2879:1-21). |
| 150.   Frost, through his various entities, had taken in $63 million from investors, the funds have no remaining cash, and there have been no exits or returns to investors. | Searles Decl., Ex. 96 (excerpts of Frost Arbitration Tr. Day 12 at 2894:17-2895:5). |
| 151.   Frost claims to have told investors the incubator fees were equivalent to a "fully loaded executive" but conceded that he never disclosed the dollar amount of those fees. | Searles Decl., Ex. 96 (excerpts of Frost Arbitration Tr. Day 13 at 2938:4-2940:6) |
| 152.   Frost admitted that there was no negotiation of incubator fees at the time the service agreements were signed. | Searles Decl., Ex. 97 (excerpts of Frost Arbitration Tr. Day 13 at 3122:7-9). |

36

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 153.   Frost could not identify any marketing materials that pre-dated December 2015 where the phrase "fully burdened executive" was used. | Searles Decl., Ex. 97 (excerpts of Frost Arbitration Tr. Day 13 at 2944:14-2945:1; 3042:13-18). |

### 2.   Other Selected Testimony and Evidence From the Arbitration Supporting the Final Award

| UNCONTROVERTED FACT | EVIDENCE |
| --- | --- |
| 154.   Seed Fund, Fund II, and Fund III investors stated in their declarations that they were not informed of the incubator fees and would not have invested if they had known of the incubator fees or their magnitude, or that Frost would draw a salary through, and charge expenses to, FDC. | Searles Decl., Ex. 101 (Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) ( |
| 155.   As Frost's and FDC's expenses grew, Frost was pressured to create new portfolio companies to generate additional incubator fees to meet FDC's increasing expenses. | Searles Decl., Ex 45 (JAMS Ex. 773); Ex. 46 (JAMS Ex. 774); Ex. 49 (JAMS Ex. 780); Ex. 73 (JAMS Ex. 1103); Ex. 69 (JAMS Ex. 1090): Ex. 70 (JAMS Ex. 1097); Ex. 76 (JAMS Ex. 1117); Ex. 79 (JAMS Ex. 1203); Ex. 80 (JAMS Ex. 1290). |
| 156.   Notwithstanding that Frost disclosed to potential investors that he contemplated starting only two to four portfolio companies per year he | Searles Decl. Ex. 11 (JAMS Ex 28); Ex. 21 (JAMS Ex. 223). |

37

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| created over two dozen incubator fee-generating portfolio companies from 2012 through 2016. | |
| 157. One of the reasons FDC's costs kept growing was because Frost decided to pay himself a generous salary (approximately $3.4 million from 2012 through 2016) once Fund II was created, and also charged extensive personal expenses to FDC (over $1.7 million from 2012 through 2016). | Searles Decl. Ex. 83 (JAMS Ex. 1327); Ex. 43 (JAMS Ex. 754); Ex. 101 (Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) (Declaration of David Weekly). |
| 158. Frost created 12 new portfolio companies between April 2014 and February 2015, when Frost and his family moved to Italy for a year and charged many personal expenses to FDC. | Searles Decl. Ex. 83 (JAMS Ex. 1327). |
| 159. | Searles Decl. Ex 83 (JAMS Ex. 1327); Ex. 101 (Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) (Declaration of David Weekly). |
| 160. Emails between Frost and William Guerry. FDC's CFO, discussed that new companies and the resultant incubator fees they would generate were needed to make ends meet. | Searles Decl., Ex 45 (JAMS Ex. 773); Ex. 46 (JAMS Ex. 774); Ex. 49 (JAMS Ex. 780); Ex. 73 (JAMS Ex. 1103); Ex. 69 (JAMS Ex. 1090): Ex. 70 (JAMS Ex. 1097); Ex. 76 (JAMS Ex. 1117); Ex. 79 (JAMS Ex. 1203); Ex. 80 |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| | (JAMS Ex. 1290). |
| 161.   Frost lied to several investors about his move to Italy, who were concerned Frost could not properly manage the Funds while sojourning in Italy.  For example, Frost told a Seed Fund investor that his family was simply "spending time in Florence this summer." | Searles Decl. Ex. 77 (JAMS Ex. 1135); Ex. 101 (Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) ( |
| 162.   Once Frost decided to start a new portfolio company, the matter would be submitted to a Fund's investment committee, which determined how many portfolio companies were founded and how much the Funds would invest in each portfolio company.  A new portfolio company would only be started if a fund's investment committee approved investment in the proposed company. But this process provided no meaningful controls, as the investment committees were chaired by Frost. | Answer, Dkt. 16, ¶¶ 35-39. |
| 163.   FMC and Frost collected undisclosed management fees from the Seed Fund and International Seed Fund.  The governing documents for these two funds did not disclose or authorize the payment of management fees. Nevertheless, from 2012 to 2014, FMC charged the Seed Fund $378,000 and the International Seed | Searles Decl., Ex. 7(JAMS Ex. 2); Ex. 57 (JAMS Ex. 840); Ex. 83 JAMS Ex. (1327). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| Fund $24,875. The charge stopped only when Frost began receiving a 2% management fee from Fund II starting in October of 2013. | |
| 164.   In addition, FMC and Frost collected unearned management fees from Fund II that should have been offset by incubator fees that exceeded market rates.  Fund II's governing document allowed its general partner to collect a 2% management fee.  The governing document also provided that incubator fees paid to FDC would not reduce the management fee "so long as such [incubator] fees [do] not exceed reasonable market rates."  Fund II paid management fees of over $1.7 million.  The accounting expert concluded that because excessive incubator fees of $9.355 million were charged to Fund II, those excess charges should have eliminated the management fees. | Searles Decl. Ex. 7 (JAMS Ex. 2); Ex. 43 (JAMS Ex. 754); Ex. 83 (JAMS Ex. 1327); Ex. 65 (JAMS 1052) (outline of arbitration testimony of Keith Palzer). |
| 165.   William Guerry was the CFO of FMC, FDC, the Funds, other Frost-related entities, and most of the portfolio companies incubated by the Frost entities from approximately June 2012 through early June 2017. | Searled Decl., Ex. 83 (JAMS Ex 1327). |

**C.    Frost's Sworn Admissions in His Deposition in this Action**

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 166.   Frost was free to take whatever discovery he | Searles Decl., Ex. 99 (Frost Depo |

40

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| wanted in arbitration | TR at 17:7-24:6). |
| 167.   Frost understood that his reputation and ability to make a living in his chosen profession was at stake in the arbitration | Searles Decl., Ex. 99 (Frost Depo TR at 17:7-24:6). |
| 168.   Frost selected the forum, and his counsel, for the arbitration | Searles Decl., Ex. 99 (Frost Depo TR at 17:7-24:6). |
| 169.   Frost acknowledged that the claims and defenses in the arbitration and this proceeding are fundamentally the same | Searles Decl., Ex. 99 (Frost Depo TR at 17:7-24:6). |
| 170.   Frost understood the standard of proof in arbitration and this proceeding is the same | Searles Decl., Ex. 99 (Frost Depo TR at 25:8-15). |
| 171.   Frost's counsel billed $1.3 million in fees during the arbitration, which was paid for the most part by VC insurance | Searles Decl., Ex. 99 (Frost Depo TR at 25:17-26:6). |
| 172.   Frost retained experts during the arbitration | Searles Decl., Ex. 99 (Frost Depo TR at 26:8-11). |
| 173.   Frost's counsel had right to cross-examine witnesses at the arbitration | Searles Decl., Ex. 99 (Frost Depo TR at 27:11-15). |
| 174.   Frost was fully incentivized to litigate the arbitration since his professional reputation and ability to make a living in his chosen profession was at stake | Searles Decl., Ex. 99 (Frost Depo TR at 27:16-21). |
| 175.   Frost is aware of any documentary evidence that he was prevented from introducing at the arbitration | Searles Decl., Ex. 99 (Frost Depo TR at 32:21-33:1). |
| 176.   Frost had no prior experience as a fund | Searles Decl., Ex. 99 (Frost Depo |

41

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| manager when he was managing the Seed Fund | TR at 33:11-17). |
| 177.   Frost agrees that the incubator was financially dependent on the fees charged to the portfolio companies to sustain itself | Searles Decl., Ex. 99 (Frost Depo TR at 33:21-24). 36:11-22 |
| 178.   Frost agrees that incubator fees were imposed on portfolio companies from the moment of their creation | Searles Decl., Ex. 99 (Frost Depo TR at 37:22-38:11). |
| 179.   Once a company was legally incorporated, Frost and Guerry would enter into a service agreement with the portfolio company. | Searles Decl., Ex. 99 (Frost Depo TR at 40:16-41:18). |
| 180.   Frost did not negotiate the amount of service fees with Guerry. | Searles Decl., Ex. 99 (Frost Depo TR at 42:2-7). |
| 181.   Fees were imposed on portfolio companies even before a CEO was hired. | Searles Decl., Ex. 99 (Frost Depo TR at 42:16-43:15). |
| 182.   Fund investors were told 2-4 companies would be created per year. | Searles Decl., Ex. 99 (Frost Depo TR at 53:2-6). |
| 183.   12 companies created from April 2014 to February 2015. | Searles Decl., Ex. 99 (Frost Depo TR at 54:12-16). |
| 184.   Frost was not aware of, or could not recall, any instances where CEO's of portfolio companies negotiated with Snow Data Capital as to whether they wanted or needed marketing services from SDC. | Searles Decl., Ex. 99 (Frost Depo TR at 58:25-59:13). |
| 185.   Frost admitted that Snow Data Capital was set up so that his friend Anthony Howcroft could obtain an "entrepreneurial visa." | Searles Decl., Ex. 99 (Frost Depo TR at 62:21-63:3). |

42

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 186. Frost understood that the Seed Fund did not allow for a management fee. | Searles Decl., Ex. 99 (Frost Depo TR at 65:13-15). |
| 187. Frost acknowledged that "the incubator was, in effect, operating the fund"; and that he charged part of his salary at the incubator to the Seed Fund, as an operating expense of the Fund. | Searles Decl., Ex. 99 (Frost Depo TR at 76:18-77:3). |
| 188. Frost admitted the incubator, FDC, would not have formed the company if the fund didn't make the decision to invest. | Searles Decl., Ex. 99 (Frost Depo TR at 82:6-17). |
| 189. Frost admitted that the members of the Fund's investment committees were also members of the incubator, being compensated by the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 84:23-85:6). |
| 190. Frost understood that he owed a duty of care and loyalty to each of the five funds, and that those duties were not contracted away by the operating agreements for those entities. | Searles Decl., Ex. 99 (Frost Depo TR at 88:15-89:15). |
| 191. Frost agreed that Adaptive Well was dissolved in April 2016, and that "it certainly would be unusual" for year-end fund report to investors to state the company had a value of $1.3 million. | Searles Decl., Ex. 99 (Frost Depo TR at 89:16-93:16). |
| 192. At all relevant times Frost controlled FMC, and was its sole managing member. | Searles Decl., Ex. 99 (Frost Depo TR at 104:12-22). |
| 193. FMC was an investment adviser to the funds. | Searles Decl., Ex. 99 (Frost Depo TR at 104:23-24). |

43

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 194.  Frost was an investment advisor to the funds. | Searles Decl., Ex. 99 (Frost Depo TR at 104:23-24). |
| 195.  Investors in the Seed Funds, would acquire a membership interest in the Fund and had an expectation of profits through efforts of others. | Searles Decl., Ex. 99 (Frost Depo TR at 105:22-106:14). |
| 196.  Frost agreed that the operating agreement of the Seed Fund made it "self-evident" that membership interests offered through that agreement were securities; and agreed to the extent other Fund agreements have similar language that they too are securities. | Searles Decl., Ex. 99 (Frost Depo TR at 111:5-113:5). |
| 197.  Frost received compensation in the form of management fees. | Searles Decl., Ex. 99 (Frost Depo TR at 124:6-10). |
| 198.  Frost used the mails and other means of interstate commerce in soliciting actual and prospective investors in the funds. | Searles Decl., Ex. 99 (Frost Depo TR at 125:15-22). |
| 199.  Frost had no prior experience, before creating FVP (later named FDC), in operating an incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 126:19-22). |
| 200.  In 2021, when the incubator was formed, neither he, nor Guerry, nor Breese, had any experience operating an incubator, yet the three of them decided what a "reasonable" service fee should be. | Searles Decl., Ex. 99 (Frost Depo TR at 135:5-136:4). |
| 201.  The Fund II limited partnership interests were securities. | Searles Decl., Ex. 99 (Frost Depo TR at 138:6-139:15). |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 202.   Frost claims that he told investors that service fees would be equivalent to the cost of "fully burdened executive." | Searles Decl., Ex. 99 (Frost Depo TR at 145:3-14). |
| 203.   Frost considered the dollar amount of the incubator fees charged by FDC to the portfolio companies to be confidential information that could not be disclosed to Fund investors, purportedly due to language in share purchase agreements. | Searles Decl., Ex. 99 (Frost Depo TR at 149:13-22, 154:23-157:3 157:12-158:1). |
| 204.   The amount of incubator fees was not disclosed in the audited financial statements of the funds that were provided to fund investors. | Searles Decl., Ex. 99 (Frost Depo TR at 145:23-146:5). |
| 205.   Frost told the Hollencrest parties, with whom Frost had a fiduciary duty of care and loyalty, that he took a strict construction of the documents they were entitled to inspect under the fund operating agreements and that they were  not entitled to inspect the books and records of the portfolio companies to determine the amount of service fees they were paying to the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 150:19-151:18). |
| 206.   Frost did not have a higher duty of loyalty to anyone, other than to investors in the funds. | Searles Decl., Ex. 99 (Frost Depo TR at 154:19-22). |
| 207.   Frost, wearing his hat as a member of the investment committee of each of the funds, made the determination of which companies to invest fund monies into. | Searles Decl., Ex.99 (Frost Depo TR at 154:23-155:4). |

45

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 208.  When funds invested in the portfolio companies they do so in return for shares. | Searles Decl., Ex. 99 (Frost Depo TR at 156:18-156:21). |
| 209.  The general partner of the funds, and Frost indirectly, would also be compensated in the form of carried interest. | Searles Decl., Ex. 99 (Frost Depo TR at 189:14-190:1). |
| 210.  The general partner of the funds was compensated to make decisions as to what companies to invest into, which was a critical part of general partner's role. | Searles Decl., Ex. 99 (Frost Depo TR at 192:2-10). |
| 211.  Frost acknowledged that that the structure of the incubator recommending an investment and then the fund's investment committee saying no to the investment may "seem a little strange." | Searles Decl., Ex. 99 (Frost Depo TR at 190:2-194:13). |
| 212.  Frost acknowledged that FDC formed 27 portfolio companies. | Searles Decl., Ex. 99 (Frost Depo TR at 192:17-194:12). |
| 213.  Frost's general model was to charge each portfolio company $40,000 per month in service fees. | Searles Decl., Ex. 99 (Frost Depo TR at 201:5-21). |
| 214.  Frost's salary paid by incubator in 2012 and 2013 was approximately $250k per year; and Frost determined the amount of his salary. | Searles Decl., Ex. 99 (Frost Depo TR at 227:9-16). |
| 215.  Frost did not disclose to Seed Fund investors the amount of his salary at the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 228:9-14). |
| 216.  Once Fund II was created, Frost increased his salary to approximately $1.2 million in 2014 and 2015. | Searles Decl., Ex. 99 (Frost Depo TR at 228:15-229:13). |

46

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 217.   Frost did not disclose the amount of his salary at the incubator to investors in Fund II. | Searles Decl., Ex. 99 (Frost Depo TR at 229:14-230:1). |
| 218.   The source of money to pay Frost's salary was incubator fees. | Searles Decl., Ex. 99 (Frost Depo TR at 230:13-25). |
| 219.   JAMS Ex. 1 was not the operative operating agreement for the Seed Fund, as it was never intended that the Seed Fund would be responsible for bearing the operating expenses of the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 231:15-232:2). |
| 220.   As Frost stated, "clearly we did not expect the Seed Fund to bear directly all operating expenses incurred by the incubator." | Searles Decl., Ex. 99 (Frost Depo TR at 233:25-235:18). |
| 221.   Frost admitted that a reasonable proxy for the "fully burdened executive" would be the CEO of the portfolio company. | Searles Decl., Ex. 99 (Frost Depo TR at 250:25-251:16). |
| 222.   When a portfolio company had its own CEO, the portfolio company was responsible for paying for that CEO. | Searles Decl., Ex. 99 (Frost Depo TR at 252:10-16). |
| 223.   Even when a CEO was put in place, the incubator would continue to charge incubator fees equivalent to a fully burdened executive. | Searles Decl., Ex. 99 (Frost Depo TR at 252:17-253:5). |
| 224.   Frost did not disclose to fund investors that service fees would be charged as soon as the portfolio company was created. | Searles Decl., Ex. 99 (Frost Depo TR at 254:8-21). |
| 225.   Service fees charged to the portfolio companies was a means of financing the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 257:14-18). |

47

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 226.   Frost did not disclose to fund investors that the service agreements were signed by Frost and Guerry. | Searles Decl., Ex. 99 (Frost Depo TR at 263:2-16). |
| 227.   Frost did not disclose to fund investors that the amount of incubator fees were not negotiated at the time the service agreements were signed by Frost and Guerry. | Searles Decl., Ex. 99 (Frost Depo TR at 263:2-16). |
| 228.   Frost did not disclose to fund investors that that the incubator would be paying for his personal chef. | Searles Decl., Ex. 99 (Frost Depo TR at 266:18-267:3). |
| 229.   Frost, in his position as the person in charge of the incubator, was concerned about meeting the expenses of the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 270:5-22). |
| 230.   FDC, the incubator itself, was dependent on the service fees it charged to the portfolio companies for its financial wherewithal. | Searles Decl., Ex. 99 (Frost Depo TR at 270:23-271:2). |
| 231.   Frost conceded that the cash flow of the incubator was an element in deciding to start new portfolio companies, but he, wearing his hat at the incubator level, was not in control of the decision of whether to have the funds invest in those companies. | Searles Decl., Ex. 99 (Frost Depo TR at 277:5-25). |
| 232.   The decision to invest in companies was at the investment committee level, and Frost was a member of the investment committee. | Searles Decl., Ex. 99 (Frost Depo TR at 278:2-280:22). |
| 233.   Generally, the same people who came up | Searles Decl., Ex. 99 (Frost Depo |

48

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| with the idea at the incubator level were the same people who served on the investment committee. | TR at 279:22-282:21). |
| 234.  Snow Data Capital charged the portfolio companies $5100 per month. | Searles Decl., Ex. 99 (Frost Depo TR. at 300:19-24). |
| 235.  Snow Data Capital served, in part, as an additional source of funds coming back into the incubator. | Searles Decl., Ex. 99 (Frost Depo TR at 300:25-301:19). |
| 236.  The incubator did not document what specific services it provided to the portfolio companies. | Searles Decl., Ex. 99 (Frost Depo TR at 304:2-306:7). |
| 237.  Fund III investors have received no return on their investments; similarly, while Frost managed Fund II, investors received no return on their investments. | Searles Decl., Ex. 99 (Frost Depo Tr. at 308:21-309:5). |

### D.    The Other Elements of the SEC's Claims Are Admitted or Are Not In Dispute

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| 238.  FMC was an investment advisor to the funds and to the funds' investors. | Searles Decl., Ex. 106-111 (Forms ADV); Ex. 99 (excerpts of Frost Depo. Tr. at 104:12-22). |
| 239.  Frost was an investment advisor to the funds and the funds' investors. | Searles Decl., Ex. 99 (excerpts of Frost's Depo. Tr. at 104:12-22). |
| 240.  FMC received compensation in exchange for providing investment advice to the funds and the funds' investors. | Searles Decl., Ex. 99 (excerpts of Frost's Depo. Tr. at 104:12-22); Ex. 83 (JAMS Ex. 1327). |
| 241.  Frost received compensation in exchange | Searles Decl., Ex. 99 (excerpts of |

| UNCONTROVERTED FACT | EVIDENCE |
|---|---|
| for providing investment advice to the funds and the funds' investors | Frost's Depo. Tr. at 124:6-10); Ex. 83 (JAMS Ex. 1327). |
| 242. The mails and other means of interstate commerce were used in operating the funds, FMC, FDC, and the other Frost-related entities | Searles Decl., Ex. 99 (excerpts of Frost's Depo. Tr. at 125:15-22); Answer, Dkt. 16, ¶ 44. |
| 243. The membership interests in the funds were securities. | Searles Decl., Ex. 99 (excerpts of Frost's Depo. Tr. at 111:5-113:5, 138:6-139:15); Ex. 7 (JAMS Ex. 2); Ex. 83 (JAMS Ex. 840). |
| 244. The funds invested in the portfolio companies, on the advice of Frost and the funds' investment committees, in exchange for shares in the portfolio companies. | Searles Decl., Ex. 104, Ex. 105, Ex. 99 (excerpts of Frost's Depo. Tr. at 156:18-156:21). |

## III. **CONCLUSIONS OF LAW**

**A.** **FMC And Frost are collaterally estopped from relitigating facts and issues determined against them in the JAMS arbitration**

1. FMC and Frost are collaterally estopped from relitigating the facts and issues concerning Judge Sunvold findings of fraud, recklessness and breach of fiduciary duties, based on the Final Arbitration Award and the extensive evidentiary record developed during the arbitration. *See e.g., C.D Anderson & Co., Inc. v. Lemps*, 832 F. 2d 1097, 1100 (9th Cir. 1987) (an arbitration decision can have res judicata or collateral estoppel effect); *May Ship Repair Contracting Corp. v. Barge Columbia N.Y.*, 160 F. Supp. 2d 594, 599 (S.D.N.Y. 2001) (same). To foreclose relitigation of an issue under the collateral estoppel doctrine, three criteria must be satisfied: (1) the issue sought to be litigated is sufficiently similar to the issue presented in an earlier

50

proceeding and sufficiently material in both proceedings to invoke the doctrine; (2) the issue was actually litigated in the first case; and (3) the issue was necessarily decided in the first case. *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003). Here, each of those factors are satisfied

### B. Both FMC And Frost are investment advisers

2. Both FMC and Frost are investment advisers. Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . ." FMC meets this definition because it provided investment advice for fees that it charged; it also filed Forms ADV with the SEC acknowledging that it was an investment adviser to each of the funds at issue in this action, including the Seed Fund and Fund II.

3. Frost also meets the definition of investment adviser. Courts have held that "'people who manage[] the funds of others for compensation are 'investment advisers' within the meaning of the [Advisers Act].'" *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (quoting *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977)) (president/COO of investment adviser who had exclusive control over the management, operation, and investment decisions of hedge fund was an investment adviser under the Advisers Act). Here, Frost is the sole owner and managing member of FMC as well as the sole owner of the managing members and general partners of the Funds, and he received compensation for giving advice to the Funds. *See In the Matter of John J. Kenny*, Exchange Act Rel. No. 47847, 56 S.E.C. 448, 485 n.54 (May 14, 2003) (Commission op.) (finding CEO, chairman and control person of an investment adviser primarily liable for violations of Section 206(1) and (2)) as they are "investment contracts" under the factors established in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) because they involve "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts

of others."

**C.      FMC and Frost violated Sections 206(1) and 206(2) of the Advisers Act**

4.      Section 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud any client or prospective client or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.  The standard for "materiality under the Advisers Act is whether there is a substantial likelihood that a reasonable investor (here, client) would have considered the information [at issue] important." *Amendments to Form ADV*, Advisers Act Rel. No. 3060, 2010 SEC LEXIS 2679, at *23 n.35 (Aug. 12, 2010); *see also Steadman v. SEC*, 603 F.2d 1126, 1130 (5th Cir. 1979).  Scienter is required for Section 206(1) and may be established by showing extreme recklessness, while Section 206(2) can be satisfied by a showing of simple negligence.  *See SEC v. Steadman*, 967 F.2d 636, 641-43 n.5 (D.C. Cir. 1992); *see also Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003).

5.      An investment adviser is a fiduciary with "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).  An investment adviser's failure to disclose material information constitutes "fraud or deceit" under the Advisers Act.  *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2003) (citing *Capital Gains*, 375 U.S. at 200).  Thus, an investment adviser has "an obligation to provide 'full and fair disclosure of all material facts' to investors and independent trustees of the fund." *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir.2008), *withdrawn*, 573 F.3d 54 (2009), *reinstated in part*, 597 F.3d 436 (2010) (*quoting Capital Gains*, 375 U.S. at 194).  Similarly, courts have held that an investment adviser's economic conflicts of interest are material and must be

disclosed. *Vernazza*, 327 F.3d at 859 (citing *Capital Gains*, 375 U.S. at 201)*; see also IMS/CPAs & Assocs.*, Securities Act Rel. No. 8031, 2001 SEC LEXIS 2323, at *31 (Nov. 5, 2001) (Commission op.) ("economic conflicts of interest, such as undisclosed compensation, are material facts that must be disclosed"); *SEC v. Wall Street Publ'g Inst., Inc.*, 591 F. Supp. 1070, 1084 ((D.D.C. 1984) (failure to disclose an economic self-interest constitutes a breach of an investment adviser's fiduciary duty under Section 206).

6.      Here, based on the Final Arbitration Award and the extensive evidentiary record developed during the arbitration, FMC and Frost breached their fiduciary duties to the Seed Fund and Fund II by failing to disclose material information and conflicts of interest regarding the nearly $22 million incubator fees charged by FDC, including:

- by failing to disclose to Seed Fund investors that the portfolio companies in which the fund invested would be charged incubator fees.

- by failing to disclose to the Seed Fund and Fund II investors that the portfolio companies would be charged flat-rate incubator fees as opposed to incubator fees charged on a case-by-case basis at or below market rates.

- by failing to disclose the amount of incubator fees actually charged to the Seed Fund and Fund II investors in the funds' 2012 through 2015 audited annual financial statements and the funds' quarterly reports. *Id.*

- by failing to disclose to the Seed Fund and Fund II investors that Frost created new portfolio companies to generate additional incubator fees to cover FDC's operational costs as well as his extravagant personal expenses and exorbitant salary.

- by charging excessive incubator fees to the portfolio companies. *Id*.

- by charging the Seed Fund undisclosed management fees, and by improperly charging Fund II over $1.7 million in management fees that should have been offset by the excessive incubator fees charged.

7.     In addition, FMC and Frost charged the Seed Fund and International Seed Fund undisclosed management fees of $402,875 and improperly charged Fund II over $1.7 million in management fees that should have been offset by the excessive incubator fees charged.

8.     These breaches of fiduciary duty and misstatements and omissions were material.  The Funds would consider it important when deciding whether to invest to know that the portfolio companies in which they had invested were paying undisclosed or improperly charged incubator fees that diminished the portfolio companies' assets.  The Funds would also have considered it important to know that some of the portfolio companies in which they were invested were not created because Frost thought these companies could pursue new and viable ideas but were created simply to generate additional incubator fees to cover Frost's extravagant personal expenses.  Similarly, the Funds would have considered it important to know of the undisclosed and/or improperly charged management fees because paying these fees directly impacted the Funds' assets.

9.     Frost acted with scienter and, at a minimum was negligent.  Because he was FMC's sole owner and managing member, the Funds' majority or sole owner of the managing members and general partners, and FDC's sole owner and managing member, he knew, or was reckless in not knowing, that it was a breach of his fiduciary duty to charge undisclosed and excessive incubator and management fees. The same evidence showing that Frost knowingly and/or recklessly breached his fiduciary duties to the Funds also demonstrates his scienter.  *See, e.g., Vernazza v.*

54

*SEC*, No. 01-71857, 2003 U.S. App. LEXIS 14351, at *19 (9th Cir. Apr. 23, 2003); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 655 (D. Conn. 2018); *SEC v. Mack*, CV-1008383 DSF(PSWx), 2021 U.S. Dist. LEXIS 200288, at *6 (C.D. Cal. Aug. 7. 2012). Further, although there is ample evidence of his scienter, Frost also acted negligently by falling below the standard of care expected of an investment adviser by charging and not disclosing these undisclosed and excessive fees.  For an investment adviser, the standard of care is based on its fiduciary duty.  *SEC v. Capital Gains*, 375 U.S. at 191-92.  As a fiduciary, Frost owed his clients undivided loyalty and should not have engaged in activity that conflicted with his clients' interests. Because Frost controlled FMC, his scienter and negligence can be imputed to the firm.  *See, e.g.*, *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (scienter of senior controlling officers may be imputed to corporation).

**C.    FMC and Frost Violated Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

10.    Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder prohibit an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative.  FMC and Frost are investment advisers to the Funds which are pooled investment vehicles. Rule 206(4)-8(a)(1) prohibits an investment adviser to a pooled investment vehicle from making an untrue statement of material fact or omitting to state a material fact necessary to make the statements made not misleading to investors or prospective investors in those pools.  Rule 206(4)-8(a)(2) provides that it is a fraudulent practice for an investment adviser to a pooled investment vehicle to engage in "fraudulent, deceptive, or manipulative" conduct with respect to any investor or prospective investor in the pooled investment vehicle.  17 C.F.R. § 275.206(4)-8; *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, Advisers Act Rel. No. 2628 at 23 – 24 (Aug. 9, 2007).  Scienter is not required for violations of Section 206(4) or Rule 206(4)-8 thereunder.  *Steadman,* 967 F.2d at 647; *see also SEC v.*

55

*Quan,* 11-cv-723 (ADM), 2013 WL 556252, at \*16 (D. Minn. Oct. 8, 2013) (applying *Steadman* reasoning to Rule 206(4)-8); *SEC v. Yorkville Advisors, LLC*, No. 12 Civ. 7728 (GBD), 2013 U.S. Dist. LEXIS 110624 \*3 (S.D.N.Y. Aug. 2013) (SEC must establish at least negligence to prove violations of 206(2) and 206(4));  Advisers Act Rel. No. 2628 at 23 - 24.

11.    Here, in violation of Rule 206(4)-8(a)(1), FMC and Frost repeatedly defrauded investors in the Funds by failing to disclose the existence of and/or the amount of incubator fees and management fees, thus making the Funds' governing agreements, pitch materials, and quarterly status reports misleading.  Additionally, in violation of Rule 206(4)-8(a)(2), FMC and Frost engaged in multiple years of deceptive conduct by charging undisclosed or improper fees and by starting new portfolio companies solely to generate additional incubator fees to cover Frost's personal expenses.

**D.    The Court Should Issue Permanent Injunctions**

12.    Section 209 of the Advisers Act provides that when the evidence establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC. *SEC v. Murphy*, 626 F.2d at 633.

13.    Factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *Id.*  Here, all of those factors weigh in favor of a permanent injunction.

///

///

///

///

56

///

///

14.   Finally, an evidentiary hearing should be held to determine monetary relief in this action, including disgorgement, prejudgment interest thereon, and a civil penalty.

Dated:  March 26, 2021                                    Respectfully submitted,

                                                         */s/ Donald W. Searles*
                                                         Donald W. Searles
                                                         Douglas M. Miller
                                                         Attorneys for Plaintiff
                                                         Securities and Exchange Commission

57

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On March 26, 2021 I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST STUART FROST AND FROST MANAGEMENT COMPANY, LLC AS TO LIABILITY AND INJUNCTIVE RELIEF** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  March 26, 2021                    /s/ Donald W. Searles
                                         Donald W. Searles

1

*SEC v. Stuart Frost, et al.*
**United States District Court—Central District of California**
**Case No. 8:19-cv-01559-JLS-JDE**

## SERVICE LIST

Raymond C. Marshall
Robert Guite
Melissa Eaves
Sheppard, Mullin, Richter & Hampton, LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
rmarhall@sheppardmullin.com
rguite@sheppardmullin.com
meaves@sheppardmullin.com
*Attorneys for Defendants Stuart Frost and*
*Frost Management Company, LL*

2