# EXHIBIT 1

# Demand for Arbitration Form

## Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 1-800-352-JAMS

🖥 www.jamsadr.com

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Initial filing fee**
- *For two-party matters, the filing fee is $1,200. For matters involving three or more parties, the filing fee is $2,000. **The entire filing fee must be paid in full to expedite the commencement of the proceedings.** Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*

Exhibit 1
Page 15



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Hollencrest Bayview Partners, L.P. |
| **ADDRESS** | 100 Bayview Circle, #500 |
| **CITY** | Newport Beach |
| **STATE** | CA |
| **ZIP** | 92660 |
| **PHONE** | |
| **FAX** | |
| **EMAIL** | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Matthew Hodel |
| **FIRM/COMPANY** | Hodel Wilks LLP |
| **ADDRESS** | 4 Park Plaza, Suite 640 |
| **CITY** | Irvine |
| **STATE** | CA |
| **ZIP** | 92614 |
| **PHONE** | (949) 450-4470 |
| **FAX** | (949) 450-4479 |
| **EMAIL** | mhodel@hodelwilks.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Frost Management Company, LLC |
| **ADDRESS** | 31910 Del Obispo, Suite 100 |
| **CITY** | San Juan Capistrano |
| **STATE** | CA |
| **ZIP** | 92675 |
| **PHONE** | |
| **FAX** | |
| **EMAIL** | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Colin C. Holley |
| **FIRM/COMPANY** | HamptonHolley LLP |
| **ADDRESS** | 2101 East Coast Hwy., Suite 100 |
| **CITY** | Corona del Mar |
| **STATE** | CA |
| **ZIP** | 92625 |
| **PHONE** | (949) 718-4550 |
| **FAX** | (949) 718-4580 |
| **EMAIL** | cholley@hamptonholley.com |

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

**SEE ATTACHMENT 1**

AMOUNT IN CONTROVERSY (US DOLLARS)

Exhibit 1
Page 17

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

ARBITRATION PROVISION LOCATION

This dispute arises out of two agreements, the Frost VP Seed, LLC Operating Agreement, effective September 22, 2011 (attached to this Demand as Exhibit "A"), and the Frost VP Early Stage Fund II, L.P. Limited Partnership Agreement effective May 29, 2013 (attached to this Demand as Exhibit "B").  Both agreements have arbitration agreements requiring arbitration administered by JAMS.  The arbitration agreements are in section 13.10 of the Frost VP Seed, LLC Operating Agreement, and in section 15.5 of the Frost VP Early Stage Fund II, L.P. Limited Partnership Agreement.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION    500 N. State College Blvd., 14th Fl., Orange, CA 92868

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: Comprehensive Rule 16.1*

☐    *By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.*

## SUBMISSION INFORMATION

SIGNATURE    *[signature]*    DATE    October 17, 2016

NAME (PRINT/TYPED)    Colin C. Holley

Exhibit 1
Page 18

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims initiated in California</u>.**

## CONSUMER ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION as defined by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*:

☐ **<u>YES</u>**, this **is** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ **<u>NO</u>**, this **is not** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.  The contract is with a consumer party, as defined in these standards;
2.  The contract was drafted by or on behalf of the non-consumer party; and
3.  The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.  An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.  An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.  An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.  An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000          ☐ $100,000 to $250,000          ☐ More than $250,000          ☐ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

Exhibit 1
Page 19



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

**RESPONDENT NAME**  Robert B. Wolford

**ADDRESS**  100 Bayview Circle, #500

**CITY**  Newport Beach   **STATE**  CA   **ZIP**  92660

**PHONE**    **FAX**    **EMAIL**

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**  Matthew Hodel

**FIRM/COMPANY**  Hodel Wilks LLP

**ADDRESS**  4 Park Plaza, Suite 640

**CITY**  Irvine   **STATE**  CA   **ZIP**  92614

**PHONE**  (949) 450-4470   **FAX**  (949) 450-4479   **EMAIL**  mhodel@hodelwilks.com

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

**RESPONDENT NAME**  SEE ATTACHMENT 2

**ADDRESS**

**CITY**    **STATE**    **ZIP**

**PHONE**    **FAX**    **EMAIL**

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/COMPANY**

**ADDRESS**

**CITY**    **STATE**    **ZIP**

**PHONE**    **FAX**    **EMAIL**

Exhibit 1
Page 20



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| | |
|---|---|
| **CLAIMANT NAME** | Frost Venture Partners GP, LLC |
| **ADDRESS** | 31910 Del Obispo, Suite 100 |

| CITY | STATE | ZIP |
|---|---|---|
| San Juan Capistrano | CA | 92675 |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Colin C. Holley |
| **FIRM/COMPANY** | HamptonHolley LLP |
| **ADDRESS** | 2101 East Coast Hwy., Suite 100 |

| CITY | STATE | ZIP |
|---|---|---|
| Corona del Mar | CA | 92625 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (949) 718-4550 | (949) 718-4580 | cholley@hamptonholley.com |

## CLAIMANT #3

| | |
|---|---|
| **CLAIMANT NAME** | |
| **ADDRESS** | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/COMPANY** | |
| **ADDRESS** | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

Exhibit 1
Page 21

# DEMAND FOR ARBITRATION FORM (CONTINUED)

## ATTACHMENT 1

### (NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT)

Claimant Frost Management Company, LLC ("Frost Management") is a member and the manager of Frost VP Seed, LLC (the "Seed Fund"), a company organized for the purpose of investing in securities. Respondents Hollencrest Bayview Partners, L.P. and Robert B. Wolford (collectively, "Respondents") are investors in and members of the Seed Fund. Frost Management and Respondents are parties to the Frost VP Seed, LLC Operating Agreement, effective September 22, 2011 (the "Seed Fund Operating Agreement," a copy of which is attached to this Demand as Exhibit "A").

Claimant Frost Venture Partners GP, LLC ("Frost Venture Partners GP") is a member and the manager of Frost VP Early Stage Fund II, L.P. ("Fund II"), a company formed for the purpose of investing in securities. Respondents Robert B. Wolford, Wolford Family Trust dated July 11, 2006, Larry Sheakley, North American Specialties Insurance Company, Inc., Louis H. Lauch Declaration Trust, Lauch Boys LLC, and PENSCO Trust Co. Custodian FBO Charles W. Reynolds Jr. IRA, are parties to the Frost VP Early Stage Fund II, L.P. Limited Partnership Agreement effective May 29, 2013 (the "Fund II Partnership Agreement," a copy of which is attached to this Demand as Exhibit "B").

For the past several months Respondents have pursued, in bad faith and for their own personal gain, a course of action intended: (a) to force Frost Management and Frost Venture Partners GP to relinquish management of the Seed Fund and Fund II; and (b) to force Frost Management and Frost Venture Partners GP, and their principal Stuart Frost, to give their ownership interests in the Seed Fund and Fund II to Respondents or others affiliated with Respondents. In order to achieve those objectives, Respondents have made false accusations that, among other things, Frost Management and Frost Venture Partners GP have mismanaged the Seed Fund and Fund II, have improperly used fund capital as part of a "Ponzi scheme;" have failed to disclose material information and conflicts of interest to Seed Fund members, have made investment decisions for the purposes of self-dealing, and have breached their fiduciary duties to Respondents and the other Seed Fund and Fund II investors. Those allegations are demonstrably false.

In pursuing their bad faith objectives Respondents have conspired with John Vigouroux, a partner in Frost Venture Partners GP and an employee of Frost Data Capital (an incubator tasked with, among other things, helping to create and grow a portfolio of companies in which the Seed Fund and Fund II have invested), and potentially with other 'moles' within Claimants' and affiliated businesses, who have been convinced by Respondents to abandon their contractual and fiduciary duties for the promise of personal gain.

Exhibit 1
Page 22

Frost Management and Frost Venture Partners GP have at all times managed the Seed Fund and Fund II in good faith and acted in the reasonable belief that their actions were in the best interests of the Seed Fund and Fund II, and all of their investors. All of Frost Management's and Frost Venture Partners GP's actions have been well within their discretion and consistent with their fiduciary and any other duties under the Seed Fund Operating Agreement and the Fund II Partnership Agreement.

Despite their knowledge that their claims against Frost Management and Frost Venture Partners GP have no factual basis, Respondents have threatened to file a lawsuit pursuing such claims, because they know such a lawsuit could damage the business reputations of Frost Management, Frost Venture Partners GP, and Mr. Frost, and could jeopardize a number of Frost Management, Frost Venture Partners GP, and Mr. Frost's current and future business investments.

Claimants allege, on information and belief, that Respondents believed they could use their false allegations as extortion to force Frost Management, Frost Venture Partners GP and Mr. Frost out of the Seed Fund and Fund II entirely, believing Frost Management, Frost Venture Partners GP and Mr. Frost would not risk damage to their reputation or the potential loss of capital gains from business investments. Claimants bring this Demand for Arbitration because they refuse to give into Respondents' bad faith tactics and extortion.

In pursuit of their wrongful goals, Respondents: (1) have disclosed confidential information of the Seed Fund and Fund II to third parties in breach of the Seed Fund Operating Agreement and the Fund II Partnership Agreement; (2) have engaged in conduct amounting to defamation and trade libel in communicating false accusations about Frost Management, Frost Venture Partners GP and Mr. Frost to third parties; and (3) conspired with and aided and abetted John Vigouroux in his breach of his fiduciary duties to Frost Venture Partners GP and to the investors in Fund II; all of which has caused monetary damage to Frost Management. Claimants seek: a declaration that they have not breached the Seed Fund Operating Agreement, the Fund II Partnership Agreement, or any fiduciary or other duties; monetary damages; indemnification pursuant to the Operating Agreement; attorneys' fees and costs as prevailing party at the conclusion of this proceeding; and such other and further relief as the Arbitrator deems just and proper.

Exhibit 1
Page 23

# DEMAND FOR ARBITRATION FORM (CONTINUED)

## ATTACHMENT 2

## (ADDITIONAL RESPONDENTS)

**RESPONDENT #3**

Wolford Family Trust dated July 11, 2006
100 Bayview Circle, #500
Newport Beach, CA 92660

Respondent #3's Attorney:

Matthew Hodel
Hodel Wilks LLP
4 Park Plaza, Suite 640
Irvine, CA 92614
Tel: (949) 450-4470
Fax: (949) 450-4479
Email: mhodel@hodelwilks.com

**RESPONDENT #4**

Larry Sheakley
320 Broadway
Cincinnati, OH 45202
Tel: (513) 729-6508
Email: larry.sheakley@sheakley.com

**RESPONDENT #5**

North American Specialties Insurance Company, Inc.
320 Broadway
Cincinnati, OH 45202
Tel: (513) 729-6508
Email: larry.sheakley@sheakley.com

Exhibit 1
Page 24

**RESPONDENT #6**

Louis H. Lauch Declaration of Trust
7498 Ayers Road
Cincinnati, OH 45255
Tel: (513) 310-5500
Email: llauch@isoc.net

**RESPONDENT #7**

Lauch Boys LLC
7498 Ayers Road
Cincinnati, OH 45255
Tel: (513) 310-5500
Email: llauch@isoc.net

**RESPONDENT #8**

PENSCO Trust Co. Custodian FBO Charles W. Reynolds Jr. IRA
P.O. Box 173859
Denver, CO 80217-3859
Tel: (310) 729-1276
Email: cwreynolds@reynoldsla.com

Exhibit 1
Page 25

# EXHIBIT A

Exhibit 1
Page 26

**FROST VP SEED, LLC**

**OPERATING AGREEMENT**

THIS OPERATING AGREEMENT (this "*Agreement*") is made effective as of the 22nd day of September, 2011 (the "*Effective Date*") by and among FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the "*Manager*"), and each person admitted from time to time as a Member of the Company (each a "*Member*" and collectively, the "*Members*"), with respect to the operation of FROST VP SEED, LLC, a Delaware limited liability company (the "*Company*"), and reads as follows:

## ARTICLE I

### NAME, PURPOSE AND OFFICES OF COMPANY

1.1 **Name.** The name of the Company is Frost VP Seed, LLC. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may determine.

1.2 **Purpose.** The purpose of the Company is to buy, sell, hold, and otherwise invest in Securities (directly or indirectly) of every kind and nature and rights and options with respect thereto and received in exchange or with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings necessary, advisable or desirable with respect to Securities held or owned by the Company; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing. The Company shall have the power to make and perform all contracts and to engage in all actions and transactions determined by the Manager to be necessary or advisable to carry out the purposes of the Company, and all other powers available to it as a limited liability company under the laws of Delaware.

1.3 **Principal Office.** The principal office of the Company shall be located at 31920 Del Obispo, Suite 260, San Juan Capistrano, CA 92675, or such other place or places as the Manager may from time to time designate by written notice to the Members.

1.4 **Registered Agent and Office.** The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

## ARTICLE II

### TERM OF COMPANY

2.1 **Term.** The term of the Company shall commence upon the date of the filing of the certificate of formation (the "*Certificate of Formation*") of the Company with the Office of

1

725167 v1/SD

Exhibit 1
Page 27

the Secretary of State of the State of Delaware.  The term of the Company shall terminate as provided in paragraph 10.1.

**2.2**     **Events Affecting the Members or the Manager.**   Except as provided in paragraph 10.1(a)(iii) or as required by the Act, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, retirement, resignation, expulsion or dissolution of the Members or the Manager (or any member or partner thereof) shall not dissolve the Company.

## ARTICLE III

### NAMES, ADMISSION, WITHDRAWAL AND QUALIFICATION OF THE MEMBER

**3.1**     **Name and Address.**  The name and address of the Members and the amount of the Members' Capital Commitments are set forth on the Schedule of Manager and Members attached hereto as **EXHIBIT A**.  The Manager shall cause **EXHIBIT A** to be amended without the consent of the Members to the extent changes requiring the amendment of **EXHIBIT A** are made pursuant to the terms of this Agreement from time to time; *provided*, that no Member's Capital Commitments shall be increased without obtaining the prior written consent of the Member. Any such amended **EXHIBIT A** shall supersede any prior **EXHIBIT A** and become a part of this Agreement.

**3.2**     **Admission of Additional Members.**  Additional Members may be admitted with the consent of the Manager, acting alone, until the earlier of [July 1, 2012] or the total Capital Commitments of the Members equal at least $[10,000,000.]   Thereafter, additional Members may be admitted to the Company only upon the consent of the Manager and a Majority-in-Interest of the Members.

**3.3**     **Withdrawal of a Member.**  No Member may withdraw or resign as a Member without the written consent of the Manager.

## ARTICLE IV

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS, AND DEFAULT OF A MEMBER

**4.1**     **Capital Accounts.**  An individual Capital Account shall be maintained for each of the Members.

**4.2**     **Capital Contributions; Capital Commitment**.

**(a)**     The Manager shall have no Capital Commitment and no obligation to contribute capital to the Company.

**(b)**     Each Member shall make capital contributions in cash installments, by wire transfer upon at least ten (10) days' advance written notice, up to the amount of its *"Capital Commitment"*.

725167 v1/SD

2

Exhibit 1
Page 28

(c)     The Manager shall return to each Member all or any cash capital contribution intended for a proposed investment which is not consummated, or applied to the payment or reimbursement of expenses pursuant to paragraph 6.1, within ten (10) days following the date on which such proposed investment is not consummated or contribution is not otherwise applied; such returned capital shall be added back to the unfunded Capital Commitments of the Member and be subject to recall by the Manager pursuant to this **ARTICLE IV**.

**4.3     Default of a Member.**  The Company shall be entitled to enforce the obligation of each Member to make contributions of capital to the Company in accordance with paragraph 4.2, and the Company shall have all remedies available at law or in equity in the event any such contribution is not so made.  A defaulting Member shall pay all costs and expenses incurred by the Company in connection with the Member's failure to make a capital contribution as required under this Agreement, including, without limitation, attorneys' fees and all fees and expenses incurred in connection with any legal proceeding relating to the failure of the Member to make such a contribution.  In the event that a Member fails to contribute capital to the Company as required under this Agreement and such default shall have continued uncured for thirty (30) or more days after delivery of written notice to the defaulting Member, the Manager shall be permitted to either (i) withhold distributions to be made to such defaulting Member pursuant to the terms of this Agreement equal to the amount of such unpaid capital contribution and recover such unpaid contribution thereon by setoff against any such distributions so withheld, or (ii) sell the defaulting Member's interest in the Company in a third party transaction and apply the proceeds towards the satisfaction of any Company expenses or other obligations of the Company.

## ARTICLE V

### COMPANY ALLOCATIONS

**5.1     Allocation of Profit and Loss.**  Profit and Loss of the Company shall be allocated among the Members in proportion to their aggregate capital contributions.

**5.2     Allocations for Tax Purposes.**  Income, gain, loss and deductions shall be allocated for income tax purposes generally in the manner in which the corresponding Profit and Loss is credited or debited (as the case may be) to their respective Capital Accounts; *provided, however,* that any difference between the Adjusted Asset Value and adjusted tax basis of any asset shall be reconciled, solely for income tax purposes, in accordance with the principles of Code Section 704(c) using any method permitted by the Treasury Regulations and selected by the Manager.

## ARTICLE VI

### COMPANY EXPENSES

**6.1     Company Expenses.**

(a)     The Company shall bear all operating expenses reasonably incurred by the Manager, the Incubator or the Company in connection with the management of the Company, the Incubator and the Manager, including but not limited to, all out-of-pocket costs

3

725167 v1/SD

Exhibit 1
Page 29

and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on and fees and expenses arising out of borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, or other similar charges, travel expenses, legal fees and expenses, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, the Incubator or the Manager, including claims by or against a governmental authority, audit and accounting fees, consulting fees relating to investments or proposed investments, taxes applicable to the Company, the Incubator or the Manager on account of their operations, fees incurred in connection with the maintenance of bank or custodian accounts, all expenses incurred in connection with the registration of the Company's and the Incubator's Securities under applicable securities laws or regulations. The Company shall also bear all out-of-pocket expenses incurred by the Manager in serving as the tax matters partner, any sales or other taxes or government charges which may be assessed against the Company, the cost of liability and other premiums for insurance protecting the Company, the Incubator, the Manager, and their respective partners, members, stockholders, managers, managing directors, officers, directors, trustees, employees, agents or affiliates in connection with their activities, all out-of-pocket expenses of preparing and distributing reports to their respective Members, all out-of-pocket expenses associated with communications with Members, including preparation and distribution of reports to their respective Members, costs associated with Company meetings, all legal, accounting, tax, consulting and professional services fees and expenses (including tax preparation) relating to the Company, the Incubator or the Manager and their activities, out-of-pocket fees and expenses relating to outsourced finance, accounting, and back-office services (or if the Manager performs the accounting function internally, an amount reimbursable to the Manager equal to the then-current market cost of a qualified third party service provider as determined by the Manager in good faith), all out-of-pocket fees, costs and expenses relating to litigation and threatened litigation involving the Company, the Incubator or the Manager, including the Company's indemnification obligation pursuant to this Agreement, and all other expenses properly chargeable to the activities of the Company, the Incubator or the Manager.

      **(b)**    The Company shall bear all out-of-pocket organizational and syndication costs, fees, and expenses incurred by or on behalf of the Manager in connection with the formation and organization of the Company, the Incubator and the Manager (including the definitive agreements related thereto), including legal and accounting fees and expenses incident thereto.

      **(c)**    The Company shall bear all liquidation costs, fees, and expenses reasonably incurred by the Manager (or its designee) in connection with the liquidation of the Company, the Incubator and Manager at the end of their respective terms, specifically including but not limited to reasonable legal and accounting fees and expenses.

725167 v1/SD

4

Exhibit 1
Page 30

# ARTICLE VII

## WITHDRAWALS BY AND DISTRIBUTIONS TO THE MEMBER AND MANAGER

**7.1    Interest.**  No interest shall be paid to a Member on account of its interest in the capital of or on account of its investment in the Company.

**7.2    Withdrawals by a Member.**  No Member shall be permitted to withdraw any amount from its Capital Account without the written consent of the Manager.

**7.3    Members' Obligation to Repay or Restore.**  Except as required by law, no Member shall be obligated at any time to repay or restore to the Company all or any part of any distribution made to it from the Company in accordance with the terms of this **ARTICLE VII** or **ARTICLE X**, and shall not be obligated at any time to restore or repay any deficit in the Member's Capital Account.

**7.4    Tax Distributions.**  Within ninety (90) days after the end of each calendar year during the Company term, the Company will distribute to the Members, as applicable, in cash an amount equal to the excess, if any of (a) the Applicable Tax Rate multiplied by the net taxable income allocated to the Members, as a result of Members' ownership of an interest in the Company for the current and all prior fiscal years, over (b) all prior cash distributions made to the Members pursuant to this paragraph 7.4 or paragraph 7.5.  The "*Applicable Tax Rate*" shall mean the combination of the highest marginal Federal and State income tax rates (plus, to the extent applicable, Medicare taxes) payable by individuals resident in the State of California taking into account the character of the net taxable income to which the rate is being applied and taking into account the deductibility of state and local taxes and any limitations on the ability of a Member to deduct any items of expense or loss under United States federal income tax principles, in each case as determined in good faith by the Manager.  Distributions made to a Member pursuant to paragraph 7.4 shall be treated as advances of and as such shall reduce the distributions to be made to the Member under paragraph 7.5.

**7.5    Discretionary Distributions.  (a)** The Manager may distribute cash, Securities or other Company assets to the Members in its reasonable discretion.  All distributions under this paragraph 7.5 shall be among the Members *pro rata* in accordance with their respective capital contributions.

**(b)**    Securities distributed in kind shall be subject to such conditions and restrictions as the Manager reasonably determines are legally required or appropriate.

**(c)**    Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of the Members as Profit or Loss pursuant to **ARTICLE V**.

**(d)**    Notwithstanding anything contained herein to the contrary, the Manager shall make distributions of Marketable Securities or any proceeds or other amounts received by the Company as soon as reasonably practical (other than amounts necessary to provide for sufficient reserves for present and future obligations of the Company (as reasonably determined by the Manager)).

5

725167 v1/SD

Exhibit 1
Page 31

**7.6      Withholding Obligations.**

(a)      If and to the extent the Company is required by law (as determined in good faith by the Manager) to make payments ("*Tax Payments*") with respect to the Members in amounts required to discharge any legal obligation of the Company or the Manager to make payments to any governmental authority with respect to any federal, state, local or foreign tax liability of such person arising as a result of such person's interest in the Company, then the amount of any such Tax Payments shall be deemed to be a loan by the Company to such person, which loan shall:  (i) be secured by such Member's interest in the Company, (ii) bear interest at the prime rate, and (iii) be payable upon demand.  Amounts paid in respect of interest on such loan shall be treated as Profit of the Company and shall not be treated as a capital contribution. The Manager shall promptly notify the Member of any Tax Payments made with respect to such Member.

(b)      If and to the extent the Company is required to make any Tax Payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided that* such person's Capital Account shall be adjusted for such person's full proportionate share of the distribution), or (ii) such Member shall promptly pay to the Company prior to such distribution an amount of cash equal to such Tax Payments.  In the event a portion of a distribution in kind is retained by the Company pursuant to clause (i), such retained Securities may, in the sole discretion of the Manager, either (1) be distributed to the Members in accordance with the terms of this **ARTICLE VII** including this paragraph 7.6(b), or (2) be sold by the Company to generate the cash necessary to satisfy such Tax Payments.

## ARTICLE VIII

### MANAGEMENT DUTIES AND RESTRICTIONS

**8.1      Management.**

(a)      Except as otherwise set forth herein, the Manager shall have the sole right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company; *provided that*, the Manager shall not, without obtaining the prior written consent of the Member, change the purpose of the Company as set forth in paragraph 1.2.  The Manager shall make, in its reasonable discretion, all decisions concerning the assets of the Company, including any acquisition and disposition thereof.

(b)      The Members understand that the Manager has formed the Incubator to provide an operating infrastructure to incubate and develop new business.  The Incubator is controlled by the Manager and or its affiliates.  It is anticipated that investment opportunities in one or more businesses formed in the Incubator will be offered to the Company but all decisions as to which, if any, such opportunities will be offered to the Company and the terms of any such investments shall be made in the sole and absolute discretion of the Manager.

**8.2      Designation of Manager.**  The Manager initially shall be the entity listed as such in the preamble to this Agreement.  In the event of a Change of Control of the Manager, a

6

Majority in Interest of the Members shall have the right to remove the Manager as a Manager only and appoint a replacement Manager. For the avoidance of doubt, the Manager shall continue to be entitled to receive all allocations and distributions to which it would otherwise be entitled to receive had it not been removed as a Manager when, as and if such allocations and distributions are made, in respect of all activities of and investments by the Company. In the event there are no Managers, a new Manager shall be appointed by a Majority in Interest of the Members.

**8.3   Resignation of Manager.** A Manager may resign as such at any time by giving written notice to the Members, in which case, in the event that there is no Manager, a Majority in Interest of the Members shall designate a replacement Manager as set forth in paragraph 8.2 above.

**8.4   Restrictions on the Members.** Except as expressly provided herein or as required by applicable law, no Member (other than a Member acting in its capacity as the Manager) shall: (a) take any part in the control or management of the Company business, (b) have any power or authority to act for or on behalf of the Company, or (c) have any right to vote on any Company matters.

**8.5   Certain Determinations by the Manager.** All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by the Manager. Such determination shall be final and conclusive.

**8.6   Other Activities.**

(a) The parties hereto acknowledge and agree that (i) in addition to the Incubator, the Manager Parties have formed and may in the future form other investment vehicles, including those which hold the type of assets which the Company may hold, (ii) no Member shall have any interest in any of the foregoing investment vehicles or the assets thereof arising solely by virtue of this Agreement, (iii) the Manager may offer the right to participate in investment opportunities available to the Company (in whole or in part), including opportunities provided by the Incubator to other private investors, groups, partnerships, corporations or other entities, including, without limitation, any investment vehicles managed by some or all of the Manager Parties, whenever the Manager, in its sole discretion, so determines, (iv) the Manager Parties shall be under no obligation to offer any particular investment opportunities which they may identify to the Company, and (v) the Manager Parties may charge fees or carried interests with regard to any investment opportunity which the Manager Parties allocate to persons other than the Company.

(b) The Members: (i) acknowledge that the Manager Parties are or may be involved in other financial, investment and professional activities, including but not limited to: management of or participation in the Incubator and other investment funds; venture capital, private equity, public equity and real estate investing; purchases and sales of Securities; investment and management counseling; otherwise making investments or presenting investment opportunities to third parties; and serving as officers, directors, advisors,

7

725167 v1/SD

Exhibit 1
Page 33

consultants, and agents of other entities; and (ii) agree that the Manager Parties may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company). Neither the Company nor any Member shall have any right by virtue of this Agreement or the existence of the Company in and to such ventures or activities or to the income or profits derived therefrom, and the Manager Parties shall have no duty or obligation to make any reports to the Member or the Company with respect to any such ventures or activities.

## ARTICLE IX

### INVESTMENT REPRESENTATION AND TRANSFER OF COMPANY INTERESTS

**9.1 Representations of the Members.** Each Member represents: (a) that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act, (b) that it is a "qualified purchaser" as defined in Section 2(51)(A) of the U.S. Investment Company Act of 1940, as amended, (c) that it has sufficient knowledge and experience in business and financial matters to evaluate the Company, its proposed activities and the risks and merits of this investment, (d) that it has the ability to accept the high risk and lack of liquidity inherent in this type of investing, (e) that it is acquiring its interest in the Company for its own account for investment purposes only and not with a view to resale or distribution, (f) that it has had access to such information concerning the Company as it deems necessary to enable it to make an informed decision concerning the purchase an interest in the Company, and (g) that it understands that the interests in the Company have not been registered under the Securities Act, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated.

**9.2 Restrictions on Transfers of Company Interests**.

    **(a)** No Member shall (directly or indirectly) sell, assign, pledge, mortgage, hypothecate, give or otherwise dispose of or transfer its interest in the Company or in its capital assets or property (a "***Transfer***") without the consent of the Manager (such consent may be granted or withheld in its sole discretion).

    **(b)** A transferee of a Member's interest shall become a substituted Member only with the consent of the Manager, and only if such transferee executes any and all instruments reasonably required by the Manager.

**9.3 Requirements for Transfer.** Notwithstanding the foregoing, the Transfer of a Member's interest in the Company, or any part thereof, shall not be permitted if such Transfer would (a) result in a violation of any law, rule, or regulation, (b) result in a violation of any agreement in which the Company is a party, (c) require the Company to register as an investment company under the U.S. Investment Company Act of 1940, as amended, (d) require the Company or any of the Manager Parties to register as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, (e) result in the Company's assets being considered, in the opinion of counsel for the Company, as "plan assets" within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended, or any regulations proposed or promulgated thereunder, or (f) result in the Company being classified for United

8

States federal income tax purposes as an association taxable as a corporation. Prior to effecting any such Transfer, the Manager shall have received an opinion satisfactory to it, or shall have waived the requirement of such an opinion, covering the substance of the immediately previous sentence. Any Member who requests or otherwise seeks to effect a Transfer hereby agrees to reimburse the Company, at the request of the Manager, for any expenses reasonably incurred by the Company in connection with such Transfer, including the costs of seeking and obtaining any legal opinion required by this paragraph and any other legal, tax, accounting and miscellaneous expenses, whether or not such Transfer is consummated.

**ARTICLE X**

**DISSOLUTION AND LIQUIDATION OF THE COMPANY**

**10.1    Termination**.

(a)    The Company shall dissolve, and the affairs of the Company shall be wound up upon the earlier of:

(i)    Upon the mutual consent of both the Manager and a Majority-in-Interest of the Members;

(ii)    Upon the election by the Manager in the event that all Company assets have been distributed in accordance with this Agreement;

(iii)    In the event of the resignation, bankruptcy, dissolution, commencement of liquidation proceedings or insolvency of the Manager unless, within ninety (90) days after the Members are provided with written notice of such event, a Majority-in-Interest of the Members agree in writing to continue the business of the Company and to the appointment, effective as of the date of such event, of a new Manager of the Company;

(iv)    Upon the entry of a decree of judicial dissolution pursuant to the Act; or

(v)    On or after the ten year anniversary following the Effective Date, the affirmative vote of a Majority-in-Interest of the Members.

(b)    In the event that the Company is dissolved pursuant to the provisions of clauses (iii) or (iv) of this paragraph 10.1, the Members shall elect one or more liquidators to manage the liquidation of the Company in the manner described in this **ARTICLE X**. Except as provided in the immediately preceding sentence, the Manager shall carry out the duties of the liquidator hereunder.

**10.2    Winding Up Procedures**.

(a)    Promptly upon final dissolution of the Company, the affairs of the Company shall be wound up and the Company liquidated. Profits and Losses (and items thereof) with respect to the Company realized during the winding up period shall be allocated among the applicable Capital Accounts of the Members pursuant to **ARTICLE V**.

9

725167 v1/SD

Exhibit 1
Page 35

**(b)**     Distributions in liquidation may be made in cash or in kind or partly in cash and partly in kind in accordance with the Members' final adjusted Capital Accounts. The Manager or the liquidator shall use its best judgment as to the most advantageous time for the Company to sell investments or to make distributions in kind.

**10.3    Payments in Liquidation**.  The assets of the Company shall be distributed in liquidation of the Company in the following order:

**(a)**     to the creditors of the Company, including the Member if the Member is a creditor, in the order of priority established by law, either by payment or by establishment of reserves; and then

**(b)**     to the Members in respect of the positive balances in their applicable Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

## ARTICLE XI

### FINANCIAL ACCOUNTING AND TAX MATTERS

**11.1    Financial Accounting; Fiscal Year.**  The books and records of the Company shall be kept in accordance with the provisions of this Agreement and otherwise on a tax basis accounting.  The Company's fiscal year shall be the calendar year.

**11.2    Valuation of Investments Owned by Company.**   For purposes of this Agreement, the value of any Security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the immediately preceding business day) shall be determined as follows:

**(a)**     a Security which is listed or quoted on a recognized securities exchange or on The NASDAQ National Market ("*NASDAQ*") shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination;

**(b)**     a Security which is traded over the counter (other than on a recognized securities exchange or NASDAQ) shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination, or if no sales occurred on any such day, be estimated at fair value and shall be determined by the Manager; and

**(c)**     for any other Security or other investments or assets of the Company hereunder shall be estimated at fair value and shall be determined by the Manager.

**11.3    Supervision; Inspection of Books.**  Proper and complete books of account of the business of the Company, copies of the Company's federal, state and local tax returns for each fiscal year, a current Schedule of Members set forth on each updated **EXHIBIT A**, this Agreement and the Company's Certificate of Formation shall be kept under the supervision of the Manager at the principal office of the Manager.  Such books and records shall be open to inspection by the

10

Exhibit 1
Page 36

Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice.

**11.4    Tax Returns and Information.**  The Manager shall use reasonable efforts to cause the Company's U.S. federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by the Members, to be prepared and delivered to the Member within ninety (90) days after the close of the Company's fiscal year.

**11.5    Tax Matters Partner.**  The Manager shall serve as the Company's tax matters partner under the Code and under any comparable provision of state law.  The tax matters partner is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members (in their capacity as such).  Notwithstanding the foregoing, without a Member's consent, the tax matters partner shall neither (i) choose any forum other than the U.S. Tax Court to litigate any proposed adjustment of, or other dispute concerning, any "partnership item" (within the meaning of Section 6231(a)(3) of the Code) nor (ii) extend, beyond one year, the statute of limitations on adjustment of or assessment of tax on any such item.  To the fullest extent permitted by law, the Company agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to (a) all fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the Manager or the Company that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Company, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise or any such claim, action, or demand; *provided* that this indemnity shall not extend to conduct by the tax matters partner adjudged  not to have been undertaken in good faith to promote the best interests of the Company.

**11.6    Reports**.  The Manager shall deliver or cause to be delivered to each Member (i) within 60 days after each fiscal quarter of the Company commencing with the fiscal quarter ending March 31, 2012, a report containing an unaudited balance sheet, statement of operations and statement of changes in members equity of the Company for such fiscal quarter and a valuation of the Securities owned by the Company as of the end of such fiscal quarter pursuant to paragraph 11.2, and (ii) within 120 days after the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2012, a report containing an audited balance sheet, statement of operations, and statement of changes in members equity of the Company for such Fiscal Year to date.

**ARTICLE XII**

**CERTAIN DEFINITIONS**

**12.1    Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the parties respective interests in the Profits or Losses of the Company during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interest shall occur.  Notwithstanding the foregoing, the Manager may from time to time cause allocations to be made to the parties'

11

725167 v1/SD

Exhibit 1
Page 37

Capital Accounts as if an Accounting Period had ended and a new Accounting Period shall commence on the next subsequent day, it being anticipated that such an allocation may be made in connection with Company distributions or at such other times if, in the Manager's reasonable judgment, circumstances make it reasonable to do so.

**12.2   Adjusted Asset Value.**  The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

      **(a)**   The initial Adjusted Asset Value of any asset contributed by the Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the Member and the Manager.

      **(b)**   In the reasonable discretion of the Manager, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member; and (ii) the distribution by the Company to a party of Company assets, unless all parties receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in Company distributions.

      **(c)**   The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts of the parties, as of the termination of the Company by expiration of the Company's term.

**12.3   Capital Account.**  The Capital Account of each party shall consist of its original capital contribution, if any, (a) increased by any additional capital contributions, its share of Profit that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by it or that are secured by any Company property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of Loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Company or that are secured by any property contributed by it to the Company. The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Manager may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable pursuant to **ARTICLE VII** and **ARTICLE X**.

**12.4   Change of Control.**  Change of Control shall mean the transfer (whether directly or indirectly) of voting securities of the Manager, in one transaction or in a series of related transactions, through which a person or "group" who does not currently hold such right, acquires (whether directly or indirectly) the right to cast a majority of the total votes entitled to be cast by

725167 v1/SD

Exhibit 1
Page 38

all equity holders of the Manager.  The death, disability or incapacitation of Stuart Frost, the principal of the Manager, shall be deemed a Change of Control.

**12.5    Code.**  The Code is the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

**12.6    Deemed Gain or Deemed Loss**. The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2), over the aggregate Adjusted Asset Value of the Securities distributed.  The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2).

**12.7    Incubator**.  Incubator shall mean Frost Venture Partners, LLC, a Delaware limited liability company.

**12.8    Majority in Interest.**  Majority in Interest shall mean Members representing a majority of the Capital Commitments.

**12.9    Manager Parties.**  The Manager Parties shall mean each of the Manager and their respective direct and indirect managers, members, partners, stockholders, officers, directors, trustees, employees, consultants, agents or any affiliate of the foregoing, including Stuart Frost.

**12.10    Marketable Securities.**  Marketable Securities shall refer to Securities that are (a) traded on a recognized securities exchange  or traded on one or more securities exchanges or quoted on the automated screen-based quotation and trade execution system operated by The NASDAQ OMX Group, Inc., or any successor thereto, and not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement.  Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the Manager, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Company within a reasonable time period.

**12.11    Profit or Loss.**  Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss arising for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

    **(a)**    Any tax-exempt income of the Company described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

    **(b)**    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury

13

Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c)    Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for United States federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(d)    In the event that the Adjusted Asset Value of any asset is adjusted under paragraphs 12.2(b) or (c), the amount of such adjustment shall, if positive, be added or, if negative, be subtracted, from such taxable income or loss;

(e)    The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

**12.12  Securities.**  Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**12.13  Securities Act.**  Securities Act is the United States Securities Act of 1933, as amended.

**12.14  Treasury Regulations.**  Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE XIII

### OTHER PROVISIONS

**13.1    Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among the residents of such state made and to be performed entirely within such state.

**13.2    Limitation of Liability of the Members.**  Except as required by law, no Member shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Company in excess of its Capital Commitment to the Company.  Notwithstanding the foregoing, each Member shall be required to pay to the Company, at such times and subject to the conditions set forth herein, all amounts that the Member has agreed to pay in respect of its Capital Commitment.

**13.3    Exculpation.**  Neither the Manager Parties nor the tax matters partner (collectively, the "*Covered Persons*") shall be liable, responsible or accountable in damages or otherwise to the Members or the Company for honest mistakes of judgment, or for action or inaction, taken in good faith and in the reasonable belief that such action or inaction was in, or not opposed to, the best interest of the Company, or for losses due to such mistakes, action, or

14

725167 v1/SD

Exhibit 1
Page 40

inaction, or to the negligence, dishonesty, or bad faith of any employee, broker, or other agent of the Company, *provided that* such employee, broker, or agent was selected with reasonable care. To the fullest extent permitted by law, no Covered Person shall be liable to the Company or the Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice of legal counsel (as to matters of law), or of accountants (as to matters of accounting), or of investment bankers, accounting firms, or other appraisers (as to matters of valuation), *provided that* any such professional or firm is selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any Covered Person of any liability by reason of such Covered Person's commission of gross negligence, intentionally wrongful conduct or recklessness or a material breach of this Agreement that has an adverse effect on the Company or the Member, determined by arbitration pursuant to paragraph 13.10; *provided, however*, that such alleged material breach of this Agreement (and any resulting Losses (as defined below)) has not been cured (if curable) within sixty (60) days after such time as it may be demonstrated that the Covered Person had actual knowledge of such alleged material breach ("*Uncured Material Breach*"); *provided further* that any liquidator other than the Manager shall be entitled to the benefit of exculpation under this paragraph 13.3 so long as such person acted in good faith. Notwithstanding any other provision of this Agreement, to the extent that, at law or in equity, the Manager Parties have duties (including fiduciary duties) and liabilities relating thereto to the Company, any Manager Party or any other person bound by this Agreement, such Manager Party acting under this Agreement shall not be liable to the Company, the Member or any other person bound by this Agreement for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities (by specifying a duty of care or otherwise) of any Covered Person to the Company or the Member otherwise existing at law or in equity or otherwise, are agreed by the Member to replace such duties and liabilities of such Covered Person.

**13.4    Indemnification.**

(a)    The Company agrees to indemnify, out of the assets of the Company only (including the proceeds of liability insurance and any amounts that the Member may be required to contribute pursuant to the terms of this Agreement), the Manager Parties and the tax matters partner (the "*Indemnified Parties*") to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, controversy, dispute, judgment or demand against the Indemnified Parties that arise out of or in any way relate to the Company, its properties, business, or affairs and (ii) such claims, actions, controversies, disputes, judgments and demands and any losses, damages or liabilities resulting from such claims, actions, controversies, disputes, judgments and demands, including amounts paid in settlement or compromise of any such claim, action or demand (collectively, "*Losses*"); *provided*, that such Indemnified Party acted in good faith and in the reasonable belief that such Indemnified Party's action or inaction was in, or not opposed to, the best interest of the Company; and *provided further,* that this indemnity shall not extend to any conduct which constitutes gross negligence, intentionally wrongful conduct or recklessness or an Uncured Material Breach.

15

**(b)** At the election of the Manager, expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph 13.4 may be paid by the Company in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party undertakes to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified and provided the undertaking shall be in form and substance reasonably acceptable to the Manager.

**(c)** The Manager may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Indemnified Party or potential Indemnified Party against any liability incurred in any capacity which results in such person being an Indemnified Party (provided that such person is serving in such capacity at the request of the Company or the Manager), whether or not the Company has the power to indemnify such person against such liability. The Manager may purchase and maintain insurance on behalf of and at the expense of the Company for the protection of any officer, director, manager, employee or other agent of any other organization in which the Company directly or indirectly owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify any person against such liabilities.

**(d)** The provisions of this paragraph 13.4 shall remain in effect as to each Indemnified Party whether or not such Indemnified Party continues to serve in the capacity that entitled such person to be indemnified. The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnified Party.

**(e)** The rights to indemnification and advancement of expenses conferred in this paragraph 13.4 shall not be exclusive and shall be in addition to any rights to which any Indemnified Party may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.

**(f)** The Manager may make, execute, record and file on its own behalf and on behalf of the Company all instruments and other documents (including one or more separate indemnification agreements between the Company and individual Indemnified Parties or Covered Persons) that the Manager deems necessary or appropriate in order to extend the benefit of the provisions of this paragraph 13.4 to the Indemnified Parties and Covered Persons; *provided* that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in this paragraph 13.4 except as otherwise may be required by applicable law.

**(g)** Notwithstanding anything contained herein to the contrary, if the unfunded Capital Commitments of the Company are insufficient to cover all fees, costs and expenses relating to litigation and threatened litigation involving the Company, including the Company's indemnification obligations pursuant to this paragraph 13.4, or expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, including claims by or against a governmental authority, the Manager (or liquidator) may, in its sole discretion, sell some or all of the Securities held by the Company to pay for such bona fide, documented obligations, fees, costs and expenses.

16

725167 v1/SD

Exhibit 1
Page 42

**(h)**     Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to this paragraph 13.4, the parties hereto intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Company, (ii) the Company, and (iii) the Manager and/or its affiliates, paragraph 13.4 shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Company shall have primary liability; second, the Company shall have secondary liability; and third, the Manager and/or its affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Company.  The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Company shall not restrict the Company from making indemnification payments to an Indemnified Party that is otherwise eligible for such indemnification payments, but such indemnification payments by the Company are not intended to relieve any investment counterparty of the Company from any liability that it would otherwise have to make indemnification payments to such Indemnified Party.  If an Indemnified Party that has received indemnification payments from the Company actually receives indemnification payments from an investment counterparty of the Company or under any insurance policy for the same loss, such Indemnified Party shall repay the Company as soon as practicable to the extent of such duplicative indemnification payments.    Indemnification payments (if any) made to an Indemnified Party by the Manager and/or its affiliates in respect of a loss for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Company shall not relieve the Company from its obligation to such Indemnified Party and/or the Manager (or any affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the Manager and/or its affiliates would be reimbursed by such Indemnified Party or directly by the Company with indemnification payments made by the Company under paragraph 13.4).  To the extent that the Company is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the Manager and/or its affiliates (other than the Company), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Company.  As used in this paragraph 13.4(h), "indemnification payments" made or to be made by an investment counterparty of the Company shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Company, and (z) payments made or to be made by or on behalf of such investment counterparty of the Company (or such successor) pursuant to an insurance policy or similar arrangement.

**13.5**     **Execution and Filing of Documents.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or by electronic mail in portable document format (PDF) will be effective as delivery of a manually executed signature page of this Agreement.

**13.6**     **Other Instruments and Acts.**  Each Member agrees to execute any other instruments or perform any other acts that are or may be necessary to effectuate and carry on the limited liability company created by this Agreement.

725167 v1/SD

17

Exhibit 1
Page 43

**13.7    Binding Agreement.**  This Agreement shall be binding upon the Members, the Manager and any of their transferees, successors, assigns, and legal representatives.

**13.8    Notices.**  Any notice or other communication that one party desires to give to another party shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be addressed to the other party at the address shown in the books and records of the Company or at such other address as a party may designate by five (5) days' advance written notice to the other party.

**13.9    Power of Attorney.**  By signing this Agreement, each Member designates and appoints the Manager its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Company's Certificate of Formation and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state or jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such states or jurisdictions.

**13.10   Arbitration.**

**(a)**    Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("*Claim*"), shall be resolved by final and binding arbitration ("*Arbitration*") before a single arbitrator ("*Arbitrator*") selected from and administered by Judicial Arbitration and Mediation Service Inc. (the "*Administrator*") in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes.  The arbitration shall be held in San Juan Capistrano, California or vicinity.

**(b)**    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

**(c)**    The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or

18

725167 v1/SD

Exhibit 1
Page 44

she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(d)     Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* that the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)     By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 13.10, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

(f)     This paragraph 13.10 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including, to the extent applicable, the Uniform Arbitration Act (10 Del. C. § 5701 et seq.) (the "*Delaware Arbitration Act*"). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this paragraph 13.10 shall be invalid or unenforceable under the Delaware Arbitration Act, to the extent applicable, or other applicable law, such invalidity shall not invalidate all of this paragraph 13.10. In that case, this paragraph 13.10 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this paragraph 13.10 shall be construed to omit such invalid or unenforceable provision.

13.11   **Confidentiality of Company Information.**

This Agreement and all financial statements, tax reports, valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the entities in which the Company has invested (collectively, the "*Confidential Information*"), that each Member may receive pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Manager, and the Company's portfolio investments (the "*Affected Parties*"). Each Member acknowledges that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. Each Member further acknowledges that the Affected Parties believe that the Confidential Information is a trade secret, the disclosure of which may cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses. Each

19

725167 v1/SD

Exhibit 1
Page 45

Member shall not reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than a disclosure on a need-to-know basis to the Member's direct and indirect equity owners that are subject to a written confidentiality agreement, policy or obligation and each Member's and Member's direct and indirect equity owners' legal, accounting or investment advisers, auditors and representatives (collectively, "*Advisers*") without the prior consent of the Manager, except to the extent required to do so in accordance with applicable law (in which case the Member shall promptly notify the Manager of its obligation to disclose any Confidential Information) or with respect to Confidential Information which otherwise becomes publicly available other than through breach of this provision by the Member. Notwithstanding the foregoing, each Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing shall have the right to disclose Confidential Information to any regulator or governmental supervisory authority having jurisdiction over the Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing, and the Member shall provide notice to the Manager of any such disclosure unless it is legally prohibited from doing so or if it relates to taxes.

**13.12 Amendment.** This Agreement may be amended only upon the consent of the Manager and a Majority in Interest of the Members.

**13.13 Entire Agreement.** This Agreement constitutes the full, complete, and final agreement of the Members and the Manager and supersedes all prior agreements between the Members and the Manager, if any, with respect to the Company.

**13.14 Liability for Third Party Reports.** In no event shall the Company or the Manager Parties have any liability to the Members with respect to any information disseminated to the Member, where such information originated from any third party, including without limitation, any entity in which the Company has made an investment.

**13.15 Anti-Money Laundering.** Notwithstanding any other provision of this Agreement, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any person, including the Members, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated in any subscription agreement related to the Company.

**13.16 Discretion.** Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the Manager is permitted or required to make a decision (a) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests and those of the Company, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any other interest of or factors affecting the Members or any other person, or (b) in its "good faith" or under another expressed standard, the Manager shall act under such express standard and shall not be subject to any other or different standards.

**13.17 Company Legal Matters.** Each Member hereby agrees and acknowledges that:

20

725167 v1/SD

Exhibit 1
Page 46

**(a)** Cooley LLP ("*Cooley*") has been retained as legal counsel by the Manager in connection with the formation of the Company and the offering of Company interests and in such capacity has provided legal services to the Manager and the Company. The Manager expects to retain Cooley to provide legal services to the Manager and the Company in connection with the management and operation of the Company.

**(b)** Cooley is not and will not represent any Member in connection with the formation of the Company, the offering of Company interests, the management and operation of the Company, or any dispute that may arise between a Member on the one hand and the Manager and the Company on the other (the "*Company Legal Matters*").

**(c)** Each Member will, if it wishes counsel on a Company Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

**(d)** Each Member hereby agrees that Cooley may represent the Manager and the Company in connection with any and all Company Legal Matters (including any dispute between the Manager or the Company and any Member) and waives any present conflict of interest with Cooley regarding Company Legal Matters arising by virtue of any representation or deemed representation of the Members or the Company on account of Cooley's representation described in paragraph 13.17(a) above; *provided, however,* that the Member is not hereby agreeing to Cooley's representation of (i) the Company in a derivative action on their behalf against the Manager, or (ii) the Manager or any other person in any action against the Company.

**13.18  Tax Classification**. For United States federal and state income tax purposes only, it is intended that the Company's existence as an entity separate from its sole member be disregarded pursuant to Code Section 7701 and the Treasury regulations thereunder and under applicable state law for so long as the Company has only one Member. The Manager will cause the Company to file such elections and information returns and perform such other actions as may be required under such regulations. If one or more Additional Members is admitted to the Company, the Company shall be treated as a partnership for federal and state income tax purposes.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

21

725167 v1/SD

Exhibit 1
Page 47

**IN WITNESS WHEREOF,** the parties hereto have executed this Operating Agreement on the date first above written.

**MANAGER:**                                    **MEMBERS:**


**FROST MANAGEMENT COMPANY, LLC**

By: _____                   Stuart Frost
    Stuart Frost
Its: Manager


THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

**SIGNATURE PAGE TO THE FROST VP SEED, LLC**

**OPERATING AGREEMENT**

Exhibit 1
Page 48

## EXHIBIT A

## FROST VP SEED, LLC

## SCHEDULE OF MEMBERS

| NAME AND ADDRESS: | CAPITAL COMMITMENT |
|---|---|
| **MANAGER AND MEMBER:** | |
| **FROST MANAGEMENT COMPANY, LLC**<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $0 |
| **MEMBER:** | |
| Stuart Frost<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $___ |

725167 v1/SD

Exhibit 1<br>Page 49

# EXHIBIT B

Exhibit 1
Page 50

# FROST VP EARLY STAGE FUND II, L.P.

## LIMITED PARTNERSHIP AGREEMENT

This **LIMITED PARTNERSHIP AGREEMENT** (the "*Agreement*") is made and entered into as of the 29th day of May, 2013, by and among **FROST VENTURE PARTNERS GP, LLC**, a Delaware limited liability company (the "*General Partner*"), and each of the entities who subscribe hereto as limited partners (the "*Limited Partners*"), who hereby form **FROST VP EARLY STAGE FUND II, L.P.**, a Delaware limited partnership (the "*Partnership*"), pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "*Act*"), as follows:

## ARTICLE 1

### NAME, PURPOSE AND OFFICES OF PARTNERSHIP

**1.1    Name.**  The name of the Partnership is Frost VP Early Stage Fund II, L.P.  The affairs of the Partnership shall be conducted under the Partnership name, or such other name as the General Partner may, in its discretion, determine.

**1.2    Purpose.**  The primary purpose of the Partnership is to provide a limited number of select investors with the opportunity to realize long-term appreciation, generally from venture capital investments in early-stage and emerging private companies, with an emphasis on Big Data and Cloud Computing technology companies that are founded and incubated by, and receive support and services as part of, that certain program operated by Frost Venture Partners, LLC (the "*Incubator*").  The general purposes of the Partnership are to buy, sell, hold and otherwise invest in Securities of every kind and nature and rights and options with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Partnership; to enter into, make, and perform all contracts and other undertakings; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.

**1.3    Principal Office.**  The principal office of the Partnership shall be 31910 Del Obispo, Suite 100, San Juan Capistrano, CA 92675, or such other place or places in the United States as the General Partner may from time to time designate.  The General Partner shall provide the Limited Partners with prompt written notice of any change in the location of the Partnership's principal office.

**1.4    Registered Agent and Office.**  The name of the registered agent for service of process of the Partnership and the address of the Partnership's registered office in the State of Delaware shall be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other agent or office in the State of Delaware as the General Partner may from time to time designate.

806590 v11/SD

Exhibit 1
Page 51

# ARTICLE 2

## TERM OF PARTNERSHIP

**2.1     Term.**  The term of the Partnership shall commence upon the date of the filing of the Certificate of Limited Partnership of the Partnership with the office of the Secretary of State of the State of Delaware (the "***Commencement Date***") and shall continue until the fifth anniversary of the Activation Date (the "***Termination Date***"), unless extended pursuant to paragraph 10.1 or sooner dissolved as provided in paragraph 10.2.

**2.2     Events Affecting a Member of the General Partner.**  The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, expulsion or removal of any member of the General Partner shall not dissolve the Partnership.

**2.3     Events Affecting a Limited Partner of the Partnership.**  The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of a Limited Partner shall not dissolve the Partnership.

**2.4     Events Affecting the General Partner.**  Except as specifically provided in paragraph 10.2, the bankruptcy, expulsion, resignation, removal or withdrawal, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of the General Partner shall not constitute an "event of withdrawal" under the Act, and upon the happening of any such event, the affairs of the Partnership shall be continued by the General Partner or any successor entity thereto.

# ARTICLE 3

## NAME AND ADMISSION OF PARTNERS

**3.1     Name and Address.**  The name and address of the General Partner and each Limited Partner (hereinafter the General Partner and the Limited Partners shall be referred to collectively as the "***Partners***" and each individually as a "***Partner***"), the amount of such Partner's Capital Commitment to the Partnership, and such Partner's Partnership Percentage are set forth on a Schedule of Partners (the "***Schedule of Partners***").  The General Partner shall cause the Schedule of Partners to be amended from time to time to reflect the admission of any new Partner, the withdrawal or substitution of any Partner, the transfer of interests among Partners, receipt by the Partnership of notice of any change of address of a Partner or the change in any Partner's Capital Commitment or Partnership Percentage.  An amended Schedule of Partners shall supersede any prior Schedule of Partners and become a part of this Agreement.  A copy of the most recent amended Schedule of Partners shall be kept on file at the principal office of the Partnership.

2.

**3.2    Admission of Additional Partners.**

(a)    Except as provided in paragraphs 3.2(b), 4.6(b)(vii)(4) and 9.6, an additional person may be admitted as a Partner only with the consent of the General Partner and a Majority in Interest of the Limited Partners.

(b)    Notwithstanding subparagraph (a) above, additional persons may be admitted as Limited Partners (or existing Limited Partners may increase their Capital Commitments) with the consent of only the General Partner on or before the date twelve (12) months following the Commencement Date.

(c)    Each additional person admitted as a Partner (or an existing Limited Partner that increases its Capital Commitment) subsequent to the Commencement Date shall (i) execute and deliver to the Partnership a counterpart of this Agreement or otherwise take such actions as the General Partner shall deem appropriate in order for such additional Partner to become bound by the terms of this Agreement and (ii) contribute that portion of its Capital Commitment which is equal to the portion of their respective Capital Commitments called to date by the General Partner pursuant to paragraph 4.2(a).  Limited Partners admitted to the Partnership after the Commencement Date will not be entitled to share in any Idle Funds Income accruing prior to or contemporaneously with their admission date.

(d)    Upon the admission of any additional Limited Partner pursuant to this paragraph 3.2, the General Partner may, in its sole discretion, make a special distribution of all or a portion of the initial contribution of capital made by such additional Limited Partner.  Such distribution shall be made to all Partners in accordance with Partnership Percentages (as adjusted to reflect the admission of such additional Limited Partner) and shall be deemed to be a return of capital to such Partners; *provided, however,* that such Partners shall be deemed, for the purposes of paragraph 4.2, not to have contributed the amount of such distribution and the amounts of their respective unfunded Capital Commitments shall be increased accordingly.

## ARTICLE 4

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND NONCONTRIBUTING PARTNERS

**4.1    Capital Accounts.**  An individual Capital Account shall be maintained for each Partner.

**4.2    Capital Contributions of the Limited Partners.**

(a)    Each Limited Partner shall contribute capital to the Partnership from time to time as requested by the General Partner upon ten (10) calendar days' written notice; *provided* that the General Partner expects to request initial capital contributions of the Limited Partners in an amount equal to approximately ten million dollars ($10,000,000) in the aggregate on or about the Commencement Date upon three (3) calendar days' written notice.  The date of the first capital contribution made to the Partnership by any Limited Partner in accordance with this paragraph 4.2(a) shall be referred to herein as the "*Activation Date*."  Each capital contribution shall be in accordance with Partnership Percentages; provided, however, a Limited Partner may

3.

806590 v11/SD

Exhibit 1
Page 53

contribute such larger percentage of the Partnership's initial capital call, up to the amount of the Limited Partner's Capital Commitment, as may be agreed to by the General Partner. Notwithstanding anything in the foregoing to the contrary, no Limited Partner shall be required to contribute any capital following the fourth anniversary of the Activation Date (the "***Commitment Period***"), except as may be necessary for (1) Partnership expenses, including, but not limited to, payment of any management fee due to the General Partner; (2) completion of transactions with respect to which the Partnership has entered into a binding commitment; (3) follow-on investments in the Securities of issuers in which the Partnership holds a pre-existing interest as of the date of such proposed follow-on investment and (4) fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d).  Further, each Limited Partner's obligation to contribute capital shall also be subject to those limitations set forth in paragraph 4.6.  Each capital contribution by any Limited Partner shall be made in cash.

**(b)**    Notwithstanding paragraph 4.2(a), with respect to the Partnership's initial request for capital contributions under paragraph 4.2, no ERISA Partner shall be required to contribute capital pursuant to this Agreement until such time as the General Partner shall have delivered notice (the "***VCOC Notice***"), to such ERISA Partner to the effect that the Partnership's first Portfolio Company investment has qualified or will qualify upon its closing as a "venture capital investment" within the meaning of the U.S. Department of Labor regulations ("***DOL Regulations***") such that the Partnership will qualify as a "venture capital operating company" (a "***VCOC***") under applicable DOL Regulations, or that less than twenty-five percent (25%) of the Partnership's Committed Capital is from Limited Partners who are "benefit plan investors" for purposes of the DOL Regulations.  In the event that an ERISA Partner has not received the VCOC Notice prior to the date on which any capital contribution would otherwise be due under paragraph 4.2(a), the General Partner, at its discretion, may either (i) defer the contribution obligation of such ERISA Partner until the VCOC Notice has been delivered (which shall, in any case, be within fifteen (15) calendar days of the corresponding contributions from non-ERISA Partners) or (ii) cause such ERISA Partner to pay such capital contribution into an interest-bearing escrow account designated by the General Partner.  The terms of any such escrow account shall be reasonably satisfactory to such ERISA Partner and in compliance with ERISA (including Dept. of Labor Adv. Op. 95-04A).  Upon delivery of the VCOC Notice, all amounts in the escrow account shall be delivered to the Partnership in fulfillment of the ERISA Partner's obligation under paragraph 4.2(a).

**(c)**    At any time within ninety (90) days of its initial contribution, the General Partner may, in its sole discretion, return to the Partners all or a portion of any capital contribution intended for a proposed investment which is not consummated as anticipated pro rata in accordance with their respective capital contributions; *provided that* such returned capital shall be added back to unfunded Capital Commitments and be subject to recall by the General Partner pursuant to this Article 4.

**(d)**    **(i)**  If, in the discretion of the General Partner, Partnership assets are insufficient to fulfill any indemnification obligation of the Partnership pursuant to paragraph 15.4, prior to the termination of the Partnership the General Partner may require each Partner to contribute capital to the Partnership in an amount up to such Partner's unfunded Capital Commitment, if any.

4.

806590 v11/SD

Exhibit 1
Page 54

**(ii)** If, in the discretion of the General Partner, Partnership assets remain insufficient to fulfill (i) any indemnification obligation of the Partnership pursuant to paragraph 15.4 following the contribution to the Partnership of the maximum amount permitted by paragraph 4.2(d)(i) and/or (ii) any obligation of the Partnership to pay amounts in respect of claims associated with prior Portfolio Company dispositions (including, without limitation, amounts associated with the terms of any transaction documents relating to the acquisition of any Portfolio Company Securities), the General Partner may recall distributions previously made to the Partners solely for the purpose of fulfilling or satisfying such an obligations or liabilities. The obligation to recontribute distributions under this paragraph 4.2(d)(ii) shall be applied pro rata in proportion to aggregate distributions from the Partnership (in each case, with any in kind distributions valued as of the date of distribution). In no event shall any Limited Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the Limited Partner from the Partnership or (2) twenty-five percent (25%) of such Limited Partner's Capital Commitment. In no event shall the General Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the General Partner from the Partnership or (2) one hundred percent (100%) of amounts distributed to the General Partner with respect to its Carry Percentage in Partnership Profit or Loss. In no event will the General Partner be permitted to call capital pursuant to this paragraph 4.2(d)(ii) after the date one (1) year from the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1).

**4.3** **Capital Contributions of the General Partner.** The General Partner shall contribute capital to the Partnership in an aggregate amount equal to $6,100,000 on the same terms under which any Limited Partner is required to contribute capital pursuant to paragraph 4.2(a). Each capital contribution made by the General Partner shall be made in cash; *provided*, that the General Partner may reduce its contribution obligation on a dollar-for-dollar basis by electing to reduce the amount of management fee that it would otherwise receive pursuant to paragraph 6.1 (each such reduction, a "***Fee Adjustment***"); provided that the aggregate amount of all Fee Adjustments over the term of the Partnership shall not exceed eighty percent (80%) of the General Partner's Capital Commitment. In the event that the General Partner elects to make a Fee Adjustment, the General Partner shall provide, prior to the first day of the fiscal year in which such reductions shall occur (for the Partnership's first fiscal year, such notice shall be provided prior to the Partnership's initial request for capital contributions under paragraph 4.2(a)), written notice (a "***Fee Adjustment Notice***") to the Partnership of the amount of such reduction (each such amount, a "***Fee Adjustment Amount***"), which amount may be expressed for a specified period as a percentage of the amount the General Partner would otherwise be obligated to contribute in cash or as a specific dollar amount. Once made, any such election shall be irrevocable for the year to which it applies. If the General Partner delivers a Fee Adjustment Notice, such election shall apply to each succeeding year unless revoked or modified prior to the year to which the revocation or modification applies. For the avoidance of doubt, the General Partner's capital contributions deemed to have been made to the Partnership pursuant to this paragraph 4.3 shall increase its capital contribution and reduce its unpaid Capital Commitment, but shall not increase the General Partner's Capital Account.

**4.4** **Acquisition of an Additional Interest by the General Partner.** In the event that the General Partner acquires a Limited Partner's interest pursuant to the terms of this

Agreement, the General Partner shall have two Partnership Percentages and two Capital Account balances for purposes of making Partnership allocations, as if such subsequently acquired interest were held by a separate entity which is a Limited Partner, although for all other purposes the General Partner shall have only one Capital Account.

### 4.5    Noncontributing Partners.

(a)    The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions to capital set forth in paragraph 4.2, and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made. If any legal proceedings relating to the failure of a Limited Partner to make such a contribution are commenced, such Limited Partner shall pay all costs and expenses incurred by the Partnership, including attorneys' fees, in connection with such proceedings.

(b)    Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.5(a), should any Limited Partner fail to make any of the capital contributions required of it under this Agreement and such failure shall have continued uncured for ten (10) or more days after delivery of written notice by the General Partner to such Limited Partner, such Limited Partner shall be in default (a "*Defaulting Limited Partner*").   In the event of such default, the General Partner may, in carrying out what it determines to be in the best interests of the nondefaulting Limited Partners, elect to enforce one or more of the provisions of this paragraph 4.5(b) in connection with such a default, to which each Limited Partner hereby expressly consents.   The General Partner shall deliver written notice to such Defaulting Limited Partner in the event that it determines to utilize one or more of the powers set forth in paragraph 4.5(a) or this paragraph 4.5(b) (a "*Default Notice*").   Upon delivery of the Default Notice, the Defaulting Limited Partner may not make any additional contributions of capital against such Defaulting Limited Partner's Capital Commitment (other than to fund management fees and other expenses of the Partnership) without the written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner.

(i)    The General Partner may waive, in whole or in part, the requirement of payment with respect to any due and unpaid capital contributions by a Defaulting Limited Partner pursuant to this Agreement and reduce such Defaulting Limited Partner's Capital Commitment accordingly.   The General Partner shall disclose any waiver made pursuant to this paragraph 4.5(b)(i) to the Advisory Committee; *provided, however*, the General Partner may not waive the capital contribution requirements of any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

(ii)    The General Partner may extend the time of payment for a Defaulting Limited Partner of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement.   The General Partner shall disclose any extension made pursuant to this paragraph 4.5(b)(ii) to the Advisory Committee; *provided, however*, the General Partner may not extend the time of payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

6.

806590 v11/SD

Exhibit 1
Page 56

**(iii)**    The General Partner may declare the entire amount of a Defaulting Limited Partner's then unfunded Capital Commitment to be immediately due and payable.

**(iv)**    On behalf of the Partnership, the General Partner may enforce, by appropriate legal proceedings, the Defaulting Limited Partner's obligation to make payment on the amount of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement or to pay the entire amount of such Defaulting Limited Partner's then unfunded Capital Commitment.

**(v)**    The General Partner shall deny the Defaulting Limited Partner the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the Capital Commitment of such Defaulting Limited Partner shall not be included for purposes of calculating a Majority in Interest or other Percentage in Interest of the Limited Partners for purposes of this Agreement.

**(vi)**    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vi), such Defaulting Limited Partner shall pay all expenses to be incurred or anticipated to be incurred by the Partnership in connection with the default and the interest on the amount of the contribution to the Partnership then due at the Prime Rate plus one hundred (100) basis points per annum (or if less, the highest rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to this Agreement until the date the contribution is made by such Defaulting Limited Partner, unless such payment is waived by the General Partner; *provided, however*, the General Partner may not waive such payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.  The accrued interest shall be paid by the Defaulting Limited Partner to the Partnership upon payment of such contribution.  The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income to the Partnership; *provided that* such income shall not be allocated to the Capital Account of the Defaulting Limited Partner.  Until such time as the unpaid contribution and accrued interest thereon shall have been paid by the Defaulting Limited Partner, the General Partner may elect to withhold any or all distributions to be made to such Defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by set off against any such distribution withheld.

**(vii)**    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vii), the General Partner and the nondefaulting Limited Partners (the "***Optionees***"), shall have the right and the option, but not the obligation, to acquire the Partnership interest of the Defaulting Limited Partner (the "***Optionor***"), as follows:

**(1)**    The General Partner shall notify the Optionees of the default within twenty (20) days of the expiration of the ten (10) day notice period commencing upon delivery of the Default Notice.  Such notice shall advise each Optionee of the portion and the price of the Optionor's interest available to it.  Each Optionee shall be offered a *pro rata* portion (in accordance with capital contributions to the Partnership) of the available Optionor's interest.  The aggregate price for the Optionor's interest shall be the lesser of fifty percent (50%) of (A) the amount of the Optionor's Capital Account calculated as of the due date of the

7.

additional contribution and adjusted to reflect the allocation of the appropriate proportion of the Partnership's unrealized gains and losses as of the due date of such defaulted contribution, and (B) the aggregate amount of the Optionor's capital contributions actually made less any distributions (valued at their fair market value on the date of distribution in accordance with paragraph 12.1) on or prior to such due date. The price for each Optionee shall be prorated according to the portion of the Optionor's interest purchased by each such Optionee.  The option granted hereunder shall be exercisable at any time after the date thirty (30) days following the date of the initial notice of default from the General Partner to the Optionor by delivery to the Optionor of a notice of exercise of option together with a nonrecourse promissory note for the purchase price and a security agreement in accordance with subparagraph (5) below, which notice and documents the General Partner shall promptly forward to the Optionor.

(2)     Should any Optionee not exercise its option within said thirty (30) day period provided in subparagraph (1), the General Partner shall immediately notify the other Optionees who have elected to exercise their option, which Optionees shall have the right and option ratably among them to acquire the portion of the Optionor's interest not so acquired (the "***Remaining Portion***") within thirty (30) days of the date of the notice specified in this subparagraph (2) on the same terms as provided in subparagraph (1).

(3)     Any amount of the Remaining Portion not acquired by the Optionees pursuant to subparagraph (2) may be acquired by the General Partner within thirty (30) days of the expiration of the thirty (30) day period specified in subparagraph (2) on the same terms as set forth in subparagraph (1).

(4)     Any amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subparagraphs (2) or (3) may, if the General Partner deems it in the best interest of the Partnership, be sold by the General Partner to any other investor, on terms not more favorable to such parties than those applicable to the Optionees' option, and upon the consent of the General Partner, any such third party purchaser may become a Limited Partner to the extent of the interest purchased hereunder.

(5)     The price due from each of the General Partner and the Optionees (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be payable by a noninterest bearing, nonrecourse promissory note (in such form as the General Partner shall designate) due upon final liquidation of the Partnership. Each such note shall be secured by the portion of the Optionor's Partnership interest so purchased by its maker pursuant to a security agreement in a form designated by the General Partner and shall be enforceable by the Optionor only against such security.

(6)     Upon exercise of any option hereunder, each Optionee (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be obligated (A) to contribute to the Partnership that portion of the additional capital then due from the Optionor equal to the percentage of the Optionor's interest purchased by such person and (B) to pay the same percentage of any further contributions otherwise due from such Optionor on the date such contributions are otherwise due.  Each person who purchases a portion of the Optionor's Partnership interest shall be deemed to have acquired such portion as of the due date of the additional capital contribution with respect to which the Optionor defaulted, and any

8.

distributions made after the due date on account of the Optionor's interest shall be distributed among such purchasers (and, unless the entire interest was purchased, the Optionor) in accordance with their ultimate respective interests in the Optionor's interest.  Distributions otherwise allocable to the Optionor under the preceding sentence shall first be used to offset any defaulted contribution of the Optionor still due to the Partnership.  Upon completion of any transaction hereunder, the General Partner shall cause the Schedule of Partners to be amended to reflect all necessary changes resulting therefrom including, without limitation, admission of a purchaser as a Limited Partner, and adjustment of Capital Account balances, Capital Commitment amounts and Partnership Percentages as of the date of Optionor's default to reflect the acquisition from Optionor of the appropriate pro rata portion of each such item.  The purchase and transfer of the Partnership interest of the Optionor shall occur automatically upon exercise by any Optionee or the General Partner of its option hereunder, without any action by Optionor.

(7)    Notwithstanding the sale of any portion of an Optionor's interest pursuant to this paragraph 4.5(b)(vii), such Optionor shall not be released from its unfunded Capital Commitment except as actually funded by the acquirer of any such portion of Optionor's interest.

(8)    In the event that any amount of the Remaining Portion is not acquired by the Optionees, the General Partner and any third party purchasers pursuant to paragraphs 4.5(b)(vii)(1)-(4), then, in its sole discretion, the General Partner may apply any of the remedies described in paragraphs 4.5(a) and (b) to such unsold portion.

(viii)    The General Partner may, in its sole discretion, elect to remove such Defaulting Limited Partner from the Partnership, in which such event (1) one hundred percent (100%) of the Defaulting Limited Partner's Capital Account balance shall be forfeited and reallocated to the Capital Accounts of the nondefaulting Partners proportionally, based on, with respect to each such Partner, the ratio that its Partnership Percentage immediately prior to such calculation bears to the aggregate Partnership Percentages of all Partners (other than the Defaulting Limited Partner) and (2) the Defaulting Limited Partner's Partnership Percentage shall be reduced to zero.

(ix)    Notwithstanding anything to the contrary in this Agreement, each Limited Partner (1) agrees that it will execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 4.5, and (2) designates and appoints the General Partner its true and lawful attorney, in its name, place and stead to make, execute and sign any and all instruments, documents or certificates on behalf of any Defaulting Limited partner in order to give effect to any remedy against such Defaulting Limited Partner (including, but not limited to, the remedies set forth in this paragraph 4.5(b)).

(x)    The Partners agree that the General Partner's authority and discretion to enforce any remedy against a Defaulting Limited Partner (including but not limited to the remedies set forth in this paragraph 4.5(b)) supersede any fiduciary duties of the General Partner to such Defaulting Limited Partner.  The Partners further agree that the remedies set forth in this paragraph 4.5(b) are fair and reasonable in light of the difficulty in ascertaining the actual

9.

806590 v11/SD

Exhibit 1
Page 59

damages that would be incurred by the Partnership and the nondefaulting Partners as a result of the Defaulting Limited Partner's failure to contribute capital when due pursuant to the terms of this Agreement.

(xi)     Notwithstanding anything to the contrary in this paragraph 4.5, a Limited Partner shall not be declared to be in default by the General Partner with respect to any due and unpaid capital contributions in the event that such Limited Partner is entitled to withdraw from the Partnership (or the General Partner has requested such withdrawal) pursuant to Article 13 and the failure to make such due and unpaid capital contributions is the consequence of or attributable to such withdrawal.

4.6     **Suspension Period.**

(a)     Notwithstanding any other provision of this Agreement to the contrary, no Limited Partner shall be required to contribute capital to the Partnership in respect of its Capital Commitment during any suspension of the Commitment Period pursuant to paragraph 4.6(b) except for:

(i)     Partnership expenses, including payment of any management fee due to the General Partner;

(ii)     follow-on investments in portfolio companies in which the Partnership had invested prior to commencement of the Suspension Period;

(iii)     completion of transactions with respect to which the Partnership has entered into a binding commitment prior to commencement of the Suspension Period; and

(iv)     fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d).

(b)     In the event that Stuart Frost (i) fails to meet the devotion of time requirements in paragraph 8.3(a) or (ii) is no longer a manager of the General Partner (each, a "*Suspension Event*"), the General Partner shall promptly deliver written notice to each Limited Partner of such Suspension Event (a "*Suspension Event Notice*").  At any time within the period commencing with the effective date of the Suspension Event Notice and ending on the date sixty (60) days thereafter, the Limited Partners shall have the right to commence a "*Suspension Period*" upon the affirmative vote of a Majority in Interest of the Limited Partners.

(c)     Any Suspension Period may be terminated at any time upon the affirmative vote of a Majority in Interest of the Limited Partners; *provided, however*, that unless within one hundred eighty (180) days after the commencement of a Suspension Period, a Majority in Interest of the Limited Partners has elected to terminate such Suspension Period and re-commence normal Partnership operations, the remaining managers of the General Partner shall be permitted to form a new private equity fund or similar entity with objectives substantially similar to the Partnership.

10.

# ARTICLE 5

## PARTNERSHIP ALLOCATIONS

**5.1    Allocation of Profit or Loss.**   Except as otherwise provided in this Article 5, Profit and Loss of the Partnership for each Accounting Period shall be allocated as follows:

**(a)**    Profit shall be allocated:

**(i)**    First, allocated as a Priority Allocation, one hundred percent (100%) to the General Partner until the cumulative Profit allocated to the General Partner pursuant to this paragraph 5.1(a)(i) in such Accounting Period and all prior Accounting Periods is equal to the aggregate Fee Adjustment Amounts (as defined in paragraph 4.3) for fiscal quarters beginning during or prior to such Accounting Period; *provided, however*, that for each separate Fee Adjustment amount the General Partner shall only receive an allocation pursuant to this paragraph 5.1(a)(i) in respect of the Fee Adjustment Amounts for a fiscal quarter to the extent that the Profit for the Accounting Period is (A) realized after the beginning of the fiscal quarter to which the corresponding Fee Adjustment Amount applies and (B) not attributable to unrealized appreciation inherent in the Partnership's assets as of the date of such election for the related fiscal quarter; and *provided further,* that such Priority Allocation shall only be allocated from Profit consisting of qualified dividend income and gains on Securities, including, without limitation, gains from the sale of Securities, any Deemed Gain allocable to the Partners in connection with a distribution or other disposition of Securities, and any Deemed Gain allocable in connection with a revaluation of Securities for any reason;

**(ii)**    Second, to the Limited Partners, until the cumulative amount of Profit allocated to the Limited Partners pursuant to this paragraph 5.1(a)(ii) for the current Accounting Period and all prior Accounting Periods equals the cumulative amount of management fees allocated to the Limited Partners pursuant to paragraph 5.1(c) for the current Accounting Period and all prior Accounting Periods;

**(iii)**    Third, among the Partners to reverse the cumulative amount of Losses allocated to the Partners pursuant to paragraph 5.1(b)(ii) for the current Accounting Period and all prior Accounting Periods; and

**(iv)**    Thereafter, any remaining Profit shall initially be allocated among the Partners in proportion to their respective Partnership Percentages.  The share of each Partner in such initial allocation shall be divided between such Partner and the General Partner and allocated as follows:

**(1)**    The Carry Percentage (as defined below) to the General Partner; and

**(2)**    The difference between one hundred percent (100%) and the Carry Percentage to such Partner.

For the purposes of this Agreement, the "***Carry Percentage***" shall mean a percentage equal to (i) in the case of Limited Partners admitted after the Activation Date, twenty percent

11.

(20%) and (ii) in the case of each Limited Partner admitted on or prior to the Activation Date, the Carry Percentage shall be 10% on the capital contributions made by such Limited Partner at the Activation Date and 20% on any capital contributions made after the Activation Date, which Carry Percentage shall be calculated as, ten percent (10%) plus the product of the percentage of the Limited Partner's Capital Commitment not contributed on or prior to the Activation Date times ten (10) percentage points (for example, a Limited Partner who contributed fifty percent (50%) of its Capital Commitment on the Activation Date would have a Carry Percentage of fifteen percent (15%)).

**(b)**    Loss shall be allocated:

**(i)**    First, Losses shall be allocated among the Partners in reverse order of the Profit previously allocated in paragraph 5.l(a)(iv) above and not previously reversed pursuant to this paragraph 5.1(b)(i) for the current Accounting Period and all prior Accounting Periods; and

**(ii)**    Thereafter, any remaining Loss shall be allocated among the Partners in proportion to their respective Partnership Percentages.

**(c)**    Management fees paid pursuant to paragraph 6.1 below shall be allocated to the Limited Partners in proportion to their respective Partnership Percentages.

**(d)**    All Idle Funds Income (net of directly associated expenses) shall be allocated to the Capital Accounts of all of the Partners in proportion to their respective Partnership Percentages.

### 5.2    Special Allocations.

**(a)**    To the extent the Partnership has taxable interest income or expense with respect to any promissory note between any Partner and the Partnership as holder and maker or maker and holder pursuant to Section 483, Sections 1271 through 1288, or Section 7872 of the Code, such interest income or expense shall be specially allocated to the Partner to whom such promissory note relates, and such Partner's Capital Account adjusted if appropriate.

**(b)**    If additional persons are admitted to the Partnership as Limited Partners subsequent to the Commencement Date, then organizational costs, fees (including the management fee set forth in paragraph 6.1), and expenses of the Partnership that are allocated to the Partners on or after the effective date of such admission shall be allocated first to such new Partners to the extent necessary to cause such persons to be treated with respect to such items as if they had been Partners from the Commencement Date.

### 5.3    Regulatory Allocations.

**(a)**    This Agreement is intended to comply with the safe harbor provisions set forth in Treasury Regulation 1.704-1(b) and the allocations set forth in paragraph 5.4(b) (the "***Regulatory Allocations***") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  In the event the Regulatory Allocations result in allocations being made that are inconsistent with the manner in which the Partners intend to divide

12.

806590 v11/SD

Exhibit 1
Page 62

Partnership Profit and Loss as reflected in paragraphs 5.1 and 5.2, the General Partner shall use its best efforts to adjust subsequent allocations of any items of profit, gain, loss, income or expense such that the net amount of the Regulatory Allocations and such subsequent special adjustments to each Partner is zero.

**(b)**    The allocations provided in this Article 5 shall be subject to the following exceptions:

**(i)**    Any loss or expense otherwise allocable to a Limited Partner which exceeds the positive balance in such Limited Partner's Capital Account shall instead be allocated first to all Partners who have positive balances in their Capital Accounts in proportion to their respective Partnership Percentages, and when all Partners' Capital Accounts have been reduced to zero, then to the General Partner; income shall first be allocated to reverse any loss allocated under this paragraph 5.3(b)(i), in reverse order of such loss allocations, until all such prior loss allocations have been reversed.

**(ii)**    In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6), which causes or increases a deficit balance in such Limited Partner's Capital Account, items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible.

**(iii)**    For purposes of this paragraph 5.3(b), the balance in a Partner's Capital Account shall take into account the adjustments provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6).

5.4    **Income Tax Allocations.**

**(a)**    Except as otherwise provided in this paragraph or as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Partner's distributive share of Partnership income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in the Partner's Capital Account pursuant to this Agreement.

**(b)**    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any asset contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Adjusted Asset Value.

**(c)**    In the event the Adjusted Asset Value of any Partnership asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Adjusted Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

13.

# ARTICLE 6

## MANAGEMENT FEE; PARTNERSHIP EXPENSES

**6.1    Management Fee.**

**(a)**    Commencing as of the Activation Date, the General Partner (or its designee) shall be compensated on a quarterly basis for services rendered during the term of the Partnership by the payment in advance by the Partnership in cash to the General Partner (or its designee) on the first day of each fiscal quarter (or portion thereof) of a management fee.

**(b)**    The management fee for each fiscal quarter (prior to the adjustments described in paragraphs 6.1(c) and (d)) shall be an amount equal to the aggregate Capital Commitments of all Limited Partners as of the first day of each such quarter multiplied by 0.5% (the percentage applicable for any period referred to herein as the "***Management Fee Percentage***").    Notwithstanding the foregoing, (i) the management fee for each of the Partnership's first and last fiscal quarters with respect to which any management fee is due shall be proportionately reduced based upon the ratio of the number of days in each such period bears to ninety (90), (ii) an additional management fee shall be payable upon the date of admission of any Limited Partner admitted subsequent to the Commencement Date to reflect the increased Capital Commitments calculated as if such Limited Partner had been admitted to the Partnership as of the Commencement Date and (iii) commencing on the expiration, termination, or suspension of the Commitment Period, and on each anniversary thereafter, the Management Fee Percentage shall be reduced by an amount equal to ten percent (10%) of the base Management Fee Percentage (i.e., by 0.2%); *provided, however*, if the suspension of the Commitment Period is terminated pursuant to paragraph 4.6(c), the base Management Fee Percentage shall be restored to the level applicable prior to suspension of the Commitment Period as of the commencement of the next fiscal quarter.

**(c)**    The management fee otherwise payable by the Partnership to the General Partner (or its designees) pursuant to paragraph 6.1(b) for a fiscal quarter shall be offset by the amount of capital that the General Partner elected not to contribute in cash (as permitted by paragraph 4.3) with respect to the immediately preceding quarter.  In the event that there exists at the time of the liquidation of the Partnership any excess of fees not offset by the reduction of management fees pursuant to the preceding sentence, such excess shall be paid over to the Partnership by the General Partner and allocated among all Limited Partners in accordance with their respective Partnership Percentages (unless a Limited Partner provides written notice to the General Partner that it elects not to receive an allocation of any such excess fees).

**(d)**    Each Limited Partner hereby agrees and acknowledges that the Incubator may receive a monthly fee from the companies in which the Partnership holds an investment (each, a "***Portfolio Company***") in exchange for certain shared advisory and support services provided to the Portfolio Company (a "***Service Fee***").  For the avoidance of doubt, any Service Fee paid by a Portfolio Company to an affiliate of the General Partner will not reduce the management fee payable to the General Partner by the Partnership pursuant to paragraph 6.1(a), so long as such Service Fee does not exceed reasonable market rates.

14.

6.2     **Expenses.**

(a)     From the management fee, the General Partner shall bear all normal operating expenses incurred in connection with the management of the Partnership, the General Partner, except for those expenses borne directly by the Partnership as set forth in subparagraphs (b), (c) and (d) below and elsewhere herein.  Such normal operating expenses to be borne by the General Partner (or its designee) shall include, without limitation, expenditures on account of salaries, wages, travel, entertainment, and other expenses of employees, consultants and agents of the Partnership or the General Partner, overhead and rentals payable for space used by the General Partner (or its designee) or the Partnership, office expenses and in managing investments of the Partnership.

(b)     The Partnership shall bear all costs and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, legal fees, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Partnership, including claims by or against a governmental authority, audit and accounting fees, tax return preparation and related fees, consulting fees relating to investments or proposed investments (including the cost of independent valuations, if any), back-office services in respect of the Partnership or the General Partner (or if the Management Company or Incubator performs such functions internally, an amount reimbursable to the Management Company or Incubator, as applicable, equal to the then-current market cost of a qualified third party service provider as determined by the General Partner in good faith), third party accounting and/or consulting fees, market research subscription or consulting fees, taxes applicable to the Partnership on account of its operations, fees incurred in connection with the maintenance of bank or custodian accounts, fees and expenses incurred in connection with the Management Company's, the General Partner's and/or their Affiliates' compliance with applicable law and regulations associated with the Partnership, and all expenses incurred in connection with the registration of the Partnership's Securities under applicable securities laws or regulations.  The Partnership shall also bear expenses incurred by the General Partner in serving as the tax matters partner (as described in paragraph 11.8), the reasonable cost of liability and other premiums for insurance protecting the Partnership, the General Partner, its managers and members, and the Management Company and its employees from liability to third parties, all out-of-pocket expenses of preparing and distributing reports to Partners, out-of-pocket expenses associated with Partnership communications with Partners, including preparation of annual or other reports to the Limited Partners, out-of-pocket costs associated with Partnership meetings or Advisory Committee matters, all out-of-pocket fees and expenses incurred by the Management Company related to regulatory compliance in connection with the management of the Partnership, all legal and accounting fees relating to the Partnership and its activities, all costs and expenses arising out of the Partnership's indemnification obligation pursuant to this Agreement, and all expenses that are properly chargeable to the activities of the Partnership.

(c)     The Partnership shall bear all organizational and syndication costs, fees, and expenses incurred by or on behalf of the General Partner in connection with the formation

15.

and organization of the Partnership and the General Partner, including legal and accounting fees and expenses incident thereto.

> **(d)** The Partnership shall bear all liquidation costs, fees, and expenses incurred by the General Partner (or its designee) in connection with the liquidation of the Partnership at the end of the Partnership's term, specifically including but not limited to legal and accounting fees and expenses.

> **(e)** Each of the Partnership and the General Partner agree to reimburse the other as appropriate to give effect to the provisions of this paragraph 6.2 in the event that either such party pays an obligation that is properly the responsibility of the other.

> **(f)** To the extent that any expenses borne by the Partnership pursuant to subparagraphs (b) and (c) above also benefit a Parallel Fund, such expenses shall be allocated among the Partnership and the applicable Parallel Funds pro rata in proportion to the aggregate capital commitments of the Partnership together with any such Parallel Funds.

## ARTICLE 7

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE PARTNERS

**7.1    Interest.**  Except as otherwise provided in this Agreement, no interest shall be paid to any Partner on account of its interest in the capital of or on account of its investment in the Partnership.

**7.2    Withdrawals by the Partners.**  No Partner may withdraw any amount from its Capital Account unless such withdrawal is made pursuant to this Article 7, Article 10 or Article 13.

**7.3    Partners' Obligation to Repay or Restore.**  Except as required by law or paragraphs 4.2(c) and 4.2(d) of this Agreement, no Limited Partner shall be obligated at any time to repay or restore to the Partnership all or any part of any distribution made to it from the Partnership in accordance with the terms of this Article 7.

**7.4    Mandatory Distributions.**  Each Partner shall be paid in cash within ninety (90) days after the end of each fiscal year during the term of the Partnership an amount equal to the excess, if any, of (i) the Applicable Tax Rate multiplied by the net taxable income allocated to such Partner as a result of such Partner's ownership of an interest in the Partnership for the current fiscal year (excluding, for this purpose and purposes of clause (y) of this paragraph 7.4, any allocations to the General Partner pursuant to paragraph 5.1(a)(i)), over (ii) all cash prior distributions made pursuant to this paragraph 7.4 or paragraph 7.5 during such fiscal year (other than amounts distributed pursuant to this paragraph 7.4 during such fiscal year in respect of net taxable income allocated to the General Partner during the preceding fiscal year); *provided, however*, that (x) the General Partner shall not be required to make any such distribution if the total amount to be distributed to all Partners is less than five hundred thousand dollars ($500,000), and (y) the General Partner shall have the authority, in its sole discretion, to make good faith estimates of amounts expected to be distributed pursuant to this paragraph 7.4 with respect to a given calendar year and to distribute such estimated amounts to all Partners as

16.

806590 v11/SD

Exhibit 1
Page 66

advances from time to time during such calendar year. The provisions of this paragraph 7.4 shall apply equally to all Partners, without regard to their tax-exempt status under the Code. For purposes of this paragraph 7.4, the "*Applicable Tax Rate*" shall refer to the highest federal, state and local income, self-employment and Medicare tax rates then applicable to individuals resident of the State of California, applied by taking into account the character of the taxable income in question (i.e., long-term capital gains, ordinary income, etc.).

7.5    **Discretionary Distributions.**    The General Partner may make distributions of cash or Marketable Securities as follows:

(a)    If at the time of a proposed distribution the Limited Partners have not previously received aggregate distributions pursuant to paragraph 7.4 and this paragraph 7.5 or otherwise (with any in-kind distributions valued at the time of distribution in accordance with paragraph 12.1) equal to the sum of their capital contributions to the Partnership ("*Payback*"), such distribution shall be made to all Partners in proportion to their respective unreturned capital contributions;

(b)    Subsequent to Payback, all such distributions may be made to the Partners in proportion to the relative undistributed net Profits standing in their respective Capital Accounts immediately prior to such distribution (including in such Capital Accounts for purposes of determining the proportions of such distribution the Deemed Gain or Deemed Loss described in paragraph 7.5(g)). For the avoidance of doubt, with respect to each Partner, the phrase "undistributed net Profit" as used in the first sentence of this paragraph 7.5(b) shall refer to aggregate allocations of Profit (as modified by the parenthetical in such first sentence) less aggregate allocations of Loss, as reduced by prior distributions of net Profit.

(c)    Notwithstanding paragraph 7.5(b) above, the General Partner may at any time subsequent to Payback make distributions to all Partners in proportion to their respective Partnership Percentages. Any distributions which may be made to the General Partner under paragraph 7.5(b) (excluding for this purpose distributions in respect of the General Partner's Partnership Percentage) shall be reduced dollar-for-dollar by the amount of distributions previously received by the General Partner pursuant to paragraph 7.4 in respect of amounts allocated to the General Partner (excluding for this purpose amounts allocated to the General Partner in respect of the General Partner's Partnership Percentage) to the extent such amounts have not previously been taken into account to reduce prior distributions under paragraph 7.5(b). In no event may a proposed distribution described in this Article 7 cause the Capital Account of the General Partner to go below zero (0).

(d)    Whenever more than one type of Securities is being distributed in kind in a single distribution or whenever more than one class of Securities of a Portfolio Company (or a portion of a class of such Securities having a tax basis per share or unit different from other portions of such class) are distributed in kind by the Partnership, each Partner shall receive its ratable portion of each type, class or portion of such class of Securities distributed in kind (except to the extent that a disproportionate distribution is necessary to avoid distributing fractional shares).

17.

806590 v11/SD

Exhibit 1
Page 67

**(e)**     Securities distributed in kind shall be subject to such conditions and restrictions as the General Partner determines are legally required or appropriate. Subject to paragraph 7.5(h), whenever types or classes of Securities are distributed in kind, each Partner shall receive its ratable portion of each type or class of Securities distributed in kind.

**(f)**     Notwithstanding any other provision of this paragraph 7.5, prior to the dissolution of the Partnership, the Partnership shall not, without the prior approval of a Majority in Interest of the Limited Partners, make a distribution of Nonmarketable Securities.

**(g)**     Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of all Partners as Profit or Loss pursuant to Article 5.

**(h)**     In order to comply with regulatory or legal restrictions on the amount of any Security that a Partner may be permitted to directly own or control (a "***Regulatory Limitation***"), in the event that any Partner would be entitled to receive a distribution of Securities from the Partnership that would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates).   Such engagement shall be separate from and outside of the structure of the Partnership.

**(i)**     No distribution shall be made to a Partner to the extent it would create or increase a deficit in its Capital Account.

### 7.6     Withholding Obligations.

**(a)**     If and to the extent the Partnership is required by law (as determined in good faith by the General Partner) to make payments ("***Tax Payments***") with respect to any Partner in amounts required to discharge any legal obligation of the Partnership or the General Partner, including any obligation pursuant to FATCA, to make payments to any governmental authority with respect to any federal, state or local income, self-employment, foreign or Medicare  tax liability of such Partner arising as a result of such Partner's interest in the Partnership, then the General Partner shall provide prompt notice to such Partner of such Tax Payments and the amount of any such Tax Payments shall be deemed to be a loan by the Partnership to such Partner, which loan shall: (i) be secured by such Partner's interest in the Partnership, (ii) bear interest at the Prime Rate (as defined in paragraph 4.5(b)(vi)), and (iii) be payable upon demand.

**(b)**     If and to the extent the Partnership is required to make any Tax Payments with respect to any Partner, either (i) such Partner's proportionate share of distributions shall be reduced by the amount of such Tax Payments (*provided that* such Partner's Capital Account shall be adjusted pursuant to paragraph 14.5 for such Partner's full proportionate share of the distribution), or (ii) such Partner shall promptly pay to the Partnership an amount of cash equal

18.

to such Tax Payments plus interest, if applicable.  In the event a portion of a distribution in kind is retained by the Partnership pursuant to clause (i), such retained Securities may, in the discretion of the General Partner, either (1) be distributed to the Partners in accordance with the terms of this Article 7 including this paragraph 7.6(b), or (2) be sold by the Partnership to generate the cash necessary to satisfy such Tax Payments.  If the Securities are sold, then for purposes of income tax allocations only under this Agreement, any gain or loss on such sale or exchange shall be allocated to the Partner to whom the Tax Payments relate.

      **(c)**     Each Limited Partner will, as applicable, take such actions as are required to establish to the reasonable satisfaction of the General Partner that the Limited Partner is (i) not subject to the withholding tax obligations imposed by Section 1471 of the Code and (ii) not subject to withholding tax obligations imposed by Section 1472 of the Code.  In addition, each Limited Partner will assist the Partnership and the General Partner with any applicable information reporting or other obligation imposed on the Partnership, the General Partner or their respective affiliates, pursuant to FATCA.  As used herein, "***FATCA***" means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, and all administrative and judicial interpretations thereof.

      **(d)**     The General Partner shall make (or cause the Partnership to make) any filings, applications or elections, and shall use all other commercially reasonable efforts, to obtain any available exemption from, or refund of, any withholding or other taxes imposed by any non-U.S. (whether sovereign or local) taxing authority with respect to amounts distributable to any Limited Partner under this Agreement.  Each Limited Partner agrees that it will cooperate with the General Partner in making any such filings, applications or elections to the extent the General Partner reasonably determines that such cooperation is necessary or desirable. Notwithstanding the foregoing, if a Limited Partner must make any such filings, applications or elections directly, the General Partner, at the request of the affected Limited Partner, shall (or shall cause the Partnership to) provide such information and take such other action as may commercially reasonably be necessary to complete or make such filings, applications or elections.

## ARTICLE 8

### MANAGEMENT DUTIES AND RESTRICTIONS

    **8.1**    **Management.**  The General Partner shall have the sole and exclusive right to manage, control, and conduct the affairs of the Partnership and to do any and all acts on behalf of the Partnership, including exercise of rights to elect to adjust the tax basis of Partnership assets and to revoke such elections and to make such other tax elections as the General Partner shall deem appropriate.  The General Partner is hereby authorized to enter, by itself or on behalf of the Partnership, into an agreement with a firm designated by the General Partner (the "***Management Company***") for the provision of certain management, administrative, operational and other services with respect to the Partnership on terms to be determined and agreed to by the General Partner, *provided that* the General Partner shall remain ultimately responsible for the overall management of the Partnership and for its duties and responsibilities hereunder.

806590 v11/SD

Exhibit 1
Page 69

**8.2**    **No Control by the Limited Partners; No Withdrawal.**  No Limited Partner shall take part in the control or management of the affairs of the Partnership nor shall any Limited Partner have any authority to act for or on behalf of the Partnership or to vote on any matter relative to the Partnership and its affairs, except as is specifically permitted by this Agreement.  Except as specifically set forth in this Agreement, no Limited Partner shall withdraw or be required to withdraw from the Partnership.

**8.3**    **Existing Funds; Follow On Funds; Parallel Funds.**

**(a)**    Except as provided below, each Managing Director shall, so long as each shall remain a manager of the General Partner, devote such business time as is necessary and appropriate to the affairs of (i) the Partnership, (ii) the Fund Affiliates (as defined below), (iii) any Parallel Funds (as defined below), (iv) those entities formed for the purpose of managing any of the foregoing and (v) any successor private equity fund (a "**Successor Fund**") formed on or after such time as at least seventy percent (70%) of the Partnership's Committed Capital has been invested, committed for investment or reserved for follow-on investment in portfolio companies, or applied, committed or reserved for Partnership working capital or expenses.  The restriction set forth in the first sentence of this paragraph 8.3(a) shall not apply following the end of the Commitment Period; *provided that* in such event the Managing Directors shall devote such business time to the Partnership as is necessary and appropriate for the effective management and liquidation of the Partnership's investments.  For the purposes of this Agreement, "**Fund Affiliates**" shall mean any investment partnership or similar entity managed directly or indirectly by Stuart Frost (each, a "**Frost Fund**"), their respective general partners and portfolio companies, the Management Company, the Incubator and any Incubator Company (as defined below).

**(b)**    Each Limited Partner hereby acknowledges that (i) the Incubator was formed to provide an operating infrastructure to incubate and develop new business (each, an "**Incubator Company**"), (ii) the General Partner expects to, but is under no obligation to, cause the Partnership to invest primarily in Incubator Companies, (iii) the Incubator is controlled by one or more Managing Directors and (iv) the Managing Directors may hold board seats and/or "founder" positions in one or more Incubator Companies and in connection with such positions, a founder's equity interest, directly or indirectly, in such Incubator Company.  Each of the Limited Partners hereby consents and agrees to the activities and investments described in this paragraph 8.3(b).

**(c)**    Pursuant to paragraph 8.3(a)(ii), the General Partner and its managers may form and serve as general partner (or in a similar management role) of (i) one or more entities organized to accommodate the capital investments of entities and persons having strategic or other important relationships with the Partnership and (ii) one or more investment partnerships or similar entities to accommodate the tax, regulatory or legal needs of investors who otherwise would invest as Limited Partners of the Partnership on substantially similar terms, including economic terms, as the Partnership (collectively, the "**Parallel Funds**").  The terms of any such Parallel Fund formed for the purposes described in subsection (i) of the immediately preceding sentence may vary from those of the Partnership.  No Parallel Fund may admit a Limited Partner or other investor (except in connection with transfers of interests) after the date twelve (12) months from the Activation Date.  In the event that any Parallel Fund is formed, upon each purchase of Securities (other than short term obligations such as money market instruments) by

the Partnership, each Parallel Fund will simultaneously invest in the same Securities on the same terms and at the same price as the Partnership; *provided, however,* that a Parallel Fund shall not be required to make any such investment in a Security if (i) the General Partner receives from the issuer thereof a written notice to the effect that the issuer will not permit such Parallel Fund to invest on the same terms as the Partnership and the General Partner provides a copy of such written notice to the Advisory Committee, or (ii) such investment is not permitted by applicable law or by the terms of the governing agreement of the Parallel Fund. Each Parallel Fund shall also dispose of each such Security at substantially the same time and on substantially the same terms as the Partnership. Each of the Limited Partners hereby consents and agrees to such activities and investments and further consents and agrees that neither the Partnership nor any of its Partners shall have any rights in or to such activities or investments, or any profits derived therefrom.

**8.4      Investment Opportunities and Restrictions.**

**(a)**      Each Limited Partner hereby agrees that the General Partner may offer the right to participate in investment opportunities of the Partnership (each, a "***Co-Investment Opportunity***") to other private investors, groups, partnerships or corporations, including, without limitation, any Limited Partner, any Frost Funds and any Successor Funds managed by some or all of the managers of the General Partner, whenever the General Partner, in its discretion, so determines. Investments by Frost Funds made in connection with any Co-Investment Opportunity will generally be allocated among the Frost Funds based on the available capital of each such fund.

**(b)**      Except upon the prior consent of the Advisory Committee, for so long as the Partnership may call capital pursuant to paragraph 4.2 for purposes of investing in Securities of issuers in which it does not yet hold an investment, neither the General Partner, the Managing Directors, nor the Management Company shall invest more than fifty thousand dollars ($50,000) in any Securities of any private company that is not an Incubator Company in which neither such party nor the Partnership then holds an investment where such Securities would be within the Partnership's investment criteria.

**(c)**      Without the consent of the Advisory Committee, the Partnership may not purchase Securities of any non-Incubator Company from or sell Securities of any non-Incubator Company to or borrow money from the General Partner, the Management Company or any of the Managing Directors; *provided, however,* following the final admission of Limited Partners pursuant to paragraph 3.2(b), the Partnership may purchase Securities from or sell Securities to a Parallel Fund at cost for the purpose of allocating then existing Securities between such entities in proportion to their respective available capital.

**(d)**      Without the consent of the Advisory Committee, the Partnership may not invest for the first time in any Portfolio Company that is not an Incubator Company in which the General Partner, the Managing Directors, or any of their Affiliates, or any entity managed or operated or controlled by any of them, holds an interest with a cash basis of more than fifty thousand dollars ($50,000).

**(e)**      The General Partner may not incur indebtedness on behalf of the Partnership, or guaranty indebtedness of companies in which the Partnership has invested, in an

806590 v11/SD
Exhibit 1
Page 71

aggregate amount exceeding ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment).

(f)      Without the prior approval of the Advisory Committee, no more than the greater of (i) four million dollars ($4,000,000) and (ii) twenty percent (20%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in the Securities of any one Portfolio Company.

(g)      At least seventy-five percent (75%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) shall be invested in Incubator Company investments, unless otherwise approved by the Advisory Committee.

(h)      Without the prior approval of the Advisory Committee, no more than ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in publicly-traded securities (excluding (i) private placements of public company securities, (ii) securities which were not publicly traded at the time of such investment, (iii) securities acquired in a "going private" transaction or series of transactions and (iv) short-term investments such as money market investments).

(i)      The aggregate cost basis of Portfolio Company investments made by the Partnership, whether or not realized, may not exceed one hundred twenty percent (120%) of the aggregate Capital Commitments of the Partners.

## ARTICLE 9

### INVESTMENT REPRESENTATION AND TRANSFER
### OF PARTNERSHIP INTERESTS

**9.1      Investment Representation of the Limited Partners.**  This Agreement is made with each of the Limited Partners in reliance upon each Limited Partner's representation to the Partnership, which by executing this Agreement each Limited Partner hereby confirms, that its interest in the Partnership is to be acquired for investment, and not with a view to the sale or distribution of any part thereof, and that it has no present intention of selling, granting participation in, or otherwise distributing the same, and each Limited Partner understands that its interest in the Partnership has not been registered under the Securities Act and that any transfer or other disposition of the interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom.  Each Limited Partner further represents that it does not have any contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participations to such person, or to any third person, with respect to its interest in the Partnership.

**9.2      Qualifications of the Limited Partners.**  Each Limited Partner represents that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act.

**9.3      Transfer by General Partner.**  The General Partner shall not sell, assign, mortgage, pledge or otherwise dispose of its interest in the Partnership or in its capital assets or property without the prior written consent of a Majority in Interest of the Limited Partners.

22.

Except as otherwise provided in the previous sentence, the Managing Directors (including for this purpose, trusts or investment vehicles formed for the benefit of such Managing Director or his family members or entities affiliates with such Managing Director) shall at all times collectively retain direct ownership and control over at least a majority of both the equity and economic interests in the General Partner, and transfers of equity interests by the Managing Directors shall be permitted only to (a) third parties who become members of the General Partner and (b) trusts or investment vehicles formed for the benefit of a Managing Partner or his family members.   Notwithstanding the foregoing, in no event shall the General Partner make any transfer of an interest in the Partnership prohibited by the events described in paragraphs 9.5(a) through 9.5(h).

**9.4** **Transfer by Limited Partner.**  No Limited Partner shall sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without the prior written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner.  Notwithstanding the foregoing, after delivery of the opinion of counsel hereinafter required by this Article 9, (*provided*, *however*, that the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel), a Limited Partner may sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without such consent (a) to any entity directly or indirectly holding eighty percent (80%) or more of the ownership interests of the Limited Partner (including profits or other economic interests) or any entity of which eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests) are held directly or indirectly by such entity, including any entity of which the Limited Partner holds, directly or indirectly, eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests), (b) pursuant to a merger, plan of reorganization, sale or pledge of, or other general encumbrance on all or substantially all of the Limited Partner's assets, (c) to certain affiliated corporations or business entities of a Limited Partner, (d) as may be required by any law or regulation, (e) by testamentary disposition or intestate succession, or (f) to a trust, profit sharing plan or other entity controlled by, or for the benefit of, such Limited Partner or one or more family members.  A change in any trustee or fiduciary of the Limited Partner shall not be considered to be a transfer, sale, assignment, mortgage, pledge or other disposition under this paragraph 9.4, *provided* written notice of such change is given to the General Partner within a reasonable period of time after the effective date thereof.

**9.5** **Requirements for Transfer.**  No transfer or other disposition of the interest of the Limited Partner shall be permitted until the General Partner shall have received an opinion of counsel satisfactory to it (or waived such opinion requirement) that the effect of such transfer or disposition would not:

**(a)** result in the Partnership's assets being considered, in the opinion of counsel for the Partnership, as "plan assets" within the meaning of the Employment Retirement Income Security Act of 1974, as amended ("***ERISA***"), or any regulations proposed or promulgated thereunder;

**(b)** result in violation of the Securities Act or any comparable state law;

23.

**(c)** require the Partnership to register as an investment company under the Investment Company Act of 1940, as amended;

**(d)** require the Partnership, the General Partner, or any member of the General Partner to register as an investment adviser under the Investment Advisers Act of 1940, as amended;

**(e)** result in a termination of the Partnership's status as a partnership for tax purposes;

**(f)** result in a violation of any law, rule, or regulation by the Limited Partner, the Partnership, the General Partner, or any member of the General Partner;

**(g)** cause the Partnership to be deemed to be a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code; or

**(h)** result in a violation of this Agreement.

Such legal opinion shall be provided to the General Partner by the transferring Limited Partner or the proposed transferee. Any costs associated with such opinion shall be borne by the transferring Limited Partner or the proposed transferee. Upon request the General Partner will use its good faith diligent efforts to provide any information possessed by the Partnership and reasonably requested by a transferring Limited Partner to enable it to render the foregoing opinion. Notwithstanding any provision of this Article 9 to the contrary, the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel provided for in this paragraph 9.5.

**9.6** **Substitution as a Limited Partner.** A transferee of a Limited Partner's interest pursuant to this Article 9 shall become a substituted Limited Partner only with the consent of the General Partner and only if such transferee (a) elects to become a substituted Limited Partner and (b) executes, acknowledges and delivers to the Partnership such other instruments as the General Partner may deem necessary or advisable to effect the admission of such transferee as a substituted Limited Partner, including, without limitation, the written acceptance and adoption by such transferee of the provisions of this Agreement. No assignment by a Limited Partner of its interest in the Partnership shall release the assignor from its liabilities to the Partnership, including but not limited to paragraph 4.2; *provided that* if the assignee becomes a Limited Partner as provided in this paragraph 9.6, the assignor shall thereupon so be released (in the case of a partial assignment, to the extent of such assignment).

## ARTICLE 10

### DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

**10.1** **Extension of Partnership Term.** Upon the Termination Date, the General Partner may in its sole discretion extend the Partnership term for up to two (2) additional one (1) year periods, and upon the conclusion of the two extension periods, with the consent of a Majority in Interest of the Limited Partners, the General Partner may extend the Partnership term for additional one (1) year periods. During such one (1) year extension periods, the General

24.

806590 v11/SD

Exhibit 1
Page 74

Partner shall use its reasonable efforts to convert the Partnership's Nonmarketable Securities into Marketable Securities or cash, and all Securities that become Marketable Securities during such period or periods.  The General Partner shall not purchase the Securities of any new issuer in which the Partnership does not already hold an interest during such period; *provided*, *however*, that the General Partner may (a) purchase additional Securities of a Portfolio Company if it deems such a purchase to be in the best interests of the Partnership, and (b) exchange the Securities of a Portfolio Company for other Securities if it deems such exchange to be in the best interests of the Partnership.  The management fee during any extension period shall be as set forth in Article 6.

**10.2     Early Termination of the Partnership.**

**(a)**     The Partnership shall dissolve, and the affairs of the Partnership shall be wound up prior to the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1):

**(i)**     ninety (90) days after the withdrawal, bankruptcy, or dissolution of the General Partner, unless a Majority in Interest of the Limited Partners elect to continue the Partnership within such ninety (90) day period; or

**(ii)**     at any time upon the election of Eighty Percent (80%) in Interest of the Limited Partners.

**(b)**     In the event that the Partnership is dissolved pursuant to the provisions of this paragraph 10.2, a Majority in Interest of the Limited Partners shall elect one or more liquidators to manage the liquidation of the Partnership in the manner described in paragraphs 10.3, 10.4 and 10.5.

**10.3     Winding Up Procedures.**

**(a)**     Promptly upon dissolution of the Partnership (unless the Partnership is continued in accordance with this Agreement or the provisions of the Act), the affairs of the Partnership shall be wound up and the Partnership liquidated.

**(b)**     Distributions during the winding up period may be made in cash or in kind or partly in cash and partly in kind.  The General Partner or the liquidator shall use its best judgment as to the most advantageous time for the Partnership to sell Securities or to make distributions in kind.  All cash and each Security distributed in kind after the date of dissolution, but prior to the final liquidation, of the Partnership shall be distributed in accordance with the provisions of Article 7.  Each Security so distributed shall be subject to reasonable conditions and restrictions necessary or advisable in order to preserve the value of such Security or for legal reasons.

**10.4     Payments in Liquidation.**  The assets of the Partnership shall be distributed in final liquidation of the Partnership in the following order:

**(a)**     to the creditors of the Partnership, other than Partners, in the order of priority established by law, either by payment or by establishment of reserves;

25.

806590 v11/SD

Exhibit 1
Page 75

**(b)**      to the Partners, in repayment of any loans made to, or other debts owed by, the Partnership to such Partners; and

**(c)**      the balance, if any, to the General Partner and the Limited Partners in respect of the positive balances in their Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

**10.5**      **Return of Excess Distributions.**

**(a)**      Notwithstanding paragraphs 7.4, 7.5 and 10.4, upon liquidation of the Partnership pursuant to this Article 10, the General Partner shall be required to pay back to the Partnership the amount by which the cumulative net distributions received by the General Partner over the life of the Partnership (excluding amounts received by the General Partner in respect of its Partnership Percentage and amounts returned to the Partnership by the General Partner pursuant to paragraph 15.4(b) prior to final liquidation of the Partnership) exceeds the amount equal to the Partnership's cumulative Profits allocated to the General Partner pursuant to paragraph 5.1(a)(iv)(1) minus the Partnership's cumulative Losses allocated to the General Partner pursuant to paragraph 5.1(b)(i); *provided, however*, that the amount of the repayment described in this paragraph 10.5(a) shall be reduced by the federal, state and other taxes payable on such amount by the members of the General Partner (assuming for this purpose that all in kind distributions were immediately sold upon receipt and such taxes were paid at the Applicable Tax Rate).

**(b)**      In the event that the assets of the General Partner are insufficient to satisfy the obligation described in the preceding sentence, each member of the General Partner shall be severally, but not jointly, responsible for his pro rata share of the General Partner's remaining obligation to the Partnership under this paragraph 10.5.  The pro rata shares described in the preceding sentence shall be based on relative distributions received by each member of the General Partner from the General Partner.

**(c)**      If Partners are required to recontribute distributions pursuant to paragraph 4.2(d)(ii) after the final liquidation and winding up of the Partnership, the amount of the General Partner's obligation under paragraph 10.5(a) shall be recomputed by treating the expense giving rise to the return of distributions pursuant to paragraph 4.2(d)(ii) as if it had occurred prior to final liquidation.  The difference between the amount originally computed pursuant to paragraph 10.5(a) as of the final liquidation and winding up of the Partnership and the amount described in the immediately preceding sentence shall reduce dollar for dollar the aggregate amount otherwise required to be recontributed by the Partners pursuant to paragraph 4.2(d)(ii).

## ARTICLE 11

### FINANCIAL ACCOUNTING, REPORTS AND MEETINGS

**11.1**      **Financial Accounting; Fiscal Year.**  The books and records of the Partnership shall be kept in accordance with the provisions of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles consistently applied, and shall be audited at the end of each fiscal year by an independent public accountant of recognized national or

26.

regional standing selected by the General Partner; *provided, however,* that if the audit requirement for the first fiscal year that began on the Commencement Date and ended on December 31, 2013 is waived pursuant to paragraph 11.4, such period shall be covered in the audit of the books and records of the Partnership for the fiscal year ending December 31, 2014. The Partnership's fiscal year shall be the calendar year.

**11.2     Supervision; Inspection of Books.**  Proper and complete books of account of the Partnership, copies of the Partnership's federal, state and local tax returns for each fiscal year, the Schedule of Partners, this Agreement and the Partnership's Certificate of Limited Partnership shall be kept under the supervision of the General Partner at the principal office of the Partnership.  Such books and records shall be open to inspection by the Limited Partners, or their accredited representatives, at any reasonable time during normal business hours after reasonable advance notice.  Such books and records shall be maintained by the General Partner or its designee for a period of five (5) years following final liquidation of the Partnership.

**11.3     Quarterly Reports.**  The General Partner shall transmit to the Limited Partners within sixty (60) days after the close of each of the first three quarters of each fiscal year, a summary of acquisitions and dispositions of investments made by the Partnership during such quarter together with a valuation of the investments then held.

**11.4     Annual Report; Financial Statements of the Partnership.**  Beginning with the fiscal year that ends December 31, 2013, the General Partner shall use reasonably commercial efforts to transmit to the Limited Partners within one hundred twenty (120) days after the close of the Partnership's fiscal year audited financial statements of the Partnership prepared in accordance with the terms of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles, including an income statement for the year then ended and a balance sheet as of the end of such year, a statement of changes in the Partners' Capital Accounts, and a list of investments then held; *provided,* that (1) the Advisory Committee may waive such requirement solely for the fiscal year that ends December 31, 2013 if it determines in its sole discretion that the aggregate capital contributions of the Partners to the Partnership during such fiscal year is not material, and (2) such requirement shall be automatically waived solely for the fiscal year that ends December 31, 2013 if the General Partner has not required the Partners to contribute capital to the Partnership during such year.  The financial statements shall be accompanied by a report from the General Partner to the Limited Partners, which shall include a status report on investments then held, a summary of acquisitions and dispositions of investments made by the Partnership during the preceding quarter and a valuation of each such investment.

**11.5     Electronic Reporting.**  The General Partner shall be entitled, in its sole discretion, to transmit the reports and statements described in paragraphs 11.3 and 11.4 (the "***Subject Reports***") to one or more Limited Partners solely (i) by electronic mail or (ii) by means of granting such Limited Partners access to a database or other forum hosted on a website designated by the General Partner (the "***Reporting Site***"), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein (including, but not limited to, establishing password protections for access to the Reporting Site, preventing the Subject Reports posted on the Reporting Site from being copied or otherwise print capable

806590 v11/SD

Exhibit 1
Page 77

and having such Subject Reports available for review for a restricted period of time (but in no event less than thirty (30) days from the first date such Subject Reports are posted on the Reporting Site)).  The General Partner shall provide each Limited Partner to which it will transmit Subject Reports pursuant to this paragraph 11.5 two (2) days advance notice of the first date on which a new Subject Report will be posted on the Reporting Site for such Limited Partner's review. Unless the General Partner exercises its discretion pursuant to and in compliance with paragraph 15.15(c) to restrict access to certain Confidential Information that may be included in a Subject Report posted on the Reporting Site, the Subject Reports posted on the Reporting Site shall contain all of the material information included in those Subject Reports transmitted to Limited Partners other than pursuant to this paragraph 11.5.  Subject to the provisions of paragraph 15.15(c), the Subject Reports shall be posted on the Reporting Site within the same number of days after the end of the applicable fiscal quarter or Fiscal Year as is required pursuant to paragraphs 11.3 and 11.4 and shall remain accessible to and downloadable or printable by the Limited Partners for at least twelve (12) months.

**11.6    Tax Returns.**

**(a)**    The General Partner shall cause the Partnership's federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by a Limited Partner, to be prepared and delivered to the Limited Partners within ninety (90) days after the close of the Partnership's fiscal year, or as soon as reasonably practicable thereafter.

**(b)**    Each Limited Partner hereby agrees and covenants that it shall not make an election under Section 732(d) of the Code with respect to property distributed to it by the Partnership without the prior written consent of the General Partner.  The General Partner may, but shall not be obligated to, cause the Partnership to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" within the meaning of Section 743(e) of the Code.  If the Partnership elects to be treated as an electing investment partnership, each Limited Partner shall (i) reasonably cooperate with the Partnership to maintain such status, (ii) shall not take any action that would be inconsistent with such election, (iii) provide the General Partner with any information necessary to allow the Partnership to comply with its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and its tax reporting and other obligations as an electing investment partnership, and (iv) provide the General Partner and such Limited Partner's transferee, promptly upon request, with the information required under Section 6031(b) of the Code or otherwise to be furnished to the Partnership or such transferee, including such information as is necessary to enable the Partnership and such transferee to compute the amount of losses disallowed under Section 743(e) of the Code, but in no event shall such Limited Partner be required to provide such information prior to its receipt of its Schedule K-1 for such taxable year, except to the extent of information, if any, required by the Partnership to complete its Schedule K-1s.  Whether or not the Partnership makes such election, promptly upon request, each Limited Partner shall provide the General Partner with any information related to such Partner necessary to allow the Partnership to comply with (a) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (b) any other U.S. federal income tax reporting obligations of the Partnership.

**11.7    Tax Matters Partner.**  The General Partner shall be the Partnership's tax matters partner under the Code and under any comparable provision of state law.  The General Partner

28.

shall have the right to resign as tax matters partner by giving thirty (30) days' written notice to each Partner.  Upon such resignation a successor tax matters partner shall be selected by a Majority in Interest of the Limited Partners.  The tax matters partner shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Internal Revenue Service and in connection with all subsequent administrative and judicial proceedings arising out of such audit.  The tax matters partner shall periodically consult with all tax exempt Limited Partners during the course of any tax audit primarily affecting the tax exempt Limited Partners.  The tax matters partner shall periodically consult with all foreign Limited Partners during the course of any tax audit primarily affecting the foreign Limited Partners.  If the tax matters partner is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Partners, then the Partnership shall be entitled to reimbursement from those Partners on whose behalf such fees and expenses were incurred.  The tax matters partner shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, and shall furnish to each Partner, if such Partner so requests in writing, a copy of each notice or other communication received by the tax matters partner from the Internal Revenue Service, except such notices or communications as are sent directly to such requesting Partner by the Internal Revenue Service.  The relationship of the tax matters partner to the Limited Partners is that of a fiduciary, and the tax matters partner has fiduciary obligations to perform its duties as tax matters partner in such manner as will serve the best interests of the Partnership and all of the Partnership's Partners.  Without the consent of a Majority in Interest of the tax exempt Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind the Limited Partners (other than in their capacities as Limited Partners).  Without the consent of a Majority in Interest of the foreign Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind such foreign Limited Partners with respect to the outcome of any audit primarily affecting the foreign Limited Partners.  To the fullest extent permitted by law, but subject to the limitations and exclusions of paragraph 15.4, the Partnership agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to all (a) fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the General Partner or the Partnership that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Partnership, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action, or demand.

## ARTICLE 12

### VALUATION; ADVISORY COMMITTEE

**12.1    Valuation.**    Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value.  Except as may be required under applicable Treasury Regulations, no value shall be placed on the goodwill or the name of the Partnership in determining the value of the interest of any Partner or in any accounting among the Partners.

        **(a)**    The following criteria shall be used for determining the fair market value of Securities:

29.

Exhibit 1
Page 79

**(i)** If traded on one or more securities exchanges or the NASDAQ National Market System, the value shall be deemed to be the average of the Securities' closing price on the principal of such exchanges during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

**(ii)** If actively traded over the counter (other than on the NASDAQ National Market System), the value shall be deemed to be the average of the average closing bid and ask prices of such Securities during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

**(iii)** If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the General Partner, taking into consideration the purchase price of the Securities, developments concerning the investee company subsequent to the acquisition of the Securities, any financial data and projections of the investee company provided to the General Partner, and such other factor or factors as the General Partner may deem relevant.

**(b)** If the General Partner in good faith determines that, because of special circumstances, the valuation methods set forth in this Article 12 do not fairly determine the value of a Security, the General Partner shall make such adjustments or use such alternative valuation method as it reasonably deems appropriate.

**(c)** The General Partner shall have the power at any time to determine, for all purposes of this Agreement, the fair market value of any assets and liabilities of the Partnership.

**12.2    Advisory Committee.**  The General Partner may appoint an Advisory Committee (the "*Advisory Committee*"), that shall consist of not less than three (3) representatives of the Limited Partners (none of whom shall be an Affiliate of the General Partner) selected by the General Partner from time to time in its reasonable judgment.  The duties of the Advisory Committee will include (a) consideration of any approvals sought by the General Partner pursuant to the terms of this Agreement; (b) advice regarding matters pertaining to conflicts of interest by the Partnership, the General Partner or any of the members of the General Partner (excluding matters otherwise expressly addressed pursuant to the terms of this Agreement); and (c) such advice and counsel as is requested by the General Partner in connection with the Partnership's investments and other Partnership matters.  The Partnership will reimburse each member for his or her reasonable out-of-pocket expenses.  All actions, consents or approvals of the Advisory Committee shall require a majority of its members serving at the time such action, consent or approval is taken, which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the General Partner.  To the fullest extent permitted by law, neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Partner in respect of the activities of the Advisory Committee, except to refrain from bad faith violations of the implied contractual obligation of good faith.  To the fullest extent permitted by law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Limited Partner represented by such member and, in so doing, shall not be considered to have acted in bad faith.

806590 v11/SD

Exhibit 1
Page 80

# ARTICLE 13

## PARTNERS SUBJECT TO SPECIAL REGULATION

### 13.1    ERISA Partners.

**(a)**    Each Limited Partner that is, or whose equity interests are at least partially owned by, an "employee benefit plan" (each, an "***ERISA Partner***") within the meaning of, and subject to the provisions of, ERISA hereby (i) acknowledges that it is its understanding that neither the Partnership, the General Partner, nor any of the Affiliated entities of the General Partner, are "fiduciaries" of such Limited Partner within the meaning of ERISA by reason of the Limited Partner investing its assets in, and being a Limited Partner of, the Partnership; (ii) acknowledges that it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (iii) acknowledges that it is aware of the provisions of Section 404 of ERISA relating to the requirements for investment and diversification of the assets of employee benefit plans and trusts subject to ERISA; (iv) represents that it has given appropriate consideration to the facts and circumstances relevant to the investment by that ERISA Partner's plan in the Partnership and has determined that such investment is reasonably designed, as part of such portfolio, to further the purposes of such plan; (v) represents that, taking into account the other investments made with the assets of such plan, and the diversification thereof, such plan's investment in the Partnership is consistent with the requirements of Section 404 and other provisions of ERISA; (vi) acknowledges that it understands that current income will not be a primary objective of the Partnership; and (vii) represents that, taking into account the other investments made with the assets of such plan, the investment of assets of such plan in the Partnership is consistent with the cash flow requirements and funding objectives of such plan.

**(b)**    Notwithstanding any provision contained herein to the contrary, each ERISA Partner may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, at the time and in the manner hereinafter provided, if either the ERISA Partner or the General Partner shall obtain an opinion of counsel (which counsel and which opinion shall be reasonably acceptable to both the ERISA Partner and the General Partner) to the effect that, as a result of applicable statutes, regulations, case law, administrative interpretations, or similar authority (i) the continuation of the ERISA Partner as a Limited Partner of the Partnership or the conduct of the Partnership will result, or there is a material likelihood the same will result, in a material violation of ERISA, or (ii) all or any portion of the assets of the Partnership constitute assets of the ERISA Partner and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the ERISA Partner.  In the event of the issuance of such opinion of counsel, a copy of such opinion shall be given to all the ERISA Partners, together with the written notice of the election of the ERISA Partner to withdraw or the written demand of the General Partner for withdrawal, whichever the case may be (and in the case of a written demand of the General Partner, such requirement shall be imposed on all benefit plan investors as defined in DOL Regulation 2510.3-101(f) on a pro rata basis and only to the extent necessary to prevent or cure the violation or plan asset problem). Thereupon, unless within ninety (90) days after receipt of such written notice and opinion the General Partner is able to eliminate the necessity for such withdrawal to the reasonable satisfaction of the ERISA Partner and the General Partner, whether by correction of the condition

806590 v11/SD

Exhibit 1
Page 81

giving rise to the necessity of the ERISA Partner's withdrawal, or the amendment of this Agreement, or otherwise, such ERISA Partner shall withdraw its entire interest in the Partnership, such withdrawal to be effective upon the last day of the fiscal quarter during which such ninety (90) day period expired.

(c)     The withdrawing ERISA Partner shall be entitled to receive within ninety (90) days after the date of such withdrawal an amount equal to the fair market value of such Partner's interest as of the effective date of such withdrawal (calculated by treating all Partnership assets as though sold at fair market value).  The fair market value of such Partner's interest shall be determined in accordance with paragraph 12.1 with any resulting net Profit or Loss allocated in accordance with the provisions of Article 5.

(d)     Any distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph may, in the sole discretion of the General Partner, be made in cash, in securities, in the form of a promissory note, the terms of which shall be mutually agreed upon by the General Partner and the withdrawing ERISA Partner, or any combination thereof; *provided*, that (i) a withdrawing ERISA Partner shall not be required to accept more than its *pro rata* share of any Securities held by the Partnership, and (ii) if a distribution in kind would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates).  Such engagement shall be separate from and outside of the structure of the Partnership.

(e)     Any valuation necessary for the purposes of a distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph shall be made by the General Partner in good faith pursuant to paragraph 12.1; *provided, however*, the General Partner shall provide thirty (30) days notice to a withdrawing ERISA Partner of the valuation of any proposed distribution, and the withdrawing ERISA Partner may object to the valuations made by the General Partner by providing written notice to the General Partner at any time prior to the first payment to the withdrawing ERISA Partner in respect of its former interest in the Partnership.  In the event that the General Partner and the withdrawing ERISA Partner cannot reach a satisfactory resolution of such valuation dispute, the valuation shall be determined by a mutually acceptable, independent securities expert selected by the General Partner and the withdrawing ERISA Partner.

**13.2**   **Governmental Plan Partners.**  Notwithstanding any provision of this Agreement to the contrary, any Limited Partner that is either a "governmental plan" as defined in Title 29, Section 1002(32) of the United States Code or an employee benefit plan subject to regulation under applicable state laws that are similar in purpose and intent to ERISA (a "***Governmental Plan Partner***") may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Governmental Plan Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Governmental Plan Partner and the General Partner) to the effect that the Governmental Plan Partner, the Partnership, or the General Partner would be in violation, or

806590 v11/SD

Exhibit 1
Page 82

there is a material likelihood the same would result, of any statute or regulation of the state of residence of the Government Plan Partner or any political subdivision of such state, enacted or promulgated after the date of formation of the Partnership, as a result of the Governmental Plan Partner continuing as a Limited Partner, and, in the case of an opinion obtained by the General Partner, that such violation would have a material adverse effect on the General Partner or the Partnership.  In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Governmental Plan Partner's interest in the Partnership shall be governed by paragraph 13.1 of the Agreement, as if the Governmental Plan Partner were an ERISA Partner.

**13.3    Private Foundation Partners.**  Notwithstanding any provision of the Agreement to the contrary, any Limited Partner that is, or whose equity interests are at least partially owned by, a "private foundation" as described in Section 509 of the Code (a "***Private Foundation Partner***"), may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Private Foundation Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Private Foundation Partner and the General Partner) to the effect that such withdrawal is necessary in order for the Private Foundation Partner to avoid (a) excise taxes imposed by Subchapter A of Chapter 42 of the Code (other than Sections 4940 and 4942 thereof), or (b) a material breach of the fiduciary duties of its trustees under any federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission, or authority having jurisdiction.  In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Private Foundation Partner's interest in the Partnership shall be governed by paragraph 13.1, as if the Private Foundation Partner were an ERISA Partner.

**13.4    Media Companies.**

**(a)**    In addition to any other restrictions applicable to Limited Partners set forth in this Agreement and notwithstanding any other provisions hereof, at any time the Partnership holds an Attributable Interest in a Media Company, no Limited Partner shall be materially involved in the management or operations of the media-related activities of the Partnership. Without limiting the generality of the foregoing, no Limited Partner or Other Restricted Person shall:

**(i)**    act as an employee of the Partnership or any Media Company if such Limited Partner's or Other Restricted Person's functions, directly or indirectly, relate to the media enterprises of the Partnership or any Media Company;

**(ii)**    serve, in any material capacity, as an independent contractor or agent with respect to any media enterprises of the Partnership or any Media Company;

**(iii)**    communicate on matters pertaining to the day-to-day operations of a Media Company with (A) an officer, director, partner, agent, representative or employee of such Media Company or (B) the General Partner;

**(iv)**    perform any services for the Partnership relating to its media enterprises or any Media Company materially relating to such Media Company's media activities, except that any Limited Partner may make loans to or act as a surety for the Partnership or any such Media Company;

**(v)**    vote on the admission of any new General Partner to the Partnership unless such admission is approved by each General Partner then existing;

**(vi)**    vote on the removal of the General Partner, unless the General Partner is (A) subject to bankruptcy proceedings, as described in Sections 17-402(a)(4) or (5) of the Act, (B) adjudicated incompetent by a court of competent jurisdiction (provided that this clause (B) shall only apply to a general partner that is a natural person) or (C) determined by a court of competent jurisdiction or the Arbitrators to have engaged in conduct constituting "cause," as that term has been used by the FCC in the context of the removal authority of limited partners, for purposes of the insulation of limited partnership interests from attribution of Media Companies; or

**(vii)**    become actively involved in the management or operation of the media activities of the Partnership or any Media Company.

**(b)**    The foregoing restrictions are intended to conform the rights and powers of Limited Partners to the criteria for non-attribution of limited partnership interests established by the FCC Attribution Orders; *provided, however*, that the foregoing shall not be deemed to prevent a Limited Partner or any Other Restricted Person from engaging in any activities that are not inconsistent with the FCC's then-prevailing policies with respect to the insulation from attribution of limited partners, as set forth in the FCC Attribution Orders.  The Partners agree that, notwithstanding anything to the contrary herein, the activities of the Advisory Committee and each member and observer thereof (acting in such capacity) shall be limited to those permitted under FCC Rules, the Ownership Rules and the FCC Attribution Orders without causing any Limited Partner or Other Restricted Person to have an interest in the Partnership that would constitute an Attributable Interest in a Media Company.  Moreover, if the Partnership receives an opinion of counsel reasonably acceptable to the General Partner to the effect that one or more of the restrictions contained in Paragraph 13.4(a) above is no longer required in order to assure that Limited Partners are not attributed with ownership interests based on the Ownership Rules and the FCC Attribution Orders, then such restriction or restrictions shall be deemed waived by virtue of such opinion.

**(c)**    Notwithstanding the foregoing, the provisions of Paragraph 13.4(a) shall not apply to any Limited Partner who (i) affirmatively elects by written notice to the General Partner not to be bound by such provisions and acknowledges that as a result of such election such Limited Partner may be deemed to hold an Attributable Interest in a Media Company and be subject to the Ownership Rules, and (ii) receives the prior written consent of the General Partner to make such election, which consent shall not be unreasonably withheld.  It is understood that it would be reasonable for the General Partner to withhold its consent if the holding by such Limited Partner of an Attributable Interest in a Media Company would be reasonably likely to result in a violation on the part of the Partnership of any Ownership Rule or FCC Rule or in the imposition on the Partnership of burdensome regulatory or other legal

34.

806590 v11/SD

Exhibit 1
Page 84

requirements, or limit the Partnership's ability to acquire an Attributable Interest in any Media Company.  The General Partner agrees to give the Limited Partners reasonable prior notice of any proposed acquisition of an Attributable Interest in a Media Company.

## ARTICLE 14

### CERTAIN DEFINITIONS

**14.1    Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the Partners' respective interests in the Profits or Losses of the Partnership during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interests shall occur.

**14.2    Adjusted Asset Value.**  The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

**(a)**    The initial Adjusted Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset at the time of contribution, as determined by the contributing Partner and the Partnership.

**(b)**    In the discretion of the General Partner, the Adjusted Asset Values of all Partnership assets may be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the following times: (i) upon distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership assets, unless all Partners receive simultaneous distributions of either undivided interests in the distributed property or identical Partnership assets in proportion to their interests in Partnership distributions as provided in paragraphs 7.4, 7.5 and 7.6 and (ii) the grant of an additional interest in the Partnership to any new or existing Partner.

**(c)**    The Adjusted Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the termination of the Partnership either by expiration of the Partnership's term or the occurrence of an event described in paragraph 10.2.

**14.3    Affiliate.**  An Affiliate of any person shall mean (a) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the person specified or (b) such person's immediate family members (excluding family members who do not reside in the same household).

**14.4    Attributable Interest.**    Attributable Interest shall mean an ownership or managerial interest in a Media Company that is sufficient under the Ownership Rules to cause the Partnership to be deemed to hold a "cognizable" or "attributable" interest for purposes of any one or more of such Ownership Rules.

35.

806590 v11/SD

Exhibit 1
Page 85

**14.5    Capital Account.**   The Capital Account of each Partner shall consist of its original capital contribution, (a) increased by any additional capital contributions, its share of income or gain that is allocated to it pursuant to this Agreement, and the amount of any Partnership liabilities that are assumed by it or that are secured by any Partnership property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of expense or loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Partnership or that are secured by any property contributed by it to the Partnership.   The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Regulations.   In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable to any Partner pursuant to Article 7 and Article 10.

**14.6    Capital Commitment; Committed Capital.**  A Partner's Capital Commitment shall mean the amount that such Partner has agreed to contribute to the capital of the Partnership as set forth opposite such Partner's name on the Schedule of Partners.   The Partnership's Committed Capital shall equal the sum of the aggregate Capital Commitments of all Partners.

**14.7    Code.**  The Code is the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

**14.8    Deemed Gain or Deemed Loss.**  The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1), over the aggregate Adjusted Asset Value of the Securities distributed.   The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1).

**14.9    FCC.**   FCC means the United States Federal Communications Commission, or any successor governmental agency, commission, bureau or other governmental entity.

**14.10    FCC Attribution Orders.**  FCC Attribution Orders means the FCC's decisions in Corporate Ownership Reporting and Disclosure by Broadcast Licensees, 97 FCC 2d 997 (1984), on recon., 58 Rad. Reg. 2d (P&F) 604 (1985), on further recon., 1 FCC Rcd 802 (1986); Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, 14 FCC Rcd 12559 (1999), on recon., 16 FCC Rcd 1097 (2001); Implementation of the Cable Television Consumer Protection and Competition Act of 1992, 14 FCC Rcd 19014 (1999); and any other FCC Rules substantially incorporating, duplicating or otherwise relying upon the policies in such decisions, as any of such policies may be further modified by the FCC from time to time.

36.

**14.11    FCC Rules.**  FCC Rules means the rules, regulations and policies of the FCC, as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder.

**14.12    Idle Funds Income.**  Idle Funds Income shall mean all income received by the Partnership from commercial paper, certificates of deposit, treasury bills, and other money market investments with maturities of less than twelve (12) months.

**14.13    Managing Directors.**    Managing Directors shall refer to Stuart Frost, John Vigouroux and Jack Kreindler.

**14.14    Marketable; Marketable Securities; Marketability.**  These terms shall refer to Securities that are (a) traded on a national securities exchange or over the counter, and (i) freely transferable pursuant to either Rule 144 of the Securities Act (without being subject to any volume restrictions set forth in Rule 144(e)) or Rule 145 of the Securities Act and (ii) not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement.  Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the General Partner, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Partnership within a reasonable time period.

**14.15    Media Company.**    Media Company means any Portfolio Company of the Partnership that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, a "daily newspaper" (as such term is defined in Note 6 to Section 73.3555 of the FCC Rules) or any other communications facility or enterprise subject to multiple ownership, cross-ownership or other ownership restrictions set forth in the Communications Act of 1934 and the Telecommunications Act of 1996, each as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder, or in the FCC Rules, but only to the extent that the FCC Attribution Orders or any comparable FCC Rules setting forth limitations on the involvement of a limited partner in the business of the facility or enterprise are relevant to determining the application of such ownership restrictions to direct or indirect ownership, managerial or comparable interests in such facility or enterprise.

**14.16    Nonmarketable Securities.**  Nonmarketable Securities are all Securities other than Marketable Securities.

**14.17    Other Restricted Person.**    Other Restricted Person means: (i) any officer, director, partner or equivalent non-corporate official of a Limited Partner; (ii) any five percent or greater voting shareholder or any other direct or indirect owner of a Limited Partner whose ownership interest in the Limited Partner constitutes an Attributable Interest; and (iii) any officer, director, partner or equivalent non-corporate official of any such shareholder or other owner who is deemed to hold a "cognizable" interest in the Limited Partner under the FCC Rules.

**14.18    Ownership Rules.**  Ownership Rules shall mean the attribution rules and the multiple and cross-ownership rules of the FCC applicable to Media Companies including,

37.

without limitation, 47 C.F.R. Sections 21.912, 26.101(a), 73.3555, 74.931(i), 76.501, 76.503,76.504 and 76.505, the FCC Attribution Orders and related provisions, and in decisions and opinions interpreting and applying such provisions.

**14.19  Partnership Percentage.**  The Partnership Percentage for each Partner shall equal the quotient of the amount of such Partner's capital contributions divided by the amount of capital contributions of all the Partners, as determined from time to time.

**14.20  Percentage in Interest; Majority in Interest.**  A specified fraction or percentage in interest of the Partners or of the Limited Partners shall mean Partners or Limited Partners of the Partnership whose Capital Commitments, stated as a percentage of the aggregate Capital Commitments of the Partnership, equal or exceed the required fraction or percentage in interest of all such Partners or Limited Partners.  A Majority in Interest shall mean more than fifty percent (50%) in interest.  Any limited partnership interest owned or controlled by the General Partner, an Affiliate of the General Partner, or a Defaulting Limited Partner shall be deemed not to be outstanding for purposes of any determination under this Agreement of a particular percentage in interest of the Limited Partners.

**14.21  Profit or Loss.**  Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Partnership's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

        **(a)**     Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

        **(b)**     Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

        **(c)**     Gain or loss resulting from any disposition of a Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

        **(d)**     The difference between the gross fair market value of all Partnership assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 14.2;

        **(e)**     Items which are specially allocated pursuant to paragraphs 3.2(c), 4.5(b)(vi), 5.1(c), 5.1(d), 5.2 and 5.3 shall not be taken into account in computing Profit or Loss; and

        **(f)**     The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

38.

806590 v11/SD

Exhibit 1
Page 88

**14.22**   **Securities.**   Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**14.23**   **Securities Act.**   Securities Act shall mean the Securities Act of 1933, as amended.

**14.24**   **Treasury Regulations.**   Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

## ARTICLE 15

### OTHER PROVISIONS

**15.1**   **Governing Law.**   This Agreement shall be governed by and construed under the laws of the State of Delaware as such law would be applied to agreements among the residents of such state made and to be performed entirely within such state.

**15.2**   **Limitation of Liability of the Limited Partners.**   Except as required by law and except for (a) liability for loans to a Limited Partner in respect of withholding or taxes paid by the Partnership on behalf of such Partner pursuant to paragraph 7.6 and (b) obligations to return distributions pursuant to paragraphs 4.2(c) and 4.2(d), no Limited Partner shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Partnership in excess of its Capital Commitment to the Partnership.  No Limited Partner shall owe any fiduciary duty to the Partnership or the Partners, except to refrain from bad faith violations of the implied contractual obligation of good faith.

**15.3**   **Exculpation.**    Neither the tax matters partner, the General Partner, the Management Company, the members of the Advisory Committee nor their respective managers, members, partners, principals, officers, employees, Affiliates or agents shall be liable, responsible or accountable in damages or otherwise to the Limited Partners or the Partnership for honest mistakes of judgment, or for action or inaction, taken in good faith and in the best interest interests of the Partnership, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any third party brokers or other agent of the Partnership, *provided that* such broker or agent was selected, engaged, and retained with reasonable care. The General Partner and such persons may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, *provided that* they (i) shall have been selected with reasonable care, (ii) are provided with all material information relevant to the matter at hand, and (iii) receive such advice in writing.  Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any person of any liability by reason of recklessness, gross negligence or willful misconduct or to the extent (but only to the extent) that such liability may not be waived, modified, or limited under applicable law, but shall be construed so as to effectuate the provisions of such paragraphs to the fullest extent permitted by law.  Notwithstanding anything to the contrary in this Agreement, to the extent that at law or

39.

in equity, an Indemnified Party has duties (including fiduciary duties) and liabilities relating thereto to the Partnership, any Partner or any other person, such Indemnified Party acting under this Agreement shall not be liable to the Partnership, any Partner or any other person for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities relating thereto of an Indemnified Party otherwise existing at law or in equity, are agreed by each Partner and the Partnership to so modify such other duties and liabilities of such Indemnified Party.  Notwithstanding any of the foregoing to the contrary, members of the Advisory Committee (including solely with respect to the conduct of any member of the Advisory Committee, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.3 so long as they acted in good faith.  This paragraph 15.3 is intended to apply solely for the benefit of the Limited Partners, and in no way shall be construed or interpreted as inuring to the benefit of any other person or entity, including, without limitation, creditors of the Partnership, of the General Partner or of the members of the General Partner or other third parties.

**15.4    Indemnification.**

806590 v11/SD

40.

Exhibit 1
Page 90

**(a)**     The Partnership agrees to indemnify, out of the assets of the Partnership only (but including amounts that the Partners may be required to contribute pursuant to paragraph 4.2(d)), the General Partner, the Management Company, the members of the Advisory Committee, the tax matters partner and their respective managers, members, partners, principals, officers, employees, Affiliates or agents (the "*Indemnified Parties*") to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, or demand against the Indemnified Parties that arise out of or in any way relate to the Partnership, its properties, business, or affairs (but excluding matters solely between or among members of the General Partner) and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Partnership) of any such claim, action or demand; *provided, however*, that this indemnity shall not extend to (1) conduct not undertaken in the good faith belief that such act or omission was in the best interests of the Partnership or (2) any conduct which constitutes recklessness, gross negligence or willful misconduct.   Notwithstanding the proviso set forth in the immediately preceding sentence, members of the Advisory Committee (including solely with respect to the conduct of any Advisory Committee member, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.4(a) so long as they acted in good faith. Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph shall be paid by the Partnership in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party provides a written undertaking to the Partnership to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified; *provided, further*, that no such advance shall be paid in the case of a claim or proceeding brought against any Indemnified Parties by a Majority in Interest or greater of the Limited Partners.  The provisions of this paragraph 15.4 shall remain in effect as to each Indemnified Party whether or not such indemnified person continues to serve in the capacity that entitled such person to be indemnified.

**(b)**     Notwithstanding anything in this paragraph 15.4 to the contrary, the Partnership shall not be permitted to indemnify an Indemnified Party serving as an officer and/or director of a Portfolio Company for liabilities that relate to a period after the Partnership has disposed of its investment in the Portfolio Company.

**(c)**     Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to paragraph 15.4(a) (as limited by paragraph 15.4(b)), the Partners intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Partnership, (ii) the Partnership, and (iii) the General Partner and/or its Affiliates, paragraph 15.4(a) shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Partnership shall have primary liability; second, the Partnership and any Parallel Fund (as applicable) shall have secondary liability; and third, the General Partner and/or its Affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Partnership and the Partnership, and/or any Parallel Fund, as applicable. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Partnership shall not restrict the Partnership from making indemnification payments to an Indemnified Party that is otherwise

41.

806590 v11/SD

Exhibit 1
Page 91

eligible for such indemnification payments, but such indemnification payments by the Partnership are not intended to relieve any investment counterparty of the Partnership from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Partnership actually receives indemnification payments from an investment counterparty of the Partnership or under any insurance policy for the same loss or expense, such Indemnified Party shall repay the Partnership as soon as practicable to the extent of such duplicative indemnification payments. Indemnification payments (if any) made to an Indemnified Party by the General Partner and/or its Affiliates in respect of a loss or expense for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Partnership and/or any Parallel Fund under the limited partnership agreement or other governing agreements of such Parallel Fund shall not relieve the Partnership and/or any Parallel Fund from its obligation to such Indemnified Party and/or the General Partner (or any Affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the General Partner and/or its Affiliates would be reimbursed by such Indemnified Party or directly by the Partnership with indemnification payments made by the Partnership under paragraph 15.4(a)). To the extent that the Partnership is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the General Partner and/or its Affiliates (other than the Partnership, or any Parallel Fund), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Partnership. As used in this paragraph 15.4(b), "indemnification payments" made or to be made by an investment counterparty of the Partnership shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Partnership, and (z) payments made or to be made by or on behalf of such investment counterparty of the Partnership (or such successor) pursuant to an insurance policy or similar arrangement.

    **15.5**    **Arbitration.**

    **(a)**    Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("***Claim***"), shall be resolved by final and binding arbitration ("***Arbitration***") before a panel of three (3) arbitrators ("***Arbitrators***") selected from and administered by Judicial Arbitration and Mediation Service Inc. (the "***Administrator***") in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes.  Each party shall select one arbitrator and the two parties shall then agree on a third arbitrator, who shall be selected from a list provided by the Administrator.  The arbitration shall be held in San Juan Capistrano, California.

    **(b)**    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

    **(c)**    The Arbitrators shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded.  The Arbitrators shall be authorized to award compensatory damages, but

806590 v11/SD

Exhibit 1
Page 92

shall *not* be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrators also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

   **(d)** Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrators; *provided, however,* the Arbitrators shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrators. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

   **(e)** By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 15.5, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

  **15.6** **Execution and Filing of Documents.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.

  **15.7** **Other Instruments and Acts.** The Partners agree to execute any other instruments or perform any other acts that are or may be reasonably necessary to effectuate and carry on the partnership created by this Agreement.

  **15.8** **Binding Agreement.** This Agreement shall be binding upon the transferees, successors, assigns, and legal representatives of the Partners.

  **15.9** **Notices; Electronic Transmission of Reports.** Any notice or other communication that one Partner desires to give to another Partner shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the Partner to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be addressed to the other Partner at the address shown on the Schedule of Partners or at such other address as a Partner may designate by ten (10) days' advance written notice to the other Partners. In addition to the provisions of

43.

806590 v11/SD

Exhibit 1
Page 93

paragraph 11.5, the General Partner shall be entitled to transmit to the Limited Partners by e-mail the reports required by paragraphs 11.3, 11.4, and 11.7.

**15.10  Power of Attorney.**  By signing this Agreement, each Limited Partner designates and appoints the General Partner its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Certificate of Limited Partnership and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Partnership by the laws of the United States of America, the laws of the state of the Partnership's formation, or any other state in which the Partnership shall conduct its affairs in order to qualify or otherwise enable the Partnership to conduct its affairs in such jurisdictions. Such attorney is not hereby granted any authority on behalf of the Limited Partners to amend this Agreement except that as attorney for each of the Limited Partners, the General Partner shall have the authority to amend this Agreement and the Certificate of Limited Partnership (and to execute any amendment to the Agreement or the Certificate of Limited Partnership on behalf of itself and as attorney in fact for each of the Limited Partners) as may be required to effect:

**(a)**  Admission of additional Partners pursuant to Article 3;

**(b)**  Additional capital commitments pursuant to Article 4;

**(c)**  Transfers of Limited Partnership interests pursuant to Article 9; and

**(d)**  Extensions of the Partnership term pursuant to Article 10.

This power of attorney and the power of attorney referenced in paragraph 4.5(b)(ix) granted by each Limited Partner shall expire as to such Partner immediately after the dissolution of the Partnership or the amendment of the Partnership's Schedule of Partners to reflect the complete withdrawal of such Partner as a Partner of the Partnership.

**15.11  Amendment.**

**(a)**  Except as provided by the immediately preceding paragraph and subject to paragraph 15.11(b), this Agreement may be amended only with the written consent of the General Partner and a Majority in Interest of the Limited Partners.

**(b)**  Notwithstanding paragraph 15.11(a), no amendment to the provisions of Article 13 may be made without the consent of each ERISA Partner, Governmental Plan Partner and Private Foundation Partner who may be adversely affected by such amendment.

**(c)**  Notwithstanding paragraphs 15.11(a) and (b), no amendment of this Agreement may modify the method of making Partnership allocations or distributions, modify the method of determining the Partnership Percentage of any Partner, reduce any Partner's Capital Account, modify any provision of this Agreement pertaining to limitations on liability of the Limited Partners, or change the restrictions contained herein, unless each Partner adversely affected thereby in a manner different than the other Partners has expressly consented in writing to such amendment.

44.

**(d)**     The Partnership's or General Partner's (or its managers', members' or employees') noncompliance with any provision hereof in any single transaction or event may be waived prospectively or retroactively in writing by the same Percentage in Interest of the Limited Partners that would be required to amend such provision pursuant to paragraphs 15.11(a), (b) or (c).  No waiver shall be deemed a waiver of any subsequent event of noncompliance except to the extent expressly provided in such waiver.

**(e)**     The General Partner shall provide a copy of any amendment to (or waiver of any provision of) this Agreement to each Limited Partner for its records within a reasonable period of time following its adoption or approval.

**15.12   Entire Agreement.**   This Agreement constitutes the full, complete, and final agreement of the Partners and supersedes all prior agreements between the Partners with respect to the Partnership.   Notwithstanding the provisions of this Agreement, including paragraph 15.11, or of any subscription agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership, without the approval of any Limited Partner or any other person, may enter into a side letter or similar agreement to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement.  The parties hereto agree that any terms contained in a side letter or similar agreement to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any subscription agreement.

**15.13   Titles; Subtitles.**   The titles and subtitles used in this Agreement are used for convenience only and shall not be considered in the interpretation of this Agreement.

**15.14   Partnership Name.**   The Partnership shall have the exclusive right to use the Partnership name as long as the Partnership continues.  Upon termination of the Partnership, the Partnership shall assign whatever rights it may have in such name to the General Partner.  No value shall be placed upon the name or the goodwill attached to it for the purpose of determining the value of any Partner's Capital Account or interest in the Partnership.

**15.15   Confidentiality.**

**(a)**     This Agreement and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Partnership and its investments, including, without limitation, information about the portfolio companies of the Partnership (collectively, the "***Confidential Information***"), that any Limited Partner may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Limited Partner or its representatives, including Confidential Information disclosed to members of the Advisory Committee, pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Partnership, constitute proprietary and confidential information about the Partnership, the General Partner and its Affiliates and the Partnership's portfolio companies (the "***Affected Parties***").  Each Limited Partner acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential

45.

806590 v11/SD

Exhibit 1
Page 95

Information is the subject of reasonable efforts to maintain its secrecy. Each Limited Partner further acknowledges and agrees that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.

      **(b)**      Each Limited Partner agrees to hold all Confidential Information in confidence, and not to disclose any Confidential Information to any third party without the prior written consent of the General Partner. Notwithstanding the preceding sentence, each Limited Partner may disclose such Confidential Information: (i) to its officers, directors, trustees, equity owners, wholly-owned subsidiaries, employees and outside experts (including but not limited to its attorneys and accountants) on a "need to know" basis, so long as such persons are bound by the same duties of confidentiality to the Partnership as such Limited Partner, and so long as such Limited Partner shall remain liable for any breach of this paragraph 15.15 by such persons; (ii) to the extent that such information is required to be disclosed in connection with any civil or criminal proceeding; (iii) to the extent that such information is required to be disclosed by applicable law or requested in connection with any governmental, administrative or regulatory proceeding or filing (including any inspection or examination or any disclosure necessary in connection with a request for information made under a state or federal freedom of information act or similar law), after reasonable prior written notice to the General Partner (except where such notice is expressly prohibited by law); (iv) to the extent that such information was received from a third party not subject to confidentiality limitations and such Limited Partner can establish that it rightfully received such information from such party other than as a result of the breach of this paragraph 15.15; (v) to the extent such information was rightfully in such Limited Partner's possession prior to the Partnership's conveyance of such information to such Limited Partner, as evidenced by the Limited Partner's prior written records; or (vi) to the extent that the information provided by the Partnership is otherwise available in the public domain in the absence of any improper or unlawful action on the part of such Partner. Any Limited Partner seeking to make disclosure in reliance on the foregoing clauses (ii) and (iii) above, such Limited Partner shall use its commercially reasonable efforts to claim any relevant exception under such laws or obligations which would prevent or limit public disclosure of the Confidential Information and provide the General Partner with prompt notice upon the Limited Partner's receipt of a request for disclosure of any Confidential Information pursuant to such laws or obligations.

      **(c)**      Each Limited Partner also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Partnership upon the General Partner's request. Notwithstanding any provision of this Agreement to the contrary, the General Partner may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any particular Limited Partner if the General Partner reasonably determines that the disclosure of such Confidential Information to such Limited Partner may result in the general public gaining access to such Confidential Information or that such disclosure is not in the best interests of the Partnership or its investments; provided, however, that to the extent that any information is not delivered to a Limited Partner based on the General Partner's exercise of its discretion under this sentence, such information shall be made available for review, but not copying, during regular business hours at a location mutually determined by the General Partner and such Limited Partner. In no

46.

806590 v11/SD

Exhibit 1
Page 96

event shall a Limited Partner be denied access to information deliverable pursuant to paragraph 11.7 of this Agreement.

**(d)** In addition, with respect to each Limited Partner that is subject to any "freedom of information," "sunshine" or other law, rule or regulation that imposes upon such Limited Partner an obligation to make information available to the public (a "***FOIA Limited Partner***"), the Partnership hereby requests confidential treatment of the Confidential Information, and such Limited Partner shall use commercially reasonable efforts to take such action as necessary for such Confidential Information to be exempt from disclosure, to the maximum extent permitted under such law, rule or regulation. Notwithstanding anything contained in this paragraph 15.15 to the contrary, each FOIA Limited Partner may publicly disclose the following: (i) the FOIA Limited Partner's status as a Limited Partner of the Partnership, (ii) the amount of such FOIA Limited Partner's Capital Commitment, (iii) the total amount of such FOIA Limited Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the FOIA Limited Partner from the Partnership, and (v) the FOIA Limited Partner's net internal rate of return with respect to the Partnership's performance as prepared by such FOIA Limited Partner (collectively, the "***Fund Level Information***"). Only with respect to FOIA Limited Partners, for purposes of this paragraph 15.15, Confidential Information shall be deemed not to include Fund Level Information.

**(e)** In addition, with respect to each Limited Partner that is a "fund of funds" or a similar pooled investment vehicle (but specifically excluding any pension, retirement or similar benefit plan) (a "***Pooled Vehicle Partner***"), the Pooled Vehicle Partner shall be permitted to make disclosure to its direct equity owners (expressly excluding permission to make disclosure to any indirect or other beneficial owners), that are subject to a written confidentiality agreement or obligation that provides a degree of protection to the Partnership comparable to that provided in this paragraph 15.15 of solely the following Confidential Information: (i) the Pooled Vehicle Partner's status as a Limited Partner of the Partnership, (ii) the amount of such Pooled Vehicle Partner's Capital Commitment, (iii) the total amount of such Pooled Vehicle Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the Pooled Vehicle Partner from the Partnership, (v) the Pooled Vehicle Partner's net internal rate of return with respect to the Partnership's performance as prepared by such Pooled Vehicle Partner, (vi) the net asset value of the Pooled Vehicle Partner's interest in the Partnership (both cost and market value), (vii) such ratios and performance information calculated by the Pooled Vehicle Partner using the information in clauses (ii) through (vi) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple"), (viii) quarterly and annual reports summarizing the status of the Pooled Vehicle Partner's investment in the Partnership (without disclosure of any information concerning a Portfolio Company, other than the name of such Portfolio Company, a description of the business of such Portfolio Company and information regarding the industry and geographic location of such Portfolio Company, the Partnership's cost basis in each such Portfolio Company, the Partnership's carry value of each investment in such Portfolio Company and, upon liquidity of any such Portfolio Company, the Partnership's rate of return related to such investment (the "***Portfolio Confidential Information***")), and (ix) the name and address of the Partnership and the names of the principals of the General Partner; provided, however, that no Pooled Vehicle Partner may provide Portfolio Confidential Information to an equity owner of such Pooled

47.

Vehicle Partner that would be a FOIA Limited Partner of the Partnership if such equity owner of the Pooled Vehicle Partner were a Limited Partner of the Partnership; other than the Fund Level Information that the Pooled Vehicle Partner would be able to disclose if it were a FOIA Limited Partner.

**(f)**       Each Limited Partner agrees to notify such Limited Partner's attorneys, accountants and other similar advisers about their obligations in connection with this paragraph 15.15 and will further cause such advisers to abide by the aforesaid provisions of this paragraph 15.15.  Notwithstanding the foregoing, no Limited Partner shall be liable to the Partnership for any breach of this paragraph 15.15 by any adviser of such Limited Partner if the adviser is bound by an obligation to keep such Confidential Information confidential and such Limited Partner agrees to enforce such obligation.

**15.16   Partnership Legal Matters.**  Each Partner hereby agrees and acknowledges that:

**(a)**       Cooley LLP ("***Cooley***") has been retained as Legal Counsel by the General Partner in connection with the formation of the Partnership and the offering of Limited Partner interests and in such capacity has provided legal services to the General Partner and the Partnership.  The General Partner expects to retain Cooley to provide legal services to the General Partner and the Partnership in connection with the management and operation of the Partnership.

**(b)**       Cooley is not and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one hand and the General Partner and the Partnership on the other (the "***Partnership Legal Matters***").

**(c)**       Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

**(d)**       Each Limited Partner hereby agrees that Cooley may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner or the Partnership and one or more Limited Partners) and waives any present conflict of interest with Cooley regarding Partnership Legal Matters arising by virtue of any representation or deemed representation of such Limited Partner or the Partnership on account of Cooley's representation described in paragraph 15.16(a) above; *provided, however,* that the Limited Partners are not hereby agreeing to Cooley's representation of the Partnership in a derivative action on their behalf against the General Partner.

**[THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

48.

806590 v11/SD

Exhibit 1
Page 98

IN WITNESS WHEREOF, the Partners have executed this Limited Partnership Agreement as of the date first written above.

GENERAL PARTNER:                           LIMITED PARTNER:

FROST VENTURE PARTNERS GP, LLC

_____
*(Print name of investing entity)*


By:_____        By:_____
        Managing Director                        *(signature)*

                                        Name:_____
                                                *(print name)*

                                        Title:_____

"THE SECURITIES EVIDENCED BY THIS PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT COVERING SUCH SECURITIES OR THE GENERAL PARTNER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE GENERAL PARTNER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE 1933 ACT."

# FROST VP EARLY STAGE FUND II, L.P.

# LIMITED PARTNERSHIP AGREEMENT

806590 v11/SD

Exhibit 1
Page 100

## TABLE OF CONTENTS

**PAGE**

ARTICLE 1      NAME, PURPOSE AND OFFICES OF PARTNERSHIP ............................1

    1.1    Name....................................................................................................1

    1.2    Purpose ...............................................................................................1

    1.3    Principal Office ..................................................................................1

    1.4    Registered Agent and Office ..............................................................1

ARTICLE 2      TERM OF PARTNERSHIP ...........................................................2

    2.1    Term ...................................................................................................2

    2.2    Events Affecting a Member of the General Partner ...........................2

    2.3    Events Affecting a Limited Partner of the Partnership ......................2

    2.4    Events Affecting the General Partner..................................................2

ARTICLE 3      NAME AND ADMISSION OF PARTNERS.................................2

    3.1    Name and Address...............................................................................2

    3.2    Admission of Additional Partners ......................................................3

ARTICLE 4      CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND
               NONCONTRIBUTING PARTNERS ................................................3

    4.1    Capital Accounts ................................................................................3

    4.2    Capital Contributions of the Limited Partners....................................3

    4.3    Capital Contributions of the General Partner .....................................5

    4.4    Acquisition of an Additional Interest by the General Partner .............6

    4.5    Noncontributing Partners....................................................................6

    4.6    Suspension Period .............................................................................10

ARTICLE 5      PARTNERSHIP ALLOCATIONS ............................................11

    5.1    Allocation of Profit or Loss..............................................................11

    5.2    Special Allocations ...........................................................................13

    5.3    Regulatory Allocations......................................................................13

    5.4    Income Tax Allocations ....................................................................14

ARTICLE 6      MANAGEMENT FEE; PARTNERSHIP EXPENSES ................14

    6.1    Management Fee ................................................................................14

    6.2    Expenses ...........................................................................................15

ARTICLE 7      WITHDRAWALS BY AND DISTRIBUTIONS TO THE
               PARTNERS...................................................................................17

TABLE OF CONTENTS
(Continued)

PAGE

| 7.1 | Interest | 17 |
|---|---|---|
| 7.2 | Withdrawals by the Partners | 17 |
| 7.3 | Partners' Obligation to Repay or Restore | 17 |
| 7.4 | Mandatory Distributions | 17 |
| 7.5 | Discretionary Distributions | 18 |
| 7.6 | Withholding Obligations | 19 |
| ARTICLE 8 | MANAGEMENT DUTIES AND RESTRICTIONS | 20 |
| 8.1 | Management | 20 |
| 8.2 | No Control by the Limited Partners; No Withdrawal | 21 |
| 8.3 | Existing Funds; Follow On Funds; Parallel Funds | 21 |
| 8.4 | Investment Opportunities and Restrictions | 22 |
| ARTICLE 9 | INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS | 23 |
| 9.1 | Investment Representation of the Limited Partners | 23 |
| 9.2 | Qualifications of the Limited Partners | 24 |
| 9.3 | Transfer by General Partner | 24 |
| 9.4 | Transfer by Limited Partner | 24 |
| 9.5 | Requirements for Transfer | 25 |
| 9.6 | Substitution as a Limited Partner | 25 |
| ARTICLE 10 | DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP | 26 |
| 10.1 | Extension of Partnership Term | 26 |
| 10.2 | Early Termination of the Partnership | 26 |
| 10.3 | Winding Up Procedures | 26 |
| 10.4 | Payments in Liquidation | 27 |
| 10.5 | Return of Excess Distributions | 27 |
| ARTICLE 11 | FINANCIAL ACCOUNTING, REPORTS AND MEETINGS | 28 |
| 11.1 | Financial Accounting; Fiscal Year | 28 |
| 11.2 | Supervision; Inspection of Books | 28 |
| 11.3 | Quarterly Reports | 28 |
| 11.4 | Annual Report; Financial Statements of the Partnership | 28 |
| 11.5 | Electronic Reporting | 29 |
| 11.6 | Tax Returns | 29 |

ii.

806590 v11/SD

Exhibit 1
Page 102

TABLE OF CONTENTS
(Continued)

PAGE

| | | | |
|---|---|---|---|
| 11.7 | Tax Matters Partner | | 30 |
| ARTICLE 12 | VALUATION; ADVISORY COMMITTEE | | 31 |
| 12.1 | Valuation | | 31 |
| 12.2 | Advisory Committee | | 32 |
| ARTICLE 13 | PARTNERS SUBJECT TO SPECIAL REGULATION | | 32 |
| 13.1 | ERISA Partners | | 32 |
| 13.2 | Governmental Plan Partners | | 34 |
| 13.3 | Private Foundation Partners | | 35 |
| 13.4 | Media Companies | | 35 |
| ARTICLE 14 | CERTAIN DEFINITIONS | | 37 |
| 14.1 | Accounting Period | | 37 |
| 14.2 | Adjusted Asset Value | | 37 |
| 14.3 | Affiliate | | 37 |
| 14.4 | Attributable Interest | | 38 |
| 14.5 | Capital Account | | 38 |
| 14.6 | Capital Commitment; Committed Capital | | 38 |
| 14.7 | Code | | 38 |
| 14.8 | Deemed Gain or Deemed Loss | | 38 |
| 14.9 | FCC | | 38 |
| 14.10 | FCC Attribution Orders | | 38 |
| 14.11 | FCC Rules | | 39 |
| 14.12 | Idle Funds Income | | 39 |
| 14.13 | Managing Directors | | 39 |
| 14.14 | Marketable; Marketable Securities; Marketability | | 39 |
| 14.15 | Media Company | | 39 |
| 14.16 | Nonmarketable Securities | | 39 |
| 14.17 | Other Restricted Person | | 39 |
| 14.18 | Ownership Rules | | 40 |
| 14.19 | Partnership Percentage | | 40 |
| 14.20 | Percentage in Interest; Majority in Interest | | 40 |
| 14.21 | Profit or Loss | | 40 |
| 14.22 | Securities | | 41 |

iii.

806590 v11/SD

Exhibit 1
Page 103

TABLE OF CONTENTS
(Continued)

PAGE

14.23   Securities Act .................................................................................................. 41

14.24   Treasury Regulations ...................................................................................... 41

ARTICLE 15      OTHER PROVISIONS .......................................................................... 41

15.1    Governing Law ................................................................................................ 41

15.2    Limitation of Liability of the Limited Partners .............................................. 41

15.3    Exculpation ..................................................................................................... 41

15.4    Indemnification ............................................................................................... 42

15.5    Arbitration ...................................................................................................... 44

15.6    Execution and Filing of Documents ............................................................... 45

15.7    Other Instruments and Acts ............................................................................ 45

15.8    Binding Agreement ......................................................................................... 45

15.9    Notices; Electronic Transmission of Reports ................................................. 45

15.10   Power of Attorney ........................................................................................... 46

15.11   Amendment ..................................................................................................... 46

15.12   Entire Agreement ............................................................................................ 47

15.13   Titles; Subtitles ............................................................................................... 47

15.14   Partnership Name ............................................................................................ 47

15.15   Confidentiality ................................................................................................ 47

15.16   Partnership Legal Matters ............................................................................... 50

iv.

806590 v11/SD

Exhibit 1
Page 104

## INDEX OF DEFINITIONS

| Term | Paragraph | Page |
|------|-----------|------|
| Accounting Period | 14.1 | 37 |
| Act | Preamble | 1 |
| Activation Date | 4.2(a) | 4 |
| Adjusted Asset Value | 14.2 | 37 |
| Administrator | 15.5(a) | 44 |
| Advisory Committee | 12.2 | 32 |
| Affected Parties | 15.15(a) | 47 |
| Affiliate | 14.3 | 37 |
| Agreement | Preamble | 1 |
| Applicable Tax Rate | 7.4 | 17 |
| Arbitration | 15.5(a) | 44 |
| Arbitrators | 15.5(a) | 44 |
| Attributable Interest | 14.4 | 37 |
| Capital Account | 14.5 | 38 |
| Capital Commitment | 14.6 | 38 |
| Carry Percentage | 5.1(b) | 12 |
| Claim | 15.5(a) | 44 |
| Code | 14.7 | 38 |
| Commencement Date | 2.1 | 2 |
| Commitment Period | 4.2(a) | 4 |
| Committed Capital | 14.6 | 38 |
| Confidential Information | 15.15(a) | 47 |
| Deemed Gain | 14.8 | 38 |
| Deemed Loss | 14.8 | 38 |
| Default Notice | 4.5(b) | 6 |
| Defaulting Limited Partner | 4.5(b) | 6 |
| DOL Regulations | 4.2(b) | 4 |
| ERISA | 9.5(a) | 24 |
| ERISA Partner | 13.1(a) | 32 |
| FCC | 14.9 | 38 |
| FCC Attribution Orders | 14.10 | 38 |
| FCC Rules | 14.11 | 39 |
| Fee Adjustment | 4.3 | 5 |
| Fee Adjustment Amount | 4.3 | 5 |
| Fee Adjustment Notice | 4.3 | 5 |
| FOIA Limited Partner | 15.15(d) | 49 |
| Frost Fund | 8.3(a) | 21 |
| Fund Affiliates | 8.3(a) | 21 |
| Fund Level Information | 15.15(d) | 49 |
| General Partner | Preamble | 1 |
| Governmental Plan Partner | 13.2 | 34 |

| Term | Paragraph | Page |
|------|-----------|------|
| Incubator | 1.2 | 1 |
| Incubator Company | 8.3(b) | 20 |
| Idle Funds Income | 14.12 | 39 |
| Indemnified Parties | 15.4(a) | 42 |
| Limited Partners | Preamble | 1 |
| Loss | 14.23 | 40 |
| Majority in Interest | 14.21 | 40 |
| Management Company | 8.1 | 20 |
| Management Fee Percentage | 6.1(b) | 14 |
| Managing Directors | 14.13 | 39 |
| Marketable | 14.14 | 39 |
| Marketable Securities | 14.14 | 39 |
| Marketability | 14.14 | 39 |
| Media Company | 14.15 | 39 |
| Nonmarketable Securities | 14.16 | 39 |
| Optionees | 4.5(b)(vii) | 8 |
| Optionor | 4.5(b)(vii) | 8 |
| Other Restricted Person | 14.17 | 39 |
| Ownership Rules | 14.18 | 40 |
| Parallel Funds | 8.3(c) | 21 |
| Partner(s) | 3.1 | 2 |
| Partnership | Preamble | 1 |
| Partnership Percentage | 14.19 | 40 |
| Payback | 7.5(a) | 18 |
| Percentage in Interest | 14.20 | 40 |
| Pooled Vehicle Partner | 15.15(e) | 49 |
| Portfolio Company | 6.1(e) | 15 |
| Portfolio Confidential Information | 15.15(e) | 50 |
| Private Foundation Partner | 13.3 | 35 |
| Profit | 14.22 | 40 |
| Regulatory Allocations | 5.4(a) | 13 |
| Regulatory Limitation | 7.5(h) | 19 |
| Remaining Portion | 4.6(b)(vii)(2) | 8 |
| Reporting Site | 11.5 | 29 |
| Schedule of Partners | 3.1 | 2 |
| Securities | 14.22 | 41 |
| Securities Act | 14.23 | 41 |
| Service Fee | 6.1(e) | 15 |
| Subject Reports | 11.5 | 29 |
| Successor Fund | 8.3(a) | 20 |
| Suspension Event | 4.6(b) | 11 |
| Suspension Event Notice | 4.6(b) | 11 |
| Suspension Period | 4.6(b) | 11 |
| Tax Payments | 7.6(a) | 19 |
| Termination Date | 2.1 | 2 |

ii.

806590 v11/SD

Exhibit 1
Page 106

| Term | Paragraph | Page |
|------|-----------|------|
| Treasury Regulations | 14.24 | 41 |
| VCOC | 4.2(b) | 4 |
| VCOC Notice | 4.2(b) | 4 |

iii.

806590 v11/SD

Exhibit 1
Page 107

## PROOF OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2101 East Coast Highway, Suite 260, Corona del Mar, California 92625.

On October 16, 2016, I served the within document(s) described as:

**DEMAND FOR ARBITRATION**

on the interested parties in this action as stated below:

Matthew Hodel
Hodel Wilks LLP
4 Park Plaza, Suite 640
Irvine, CA 92614

Louis H. Lauch Declaration of Trust
7498 Ayers Road
Cincinnati, OH 45255

Lauch Boys LLC
7498 Ayers Road
Cincinnati, OH 45255

Larry Sheakley
320 Broadway
Cincinnati, OH 45202

North American Specialties Insurance Company, Inc.
320 Broadway
Cincinnati, OH 45202

PENSCO Trust Co.
   Custodian FBO Charles W. Reynolds Jr. IRA
P.O. Box 173859
Denver, CO 80217-3859

[X]   (BY MAIL) By placing a true copy of the foregoing document(s) in a sealed envelope addressed as set forth above.  I placed each such envelope for collection and mailing following ordinary business practices.  I am readily familiar with this Firm's practice for collection and processing of correspondence for mailing.  Under that practice, the correspondence would be deposited with the United States Postal Service on that same day, with postage thereon fully prepaid at Corona del Mar, California, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 17, 2016, at Corona del Mar, California.

Colin C. Holley
(Type or print name)

(Signature)

- 1 -

4853-0724-1018

Exhibit 1
Page 108

# EXHIBIT 2

MATTHEW A. HODEL (SB# 93962)
mhodel@hodelwilks.com
ASHLEY E. MERLO (SB# 247997)
amerlo@hodelwilks.com
HODEL WILKS LLP
4 Park Plaza, Suite 640
Irvine, CA 92614
Telephone: (949) 450-4470
Facsimile: (949) 450-4479

Attorneys for Respondents and Counterclaimants
HOLLENCREST BAYVIEW PARTNERS, L.P.,
ROBERT B. WOLFORD, and WOLFORD
FAMILY TRUST, date July 11, 2006

IN THE MATTER OF ARBITRATION BEFORE JAMS

| | |
|---|---|
| FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company; and FROST VENTURE PARTNERS GP, LLC, a Delaware limited liability company;<br><br>Claimants,<br><br>vs.<br><br>HOLLENCREST BAYVIEW PARTNERS, L.P., a Delaware limited partnership; ROBERT B. WOLFORD, an individual; WOLFORD FAMILY TRUST, dated July 11, 2006;<br><br>Respondents.<br><br>HOLLENCREST BAYVIEW PARTNERS, L.P., a Delaware limited partnership; ROBERT B. WOLFORD, an individual; ROBERT B. WOLFORD, as Trustee of the | CASE NO. 1200052341<br><br>**AMENDED COUNTERCLAIMS OF HOLLENCREST BAYVIEW PARTNERS, L.P., ROBERT B. WOLFORD, INDIVIDUALLY AND AS TRUSTEE OF THE WOLFORD FAMILY TRUST** |

Exhibit 2
Page 109

WOLFORD FAMILY TRUST, dated July 11, 2006; derivatively, on behalf of FROST VP SEED, LLC, a Delaware limited liability company, and FROST VP EARLY STAGE FUND II, L.P., a Delaware limited partnership;

                              Counter-Claimants,

vs.

FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company; FROST VENTURE PARTNERS GP, LLC, a Delaware limited liability company; FROST DATA CAPITAL, LLC f/k/a FROST VENTURE PARTNERS, LLC, and STUART FROST, an individual;

                              Counter-Respondents,

and

FROST VP SEED, LLC, a Delaware limited liability company; and FROST VP EARLY STAGE FUND II, L.P., a Delaware limited partnership,

                              Nominal Respondents.

2

Exhibit 2
Page 110

Respondents and counter-claimants Hollencrest Bayview Partners, L.P., Robert B. Wolford, and Robert B. Wolford as Trustee of the Wolford Family Trust, dated July 11, 2006 (collectively, the "Hollencrest Investors"), on behalf of themselves and, to the extent necessary, derivatively, on behalf of Frost VP Seed, LLC (the "Seed Fund") and Frost VP Early Stage Fund II, L.P. ("Fund II")(collectively, the "Funds"), allege as follows:

## INTRODUCTION

1.     The Hollencrest Investors and their clients invested nearly $6 million in the Seed Fund (as defined below), representing an ownership stake of approximately 80% in the Seed Fund. The Hollencrest Investors and their clients invested approximately $1.25 million in Fund II (as defined below). The Hollencrest Investors have received multiple reports from credible sources, including current and former insiders, such as officers of Counter-Respondents, that the individual primarily responsible for managing the Funds – the Funds' namesake, Stuart Frost – has severely and unlawfully mismanaged and abused the Funds.

2.     The Funds' performance has been dismal. During the nearly five years since the inception of the first fund, the Seed Fund, not a penny has been returned to investors. This nonperformance is directly contrary to pre-investment representations made by Frost to the Hollencrest Investors when he reassured them that expenses would be lean and they could expect a return on their investment within two to five years after the Funds made their underlying investments. Frost's alleged misbehavior includes (a) material misrepresentations concerning the performance of the Funds and the financial status of the Funds' investments – in companies referred to as "Portfolio Companies"; (b) neglecting the Funds by taking long vacations in Italy at critical stages of execution of the Funds' investment strategy, and (c) failing to disclose, and charging, abusive and unconscionable fees and expenses, directly or indirectly, by the Frost entities to the Funds and the Portfolio Companies, all to pay his lavish and extraordinary personal

Exhibit 2
Page 111

and family expenses. Stuart Frost also failed to appropriately consult with advisory committees contemplated by the Funds' governing agreements.

3.    Based on the information the Hollencrest Investors have received, Stuart Frost and the entities he established to manage the Funds have breached their fiduciary duties, including their duties of care, loyalty, and disclosure. As a result, the Funds and the entities that manage them are in a dire financial state and may soon be insolvent, if they are not insolvent already.  Further, the portfolio companies have for the most part failed and the future of the few that remain is uncertain, at best.

4.    The Hollencrest Investors justifiably voiced their concerns to Stuart Frost directly, but were met with antagonism, misdirection and stonewalling. As a result, they attempted to exercise their contractual and statutory rights to inspect the books and records of the Funds. On July 26, 2016, the Hollencrest Investors wrote to Stuart Frost, explained the substance of the reports they received, and notified Stuart Frost of their election to exercise their inspection rights. The Hollencrest Investors attached a list of specific categories of documents necessary to investigate Stuart Frost's management of the Funds. The Hollencrest Investors' letter asked a series of pointed questions requesting information and documents from Counter-Respondents in order to determine whether the information they were receiving from insiders and others concerning the potential abuses were valid. Rather than respond by providing forthright answers and delivering the requested documents, Stuart Frost again met the Hollencrest Investors' requests with evasion, antagonism, misdirection and stonewalling.  Frost forced the Hollencrest Investors to pursue this litigation.  Only through this litigation have they been able to begin to take discovery of the necessary books and records to understand and verify the extent of Frost's financial fraud and mismanagement.

5.    Stuart Frost has recently made disparaging statements regarding the Hollencrest Investors to the Funds' other investors, threatened the Hollencrest Investors, and is now threatening to make the Funds pay any fees and costs Claimants – the Funds

respective manager and general partner – incur in this arbitration, which *they initiated* as claimants, as "indemnification." Any such action would be unlawful and contrary to the Funds' governing agreements. The Hollencrest Investors' demand for an accounting in this arbitration will seek information pertaining to any such payments.

## THE PARTIES

6.    Counterclaimant Hollencrest Bayview Partners, L.P. is a member in the Seed Fund.

7.    Counterclaimant Robert B. Wolford ("Wolford") is a member of the Seed Fund. Wolford is also a managing director of Hollencrest Securities, LLC, the investment manager for the general partner of claimant Hollencrest Bayview Partners, L.P. Hollencrest Securities, LLC also acts as an investment advisor for, and authorized representative of, other non-party investors in the Funds.

8.    Counterclaimant Robert B. Wolford, as Trustee of the Wolford Family Trust, dated July 11, 2006 (the "Wolford Trust"), is a limited partner of Fund II.

9.    Nominal respondent Frost VP Seed, LLC, the "Seed Fund," is a Delaware limited liability company.

10.    Counter-respondent Frost Management Company, LLC, a Delaware limited liability company, is identified as the manager of the Seed Fund in its governing agreement.

11.    Nominal respondent Frost VP Early Stage Fund II, L.P., "Fund II," is a Delaware limited partnership.

12.    Counter-respondent Frost Venture Partners GP, LLC, a Delaware limited liability company, is the general partner of Fund II.

13.    Counter-respondent Frost Data Capital, LLC, f/k/a Frost Venture Partners, LLC (the "Incubator"), is an entity solely owned and controlled by counter-respondent

Stuart Frost. The Incubator is the entity through which the Seed Fund and Fund II make equity investments in start-up companies (the "Portfolio Companies"). The Incubator receives certain monthly fees from the Portfolio Companies.

14.    The Hollencrest Investors are informed and believe that Counter-respondent Stuart Frost ("Frost"), an individual, is the sole member, manager of and/or general partner of, and exercises complete control over, Frost Management Company, LLC, Frost Venture Partners GP, LLC and the Incubator. The Hollencrest Investors are informed and believe that Stuart Frost has also been acting as the sole manager of the Seed Fund.

15.    Stuart Frost, Frost Management Company, LLC, Frost Venture Partners GP, LLC and the Incubator are collectively referred to herein as "Counter-Respondents," and Frost Management Company, LLC, Frost Venture Partners GP, LLC and the Incubator as the "Entity Counter-Respondents." The Hollencrest Investors are informed and believe that Counter-Respondents are agents of each other, and the alter egos of each other, such that any award against one of them should be treated as an award against all of them.

16.    Namely, Frost has used the assets of the Entity Counter-Respondents for his personal use and caused the assets of said entities to be transferred to him without adequate consideration. For example, at least the following personal expenses were paid through one or more of the Entity Counter-Respondents: lease payments for a Ferrari automobile, rent payments for a villa and apartment in Italy, the costs for chartering airplane travel for Frost and his family, the salary for a personal chef, the fees and costs associated with a membership at Monarch Beach, and yacht purchase and loan payments.

17.    In addition, on information and belief, Frost has used the Entity Counter-Respondents as a mere shell, instrumentality or conduit from which he has carried on business as if the entities did not exist. He has dominated and controlled the Entity Counter-Respondents, each of which is now insolvent, and received preferential

repayment of loans and expenses as a result of his exercise of power over the Entity Counter-Respondents. For example, the above described personal expenses have been paid through one or more of the Entity Counter-Respondents with no oversight or approval mechanism. The Entity Counter-Respondents also have failed to keep adequate corporate governance books, records and minutes. Some of the Entity Counter-Respondents do not maintain their own financial statements or general ledgers.

## FACTS

18.    In 2012, Hollencrest Bayview Partners, L.P. became a member of the Seed Fund by entering into an amended and restated operating agreement. A true and correct copy of the Seed Funds' operating agreement is attached hereto as Exhibit A.

19.    In 2012, Wolford became a member of the Seed Fund by entering into the Seed Fund's amended and restated operating agreement, Exhibit A.

20.    In 2013, the Wolford Trust became a limited partner of Fund II by entering into a limited partnership agreement. A true and correct copy of Fund II's limited partnership agreement is attached hereto as Exhibit B.

21.    Arbitration Agreement: Both governing agreements identified above include arbitration clauses. Section 13.10 of the Seed Fund's operating agreement requires arbitration of any dispute arising out of or relating to the agreement. Section 15.5 of Fund II's limited partnership agreement establishes a similar requirement to arbitrate.

22.    Inspection Rights: The Hollencrest Investors have contractual and statutory rights to inspect the books and records of the Funds pursuant to the following:

a. The Seed Fund is a Delaware limited liability company subject to Delaware Code § 18-305, which establishes the right of a member and its agents to inspect the books and records of the partnership for any purpose reasonably related to the limited partner's interest as a limited partner.

b. Section 11.3 of the Seed Fund's operating agreement states that the Seed Fund's "books and records shall be open to inspection by the Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice."

c. Fund II is a Delaware limited partnership subject to Delaware Code § 17-305, which establishes the right of a limited partner and its agents to inspect the books and records of the partnership for any purpose reasonably related to the limited partner's interest as a limited partner.

d. Section 11.2 of Fund II's limited partnership agreement states that the Fund II's "books and records shall be open to inspection by the Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice."

23.    The stated purpose of the Funds was to use the investors' capital, including capital contributed by the Hollencrest Investors, to invest in technology start-up companies with an emphasis on "Big Data and Cloud Computing" technology companies. Stuart Frost held himself out as someone with knowledge and expertise in the field, with relationships that would enable him to identify, evaluate and manage promising start-up companies with the goal of facilitating their eventual sale to well-established, highly capitalized technology companies – household names such as Microsoft, Google and Amazon. The Funds' business model, as spelled out in the Funds' governing agreements, called for the use of a Stuart Frost controlled "Incubator" company, Frost Data Capital, LLC f/k/a Frost Venture Partners, LLC, to invest in and manage the start-up companies by, among other things, appointing officers and filling seats on each start-up companies' board of directors. The start-up companies are referred to in the governing agreements and herein as the "Portfolio Companies."

24.    Purportedly, in return for the services the Incubator was to provide to the Portfolio Companies, the Portfolio Companies were to pay the Incubator management

fees. In soliciting the Hollencrest Investors' investment, Frost represented that costs and expenses would be kept to a minimum, and more specifically, (a) that the Funds "will not be expected to cover expenses and salaries incurred by" the Incubator, (b) that the fees charged by the Incubator to the Portfolio Companies would be determined on a "case-by-case basis, and are expected to be adjusted based on the individual needs of each company as their business matures," (c) that the Incubator's "policy will be to only charge for services that the [Portfolio Companies] would require in the normal course of business," and (d) that the Incubator would employ a "consistent 'lean startup' process used across all companies." Likewise, pursuant to the Fund II agreement, the fees charged the Portfolio Companies were not to exceed "reasonable market rates."

25. The Incubator is not owned by the Funds; it is owned by Stuart Frost. Thus, because Stuart Frost is a fiduciary, a fact he admitted at his recent deposition, of the Funds which have ownership interests in the Portfolio Companies, his dealings with the Portfolio Companies on behalf of the Incubator are constrained by his duties of care, loyalty and disclosure to the Funds and its investors. He does not have, as he apparently seems to claim, unfettered discretion to treat the Incubator and Portfolio Companies in any manner he sees fit, without regard to the interests of the Funds. He cannot loot the Portfolio Companies, directly or indirectly. Nor may he use them as mere instrumentalities to generate unwarranted fees for his Incubator, to the detriment of the Funds. Frost was doing just that—i.e., directing fund investment money into purported Portfolio Companies that had no rational business plan, thin management teams (if any), no viable product or service, charging unreasonable and often personal expenses to the Portfolio Companies and/or continuing to collect management fees from Portfolio Companies that were defunct, simply to generate the payment of excessive fees back to the Incubator.

26. The stated goal of the Funds was to "exit" the Funds' positions in the Portfolio Companies within two to five years after start-up, by way of a sale of the

Portfolio Company or other transaction. To date, only two Portfolio Company have been sold, and even those sales were made at "fire sale" prices that resulted in zero return of capital to the Funds on their investments. Neither the Hollencrest Investors, nor any of the investors in the Funds, have received a single penny in return for their investments in the Funds. In fact, it appears that the investors in the Funds will not even recoup their initial investment in the Funds. This failure is due primarily to the excessive management fees and expenses charged by the Incubator and the distorted cap tables Frost created, giving him, and his affiliates, a majority and controlling interest in each of the Portfolio Companies and loading them up with debt, deterring investment from outside investors. The distorted cap tables were further amplified by a Profit Interest Vehicle created by Frost, through which he, his family members, and affiliates, obtained additional interests in the Portfolio Companies and over which Frost had sole control.

27.    The Hollencrest Investors have received troubling reports from multiple credible sources, including other investors, current and former officers of Counter-Respondents, and others with inside information regarding the management of the Funds. Among other things, the Hollencrest Investors have received the following information:

a.    Shortly after the Hollencrest Investors made their capital contributions to Fund II, the Funds' namesake Stuart Frost – the individual with the purported expertise and relationships in the Big Data and Cloud Computing technology field with primary management responsibility – moved to Italy for a year with his family and stayed in expensive villas. Stuart Frost's imminent move to Italy for an extended personal vacation was a material fact that should have been disclosed to the investors prior to their investment, but the Hollencrest Investors received no such disclosure. The Hollencrest Investors are informed and believe that to the extent any other investors learned of and complained about Stuart Frost's departure, Stuart Frost gave such investors preferential treatment, without disclosing such treatment to the Funds' other investors.

b.  Stuart Frost, who also became a member of the Seed Fund, did not initially make all of the capital contributions required of him as a member of the Seed Fund. This material fact was not disclosed to the Hollencrest Investors. Similarly, Frost invested only $50,000 of the $6 million he represented he would invest in Fund II; the balance was invested by a third party.  And even the $50,000 was, according to Frost's deposition testimony, allocated from the management fees earned by the manager of Fund II—Frost Venture Partners GP, LLC—not from Frost's own funds.

c.  The relationships between Stuart Frost and his various Frost entities, including the Incubator, the Funds, and the Portfolio Companies were fraught with conflicts of interest, both potential and actual. The Funds' agreements required Stuart Frost to manage the Funds consistent with his fiduciary duties, to act in good faith in the best interests of the Funds in connection with the management of the Funds. Counter-Respondents were not free to engage in self-dealing and/or pay themselves unwarranted profits at the expense of the Funds. Nevertheless, Counter-Respondents failed to establish any segregation of duties amongst the management of the various entities, including without limitation the entities' accounting and legal oversight. In fact, Frost admitted at his most recent deposition that there was no outside oversight over the activities of the Incubator—he charged whatever fees he wanted to charge, and shifted whatever expenses, including personal expenses, he wanted to shift.

d.  The Funds' governing agreements provided for the establishment of an Advisory Committee, the duties of which included (a) consideration of any approvals sought by the manager of the respective fund, (b) advising with respect to matters pertaining to conflicts of interest, and (c) rendering advice and counsel as requested. However, Stuart Frost failed to consult with or even properly establish and staff the Advisory Committees for the Funds in the first place. Proper

records and minutes of such committee meetings have not been kept. As a result, Frost's conflicts of interest in connection with managing the Funds and running the Incubator were rampant and without any check or balance. The Funds may have invested in Portfolio Companies in which Stuart Frost had the greatest personal ownership interest, or Portfolio Companies that would generate the greatest management fees for his Incubator entity. To generate fees for the Incubator, Stuart Frost may have invested the Funds' capital in Portfolio Companies that had no viable products or business plan, thin management teams, and little chance of success. He directed imprudent investments in questionable Portfolio Companies, and sought additional rounds of funding from investors, for the purpose of generating more fees for Counter-Respondents and not for the purpose of realizing any return on the Funds' investments. In sum, Stuart Frost engaged in classic fraudulent self-dealing.

e.  The Incubator overcharged the Portfolio Companies for fees and expenses. The Incubator may have charged fees and expenses for Portfolio Companies that were dormant or abandoned. The Incubator may have received fees and expenses for services that were not rendered.

f.  The sum total of the Funds' capital paid to the Incubator in the form of fees and expenses, through the Portfolio Companies, was too large relative to the capital committed such that those payments are abusive and are believed to exceed industry norms.

g.  One or more entities wholly-owned by Stuart Frost received money diverted from the Funds, and Stuart Frost caused those entities to pay for personal luxuries without any identifiable business purpose.

h.  Stuart Frost, directly or indirectly through one of his entities, made one or more loans to the Portfolio Companies. Any such loans put his financial interests in a senior position to the Funds' equity investments, subordinating the Funds'

ownership interest to Stuart Frost's financial interests. These loans were not disclosed to the Hollencrest Investors.

i.   Counter-Respondents reported to the Funds' investors valuations of Portfolio Companies that were unsubstantiated and apparently overstated. Some of these Portfolio Companies may have been worthless at the time Counter-Respondents reported significant valuations. For instance, in the first quarter of 2016, Counter-Respondents reported that a Seed Fund Portfolio Company named Cirro Inc. had a valuation, as of March 31, 2016, of $2,453,776. Three months later, Counter-Respondents represented that Cirro Inc. was worthless. To date, Counter-Respondents have failed and refused to provide and documents or information to explain how the company's value could have vanished in such a short period of time.

j.   Third parties have made offers to purchase Portfolio Companies that Counter-Respondents have rejected, despite the stated goal that the Funds were intended to make short term investments, and the goal that the Funds would exit their positions in Portfolio Companies in two to five years after start-up. Some of these Portfolio Companies have since failed because they have depleted their capital. Stuart Frost has rejected these offers without any identifiable decision making process. To date, Counter-Respondents have failed to consummate a single transaction involving the sale of the Funds' interest in a Portfolio Company that resulted in any return of capital to either of the Funds.

k.   The Funds have depleted their capital, and the Hollencrest Investors' interests in the Funds may be worthless.

l.   Counter-Respondents and their affiliates may be insolvent. They have significant debt and a negative net worth. They have no income coming in, other than fees and expenses that they charge the Portfolio Companies, which is a

precarious and abusive practice. Several key staff members have been terminated and others apparently have not received wages for more than ten months.

m. In addition to the foregoing, Counter-Respondents have failed to disclose material information to the Funds' investors, as required by the Funds' governing agreements, their fiduciary duties, and by law. Counter-Respondents may have, in ways not enumerated above, breached their fiduciary duties and otherwise engaged in unlawful conduct.

28.     On or about July 19, 2016, the Hollencrest Investors met with Stuart Frost and other officers of Counter-Respondents to voice their concerns regarding the information that had been reported to them, as set forth above. At the meeting, Stuart Frost was unable or unwilling to provide answers to address the Hollencrest Investors' concerns. He stopped answering legitimate questions and said, "I need to speak with a lawyer."

29.     On July 26, 2016, the Hollencrest Investors wrote to Counter-Respondents, explained the substance of the reports they received, and notified Counter-Respondents of their election to exercise their inspection rights. The Hollencrest Investors attached a list of specific categories of documents necessary to investigate the management of the Funds.

30.     Rather than allay the Hollencrest Investors' fears by providing full and open access to the requested records, Counter-Respondents chose instead to accuse the Hollencrest Investors of harassing Stuart Frost in pursuit of some imaginary "vendetta" – there is no prior history of disputes between the parties that would suggest any personal animus – and by narrowly and unlawfully limiting the Hollencrest Investors' access to Counter-Respondents' records. On August 15, 2016, Respondents purported to make information available at the office of Respondents' counsel, but limited The Hollencrest Investors' access. Among other things, Counter-Respondents have provided no useful information pertaining to the Portfolio Companies, and have specifically refused to

disclose information relating to the fees Counter-Respondents caused the Portfolio Companies to pay them.

31. To date, Counter-Respondents have failed and refused to provide the Hollencrest Investors with all of the requested documents and information.

32. Meanwhile, Counter-Respondents' Chief Operating Officer at the time, John Vigouroux, purported to facilitate a resolution of the disputes between Stuart Frost and a number of investors in the Funds, including the Hollencrest Investors. When those discussions did not go the way Stuart Frost wanted, he terminated John Vigouroux, sent threatening communications to the Hollencrest Investors, and preemptively commenced this arbitration based on false accusations, some of which he repeated in communications to all of the Funds' investors.

33. Among other things, in a communication to the Hollencrest Investors, dated October 17, 2016, Stuart Frost, in violation of California Penal Code §§ 518, 519, threatened to file a complaint with the Securities and Exchange Commission against the Hollencrest Investors, and asked "what will the following parties think when they hear my side of this sordid story," identifying "Local and national press," "Current and potential clients," "Fund managers that you have, or would like to have, relationships with," "Your advisory board," and "The SEC."

34. Demand Futility: As discussed above, Stuart Frost is the individual at the center of the Frost entities, with ownership and full control of the Funds, and the Funds' respective general partner and manager. When Counter-Respondents' Chief Operating Officer attempted to facilitate a resolution of the disputes, Stuart Frost terminated him. Under such circumstances, any demand by the Hollencrest Investors that the Funds take legal action against Stuart Frost or any of Counter-Respondents would be futile.

## FIRST CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

35.    The above facts are reincorporated by this reference.

36.    Counter-Respondents owe fiduciary duties, including the duties of loyalty, care and full disclosure to the Funds and their investors, including without limitation the Hollencrest Investors.

37.    The Hollencrest Investors are informed and believe that Counter-Respondents breached their fiduciary duties to the Funds and their investors, including the Hollencrest Investors by, among other things, (1) failing to require Stuart Frost to make all of the capital contributions required of him as a member of the Seed Fund, (2) allowing the Funds' interests in the Portfolio Companies to be depleted by the payment of unjustified and unreasonable fees and expenses to the Incubator entity and/or other Counter-Respondents, and engaging in other conduct that constituted unlawful self-dealing, (3) allowing Stuart Frost, or one of his entities, to make one or more undisclosed loans to the Portfolio Companies such that the loans were senior to the Funds' equity investments, (4) reporting to the Funds and their investors valuations of Portfolio Companies that were unsubstantiated and overstated, (5) leaving the country for a year, and taking extended vacations on other occasions, and without disclosing to the Funds and their investors his plan to do so, (6) using the assets of the Entity Counter-Respondents to pay for personal expenses, including, but not limited to: lease payments for a Ferrari automobile, rent payments for a villa and apartment in Italy, the costs for chartering airplane travel for Frost and his family, the salary for a personal chef, the fees and costs associated with a membership at Monarch Beach, and the purchase of and loan payments on a yacht; (7) allowing Stuart Frost to make investment decisions on his own, without consulting with any oversight committees, (8) investing in Portfolio Companies with no viable business plan and little chance of success for the purpose of generating fees for the Incubator, (9) failing to disclose to the Funds and their investors that Counter-

14
Exhibit 2
Page 124

Respondents may be insolvent, that they had terminated key personnel, and have been unable to pay personnel their wages, (10) otherwise failing to disclose material information to the Funds and their investors, as required by the Funds governing agreements, Counter-Respondents' fiduciary duties, and by law, and (11) wrongfully causing the Funds to pay for expenses incurred in this arbitration, which the Funds' respective manager and general partner initiated.

38.   As a direct and proximate result of Counter-Respondents' deceitful and fraudulent conduct as alleged herein, the Funds and their investors, including the Hollencrest Investors, have suffered actual, compensatory, incidental and consequential damages, in an amount to be determined in this arbitration.

39.   Counter-Respondents' conduct as alleged above was intentional, outrageous, malicious, fraudulent and oppressive, and was undertaken with conscious disregard of the rights of the Funds and their investors. Thus, the Funds and their investors, including the Hollencrest Investors, are entitled to an award of exemplary and/or punitive damages.

## SECOND CLAIM FOR RELIEF

## BREACH OF OPERATING AGREEMENT

40.   The above facts are incorporated by this reference.

41.   The operating agreement of the Seed Fund appointed Frost Management Company, LLC as manager of the Seed Fund. The express terms of the operating agreement, as reflected in the attached, are supplemented by the parties' duty of good faith and fair dealing.

42.   The Hollencrest Investors fully performed all of their obligations under the operating agreement, except for those aspects of their performance that have been excused due to Counter-Respondents' failure to perform and/or breach of fiduciary duties.

43.    The Hollencrest Investors are informed and believe that Frost Management Company, LLC, as manager of the Seed Fund, breached the operating agreement by, among other things, the acts and omissions alleged above, including, but not limited to (1) failing to require Stuart Frost to make all of the capital contributions required of him as a member of the Seed Fund, (2) allowing the Seed Fund's interests in the Portfolio Companies to be depleted by the payment of unjustified and unreasonable fees and expenses to the Incubator entity and/or other Counter-Respondents, (3) allowing Stuart Frost, or one of his entities, to make one or more undisclosed loans to the Portfolio Companies such that the loans were senior to the Funds' equity investments, (4) reporting to the Seed Fund and its investors valuations of Portfolio Companies that were unsubstantiated and overstated, (5) failing to disclose material information to the Seed Funds' investors, as required by the Seed Funds' governing agreements, the manager's fiduciary duties, and by law, and (6) wrongfully causing the Funds to pay for their expenses incurred in this arbitration, which the manager Frost Management Company, LLC instituted.

44.    As a direct, proximate and legal result of Frost Management Company, LLC's breach of the operating agreement, the Seed Fund and its members, including the Hollencrest Investors, have suffered actual, compensatory, incidental and consequential damages in an amount to be determined in this arbitration.

**THIRD CLAIM FOR RELIEF**

**BREACH OF LIMITED PARTNERSHIP AGREEMENT**

45.    The above facts are incorporated by this reference.

46.    The limited partnership agreement of Fund II appointed Frost Venture Partners GP, LLC as general partner of Fund II. The express terms of the limited partnership agreement, as reflected in the attached, are supplemented by the parties' duty of good faith and fair dealing.

16
Exhibit 2
Page 126

47.    The Hollencrest Investors fully performed all of their obligations under the operating agreement, except for those aspects of their performance that have been excused due to Counter-Respondents' failure to perform and/or breach of fiduciary duties.

48.    The Hollencrest Investors are informed and believe that Frost Venture Partners GP, LLC, as general partner of Fund II, breached the limited partnership agreement by, among other things, the acts and omissions alleged above, including, but not limited to (1) failing to require Stuart Frost to make all of the capital contributions required of him as a limited partner of Fund II, (2) allowing Fund II's interests in the Portfolio Companies to be depleted by the payment of unjustified and unreasonable fees and expenses to the Incubator entity and/or other Counter-Respondents, (3) allowing Stuart Frost, or one of his entities, to make one or more undisclosed loans to the Portfolio Companies such that the loans were senior to the Funds' equity investments, (4) reporting to Fund II and its investors valuations of Portfolio Companies that were unsubstantiated and overstated, (5) failing to disclose material information to the Fund II investors, as required Fund II's governing agreements, the general partner's fiduciary duties, and by law, and (6) wrongfully causing the Funds to pay for its expenses incurred in this arbitration, which the general partner Frost Venture Partners GP, LLC instituted.

49.    As a direct, proximate and legal result of Frost Venture Partners GP, LLC's breach of the limited partnership agreement, Fund II and its members, including the Hollencrest Investors, have suffered actual, compensatory, incidental and consequential damages in an amount to be determined in this arbitration

## FOURTH CLAIM FOR RELIEF

### FRAUD

50.    The above facts are incorporated by this reference.

51.    Counter-Respondents, including Stuart Frost, owed fiduciary duties, including the duty of disclosure, to the Funds and their investors, including the

17
Exhibit 2
Page 127

Hollencrest Investors. The Funds and their investors, including the Hollencrest Investors, relied upon the confidential relationship between themselves and Counter-Respondents, including Counter-Respondents' duty to disclose material facts.

52.    As alleged above, Counter-Respondents depleted the value of the Funds' investments in the Portfolio Companies by paying themselves unjustified and unreasonable fees and expenses, including, but not limited to fees and expenses paid by Portfolio Companies that were dormant or abandoned, and fees and expenses for services that were not rendered or were grossly over-valued.

53.    Shortly after the investors made their capital contributions to Fund II, Stuart Frost, the Funds' namesake and the individual in control of the Frost entities – and the individual with the purported expertise and relationships to manage the Funds – moved to Italy for a year for an extended vacation. Stuart Frost's imminent move to Italy was a material fact that should have been disclosed to the Hollencrest Investors prior to their investment, but he made no such disclosure.

54.    The Hollencrest Investors are informed and believe Counter-Respondents failed to disclose that Stuart Frost made investment decisions on his own without consulting with oversight committees, as contemplated by the Funds' governing agreements. Counter-Respondents failed to disclose that, in order to generate fees and expenses for the Incubator or other Frost entities, Stuart Frost may have invested the Funds' capital in Portfolio Companies that had not products, no viable business plan, thin management teams, and little chance of success.

55.    The Hollencrest Investors are informed and believe Counter-Respondents failed to disclose that Stuart Frost, directly or indirectly through one of his entities, made one or more loans to the Portfolio Companies, placing his own financial interests in a senior position to the Funds' equity investments.

56.     The Hollencrest Investors are informed and believe Counter-Respondents reported to the Funds' investors valuations of Portfolio Companies that were unsubstantiated and overstated.

57.     The Hollencrest Investors are informed and believe Counter-Respondents failed to disclose that Stuart Frost, a member of the Seed Fund, did not make all of the capital contributions required of him as a member of the Seed Fund.

58.     In addition to the foregoing, the Hollencrest Investors are informed and believe, based on Counter-Respondents' failure to fully comply with the Hollencrest Investors' books and records request, that in ways not enumerated above, Counter-Respondents have failed to disclose material facts concerning the Funds. They are also wrongfully causing the Funds to pay for their expenses incurred in this arbitration, which they instituted.

59.     As a direct and proximate result of Counter-Respondents' deceitful and fraudulent conduct as alleged herein, the Funds and their investors, including the Hollencrest Investors, have suffered actual, compensatory, incidental and consequential damages, in an amount to be determined in this arbitration.

60.     Counter-Respondents' conduct as alleged above was intentional, outrageous, malicious, fraudulent and oppressive, and was undertaken with conscious disregard of the rights of the Funds and their investors. Thus, the Funds and their investors, including the Hollencrest Investors, are entitled to an award of exemplary and/or punitive damages.

## FIFTH CLAIM FOR RELIEF

### CONVERSION

61.     The above facts are reincorporated by this reference.

62.     As alleged above, the Hollencrest Investors are members and limited partners of the Funds.

63.     Counter-Respondents have converted the property and assets of the Funds and its investors, including the Hollencrest Investors, as alleged more fully above.

64.     As a direct and proximate result of Counter-Respondents' conversion of the Funds' assets as alleged herein, the Funds and their investors, including the Hollencrest Investors, have suffered actual, compensatory, incidental and consequential damages, in an amount to be determined in this arbitration.

65.     Counter-Respondents' conduct as alleged above was intentional, outrageous, malicious, fraudulent and oppressive, and was undertaken with conscious disregard of the rights of the Funds and their investors. Thus, the Funds and their investors, including the Hollencrest Investors, are entitled to an award of exemplary and/or punitive damages.

## SIXTH CLAIM FOR RELIEF

## ACCOUNTING

66.     The above facts are reincorporated by this reference.

67.     At all times mentioned herein, there existed a fiduciary relationship between Counter-Respondents, on the one hand, and the Funds and their investors on the other.

68.     Based on Counter-Respondents failure and refusal to fully comply with the Hollencrest Investors' requests to inspect the books and records of the Funds and the related entities, the amount of fees paid to Counter-Respondents and other unlawful conversion of the Funds' investments can only be determined by an accounting.

69.     All of the books and records of the Funds, Counter-Respondents, and the Portfolio Companies are in the possession and control of Counter-Respondents.

## SEVENTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

70.     The above facts are reincorporated by this reference

71.    A dispute has arisen between the Hollencrest Investors and Counter-Respondents regarding the parties' respective rights and responsibilities under the Funds' governing agreements. Shortly before filing their demand for arbitration, Counter-Respondents wrote to the Funds' investors and to the Hollencrest Investors and contended that they are entitled to "indemnification" by the Funds for fees and costs incurred as a result of Counter-Respondents' decision to sue the Hollencrest Investors in this arbitration.

72.    The Hollencrest Investors contend that Counter-Respondents are not entitled to cause the Funds to pay their fees and costs as "indemnification" where, as here, Counter-Respondents sued the Hollencrest Investors. Further, Counter-Respondents are not entitled to indemnification where, as here, Counter-Respondents' conduct constitutes gross negligence, intentionally wrongful conduct or recklessness, or that Counter-Respondents took actions that they did not in good faith believe were in the best interests of the Funds. Counter-Respondents are also not entitled to indemnification without first providing a written undertaking to the Funds to repay their fees and costs if it is ultimately determined that Counter-Respondents were not entitled to be indemnified.

<strong>REQUESTED RELIEF</strong>

The Hollencrest Investors hereby respectfully requests:

     a.    An award of compensatory and punitive damages;

     b.    An award ordering that Frost Management Company, LLC and Frost Venture Partners GP, LLC be removed as manager and general partner, respectively of the Funds;

     c.    An award setting forth declaratory relief setting forth the scope of the parties' respective rights and obligations with respect to indemnification;

21<br>Exhibit 2<br>Page 131

d.    An award of prevailing party attorneys' fees, costs and expenses as permitted by law in an action to recover a common fund, and pursuant to the Funds' governing agreements; and

e.    An award granting all other relief and orders as may be necessary to protect their rights and interests as set forth above, and as the Arbitrator otherwise deems just and proper, and to conform to proof as the arbitration proceeds.

DATED: March __7__, 2017

HODEL WILKS LLP

By: _____
         MATTHEW A. HODEL

Attorneys for Respondents and Counterclaimants
HOLLENCREST BAYVIEW PARTNERS, L.P., ROBERT B. WOLFORD, Individually and as Trustee of the WOLFORD FAMILY TRUST, dated July 11, 2006

# EXHIBIT A

# EXHIBIT A

Exhibit 2
Page 133

# FROST VP SEED, LLC

# OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "*Agreement*") is made effective as of the 22nd day of September, 2011 (the "*Effective Date*") by and among FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the "*Manager*"), and each person admitted from time to time as a Member of the Company (each a "*Member*" and collectively, the "*Members*"), with respect to the operation of FROST VP SEED, LLC, a Delaware limited liability company (the "*Company*"), and reads as follows:

## ARTICLE I

### NAME, PURPOSE AND OFFICES OF COMPANY

1.1     **Name.**  The name of the Company is Frost VP Seed, LLC.  The affairs of the Company shall be conducted under the Company name or such other name as the Manager may determine.

1.2     **Purpose.**  The purpose of the Company is to buy, sell, hold, and otherwise invest in Securities (directly or indirectly) of every kind and nature and rights and options with respect thereto and received in exchange or with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings necessary, advisable or desirable with respect to Securities held or owned by the Company; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.  The Company shall have the power to make and perform all contracts and to engage in all actions and transactions determined by the Manager to be necessary or advisable to carry out the purposes of the Company, and all other powers available to it as a limited liability company under the laws of Delaware.

1.3     **Principal Office.**  The principal office of the Company shall be located at 31920 Del Obispo, Suite 260, San Juan Capistrano, CA 92675, or such other place or places as the Manager may from time to time designate by written notice to the Members.

1.4     **Registered Agent and Office.**  The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

## ARTICLE II

### TERM OF COMPANY

2.1     **Term.**  The term of the Company shall commence upon the date of the filing of the certificate of formation (the "*Certificate of Formation*") of the Company with the Office of

1

725167 v1/SD

Exhibit 2
Page 134

the Secretary of State of the State of Delaware. The term of the Company shall terminate as provided in paragraph 10.1.

**2.2    Events Affecting the Members or the Manager.** Except as provided in paragraph 10.1(a)(iii) or as required by the Act, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, retirement, resignation, expulsion or dissolution of the Members or the Manager (or any member or partner thereof) shall not dissolve the Company.

## ARTICLE III

### NAMES, ADMISSION, WITHDRAWAL AND QUALIFICATION OF THE MEMBER

**3.1    Name and Address.** The name and address of the Members and the amount of the Members' Capital Commitments are set forth on the Schedule of Manager and Members attached hereto as EXHIBIT A. The Manager shall cause EXHIBIT A to be amended without the consent of the Members to the extent changes requiring the amendment of EXHIBIT A are made pursuant to the terms of this Agreement from time to time; *provided*, that no Member's Capital Commitments shall be increased without obtaining the prior written consent of the Member. Any such amended EXHIBIT A shall supersede any prior EXHIBIT A and become a part of this Agreement.

**3.2    Admission of Additional Members.** Additional Members may be admitted with the consent of the Manager, acting alone, until the earlier of [July 1, 2012] or the total Capital Commitments of the Members equal at least $[10,000,000.] Thereafter, additional Members may be admitted to the Company only upon the consent of the Manager and a Majority-in-Interest of the Members.

**3.3    Withdrawal of a Member.** No Member may withdraw or resign as a Member without the written consent of the Manager.

## ARTICLE IV

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS, AND DEFAULT OF A MEMBER

**4.1    Capital Accounts.** An individual Capital Account shall be maintained for each of the Members.

**4.2    Capital Contributions; Capital Commitment.**

**(a)**    The Manager shall have no Capital Commitment and no obligation to contribute capital to the Company.

**(b)**    Each Member shall make capital contributions in cash installments, by wire transfer upon at least ten (10) days' advance written notice, up to the amount of its *"Capital Commitment"*.

2

725167 v1/SD

Exhibit 2
Page 135

(c)   The Manager shall return to each Member all or any cash capital contribution intended for a proposed investment which is not consummated, or applied to the payment or reimbursement of expenses pursuant to paragraph 6.1, within ten (10) days following the date on which such proposed investment is not consummated or contribution is not otherwise applied; such returned capital shall be added back to the unfunded Capital Commitments of the Member and be subject to recall by the Manager pursuant to this **ARTICLE IV**.

**4.3**   **Default of a Member.** The Company shall be entitled to enforce the obligation of each Member to make contributions of capital to the Company in accordance with paragraph 4.2, and the Company shall have all remedies available at law or in equity in the event any such contribution is not so made. A defaulting Member shall pay all costs and expenses incurred by the Company in connection with the Member's failure to make a capital contribution as required under this Agreement, including, without limitation, attorneys' fees and all fees and expenses incurred in connection with any legal proceeding relating to the failure of the Member to make such a contribution. In the event that a Member fails to contribute capital to the Company as required under this Agreement and such default shall have continued uncured for thirty (30) or more days after delivery of written notice to the defaulting Member, the Manager shall be permitted to either (i) withhold distributions to be made to such defaulting Member pursuant to the terms of this Agreement equal to the amount of such unpaid capital contribution and recover such unpaid contribution thereon by setoff against any such distributions so withheld, or (ii) sell the defaulting Member's interest in the Company in a third party transaction and apply the proceeds towards the satisfaction of any Company expenses or other obligations of the Company.

## ARTICLE V

### COMPANY ALLOCATIONS

**5.1**   **Allocation of Profit and Loss.** Profit and Loss of the Company shall be allocated among the Members in proportion to their aggregate capital contributions.

**5.2**   **Allocations for Tax Purposes.** Income, gain, loss and deductions shall be allocated for income tax purposes generally in the manner in which the corresponding Profit and Loss is credited or debited (as the case may be) to their respective Capital Accounts; *provided, however,* that any difference between the Adjusted Asset Value and adjusted tax basis of any asset shall be reconciled, solely for income tax purposes, in accordance with the principles of Code Section 704(c) using any method permitted by the Treasury Regulations and selected by the Manager.

## ARTICLE VI

### COMPANY EXPENSES

**6.1**   **Company Expenses.**

(a)   The Company shall bear all operating expenses reasonably incurred by the Manager, the Incubator or the Company in connection with the management of the Company, the Incubator and the Manager, including but not limited to, all out-of-pocket costs

3

725167 v1/SD

Exhibit 2
Page 136

and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on and fees and expenses arising out of borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, or other similar charges, travel expenses, legal fees and expenses, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, the Incubator or the Manager, including claims by or against a governmental authority, audit and accounting fees, consulting fees relating to investments or proposed investments, taxes applicable to the Company, the Incubator or the Manager on account of their operations, fees incurred in connection with the maintenance of bank or custodian accounts, all expenses incurred in connection with the registration of the Company's and the Incubator's Securities under applicable securities laws or regulations. The Company shall also bear all out-of-pocket expenses incurred by the Manager in serving as the tax matters partner, any sales or other taxes or government charges which may be assessed against the Company, the cost of liability and other premiums for insurance protecting the Company, the Incubator, the Manager, and their respective partners, members, stockholders, managers, managing directors, officers, directors, trustees, employees, agents or affiliates in connection with their activities, all out-of-pocket expenses of preparing and distributing reports to their respective Members, all out-of-pocket expenses associated with communications with Members, including preparation and distribution of reports to their respective Members, costs associated with Company meetings, all legal, accounting, tax, consulting and professional services fees and expenses (including tax preparation) relating to the Company, the Incubator or the Manager and their activities, out-of-pocket fees and expenses relating to outsourced finance, accounting, and back-office services (or if the Manager performs the accounting function internally, an amount reimbursable to the Manager equal to the then-current market cost of a qualified third party service provider as determined by the Manager in good faith), all out-of-pocket fees, costs and expenses relating to litigation and threatened litigation involving the Company, the Incubator or the Manager, including the Company's indemnification obligation pursuant to this Agreement, and all other expenses properly chargeable to the activities of the Company, the Incubator or the Manager.

(b)    The Company shall bear all out-of-pocket organizational and syndication costs, fees, and expenses incurred by or on behalf of the Manager in connection with the formation and organization of the Company, the Incubator and the Manager (including the definitive agreements related thereto), including legal and accounting fees and expenses incident thereto.

(c)    The Company shall bear all liquidation costs, fees, and expenses reasonably incurred by the Manager (or its designee) in connection with the liquidation of the Company, the Incubator and Manager at the end of their respective terms, specifically including but not limited to reasonable legal and accounting fees and expenses.

4

Exhibit 2
Page 137

## ARTICLE VII

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE MEMBER AND MANAGER

**7.1     Interest.** No interest shall be paid to a Member on account of its interest in the capital of or on account of its investment in the Company.

**7.2     Withdrawals by a Member.** No Member shall be permitted to withdraw any amount from its Capital Account without the written consent of the Manager.

**7.3     Members' Obligation to Repay or Restore.** Except as required by law, no Member shall be obligated at any time to repay or restore to the Company all or any part of any distribution made to it from the Company in accordance with the terms of this **ARTICLE VII** or **ARTICLE X**, and shall not be obligated at any time to restore or repay any deficit in the Member's Capital Account.

**7.4     Tax Distributions.** Within ninety (90) days after the end of each calendar year during the Company term, the Company will distribute to the Members, as applicable, in cash an amount equal to the excess, if any of (a) the Applicable Tax Rate multiplied by the net taxable income allocated to the Members, as a result of Members' ownership of an interest in the Company for the current and all prior fiscal years, over (b) all prior cash distributions made to the Members pursuant to this paragraph 7.4 or paragraph 7.5. The *"Applicable Tax Rate"* shall mean the combination of the highest marginal Federal and State income tax rates (plus, to the extent applicable, Medicare taxes) payable by individuals resident in the State of California taking into account the character of the net taxable income to which the rate is being applied and taking into account the deductibility of state and local taxes and any limitations on the ability of a Member to deduct any items of expense or loss under United States federal income tax principles, in each case as determined in good faith by the Manager. Distributions made to a Member pursuant to paragraph 7.4 shall be treated as advances of and as such shall reduce the distributions to be made to the Member under paragraph 7.5.

**7.5     Discretionary Distributions.** (a) The Manager may distribute cash, Securities or other Company assets to the Members in its reasonable discretion. All distributions under this paragraph 7.5 shall be among the Members *pro rata* in accordance with their respective capital contributions.

          **(b)** Securities distributed in kind shall be subject to such conditions and restrictions as the Manager reasonably determines are legally required or appropriate.

          **(c)** Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of the Members as Profit or Loss pursuant to. **ARTICLE V.**

          **(d)** Notwithstanding anything contained herein to the contrary, the Manager shall make distributions of Marketable Securities or any proceeds or other amounts received by the Company as soon as reasonably practical (other than amounts necessary to provide for sufficient reserves for present and future obligations of the Company (as reasonably determined by the Manager)).

5

725167 v1/SD.

Exhibit 2
Page 138

**7.6**    **Withholding Obligations.**

(a)    If and to the extent the Company is required by law (as determined in good faith by the Manager) to make payments ("*Tax Payments*") with respect to the Members in amounts required to discharge any legal obligation of the Company or the Manager to make payments to any governmental authority with respect to any federal, state, local or foreign tax liability of such person arising as a result of such person's interest in the Company, then the amount of any such Tax Payments shall be deemed to be a loan by the Company to such person, which loan shall: (i) be secured by such Member's interest in the Company, (ii) bear interest at the prime rate, and (iii) be payable upon demand. Amounts paid in respect of interest on such loan shall be treated as Profit of the Company and shall not be treated as a capital contribution. The Manager shall promptly notify the Member of any Tax Payments made with respect to such Member.

(b)    If and to the extent the Company is required to make any Tax Payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided that* such person's Capital Account shall be adjusted for such person's full proportionate share of the distribution), or (ii) such Member shall promptly pay to the Company prior to such distribution an amount of cash equal to such Tax Payments. In the event a portion of a distribution in kind is retained by the Company pursuant to clause (i), such retained Securities may, in the sole discretion of the Manager, either (1) be distributed to the Members in accordance with the terms of this **ARTICLE VII** including this paragraph 7.6(b), or (2) be sold by the Company to generate the cash necessary to satisfy such Tax Payments.

## ARTICLE VIII

### MANAGEMENT DUTIES AND RESTRICTIONS

**8.1**    **Management.**

(a)    Except as otherwise set forth herein, the Manager shall have the sole right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company; *provided that*, the Manager shall not, without obtaining the prior written consent of the Member, change the purpose of the Company as set forth in paragraph 1.2. The Manager shall make, in its reasonable discretion, all decisions concerning the assets of the Company, including any acquisition and disposition thereof.

(b)    The Members understand that the Manager has formed the Incubator to provide an operating infrastructure to incubate and develop new business. The Incubator is controlled by the Manager and or its affiliates. It is anticipated that investment opportunities in one or more businesses formed in the Incubator will be offered to the Company but all decisions as to which, if any, such opportunities will be offered to the Company and the terms of any such investments shall be made in the sole and absolute discretion of the Manager.

**8.2**    **Designation of Manager.** The Manager initially shall be the entity listed as such in the preamble to this Agreement. In the event of a Change of Control of the Manager, a

6

725167 v1/SD

Exhibit 2
Page 139

Majority in Interest of the Members shall have the right to remove the Manager as a Manager only and appoint a replacement Manager. For the avoidance of doubt, the Manager shall continue to be entitled to receive all allocations and distributions to which it would otherwise be entitled to receive had it not been removed as a Manager when, as and if such allocations and distributions are made, in respect of all activities of and investments by the Company. In the event there are no Managers, a new Manager shall be appointed by a Majority in Interest of the Members.

**8.3    Resignation of Manager.** A Manager may resign as such at any time by giving written notice to the Members, in which case, in the event that there is no Manager, a Majority in Interest of the Members shall designate a replacement Manager as set forth in paragraph 8.2 above.

**8.4    Restrictions on the Members.** Except as expressly provided herein or as required by applicable law, no Member (other than a Member acting in its capacity as the Manager) shall:   (a) take any part in the control or management of the Company business, (b) have any power or authority to act for or on behalf of the Company, or (c) have any right to vote on any Company matters.

**8.5    Certain Determinations by the Manager.** All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by the Manager. Such determination shall be final and conclusive.

**8.6    Other Activities.**

**(a)**    The parties hereto acknowledge and agree that (i) in addition to the Incubator, the Manager Parties have formed and may in the future form other investment vehicles, including those which hold the type of assets which the Company may hold, (ii) no Member shall have any interest in any of the foregoing investment vehicles or the assets thereof arising solely by virtue of this Agreement, (iii) the Manager may offer the right to participate in investment opportunities available to the Company (in whole or in part), including opportunities provided by the Incubator to other private investors, groups, partnerships, corporations or other entities, including, without limitation, any investment vehicles managed by some or all of the Manager Parties, whenever the Manager, in its sole discretion, so determines, (iv) the Manager Parties shall be under no obligation to offer any particular investment opportunities which they may identify to the Company, and (v) the Manager Parties may charge fees or carried interests with regard to any investment opportunity which the Manager Parties allocate to persons other than the Company.

**(b)**    The Members:  (i) acknowledge that the Manager Parties are or may be involved in other financial, investment and professional activities, including but not limited to: management of or participation in the Incubator and other investment funds; venture capital, private equity, public equity and real estate investing; purchases and sales of Securities; investment and management counseling; otherwise making investments or presenting investment opportunities to third parties; and serving as officers, directors, advisors,

7

725167 v1/SD

Exhibit 2
Page 140

consultants, and agents of other entities; and (ii) agree that the Manager Parties may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company). Neither the Company nor any Member shall have any right by virtue of this Agreement or the existence of the Company in and to such ventures or activities or to the income or profits derived therefrom, and the Manager Parties shall have no duty or obligation to make any reports to the Member or the Company with respect to any such ventures or activities.

## ARTICLE IX

### INVESTMENT REPRESENTATION AND TRANSFER OF COMPANY INTERESTS

**9.1    Representations of the Members.**  Each Member represents:  (a) that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act, (b) that it is a "qualified purchaser" as defined in Section 2(51)(A) of the U.S. Investment Company Act of 1940, as amended, (c) that it has sufficient knowledge and experience in business and financial matters to evaluate the Company, its proposed activities and the risks and merits of this investment, (d) that it has the ability to accept the high risk and lack of liquidity inherent in this type of investing, (e) that it is acquiring its interest in the Company for its own account for investment purposes only and not with a view to resale or distribution, (f) that it has had access to such information concerning the Company as it deems necessary to enable it to make an informed decision concerning the purchase an interest in the Company, and (g) that it understands that the interests in the Company have not been registered under the Securities Act, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated.

**9.2    Restrictions on Transfers of Company Interests.**

(a)    No Member shall (directly or indirectly) sell, assign, pledge, mortgage, hypothecate, give or otherwise dispose of or transfer its interest in the Company or in its capital assets or property (a *"Transfer"*) without the consent of the Manager (such consent may be granted or withheld in its sole discretion).

(b)    A transferee of a Member's interest shall become a substituted Member only with the consent of the Manager, and only if such transferee executes any and all instruments reasonably required by the Manager.

**9.3    Requirements for Transfer.**  Notwithstanding the foregoing, the Transfer of a Member's interest in the Company, or any part thereof, shall not be permitted if such Transfer would (a) result in a violation of any law, rule, or regulation, (b) result in a violation of any agreement in which the Company is a party, (c) require the Company to register as an investment company under the U.S. Investment Company Act of 1940, as amended, (d) require the Company or any of the Manager Parties to register as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, (e) result in the Company's assets being considered, in the opinion of counsel for the Company, as "plan assets" within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended, or any regulations proposed or promulgated thereunder, or (f) result in the Company being classified for United

8

725167 v1/SD

Exhibit 2
Page 141

States federal income tax purposes as an association taxable as a corporation. Prior to effecting any such Transfer, the Manager shall have received an opinion satisfactory to it, or shall have waived the requirement of such an opinion, covering the substance of the immediately previous sentence. Any Member who requests or otherwise seeks to effect a Transfer hereby agrees to reimburse the Company, at the request of the Manager, for any expenses reasonably incurred by the Company in connection with such Transfer, including the costs of seeking and obtaining any legal opinion required by this paragraph and any other legal, tax, accounting and miscellaneous expenses, whether or not such Transfer is consummated.

## ARTICLE X

### DISSOLUTION AND LIQUIDATION OF THE COMPANY

**10.1   Termination.**

(a)   The Company shall dissolve, and the affairs of the Company shall be wound up upon the earlier of:

(i)   Upon the mutual consent of both the Manager and a Majority-in-Interest of the Members;

(ii)   Upon the election by the Manager in the event that all Company assets have been distributed in accordance with this Agreement;

(iii)   In the event of the resignation, bankruptcy, dissolution, commencement of liquidation proceedings or insolvency of the Manager unless, within ninety (90) days after the Members are provided with written notice of such event, a Majority-in-Interest of the Members agree in writing to continue the business of the Company and to the appointment, effective as of the date of such event, of a new Manager of the Company;

(iv)   Upon the entry of a decree of judicial dissolution pursuant to the Act; or

(v)   On or after the ten year anniversary following the Effective Date, the affirmative vote of a Majority-in-Interest of the Members.

(b)   In the event that the Company is dissolved pursuant to the provisions of clauses (iii) or (iv) of this paragraph 10.1, the Members shall elect one or more liquidators to manage the liquidation of the Company in the manner described in this **ARTICLE X**. Except as provided in the immediately preceding sentence, the Manager shall carry out the duties of the liquidator hereunder.

**10.2   Winding Up Procedures.**

(a)   Promptly upon final dissolution of the Company, the affairs of the Company shall be wound up and the Company liquidated. Profits and Losses (and items thereof) with respect to the Company realized during the winding up period shall be allocated among the applicable Capital Accounts of the Members pursuant to **ARTICLE V**.

9

725167 v1/SD

Exhibit 2
Page 142

(b)      Distributions in liquidation may be made in cash or in kind or partly in cash and partly in kind in accordance with the Members' final adjusted Capital Accounts. The Manager or the liquidator shall use its best judgment as to the most advantageous time for the Company to sell investments or to make distributions in kind.

**10.3    Payments in Liquidation.** The assets of the Company shall be distributed in liquidation of the Company in the following order:

(a)      to the creditors of the Company, including the Member if the Member is a creditor, in the order of priority established by law, either by payment or by establishment of reserves; and then

(b)      to the Members in respect of the positive balances in their applicable Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

## ARTICLE XI

### FINANCIAL ACCOUNTING AND TAX MATTERS

**11.1    Financial Accounting; Fiscal Year.** The books and records of the Company shall be kept in accordance with the provisions of this Agreement and otherwise on a tax basis accounting. The Company's fiscal year shall be the calendar year.

**11.2    Valuation of Investments Owned by Company.** For purposes of this Agreement, the value of any Security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the immediately preceding business day) shall be determined as follows:

(a)      a Security which is listed or quoted on a recognized securities exchange or on The NASDAQ National Market ("*NASDAQ*") shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination;

(b)      a Security which is traded over the counter (other than on a recognized securities exchange or NASDAQ) shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination, or if no sales occurred on any such day, be estimated at fair value and shall be determined by the Manager; and

(c)      for any other Security or other investments or assets of the Company hereunder shall be estimated at fair value and shall be determined by the Manager.

**11.3    Supervision; Inspection of Books.** Proper and complete books of account of the business of the Company, copies of the Company's federal, state and local tax returns for each fiscal year, a current Schedule of Members set forth on each updated **EXHIBIT A**, this Agreement and the Company's Certificate of Formation shall be kept under the supervision of the Manager at the principal office of the Manager. Such books and records shall be open to inspection by the

10

725167 v1/SD

Exhibit 2
Page 143

Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice.

**11.4   Tax Returns and Information.**  The Manager shall use reasonable efforts to cause the Company's U.S. federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by the Members, to be prepared and delivered to the Member within ninety (90) days after the close of the Company's fiscal year.

**11.5   Tax Matters Partner.**  The Manager shall serve as the Company's tax matters partner under the Code and under any comparable provision of state law.  The tax matters partner is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members (in their capacity as such).  Notwithstanding the foregoing, without a Member's consent, the tax matters partner shall neither (i) choose any forum other than the U.S. Tax Court to litigate any proposed adjustment of, or other dispute concerning, any "partnership item" (within the meaning of Section 6231(a)(3) of the Code) nor (ii) extend, beyond one year, the statute of limitations on adjustment of or assessment of tax on any such item.  To the fullest extent permitted by law, the Company agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to (a) all fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the Manager or the Company that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Company, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise or any such claim, action, or demand; *provided* that this indemnity shall not extend to conduct by the tax matters partner adjudged not to have been undertaken in good faith to promote the best interests of the Company.

**11.6   Reports.**  The Manager shall deliver or cause to be delivered to each Member (i) within 60 days after each fiscal quarter of the Company commencing with the fiscal quarter ending March 31, 2012, a report containing an unaudited balance sheet, statement of operations and statement of changes in members equity of the Company for such fiscal quarter and a valuation of the Securities owned by the Company as of the end of such fiscal quarter pursuant to paragraph 11.2, and (ii) within 120 days after the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2012, a report containing an audited balance sheet, statement of operations, and statement of changes in members equity of the Company for such Fiscal Year to date.

## ARTICLE XII

### CERTAIN DEFINITIONS

**12.1   Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the parties respective interests in the Profits or Losses of the Company during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interest shall occur.  Notwithstanding the foregoing, the Manager may from time to time cause allocations to be made to the parties'

11

725167 v1/SD

Exhibit 2
Page 144

Capital Accounts as if an Accounting Period had ended and a new Accounting Period shall commence on the next subsequent day, it being anticipated that such an allocation may be made in connection with Company distributions or at such other times if, in the Manager's reasonable judgment, circumstances make it reasonable to do so.

**12.2   Adjusted Asset Value.** The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

(a)   The initial Adjusted Asset Value of any asset contributed by the Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the Member and the Manager.

(b)   In the reasonable discretion of the Manager, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member; and (ii) the distribution by the Company to a party of Company assets, unless all parties receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in Company distributions.

(c)   The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts of the parties, as of the termination of the Company by expiration of the Company's term.

**12.3   Capital Account.** The Capital Account of each party shall consist of its original capital contribution, if any, (a) increased by any additional capital contributions, its share of Profit that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by it or that are secured by any Company property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of Loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Company or that are secured by any property contributed by it to the Company. The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Manager may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable pursuant to ARTICLE VII and ARTICLE X.

**12.4   Change of Control.** Change of Control shall mean the transfer (whether directly or indirectly) of voting securities of the Manager, in one transaction or in a series of related transactions, through which a person or "group" who does not currently hold such right, acquires (whether directly or indirectly) the right to cast a majority of the total votes entitled to be cast by

12

725167 v1/SD

Exhibit 2
Page 145

all equity holders of the Manager. The death, disability or incapacitation of Stuart Frost, the principal of the Manager, shall be deemed a Change of Control.

12.5    **Code.** The Code is the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

12.6    **Deemed Gain or Deemed Loss.** The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2), over the aggregate Adjusted Asset Value of the Securities distributed. The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2).

12.7    **Incubator.** Incubator shall mean Frost Venture Partners, LLC, a Delaware limited liability company.

12.8    **Majority in Interest.** Majority in Interest shall mean Members representing a majority of the Capital Commitments.

12.9    **Manager Parties.** The Manager Parties shall mean each of the Manager and their respective direct and indirect managers, members, partners, stockholders, officers, directors, trustees, employees, consultants, agents or any affiliate of the foregoing, including Stuart Frost.

12.10    **Marketable Securities.** Marketable Securities shall refer to Securities that are (a) traded on a recognized securities exchange or traded on one or more securities exchanges or quoted on the automated screen-based quotation and trade execution system operated by The NASDAQ OMX Group, Inc., or any successor thereto, and not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement. Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the Manager, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Company within a reasonable time period.

12.11    **Profit or Loss.** Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss arising for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any tax-exempt income of the Company described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury

13

725167 v1/SD

Exhibit 2
Page 146

Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c)     Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for United States federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(d)     In the event that the Adjusted Asset Value of any asset is adjusted under paragraphs 12.2(b) or (c), the amount of such adjustment shall, if positive, be added or, if negative, be subtracted, from such taxable income or loss;

(e)     The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

**12.12  Securities.**  Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**12.13  Securities Act.**  Securities Act is the United States Securities Act of 1933, as amended.

**12.14  Treasury Regulations.**  Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE XIII

### OTHER PROVISIONS

**13.1    Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among the residents of such state made and to be performed entirely within such state.

**13.2    Limitation of Liability of the Members.**  Except as required by law, no Member shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Company in excess of its Capital Commitment to the Company.  Notwithstanding the foregoing, each Member shall be required to pay to the Company, at such times and subject to the conditions set forth herein, all amounts that the Member has agreed to pay in respect of its Capital Commitment.

**13.3    Exculpation.**  Neither the Manager Parties nor the tax matters partner (collectively, the *"Covered Persons"*) shall be liable, responsible or accountable in damages or otherwise to the Members or the Company for honest mistakes of judgment, or for action or inaction, taken in good faith and in the reasonable belief that such action or inaction was in, or not opposed to, the best interest of the Company, or for losses due to such mistakes, action, or

14

725167 v1/SD

Exhibit 2
Page 147

inaction, or to the negligence, dishonesty, or bad faith of any employee, broker, or other agent of the Company, *provided that* such employee, broker, or agent was selected with reasonable care. To the fullest extent permitted by law, no Covered Person shall be liable to the Company or the Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice of legal counsel (as to matters of law), or of accountants (as to matters of accounting), or of investment bankers, accounting firms, or other appraisers (as to matters of valuation), *provided that* any such professional or firm is selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any Covered Person of any liability by reason of such Covered Person's commission of gross negligence, intentionally wrongful conduct or recklessness or a material breach of this Agreement that has an adverse effect on the Company or the Member, determined by arbitration pursuant to paragraph 13.10; *provided, however*, that such alleged material breach of this Agreement (and any resulting Losses (as defined below)) has not been cured (if curable) within sixty (60) days after such time as it may be demonstrated that the Covered Person had actual knowledge of such alleged material breach (*"Uncured Material Breach"*); *provided further* that any liquidator other than the Manager shall be entitled to the benefit of exculpation under this paragraph 13.3 so long as such person acted in good faith. Notwithstanding any other provision of this Agreement, to the extent that, at law or in equity, the Manager Parties have duties (including fiduciary duties) and liabilities relating thereto to the Company, any Manager Party or any other person bound by this Agreement, such Manager Party acting under this Agreement shall not be liable to the Company, the Member or any other person bound by this Agreement for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities (by specifying a duty of care or otherwise) of any Covered Person to the Company or the Member otherwise existing at law or in equity or otherwise, are agreed by the Member to replace such duties and liabilities of such Covered Person.

### 13.4   Indemnification.

(a)     The Company agrees to indemnify, out of the assets of the Company only (including the proceeds of liability insurance and any amounts that the Member may be required to contribute pursuant to the terms of this Agreement), the Manager Parties and the tax matters partner (the *"Indemnified Parties"*) to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, controversy, dispute, judgment or demand against the Indemnified Parties that arise out of or in any way relate to the Company, its properties, business, or affairs and (ii) such claims, actions, controversies, disputes, judgments and demands and any losses, damages or liabilities resulting from such claims, actions, controversies, disputes, judgments and demands, including amounts paid in settlement or compromise of any such claim, action or demand (collectively, *"Losses"*); *provided*, that such Indemnified Party acted in good faith and in the reasonable belief that such Indemnified Party's action or inaction was in, or not opposed to, the best interest of the Company; and *provided further*, that this indemnity shall not extend to any conduct which constitutes gross negligence, intentionally wrongful conduct or recklessness or an Uncured Material Breach.

15

Exhibit 2
Page 148

**(b)** At the election of the Manager, expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph 13.4 may be paid by the Company in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party undertakes to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified and provided the undertaking shall be in form and substance reasonably acceptable to the Manager.

**(c)** The Manager may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Indemnified Party or potential Indemnified Party against any liability incurred in any capacity which results in such person being an Indemnified Party (provided that such person is serving in such capacity at the request of the Company or the Manager), whether or not the Company has the power to indemnify such person against such liability. The Manager may purchase and maintain insurance on behalf of and at the expense of the Company for the protection of any officer, director, manager, employee or other agent of any other organization in which the Company directly or indirectly owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify any person against such liabilities.

**(d)** The provisions of this paragraph 13.4 shall remain in effect as to each Indemnified Party whether or not such Indemnified Party continues to serve in the capacity that entitled such person to be indemnified. The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnified Party.

**(e)** The rights to indemnification and advancement of expenses conferred in this paragraph 13.4 shall not be exclusive and shall be in addition to any rights to which any Indemnified Party may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.

**(f)** The Manager may make, execute, record and file on its own behalf and on behalf of the Company all instruments and other documents (including one or more separate indemnification agreements between the Company and individual Indemnified Parties or Covered Persons) that the Manager deems necessary or appropriate in order to extend the benefit of the provisions of this paragraph 13.4 to the Indemnified Parties and Covered Persons; *provided* that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in this paragraph 13.4 except as otherwise may be required by applicable law.

**(g)** Notwithstanding anything contained herein to the contrary, if the unfunded Capital Commitments of the Company are insufficient to cover all fees, costs and expenses relating to litigation and threatened litigation involving the Company, including the Company's indemnification obligations pursuant to this paragraph 13.4, or expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, including claims by or against a governmental authority, the Manager (or liquidator) may, in its sole discretion, sell some or all of the Securities held by the Company to pay for such bona fide, documented obligations, fees, costs and expenses.

16

725167 v1/SD

Exhibit 2
Page 149

(h)      Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to this paragraph 13.4, the parties hereto intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Company, (ii) the Company, and (iii) the Manager and/or its affiliates, paragraph 13.4 shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Company shall have primary liability; second, the Company shall have secondary liability; and third, the Manager and/or its affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Company. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Company shall not restrict the Company from making indemnification payments to an Indemnified Party that is otherwise eligible for such indemnification payments, but such indemnification payments by the Company are not intended to relieve any investment counterparty of the Company from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Company actually receives indemnification payments from an investment counterparty of the Company or under any insurance policy for the same loss, such Indemnified Party shall repay the Company as soon as practicable to the extent of such duplicative indemnification payments.   Indemnification payments (if any) made to an Indemnified Party by the Manager and/or its affiliates in respect of a loss for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Company shall not relieve the Company from its obligation to such Indemnified Party and/or the Manager (or any affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the Manager and/or its affiliates would be reimbursed by such Indemnified Party or directly by the Company with indemnification payments made by the Company under paragraph 13.4). To the extent that the Company is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the Manager and/or its affiliates (other than the Company), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Company. As used in this paragraph 13.4(h), "indemnification payments" made or to be made by an investment counterparty of the Company shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Company, and (z) payments made or to be made by or on behalf of such investment counterparty of the Company (or such successor) pursuant to an insurance policy or similar arrangement.

13.5    **Execution and Filing of Documents.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or by electronic mail in portable document format (PDF) will be effective as delivery of a manually executed signature page of this Agreement.

13.6    **Other Instruments and Acts.** Each Member agrees to execute any other instruments or perform any other acts that are or may be necessary to effectuate and carry on the limited liability company created by this Agreement.

17

725167 v1/SD

Exhibit 2
Page 150

**13.7    Binding Agreement.** This Agreement shall be binding upon the Members, the Manager and any of their transferees, successors, assigns, and legal representatives.

**13.8    Notices.** Any notice or other communication that one party desires to give to another party shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be addressed to the other party at the address shown in the books and records of the Company or at such other address as a party may designate by five (5) days' advance written notice to the other party.

**13.9    Power of Attorney.** By signing this Agreement, each Member designates and appoints the Manager its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Company's Certificate of Formation and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state or jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such states or jurisdictions.

**13.10    Arbitration.**

(a)    Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement (*"Claim"*), shall be resolved by final and binding arbitration (*"Arbitration"*) before a single arbitrator (*"Arbitrator"*) selected from and administered by Judicial Arbitration and Mediation Service Inc. (the *"Administrator"*) in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. The arbitration shall be held in San Juan Capistrano, California or vicinity.

(b)    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)    The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or

18

725167 v1/SD

Exhibit 2
Page 151

she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

**(d)**    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* that the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

**(e)**    By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 13.10, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

**(f)**    This paragraph 13.10 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including, to the extent applicable, the Uniform Arbitration Act (10 Del. C. § 5701 et seq.) (the *"Delaware Arbitration Act"*). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this paragraph 13.10 shall be invalid or unenforceable under the Delaware Arbitration Act, to the extent applicable, or other applicable law, such invalidity shall not invalidate all of this paragraph 13.10. In that case, this paragraph 13.10 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this paragraph 13.10 shall be construed to omit such invalid or unenforceable provision.

### 13.11   Confidentiality of Company Information.

This Agreement and all financial statements, tax reports, valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the entities in which the Company has invested (collectively, the *"Confidential Information"*), that each Member may receive pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Manager, and the Company's portfolio investments (the *"Affected Parties"*). Each Member acknowledges that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. Each Member further acknowledges that the Affected Parties believe that the Confidential Information is a trade secret, the disclosure of which may cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses. Each

19

725167 v1/SD

Exhibit 2
Page 152

Member shall not reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than a disclosure on a need-to-know basis to the Member's direct and indirect equity owners that are subject to a written confidentiality agreement, policy or obligation and each Member's and Member's direct and indirect equity owners' legal, accounting or investment advisers, auditors and representatives (collectively, "*Advisers*") without the prior consent of the Manager, except to the extent required to do so in accordance with applicable law (in which case the Member shall promptly notify the Manager of its obligation to disclose any Confidential Information) or with respect to Confidential Information which otherwise becomes publicly available other than through breach of this provision by the Member. Notwithstanding the foregoing, each Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing shall have the right to disclose Confidential Information to any regulator or governmental supervisory authority having jurisdiction over the Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing, and the Member shall provide notice to the Manager of any such disclosure unless it is legally prohibited from doing so or if it relates to taxes.

**13.12  Amendment.**  This Agreement may be amended only upon the consent of the Manager and a Majority in Interest of the Members.

**13.13  Entire Agreement.**  This Agreement constitutes the full, complete, and final agreement of the Members and the Manager and supersedes all prior agreements between the Members and the Manager, if any, with respect to the Company.

**13.14  Liability for Third Party Reports.**  In no event shall the Company or the Manager Parties have any liability to the Members with respect to any information disseminated to the Member, where such information originated from any third party, including without limitation, any entity in which the Company has made an investment.

**13.15  Anti-Money Laundering.**  Notwithstanding any other provision of this Agreement, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any person, including the Members, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated in any subscription agreement related to the Company.

**13.16  Discretion.**  Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the Manager is permitted or required to make a decision (a) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests and those of the Company, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any other interest of or factors affecting the Members or any other person, or (b) in its "good faith" or under another expressed standard, the Manager shall act under such express standard and shall not be subject to any other or different standards.

**13.17  Company Legal Matters.**  Each Member hereby agrees and acknowledges that:

20

725167 v1/SD

Exhibit 2
Page 153

(a)     Cooley LLP ("*Cooley*") has been retained as legal counsel by the Manager in connection with the formation of the Company and the offering of Company interests and in such capacity has provided legal services to the Manager and the Company. The Manager expects to retain Cooley to provide legal services to the Manager and the Company in connection with the management and operation of the Company.

(b)     Cooley is not and will not represent any Member in connection with the formation of the Company, the offering of Company interests, the management and operation of the Company, or any dispute that may arise between a Member on the one hand and the Manager and the Company on the other (the "*Company Legal Matters*").

(c)     Each Member will, if it wishes counsel on a Company Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)     Each Member hereby agrees that Cooley may represent the Manager and the Company in connection with any and all Company Legal Matters (including any dispute between the Manager or the Company and any Member) and waives any present conflict of interest with Cooley regarding Company Legal Matters arising by virtue of any representation or deemed representation of the Members or the Company on account of Cooley's representation described in paragraph 13.17(a) above; *provided, however,* that the Member is not hereby agreeing to Cooley's representation of (i) the Company in a derivative action on their behalf against the Manager, or (ii) the Manager or any other person in any action against the Company.

13.18   **Tax Classification.** For United States federal and state income tax purposes only, it is intended that the Company's existence as an entity separate from its sole member be disregarded pursuant to Code Section 7701 and the Treasury regulations thereunder and under applicable state law for so long as the Company has only one Member. The Manager will cause the Company to file such elections and information returns and perform such other actions as may be required under such regulations. If one or more Additional Members is admitted to the Company, the Company shall be treated as a partnership for federal and state income tax purposes.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

21

725167 v1/SD

Exhibit 2
Page 154

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement on the date first above written.

MANAGER:                                    MEMBERS:

FROST MANAGEMENT COMPANY, LLC

By: _____                Stuart Frost
    Stuart Frost
Its: Manager

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

SIGNATURE PAGE TO THE FROST VP SEED, LLC
OPERATING AGREEMENT

Exhibit 2
Page 155

EXHIBIT A

FROST VP SEED, LLC

SCHEDULE OF MEMBERS

| NAME AND ADDRESS: | CAPITAL COMMITMENT |
|---|---|
| **MANAGER AND MEMBER:** | |
| FROST MANAGEMENT COMPANY, LLC<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $0 |
| **MEMBER:** | |
| Stuart Frost<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $___ |

725167 v1/SD

Exhibit 2
Page 156

EXHIBIT B

# EXHIBIT B

Exhibit 2
Page 157

# FROST VP EARLY STAGE FUND II, L.P.

## LIMITED PARTNERSHIP AGREEMENT

This LIMITED PARTNERSHIP AGREEMENT (the *"Agreement"*) is made and entered into as of the 29th day of May, 2013, by and among FROST VENTURE PARTNERS GP, LLC, a Delaware limited liability company (the *"General Partner"*), and each of the entities who subscribe hereto as limited partners (the *"Limited Partners"*), who hereby form FROST VP EARLY STAGE FUND II, L.P., a Delaware limited partnership (the *"Partnership"*), pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the *"Act"*), as follows:

## ARTICLE 1

### NAME, PURPOSE AND OFFICES OF PARTNERSHIP

**1.1　Name.** The name of the Partnership is Frost VP Early Stage Fund II, L.P. The affairs of the Partnership shall be conducted under the Partnership name, or such other name as the General Partner may, in its discretion, determine.

**1.2　Purpose.** The primary purpose of the Partnership is to provide a limited number of select investors with the opportunity to realize long-term appreciation, generally from venture capital investments in early-stage and emerging private companies, with an emphasis on Big Data and Cloud Computing technology companies that are founded and incubated by, and receive support and services as part of, that certain program operated by Frost Venture Partners, LLC (the *"Incubator"*). The general purposes of the Partnership are to buy, sell, hold and otherwise invest in Securities of every kind and nature and rights and options with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Partnership; to enter into, make, and perform all contracts and other undertakings; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.

**1.3　Principal Office.** The principal office of the Partnership shall be 31910 Del Obispo, Suite 100, San Juan Capistrano, CA 92675, or such other place or places in the United States as the General Partner may from time to time designate. The General Partner shall provide the Limited Partners with prompt written notice of any change in the location of the Partnership's principal office.

**1.4　Registered Agent and Office.** The name of the registered agent for service of process of the Partnership and the address of the Partnership's registered office in the State of Delaware shall be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other agent or office in the State of Delaware as the General Partner may from time to time designate.

1.

806590 v11/SD

Exhibit 2
Page 158

## ARTICLE 2

### TERM OF PARTNERSHIP

**2.1    Term.** The term of the Partnership shall commence upon the date of the filing of the Certificate of Limited Partnership of the Partnership with the office of the Secretary of State of the State of Delaware (the *"Commencement Date"*) and shall continue until the fifth anniversary of the Activation Date (the *"Termination Date"*), unless extended pursuant to paragraph 10.1 or sooner dissolved as provided in paragraph 10.2.

**2.2    Events Affecting a Member of the General Partner.** The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, expulsion or removal of any member of the General Partner shall not dissolve the Partnership.

**2.3    Events Affecting a Limited Partner of the Partnership.** The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of a Limited Partner shall not dissolve the Partnership.

**2.4    Events Affecting the General Partner.** Except as specifically provided in paragraph 10.2, the bankruptcy, expulsion, resignation, removal or withdrawal, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of the General Partner shall not constitute an "event of withdrawal" under the Act, and upon the happening of any such event, the affairs of the Partnership shall be continued by the General Partner or any successor entity thereto.

## ARTICLE 3

### NAME AND ADMISSION OF PARTNERS

**3.1    Name and Address.** The name and address of the General Partner and each Limited Partner (hereinafter the General Partner and the Limited Partners shall be referred to collectively as the *"Partners"* and each individually as a *"Partner"*), the amount of such Partner's Capital Commitment to the Partnership, and such Partner's Partnership Percentage are set forth on a Schedule of Partners (the *"Schedule of Partners"*). The General Partner shall cause the Schedule of Partners to be amended from time to time to reflect the admission of any new Partner, the withdrawal or substitution of any Partner, the transfer of interests among Partners, receipt by the Partnership of notice of any change of address of a Partner or the change in any Partner's Capital Commitment or Partnership Percentage. An amended Schedule of Partners shall supersede any prior Schedule of Partners and become a part of this Agreement. A copy of the most recent amended Schedule of Partners shall be kept on file at the principal office of the Partnership.

2.

806590 v11/SD

Exhibit 2
Page 159

**3.2** **Admission of Additional Partners.**

(a) Except as provided in paragraphs 3.2(b), 4.6(b)(vii)(4) and 9.6, an additional person may be admitted as a Partner only with the consent of the General Partner and a Majority in Interest of the Limited Partners.

(b) Notwithstanding subparagraph (a) above, additional persons may be admitted as Limited Partners (or existing Limited Partners may increase their Capital Commitments) with the consent of only the General Partner on or before the date twelve (12) months following the Commencement Date.

(c) Each additional person admitted as a Partner (or an existing Limited Partner that increases its Capital Commitment) subsequent to the Commencement Date shall (i) execute and deliver to the Partnership a counterpart of this Agreement or otherwise take such actions as the General Partner shall deem appropriate in order for such additional Partner to become bound by the terms of this Agreement and (ii) contribute that portion of its Capital Commitment which is equal to the portion of their respective Capital Commitments called to date by the General Partner pursuant to paragraph 4.2(a). Limited Partners admitted to the Partnership after the Commencement Date will not be entitled to share in any Idle Funds Income accruing prior to or contemporaneously with their admission date.

(d) Upon the admission of any additional Limited Partner pursuant to this paragraph 3.2, the General Partner may, in its sole discretion, make a special distribution of all or a portion of the initial contribution of capital made by such additional Limited Partner. Such distribution shall be made to all Partners in accordance with Partnership Percentages (as adjusted to reflect the admission of such additional Limited Partner) and shall be deemed to be a return of capital to such Partners; *provided, however,* that such Partners shall be deemed, for the purposes of paragraph 4.2, not to have contributed the amount of such distribution and the amounts of their respective unfunded Capital Commitments shall be increased accordingly.

## ARTICLE 4

CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS
AND NONCONTRIBUTING PARTNERS

**4.1** **Capital Accounts.** An individual Capital Account shall be maintained for each Partner.

**4.2** **Capital Contributions of the Limited Partners.**

(a) Each Limited Partner shall contribute capital to the Partnership from time to time as requested by the General Partner upon ten (10) calendar days' written notice; *provided* that the General Partner expects to request initial capital contributions of the Limited Partners in an amount equal to approximately ten million dollars ($10,000,000) in the aggregate on or about the Commencement Date upon three (3) calendar days' written notice. The date of the first capital contribution made to the Partnership by any Limited Partner in accordance with this paragraph 4.2(a) shall be referred to herein as the "*Activation Date.*" Each capital contribution shall be in accordance with Partnership Percentages; provided, however, a Limited Partner may

806590 v11/SD

3.

Exhibit 2
Page 160

contribute such larger percentage of the Partnership's initial capital call, up to the amount of the Limited Partner's Capital Commitment, as may be agreed to by the General Partner. Notwithstanding anything in the foregoing to the contrary, no Limited Partner shall be required to contribute any capital following the fourth anniversary of the Activation Date (the "*Commitment Period*"), except as may be necessary for (1) Partnership expenses, including, but not limited to, payment of any management fee due to the General Partner; (2) completion of transactions with respect to which the Partnership has entered into a binding commitment; (3) follow-on investments in the Securities of issuers in which the Partnership holds a pre-existing interest as of the date of such proposed follow-on investment and (4) fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d). Further, each Limited Partner's obligation to contribute capital shall also be subject to those limitations set forth in paragraph 4.6. Each capital contribution by any Limited Partner shall be made in cash.

(b)   Notwithstanding paragraph 4.2(a), with respect to the Partnership's initial request for capital contributions under paragraph 4.2, no ERISA Partner shall be required to contribute capital pursuant to this Agreement until such time as the General Partner shall have delivered notice (the "*VCOC Notice*"), to such ERISA Partner to the effect that the Partnership's first Portfolio Company investment has qualified or will qualify upon its closing as a "venture capital investment" within the meaning of the U.S. Department of Labor regulations ("*DOL Regulations*") such that the Partnership will qualify as a "venture capital operating company" (a "*VCOC*") under applicable DOL Regulations, or that less than twenty-five percent (25%) of the Partnership's Committed Capital is from Limited Partners who are "benefit plan investors" for purposes of the DOL Regulations. In the event that an ERISA Partner has not received the VCOC Notice prior to the date on which any capital contribution would otherwise be due under paragraph 4.2(a), the General Partner, at its discretion, may either (i) defer the contribution obligation of such ERISA Partner until the VCOC Notice has been delivered (which shall, in any case, be within fifteen (15) calendar days of the corresponding contributions from non-ERISA Partners) or (ii) cause such ERISA Partner to pay such capital contribution into an interest-bearing escrow account designated by the General Partner. The terms of any such escrow account shall be reasonably satisfactory to such ERISA Partner and in compliance with ERISA (including Dept. of Labor Adv. Op. 95-04A). Upon delivery of the VCOC Notice, all amounts in the escrow account shall be delivered to the Partnership in fulfillment of the ERISA Partner's obligation under paragraph 4.2(a).

(c)   At any time within ninety (90) days of its initial contribution, the General Partner may, in its sole discretion, return to the Partners all or a portion of any capital contribution intended for a proposed investment which is not consummated as anticipated pro rata in accordance with their respective capital contributions; *provided that* such returned capital shall be added back to unfunded Capital Commitments and be subject to recall by the General Partner pursuant to this Article 4.

(d)   (i)  If, in the discretion of the General Partner, Partnership assets are insufficient to fulfill any indemnification obligation of the Partnership pursuant to paragraph 15.4, prior to the termination of the Partnership the General Partner may require each Partner to contribute capital to the Partnership in an amount up to such Partner's unfunded Capital Commitment, if any.

4.

806590 v11/SD

Exhibit 2
Page 161

(ii)    If, in the discretion of the General Partner, Partnership assets remain insufficient to fulfill (i) any indemnification obligation of the Partnership pursuant to paragraph 15.4 following the contribution to the Partnership of the maximum amount permitted by paragraph 4.2(d)(i) and/or (ii) any obligation of the Partnership to pay amounts in respect of claims associated with prior Portfolio Company dispositions (including, without limitation, amounts associated with the terms of any transaction documents relating to the acquisition of any Portfolio Company Securities), the General Partner may recall distributions previously made to the Partners solely for the purpose of fulfilling or satisfying such an obligations or liabilities. The obligation to recontribute distributions under this paragraph 4.2(d)(ii) shall be applied pro rata in proportion to aggregate distributions from the Partnership (in each case, with any in kind distributions valued as of the date of distribution). In no event shall any Limited Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the Limited Partner from the Partnership or (2) twenty-five percent (25%) of such Limited Partner's Capital Commitment. In no event shall the General Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the General Partner from the Partnership or (2) one hundred percent (100%) of amounts distributed to the General Partner with respect to its Carry Percentage in Partnership Profit or Loss. In no event will the General Partner be permitted to call capital pursuant to this paragraph 4.2(d)(ii) after the date one (1) year from the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1).

4.3    **Capital Contributions of the General Partner.** The General Partner shall contribute capital to the Partnership in an aggregate amount equal to $6,100,000 on the same terms under which any Limited Partner is required to contribute capital pursuant to paragraph 4.2(a). Each capital contribution made by the General Partner shall be made in cash; *provided*, that the General Partner may reduce its contribution obligation on a dollar-for-dollar basis by electing to reduce the amount of management fee that it would otherwise receive pursuant to paragraph 6.1 (each such reduction, a *"Fee Adjustment"*); provided that the aggregate amount of all Fee Adjustments over the term of the Partnership shall not exceed eighty percent (80%) of the General Partner's Capital Commitment. In the event that the General Partner elects to make a Fee Adjustment, the General Partner shall provide, prior to the first day of the fiscal year in which such reductions shall occur (for the Partnership's first fiscal year, such notice shall be provided prior to the Partnership's initial request for capital contributions under paragraph 4.2(a)), written notice (a *"Fee Adjustment Notice"*) to the Partnership of the amount of such reduction (each such amount, a *"Fee Adjustment Amount"*), which amount may be expressed for a specified period as a percentage of the amount the General Partner would otherwise be obligated to contribute in cash or as a specific dollar amount. Once made, any such election shall be irrevocable for the year to which it applies. If the General Partner delivers a Fee Adjustment Notice, such election shall apply to each succeeding year unless revoked or modified prior to the year to which the revocation or modification applies. For the avoidance of doubt, the General Partner's capital contributions deemed to have been made to the Partnership pursuant to this paragraph 4.3 shall increase its capital contribution and reduce its unpaid Capital Commitment, but shall not increase the General Partner's Capital Account.

4.4    **Acquisition of an Additional Interest by the General Partner.** In the event that the General Partner acquires a Limited Partner's interest pursuant to the terms of this

5.

806590 v11/SD

Exhibit 2
Page 162

Agreement, the General Partner shall have two Partnership Percentages and two Capital Account balances for purposes of making Partnership allocations, as if such subsequently acquired interest were held by a separate entity which is a Limited Partner, although for all other purposes the General Partner shall have only one Capital Account.

### 4.5    Noncontributing Partners.

(a)    The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions to capital set forth in paragraph 4.2, and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made. If any legal proceedings relating to the failure of a Limited Partner to make such a contribution are commenced, such Limited Partner shall pay all costs and expenses incurred by the Partnership, including attorneys' fees, in connection with such proceedings.

(b)    Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.5(a), should any Limited Partner fail to make any of the capital contributions required of it under this Agreement and such failure shall have continued uncured for ten (10) or more days after delivery of written notice by the General Partner to such Limited Partner, such Limited Partner shall be in default (a *"Defaulting Limited Partner"*). In the event of such default, the General Partner may, in carrying out what it determines to be in the best interests of the nondefaulting Limited Partners, elect to enforce one or more of the provisions of this paragraph 4.5(b) in connection with such a default, to which each Limited Partner hereby expressly consents. The General Partner shall deliver written notice to such Defaulting Limited Partner in the event that it determines to utilize one or more of the powers set forth in paragraph 4.5(a) or this paragraph 4.5(b) (a *"Default Notice"*). Upon delivery of the Default Notice, the Defaulting Limited Partner may not make any additional contributions of capital against such Defaulting Limited Partner's Capital Commitment (other than to fund management fees and other expenses of the Partnership) without the written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner.

(i)    The General Partner may waive, in whole or in part, the requirement of payment with respect to any due and unpaid capital contributions by a Defaulting Limited Partner pursuant to this Agreement and reduce such Defaulting Limited Partner's Capital Commitment accordingly. The General Partner shall disclose any waiver made pursuant to this paragraph 4.5(b)(i) to the Advisory Committee; *provided, however*, the General Partner may not waive the capital contribution requirements of any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

(ii)    The General Partner may extend the time of payment for a Defaulting Limited Partner of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement. The General Partner shall disclose any extension made pursuant to this paragraph 4.5(b)(ii) to the Advisory Committee; *provided, however*, the General Partner may not extend the time of payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

6.

Exhibit 2
Page 163

(iii)    The General Partner may declare the entire amount of a Defaulting Limited Partner's then unfunded Capital Commitment to be immediately due and payable.

(iv)    On behalf of the Partnership, the General Partner may enforce, by appropriate legal proceedings, the Defaulting Limited Partner's obligation to make payment on the amount of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement or to pay the entire amount of such Defaulting Limited Partner's then unfunded Capital Commitment.

(v)    The General Partner shall deny the Defaulting Limited Partner the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the Capital Commitment of such Defaulting Limited Partner shall not be included for purposes of calculating a Majority in Interest or other Percentage in Interest of the Limited Partners for purposes of this Agreement.

(vi)    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vi), such Defaulting Limited Partner shall pay all expenses to be incurred or anticipated to be incurred by the Partnership in connection with the default and the interest on the amount of the contribution to the Partnership then due at the Prime Rate plus one hundred (100) basis points per annum (or if less, the highest rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to this Agreement until the date the contribution is made by such Defaulting Limited Partner, unless such payment is waived by the General Partner; *provided, however*, the General Partner may not waive such payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee. The accrued interest shall be paid by the Defaulting Limited Partner to the Partnership upon payment of such contribution. The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income to the Partnership; *provided that* such income shall not be allocated to the Capital Account of the Defaulting Limited Partner. Until such time as the unpaid contribution and accrued interest thereon shall have been paid by the Defaulting Limited Partner, the General Partner may elect to withhold any or all distributions to be made to such Defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by set off against any such distribution withheld.

(vii)    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vii), the General Partner and the nondefaulting Limited Partners (the "*Optionees*"), shall have the right and the option, but not the obligation, to acquire the Partnership interest of the Defaulting Limited Partner (the "*Optionor*"), as follows:

(1)    The General Partner shall notify the Optionees of the default within twenty (20) days of the expiration of the ten (10) day notice period commencing upon delivery of the Default Notice. Such notice shall advise each Optionee of the portion and the price of the Optionor's interest available to it. Each Optionee shall be offered a *pro rata* portion (in accordance with capital contributions to the Partnership) of the available Optionor's interest. The aggregate price for the Optionor's interest shall be the lesser of fifty percent (50%) of (A) the amount of the Optionor's Capital Account calculated as of the due date of the

7.

Exhibit 2
Page 164

additional contribution and adjusted to reflect the allocation of the appropriate proportion of the Partnership's unrealized gains and losses as of the due date of such defaulted contribution, and (B) the aggregate amount of the Optionor's capital contributions actually made less any distributions (valued at their fair market value on the date of distribution in accordance with paragraph 12.1) on or prior to such due date. The price for each Optionee shall be prorated according to the portion of the Optionor's interest purchased by each such Optionee. The option granted hereunder shall be exercisable at any time after the date thirty (30) days following the date of the initial notice of default from the General Partner to the Optionor by delivery to the Optionor of a notice of exercise of option together with a nonrecourse promissory note for the purchase price and a security agreement in accordance with subparagraph (5) below, which notice and documents the General Partner shall promptly forward to the Optionor.

(2)     Should any Optionee not exercise its option within said thirty (30) day period provided in subparagraph (1), the General Partner shall immediately notify the other Optionees who have elected to exercise their option, which Optionees shall have the right and option ratably among them to acquire the portion of the Optionor's interest not so acquired (the "*Remaining Portion*") within thirty (30) days of the date of the notice specified in this subparagraph (2) on the same terms as provided in subparagraph (1).

(3)     Any amount of the Remaining Portion not acquired by the Optionees pursuant to subparagraph (2) may be acquired by the General Partner within thirty (30) days of the expiration of the thirty (30) day period specified in subparagraph (2) on the same terms as set forth in subparagraph (1).

(4)     Any amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subparagraphs (2) or (3) may, if the General Partner deems it in the best interest of the Partnership, be sold by the General Partner to any other investor, on terms not more favorable to such parties than those applicable to the Optionees' option, and upon the consent of the General Partner, any such third party purchaser may become a Limited Partner to the extent of the interest purchased hereunder.

(5)     The price due from each of the General Partner and the Optionees (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be payable by a noninterest bearing, nonrecourse promissory note (in such form as the General Partner shall designate) due upon final liquidation of the Partnership. Each such note shall be secured by the portion of the Optionor's Partnership interest so purchased by its maker pursuant to a security agreement in a form designated by the General Partner and shall be enforceable by the Optionor only against such security.

(6)     Upon exercise of any option hereunder, each Optionee (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be obligated (A) to contribute to the Partnership that portion of the additional capital then due from the Optionor equal to the percentage of the Optionor's interest purchased by such person and (B) to pay the same percentage of any further contributions otherwise due from such Optionor on the date such contributions are otherwise due. Each person who purchases a portion of the Optionor's Partnership interest shall be deemed to have acquired such portion as of the due date of the additional capital contribution with respect to which the Optionor defaulted, and any

8.

Exhibit 2
Page 165

distributions made after the due date on account of the Optionor's interest shall be distributed among such purchasers (and, unless the entire interest was purchased, the Optionor) in accordance with their ultimate respective interests in the Optionor's interest. Distributions otherwise allocable to the Optionor under the preceding sentence shall first be used to offset any defaulted contribution of the Optionor still due to the Partnership. Upon completion of any transaction hereunder, the General Partner shall cause the Schedule of Partners to be amended to reflect all necessary changes resulting therefrom including, without limitation, admission of a purchaser as a Limited Partner, and adjustment of Capital Account balances, Capital Commitment amounts and Partnership Percentages as of the date of Optionor's default to reflect the acquisition from Optionor of the appropriate pro rata portion of each such item. The purchase and transfer of the Partnership interest of the Optionor shall occur automatically upon exercise by any Optionee or the General Partner of its option hereunder, without any action by Optionor.

(7) Notwithstanding the sale of any portion of an Optionor's interest pursuant to this paragraph 4.5(b)(vii), such Optionor shall not be released from its unfunded Capital Commitment except as actually funded by the acquirer of any such portion of Optionor's interest.

(8) In the event that any amount of the Remaining Portion is not acquired by the Optionees, the General Partner and any third party purchasers pursuant to paragraphs 4.5(b)(vii)(1)-(4), then, in its sole discretion, the General Partner may apply any of the remedies described in paragraphs 4.5(a) and (b) to such unsold portion.

(viii) The General Partner may, in its sole discretion, elect to remove such Defaulting Limited Partner from the Partnership, in which such event (1) one hundred percent (100%) of the Defaulting Limited Partner's Capital Account balance shall be forfeited and reallocated to the Capital Accounts of the nondefaulting Partners proportionally, based on, with respect to each such Partner, the ratio that its Partnership Percentage immediately prior to such calculation bears to the aggregate Partnership Percentages of all Partners (other than the Defaulting Limited Partner) and (2) the Defaulting Limited Partner's Partnership Percentage shall be reduced to zero.

(ix) Notwithstanding anything to the contrary in this Agreement, each Limited Partner (1) agrees that it will execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 4.5, and (2) designates and appoints the General Partner its true and lawful attorney, in its name, place and stead to make, execute and sign any and all instruments, documents or certificates on behalf of any Defaulting Limited partner in order to give effect to any remedy against such Defaulting Limited Partner (including, but not limited to, the remedies set forth in this paragraph 4.5(b)).

(x) The Partners agree that the General Partner's authority and discretion to enforce any remedy against a Defaulting Limited Partner (including but not limited to the remedies set forth in this paragraph 4.5(b)) supersede any fiduciary duties of the General Partner to such Defaulting Limited Partner. The Partners further agree that the remedies set forth in this paragraph 4.5(b) are fair and reasonable in light of the difficulty in ascertaining the actual

9.

806590 v11/SD

Exhibit 2
Page 166

damages that would be incurred by the Partnership and the nondefaulting Partners as a result of the Defaulting Limited Partner's failure to contribute capital when due pursuant to the terms of this Agreement.

(xi)  Notwithstanding anything to the contrary in this paragraph 4.5, a Limited Partner shall not be declared to be in default by the General Partner with respect to any due and unpaid capital contributions in the event that such Limited Partner is entitled to withdraw from the Partnership (or the General Partner has requested such withdrawal) pursuant to Article 13 and the failure to make such due and unpaid capital contributions is the consequence of or attributable to such withdrawal.

**4.6  Suspension Period.**

(a)  Notwithstanding any other provision of this Agreement to the contrary, no Limited Partner shall be required to contribute capital to the Partnership in respect of its Capital Commitment during any suspension of the Commitment Period pursuant to paragraph 4.6(b) except for:

(i)  Partnership expenses, including payment of any management fee due to the General Partner;

(ii)  follow-on investments in portfolio companies in which the Partnership had invested prior to commencement of the Suspension Period;

(iii)  completion of transactions with respect to which the Partnership has entered into a binding commitment prior to commencement of the Suspension Period; and

(iv)  fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d).

(b)  In the event that Stuart Frost (i) fails to meet the devotion of time requirements in paragraph 8.3(a) or (ii) is no longer a manager of the General Partner (each, a *"Suspension Event"*), the General Partner shall promptly deliver written notice to each Limited Partner of such Suspension Event (a *"Suspension Event Notice"*). At any time within the period commencing with the effective date of the Suspension Event Notice and ending on the date sixty (60) days thereafter, the Limited Partners shall have the right to commence a *"Suspension Period"* upon the affirmative vote of a Majority in Interest of the Limited Partners.

(c)  Any Suspension Period may be terminated at any time upon the affirmative vote of a Majority in Interest of the Limited Partners; *provided, however*, that unless within one hundred eighty (180) days after the commencement of a Suspension Period, a Majority in Interest of the Limited Partners has elected to terminate such Suspension Period and re-commence normal Partnership operations, the remaining managers of the General Partner shall be permitted to form a new private equity fund or similar entity with objectives substantially similar to the Partnership.

10.

806590 v11/SD

Exhibit 2
Page 167

## ARTICLE 5

### PARTNERSHIP ALLOCATIONS

**5.1    Allocation of Profit or Loss.** Except as otherwise provided in this Article 5, Profit and Loss of the Partnership for each Accounting Period shall be allocated as follows:

(a)    Profit shall be allocated:

(i)    First, allocated as a Priority Allocation, one hundred percent (100%) to the General Partner until the cumulative Profit allocated to the General Partner pursuant to this paragraph 5.1(a)(i) in such Accounting Period and all prior Accounting Periods is equal to the aggregate Fee Adjustment Amounts (as defined in paragraph 4.3) for fiscal quarters beginning during or prior to such Accounting Period; *provided, however,* that for each separate Fee Adjustment amount the General Partner shall only receive an allocation pursuant to this paragraph 5.1(a)(i) in respect of the Fee Adjustment Amounts for a fiscal quarter to the extent that the Profit for the Accounting Period is (A) realized after the beginning of the fiscal quarter to which the corresponding Fee Adjustment Amount applies and (B) not attributable to unrealized appreciation inherent in the Partnership's assets as of the date of such election for the related fiscal quarter; and *provided further,* that such Priority Allocation shall only be allocated from Profit consisting of qualified dividend income and gains on Securities, including, without limitation, gains from the sale of Securities, any Deemed Gain allocable to the Partners in connection with a distribution or other disposition of Securities, and any Deemed Gain allocable in connection with a revaluation of Securities for any reason;

(ii)    Second, to the Limited Partners, until the cumulative amount of Profit allocated to the Limited Partners pursuant to this paragraph 5.1(a)(ii) for the current Accounting Period and all prior Accounting Periods equals the cumulative amount of management fees allocated to the Limited Partners pursuant to paragraph 5.1(c) for the current Accounting Period and all prior Accounting Periods;

(iii)    Third, among the Partners to reverse the cumulative amount of Losses allocated to the Partners pursuant to paragraph 5.1(b)(ii) for the current Accounting Period and all prior Accounting Periods; and

(iv)    Thereafter, any remaining Profit shall initially be allocated among the Partners in proportion to their respective Partnership Percentages. The share of each Partner in such initial allocation shall be divided between such Partner and the General Partner and allocated as follows:

(1)    The Carry Percentage (as defined below) to the General Partner; and

(2)    The difference between one hundred percent (100%) and the Carry Percentage to such Partner.

For the purposes of this Agreement, the *"Carry Percentage"* shall mean a percentage equal to (i) in the case of Limited Partners admitted after the Activation Date, twenty percent

11.

806590 v11/SD

Exhibit 2
Page 168

(20%) and (ii) in the case of each Limited Partner admitted on or prior to the Activation Date, the Carry Percentage shall be 10% on the capital contributions made by such Limited Partner at the Activation Date and 20% on any capital contributions made after the Activation Date, which Carry Percentage shall be calculated as, ten percent (10%) plus the product of the percentage of the Limited Partner's Capital Commitment not contributed on or prior to the Activation Date times ten (10) percentage points (for example, a Limited Partner who contributed fifty percent (50%) of its Capital Commitment on the Activation Date would have a Carry Percentage of fifteen percent (15%)).

**(b)** Loss shall be allocated:

**(i)** First, Losses shall be allocated among the Partners in reverse order of the Profit previously allocated in paragraph 5.l(a)(iv) above and not previously reversed pursuant to this paragraph 5.1(b)(i) for the current Accounting Period and all prior Accounting Periods; and

**(ii)** Thereafter, any remaining Loss shall be allocated among the Partners in proportion to their respective Partnership Percentages.

**(c)** Management fees paid pursuant to paragraph 6.1 below shall be allocated to the Limited Partners in proportion to their respective Partnership Percentages.

**(d)** All Idle Funds Income (net of directly associated expenses) shall be allocated to the Capital Accounts of all of the Partners in proportion to their respective Partnership Percentages.

5.2    **Special Allocations.**

**(a)** To the extent the Partnership has taxable interest income or expense with respect to any promissory note between any Partner and the Partnership as holder and maker or maker and holder pursuant to Section 483, Sections 1271 through 1288, or Section 7872 of the Code, such interest income or expense shall be specially allocated to the Partner to whom such promissory note relates, and such Partner's Capital Account adjusted if appropriate.

**(b)** If additional persons are admitted to the Partnership as Limited Partners subsequent to the Commencement Date, then organizational costs, fees (including the management fee set forth in paragraph 6.1), and expenses of the Partnership that are allocated to the Partners on or after the effective date of such admission shall be allocated first to such new Partners to the extent necessary to cause such persons to be treated with respect to such items as if they had been Partners from the Commencement Date.

5.3    **Regulatory Allocations.**

**(a)** This Agreement is intended to comply with the safe harbor provisions set forth in Treasury Regulation 1.704-1(b) and the allocations set forth in paragraph 5.4(b) (the *"Regulatory Allocations"*) are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b). In the event the Regulatory Allocations result in allocations being made that are inconsistent with the manner in which the Partners intend to divide

12.

Exhibit 2
Page 169

Partnership Profit and Loss as reflected in paragraphs 5.1 and 5.2, the General Partner shall use its best efforts to adjust subsequent allocations of any items of profit, gain, loss, income or expense such that the net amount of the Regulatory Allocations and such subsequent special adjustments to each Partner is zero.

(b)      The allocations provided in this Article 5 shall be subject to the following exceptions:

(i)      Any loss or expense otherwise allocable to a Limited Partner which exceeds the positive balance in such Limited Partner's Capital Account shall instead be allocated first to all Partners who have positive balances in their Capital Accounts in proportion to their respective Partnership Percentages, and when all Partners' Capital Accounts have been reduced to zero, then to the General Partner; income shall first be allocated to reverse any loss allocated under this paragraph 5.3(b)(i), in reverse order of such loss allocations, until all such prior loss allocations have been reversed.

(ii)      In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6), which causes or increases a deficit balance in such Limited Partner's Capital Account, items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible.

(iii)      For purposes of this paragraph 5.3(b), the balance in a Partner's Capital Account shall take into account the adjustments provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6).

5.4      Income Tax Allocations.

(a)      Except as otherwise provided in this paragraph or as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Partner's distributive share of Partnership income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in the Partner's Capital Account pursuant to this Agreement.

(b)      In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any asset contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Adjusted Asset Value.

(c)      In the event the Adjusted Asset Value of any Partnership asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Adjusted Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

13.

806590 v11/SD

Exhibit 2
Page 170

## ARTICLE 6

### MANAGEMENT FEE; PARTNERSHIP EXPENSES

**6.1     Management Fee.**

   **(a)**     Commencing as of the Activation Date, the General Partner (or its designee) shall be compensated on a quarterly basis for services rendered during the term of the Partnership by the payment in advance by the Partnership in cash to the General Partner (or its designee) on the first day of each fiscal quarter (or portion thereof) of a management fee.

   **(b)**     The management fee for each fiscal quarter (prior to the adjustments described in paragraphs 6.1(c) and (d)) shall be an amount equal to the aggregate Capital Commitments of all Limited Partners as of the first day of each such quarter multiplied by 0.5% (the percentage applicable for any period referred to herein as the *"Management Fee Percentage"*).     Notwithstanding the foregoing, (i) the management fee for each of the Partnership's first and last fiscal quarters with respect to which any management fee is due shall be proportionately reduced based upon the ratio of the number of days in each such period bears to ninety (90), (ii) an additional management fee shall be payable upon the date of admission of any Limited Partner admitted subsequent to the Commencement Date to reflect the increased Capital Commitments calculated as if such Limited Partner had been admitted to the Partnership as of the Commencement Date and (iii) commencing on the expiration, termination, or suspension of the Commitment Period, and on each anniversary thereafter, the Management Fee Percentage shall be reduced by an amount equal to ten percent (10%) of the base Management Fee Percentage (i.e., by 0.2%); *provided, however*, if the suspension of the Commitment Period is terminated pursuant to paragraph 4.6(c), the base Management Fee Percentage shall be restored to the level applicable prior to suspension of the Commitment Period as of the commencement of the next fiscal quarter.

   **(c)**     The management fee otherwise payable by the Partnership to the General Partner (or its designees) pursuant to paragraph 6.1(b) for a fiscal quarter shall be offset by the amount of capital that the General Partner elected not to contribute in cash (as permitted by paragraph 4.3) with respect to the immediately preceding quarter.  In the event that there exists at the time of the liquidation of the Partnership any excess of fees not offset by the reduction of management fees pursuant to the preceding sentence, such excess shall be paid over to the Partnership by the General Partner and allocated among all Limited Partners in accordance with their respective Partnership Percentages (unless a Limited Partner provides written notice to the General Partner that it elects not to receive an allocation of any such excess fees).

   **(d)**     Each Limited Partner hereby agrees and acknowledges that the Incubator may receive a monthly fee from the companies in which the Partnership holds an investment (each, a *"Portfolio Company"*) in exchange for certain shared advisory and support services provided to the Portfolio Company (a *"Service Fee"*).  For the avoidance of doubt, any Service Fee paid by a Portfolio Company to an affiliate of the General Partner will not reduce the management fee payable to the General Partner by the Partnership pursuant to paragraph 6.1(a), so long as such Service Fee does not exceed reasonable market rates.

14.

Exhibit 2
Page 171

**6.2     Expenses.**

(a)     From the management fee, the General Partner shall bear all normal operating expenses incurred in connection with the management of the Partnership, the General Partner, except for those expenses borne directly by the Partnership as set forth in subparagraphs (b), (c) and (d) below and elsewhere herein. Such normal operating expenses to be borne by the General Partner (or its designee) shall include, without limitation, expenditures on account of salaries, wages, travel, entertainment, and other expenses of employees, consultants and agents of the Partnership or the General Partner, overhead and rentals payable for space used by the General Partner (or its designee) or the Partnership, office expenses and in managing investments of the Partnership.

(b)     The Partnership shall bear all costs and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, legal fees, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Partnership, including claims by or against a governmental authority, audit and accounting fees, tax return preparation and related fees, consulting fees relating to investments or proposed investments (including the cost of independent valuations, if any), back-office services in respect of the Partnership or the General Partner (or if the Management Company or Incubator performs such functions internally, an amount reimbursable to the Management Company or Incubator, as applicable, equal to the then-current market cost of a qualified third party service provider as determined by the General Partner in good faith), third party accounting and/or consulting fees, market research subscription or consulting fees, taxes applicable to the Partnership on account of its operations, fees incurred in connection with the maintenance of bank or custodian accounts, fees and expenses incurred in connection with the Management Company's, the General Partner's and/or their Affiliates' compliance with applicable law and regulations associated with the Partnership, and all expenses incurred in connection with the registration of the Partnership's Securities under applicable securities laws or regulations. The Partnership shall also bear expenses incurred by the General Partner in serving as the tax matters partner (as described in paragraph 11.8), the reasonable cost of liability and other premiums for insurance protecting the Partnership, the General Partner, its managers and members, and the Management Company and its employees from liability to third parties, all out-of-pocket expenses of preparing and distributing reports to Partners, out-of-pocket expenses associated with Partnership communications with Partners, including preparation of annual or other reports to the Limited Partners, out-of-pocket costs associated with Partnership meetings or Advisory Committee matters, all out-of-pocket fees and expenses incurred by the Management Company related to regulatory compliance in connection with the management of the Partnership, all legal and accounting fees relating to the Partnership and its activities, all costs and expenses arising out of the Partnership's indemnification obligation pursuant to this Agreement, and all expenses that are properly chargeable to the activities of the Partnership.

(c)     The Partnership shall bear all organizational and syndication costs, fees, and expenses incurred by or on behalf of the General Partner in connection with the formation

15.

806590 v11/SD

Exhibit 2
Page 172

and organization of the Partnership and the General Partner, including legal and accounting fees and expenses incident thereto.

(d)    The Partnership shall bear all liquidation costs, fees, and expenses incurred by the General Partner (or its designee) in connection with the liquidation of the Partnership at the end of the Partnership's term, specifically including but not limited to legal and accounting fees and expenses.

(e)    Each of the Partnership and the General Partner agree to reimburse the other as appropriate to give effect to the provisions of this paragraph 6.2 in the event that either such party pays an obligation that is properly the responsibility of the other.

(f)    To the extent that any expenses borne by the Partnership pursuant to subparagraphs (b) and (c) above also benefit a Parallel Fund, such expenses shall be allocated among the Partnership and the applicable Parallel Funds pro rata in proportion to the aggregate capital commitments of the Partnership together with any such Parallel Funds.

## ARTICLE 7

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE PARTNERS

7.1    **Interest.** Except as otherwise provided in this Agreement, no interest shall be paid to any Partner on account of its interest in the capital of or on account of its investment in the Partnership.

7.2    **Withdrawals by the Partners.** No Partner may withdraw any amount from its Capital Account unless such withdrawal is made pursuant to this Article 7, Article 10 or Article 13.

7.3    **Partners' Obligation to Repay or Restore.** Except as required by law or paragraphs 4.2(c) and 4.2(d) of this Agreement, no Limited Partner shall be obligated at any time to repay or restore to the Partnership all or any part of any distribution made to it from the Partnership in accordance with the terms of this Article 7.

7.4    **Mandatory Distributions.** Each Partner shall be paid in cash within ninety (90) days after the end of each fiscal year during the term of the Partnership an amount equal to the excess, if any, of (i) the Applicable Tax Rate multiplied by the net taxable income allocated to such Partner as a result of such Partner's ownership of an interest in the Partnership for the current fiscal year (excluding, for this purpose and purposes of clause (y) of this paragraph 7.4, any allocations to the General Partner pursuant to paragraph 5.1(a)(i)), over (ii) all cash prior distributions made pursuant to this paragraph 7.4 or paragraph 7.5 during such fiscal year (other than amounts distributed pursuant to this paragraph 7.4 during such fiscal year in respect of net taxable income allocated to the General Partner during the preceding fiscal year); *provided, however*, that (x) the General Partner shall not be required to make any such distribution if the total amount to be distributed to all Partners is less than five hundred thousand dollars ($500,000), and (y) the General Partner shall have the authority, in its sole discretion, to make good faith estimates of amounts expected to be distributed pursuant to this paragraph 7.4 with respect to a given calendar year and to distribute such estimated amounts to all Partners as

16.

806590 v11/SD

Exhibit 2
Page 173

advances from time to time during such calendar year. The provisions of this paragraph 7.4 shall apply equally to all Partners, without regard to their tax-exempt status under the Code. For purposes of this paragraph 7.4, the "*Applicable Tax Rate*" shall refer to the highest federal, state and local income, self-employment and Medicare tax rates then applicable to individuals resident of the State of California, applied by taking into account the character of the taxable income in question (i.e., long-term capital gains, ordinary income, etc.).

**7.5    Discretionary Distributions.** The General Partner may make distributions of cash or Marketable Securities as follows:

(a)    If at the time of a proposed distribution the Limited Partners have not previously received aggregate distributions pursuant to paragraph 7.4 and this paragraph 7.5 or otherwise (with any in-kind distributions valued at the time of distribution in accordance with paragraph 12.1) equal to the sum of their capital contributions to the Partnership ("*Payback*"), such distribution shall be made to all Partners in proportion to their respective unreturned capital contributions;

(b)    Subsequent to Payback, all such distributions may be made to the Partners in proportion to the relative undistributed net Profits standing in their respective Capital Accounts immediately prior to such distribution (including in such Capital Accounts for purposes of determining the proportions of such distribution the Deemed Gain or Deemed Loss described in paragraph 7.5(g)). For the avoidance of doubt, with respect to each Partner, the phrase "undistributed net Profit" as used in the first sentence of this paragraph 7.5(b) shall refer to aggregate allocations of Profit (as modified by the parenthetical in such first sentence) less aggregate allocations of Loss, as reduced by prior distributions of net Profit.

(c)    Notwithstanding paragraph 7.5(b) above, the General Partner may at any time subsequent to Payback make distributions to all Partners in proportion to their respective Partnership Percentages. Any distributions which may be made to the General Partner under paragraph 7.5(b) (excluding for this purpose distributions in respect of the General Partner's Partnership Percentage) shall be reduced dollar-for-dollar by the amount of distributions previously received by the General Partner pursuant to paragraph 7.4 in respect of amounts allocated to the General Partner (excluding for this purpose amounts allocated to the General Partner in respect of the General Partner's Partnership Percentage) to the extent such amounts have not previously been taken into account to reduce prior distributions under paragraph 7.5(b). In no event may a proposed distribution described in this Article 7 cause the Capital Account of the General Partner to go below zero (0).

(d)    Whenever more than one type of Securities is being distributed in kind in a single distribution or whenever more than one class of Securities of a Portfolio Company (or a portion of a class of such Securities having a tax basis per share or unit different from other portions of such class) are distributed in kind by the Partnership, each Partner shall receive its ratable portion of each type, class or portion of such class of Securities distributed in kind (except to the extent that a disproportionate distribution is necessary to avoid distributing fractional shares).

17.

806590 v11/SD

Exhibit 2
Page 174

(e)     Securities distributed in kind shall be subject to such conditions and restrictions as the General Partner determines are legally required or appropriate. Subject to paragraph 7.5(h), whenever types or classes of Securities are distributed in kind, each Partner shall receive its ratable portion of each type or class of Securities distributed in kind.

(f)     Notwithstanding any other provision of this paragraph 7.5, prior to the dissolution of the Partnership, the Partnership shall not, without the prior approval of a Majority in Interest of the Limited Partners, make a distribution of Nonmarketable Securities.

(g)     Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of all Partners as Profit or Loss pursuant to Article 5.

(h)     In order to comply with regulatory or legal restrictions on the amount of any Security that a Partner may be permitted to directly own or control (a *"Regulatory Limitation"*), in the event that any Partner would be entitled to receive a distribution of Securities from the Partnership that would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates).   Such engagement shall be separate from and outside of the structure of the Partnership.

(i)     No distribution shall be made to a Partner to the extent it would create or increase a deficit in its Capital Account.

7.6     **Withholding Obligations.**

(a)     If and to the extent the Partnership is required by law (as determined in good faith by the General Partner) to make payments (*"Tax Payments"*) with respect to any Partner in amounts required to discharge any legal obligation of the Partnership or the General Partner, including any obligation pursuant to FATCA, to make payments to any governmental authority with respect to any federal, state or local income, self-employment, foreign or Medicare tax liability of such Partner arising as a result of such Partner's interest in the Partnership, then the General Partner shall provide prompt notice to such Partner of such Tax Payments and the amount of any such Tax Payments shall be deemed to be a loan by the Partnership to such Partner, which loan shall: (i) be secured by such Partner's interest in the Partnership, (ii) bear interest at the Prime Rate (as defined in paragraph 4.5(b)(vi)), and (iii) be payable upon demand.

(b)     If and to the extent the Partnership is required to make any Tax Payments with respect to any Partner, either (i) such Partner's proportionate share of distributions shall be reduced by the amount of such Tax Payments (*provided that* such Partner's Capital Account shall be adjusted pursuant to paragraph 14.5 for such Partner's full proportionate share of the distribution), or (ii) such Partner shall promptly pay to the Partnership an amount of cash equal

18.

806590 v11/SD

Exhibit 2
Page 175

to such Tax Payments plus interest, if applicable. In the event a portion of a distribution in kind is retained by the Partnership pursuant to clause (i), such retained Securities may, in the discretion of the General Partner, either (1) be distributed to the Partners in accordance with the terms of this Article 7 including this paragraph 7.6(b), or (2) be sold by the Partnership to generate the cash necessary to satisfy such Tax Payments. If the Securities are sold, then for purposes of income tax allocations only under this Agreement, any gain or loss on such sale or exchange shall be allocated to the Partner to whom the Tax Payments relate.

(c)     Each Limited Partner will, as applicable, take such actions as are required to establish to the reasonable satisfaction of the General Partner that the Limited Partner is (i) not subject to the withholding tax obligations imposed by Section 1471 of the Code and (ii) not subject to withholding tax obligations imposed by Section 1472 of the Code. In addition, each Limited Partner will assist the Partnership and the General Partner with any applicable information reporting or other obligation imposed on the Partnership, the General Partner or their respective affiliates, pursuant to FATCA. As used herein, *"FATCA"* means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, and all administrative and judicial interpretations thereof.

(d)     The General Partner shall make (or cause the Partnership to make) any filings, applications or elections, and shall use all other commercially reasonable efforts, to obtain any available exemption from, or refund of, any withholding or other taxes imposed by any non-U.S. (whether sovereign or local) taxing authority with respect to amounts distributable to any Limited Partner under this Agreement. Each Limited Partner agrees that it will cooperate with the General Partner in making any such filings, applications or elections to the extent the General Partner reasonably determines that such cooperation is necessary or desirable. Notwithstanding the foregoing, if a Limited Partner must make any such filings, applications or elections directly, the General Partner, at the request of the affected Limited Partner, shall (or shall cause the Partnership to) provide such information and take such other action as may commercially reasonably be necessary to complete or make such filings, applications or elections.

## ARTICLE 8

### MANAGEMENT DUTIES AND RESTRICTIONS

8.1     **Management.** The General Partner shall have the sole and exclusive right to manage, control, and conduct the affairs of the Partnership and to do any and all acts on behalf of the Partnership, including exercise of rights to elect to adjust the tax basis of Partnership assets and to revoke such elections and to make such other tax elections as the General Partner shall deem appropriate. The General Partner is hereby authorized to enter, by itself or on behalf of the Partnership, into an agreement with a firm designated by the General Partner (the *"Management Company"*) for the provision of certain management, administrative, operational and other services with respect to the Partnership on terms to be determined and agreed to by the General Partner, *provided that* the General Partner shall remain ultimately responsible for the overall management of the Partnership and for its duties and responsibilities hereunder.

19.

Exhibit 2
Page 176

**8.2    No Control by the Limited Partners; No Withdrawal.** No Limited Partner shall take part in the control or management of the affairs of the Partnership nor shall any Limited Partner have any authority to act for or on behalf of the Partnership or to vote on any matter relative to the Partnership and its affairs, except as is specifically permitted by this Agreement. Except as specifically set forth in this Agreement, no Limited Partner shall withdraw or be required to withdraw from the Partnership.

**8.3    Existing Funds; Follow On Funds; Parallel Funds.**

**(a)**    Except as provided below, each Managing Director shall, so long as each shall remain a manager of the General Partner, devote such business time as is necessary and appropriate to the affairs of (i) the Partnership, (ii) the Fund Affiliates (as defined below), (iii) any Parallel Funds (as defined below), (iv) those entities formed for the purpose of managing any of the foregoing and (v) any successor private equity fund (a *"Successor Fund"*) formed on or after such time as at least seventy percent (70%) of the Partnership's Committed Capital has been invested, committed for investment or reserved for follow-on investment in portfolio companies, or applied, committed or reserved for Partnership working capital or expenses. The restriction set forth in the first sentence of this paragraph 8.3(a) shall not apply following the end of the Commitment Period; *provided that* in such event the Managing Directors shall devote such business time to the Partnership as is necessary and appropriate for the effective management and liquidation of the Partnership's investments. For the purposes of this Agreement, *"Fund Affiliates"* shall mean any investment partnership or similar entity managed directly or indirectly by Stuart Frost (each, a *"Frost Fund"*), their respective general partners and portfolio companies, the Management Company, the Incubator and any Incubator Company (as defined below).

**(b)**    Each Limited Partner hereby acknowledges that (i) the Incubator was formed to provide an operating infrastructure to incubate and develop new business (each, an *"Incubator Company"*), (ii) the General Partner expects to, but is under no obligation to, cause the Partnership to invest primarily in Incubator Companies, (iii) the Incubator is controlled by one or more Managing Directors and (iv) the Managing Directors may hold board seats and/or "founder" positions in one or more Incubator Companies and in connection with such positions, a founder's equity interest, directly or indirectly, in such Incubator Company. Each of the Limited Partners hereby consents and agrees to the activities and investments described in this paragraph 8.3(b).

**(c)**    Pursuant to paragraph 8.3(a)(ii), the General Partner and its managers may form and serve as general partner (or in a similar management role) of (i) one or more entities organized to accommodate the capital investments of entities and persons having strategic or other important relationships with the Partnership and (ii) one or more investment partnerships or similar entities to accommodate the tax, regulatory or legal needs of investors who otherwise would invest as Limited Partners of the Partnership on substantially similar terms, including economic terms, as the Partnership (collectively, the *"Parallel Funds"*). The terms of any such Parallel Fund formed for the purposes described in subsection (i) of the immediately preceding sentence may vary from those of the Partnership. No Parallel Fund may admit a Limited Partner or other investor (except in connection with transfers of interests) after the date twelve (12) months from the Activation Date. In the event that any Parallel Fund is formed, upon each purchase of Securities (other than short term obligations such as money market instruments) by

20.

806590 v11/SD

Exhibit 2
Page 177

the Partnership, each Parallel Fund will simultaneously invest in the same Securities on the same terms and at the same price as the Partnership; *provided, however,* that a Parallel Fund shall not be required to make any such investment in a Security if (i) the General Partner receives from the issuer thereof a written notice to the effect that the issuer will not permit such Parallel Fund to invest on the same terms as the Partnership and the General Partner provides a copy of such written notice to the Advisory Committee, or (ii) such investment is not permitted by applicable law or by the terms of the governing agreement of the Parallel Fund. Each Parallel Fund shall also dispose of each such Security at substantially the same time and on substantially the same terms as the Partnership. Each of the Limited Partners hereby consents and agrees to such activities and investments and further consents and agrees that neither the Partnership nor any of its Partners shall have any rights in or to such activities or investments, or any profits derived therefrom.

**8.4    Investment Opportunities and Restrictions.**

**(a)**    Each Limited Partner hereby agrees that the General Partner may offer the right to participate in investment opportunities of the Partnership (each, a *"Co-Investment Opportunity"*) to other private investors, groups, partnerships or corporations, including, without limitation, any Limited Partner, any Frost Funds and any Successor Funds managed by some or all of the managers of the General Partner, whenever the General Partner, in its discretion, so determines. Investments by Frost Funds made in connection with any Co-Investment Opportunity will generally be allocated among the Frost Funds based on the available capital of each such fund.

**(b)**    Except upon the prior consent of the Advisory Committee, for so long as the Partnership may call capital pursuant to paragraph 4.2 for purposes of investing in Securities of issuers in which it does not yet hold an investment, neither the General Partner, the Managing Directors, nor the Management Company shall invest more than fifty thousand dollars ($50,000) in any Securities of any private company that is not an Incubator Company in which neither such party nor the Partnership then holds an investment where such Securities would be within the Partnership's investment criteria.

**(c)**    Without the consent of the Advisory Committee, the Partnership may not purchase Securities of any non-Incubator Company from or sell Securities of any non-Incubator Company to or borrow money from the General Partner, the Management Company or any of the Managing Directors; *provided, however,* following the final admission of Limited Partners pursuant to paragraph 3.2(b), the Partnership may purchase Securities from or sell Securities to a Parallel Fund at cost for the purpose of allocating then existing Securities between such entities in proportion to their respective available capital.

**(d)**    Without the consent of the Advisory Committee, the Partnership may not invest for the first time in any Portfolio Company that is not an Incubator Company in which the General Partner, the Managing Directors, or any of their Affiliates, or any entity managed or operated or controlled by any of them, holds an interest with a cash basis of more than fifty thousand dollars ($50,000).

**(e)**    The General Partner may not incur indebtedness on behalf of the Partnership, or guaranty indebtedness of companies in which the Partnership has invested, in an

21.

Exhibit 2
Page 178

aggregate amount exceeding ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment).

      **(f)** Without the prior approval of the Advisory Committee, no more than the greater of (i) four million dollars ($4,000,000) and (ii) twenty percent (20%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in the Securities of any one Portfolio Company.

      **(g)** At least seventy-five percent (75%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) shall be invested in Incubator Company investments, unless otherwise approved by the Advisory Committee.

      **(h)** Without the prior approval of the Advisory Committee, no more than ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in publicly-traded securities (excluding (i) private placements of public company securities, (ii) securities which were not publicly traded at the time of such investment, (iii) securities acquired in a "going private" transaction or series of transactions and (iv) short-term investments such as money market investments).

      **(i)** The aggregate cost basis of Portfolio Company investments made by the Partnership, whether or not realized, may not exceed one hundred twenty percent (120%) of the aggregate Capital Commitments of the Partners.

### ARTICLE 9

#### INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS

    **9.1** **Investment Representation of the Limited Partners.** This Agreement is made with each of the Limited Partners in reliance upon each Limited Partner's representation to the Partnership, which by executing this Agreement each Limited Partner hereby confirms, that its interest in the Partnership is to be acquired for investment, and not with a view to the sale or distribution of any part thereof, and that it has no present intention of selling, granting participation in, or otherwise distributing the same; and each Limited Partner understands that its interest in the Partnership has not been registered under the Securities Act and that any transfer or other disposition of the interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom. Each Limited Partner further represents that it does not have any contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participations to such person, or to any third person, with respect to its interest in the Partnership.

    **9.2** **Qualifications of the Limited Partners.** Each Limited Partner represents that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act.

    **9.3** **Transfer by General Partner.** The General Partner shall not sell, assign, mortgage, pledge or otherwise dispose of its interest in the Partnership or in its capital assets or property without the prior written consent of a Majority in Interest of the Limited Partners.

22.

806590 v11/SD

Exhibit 2
Page 179

Except as otherwise provided in the previous sentence, the Managing Directors (including for this purpose, trusts or investment vehicles formed for the benefit of such Managing Director or his family members or entities affiliates with such Managing Director) shall at all times collectively retain direct ownership and control over at least a majority of both the equity and economic interests in the General Partner, and transfers of equity interests by the Managing Directors shall be permitted only to (a) third parties who become members of the General Partner and (b) trusts or investment vehicles formed for the benefit of a Managing Partner or his family members. Notwithstanding the foregoing, in no event shall the General Partner make any transfer of an interest in the Partnership prohibited by the events described in paragraphs 9.5(a) through 9.5(h).

     **9.4**   **Transfer by Limited Partner.** No Limited Partner shall sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without the prior written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner. Notwithstanding the foregoing, after delivery of the opinion of counsel hereinafter required by this Article 9, (*provided, however,* that the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel), a Limited Partner may sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without such consent (a) to any entity directly or indirectly holding eighty percent (80%) or more of the ownership interests of the Limited Partner (including profits or other economic interests) or any entity of which eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests) are held directly or indirectly by such entity, including any entity of which the Limited Partner holds, directly or indirectly, eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests), (b) pursuant to a merger, plan of reorganization, sale or pledge of, or other general encumbrance on all or substantially all of the Limited Partner's assets, (c) to certain affiliated corporations or business entities of a Limited Partner, (d) as may be required by any law or regulation, (e) by testamentary disposition or intestate succession, or (f) to a trust, profit sharing plan or other entity controlled by, or for the benefit of, such Limited Partner or one or more family members. A change in any trustee or fiduciary of the Limited Partner shall not be considered to be a transfer, sale, assignment, mortgage, pledge or other disposition under this paragraph 9.4, *provided* written notice of such change is given to the General Partner within a reasonable period of time after the effective date thereof.

     **9.5**    **Requirements for Transfer.** No transfer or other disposition of the interest of the Limited Partner shall be permitted until the General Partner shall have received an opinion of counsel satisfactory to it (or waived such opinion requirement) that the effect of such transfer or disposition would not:

     **(a)**   result in the Partnership's assets being considered, in the opinion of counsel for the Partnership, as "plan assets" within the meaning of the Employment Retirement Income Security Act of 1974, as amended (*"ERISA"*), or any regulations proposed or promulgated thereunder;

     **(b)**   result in violation of the Securities Act or any comparable state law;

23.

806590 v11/SD

Exhibit 2
Page 180

(c)    require the Partnership to register as an investment company under the Investment Company Act of 1940, as amended;

(d)    require the Partnership, the General Partner, or any member of the General Partner to register as an investment adviser under the Investment Advisers Act of 1940, as amended;

(e)    result in a termination of the Partnership's status as a partnership for tax purposes;

(f)    result in a violation of any law, rule, or regulation by the Limited Partner, the Partnership, the General Partner, or any member of the General Partner;

(g)    cause the Partnership to be deemed to be a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code; or

(h)    result in a violation of this Agreement.

Such legal opinion shall be provided to the General Partner by the transferring Limited Partner or the proposed transferee. Any costs associated with such opinion shall be borne by the transferring Limited Partner or the proposed transferee. Upon request the General Partner will use its good faith diligent efforts to provide any information possessed by the Partnership and reasonably requested by a transferring Limited Partner to enable it to render the foregoing opinion. Notwithstanding any provision of this Article 9 to the contrary, the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel provided for in this paragraph 9.5.

9.6    **Substitution as a Limited Partner.** A transferee of a Limited Partner's interest pursuant to this Article 9 shall become a substituted Limited Partner only with the consent of the General Partner and only if such transferee (a) elects to become a substituted Limited Partner and (b) executes, acknowledges and delivers to the Partnership such other instruments as the General Partner may deem necessary or advisable to effect the admission of such transferee as a substituted Limited Partner, including, without limitation, the written acceptance and adoption by such transferee of the provisions of this Agreement. No assignment by a Limited Partner of its interest in the Partnership shall release the assignor from its liabilities to the Partnership, including but not limited to paragraph 4.2; *provided that* if the assignee becomes a Limited Partner as provided in this paragraph 9.6, the assignor shall thereupon so be released (in the case of a partial assignment, to the extent of such assignment).

## ARTICLE 10

### DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

10.1    **Extension of Partnership Term.** Upon the Termination Date, the General Partner may in its sole discretion extend the Partnership term for up to two (2) additional one (1) year periods, and upon the conclusion of the two extension periods, with the consent of a Majority in Interest of the Limited Partners, the General Partner may extend the Partnership term for additional one (1) year periods. During such one (1) year extension periods, the General

24.

806590 v11/SD

Exhibit 2
Page 181

Partner shall use its reasonable efforts to convert the Partnership's Nonmarketable Securities into Marketable Securities or cash, and all Securities that become Marketable Securities during such period or periods. The General Partner shall not purchase the Securities of any new issuer in which the Partnership does not already hold an interest during such period; *provided, however,* that the General Partner may (a) purchase additional Securities of a Portfolio Company if it deems such a purchase to be in the best interests of the Partnership, and (b) exchange the Securities of a Portfolio Company for other Securities if it deems such exchange to be in the best interests of the Partnership. The management fee during any extension period shall be as set forth in Article 6.

**10.2    Early Termination of the Partnership.**

(a)    The Partnership shall dissolve, and the affairs of the Partnership shall be wound up prior to the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1):

(i)    ninety (90) days after the withdrawal, bankruptcy, or dissolution of the General Partner, unless a Majority in Interest of the Limited Partners elect to continue the Partnership within such ninety (90) day period; or

(ii)    at any time upon the election of Eighty Percent (80%) in Interest of the Limited Partners.

(b)    In the event that the Partnership is dissolved pursuant to the provisions of this paragraph 10.2, a Majority in Interest of the Limited Partners shall elect one or more liquidators to manage the liquidation of the Partnership in the manner described in paragraphs 10.3, 10.4 and 10.5.

**10.3    Winding Up Procedures.**

(a)    Promptly upon dissolution of the Partnership (unless the Partnership is continued in accordance with this Agreement or the provisions of the Act), the affairs of the Partnership shall be wound up and the Partnership liquidated.

(b)    Distributions during the winding up period may be made in cash or in kind or partly in cash and partly in kind. The General Partner or the liquidator shall use its best judgment as to the most advantageous time for the Partnership to sell Securities or to make distributions in kind. All cash and each Security distributed in kind after the date of dissolution, but prior to the final liquidation, of the Partnership shall be distributed in accordance with the provisions of Article 7. Each Security so distributed shall be subject to reasonable conditions and restrictions necessary or advisable in order to preserve the value of such Security or for legal reasons.

**10.4    Payments in Liquidation.** The assets of the Partnership shall be distributed in final liquidation of the Partnership in the following order:

(a)    to the creditors of the Partnership, other than Partners, in the order of priority established by law, either by payment or by establishment of reserves;

25.

806590 v11/SD

Exhibit 2
Page 182

(b)    to the Partners, in repayment of any loans made to, or other debts owed by, the Partnership to such Partners; and

(c)    the balance, if any, to the General Partner and the Limited Partners in respect of the positive balances in their Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

10.5    **Return of Excess Distributions.**

(a)    Notwithstanding paragraphs 7.4, 7.5 and 10.4, upon liquidation of the Partnership pursuant to this Article 10, the General Partner shall be required to pay back to the Partnership the amount by which the cumulative net distributions received by the General Partner over the life of the Partnership (excluding amounts received by the General Partner in respect of its Partnership Percentage and amounts returned to the Partnership by the General Partner pursuant to paragraph 15.4(b) prior to final liquidation of the Partnership) exceeds the amount equal to the Partnership's cumulative Profits allocated to the General Partner pursuant to paragraph 5.1(a)(iv)(1) minus the Partnership's cumulative Losses allocated to the General Partner pursuant to paragraph 5.1(b)(i); *provided, however*, that the amount of the repayment described in this paragraph 10.5(a) shall be reduced by the federal, state and other taxes payable on such amount by the members of the General Partner (assuming for this purpose that all in kind distributions were immediately sold upon receipt and such taxes were paid at the Applicable Tax Rate).

(b)    In the event that the assets of the General Partner are insufficient to satisfy the obligation described in the preceding sentence, each member of the General Partner shall be severally, but not jointly, responsible for his pro rata share of the General Partner's remaining obligation to the Partnership under this paragraph 10.5. The pro rata shares described in the preceding sentence shall be based on relative distributions received by each member of the General Partner from the General Partner.

(c)    If Partners are required to recontribute distributions pursuant to paragraph 4.2(d)(ii) after the final liquidation and winding up of the Partnership, the amount of the General Partner's obligation under paragraph 10.5(a) shall be recomputed by treating the expense giving rise to the return of distributions pursuant to paragraph 4.2(d)(ii) as if it had occurred prior to final liquidation. The difference between the amount originally computed pursuant to paragraph 10.5(a) as of the final liquidation and winding up of the Partnership and the amount described in the immediately preceding sentence shall reduce dollar for dollar the aggregate amount otherwise required to be recontributed by the Partners pursuant to paragraph 4.2(d)(ii).

## ARTICLE 11

### FINANCIAL ACCOUNTING, REPORTS AND MEETINGS

11.1    **Financial Accounting; Fiscal Year.** The books and records of the Partnership shall be kept in accordance with the provisions of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles consistently applied, and shall be audited at the end of each fiscal year by an independent public accountant of recognized national or

26.

806590 v11/SD

Exhibit 2
Page 183

regional standing selected by the General Partner; *provided, however,* that if the audit requirement for the first fiscal year that began on the Commencement Date and ended on December 31, 2013 is waived pursuant to paragraph 11.4, such period shall be covered in the audit of the books and records of the Partnership for the fiscal year ending December 31, 2014. The Partnership's fiscal year shall be the calendar year.

**11.2    Supervision; Inspection of Books.** Proper and complete books of account of the Partnership, copies of the Partnership's federal, state and local tax returns for each fiscal year, the Schedule of Partners, this Agreement and the Partnership's Certificate of Limited Partnership shall be kept under the supervision of the General Partner at the principal office of the Partnership. Such books and records shall be open to inspection by the Limited Partners, or their accredited representatives, at any reasonable time during normal business hours after reasonable advance notice. Such books and records shall be maintained by the General Partner or its designee for a period of five (5) years following final liquidation of the Partnership.

**11.3    Quarterly Reports.** The General Partner shall transmit to the Limited Partners within sixty (60) days after the close of each of the first three quarters of each fiscal year, a summary of acquisitions and dispositions of investments made by the Partnership during such quarter together with a valuation of the investments then held.

**11.4    Annual Report; Financial Statements of the Partnership.** Beginning with the fiscal year that ends December 31, 2013, the General Partner shall use reasonably commercial efforts to transmit to the Limited Partners within one hundred twenty (120) days after the close of the Partnership's fiscal year audited financial statements of the Partnership prepared in accordance with the terms of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles, including an income statement for the year then ended and a balance sheet as of the end of such year, a statement of changes in the Partners' Capital Accounts, and a list of investments then held; *provided,* that (1) the Advisory Committee may waive such requirement solely for the fiscal year that ends December 31, 2013 if it determines in its sole discretion that the aggregate capital contributions of the Partners to the Partnership during such fiscal year is not material, and (2) such requirement shall be automatically waived solely for the fiscal year that ends December 31, 2013 if the General Partner has not required the Partners to contribute capital to the Partnership during such year. The financial statements shall be accompanied by a report from the General Partner to the Limited Partners, which shall include a status report on investments then held, a summary of acquisitions and dispositions of investments made by the Partnership during the preceding quarter and a valuation of each such investment.

**11.5    Electronic Reporting.** The General Partner shall be entitled, in its sole discretion, to transmit the reports and statements described in paragraphs 11.3 and 11.4 (the *"Subject Reports"*) to one or more Limited Partners solely (i) by electronic mail or (ii) by means of granting such Limited Partners access to a database or other forum hosted on a website designated by the General Partner (the *"Reporting Site"*), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein (including, but not limited to, establishing password protections for access to the Reporting Site, preventing the Subject Reports posted on the Reporting Site from being copied or otherwise print capable

27.

Exhibit 2
Page 184

and having such Subject Reports available for review for a restricted period of time (but in no event less than thirty (30) days from the first date such Subject Reports are posted on the Reporting Site)). The General Partner shall provide each Limited Partner to which it will transmit Subject Reports pursuant to this paragraph 11.5 two (2) days advance notice of the first date on which a new Subject Report will be posted on the Reporting Site for such Limited Partner's review. Unless the General Partner exercises its discretion pursuant to and in compliance with paragraph 15.15(c) to restrict access to certain Confidential Information that may be included in a Subject Report posted on the Reporting Site, the Subject Reports posted on the Reporting Site shall contain all of the material information included in those Subject Reports transmitted to Limited Partners other than pursuant to this paragraph 11.5. Subject to the provisions of paragraph 15.15(c), the Subject Reports shall be posted on the Reporting Site within the same number of days after the end of the applicable fiscal quarter or Fiscal Year as is required pursuant to paragraphs 11.3 and 11.4 and shall remain accessible to and downloadable or printable by the Limited Partners for at least twelve (12) months.

### 11.6　Tax Returns.

(a)　The General Partner shall cause the Partnership's federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by a Limited Partner, to be prepared and delivered to the Limited Partners within ninety (90) days after the close of the Partnership's fiscal year, or as soon as reasonably practicable thereafter.

(b)　Each Limited Partner hereby agrees and covenants that it shall not make an election under Section 732(d) of the Code with respect to property distributed to it by the Partnership without the prior written consent of the General Partner. The General Partner may, but shall not be obligated to, cause the Partnership to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" within the meaning of Section 743(e) of the Code. If the Partnership elects to be treated as an electing investment partnership, each Limited Partner shall (i) reasonably cooperate with the Partnership to maintain such status, (ii) shall not take any action that would be inconsistent with such election, (iii) provide the General Partner with any information necessary to allow the Partnership to comply with its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and its tax reporting and other obligations as an electing investment partnership, and (iv) provide the General Partner and such Limited Partner's transferee, promptly upon request, with the information required under Section 6031(b) of the Code or otherwise to be furnished to the Partnership or such transferee, including such information as is necessary to enable the Partnership and such transferee to compute the amount of losses disallowed under Section 743(e) of the Code, but in no event shall such Limited Partner be required to provide such information prior to its receipt of its Schedule K-1 for such taxable year, except to the extent of information, if any, required by the Partnership to complete its Schedule K-1s. Whether or not the Partnership makes such election, promptly upon request, each Limited Partner shall provide the General Partner with any information related to such Partner necessary to allow the Partnership to comply with (a) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (b) any other U.S. federal income tax reporting obligations of the Partnership.

### 11.7　Tax Matters Partner.

The General Partner shall be the Partnership's tax matters partner under the Code and under any comparable provision of state law. The General Partner

28.

806590 v11/SD

Exhibit 2
Page 185

shall have the right to resign as tax matters partner by giving thirty (30) days' written notice to each Partner. Upon such resignation a successor tax matters partner shall be selected by a Majority in Interest of the Limited Partners. The tax matters partner shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Internal Revenue Service and in connection with all subsequent administrative and judicial proceedings arising out of such audit. The tax matters partner shall periodically consult with all tax exempt Limited Partners during the course of any tax audit primarily affecting the tax exempt Limited Partners. The tax matters partner shall periodically consult with all foreign Limited Partners during the course of any tax audit primarily affecting the foreign Limited Partners. If the tax matters partner is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Partners, then the Partnership shall be entitled to reimbursement from those Partners on whose behalf such fees and expenses were incurred. The tax matters partner shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, and shall furnish to each Partner, if such Partner so requests in writing, a copy of each notice or other communication received by the tax matters partner from the Internal Revenue Service, except such notices or communications as are sent directly to such requesting Partner by the Internal Revenue Service. The relationship of the tax matters partner to the Limited Partners is that of a fiduciary, and the tax matters partner has fiduciary obligations to perform its duties as tax matters partner in such manner as will serve the best interests of the Partnership and all of the Partnership's Partners. Without the consent of a Majority in Interest of the tax exempt Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind the Limited Partners (other than in their capacities as Limited Partners). Without the consent of a Majority in Interest of the foreign Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind such foreign Limited Partners with respect to the outcome of any audit primarily affecting the foreign Limited Partners. To the fullest extent permitted by law, but subject to the limitations and exclusions of paragraph 15.4, the Partnership agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to all (a) fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the General Partner or the Partnership that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Partnership, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action, or demand.

## ARTICLE 12

### VALUATION; ADVISORY COMMITTEE

12.1    **Valuation.** Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value. Except as may be required under applicable Treasury Regulations, no value shall be placed on the goodwill or the name of the Partnership in determining the value of the interest of any Partner or in any accounting among the Partners.

(a)    The following criteria shall be used for determining the fair market value of Securities:

29.

806590 v11/SD

Exhibit 2
Page 186

(i)     If traded on one or more securities exchanges or the NASDAQ National Market System, the value shall be deemed to be the average of the Securities' closing price on the principal of such exchanges during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

(ii)    If actively traded over the counter (other than on the NASDAQ National Market System), the value shall be deemed to be the average of the average closing bid and ask prices of such Securities during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

(iii)   If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the General Partner, taking into consideration the purchase price of the Securities, developments concerning the investee company subsequent to the acquisition of the Securities, any financial data and projections of the investee company provided to the General Partner, and such other factor or factors as the General Partner may deem relevant.

(b)     If the General Partner in good faith determines that, because of special circumstances, the valuation methods set forth in this Article 12 do not fairly determine the value of a Security, the General Partner shall make such adjustments or use such alternative valuation method as it reasonably deems appropriate.

(c)     The General Partner shall have the power at any time to determine, for all purposes of this Agreement, the fair market value of any assets and liabilities of the Partnership.

12.2    **Advisory Committee.** The General Partner may appoint an Advisory Committee (the "*Advisory Committee*"), that shall consist of not less than three (3) representatives of the Limited Partners (none of whom shall be an Affiliate of the General Partner) selected by the General Partner from time to time in its reasonable judgment. The duties of the Advisory Committee will include (a) consideration of any approvals sought by the General Partner pursuant to the terms of this Agreement; (b) advice regarding matters pertaining to conflicts of interest by the Partnership, the General Partner or any of the members of the General Partner (excluding matters otherwise expressly addressed pursuant to the terms of this Agreement); and (c) such advice and counsel as is requested by the General Partner in connection with the Partnership's investments and other Partnership matters. The Partnership will reimburse each member for his or her reasonable out-of-pocket expenses. All actions, consents or approvals of the Advisory Committee shall require a majority of its members serving at the time such action, consent or approval is taken, which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the General Partner. To the fullest extent permitted by law, neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Partner in respect of the activities of the Advisory Committee, except to refrain from bad faith violations of the implied contractual obligation of good faith. To the fullest extent permitted by law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Limited Partner represented by such member and, in so doing, shall not be considered to have acted in bad faith.

30.

Exhibit 2
Page 187

# ARTICLE 13

## PARTNERS SUBJECT TO SPECIAL REGULATION

### 13.1   ERISA Partners.

(a)   Each Limited Partner that is, or whose equity interests are at least partially owned by, an "employee benefit plan" (each, an *ERISA Partner*") within the meaning of, and subject to the provisions of, ERISA hereby (i) acknowledges that it is its understanding that neither the Partnership, the General Partner, nor any of the Affiliated entities of the General Partner, are "fiduciaries" of such Limited Partner within the meaning of ERISA by reason of the Limited Partner investing its assets in, and being a Limited Partner of, the Partnership; (ii) acknowledges that it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (iii) acknowledges that it is aware of the provisions of Section 404 of ERISA relating to the requirements for investment and diversification of the assets of employee benefit plans and trusts subject to ERISA; (iv) represents that it has given appropriate consideration to the facts and circumstances relevant to the investment by that ERISA Partner's plan in the Partnership and has determined that such investment is reasonably designed, as part of such portfolio, to further the purposes of such plan; (v) represents that, taking into account the other investments made with the assets of such plan, and the diversification thereof, such plan's investment in the Partnership is consistent with the requirements of Section 404 and other provisions of ERISA; (vi) acknowledges that it understands that current income will not be a primary objective of the Partnership; and (vii) represents that, taking into account the other investments made with the assets of such plan, the investment of assets of such plan in the Partnership is consistent with the cash flow requirements and funding objectives of such plan.

(b)   Notwithstanding any provision contained herein to the contrary, each ERISA Partner may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, at the time and in the manner hereinafter provided, if either the ERISA Partner or the General Partner shall obtain an opinion of counsel (which counsel and which opinion shall be reasonably acceptable to both the ERISA Partner and the General Partner) to the effect that, as a result of applicable statutes, regulations, case law, administrative interpretations, or similar authority (i) the continuation of the ERISA Partner as a Limited Partner of the Partnership or the conduct of the Partnership will result, or there is a material likelihood the same will result, in a material violation of ERISA, or (ii) all or any portion of the assets of the Partnership constitute assets of the ERISA Partner and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the ERISA Partner. In the event of the issuance of such opinion of counsel, a copy of such opinion shall be given to all the ERISA Partners, together with the written notice of the election of the ERISA Partner to withdraw or the written demand of the General Partner for withdrawal, whichever the case may be (and in the case of a written demand of the General Partner, such requirement shall be imposed on all benefit plan investors as defined in DOL Regulation 2510.3-101(f) on a pro rata basis and only to the extent necessary to prevent or cure the violation or plan asset problem). Thereupon, unless within ninety (90) days after receipt of such written notice and opinion the General Partner is able to eliminate the necessity for such withdrawal to the reasonable satisfaction of the ERISA Partner and the General Partner, whether by correction of the condition

31.

806590 v11/SD

Exhibit 2
Page 188

giving rise to the necessity of the ERISA Partner's withdrawal, or the amendment of this Agreement, or otherwise, such ERISA Partner shall withdraw its entire interest in the Partnership, such withdrawal to be effective upon the last day of the fiscal quarter during which such ninety (90) day period expired.

(c)    The withdrawing ERISA Partner shall be entitled to receive within ninety (90) days after the date of such withdrawal an amount equal to the fair market value of such Partner's interest as of the effective date of such withdrawal (calculated by treating all Partnership assets as though sold at fair market value). The fair market value of such Partner's interest shall be determined in accordance with paragraph 12.1 with any resulting net Profit or Loss allocated in accordance with the provisions of Article 5.

(d)    Any distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph may, in the sole discretion of the General Partner, be made in cash, in securities, in the form of a promissory note, the terms of which shall be mutually agreed upon by the General Partner and the withdrawing ERISA Partner, or any combination thereof; *provided*, that (i) a withdrawing ERISA Partner shall not be required to accept more than its *pro rata* share of any Securities held by the Partnership, and (ii) if a distribution in kind would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates). Such engagement shall be separate from and outside of the structure of the Partnership.

(e)    Any valuation necessary for the purposes of a distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph shall be made by the General Partner in good faith pursuant to paragraph 12.1; *provided, however*, the General Partner shall provide thirty (30) days notice to a withdrawing ERISA Partner of the valuation of any proposed distribution, and the withdrawing ERISA Partner may object to the valuations made by the General Partner by providing written notice to the General Partner at any time prior to the first payment to the withdrawing ERISA Partner in respect of its former interest in the Partnership. In the event that the General Partner and the withdrawing ERISA Partner cannot reach a satisfactory resolution of such valuation dispute, the valuation shall be determined by a mutually acceptable, independent securities expert selected by the General Partner and the withdrawing ERISA Partner.

13.2    **Governmental Plan Partners.** Notwithstanding any provision of this Agreement to the contrary, any Limited Partner that is either a "governmental plan" as defined in Title 29, Section 1002(32) of the United States Code or an employee benefit plan subject to regulation under applicable state laws that are similar in purpose and intent to ERISA (a "*Governmental Plan Partner*") may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Governmental Plan Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Governmental Plan Partner and the General Partner) to the effect that the Governmental Plan Partner, the Partnership, or the General Partner would be in violation, or

806590 v11/SD

Exhibit 2
Page 189

there is a material likelihood the same would result, of any statute or regulation of the state of residence of the Government Plan Partner or any political subdivision of such state, enacted or promulgated after the date of formation of the Partnership, as a result of the Governmental Plan Partner continuing as a Limited Partner, and, in the case of an opinion obtained by the General Partner, that such violation would have a material adverse effect on the General Partner or the Partnership. In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Governmental Plan Partner's interest in the Partnership shall be governed by paragraph 13.1 of the Agreement, as if the Governmental Plan Partner were an ERISA Partner.

13.3    **Private Foundation Partners.** Notwithstanding any provision of the Agreement to the contrary, any Limited Partner that is, or whose equity interests are at least partially owned by, a "private foundation" as described in Section 509 of the Code (a *"Private Foundation Partner"*), may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Private Foundation Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Private Foundation Partner and the General Partner) to the effect that such withdrawal is necessary in order for the Private Foundation Partner to avoid (a) excise taxes imposed by Subchapter A of Chapter 42 of the Code (other than Sections 4940 and 4942 thereof), or (b) a material breach of the fiduciary duties of its trustees under any federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission, or authority having jurisdiction. In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Private Foundation Partner's interest in the Partnership shall be governed by paragraph 13.1, as if the Private Foundation Partner were an ERISA Partner.

13.4    **Media Companies.**

(a)    In addition to any other restrictions applicable to Limited Partners set forth in this Agreement and notwithstanding any other provisions hereof, at any time the Partnership holds an Attributable Interest in a Media Company, no Limited Partner shall be materially involved in the management or operations of the media-related activities of the Partnership. Without limiting the generality of the foregoing, no Limited Partner or Other Restricted Person shall:

(i)    act as an employee of the Partnership or any Media Company if such Limited Partner's or Other Restricted Person's functions, directly or indirectly, relate to the media enterprises of the Partnership or any Media Company;

(ii)    serve, in any material capacity, as an independent contractor or agent with respect to any media enterprises of the Partnership or any Media Company;

(iii)    communicate on matters pertaining to the day-to-day operations of a Media Company with (A) an officer, director, partner, agent, representative or employee of such Media Company or (B) the General Partner;

33.

806590 v11/SD

Exhibit 2
Page 190

(iv)   perform any services for the Partnership relating to its media enterprises or any Media Company materially relating to such Media Company's media activities, except that any Limited Partner may make loans to or act as a surety for the Partnership or any such Media Company;

(v)   vote on the admission of any new General Partner to the Partnership unless such admission is approved by each General Partner then existing;

(vi)   vote on the removal of the General Partner, unless the General Partner is (A) subject to bankruptcy proceedings, as described in Sections 17-402(a)(4) or (5) of the Act, (B) adjudicated incompetent by a court of competent jurisdiction (provided that this clause (B) shall only apply to a general partner that is a natural person) or (C) determined by a court of competent jurisdiction or the Arbitrators to have engaged in conduct constituting "cause," as that term has been used by the FCC in the context of the removal authority of limited partners, for purposes of the insulation of limited partnership interests from attribution of Media Companies; or

(vii)   become actively involved in the management or operation of the media activities of the Partnership or any Media Company.

(b)   The foregoing restrictions are intended to conform the rights and powers of Limited Partners to the criteria for non-attribution of limited partnership interests established by the FCC Attribution Orders; *provided, however*, that the foregoing shall not be deemed to prevent a Limited Partner or any Other Restricted Person from engaging in any activities that are not inconsistent with the FCC's then-prevailing policies with respect to the insulation from attribution of limited partners, as set forth in the FCC Attribution Orders. The Partners agree that, notwithstanding anything to the contrary herein, the activities of the Advisory Committee and each member and observer thereof (acting in such capacity) shall be limited to those permitted under FCC Rules, the Ownership Rules and the FCC Attribution Orders without causing any Limited Partner or Other Restricted Person to have an interest in the Partnership that would constitute an Attributable Interest in a Media Company. Moreover, if the Partnership receives an opinion of counsel reasonably acceptable to the General Partner to the effect that one or more of the restrictions contained in Paragraph 13.4(a) above is no longer required in order to assure that Limited Partners are not attributed with ownership interests based on the Ownership Rules and the FCC Attribution Orders, then such restriction or restrictions shall be deemed waived by virtue of such opinion.

(c)   Notwithstanding the foregoing, the provisions of Paragraph 13.4(a) shall not apply to any Limited Partner who (i) affirmatively elects by written notice to the General Partner not to be bound by such provisions and acknowledges that as a result of such election such Limited Partner may be deemed to hold an Attributable Interest in a Media Company and be subject to the Ownership Rules, and (ii) receives the prior written consent of the General Partner to make such election, which consent shall not be unreasonably withheld. It is understood that it would be reasonable for the General Partner to withhold its consent if the holding by such Limited Partner of an Attributable Interest in a Media Company would be reasonably likely to result in a violation on the part of the Partnership of any Ownership Rule or FCC Rule or in the imposition on the Partnership of burdensome regulatory or other legal

34.

806590 v11/SD

Exhibit 2
Page 191

requirements, or limit the Partnership's ability to acquire an Attributable Interest in any Media Company. The General Partner agrees to give the Limited Partners reasonable prior notice of any proposed acquisition of an Attributable Interest in a Media Company.

## ARTICLE 14

### CERTAIN DEFINITIONS

14.1    **Accounting Period.** An Accounting Period shall be (a) a calendar year if there are no changes in the Partners' respective interests in the Profits or Losses of the Partnership during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interests shall occur.

14.2    **Adjusted Asset Value.** The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Adjusted Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset at the time of contribution, as determined by the contributing Partner and the Partnership.

(b)    In the discretion of the General Partner, the Adjusted Asset Values of all Partnership assets may be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the following times: (i) upon distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership assets, unless all Partners receive simultaneous distributions of either undivided interests in the distributed property or identical Partnership assets in proportion to their interests in Partnership distributions as provided in paragraphs 7.4, 7.5 and 7.6 and (ii) the grant of an additional interest in the Partnership to any new or existing Partner.

(c)    The Adjusted Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the termination of the Partnership either by expiration of the Partnership's term or the occurrence of an event described in paragraph 10.2.

14.3    **Affiliate.** An Affiliate of any person shall mean (a) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the person specified or (b) such person's immediate family members (excluding family members who do not reside in the same household).

14.4    **Attributable Interest.** Attributable Interest shall mean an ownership or managerial interest in a Media Company that is sufficient under the Ownership Rules to cause the Partnership to be deemed to hold a "cognizable" or "attributable" interest for purposes of any one or more of such Ownership Rules.

35.

806590 v11/SD

Exhibit 2
Page 192

**14.5   Capital Account.**  The Capital Account of each Partner shall consist of its original capital contribution, (a) increased by any additional capital contributions, its share of income or gain that is allocated to it pursuant to this Agreement, and the amount of any Partnership liabilities that are assumed by it or that are secured by any Partnership property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of expense or loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Partnership or that are secured by any property contributed by it to the Partnership.  The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable to any Partner pursuant to Article 7 and Article 10.

**14.6   Capital Commitment; Committed Capital.**  A Partner's Capital Commitment shall mean the amount that such Partner has agreed to contribute to the capital of the Partnership as set forth opposite such Partner's name on the Schedule of Partners.  The Partnership's Committed Capital shall equal the sum of the aggregate Capital Commitments of all Partners.

**14.7   Code.**  The Code is the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

**14.8   Deemed Gain or Deemed Loss.**  The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1), over the aggregate Adjusted Asset Value of the Securities distributed.  The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1).

**14.9   FCC.**  FCC means the United States Federal Communications Commission, or any successor governmental agency, commission, bureau or other governmental entity.

**14.10   FCC Attribution Orders.**  FCC Attribution Orders means the FCC's decisions in Corporate Ownership Reporting and Disclosure by Broadcast Licensees, 97 FCC 2d 997 (1984), on recon., 58 Rad. Reg. 2d (P&F) 604 (1985), on further recon., 1 FCC Rcd 802 (1986); Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, 14 FCC Rcd 12559 (1999), on recon., 16 FCC Rcd 1097 (2001); Implementation of the Cable Television Consumer Protection and Competition Act of 1992, 14 FCC Rcd 19014 (1999); and any other FCC Rules substantially incorporating, duplicating or otherwise relying upon the policies in such decisions, as any of such policies may be further modified by the FCC from time to time.

36.

806590 v11/SD

Exhibit 2
Page 193

**14.11   FCC Rules.** FCC Rules means the rules, regulations and policies of the FCC, as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder.

**14.12   Idle Funds Income.** Idle Funds Income shall mean all income received by the Partnership from commercial paper, certificates of deposit, treasury bills, and other money market investments with maturities of less than twelve (12) months.

**14.13   Managing Directors.** Managing Directors shall refer to Stuart Frost, John Vigouroux and Jack Kreindler.

**14.14   Marketable; Marketable Securities; Marketability.** These terms shall refer to Securities that are (a) traded on a national securities exchange or over the counter, and (i) freely transferable pursuant to either Rule 144 of the Securities Act (without being subject to any volume restrictions set forth in Rule 144(e)) or Rule 145 of the Securities Act and (ii) not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement. Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the General Partner, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Partnership within a reasonable time period.

**14.15   Media Company.** Media Company means any Portfolio Company of the Partnership that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, a "daily newspaper" (as such term is defined in Note 6 to Section 73.3555 of the FCC Rules) or any other communications facility or enterprise subject to multiple ownership, cross-ownership or other ownership restrictions set forth in the Communications Act of 1934 and the Telecommunications Act of 1996, each as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder, or in the FCC Rules, but only to the extent that the FCC Attribution Orders or any comparable FCC Rules setting forth limitations on the involvement of a limited partner in the business of the facility or enterprise are relevant to determining the application of such ownership restrictions to direct or indirect ownership, managerial or comparable interests in such facility or enterprise.

**14.16   Nonmarketable Securities.** Nonmarketable Securities are all Securities other than Marketable Securities.

**14.17   Other Restricted Person.** Other Restricted Person means: (i) any officer, director, partner or equivalent non-corporate official of a Limited Partner; (ii) any five percent or greater voting shareholder or any other direct or indirect owner of a Limited Partner whose ownership interest in the Limited Partner constitutes an Attributable Interest; and (iii) any officer, director, partner or equivalent non-corporate official of any such shareholder or other owner who is deemed to hold a "cognizable" interest in the Limited Partner under the FCC Rules.

**14.18   Ownership Rules.** Ownership Rules shall mean the attribution rules and the multiple and cross-ownership rules of the FCC applicable to Media Companies including,

37.

806590 v11/SD

Exhibit 2
Page 194

without limitation, 47 C.F.R. Sections 21.912, 26.101(a), 73.3555, 74.931(i), 76.501, 76.503,76.504 and 76.505, the FCC Attribution Orders and related provisions, and in decisions and opinions interpreting and applying such provisions.

**14.19 Partnership Percentage.** The Partnership Percentage for each Partner shall equal the quotient of the amount of such Partner's capital contributions divided by the amount of capital contributions of all the Partners, as determined from time to time.

**14.20 Percentage in Interest; Majority in Interest.** A specified fraction or percentage in interest of the Partners or of the Limited Partners shall mean Partners or Limited Partners of the Partnership whose Capital Commitments, stated as a percentage of the aggregate Capital Commitments of the Partnership, equal or exceed the required fraction or percentage in interest of all such Partners or Limited Partners. A Majority in Interest shall mean more than fifty percent (50%) in interest. Any limited partnership interest owned or controlled by the General Partner, an Affiliate of the General Partner, or a Defaulting Limited Partner shall be deemed not to be outstanding for purposes of any determination under this Agreement of a particular percentage in interest of the Limited Partners.

**14.21 Profit or Loss.** Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Partnership's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(b)     Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c)     Gain or loss resulting from any disposition of a Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(d)     The difference between the gross fair market value of all Partnership assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 14.2;

(e)     Items which are specially allocated pursuant to paragraphs 3.2(c), 4.5(b)(vi), 5.1(c), 5.1(d), 5.2 and 5.3 shall not be taken into account in computing Profit or Loss; and

(f)     The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

38.

806590 v11/SD

Exhibit 2
Page 195

**14.22  Securities.**  Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**14.23  Securities Act.**  Securities Act shall mean the Securities Act of 1933, as amended.

**14.24  Treasury Regulations.**  Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

## ARTICLE 15

### OTHER PROVISIONS

**15.1  Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware as such law would be applied to agreements among the residents of such state made and to be performed entirely within such state.

**15.2  Limitation of Liability of the Limited Partners.**  Except as required by law and except for (a) liability for loans to a Limited Partner in respect of withholding or taxes paid by the Partnership on behalf of such Partner pursuant to paragraph 7.6 and (b) obligations to return distributions pursuant to paragraphs 4.2(c) and 4.2(d), no Limited Partner shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Partnership in excess of its Capital Commitment to the Partnership.  No Limited Partner shall owe any fiduciary duty to the Partnership or the Partners, except to refrain from bad faith violations of the implied contractual obligation of good faith.

**15.3  Exculpation.**  Neither the tax matters partner, the General Partner, the Management Company, the members of the Advisory Committee nor their respective managers, members, partners, principals, officers, employees, Affiliates or agents shall be liable, responsible or accountable in damages or otherwise to the Limited Partners or the Partnership for honest mistakes of judgment, or for action or inaction, taken in good faith and in the best interest interests of the Partnership, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any third party brokers or other agent of the Partnership, *provided that* such broker or agent was selected, engaged, and retained with reasonable care. The General Partner and such persons may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, *provided that* they (i) shall have been selected with reasonable care, (ii) are provided with all material information relevant to the matter at hand, and (iii) receive such advice in writing.  Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any person of any liability by reason of recklessness, gross negligence or willful misconduct or to the extent (but only to the extent) that such liability may not be waived, modified, or limited under applicable law, but shall be construed so as to effectuate the provisions of such paragraphs to the fullest extent permitted by law.  Notwithstanding anything to the contrary in this Agreement, to the extent that at law or

806590 v11/SD.

Exhibit 2
Page 196

in equity, an Indemnified Party has duties (including fiduciary duties) and liabilities relating thereto to the Partnership, any Partner or any other person, such Indemnified Party acting under this Agreement shall not be liable to the Partnership, any Partner or any other person for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities relating thereto of an Indemnified Party otherwise existing at law or in equity, are agreed by each Partner and the Partnership to so modify such other duties and liabilities of such Indemnified Party. Notwithstanding any of the foregoing to the contrary, members of the Advisory Committee (including solely with respect to the conduct of any member of the Advisory Committee, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.3 so long as they acted in good faith. This paragraph 15.3 is intended to apply solely for the benefit of the Limited Partners, and in no way shall be construed or interpreted as inuring to the benefit of any other person or entity, including, without limitation, creditors of the Partnership, of the General Partner or of the members of the General Partner or other third parties.

**15.4    Indemnification.**

806590 v11/SD

Exhibit 2
Page 197

(a)    The Partnership agrees to indemnify, out of the assets of the Partnership only (but including amounts that the Partners may be required to contribute pursuant to paragraph 4.2(d)), the General Partner, the Management Company, the members of the Advisory Committee, the tax matters partner and their respective managers, members, partners, principals, officers, employees, Affiliates or agents (the "*Indemnified Parties*") to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, or demand against the Indemnified Parties that arise out of or in any way relate to the Partnership, its properties, business, or affairs (but excluding matters solely between or among members of the General Partner) and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Partnership) of any such claim, action or demand; *provided, however,* that this indemnity shall not extend to (1) conduct not undertaken in the good faith belief that such act or omission was in the best interests of the Partnership or (2) any conduct which constitutes recklessness, gross negligence or willful misconduct.    Notwithstanding the proviso set forth in the immediately preceding sentence, members of the Advisory Committee (including solely with respect to the conduct of any Advisory Committee member, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.4(a) so long as they acted in good faith. Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph shall be paid by the Partnership in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party provides a written undertaking to the Partnership to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified; *provided, further,* that no such advance shall be paid in the case of a claim or proceeding brought against any Indemnified Parties by a Majority in Interest or greater of the Limited Partners. The provisions of this paragraph 15.4 shall remain in effect as to each Indemnified Party whether or not such indemnified person continues to serve in the capacity that entitled such person to be indemnified.

(b)    Notwithstanding anything in this paragraph 15.4 to the contrary, the Partnership shall not be permitted to indemnify an Indemnified Party serving as an officer and/or director of a Portfolio Company for liabilities that relate to a period after the Partnership has disposed of its investment in the Portfolio Company.

(c)    Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to paragraph 15.4(a) (as limited by paragraph 15.4(b)), the Partners intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Partnership, (ii) the Partnership, and (iii) the General Partner and/or its Affiliates, paragraph 15.4(a) shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Partnership shall have primary liability; second, the Partnership and any Parallel Fund (as applicable) shall have secondary liability; and third, the General Partner and/or its Affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Partnership and the Partnership, and/or any Parallel Fund, as applicable. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Partnership shall not restrict the Partnership from making indemnification payments to an Indemnified Party that is otherwise

41.

806590 v11/SD

Exhibit 2
Page 198

eligible for such indemnification payments, but such indemnification payments by the Partnership are not intended to relieve any investment counterparty of the Partnership from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Partnership actually receives indemnification payments from an investment counterparty of the Partnership or under any insurance policy for the same loss or expense, such Indemnified Party shall repay the Partnership as soon as practicable to the extent of such duplicative indemnification payments. Indemnification payments (if any) made to an Indemnified Party by the General Partner and/or its Affiliates in respect of a loss or expense for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Partnership and/or any Parallel Fund under the limited partnership agreement or other governing agreements of such Parallel Fund shall not relieve the Partnership and/or any Parallel Fund from its obligation to such Indemnified Party and/or the General Partner (or any Affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the General Partner and/or its Affiliates would be reimbursed by such Indemnified Party or directly by the Partnership with indemnification payments made by the Partnership under paragraph 15.4(a)). To the extent that the Partnership is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the General Partner and/or its Affiliates (other than the Partnership, or any Parallel Fund), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Partnership. As used in this paragraph 15.4(b), "indemnification payments" made or to be made by an investment counterparty of the Partnership shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Partnership, and (z) payments made or to be made by or on behalf of such investment counterparty of the Partnership (or such successor) pursuant to an insurance policy or similar arrangement.

### 15.5    Arbitration.

(a)    Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("*Claim*"), shall be resolved by final and binding arbitration ("*Arbitration*") before a panel of three (3) arbitrators ("*Arbitrators*") selected from and administered by Judicial Arbitration and Mediation Service Inc. (the "*Administrator*") in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. Each party shall select one arbitrator and the two parties shall then agree on a third arbitrator, who shall be selected from a list provided by the Administrator. The arbitration shall be held in San Juan Capistrano, California.

(b)    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)    The Arbitrators shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrators shall be authorized to award compensatory damages, but

42.

806590 v11/SD

Exhibit 2
Page 199

shall *not* be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrators also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(d)     Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrators; *provided, however,* the Arbitrators shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrators. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)     By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 15.5, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

15.6     **Execution and Filing of Documents.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.

15.7     **Other Instruments and Acts.**  The Partners agree to execute any other instruments or perform any other acts that are or may be reasonably necessary to effectuate and carry on the partnership created by this Agreement.

15.8     **Binding Agreement.**  This Agreement shall be binding upon the transferees, successors, assigns, and legal representatives of the Partners.

15.9     **Notices; Electronic Transmission of Reports.**  Any notice or other communication that one Partner desires to give to another Partner shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the Partner to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be addressed to the other Partner at the address shown on the Schedule of Partners or at such other address as a Partner may designate by ten (10) days' advance written notice to the other Partners. In addition to the provisions of

43.

806590 v11/SD

Exhibit 2
Page 200

paragraph 11.5, the General Partner shall be entitled to transmit to the Limited Partners by e-mail the reports required by paragraphs 11.3, 11.4, and 11.7.

**15.10  Power of Attorney.** By signing this Agreement, each Limited Partner designates and appoints the General Partner its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Certificate of Limited Partnership and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Partnership by the laws of the United States of America, the laws of the state of the Partnership's formation, or any other state in which the Partnership shall conduct its affairs in order to qualify or otherwise enable the Partnership to conduct its affairs in such jurisdictions. Such attorney is not hereby granted any authority on behalf of the Limited Partners to amend this Agreement except that as attorney for each of the Limited Partners, the General Partner shall have the authority to amend this Agreement and the Certificate of Limited Partnership (and to execute any amendment to the Agreement or the Certificate of Limited Partnership on behalf of itself and as attorney in fact for each of the Limited Partners) as may be required to effect:

(a)  Admission of additional Partners pursuant to Article 3;

(b)  Additional capital commitments pursuant to Article 4;

(c)  Transfers of Limited Partnership interests pursuant to Article 9; and

(d)  Extensions of the Partnership term pursuant to Article 10.

This power of attorney and the power of attorney referenced in paragraph 4.5(b)(ix) granted by each Limited Partner shall expire as to such Partner immediately after the dissolution of the Partnership or the amendment of the Partnership's Schedule of Partners to reflect the complete withdrawal of such Partner as a Partner of the Partnership.

**15.11  Amendment.**

(a)  Except as provided by the immediately preceding paragraph and subject to paragraph 15.11(b), this Agreement may be amended only with the written consent of the General Partner and a Majority in Interest of the Limited Partners.

(b)  Notwithstanding paragraph 15.11(a), no amendment to the provisions of Article 13 may be made without the consent of each ERISA Partner, Governmental Plan Partner and Private Foundation Partner who may be adversely affected by such amendment.

(c)  Notwithstanding paragraphs 15.11(a) and (b), no amendment of this Agreement may modify the method of making Partnership allocations or distributions, modify the method of determining the Partnership Percentage of any Partner, reduce any Partner's Capital Account, modify any provision of this Agreement pertaining to limitations on liability of the Limited Partners, or change the restrictions contained herein, unless each Partner adversely affected thereby in a manner different than the other Partners has expressly consented in writing to such amendment.

44.

806590 v11/SD

Exhibit 2
Page 201

(d)     The Partnership's or General Partner's (or its managers', members' or employees') noncompliance with any provision hereof in any single transaction or event may be waived prospectively or retroactively in writing by the same Percentage in Interest of the Limited Partners that would be required to amend such provision pursuant to paragraphs 15.11(a), (b) or (c).  No waiver shall be deemed a waiver of any subsequent event of noncompliance except to the extent expressly provided in such waiver.

(e)     The General Partner shall provide a copy of any amendment to (or waiver of any provision of) this Agreement to each Limited Partner for its records within a reasonable period of time following its adoption or approval.

15.12  **Entire Agreement.**  This Agreement constitutes the full, complete, and final agreement of the Partners and supersedes all prior agreements between the Partners with respect to the Partnership.  Notwithstanding the provisions of this Agreement, including paragraph 15.11, or of any subscription agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership, without the approval of any Limited Partner or any other person, may enter into a side letter or similar agreement to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement.  The parties hereto agree that any terms contained in a side letter or similar agreement to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any subscription agreement.

15.13  **Titles; Subtitles.**  The titles and subtitles used in this Agreement are used for convenience only and shall not be considered in the interpretation of this Agreement.

15.14  **Partnership Name.**  The Partnership shall have the exclusive right to use the Partnership name as long as the Partnership continues.  Upon termination of the Partnership, the Partnership shall assign whatever rights it may have in such name to the General Partner.  No value shall be placed upon the name or the goodwill attached to it for the purpose of determining the value of any Partner's Capital Account or interest in the Partnership.

15.15  **Confidentiality.**

(a)     This Agreement and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Partnership and its investments, including, without limitation, information about the portfolio companies of the Partnership (collectively, the "*Confidential Information*"), that any Limited Partner may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Limited Partner or its representatives, including Confidential Information disclosed to members of the Advisory Committee, pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Partnership, constitute proprietary and confidential information about the Partnership, the General Partner and its Affiliates and the Partnership's portfolio companies (the "*Affected Parties*").  Each Limited Partner acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential

45.

806590 v11/SD

Exhibit 2
Page 202

Information is the subject of reasonable efforts to maintain its secrecy. Each Limited Partner further acknowledges and agrees that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.

(b)    Each Limited Partner agrees to hold all Confidential Information in confidence, and not to disclose any Confidential Information to any third party without the prior written consent of the General Partner. Notwithstanding the preceding sentence, each Limited Partner may disclose such Confidential Information: (i) to its officers, directors, trustees, equity owners, wholly-owned subsidiaries, employees and outside experts (including but not limited to its attorneys and accountants) on a "need to know" basis, so long as such persons are bound by the same duties of confidentiality to the Partnership as such Limited Partner, and so long as such Limited Partner shall remain liable for any breach of this paragraph 15.15 by such persons; (ii) to the extent that such information is required to be disclosed in connection with any civil or criminal proceeding; (iii) to the extent that such information is required to be disclosed by applicable law or requested in connection with any governmental, administrative or regulatory proceeding or filing (including any inspection or examination or any disclosure necessary in connection with a request for information made under a state or federal freedom of information act or similar law), after reasonable prior written notice to the General Partner (except where such notice is expressly prohibited by law); (iv) to the extent that such information was received from a third party not subject to confidentiality limitations and such Limited Partner can establish that it rightfully received such information from such party other than as a result of the breach of this paragraph 15.15; (v) to the extent such information was rightfully in such Limited Partner's possession prior to the Partnership's conveyance of such information to such Limited Partner, as evidenced by the Limited Partner's prior written records; or (vi) to the extent that the information provided by the Partnership is otherwise available in the public domain in the absence of any improper or unlawful action on the part of such Partner. Any Limited Partner seeking to make disclosure in reliance on the foregoing clauses (ii) and (iii) above, such Limited Partner shall use its commercially reasonable efforts to claim any relevant exception under such laws or obligations which would prevent or limit public disclosure of the Confidential Information and provide the General Partner with prompt notice upon the Limited Partner's receipt of a request for disclosure of any Confidential Information pursuant to such laws or obligations.

(c)    Each Limited Partner also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Partnership upon the General Partner's request. Notwithstanding any provision of this Agreement to the contrary, the General Partner may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any particular Limited Partner if the General Partner reasonably determines that the disclosure of such Confidential Information to such Limited Partner may result in the general public gaining access to such Confidential Information or that such disclosure is not in the best interests of the Partnership or its investments; provided, however, that to the extent that any information is not delivered to a Limited Partner based on the General Partner's exercise of its discretion under this sentence, such information shall be made available for review, but not copying, during regular business hours at a location mutually determined by the General Partner and such Limited Partner. In no

46.

806590 v11/SD

Exhibit 2
Page 203

event shall a Limited Partner be denied access to information deliverable pursuant to paragraph 11.7 of this Agreement.

(d)    In addition, with respect to each Limited Partner that is subject to any "freedom of information," "sunshine" or other law, rule or regulation that imposes upon such Limited Partner an obligation to make information available to the public (a "**FOIA Limited Partner**"), the Partnership hereby requests confidential treatment of the Confidential Information, and such Limited Partner shall use commercially reasonable efforts to take such action as necessary for such Confidential Information to be exempt from disclosure, to the maximum extent permitted under such law, rule or regulation. Notwithstanding anything contained in this paragraph 15.15 to the contrary, each FOIA Limited Partner may publicly disclose the following: (i) the FOIA Limited Partner's status as a Limited Partner of the Partnership, (ii) the amount of such FOIA Limited Partner's Capital Commitment, (iii) the total amount of such FOIA Limited Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the FOIA Limited Partner from the Partnership, and (v) the FOIA Limited Partner's net internal rate of return with respect to the Partnership's performance as prepared by such FOIA Limited Partner (collectively, the "**Fund Level Information**"). Only with respect to FOIA Limited Partners, for purposes of this paragraph 15.15, Confidential Information shall be deemed not to include Fund Level Information.

(e)    In addition, with respect to each Limited Partner that is a "fund of funds" or a similar pooled investment vehicle (but specifically excluding any pension, retirement or similar benefit plan) (a "**Pooled Vehicle Partner**"), the Pooled Vehicle Partner shall be permitted to make disclosure to its direct equity owners (expressly excluding permission to make disclosure to any indirect or other beneficial owners), that are subject to a written confidentiality agreement or obligation that provides a degree of protection to the Partnership comparable to that provided in this paragraph 15.15 of solely the following Confidential Information: (i) the Pooled Vehicle Partner's status as a Limited Partner of the Partnership, (ii) the amount of such Pooled Vehicle Partner's Capital Commitment, (iii) the total amount of such Pooled Vehicle Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the Pooled Vehicle Partner from the Partnership, (v) the Pooled Vehicle Partner's net internal rate of return with respect to the Partnership's performance as prepared by such Pooled Vehicle Partner, (vi) the net asset value of the Pooled Vehicle Partner's interest in the Partnership (both cost and market value), (vii) such ratios and performance information calculated by the Pooled Vehicle Partner using the information in clauses (ii) through (vi) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple"), (viii) quarterly and annual reports summarizing the status of the Pooled Vehicle Partner's investment in the Partnership (without disclosure of any information concerning a Portfolio Company, other than the name of such Portfolio Company, a description of the business of such Portfolio Company and information regarding the industry and geographic location of such Portfolio Company, the Partnership's cost basis in each such Portfolio Company, the Partnership's carry value of each investment in such Portfolio Company and, upon liquidity of any such Portfolio Company, the Partnership's rate of return related to such investment (the "**Portfolio Confidential Information**")), and (ix) the name and address of the Partnership and the names of the principals of the General Partner; provided, however, that no Pooled Vehicle Partner may provide Portfolio Confidential Information to an equity owner of such Pooled

47.

806590 v11/SD

Exhibit 2
Page 204

Vehicle Partner that would be a FOIA Limited Partner of the Partnership if such equity owner of the Pooled Vehicle Partner were a Limited Partner of the Partnership; other than the Fund Level Information that the Pooled Vehicle Partner would be able to disclose if it were a FOIA Limited Partner.

(f)    Each Limited Partner agrees to notify such Limited Partner's attorneys, accountants and other similar advisers about their obligations in connection with this paragraph 15.15. and will further cause such advisers to abide by the aforesaid provisions of this paragraph 15.15. Notwithstanding the foregoing, no Limited Partner shall be liable to the Partnership for any breach of this paragraph 15.15 by any adviser of such Limited Partner if the adviser is bound by an obligation to keep such Confidential Information confidential and such Limited Partner agrees to enforce such obligation.

15.16    **Partnership Legal Matters.** Each Partner hereby agrees and acknowledges that:

(a)    Cooley LLP ("*Cooley*") has been retained as Legal Counsel by the General Partner in connection with the formation of the Partnership and the offering of Limited Partner interests and in such capacity has provided legal services to the General Partner and the Partnership. The General Partner expects to retain Cooley to provide legal services to the General Partner and the Partnership in connection with the management and operation of the Partnership.

(b)    Cooley is not and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one hand and the General Partner and the Partnership on the other (the "*Partnership Legal Matters*").

(c)    Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)    Each Limited Partner hereby agrees that Cooley may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner or the Partnership and one or more Limited Partners) and waives any present conflict of interest with Cooley regarding Partnership Legal Matters arising by virtue of any representation or deemed representation of such Limited Partner or the Partnership on account of Cooley's representation described in paragraph 15.16(a) above; *provided, however,* that the Limited Partners are not hereby agreeing to Cooley's representation of the Partnership in a derivative action on their behalf against the General Partner.

**[THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

48.

IN WITNESS WHEREOF, the Partners have executed this Limited Partnership Agreement as of the date first written above.

GENERAL PARTNER:                    LIMITED PARTNER:

FROST VENTURE PARTNERS GP, LLC

_____
                                    *(Print name of investing entity)*

By:_____    By:_____
        Managing Director                    *(signature)*

                                    Name:_____
                                            *(print name)*

                                    Title:_____

"THE SECURITIES EVIDENCED BY THIS PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT COVERING SUCH SECURITIES OR THE GENERAL PARTNER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE GENERAL PARTNER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE 1933 ACT."

SIGNATURE PAGE TO LIMITED PARTNERSHIP AGREEMENT
OF FROST VP EARLY STAGE FUND II, L.P.

Exhibit 2
Page 206

**FROST VP EARLY STAGE FUND II, L.P.**

**LIMITED PARTNERSHIP AGREEMENT**

806590 v11/SD

Exhibit 2
Page 207

TABLE OF CONTENTS

PAGE

ARTICLE 1     NAME, PURPOSE AND OFFICES OF PARTNERSHIP ...............................1

    1.1     Name................................................................................................1

    1.2     Purpose ...........................................................................................1

    1.3     Principal Office ...............................................................................1

    1.4     Registered Agent and Office ...........................................................1

ARTICLE 2     TERM OF PARTNERSHIP ........................................................2

    2.1     Term ................................................................................................2

    2.2     Events Affecting a Member of the General Partner .........................2

    2.3     Events Affecting a Limited Partner of the Partnership .....................2

    2.4     Events Affecting the General Partner ...............................................2

ARTICLE 3     NAME AND ADMISSION OF PARTNERS ...............................2

    3.1     Name and Address............................................................................2

    3.2     Admission of Additional Partners ....................................................3

ARTICLE 4     CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND
             NONCONTRIBUTING PARTNERS ......................................3

    4.1     Capital Accounts .............................................................................3

    4.2     Capital Contributions of the Limited Partners.................................3

    4.3     Capital Contributions of the General Partner ..................................5

    4.4     Acquisition of an Additional Interest by the General Partner ..........6

    4.5     Noncontributing Partners.................................................................6

    4.6     Suspension Period ..........................................................................10

ARTICLE 5     PARTNERSHIP ALLOCATIONS ..........................................11

    5.1     Allocation of Profit or Loss...........................................................11

    5.2     Special Allocations ........................................................................13

    5.3     Regulatory Allocations ..................................................................13

    5.4     Income Tax Allocations .................................................................14

ARTICLE 6     MANAGEMENT FEE; PARTNERSHIP EXPENSES ...............14

    6.1     Management Fee ............................................................................14

    6.2     Expenses ........................................................................................15

ARTICLE 7     WITHDRAWALS BY AND DISTRIBUTIONS TO THE
             PARTNERS......................................................................17

TABLE OF CONTENTS
(Continued)

PAGE

| | | |
|---|---|---|
| 7.1 | Interest | 17 |
| 7.2 | Withdrawals by the Partners | 17 |
| 7.3 | Partners' Obligation to Repay or Restore | 17 |
| 7.4 | Mandatory Distributions | 17 |
| 7.5 | Discretionary Distributions | 18 |
| 7.6 | Withholding Obligations | 19 |
| ARTICLE 8 | MANAGEMENT DUTIES AND RESTRICTIONS | 20 |
| 8.1 | Management | 20 |
| 8.2 | No Control by the Limited Partners; No Withdrawal | 21 |
| 8.3 | Existing Funds; Follow On Funds; Parallel Funds | 21 |
| 8.4 | Investment Opportunities and Restrictions | 22 |
| ARTICLE 9 | INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS | 23 |
| 9.1 | Investment Representation of the Limited Partners | 23 |
| 9.2 | Qualifications of the Limited Partners | 24 |
| 9.3 | Transfer by General Partner | 24 |
| 9.4 | Transfer by Limited Partner | 24 |
| 9.5 | Requirements for Transfer | 25 |
| 9.6 | Substitution as a Limited Partner | 25 |
| ARTICLE 10 | DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP | 26 |
| 10.1 | Extension of Partnership Term | 26 |
| 10.2 | Early Termination of the Partnership | 26 |
| 10.3 | Winding Up Procedures | 26 |
| 10.4 | Payments in Liquidation | 27 |
| 10.5 | Return of Excess Distributions | 27 |
| ARTICLE 11 | FINANCIAL ACCOUNTING, REPORTS AND MEETINGS | 28 |
| 11.1 | Financial Accounting; Fiscal Year | 28 |
| 11.2 | Supervision; Inspection of Books | 28 |
| 11.3 | Quarterly Reports | 28 |
| 11.4 | Annual Report; Financial Statements of the Partnership | 28 |
| 11.5 | Electronic Reporting | 29 |
| 11.6 | Tax Returns | 29 |

ii.

806590 v11/SD

Exhibit 2
Page 209

**TABLE OF CONTENTS**
**(Continued)**

PAGE

| | | |
|---|---|---|
| 11.7 | Tax Matters Partner | 30 |
| ARTICLE 12 | VALUATION; ADVISORY COMMITTEE | 31 |
| 12.1 | Valuation | 31 |
| 12.2 | Advisory Committee | 32 |
| ARTICLE 13 | PARTNERS SUBJECT TO SPECIAL REGULATION | 32 |
| 13.1 | ERISA Partners | 32 |
| 13.2 | Governmental Plan Partners | 34 |
| 13.3 | Private Foundation Partners | 35 |
| 13.4 | Media Companies | 35 |
| ARTICLE 14 | CERTAIN DEFINITIONS | 37 |
| 14.1 | Accounting Period | 37 |
| 14.2 | Adjusted Asset Value | 37 |
| 14.3 | Affiliate | 37 |
| 14.4 | Attributable Interest | 38 |
| 14.5 | Capital Account | 38 |
| 14.6 | Capital Commitment; Committed Capital | 38 |
| 14.7 | Code | 38 |
| 14.8 | Deemed Gain or Deemed Loss | 38 |
| 14.9 | FCC | 38 |
| 14.10 | FCC Attribution Orders | 38 |
| 14.11 | FCC Rules | 39 |
| 14.12 | Idle Funds Income | 39 |
| 14.13 | Managing Directors | 39 |
| 14.14 | Marketable; Marketable Securities; Marketability | 39 |
| 14.15 | Media Company | 39 |
| 14.16 | Nonmarketable Securities | 39 |
| 14.17 | Other Restricted Person | 39 |
| 14.18 | Ownership Rules | 40 |
| 14.19 | Partnership Percentage | 40 |
| 14.20 | Percentage in Interest; Majority in Interest | 40 |
| 14.21 | Profit or Loss | 40 |
| 14.22 | Securities | 41 |

iii.

## TABLE OF CONTENTS
### (Continued)

PAGE

14.23  Securities Act..................................................................................................41

14.24  Treasury Regulations.......................................................................................41

ARTICLE 15      OTHER PROVISIONS ..........................................................................41

15.1  Governing Law..................................................................................................41

15.2  Limitation of Liability of the Limited Partners ...............................................41

15.3  Exculpation.......................................................................................................41

15.4  Indemnification.................................................................................................42

15.5  Arbitration ........................................................................................................44

15.6  Execution and Filing of Documents ................................................................45

15.7  Other Instruments and Acts .............................................................................45

15.8  Binding Agreement ..........................................................................................45

15.9  Notices; Electronic Transmission of Reports ..................................................45

15.10  Power of Attorney ...........................................................................................46

15.11  Amendment .....................................................................................................46

15.12  Entire Agreement.............................................................................................47

15.13  Titles; Subtitles ...............................................................................................47

15.14  Partnership Name ............................................................................................47

15.15  Confidentiality.................................................................................................47

15.16  Partnership Legal Matters................................................................................50

806590 v11/SD

iv.

Exhibit 2
Page 211

# INDEX OF DEFINITIONS

| Term | Paragraph | Page |
|------|-----------|------|
| Accounting Period | 14.1 | 37 |
| Act | Preamble | 1 |
| Activation Date | 4.2(a) | 4 |
| Adjusted Asset Value | 14.2 | 37 |
| Administrator | 15.5(a) | 44 |
| Advisory Committee | 12.2 | 32 |
| Affected Parties | 15.15(a) | 47 |
| Affiliate | 14.3 | 37 |
| Agreement | Preamble | 1 |
| Applicable Tax Rate | 7.4 | 17 |
| Arbitration | 15.5(a) | 44 |
| Arbitrators | 15.5(a) | 44 |
| Attributable Interest | 14.4 | 37 |
| Capital Account | 14.5 | 38 |
| Capital Commitment | 14.6 | 38 |
| Carry Percentage | 5.1(b) | 12 |
| Claim | 15.5(a) | 44 |
| Code | 14.7 | 38 |
| Commencement Date | 2.1 | 2 |
| Commitment Period | 4.2(a) | 4 |
| Committed Capital | 14.6 | 38 |
| Confidential Information | 15.15(a) | 47 |
| Deemed Gain | 14.8 | 38 |
| Deemed Loss | 14.8 | 38 |
| Default Notice | 4.5(b) | 6 |
| Defaulting Limited Partner | 4.5(b) | 6 |
| DOL Regulations | 4.2(b) | 4 |
| ERISA | 9.5(a) | 24 |
| ERISA Partner | 13.1(a) | 32 |
| FCC | 14.9 | 38 |
| FCC Attribution Orders | 14.10 | 38 |
| FCC Rules | 14.11 | 39 |
| Fee Adjustment | 4.3 | 5 |
| Fee Adjustment Amount | 4.3 | 5 |
| Fee Adjustment Notice | 4.3 | 5 |
| FOIA Limited Partner | 15.15(d) | 49 |
| Frost Fund | 8.3(a) | 21 |
| Fund Affiliates | 8.3(a) | 21 |
| Fund Level Information | 15.15(d) | 49 |
| General Partner | Preamble | 1 |
| Governmental Plan Partner | 13.2 | 34 |

806590 v11/SD

i.

Exhibit 2
Page 212

| Term | Paragraph | Page |
|------|-----------|------|
| Incubator | 1.2 | 1 |
| Incubator Company | 8.3(b) | 20 |
| Idle Funds Income | 14.12 | 39 |
| Indemnified Parties | 15.4(a) | 42 |
| Limited Partners | Preamble | 1 |
| Loss | 14.23 | 40 |
| Majority in Interest | 14.21 | 40 |
| Management Company | 8.1 | 20 |
| Management Fee Percentage | 6.1(b) | 14 |
| Managing Directors | 14.13 | 39 |
| Marketable | 14.14 | 39 |
| Marketable Securities | 14.14 | 39 |
| Marketability | 14.14 | 39 |
| Media Company | 14.15 | 39 |
| Nonmarketable Securities | 14.16 | 39 |
| Optionees | 4.5(b)(vii) | 8 |
| Optionor | 4.5(b)(vii) | 8 |
| Other Restricted Person | 14.17 | 39 |
| Ownership Rules | 14.18 | 40 |
| Parallel Funds | 8.3(c) | 21 |
| Partner(s) | 3.1 | 2 |
| Partnership | Preamble | 1 |
| Partnership Percentage | 14.19 | 40 |
| Payback | 7.5(a) | 18 |
| Percentage in Interest | 14.20 | 40 |
| Pooled Vehicle Partner | 15.15(e) | 49 |
| Portfolio Company | 6.1(e) | 15 |
| Portfolio Confidential Information | 15.15(e) | 50 |
| Private Foundation Partner | 13.3 | 35 |
| Profit | 14.22 | 40 |
| Regulatory Allocations | 5.4(a) | 13 |
| Regulatory Limitation | 7.5(h) | 19 |
| Remaining Portion | 4.6(b)(vii)(2) | 8 |
| Reporting Site | 11.5 | 29 |
| Schedule of Partners | 3.1 | 2 |
| Securities | 14.22 | 41 |
| Securities Act | 14.23 | 41 |
| Service Fee | 6.1(e) | 15 |
| Subject Reports | 11.5 | 29 |
| Successor Fund | 8.3(a) | 20 |
| Suspension Event | 4.6(b) | 11 |
| Suspension Event Notice | 4.6(b) | 11 |
| Suspension Period | 4.6(b) | 11 |
| Tax Payments | 7.6(a) | 19 |
| Termination Date | 2.1 | 2 |

ii.

806590 v11/SD

Exhibit 2
Page 213

| Term | Paragraph | Page |
|------|-----------|------|
| Treasury Regulations | 14.24 | 41 |
| VCOC | 4.2(b) | 4 |
| VCOC Notice | 4.2(b) | 4 |

iii.

806590 v11/SD

Exhibit 2
Page 214

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF ORANGE             )

I am employed in the County of Orange, State of California. I am over the age of 18, and not a party to the within action. My business address is Hodel Wilks LLP, 4 Park Plaza, Suite 640, Irvine, CA 92614.

On **March 7, 2017**, I served the foregoing document(s) described as: **AMENDED COUNTERCLAIMS OF HOLLENCREST BAYVIEW PARTNERS, L.P., ROBERT B. WOLFORD, INDIVIDUALLY AND AS TRUSTEE OF THE WOLFORD FAMILY TRUST** on the interested parties by placing a true and correct copy thereof in a sealed envelope(s) addressed as follows:

Colin C. Holley
Hampton Holley LLP
2101 East Coast Hwy., Suite 100
Corona del Mar, CA 92625
Telephone: (949) 718-4550
Facsimile: (949) 718-4580
Email: cholley@hamptonholley.com

Attorney for Frost Management Company, LLC

☒  **BY ELECTRONIC MAIL WHERE INDICATED:** Pursuant to C.R.C. 2060, I served the foregoing document described by emailing to it each of the aforementioned electronic mail addresses and the transmission was reported as complete and without error. My email address is hdorris@hodelwilks.com.

☒  **BY MAIL:** I caused such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Irvine, California. I am readily familiar with the practice of Hodel Wilks LLP for collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒  **STATE:** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **March 7, 2017**, at Irvine, California.

_____
**Heather Dorris**

Exhibit 2
Page 215

# EXHIBIT 3

**HON. STEPHEN J. SUNDVOLD (RET.)**
**JAMS**
**500 N. State College Blvd.**
**14th Floor**
**Orange, CA  92868**
**Tel:  714-939-1300**
**Fax:  714-939-8710**

**Arbitrator**

## IN THE MATTER OF

### JAMS No. 1200052341

**FROST MANAGEMENT COMPANY, ET AL.**
        **Claimant,**

    **vs.**

**HOLLENCREST BAYVIEW PARTNERS, LP, ET AL.**
        **Respondent.**

---

### FINAL AWARD

---

THE UNDERSIGNED ARBITRATOR, finds, and having issued the Corrected Interim Award dated April 18, 2018, attached as Exhibit A and incorporated herein by reference, the Partial Final Award dated June 7, 2018, attached as Exhibit B and incorporated herein by reference, and the Order Appointing replacement Manager, Establishing Oversight Committees and Reconfirming the Elimination of Voting Rights of Frost Venture Partner GP LLC, attached as Exhibits C and incorporated herein by reference, concludes and issues this Final Award as follows:

### INTRODUCTION

The above-entitled matter came on for hearing on January 22, 2018 before the Hon. Stephen J. Sundvold (Ret.). Claimants and Counter-Respondents FROST MANAGEMENT COMPANY, LLC and FROST VENTURE PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST DATA CAPITAL, LLC were represented by Hampton & Holley, LLP by Colin Holley and The Gimino Law Office, APC by Peter Gimino III. Respondents and Counter-Claimants HOLLENCREST BAYVIEW PARTNERS, L.P. and ROBERT B. WOLFORD, individually and as Trustee of the WOLFORD FAMILY

Exhibit 3
Page 216

TRUST dated July 11, 2006, were represented by Hodel Wilks L.L.P. By Matthew Hodel, Fred Wilks and Samuel Hyams.

Jurisdiction to arbitrate this matter was pursuant to the Operating Agreements of the Seed Fund (EX 840 para. 13.10) and Fund II (EX 2 para. 15.5).

The matter proceeded to hearing from January 15, 2018 daily through February 2, 2018 and again on February 15, 2018 and February 16, 2018. By Order of the Arbitrator, the order of proof at the hearing was determined that the Respondent Counter-Claimants would proceed first with presentation of evidence. Each side presented written arbitration briefs. The sworn testimony of 29 witnesses in person, by deposition and electronically by Face-Time was presented. Exhibits were presented and received. Both sides made oral closing arguments and rebuttals.

The factual findings that follow are necessary to the Award. They are derived from the admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weight of the evidence, both oral and written.

## ANALYSIS AND OPINION

### THE PARTIES

Counter-Claimant Frost VP Seed, LLC (hereinafter "Seed Fund") is a Delaware limited liability company formed for the purpose of investing in technology start-up companies.

The manager of the Seed Fund is Counter-Respondent Frost Management Company, LLC (EX 840).

Counter-Claimant Frost VP Early Stage Fund II, LP (hereinafter "Fund II") is a Delaware limited liability partnership also formed for the purpose of investing in the same early stage companies, known as Portfolio Companies.

The manager of Fund II is Counter-Respondent Frost Venture Partners GP, LLC (EX 2).

Counter-Claimant Hollencrest Bayview Partners. L.P. (hereinafter "Hollencrest") is an investor in, and thus a member of, the Seed Fund.

Counter-Claimant Robert Wolford is a managing director of Hollencrest Securities, LLC, the investment manager of Hollencrest and a registered investment advisor of other non-party investors in the Seed Fund and Fund II.

2

Exhibit 3
Page 217

Stuart Frost (hereinafter "Frost") owns and controls Frost Data Capital, LLC, formerly known as Frost Venture Partners, LLC, (hereinafter "FDC" or the "Incubator"). Frost, who had no prior experience as a fund manager, created and controlled the fund managers who distributed the funds' investments into the Portfolio Companies. Frost's experience was as a founder and CEO of data software companies (EX 28).

### THE DERIVATIVE CLAIMS

Hollencrest and Wolford bring these claims pursuant to 6 Del. C. Section 17-1001 and 6 Del. C. Section 18-1001 which allow a limited partner or member of a limited liability company to bring an action on behalf of a limited partnership or limited liability company. The Arbitrator finds that the nature of the alleged injuries sustained by the partnership and LLC, as a whole here, are in fact of the nature required to allow this matter to proceed in a derivative manner. See *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d. 1013 (Del. 2004). The primary harm here was to the Funds. All the investors in these Funds suffered harm as a function of their pro rata investment in these Funds. The procedural pre-lawsuit requirements were satisfied or were futile.

### THE FROST INCUBATOR MODEL

The Incubator model Frost envisioned would take ideas and needs from "big-data" major companies (problems), pass them through the Incubator, which would determine if the problem could be solved. The Incubator would then write up a minimally viable segment or product (as little as 2-3 paragraphs) and then pass the idea into a newly created start-up company which would incubate those ideas into software that would be acquired, sold or "go public" ("Exits") as new publicly-held companies within 2 to 5 years (EX 28, see also Giles depo. P. 68:8 - 69:14).

The Incubator management team would be "world class". The incubated companies would share services with each other creating a lean and highly capital efficient model.

In application, the evidence showed that no capital was invested into the Incubator itself and the Incubator was financially dependent on fees charged to the Portfolio Companies to sustain itself. As the number of incubator employees and their salaries went up, the need to increase the amounts coming into the Incubator increased. The Incubator's payroll expense alone went from $672,514 in 2012 to $5,215,955 in 2015 (Weekly Power Point slide 18).

### THE SEED FUND

The Seed Fund "pitch deck" (EX 28) lays out the pitch that was given to investors to raise a target of fifteen million dollars. The Seed Fund would then invest $750,000 to $1,500,000 into each of 10-15 start-up companies. The Seed Fund would have no management fee or carry cost. All investments would be approved by the "Investment Committee" (EX 28). The Operating Agreement for the Seed Fund (EX 840 para. 6.1(a)) authorized the manager to be reimbursed

3

for "out of pocket" expenses. It mentions in Paragraph 8.1 (b) the formation of the Incubator, but does not authorize payments to it from the Portfolio Companies. The "bubble" flow chart at slide 11 of Exhibit 28, the Pitch Deck, shows many "$ arrows" going into the Portfolio Companies, but does not show any "$ arrows" going from the Portfolio Companies to the Incubator.

FUND II

The Fund II Operating Agreement (EX 2) is significantly different from the Seed Fund. It authorizes the manager to be paid a management fee of 2% (EX 2 para. 6.1 (b)). All "normal operating expenses" incurred in connection with the management of Fund II were to be paid from the management fee (EX 2 para. 6.2 (a)).

The Operating Agreement (EX 2 para. 6.1 (d)) addresses that payments for "shared advisory and support services" may be charged by the Incubator to the Portfolio Companies. No method of calculation of those fees is identified. Those fees collected would not reduce the 2% management fee, "so long as such Service Fee does not exceed reasonable market rates." Any excess charges would reduce the management fee.

THE INVESTMENTS

Hollencrest was provided with the Frost Executive Summary (EX 223) dated October 18, 2011. Importantly, at page 5 of that document, they were told that the services provided by the Incubator to the Portfolio Companies would be decided by their respective individual boards, on a case-by-case basis, and would be adjusted from time to time as needed. The Portfolio Companies would only be charged for services that would be required in the normal course of business and they would receive higher quality services at a lower price than they would otherwise be able to afford. Frost would provide "economies of scale."

In late December and early January, Frost, in emails to Hollencrest, indicated that the first "exits" by Portfolio Companies were on the immediate horizon and they didn't want to miss out and that they should bring others into the opportunity (EXs 250 and 251). They and their clients invested $6.1 M. There were no immediate "exits." When Hollencrest later complained that no exits had occurred, Frost accused them of looking for a "fast buck" (EX. 339).

Wolford testified that the Hollencrest investments were anticipated to be 33 1/3% of the Seed Fund based on discussions with Frost. In actuality, they were approximately 80%. They were told that a Frost entity would invest $6.1M into Fund II. However, Frost did not disclose that $6M of that $6.1M came from an individual named Michael Colaco who had no right to participate in management of, and a "0" membership interest in, the Frost entity (EX 4 at § 5.1, and EX A attached thereto). In reality, Frost only invested $50K.

4

FINAL AWARD

Exhibit 3
Page 219

The investments were made after months of due diligence, vetting and background checks (EX 1385 and 1386), Hollencrest and its related party sophisticated investors invested $6.1M of the total of $7.5M invested in the Seed Fund.

Wolford was the only Hollencrest related party to invest in Fund II. He invested $100K (EX 310). The other Hollencrest investors were displeased that there had been no liquidity events (Exits) in the first two years and there had been a lack of transparency in the management of the Fund. Some of the Hollencrest investors did make direct investments into some of the Portfolio Companies. Those investments did not pass through the Funds. Fund II raised a total of $41.1M.

A later fund, Fund III, which is not a party, derivatively or otherwise to this arbitration, is believed to have invested approximately $13M into the incubator. There also were numerous direct investments into the Portfolio Companies by party and non-party investors in unknown amounts.

THE INCUBATOR FEES

Incubator fees were imposed upon the Portfolio Companies from the moment of their creation. In most instances, the Service Agreements were signed on their behalf by Frost and Frost CFO William Guerry before the company was officially formed (EX 152, Testimony of Wm. Guerry). Cancellation of the Service Agreement required 180 days' notice. (EX 597 para. 4). Once a CEO was chosen for the new company, he or she was saddled with up to a $40,000 monthly non-negotiable, non-cancellable fee for six months. Fees were imposed even if no CEO had been hired (EX 1011). The imposed Incubator fee was a flat fee regardless of the level of development of the company, the existence of any employees or the number of them (EX 1097). With rare exceptions, they were not negotiable. Frost never did an analysis of the actual costs for the services included in the fees. Some CEOs did the analysis as to value of the services and concluded that they ranged from $8,000 to $12,000 per month (Testimony of John Burke, Paul Myer, Doug Lawson, Cary Breese, Mark Lelinski). The actual fees imposed ranged from approximately $30,000 to $40,000 per month.

With the exception of only two witnesses, Babur Ozden, the CEO of Maana and Miles Mahoney, a Frost insider, who testified that the $40,000 monthly Incubator fee caused him "no heartburn," the record shows that numerous other CEOs for the Portfolio Companies complained about the excessive incubator fees (EX 795, EX 1097) Many tried, with little or no success to negotiate them down. Ozden, who is still the CEO of Maana and closely connected to Frost, testified, incredibly, that the Incubator service fee was a "mere fraction" of its actual worth.

The Incubator fees were to cover things like rent, human resources, mentoring, marketing, and payroll. They were not adjusted as the number of employees went up or down. Companies that had moved physically out of the Incubator offices, were charged the same as companies who resided in the offices. Frost CFO Guerry stated in his testimony that the rent allocations were done without any formula and were arbitrary. Hollencrest's incubator expert, Alexander Maleki,

5

Exhibit 3
Page 220

testified that these mandatory fixed fees were not consistent with industry standards. These fees created a burn-rate for the invested funds that shortened the "runway" for these new companies to get off the ground. For example, a company that was given an investment of $500,000 and was required to pay $40,000 per month in addition to salaries to its CEO and chief technology officer (CTO) would be burned out in well less than 8-10 months. The high fees also discouraged investors and were often hidden from them (EX 1111, EX 936). They were not reported to investors even after the company auditors told them that related party transactions which were not arms-length, needed to be reported to investors (EX 766).

Hollencrest's damages expert, David Weekly, calculated the reasonable Incubator charges to be $6,898,381. The actual incubator charges paid by the Portfolio Companies was $21,690,382. After allocating those expenses to the Seed Fund (17%) and Fund II (63%) he calculated the excess fees to be $11,846,575 (EX 1327, power point slide 29-30).

The Incubator itself was undercapitalized and always insolvent (Weekly testimony). The only source of income was incubator fees. The record is clear that, although the original pitch materials contemplated only 2-4 companies being created per year (EX 28), well over 20 were created, twelve in the period April 2014 to February, 2015 alone (EX 152 and 178). The email record also establishes that "new ideas" did not create "new companies," it was the need to meet the cash flow needs of the Incubator. Numerous emails show CFO Guerry advising Frost that new companies and the resultant immediate incubator fees were needed to make ends meet (EXs 773, 152, 774, 780, 798, 157, and 1090). These fees were unreasonable in their amount and application. They also were in violation of Frost's fiduciary obligations to the Funds whose investments were the only source of funds from which the Portfolio Companies could pay the incubator charges.

### SNOW DATA CAPITAL

Snow Data Capital was created by Stuart Frost ostensibly to provide marketing services to the Portfolio Companies. In reality, it was created to provide employment for his friend Anthony Howcroft who needed a job to qualify for a green card for immigration purposes. Frost and Howcroft were friends in England. Rather than pay Howcroft from the already excessive Incubator Fees which included marketing, Frost imposed an additional $5,100 per month on the Portfolio Companies. Again, no Portfolio Company was asked if they wanted or needed additional marketing services. They had no voice in the decision. The additional fees were imposed whether needed or not.

### MANAGEMENT FEES

The Seed Fund was not to be charged a management fee (EX 28). Frost charged the Seed Fund $16,000 per month for his salary (which was called "management services," EX 748) from June 2012 through September 2013 ($256,000 in total). This charge stopped only when Frost began receiving the 2% management fee from Fund II in October of 2013 (EX 1372). The Seed Fund

6

FINAL AWARD

Exhibit 3
Page 221

was also charged a management fee of $122,330 in 2012. The Seed Fund was represented to be a "no management fee" fund. These charges are improper.

Hollencrest additionally claims that $114,000 in shared services fees "may have been charged contrary to industry standards" (Palzer PowerPoint p.15). They have not met their burden of proof on this issue.

The Fund II Limited Partnership Agreement (EX 2) at Paragraph 6.1 allows Frost to collect a management fee of 2%. The Limited Partners also agreed that the Incubator, an affiliate of the General Partner, may receive a "Service Fee" for services rendered to the Portfolio Companies and that such fee would not reduce the General Partner's management fee (2%) "so long as such Service Fee does not exceed reasonable market rates." (EX 2 para. 6.1 (d)). The General Partner, Frost General Partners GP, LLC received management fees of $1,731,099 from 2013 through 2015 (EX 754). The net to the individual General Partners, after expenses of $615,387, was $1,116,171. The total excess Incubator Fees charged by the Incubator to the Portfolio Companies was $14,792,001 (EX 1327, Weekly power point slide 32). The amount of excess Incubator Fees David Weekly allocated to Fund II alone are $9,355,042 (EX 1327, Weekly power point slide 32). Those excess charges would accordingly reduce the GP's right to claim the 2% management fee down to zero. The net reduction would completely cancel the management fee by well over $7M. Accordingly, the GP was not entitled to any of the 2% management fee.

FROST's PERSONAL EXPENSES

Stuart Frost held a 62.5% interest in the GP. He was entitled to receive 62.5% of the net 2% fees after expenses. These proceeds would arguably have been income to him. Rather than receiving this income, he instructed CFO Guerry to pay hundreds of thousands of dollars of personal expenses ($788,712, EX 754) from "his" 62.5% share of the management fee profits. These expenses included villas in Italy, private schools in Italy for his children, chartered air travel, and vacation expenses. When his expenses in 2014 exceeded his 62.5% share of the fees for that year, he instructed Guerry to pay them from the share of the other GP members. His K-1 for 2014 was only $3,303. His total for K-1s from 2013 through 2015 was $24,385 (EX 754).

The payment of these personal expenses by the Incubator was improper. There was no business purpose for them. With the reduction of the management fee, due to the excessive Incubator fees, there was no management fee from which these expenses could be paid. Fund II is entitled to be reimbursed for these personal expenses that were paid out of Incubator funds. Should the excess Incubator Fees actually be repaid to Fund II, arguably, Frost would have a claim for his 62.5% of the restored 2% management fee. Hollencrest and Wolford can't have it both ways. The Arbitrator is ordering the repayment of the excessive fees as damages.

Frost received compensation and personal benefits totaling more than $5M between 2012 and early 2017 (EX 1327, Weekly testimony, power point slide 21-24).

BREACHES OF FIDUCIARY OBLIGATIONS

7

Exhibit 3
Page 222

Under the Delaware Limited Liability Corporation Act and the Delaware Revised Limited Partnership Act, the parties can contractually eliminate altogether any fiduciary duties that might be owed by the general partner and managing members to the limited partners, members or the Funds themselves (see **Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC**, 2009 BL 100510 (Del. Ch. April 20, 2009).

The Operating Agreements here (EX 840 and EX 2) do not eliminate fiduciary duties altogether. Section 8.6 of the Seed Fund Operating Agreement does limit the Manager's liability for "other activities" which may conflict with the company. The Arbitrator finds no such language in the Fund II Partnership Agreement (EX 2).

Frost owes duties of care and loyalty to the investors in the Seed Fund and Fund II. Those obligations were not contracted away in the Operating Agreements for those entities (EX 2 and EX 840).

It is clear that Frost has failed to live up to those duties and obligations. He imposed excessive Incubator Fees for his own benefit. Those fees and the 2% management fee from Fund II were the only sources of funds to pay him the $5M in salary and benefits he received.

On April 8, 2014, Frost asked the CFO, "just for kicks" to calculate the cash flow that would be generated from twelve new companies being started between April and July (EX 773).

In June of 2014, just after starting five new companies (EX 152), he moved his family to Italy for a year. As valuable as he (and Babur Ozden) claim that his mentoring was to the Portfolio Companies, being physically, and nine time zones, away for one year made it extremely difficult, if not impossible to fulfill this obligation. On June 6, 2014, only two weeks before his departure to Italy, when investor Tom Turney asked about a "rumor" that Frost was moving to Italy, Frost denied the move and indicated that his family was "spending time in Florence this summer" (EX 1135). Frost had already paid the enrollment fees for his children to be schooled in Italy for the following year (EX 653). It is critical to note that Frost did not just indicate that he would be working remotely for the next year! He knew that his physical absence from Incubator would have an effect on the Portfolio Companies. His ability to immediately respond electronically was not a reality (EX 525).

Frost was paid gross wages by FDC of $1.2M in 2014 and $1.118M in 2015 (EX 1327 and Weekly power point slide 23). For one entire year of that time, June 23, 2014 until June 2015, he resided in various villas in Italy.

The relationship with key investors suffered while Frost was away in Italy (EXs 499 and 501).

Perhaps the greatest failure of fiduciary responsibility was the failure to adequately inform the investors about the financial progress or lack thereof by the Portfolio Companies. Some financial reports were never completed or provided. All that were done, were late. Hollencrest

8

repeatedly chased after reports (EXs 349, 351, 352, 78 and 79). These lapses in reporting are violations of the reporting requirements of the Operating and Partnership Agreements (EX 2 and EX 840) which set out specific deadlines for reporting. Some Portfolio Companies were carried on the books long after they had been dissolved. For example, Adaptive Well was dissolved in August of 2016. On the year-end statements in December 2016 given to investors, it was still shown with a value of $1.3M (EX 87).

### THE FAILED PROMISES

There never were any "EXITS." Notwithstanding all the representations, before during and after all the investments into the Seed Fund and Fund II, that exits were "imminent," there never have been any successful exits that resulted in proceeds being distributed to the investors. There were three "sales" that took place to insiders (Miles Mahoney and John Burke's "Irish Acquisitions" company) in 2017, the terms of which have never been explained to investors or shown in the QuickBooks. A belated breakdown of the proceeds of the sales presented after the close of evidence was not considered by the Arbitrator.

The biggest, monetarily, of all the failed "promises" was the whiteboard in Frost's office which was present at the March 17, 2016 meeting with Hollencrest (Exhibit 18). The photograph of the whiteboard showed ten large corporate investors and the $718M that they were going to invest and eight Portfolio Companies in active acquisition talks. In actuality, only $5M was invested and there were no acquisitions.

On June 24, 2016, John Vigouroux wrote to Frost (EX 829). He attached a list of critical problems. He noted that every Portfolio Company CEO was "panicked" about Frost dissolving. He also indicated that many of the investors were telling others that the Frost "ship is sinking". He also stated that some investors were wanting "to go legal." On June 28, 2016 he wrote again (EX 904) setting out discussions he and Michael Colaco had concerning Frost being removed as manager and re-branding the funds. This all transpired a month before-

### THE JULY 19, 2016 MEETING

In the time period leading up to a meeting held at Frost's office on July 19, 2016, Hollencrest heard reports from various Frost employees and investors concerning allegations about Frost. They met with Carey Breese, a former Frost employee and Portfolio Company CEO, who wanted to "clear the air" about what was happening at the Incubator. They met with John Vigouroux, President of FDC, who told them their concerns were well-founded and he identified other unhappy investors. In emails sent just prior to the meeting, it was clear that the Hollencrest parties had serious concerns (EXs 372 and 383). Frost employees were told not to talk to investors (EX 370). Hollencrest met and talked with several other disgruntled employees and investors.

Hollencrest prepared notes before and following the meeting (EX 21 and EX 448). The meeting started with Frost distributing a status sheet about each of the Portfolio Companies. Greg

9

Pellizzon, a Hollencrest principle, explained why the meeting was requested. Frost was told that Hollencrest had been contacted by a "whistleblower" on June 27, 2016. A letter from investor Larry Sheakley was read aloud (EX 387). Frost then indicated that he needed legal counsel. Pellizzon read two resolutions from shareholders that outlined restructuring or replacement of FDC as manager of the funds.

The Arbitrator finds that Hollencrest did not circulate or publish to others that Frost was conducting a "Ponzi" scheme. Had such remarks been made among the investors, they would have been privileged. They did not make threats to report Frost to the SEC. They did not accuse him of committing any crime. It is clear from the evidence, that others, inside and outside the Frost entities, both before and after the July 19, 2016 meeting talked about "Ponzi schemes" in connection to Frost. The Portfolio Company CEOs themselves used the term "Ponzi scheme" in discussions about the Incubator (Testimony of Stephen Gotz). Frost himself in his letter to investors on October 2016 told investors that he had been accused of conducting a "Ponzi scheme" (EX 422). This republication itself was much broader in its scope than the previous comments. Frost had an ugly reputation with investors well before the July 19, 2016 meeting (EX 830).

The Arbitrator finds that Hollencrest and Wolford prevail on Frost's claims against them.

## ALTER EGO

In a recent Delaware Court of Chancery opinion, **Doberstein v. G-P Industries, Inc.** C.A. No. 9995-VCP (Del. Ch. Oct. 30, 2015), the Court stated that to state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the entity through its alter ego, has created a sham entity designed to defraud investors and creditors. Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking (FDC was not); (2) whether the company was solvent (FDC was not); (3) whether corporate formalities were observed (FDC did not); whether the dominant shareholder siphoned company funds (Stuart Frost did); and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder (it did).

The Frost entities had minimal or no initial capitalization, except for the strange contribution of Michael Colaco who invested $6 million and had no right to participate in the management of the business. His contribution was used as an investment in Fund II. His $6 million was not used as "capital" for any Frost entity.

There were numerous and continuous "related party transactions" that were not reported to the investors, even after the auditors advised that they should be (EX 90 para. 15a, EX 766). Many of these transactions involved the payment of Stuart Frost's personal expenses.

The Frost entities all used the same CFO, bookkeeper, offices, and were all controlled by Stuart Frost (Guerry testimony). The Services Agreements entered into by the Portfolio Companies

10

Exhibit 3
Page 225

were signed by Frost and his CFO, Guerry, and were binding and non-cancellable for 180 days on the newly created companies. Guerry was also the CFO of the Portfolio Companies.

Loans were made to the Portfolio Companies by FDC to allow their continued operations. Those proceeds of those loans then went back to the Incubator in the form of excessive fees (EX 936).

In June 2016, (EX 1117), Frost advised senior FDC management to shift Incubator personnel to the Portfolio Companies to achieve cost savings for FDC. Incubator payrolls were missed and salaries were reduced (Guerry testimony). Simultaneously, he suggested starting more new companies (EX 1117).

Frost paid his own legal fees from the Funds' assets (EX 1393).

The evidence demonstrates Stuart Frost's personal control over these entities and his use of that control to take actions and make decisions to his self-interest to the detriment of the investors.

The Arbitrator finds that Stuart Frost was the alter ego for the Frost entities.

## CONCLUSION

The Incubator (FDC) imposed excessive Incubator Fees on the Portfolio Companies in violation of the Operating and Partnership agreements. The Seed Fund's share of the excessive fees is $2,491,532 and Fund II's share is $9,355,042.

The Seed Fund was wrongfully charged $378,000 in fees for management and services of their fund.

Absent the return of the excessive Incubator Fees, the 2% management fee charged to Fund II is to be reduced by the amount of the excessive Incubator Fees.

Stuart Frost violated his fiduciary duty of care and loyalty to the members of the LLC and limited partners in the funds. He is to be removed as manager of the funds. He is found to be the alter ego of the Frost entities sued here.

An accounting is to be ordered, which will include the proceeds of the recent sale of Portfolio Companies Exara, Ubix Labs, and Source Thought.

Hollencrest and Wolford prevail on the claims of Frost.

Hollencrest and Wolford are the prevailing parties and are entitled to their reasonable attorney fees, witness expenses and costs of this Arbitration (EX 840 section 13.10 (d) and EX 2 section 15.5 (d)).

11

Exhibit 3
Page 226

**FURTHER PARTIAL FINAL AWARD RE (1) REFUND OF FROST PARTIES' LITIGATION EXPENSES PAID FROM THE FUNDS, (2) PREVAILING PARTY ATTORNEY'S FEES AND LITIGATION EXPENSES AND (3) PUNITIVE DAMAGES**

Following the issuance of the initial interim award, which has been corrected as set forth above, the parties briefed additional issues which were reserved until after the initial interim award. The Arbitrator now finds as set forth below.

Frost, the manager of the Seed Fund, and the GP of Fund II, were not entitled to use the Funds' money to pay legal fees incurred in this proceeding where Frost's conduct was "not undertaken in the good faith belief that such act or omission was in the best interests" of the Funds, or his conduct "constitutes recklessness, gross negligence or willful misconduct." (EX 2 at § 15.4(a), EX 840 at § 13.4(a). The arbitrator therefore finds that Counter-Respondents shall refund the following amounts: $130,340.10 to the Seed Fund, and $129,247.63 to Fund II (EX 1393).

The conduct of Stuart Frost was at least reckless. In his fiduciary capacity, he acted with conscious indifference and/or reckless indifference to the consequences of his actions and the rights of investors. At a minimum, Stuart Frost was willfully blind to or consciously disregarded the substantial and unjustifiable risk that his conduct would turn out to violate his fiduciary duties. Therefore, punitive damages against Counter-Respondents are appropriate in the amount of $771,000, to be split equally between the Funds, which approximates the expenses Weekly found Frost incurred in connection with his move to Italy.

Stuart Frost is ordered to provide to Counter-Respondents an up-to-date list of investors in the Seed Fund and Fund II, including the investors' contact information.

Hollencrest and Wolford are awarded their attorney fees, costs and expenses through April 30, 2018 in the amount of $3,257,091.09. The Arbitrator reserves jurisdiction to award additional attorney fees and costs incurred by Hollencrest Wolford after April 30, 2018.

Based on the finding of alter ego relationship, all of Counter-Respondents (Frost Management Company LLC, Frost Venture Partners GP LLC, Frost Data Capital LLC and Stuart Frost) shall be jointly and severally responsible for the damages, attorney fees, costs and expenses awarded.

In sum, the Arbitrator awards:

1. To the Seed Fund:  $3,385,372.10 (comprised or $2,491,532 in incubator fees, plus $378,000 for a management fee, plus $130,340.10 in Frost's legal fees charged to the Seed Fund, plus $385,500 one half of punitive damages).

---

12

FINAL AWARD

Exhibit 3
Page 227

2. To Fund II:  $9,869,789.63 (comprised of $9,355,042 in excessive incubator fees, plus $129,247.63 in Frost's legal fees charged to Fund II, plus $385,500 one half of punitive damages).

3. To Hollencrest and Wolford: $3,257,091.09 for attorney fees and costs incurred through April 30, 2018.

## ATTORNEY FEES AND COSTS

A telephonic hearing was held on August 21, 2018 before the Honorable Stephen J. Sundvold (Ret.) on the motion by respondents and counterclaimants, Hollencrest Bayview Partners, L.P. and Robert Wolford, individually and as Trustee for the Wolford Family Trust, seeking a second award of prevailing party attorney's fees and litigation expenses. Present and representing respondents and counterclaimants was Matthew Hodel of Hodel Wilks LLP. Present and representing claimants and counter-respondents Frost Management Company LLC and Frost Venture Partners GP LLC and counter-respondents Stuart Frost and Frost Data Capital, LLC was Colin Holley of HamptonHolley LLP.

After considering all papers filed in connection with this second motion for fees and costs, and oral argument from counsel, the arbitrator granted the motion and awarded respondents and counterclaimants an additional $166,675.65 in attorney's fees and $42,258.10 in costs.

Therefore, the arbitrator awards to respondents and counterclaimants additional prevailing party litigation expenses of $208,933.75 against claimants and counter-respondents.

This Final Award resolves all claims between the parties submitted for decision in this proceeding.  This award shall be final for the purpose of awarding such further expenses and seeking confirmation of the same in the Superior Court.

DATED:  August 27, 2018

Hon. Stephen J. Sundvold (Ret.)
Arbitrator

# EXHIBIT

# A

Exhibit 3
Page 229

HON. STEPHEN J. SUNDVOLD (RET.)
JAMS
500 N. State College Blvd.
14th Floor
Orange, CA  92868
Tel:  714-939-1300
Fax:  714-939-8710

Arbitrator

IN THE MATTER OF

JAMS No. 1200052341

FROST MANAGEMENT COMPANY, ET AL.
          Claimant,

vs.

HOLLENCREST BAYVIEW PARTNERS, LP, ET AL.
          Respondent.

---

### CORRECTED INTERIM AWARD

---

### INTRODUCTION

The above-entitled matter came on for hearing on January 22, 2018 before the Hon. Stephen J. Sundvold (Ret.). Claimants and Counter-Respondents FROST MANAGEMENT COMPANY, LLC and FROST VENTURE PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST DATA CAPITAL, LLC were represented by Hampton & Holley, LLP by Colin Holley and The Gimino Law Office, APC by Peter Gimino III. Respondents and Counter-Claimants HOLLENCREST BAYVIEW PARTNERS, L.P. and ROBERT B. WOLFORD, individually and as Trustee of the WOLFORD FAMILY TRUST dated July 11, 2006, were represented by Hodel Wilks L.L.P. By Matthew Hodel, Fred Wilks and Samuel Hyams.

Jurisdiction to arbitrate this matter was pursuant to the Operating Agreements of the Seed Fund (EX 840 para. 13.10) and Fund II (EX 2 para. 15.5).

Exhibit 3
Page 230

The matter proceeded to hearing from January 15, 2018 daily through February 2, 2018 and again on February 15, 2018 and February 16, 2018. By Order of the Arbitrator, the order of proof at the hearing was determined that the Respondent Counter-Claimants would proceed first with presentation of evidence. Each side presented written arbitration briefs. The sworn testimony of 29 witnesses in person, by deposition and electronically by Face-Time was presented. Exhibits were presented and received. Both sides made oral closing arguments and rebuttals.

The factual findings that follow are necessary to the Award. They are derived from the admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weight of the evidence, both oral and written.

## ANALYSIS AND OPINION

### THE PARTIES

Counter-Claimant Frost VP Seed, LLC (hereinafter "Seed Fund") is a Delaware limited liability company formed for the purpose of investing in technology start-up companies.

The manager of the Seed Fund is Counter-Respondent Frost Management Company, LLC (EX 840).

Counter-Claimant Frost VP Early Stage Fund II, LP (hereinafter "Fund II") is a Delaware limited liability partnership also formed for the purpose of investing in the same early stage companies, known as Portfolio Companies.

The manager of Fund II is Counter-Respondent Frost Venture Partners GP, LLC (EX 2).

Counter-Claimant Hollencrest Bayview Partners. L.P. (hereinafter "Hollencrest") is an investor in, and thus a member of, the Seed Fund.

Counter-Claimant Robert Wolford is a managing director of Hollencrest Securities, LLC, the investment manager of Hollencrest and a registered investment advisor of other non-party investors in the Seed Fund and Fund II.

Stuart Frost (herinafter "Frost") owns and controls Frost Data Capital, LLC, formerly known as Frost Venture Partners, LLC, (herinafter "FDC" or the "Incubator"). Frost, who had no prior experience as a fund manager, created and controlled the fund managers who distributed the funds' investments into the Portfolio Companies. Frost's experience was as a founder and CEO of data software companies (EX 28).

## THE DERIVATIVE CLAIMS

Hollencrest and Wolford bring these claims pursuant to 6 Del. C. Section 17-1001 and 6 Del. C. Section 18-1001 which allow a limited partner or member of a limited liability company to bring an action on behalf of a limited partnership or limited liability company. The Arbitrator finds that the nature of the alleged injuries sustained by the partnership and LLC, as a whole here, are in fact of the nature required to allow this matter to proceed in a derivative manner. See *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d. 1013 (Del. 2004). The primary harm here was to the Funds. All the investors in these Funds suffered harm as a function of their pro rata investment in these Funds. The procedural pre-lawsuit requirements were satisfied or were futile.

## THE FROST INCUBATOR MODEL

The Incubator model Frost envisioned would take ideas and needs from "big-data" major companies (problems), pass them through the Incubator, which would determine if the problem could be solved. The Incubator would then write up a minimally viable segment or product (as little as 2-3 paragraphs) and then pass the idea into a newly created start-up company which would incubate those ideas into software that would be acquired, sold or "go public" ("Exits") as new publicly-held companies within 2 to 5 years (EX 28, see also Giles depo. P. 68:8 - 69:14).

The Incubator management team would be "world class". The incubated companies would share services with each other creating a lean and highly capital efficient model.

In application, the evidence showed that no capital was invested into the Incubator itself and the Incubator was financially dependent on fees charged to the Portfolio Companies to sustain itself. As the number of incubator employees and their salaries went up, the need to increase the amounts coming into the Incubator increased. The Incubator's payroll expense alone went from $672,514 in 2012 to $5,215,955 in 2015 (Weekly Power Point slide 18).

## THE SEED FUND

The Seed Fund "pitch deck" (EX 28) lays out the pitch that was given to investors to raise a target of fifteen million dollars. The Seed Fund would then invest $750,000 to $1,500,000 into each of 10-15 start-up companies. The Seed Fund would have no management fee or carry cost. All investments would be approved by the "Investment Committee" (EX 28). The Operating Agreement for the Seed Fund (EX 840 para. 6.1(a)) authorized the manager to be reimbursed for "out of pocket" expenses. It mentions in Paragraph 8.1 (b) the formation of the Incubator, but does not authorize payments to it from the Portfolio Companies. The "bubble" flow chart at slide 11 of Exhibit 28, the Pitch Deck, shows many "$ arrows" going into the Portfolio

3

Exhibit 3
Page 232

Companies, but does not show any "$ arrows" going <u>from</u> the Portfolio Companies to the Incubator.

### FUND II

The Fund II Operating Agreement (EX 2) is significantly different from the Seed Fund. It authorizes the manager to be paid a management fee of 2% (EX 2 para. 6.1 (b)). All "normal operating expenses" incurred in connection with the management of Fund II were to be paid from the management fee (EX 2 para. 6.2 (a)).

The Operating Agreement (EX 2 para. 6.1 (d)) addresses that payments for "shared advisory and support services" may be charged by the Incubator to the Portfolio Companies. No method of calculation of those fees is identified. Those fees collected would not reduce the 2% management fee, "so long as such Service Fee does not exceed reasonable market rates." Any excess charges would reduce the management fee.

### THE INVESTMENTS

Hollencrest was provided with the Frost Executive Summary (EX 223) dated October 18, 2011. Importantly, at page 5 of that document, they were told that the services provided by the Incubator to the Portfolio Companies would be decided by their respective individual boards, on a case-by-case basis, and would be adjusted from time to time as needed. The Portfolio Companies would only be charged for services that would be required in the normal course of business and they would receive higher quality services at a lower price than they would otherwise be able to afford. Frost would provide "economies of scale."

In late December and early January, Frost, in emails to Hollencrest, indicated that the first "exits" by Portfolio Companies were on the immediate horizon and they didn't want to miss out and that they should bring others into the opportunity (EXs 250 and 251). They and their clients invested $6.1 M. There were no immediate "exits." When Hollencrest later complained that no exits had occurred, Frost accused them of looking for a "fast buck" (EX. 339).

Wolford testified that the Hollencrest investments were anticipated to be 33 1/3% of the Seed Fund based on discussions with Frost. In actuality, they were approximately 80%. They were told that Frost would invest $6M and he only invested $50K.

The investments were made after months of due diligence, vetting and background checks (EX 1385 and 1386), Hollencrest and its related party sophisticated investors invested $6.1M of the total of $7.5M invested in the Seed Fund.

Wolford was the only Hollencrest related party to invest in Fund II. He invested $100K (EX 310). The other Hollencrest investors were displeased that there had been no liquidity events (Exits) in the first two years and there had been a lack of transparency in the management of the

4

CORRECTED INTERIM AWARD

Exhibit 3
Page 233

Fund. Some of the Hollencrest investors did make direct investments into some of the Portfolio Companies. Those investments did not pass through the Funds. Fund II raised a total of $41.1M.

A later fund, Fund III, which is not a party, derivatively or otherwise to this arbitration, is believed to have invested approximately $13M into the incubator. There also were numerous direct investments into the Portfolio Companies by party and non-party investors in unknown amounts.

### THE INCUBATOR FEES

Incubator fees were imposed upon the Portfolio Companies from the moment of their creation. In most instances, the Service Agreements were signed on their behalf by Frost and Frost CFO William Guerry before the company was officially formed (EX 152, Testimony of Wm. Guerry). Cancellation of the Service Agreement required 180 days' notice. (EX 597 para. 4). Once a CEO was chosen for the new company, he or she was saddled with a $40,000 monthly non-negotiable, non-cancellable fee for six months. Fees were imposed even if no CEO had been hired (EX 1011). The imposed Incubator fee was a flat fee regardless of the level of development of the company, the existence of any employees or the number of them (EX 1097). With rare exceptions, they were not negotiable. Frost never did an analysis of the actual costs for the services included in the fees. Some CEOs did the analysis as to value of the services and concluded that they ranged from $8,000 to $12,000 per month. The actual fees imposed ranged from approximately $30,000 to $40,000 per month.

With the exception of only two witnesses, Babur Ozden, the CEO of Maana and Miles Mahoney, a Frost insider, who testified that the $40,000 monthly Incubator fee caused him "no heartburn," the record shows that every other CEO for all the Portfolio Companies complained about the excessive incubator fees (EX 795, EX 1097) Many tried, with little or no success to negotiate them down. Ozden, who is still the CEO of Maana and closely connected to Frost, testified, incredibly, that the Incubator service fee was a "mere fraction" of its actual worth.

The Incubator fees were to cover things like rent, human resources, mentoring, marketing, and payroll. They were not adjusted as the number of employees went up or down. Companies that had moved physically out of the Incubator offices, were charged the same as companies who resided in the offices. Frost CFO Guerry stated in his testimony that the rent allocations were done without any formula and were arbitrary. Hollencrest's incubator expert, Alexander Maleki, testified that these mandatory fixed fees were not consistent with industry standards. These fees created a burn-rate for the invested funds that shortened the "runway" for these new companies to get off the ground. For example, a company that was given an investment of $500,000 and was required to pay $40,000 per month in addition to salaries to its CEO and chief technology officer (CTO) would be burned out in well less than 8-10 months. The high fees also discouraged investors and were often hidden from them (EX 1111, EX 936). They were not reported to investors even after the company auditors told them that related party transactions which were not arms-length, needed to be reported to investors (EX 766).

Exhibit 3
Page 234

Hollencrest's damages expert, David Weekly, calculated the reasonable Incubator charges to be $6,898,381. The actual incubator charges paid by the Portfolio Companies was $21,690,382. After allocating those expenses to the Seed Fund (17%) and Fund II (63%) he calculated the excess fees to be $11,846,575 (EX 1327, power point slide 29-30).

The Incubator itself was undercapitalized and always insolvent (Weekly testimony). The only source of income was incubator fees. The record is clear that, although the original pitch materials contemplated only 2-4 companies being created per year (EX 28), well over 20 were created, twelve in the period April 2014 to February, 2015 alone (EX 152 and 178). The email record also establishes that "new ideas" did not create "new companies," it was the need to meet the cash flow needs of the Incubator. Numerous emails show CFO Guerry advising Frost that new companies and the resultant immediate incubator fees were needed to make ends meet (EXs 773, 152, 774, 780, 798, 157, and 1090). These fees were unreasonable in their amount and application. They also were in violation of Frost's fiduciary obligations to the Funds whose investments were the only source of funds from which the Portfolio Companies could pay the incubator charges.

### SNOW DATA CAPITAL

Snow Data Capital was created by Stuart Frost ostensibly to provide marketing services to the Portfolio Companies. In reality, it was created to provide employment for his friend Anthony Howcroft who needed a job to qualify for a green card for immigration purposes. Frost and Howcroft were friends in England. Rather than pay Howcroft from the already excessive Incubator Fees which included marketing, Frost imposed an additional $5,100 per month on the Portfolio Companies. Again, no Portfolio Company was asked if they wanted or needed additional marketing services. They had no voice in the decision. The additional fees were imposed whether needed or not.

### MANAGEMENT FEES

The Seed Fund was not to be charged a management fee (EX 28). Frost charged the Seed Fund $16,000 per month for his salary (which was called "management services," EX 748) from June 2012 through September 2013 ($256,000 in total). This charge stopped only when Frost began receiving the 2% management fee from Fund II in October of 2013 (EX 1372). The Seed Fund was also charged a management fee of $122,330 in 2012. The Seed Fund was represented to be a "no management fee" fund. These charges are improper.

Hollencrest additionally claims that $114,000 in shared services fees "may have been charged contrary to industry standards" (Palzer PowerPoint p.15). They have not met their burden of proof on this issue.

The Fund II Limited Partnership Agreement (EX 2) at Paragraph 6.1 allows Frost to collect a management fee of 2%. The Limited Partners also agreed that the Incubator, an affiliate of the General Partner, may receive a "Service Fee" for services rendered to the Portfolio Companies

6

Exhibit 3
Page 235

and that such fee would not reduce the General Partner's management fee (2%) "so long as such Service Fee does not exceed reasonable market rates." (EX 2 para. 6.1 (d)). The General Partner, Frost General Partners GP, LLC received management fees of $1,731,099 from 2013 through 2015 (EX 754). The net to the individual General Partners, after expenses of $615,387, was $1,116,171. The excess Incubator Fees charged by the GP to Fund II alone are $9,355,042. Those excess charges would accordingly reduce the GP's right to claim the 2% management fee down to zero. The net reduction would completely cancel the management fee by well over $7M. Accordingly, the GP was not entitled to any of the 2% management fee.

### FROST's PERSONAL EXPENSES

Stuart Frost held a 62.5% interest in the GP. He was entitled to receive 62.5% of the net 2% fees after expenses. These proceeds would arguably have been income to him. Rather than receiving this income, he instructed CFO Guerry to pay hundreds of thousands of dollars of personal expenses ($788,712, EX 754) from "his" 62.5% share of the management fee profits. These expenses included villas in Italy, private schools in Italy for his children, chartered air travel, and vacation expenses. When his expenses in 2014 exceeded his 62.5% share of the fees for that year, he instructed Guerry to pay them from the share of the other GP members. His K-1 for 2014 was only $3,303. His total for K-1s from 2013 through 2015 was $24,385 (EX 754).

The payment of these personal expenses by the Incubator was improper. There was no business purpose for them. With the reduction of the management fee, due to the excessive Incubator fees, there was no management fee from which these expenses could be paid. Fund II is entitled to be reimbursed for these personal expenses that were paid out of Incubator funds. Should the excess Incubator Fees actually be repaid to Fund II, arguably, Frost would have a claim for his 62.5% of the restored 2% management fee. Hollencrest and Wolford can't have it both ways. The Arbitrator is ordering the repayment of the excessive fees as damages.

Frost received compensation and personal benefits totaling more than $5M between 2012 and early 2017 (EX 1327, Weekly testimony, power point slide 21-24).

### BREACHES OF FIDUCIARY OBLIGATIONS

Under the Delaware Limited Liability Corporation Act and the Delaware Revised Limited Partnership Act, the parties can contractually eliminate altogether any fiduciary duties that might be owed by the general partner and managing members to the limited partners, members or the Funds themselves (see *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 BL 100510 (Del. Ch. April 20, 2009).

The Operating Agreements here (EX 840 and EX 2) do not eliminate fiduciary duties altogether. Section 8.6 of the Seed Fund Operating Agreement does limit the Manager's liability for "other activities" which may conflict with the company. The Arbitrator finds no such language in the Fund II Partnership Agreement (EX 2).

Exhibit 3
Page 236

Frost owes duties of care and loyalty to the investors in the Seed Fund and Fund II. Those obligations were not contracted away in the Operating Agreements for those entities (EX 2 and EX 840).

It is clear that Frost has failed to live up to those duties and obligations. He imposed excessive Incubator Fees for his own benefit. Those fees and the 2% management fee from Fund II were the only sources of funds to pay him the $5M in salary and benefits he received.

On April 8, 2014, Frost asked the CFO, "just for kicks" to calculate the cash flow that would be generated from twelve new companies being started between April and July (EX 773).

In June of 2014, just after starting five new companies (EX 152), he moved his family to Italy for a year. As valuable as he (and Babur Ozden) claim that his mentoring was to the Portfolio Companies, being physically, and nine time zones, away for one year made it extremely difficult, if not impossible to fulfill this obligation. On June 6, 2014, only two weeks before his departure to Italy, when investor Tom Turney asked about a "rumor" that Frost was moving to Italy, Frost denied the move and indicated that his family was "spending time in Florence this summer" (EX 1135). Frost had already paid the enrollment fees for his children to be schooled in Italy for the following year (EX 653). It is critical to note that Frost did not just indicate that he would be working remotely for the next year! He knew that his physical absence from Incubator would have an effect on the Portfolio Companies. His ability to immediately respond electronically was not a reality (EX 525).

Frost was paid gross wages by FDC of $1.2M in 2014 and $1.118M in 2015 (EX 1327 and Weekly power point slide 23). For one entire year of that time, June 23, 2014 until June 2015, he resided in various villas in Italy.

The relationship with key investors suffered while Frost was away in Italy (EXs 499 and 501).

Perhaps the greatest failure of fiduciary responsibility was the failure to adequately inform the investors about the financial progress or lack thereof by the Portfolio Companies. Some financial reports were never completed or provided. All that were done, were late. Hollencrest repeatedly chased after reports (EXs 349, 351, 352, 78 and 79). These lapses in reporting are violations of the reporting requirements of the Operating and Partnership Agreements (EX 2 and EX 840) which set out specific deadlines for reporting. Some Portfolio Companies were carried on the books long after they had been dissolved. For example, Adaptive Well was dissolved in August of 2016. On the year-end statements in December 2016 given to investors, it was still shown with a value of $1.3M (EX 87).

THE FAILED PROMISES

There never were any "EXITS." Notwithstanding all the representations, before during and after all the investments into the Seed Fund and Fund II, that exits were "imminent," there never have been any successful exits that resulted in proceeds being distributed to the investors.

8

Exhibit 3
Page 237

There were three "sales" that took place to insiders (Miles Mahoney and John Burke's "Irish Acquisitions" company) in 2017, the terms of which have never been explained to investors or shown in the QuickBooks. A belated breakdown of the proceeds of the sales presented after the close of evidence was not considered by the Arbitrator.

The biggest, monetarily, of all the failed "promises" was the whiteboard in Frost's office which was present at the March 17, 2016 meeting with Hollencrest (Exhibit 18). The photograph of the whiteboard showed ten large corporate investors and the $718M that they were going to invest and eight Portfolio Companies in active acquisition talks. In actuality, only $5M was invested and there were no acquisitions.

On June 24, 2016, John Vigouroux wrote to Frost (EX 829). He attached a list of critical problems. He noted that every Portfolio Company CEO was "panicked" about Frost dissolving. He also indicated that many of the investors were telling others that the Frost "ship is sinking". He also stated that some investors were wanting "to go legal." On June 28, 2016 he wrote again (EX 904) setting out discussions he and Michael Colaco had concerning Frost being removed as manager and re-branding the funds. This all transpired a month before-

### THE JULY 19, 2016 MEETING

In the time period leading up to a meeting held at Frost's office on July 19, 2016, Hollencrest heard reports from various Frost employees and investors concerning allegations about Frost. They met with Carey Breese, a former Frost employee and Portfolio Company CEO, who wanted to "clear the air" about what was happening at the Incubator. They met with John Vigouroux, President of FDC, who told them their concerns were well-founded and he identified other unhappy investors. In emails sent just prior to the meeting, it was clear that the Hollencrest parties had serious concerns (EXs 372 and 383). Frost employees were told not to talk to investors (EX 370). Hollencrest met and talked with several other disgruntled employees and investors.

Hollencrest prepared notes before and following the meeting (EX 21 and EX 448). The meeting started with Frost distributing a status sheet about each of the Portfolio Companies. Greg Pellizzon, a Hollencrest principle, explained why the meeting was requested. Frost was told that Hollencrest had been contacted by a "whistleblower" on June 27, 2016. A letter from investor Larry Sheakley was read aloud (EX 387). Frost then indicated that he needed legal counsel. Pellizzon read two resolutions from shareholders that outlined restructuring or replacement of FDC as manager of the funds.

The Arbitrator finds that Hollencrest did not circulate or publish to others that Frost was conducting a "Ponzi" scheme. Had such remarks been made among the investors, they would have been privileged. They did not make threats to report Frost to the SEC. They did not accuse him of committing any crime. It is clear from the evidence, that others, inside and outside the Frost entities, both before and after the July 19, 2016 meeting talked about "Ponzi schemes" in connection to Frost. The Portfolio Company CEOs themselves used the term "Ponzi scheme" in

9

CORRECTED INTERIM AWARD

Exhibit 3
Page 238

discussions about the Incubator (Testimony of Stephen Gotz). Frost himself in his letter to investors on October 2016 told investors that he had been accused of conducting a "Ponzi scheme" (EX 422). This republication itself was much broader in its scope than the previous comments. Frost had an ugly reputation with investors well before the July 19, 2016 meeting (EX 830).

The Arbitrator finds that Hollencrest and Wolford prevail on Frost's claims against them.

ALTER EGO

In a recent Delaware Court of Chancery opinion, *Doberstein v. G-P Industries, Inc.* C.A. No. 9995-VCP (Del. Ch. Oct. 30, 2015), the Court stated that to state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the entity through its alter ego, has created a sham entity designed to defraud investors and creditors. Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking (FDC was not); (2) whether the company was solvent (FDC was not); (3) whether corporate formalities were observed (FDC did not); whether the dominant shareholder siphoned company funds (Stuart Frost did); and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder (it did).

The Frost entities had minimal or no initial capitalization, except for the strange contribution of Michael Colaco who invested $6 million and had no right to participate in the management of the business. His contribution was used as an investment in Fund II. His $6 million was not used as "capital" for any Frost entity.

There were numerous and continuous "related party transactions" that were not reported to the investors, even after the auditors advised that they should be (EX 90 para. 15a, EX 766). Many of these transactions involved the payment of Stuart Frost's personal expenses.

The Frost entities all used the same CFO, bookkeeper, offices, and were all controlled by Stuart Frost (Guerry testimony). The Services Agreements entered into by the Portfolio Companies were signed by Frost and his CFO, Guerry, and were binding and non-cancellable for 180 days on the newly created companies. Guerry was also the CFO of the Portfolio Companies.

Loans were made to the Portfolio Companies by FDC to allow their continued operations. Those proceeds of those loans then went back to the Incubator in the form of excessive fees (EX 936).

In June 2016, (EX 1117), Frost advised senior FDC management to shift Incubator personnel to the Portfolio Companies to achieve cost savings for FDC. Incubator payrolls were missed and salaries were reduced (Guerry testimony). Simultaneously, he suggested starting more new companies (EX 1117).

Frost paid his own legal fees from the Funds' assets (EX 1393).

10

CORRECTED INTERIM AWARD

Exhibit 3
Page 239

The evidence demonstrates Stuart Frost's personal control over these entities and his use of that control to take actions and make decisions to his self-interest to the detriment of the investors.

The Arbitrator finds that Stuart Frost was the alter ego for the Frost entities.

## CONCLUSION / INTERIM AWARD

The Incubator (FDC) imposed excessive Incubator Fees on the Portfolio Companies in violation of the Operating and Partnership agreements. The Seed Fund's share of the excessive fees is $2,491,532 and Fund II's share is $9,355,042.

The Seed Fund was wrongfully charged $378,000 in fees for management and services of their fund.

Absent the return of the excessive Incubator Fees, the 2% management fee charged to Fund II is to be reduced by the amount of the excessive Incubator Fees.

Stuart Frost violated his fiduciary duty of care and loyalty to the members of the LLC and limited partners in the funds. He is to be removed as manager of the funds. He is found to be the alter ego of the Frost entities sued here.

An accounting is to be ordered, which will include the proceeds of the recent sale of Portfolio Companies Exara, Ubix Labs, and Source Thought.

Hollencrest and Wolford prevail on the claims of Frost.

Hollencrest and Wolford are the prevailing parties and are entitled to their reasonable attorney fees, witness expenses and costs of this Arbitration (EX 840 section 13.10 (d) and EX 2 section 15.5 (d)).

DATED:  April 18, 2018

Hon. Stephen J. Sundvold (Ret.)
Arbitrator

11
CORRECTED INTERIM AWARD

Exhibit 3
Page 240

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Frost Management Company, et al. vs. Hollencrest Bayview Partners, LP, et al.
Reference No. 1200052341

I, Gloria Hong, not a party to the within action, hereby declare that on  April 18, 2018, I served the attached CORRECTED INTERIM AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Orange, CALIFORNIA, addressed as follows:

Colin C. Holley Esq.
Hampton & Holley, LLP
2101 E. Coast Highway
Suite 100
Corona del Mar, CA   92625
Phone: 949-718-4550
cholley@hamptonholley.com
   Parties Represented:
   Frost Management Company, LLC
   Frost Venture Partners GP, LLC

Matthew A. Hodel Esq.
Fred L. Wilks Esq.
Ashley E. Merlo Esq.
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
mhodel@hodelwilks.com
fwilks@hodelwilks.com
amerlo@hodelwilks.com
   Parties Represented:
   Hollencrest Bayview Partners, LP
   Robert B. Wolford
   Wolford Family Trust dated July 11, 2006

Peter J. Gimino III Esq.
Gimino Law Office, APC
1 Park Plaza
Suite 600
Irvine, CA   92614
Phone: 949-225-4446
pgimino@giminolaw.com
   Parties Represented:
   Frost Management Company, LLC
   Frost Venture Partners GP, LLC

Mr. Samuel Z. Hyams
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
shyams@hodelwilks.com
   Parties Represented:
   Hollencrest Bayview Partners, LP
   Robert B. Wolford
   Wolford Family Trust dated July 11, 2006

Exhibit 3
Page 241

I declare under penalty of perjury the foregoing to be true and correct. Executed at Orange,

CALIFORNIA on  April 18, 2018.

Gloria Hong
ghong@jamsadr.com

Exhibit 3
Page 242

# EXHIBIT

# B

Exhibit 3
Page 243

HON. STEPHEN J. SUNDVOLD (RET.)
JAMS
500 N. State College Blvd.
14th Floor
Orange, CA  92868
Tel:  714-939-1300
Fax:  714-939-8710

Arbitrator

## IN THE MATTER OF

## JAMS No. 1200052341

**FROST MANAGEMENT COMPANY, ET AL.**
        **Claimant,**

    **vs.**

**HOLLENCREST BAYVIEW PARTNERS, LP, ET AL.**
        **Respondent.**

---

## PARTIAL FINAL AWARD

---

The Arbitrator has reviewed the papers and heard argument from the parties on three motions: The "Frost Parties" motion for reconsideration and Hollencrest/Wolford's request that the Frost Parties refund litigation expenses and Hollencrest/Wolford's motion to determine the amount of prevailing party attorney's fees and costs and motion seeking punitive damages.

The Arbitrator grants the Frost Parties' motion for reconsideration in that he has determined that certain, limited matters should be corrected in the Corrected Interim Award dated April 18, 2018. Those corrections are found in this Partial Final Award that follows at pages 2-12.

The Arbitrator orders that the Frost Parties refund to the Funds money the Frost Parties advanced from the Funds to pay litigation expenses in connection with this litigation. The Arbitrator makes a further award in favor of Hollencrest/Wolford by awarding them attorney's fees and litigation expenses. The Arbitrator also awards punitive damages as set forth below in the further award that follows.

Exhibit 3
Page 244

## INTRODUCTION

The above-entitled matter came on for hearing on January 22, 2018 before the Hon. Stephen J. Sundvold (Ret.). Claimants and Counter-Respondents FROST MANAGEMENT COMPANY, LLC and FROST VENTURE PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST DATA CAPITAL, LLC were represented by Hampton & Holley, LLP by Colin Holley and The Gimino Law Office, APC by Peter Gimino III. Respondents and Counter-Claimants HOLLENCREST BAYVIEW PARTNERS, L.P. and ROBERT B. WOLFORD, individually and as Trustee of the WOLFORD FAMILY TRUST dated July 11, 2006, were represented by Hodel Wilks L.L.P. By Matthew Hodel, Fred Wilks and Samuel Hyams.

Jurisdiction to arbitrate this matter was pursuant to the Operating Agreements of the Seed Fund (EX 840 para. 13.10) and Fund II (EX 2 para. 15.5).

The matter proceeded to hearing from January 15, 2018 daily through February 2, 2018 and again on February 15, 2018 and February 16, 2018. By Order of the Arbitrator, the order of proof at the hearing was determined that the Respondent Counter-Claimants would proceed first with presentation of evidence. Each side presented written arbitration briefs. The sworn testimony of 29 witnesses in person, by deposition and electronically by Face-Time was presented. Exhibits were presented and received. Both sides made oral closing arguments and rebuttals.

The factual findings that follow are necessary to the Award. They are derived from the admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weight of the evidence, both oral and written.

## ANALYSIS AND OPINION

### THE PARTIES

Counter-Claimant Frost VP Seed, LLC (hereinafter "Seed Fund") is a Delaware limited liability company formed for the purpose of investing in technology start-up companies.

The manager of the Seed Fund is Counter-Respondent Frost Management Company, LLC (EX 840).

Counter-Claimant Frost VP Early Stage Fund II, LP (hereinafter "Fund II") is a Delaware limited liability partnership also formed for the purpose of investing in the same early stage companies, known as Portfolio Companies.

2

PARTIAL FINAL AWARD

Exhibit 3
Page 245

The manager of Fund II is Counter-Respondent Frost Venture Partners GP, LLC (EX 2).

Counter-Claimant Hollencrest Bayview Partners. L.P. (hereinafter "Hollencrest") is an investor in, and thus a member of, the Seed Fund.

Counter-Claimant Robert Wolford is a managing director of Hollencrest Securities, LLC, the investment manager of Hollencrest and a registered investment advisor of other non-party investors in the Seed Fund and Fund II.

Stuart Frost (hereinafter "Frost") owns and controls Frost Data Capital, LLC, formerly known as Frost Venture Partners, LLC, (hereinafter "FDC" or the "Incubator"). Frost, who had no prior experience as a fund manager, created and controlled the fund managers who distributed the funds' investments into the Portfolio Companies. Frost's experience was as a founder and CEO of data software companies (EX 28).

### THE DERIVATIVE CLAIMS

Hollencrest and Wolford bring these claims pursuant to 6 Del. C. Section 17-1001 and 6 Del. C. Section 18-1001 which allow a limited partner or member of a limited liability company to bring an action on behalf of a limited partnership or limited liability company. The Arbitrator finds that the nature of the alleged injuries sustained by the partnership and LLC, as a whole here, are in fact of the nature required to allow this matter to proceed in a derivative manner. See *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d. 1013 (Del. 2004). The primary harm here was to the Funds. All the investors in these Funds suffered harm as a function of their pro rata investment in these Funds. The procedural pre-lawsuit requirements were satisfied or were futile.

### THE FROST INCUBATOR MODEL

The Incubator model Frost envisioned would take ideas and needs from "big-data" major companies (problems), pass them through the Incubator, which would determine if the problem could be solved. The Incubator would then write up a minimally viable segment or product (as little as 2-3 paragraphs) and then pass the idea into a newly created start-up company which would incubate those ideas into software that would be acquired, sold or "go public" ("Exits") as new publicly-held companies within 2 to 5 years (EX 28, see also Giles depo. P. 68:8 - 69:14).

The Incubator management team would be "world class". The incubated companies would share services with each other creating a lean and highly capital efficient model.

In application, the evidence showed that no capital was invested into the Incubator itself and the Incubator was financially dependent on fees charged to the Portfolio Companies to sustain itself. As the number of incubator employees and their salaries went up, the need to increase

**3**

PARTIAL FINAL AWARD

Exhibit 3
Page 246

the amounts coming into the Incubator increased. The Incubator's payroll expense alone went from $672,514 in 2012 to $5,215,955 in 2015 (Weekly Power Point slide 18).

### THE SEED FUND

The Seed Fund "pitch deck" (EX 28) lays out the pitch that was given to investors to raise a target of fifteen million dollars. The Seed Fund would then invest $750,000 to $1,500,000 into each of 10-15 start-up companies. The Seed Fund would have no management fee or carry cost. All investments would be approved by the "Investment Committee" (EX 28). The Operating Agreement for the Seed Fund (EX 840 para. 6.1(a)) authorized the manager to be reimbursed for "out of pocket" expenses. It mentions in Paragraph 8.1 (b) the formation of the Incubator, but does not authorize payments to it from the Portfolio Companies. The "bubble" flow chart at slide 11 of Exhibit 28, the Pitch Deck, shows many "$ arrows" going into the Portfolio Companies, but does not show any "$ arrows" going from the Portfolio Companies to the Incubator.

### FUND II

The Fund II Operating Agreement (EX 2) is significantly different from the Seed Fund. It authorizes the manager to be paid a management fee of 2% (EX 2 para. 6.1 (b)). All "normal operating expenses" incurred in connection with the management of Fund II were to be paid from the management fee (EX 2 para. 6.2 (a)).

The Operating Agreement (EX 2 para. 6.1 (d)) addresses that payments for "shared advisory and support services" may be charged by the Incubator to the Portfolio Companies. No method of calculation of those fees is identified. Those fees collected would not reduce the 2% management fee, "so long as such Service Fee does not exceed reasonable market rates." Any excess charges would reduce the management fee.

### THE INVESTMENTS

Hollencrest was provided with the Frost Executive Summary (EX 223) dated October 18, 2011. Importantly, at page 5 of that document, they were told that the services provided by the Incubator to the Portfolio Companies would be decided by their respective individual boards, on a case-by-case basis, and would be adjusted from time to time as needed. The Portfolio Companies would only be charged for services that would be required in the normal course of business and they would receive higher quality services at a lower price than they would otherwise be able to afford. Frost would provide "economies of scale."

In late December and early January, Frost, in emails to Hollencrest, indicated that the first "exits" by Portfolio Companies were on the immediate horizon and they didn't want to miss out and that they should bring others into the opportunity (EXs 250 and 251). They and their clients invested $6.1 M. There were no immediate "exits." When Hollencrest later complained that no exits had occurred, Frost accused them of looking for a "fast buck" (EX. 339).

**4**

PARTIAL FINAL AWARD

Exhibit 3
Page 247

Wolford testified that the Hollencrest investments were anticipated to be 33 1/3% of the Seed Fund based on discussions with Frost. In actuality, they were approximately 80%. They were told that a Frost entity would invest $6.1M into Fund II. However, Frost did not disclose that $6M of that $6.1M came from an individual named Michael Colaco who had no right to participate in management of, and a "0" membership interest in, the Frost entity (EX 4 at § 5.1, and EX A attached thereto). In reality, Frost only invested $50K.

The investments were made after months of due diligence, vetting and background checks (EX 1385 and 1386), Hollencrest and its related party sophisticated investors invested $6.1M of the total of $7.5M invested in the Seed Fund.

Wolford was the only Hollencrest related party to invest in Fund II. He invested $100K (EX 310). The other Hollencrest investors were displeased that there had been no liquidity events (Exits) in the first two years and there had been a lack of transparency in the management of the Fund. Some of the Hollencrest investors did make direct investments into some of the Portfolio Companies. Those investments did not pass through the Funds. Fund II raised a total of $41.1M.

A later fund, Fund III, which is not a party, derivatively or otherwise to this arbitration, is believed to have invested approximately $13M into the incubator. There also were numerous direct investments into the Portfolio Companies by party and non-party investors in unknown amounts.

### THE INCUBATOR FEES

Incubator fees were imposed upon the Portfolio Companies from the moment of their creation. In most instances, the Service Agreements were signed on their behalf by Frost and Frost CFO William Guerry before the company was officially formed (EX 152, Testimony of Wm. Guerry). Cancellation of the Service Agreement required 180 days' notice. (EX 597 para. 4). Once a CEO was chosen for the new company, he or she was saddled with up to a $40,000 monthly non-negotiable, non-cancellable fee for six months. Fees were imposed even if no CEO had been hired (EX 1011). The imposed Incubator fee was a flat fee regardless of the level of development of the company, the existence of any employees or the number of them (EX 1097). With rare exceptions, they were not negotiable. Frost never did an analysis of the actual costs for the services included in the fees. Some CEOs did the analysis as to value of the services and concluded that they ranged from $8,000 to $12,000 per month (Testimony of John Burke, Paul Myer, Doug Lawson, Cary Breese, Mark Lelinski). The actual fees imposed ranged from approximately $30,000 to $40,000 per month.

With the exception of only two witnesses, Babur Ozden, the CEO of Maana and Miles Mahoney, a Frost insider, who testified that the $40,000 monthly Incubator fee caused him "no heartburn," the record shows that numerous other CEOs for the Portfolio Companies complained about the excessive incubator fees (EX 795, EX 1097) Many tried, with little or no success to negotiate them down. Ozden, who is still the CEO of Maana and closely connected to

Frost, testified, incredibly, that the Incubator service fee was a "mere fraction" of its actual worth.

The Incubator fees were to cover things like rent, human resources, mentoring, marketing, and payroll. They were not adjusted as the number of employees went up or down. Companies that had moved physically out of the Incubator offices, were charged the same as companies who resided in the offices. Frost CFO Guerry stated in his testimony that the rent allocations were done without any formula and were arbitrary. Hollencrest's incubator expert, Alexander Maleki, testified that these mandatory fixed fees were not consistent with industry standards. These fees created a burn-rate for the invested funds that shortened the "runway" for these new companies to get off the ground. For example, a company that was given an investment of $500,000 and was required to pay $40,000 per month in addition to salaries to its CEO and chief technology officer (CTO) would be burned out in well less than 8-10 months. The high fees also discouraged investors and were often hidden from them (EX 1111, EX 936). They were not reported to investors even after the company auditors told them that related party transactions which were not arms-length, needed to be reported to investors (EX 766).

Hollencrest's damages expert, David Weekly, calculated the reasonable Incubator charges to be $6,898,381. The actual incubator charges paid by the Portfolio Companies was $21,690,382. After allocating those expenses to the Seed Fund (17%) and Fund II (63%) he calculated the excess fees to be $11,846,575 (EX 1327, power point slide 29-30).

The Incubator itself was undercapitalized and always insolvent (Weekly testimony). The only source of income was incubator fees. The record is clear that, although the original pitch materials contemplated only 2-4 companies being created per year (EX 28), well over 20 were created, twelve in the period April 2014 to February, 2015 alone (EX 152 and 178). The email record also establishes that "new ideas" did not create "new companies," it was the need to meet the cash flow needs of the Incubator. Numerous emails show CFO Guerry advising Frost that new companies and the resultant immediate incubator fees were needed to make ends meet (EXs 773, 152, 774, 780, 798, 157, and 1090). These fees were unreasonable in their amount and application. They also were in violation of Frost's fiduciary obligations to the Funds whose investments were the only source of funds from which the Portfolio Companies could pay the incubator charges.

### SNOW DATA CAPITAL

Snow Data Capital was created by Stuart Frost ostensibly to provide marketing services to the Portfolio Companies. In reality, it was created to provide employment for his friend Anthony Howcroft who needed a job to qualify for a green card for immigration purposes. Frost and Howcroft were friends in England. Rather than pay Howcroft from the already excessive Incubator Fees which included marketing, Frost imposed an additional $5,100 per month on the Portfolio Companies. Again, no Portfolio Company was asked if they wanted or needed additional marketing services. They had no voice in the decision. The additional fees were imposed whether needed or not.

## MANAGEMENT FEES

The Seed Fund was not to be charged a management fee (EX 28). Frost charged the Seed Fund $16,000 per month for his salary (which was called "management services," EX 748) from June 2012 through September 2013 ($256,000 in total). This charge stopped only when Frost began receiving the 2% management fee from Fund II in October of 2013 (EX 1372). The Seed Fund was also charged a management fee of $122,330 in 2012. The Seed Fund was represented to be a "no management fee" fund. These charges are improper.

Hollencrest additionally claims that $114,000 in shared services fees "may have been charged contrary to industry standards" (Palzer PowerPoint p.15). They have not met their burden of proof on this issue.

The Fund II Limited Partnership Agreement (EX 2) at Paragraph 6.1 allows Frost to collect a management fee of 2%. The Limited Partners also agreed that the Incubator, an affiliate of the General Partner, may receive a "Service Fee" for services rendered to the Portfolio Companies and that such fee would not reduce the General Partner's management fee (2%) "so long as such Service Fee does not exceed reasonable market rates." (EX 2 para. 6.1 (d)). The General Partner, Frost General Partners GP, LLC received management fees of $1,731,099 from 2013 through 2015 (EX 754). The net to the individual General Partners, after expenses of $615,387, was $1,116,171. The total excess Incubator Fees charged by the Incubator to the Portfolio Companies was $14,792,001 (EX 1327, Weekly power point slide 32). The amount of excess Incubator Fees David Weekly allocated to Fund II alone are $9,355,042 (EX 1327, Weekly power point slide 32). Those excess charges would accordingly reduce the GP's right to claim the 2% management fee down to zero. The net reduction would completely cancel the management fee by well over $7M. Accordingly, the GP was not entitled to any of the 2% management fee.

## FROST's PERSONAL EXPENSES

Stuart Frost held a 62.5% interest in the GP. He was entitled to receive 62.5% of the net 2% fees after expenses. These proceeds would arguably have been income to him. Rather than receiving this income, he instructed CFO Guerry to pay hundreds of thousands of dollars of personal expenses ($788,712, EX 754) from "his" 62.5% share of the management fee profits. These expenses included villas in Italy, private schools in Italy for his children, chartered air travel, and vacation expenses. When his expenses in 2014 exceeded his 62.5% share of the fees for that year, he instructed Guerry to pay them from the share of the other GP members. His K-1 for 2014 was only $3,303. His total for K-1s from 2013 through 2015 was $24,385 (EX 754).

The payment of these personal expenses by the Incubator was improper. There was no business purpose for them. With the reduction of the management fee, due to the excessive Incubator fees, there was no management fee from which these expenses could be paid. Fund II is entitled to be reimbursed for these personal expenses that were paid out of Incubator funds. Should the excess Incubator Fees actually be repaid to Fund II, arguably, Frost would

7

PARTIAL FINAL AWARD

Exhibit 3
Page 250

have a claim for his 62.5% of the restored 2% management fee. Hollencrest and Wolford can't have it both ways. The Arbitrator is ordering the repayment of the excessive fees as damages.

Frost received compensation and personal benefits totaling more than $5M between 2012 and early 2017 (EX 1327, Weekly testimony, power point slide 21-24).

### BREACHES OF FIDUCIARY OBLIGATIONS

Under the Delaware Limited Liability Corporation Act and the Delaware Revised Limited Partnership Act, the parties can contractually eliminate altogether any fiduciary duties that might be owed by the general partner and managing members to the limited partners, members or the Funds themselves (see *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 BL 100510 (Del. Ch. April 20, 2009).

The Operating Agreements here (EX 840 and EX 2) do not eliminate fiduciary duties altogether. Section 8.6 of the Seed Fund Operating Agreement does limit the Manager's liability for "other activities" which may conflict with the company. The Arbitrator finds no such language in the Fund II Partnership Agreement (EX 2).

Frost owes duties of care and loyalty to the investors in the Seed Fund and Fund II. Those obligations were not contracted away in the Operating Agreements for those entities (EX 2 and EX 840).

It is clear that Frost has failed to live up to those duties and obligations. He imposed excessive Incubator Fees for his own benefit. Those fees and the 2% management fee from Fund II were the only sources of funds to pay him the $5M in salary and benefits he received.

On April 8, 2014, Frost asked the CFO, "just for kicks" to calculate the cash flow that would be generated from twelve new companies being started between April and July (EX 773).

In June of 2014, just after starting five new companies (EX 152), he moved his family to Italy for a year. As valuable as he (and Babur Ozden) claim that his mentoring was to the Portfolio Companies, being physically, and nine time zones, away for one year made it extremely difficult, if not impossible to fulfill this obligation. On June 6, 2014, only two weeks before his departure to Italy, when investor Tom Turney asked about a "rumor" that Frost was moving to Italy, Frost denied the move and indicated that his family was "spending time in Florence this summer" (EX 1135). Frost had already paid the enrollment fees for his children to be schooled in Italy for the following year (EX 653). It is critical to note that Frost did not just indicate that he would be working remotely for the next year! He knew that his physical absence from Incubator would have an effect on the Portfolio Companies. His ability to immediately respond electronically was not a reality (EX 525).

Frost was paid gross wages by FDC of $1.2M in 2014 and $1.118M in 2015 (EX 1327 and Weekly power point slide 23). For one entire year of that time, June 23, 2014 until June 2015, he resided in various villas in Italy.

The relationship with key investors suffered while Frost was away in Italy (EXs 499 and 501).

Perhaps the greatest failure of fiduciary responsibility was the failure to adequately inform the investors about the financial progress or lack thereof by the Portfolio Companies. Some financial reports were never completed or provided. All that were done, were late. Hollencrest repeatedly chased after reports (EXs 349, 351, 352, 78 and 79). These lapses in reporting are violations of the reporting requirements of the Operating and Partnership Agreements (EX 2 and EX 840) which set out specific deadlines for reporting. Some Portfolio Companies were carried on the books long after they had been dissolved. For example, Adaptive Well was dissolved in August of 2016. On the year-end statements in December 2016 given to investors, it was still shown with a value of $1.3M (EX 87).

### THE FAILED PROMISES

There never were any "EXITS." Notwithstanding all the representations, before during and after all the investments into the Seed Fund and Fund II, that exits were "imminent," there never have been any successful exits that resulted in proceeds being distributed to the investors. There were three "sales" that took place to insiders (Miles Mahoney and John Burke's "Irish Acquisitions" company) in 2017, the terms of which have never been explained to investors or shown in the QuickBooks. A belated breakdown of the proceeds of the sales presented after the close of evidence was not considered by the Arbitrator.

The biggest, monetarily, of all the failed "promises" was the whiteboard in Frost's office which was present at the March 17, 2016 meeting with Hollencrest (Exhibit 18). The photograph of the whiteboard showed ten large corporate investors and the $718M that they were going to invest and eight Portfolio Companies in active acquisition talks. In actuality, only $5M was invested and there were no acquisitions.

On June 24, 2016, John Vigouroux wrote to Frost (EX 829). He attached a list of critical problems. He noted that every Portfolio Company CEO was "panicked" about Frost dissolving. He also indicated that many of the investors were telling others that the Frost "ship is sinking". He also stated that some investors were wanting "to go legal." On June 28, 2016 he wrote again (EX 904) setting out discussions he and Michael Colaco had concerning Frost being removed as manager and re-branding the funds. This all transpired a month before-

### THE JULY 19, 2016 MEETING

In the time period leading up to a meeting held at Frost's office on July 19, 2016, Hollencrest heard reports from various Frost employees and investors concerning allegations about Frost. They met with Carey Breese, a former Frost employee and Portfolio Company CEO, who wanted

to "clear the air" about what was happening at the Incubator. They met with John Vigouroux, President of FDC, who told them their concerns were well-founded and he identified other unhappy investors. In emails sent just prior to the meeting, it was clear that the Hollencrest parties had serious concerns (EXs 372 and 383). Frost employees were told not to talk to investors (EX 370). Hollencrest met and talked with several other disgruntled employees and investors.

Hollencrest prepared notes before and following the meeting (EX 21 and EX 448). The meeting started with Frost distributing a status sheet about each of the Portfolio Companies. Greg Pellizzon, a Hollencrest principle, explained why the meeting was requested. Frost was told that Hollencrest had been contacted by a "whistleblower" on June 27, 2016. A letter from investor Larry Sheakley was read aloud (EX 387). Frost then indicated that he needed legal counsel. Pellizzon read two resolutions from shareholders that outlined restructuring or replacement of FDC as manager of the funds.

The Arbitrator finds that Hollencrest did not circulate or publish to others that Frost was conducting a "Ponzi" scheme. Had such remarks been made among the investors, they would have been privileged. They did not make threats to report Frost to the SEC. They did not accuse him of committing any crime. It is clear from the evidence, that others, inside and outside the Frost entities, both before and after the July 19, 2016 meeting talked about "Ponzi schemes" in connection to Frost. The Portfolio Company CEOs themselves used the term "Ponzi scheme" in discussions about the Incubator (Testimony of Stephen Gotz). Frost himself in his letter to investors on October 2016 told investors that he had been accused of conducting a "Ponzi scheme" (EX 422). This republication itself was much broader in its scope than the previous comments. Frost had an ugly reputation with investors well before the July 19, 2016 meeting (EX 830).

The Arbitrator finds that Hollencrest and Wolford prevail on Frost's claims against them.

ALTER EGO

In a recent Delaware Court of Chancery opinion, **Doberstein v. G-P Industries, Inc.** C.A. No. 9995-VCP (Del. Ch. Oct. 30, 2015), the Court stated that to state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the entity through its alter ego, has created a sham entity designed to defraud investors and creditors. Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking (FDC was not); (2) whether the company was solvent (FDC was not); (3) whether corporate formalities were observed (FDC did not); whether the dominant shareholder siphoned company funds (Stuart Frost did); and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder (it did).

The Frost entities had minimal or no initial capitalization, except for the strange contribution of Michael Colaco who invested $6 million and had no right to participate in the management of

the business. His contribution was used as an investment in Fund II. His $6 million was not used as "capital" for any Frost entity.

There were numerous and continuous "related party transactions" that were not reported to the investors, even after the auditors advised that they should be (EX 90 para. 15a, EX 766). Many of these transactions involved the payment of Stuart Frost's personal expenses.

The Frost entities all used the same CFO, bookkeeper, offices, and were all controlled by Stuart Frost (Guerry testimony). The Services Agreements entered into by the Portfolio Companies were signed by Frost and his CFO, Guerry, and were binding and non-cancellable for 180 days on the newly created companies. Guerry was also the CFO of the Portfolio Companies.

Loans were made to the Portfolio Companies by FDC to allow their continued operations. Those proceeds of those loans then went back to the Incubator in the form of excessive fees (EX 936).

In June 2016, (EX 1117), Frost advised senior FDC management to shift Incubator personnel to the Portfolio Companies to achieve cost savings for FDC. Incubator payrolls were missed and salaries were reduced (Guerry testimony). Simultaneously, he suggested starting more new companies (EX 1117).

Frost paid his own legal fees from the Funds' assets (EX 1393).

The evidence demonstrates Stuart Frost's personal control over these entities and his use of that control to take actions and make decisions to his self-interest to the detriment of the investors.

The Arbitrator finds that Stuart Frost was the alter ego for the Frost entities.

## CONCLUSION

The Incubator (FDC) imposed excessive Incubator Fees on the Portfolio Companies in violation of the Operating and Partnership agreements. The Seed Fund's share of the excessive fees is $2,491,532 and Fund II's share is $9,355,042.

The Seed Fund was wrongfully charged $378,000 in fees for management and services of their fund.

Absent the return of the excessive Incubator Fees, the 2% management fee charged to Fund II is to be reduced by the amount of the excessive Incubator Fees.

Stuart Frost violated his fiduciary duty of care and loyalty to the members of the LLC and limited partners in the funds. He is to be removed as manager of the funds. He is found to be the alter ego of the Frost entities sued here.

11

PARTIAL FINAL AWARD

Exhibit 3
Page 254

An accounting is to be ordered, which will include the proceeds of the recent sale of Portfolio Companies Exara, Ubix Labs, and Source Thought.

Hollencrest and Wolford prevail on the claims of Frost.

Hollencrest and Wolford are the prevailing parties and are entitled to their reasonable attorney fees, witness expenses and costs of this Arbitration (EX 840 section 13.10 (d) and EX 2 section 15.5 (d)).

### FURTHER PARTIAL FINAL AWARD RE (1) REFUND OF FROST PARTIES' LITIGATION EXPENSES PAID FROM THE FUNDS, (2) PREVAILING PARTY ATTORNEY'S FEES AND LITIGATION EXPENSES AND (3) PUNITIVE DAMAGES

Following the issuance of the initial interim award, which has been corrected as set forth above, the parties briefed additional issues which were reserved until after the initial interim award. The Arbitrator now finds as set forth below.

Frost, the manager of the Seed Fund, and the GP of Fund II, were not entitled to use the Funds' money to pay legal fees incurred in this proceeding where Frost's conduct was "not undertaken in the good faith belief that such act or omission was in the best interests" of the Funds, or his conduct "constitutes recklessness, gross negligence or willful misconduct." (EX 2 at § 15.4(a), EX 840 at § 13.4(a). The arbitrator therefore finds that Counter-Respondents shall refund the following amounts: $130,340.10 to the Seed Fund, and $129,247.63 to Fund II (EX 1393).

The conduct of Stuart Frost was at least reckless. In his fiduciary capacity, he acted with conscious indifference and/or reckless indifference to the consequences of his actions and the rights of investors. At a minimum, Stuart Frost was willfully blind to or consciously disregarded the substantial and unjustifiable risk that his conduct would turn out to violate his fiduciary duties. Therefore, punitive damages against Counter-Respondents are appropriate in the amount of $771,000, to be split equally between the Funds, which approximates the expenses Weekly found Frost incurred in connection with his move to Italy.

Stuart Frost is ordered to provide to Counter-Respondents an up-to-date list of investors in the Seed Fund and Fund II, including the investors' contact information.

Hollencrest and Wolford are awarded their attorney fees, costs and expenses through April 30, 2018 in the amount of $3,257,091.09. The Arbitrator reserves jurisdiction to award additional attorney fees and costs incurred by Hollencrest Wolford after April 30, 2018.

Based on the finding of alter ego relationship, all of Counter-Respondents (Frost Management Company LLC, Frost Venture Partners GP LLC, Frost Data Capital LLC and Stuart Frost) shall be jointly and severally responsible for the damages, attorney fees, costs and expenses awarded.

In sum, the Arbitrator awards:

1. To the Seed Fund: $3,385,372.10 (comprised or $2,491,532 in incubator fees, plus $378,000 for a management fee, plus $130,340.10 in Frost's legal fees charged to the Seed Fund, plus $385,500 one half of punitive damages).

2. To Fund II: $9,869,789.63 (comprised of $9,355,042 in excessive incubator fees, plus $129,247.63 in Frost's legal fees charged to Fund II, plus $385,500 one half of punitive damages).

3. To Hollencrest and Wolford: $3,257,091.09 for attorney fees and costs incurred through April 30, 2018.

The Arbitrator reserves jurisdiction to conduct further hearings regarding matters relating to this dispute, including without limitation the removal and replacement of management of the Funds, a final award of attorney fees, Stuart Frost and the Frost entities' voting rights or ability to share in the damages, and the treatment of documents designated "confidential" in this arbitration

DATED: May 1, 2018

Hon. Stephen J. Sundvold (Ret.)
Arbitrator

**13**

PARTIAL FINAL AWARD

Exhibit 3
Page 256

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Frost Management Company, et al. vs. Hollencrest Bayview Partners, LP, et al.
Reference No. 1200052341

I, Carol Edwards, not a party to the within action, hereby declare that on June 7, 2018, I served the attached PARTIAL FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Orange, CALIFORNIA, addressed as follows:

Colin C. Holley Esq.
Hampton & Holley, LLP
2101 E. Coast Highway
Suite 100
Corona del Mar, CA   92625
Phone: 949-718-4550
cholley@hamptonholley.com
    Parties Represented:
    Frost Management Company LLC
    Frost Venture Partners GP LLC

Matthew A. Hodel Esq.
Fred L. Wilks Esq.
Ashley E. Merlo Esq.
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
mhodel@hodelwilks.com
fwilks@hodelwilks.com
amerlo@hodelwilks.com
    Parties Represented:
    Hollencrest Bayview Partners, LP
    Robert B. Wolford
    Wolford Family Trust dated July 11, 2006

Peter J. Gimino III Esq.
Gimino Law Office, APC
1 Park Plaza
Suite 600
Irvine, CA   92614
Phone: 949-225-4446
pgimino@giminolaw.com
    Parties Represented:
    Frost Management Company LLC
    Frost Venture Partners GP LLC

Mr. Samuel Z. Hyams
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
shyams@hodelwilks.com
    Parties Represented:
    Hollencrest Bayview Partners, LP
    Robert B. Wolford

Exhibit 3
Page 257

Wolford Family Trust dated July 11, 2006

I declare under penalty of perjury the foregoing to be true and correct. Executed at Orange,

CALIFORNIA on  June 7, 2018.

Carol Edwards
CEdwards@jamsadr.com

Exhibit 3
Page 258

# EXHIBIT

# C

Exhibit 3
Page 259

HON. STEPHEN J. SUNDVOLD (RET.)
JAMS
500 N. State College Blvd.
14th Floor
Orange, CA 92868
Tel: 714-939-1300
Fax: 714-939-8710

Arbitrator

## IN THE MATTER OF

## JAMS No. 1200052341

FROST MANAGEMENT COMPANY, ET AL.
        Claimant,

    vs.

HOLLENCREST BAYVIEW PARTNERS, LP, ET AL.
        Respondent.

---

## ORDER APPOINTING REPLACEMENT MANAGER, ESTABLISHING OVERSIGHT COMMITTEES AND RECONFIRMING THE ELIMINATION OF VOTING RIGHTS OF FROST VENTURE PARTNERS GP LLC

A telephonic hearing was held on June 12, 2018 before the Hon. Stephen J. Sundvold (Ret.). Claimants and Counter-Respondents FROST MANAGEMENT COMPANY, LLC and FROST VENTURE PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST DATA CAPITAL, LLC were represented by Hampton & Holley, LLP by Colin Holley. Respondents and Counter-Claimants HOLLENCREST BAYVIEW PARTNERS, L.P. and ROBERT B. WOLFORD, individually and as Trustee of the WOLFORD FAMILY TRUST dated July 11, 2006, were represented by Hodel Wilks L.L.P. By Matthew Hodel and Fred Wilks.

There was no dispute between the parties that the Arbitrator has authority under the parties' agreements and Delaware law to remove Stuart Frost (and the managing Frost entities) from the management of Frost VP Seed, LLC ("Seed Fund") and Frost VP Early Stage Fund II, LP ("Fund II"), and appoint an independent replacement manager.

At a hearing held on June 12, 2018, the Arbitrator ordered the temporary appointment of an

Exhibit 3
Page 260

interim manager, Brian Weiss of Force Ten Partners LLC ("Force 10"), to oversee management of the Seed Fund and Fund II, as reflected in the Arbitrator's Temporary Order Appointing Interim Manager Pending Confirmation at Further Hearing, dated June 14, 2018 (the "Interim Order"). The Arbitrator delayed ruling on certain issues relating to the appointment of the interim manager pending a further meet and confer between the parties regarding the terms of the appointment.

A further hearing was held on July 20, 2018 with the Frost parties represented by George Hampton of Hampton Holley LLP, Hollencrest and Wolford represented by Matthew Hodel of Hodel Wilks LLP and Larry Sheakley, Lou Lauch and Charles Reynolds, Jr. represented by Andrew Stolper of Frank Sims & Stolper LLP.

As a result of the further hearing on July 20, 2018, the Arbitrator finds and rules as follows:

1.   The advisory committee referred to in Paragraph 6 of the Interim Order shall be referred to as the "oversight committee." The Seed Fund and Fund II each shall have an oversight committee. The Seed Fund committee shall have three members and the Fund II committee shall have up to five members. Oversight committee members must be investors in the fund on which the oversight board they are serving. The fund manager shall consult with the oversight committee concerning the management of the fund.

2.   Oversight committee members shall serve for a term of two years. At the end of two years, or in the event an oversight committee member leaves or resigns the committee prior to the term's completion, a replacement committee member may be nominated by any investor in the relevant fund or by the manager for two-year term, subject to the voting procedures described herein.

3.   At the July 20, 2018 hearing, Mr. Weiss proposed to nominate, for the initial two-year term, Marcel Cavaricci, Chris Spence and Cameron Akers of Hollencrest Bayview Partners, L.P, to be members of the Seed Fund oversight committee.  For Fund II, Rob Wolford, Lou Lauch, Charles W. Reynolds, Jr., and John Kensey were nominated to be members of the Fund II oversight committee. If any investor in either fund desires to nominate alternative oversight committee members, such investor shall make nominations by sending written notice to Mr. Weiss within thirty (30) days after the notice described paragraph 8 below. If any such nominations are timely received, following such notice, Mr. Weiss shall promptly hold an election and the top three vote-receiving candidates for the Seed Fund and top five vote receiving-candidates for Fund II, as measured by the plurality of votes received, with such votes weighted based on the respective voter's ownership interest in each fund, shall be elected (the "Plurality").

ORDER APPOINTING REPLACEMENT MANAGER Etc.

Exhibit 3
Page 261

4.  The manager, in its discretion, may hold joint meetings of the oversight committees.

5.   For Fund II, the oversight committee is empowered to grant its manager additional compensation, so long as that compensation does not exceed the compensation the fund documents authorized could be paid to the manager.

6.  The oversight committees in consultation with the manager are authorized to forgo audited financial statements if they determine that doing so is in the best interests of the funds.

7.  The oversight committee members and the manager shall be entitled to indemnity from the respective funds for whom they serve for acts, within the scope of their service on such committees, to the maximum extent permissible under Delaware law, (with oversight committee members being analogous to directors under such law).

8.  Within fifteen (15) days after the date of this order, Mr. Weiss shall provide written notice by email and overnight mail to all investors notifying them of this order. Such notice shall include a copy of this order. The notice shall also inform investors that Force 10, acting through Brian Weiss, shall, without further action, become the permanent replacement manager of the Funds unless any investor, within thirty (30) days after the notice is sent, nominates in writing one or more alternative candidates to serve in that role ("Alternative Candidate(s)"). Any such nomination of Alternative Candidate shall include the proposed compensation terms for any nominated replacement manager. Upon receipt of any such nomination, Mr. Weiss shall notify all investors in the Fund(s) of such nomination and proposed compensation terms and shall hold a vote among Mr. Weiss and the Alternative Candidate(s) to determine the permanent manager of the Funds.

9.  The Interim Order, at its paragraph 8, eliminated the voting rights of Stuart Frost and his affiliates and agents but left open the question as to whether voting rights belonging to Frost Venture Partners GP LLC, notwithstanding that they have been eliminated by the June 14, 2018 order, might be able to be exercised by Mike Colaco: "Mike Colaco's voting rights, if any, shall be determined later by agreement or at further hearing identified below." Having heard argument on this issue at the July 20 hearing, the arbitrator ruled that the voting rights of Frost Venture Partners GP LLC may not be exercised by Mike Colaco.

3

ORDER APPOINTING REPLACEMENT MANAGER Etc.

Exhibit 3
Page 262

10. Other than as stated in this order and the Interim Order the duties and obligations of the replacement manager shall conform to terms and conditions of the existing fund agreements.

IT IS SO FOUND AND ORDERED.

DATED: July 30, 2018

Hon. Stephen J. Sundvold (Ret.)
Arbitrator

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Frost Management Company, et al. vs. Hollencrest Bayview Partners, LP, et al.
Reference No. 1200052341

I, Carol Edwards, not a party to the within action, hereby declare that on July 30, 2018, I served the attached ORDER APPOINTING REPLACEMENT MANAGER on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Orange, CALIFORNIA, addressed as follows:

Colin C. Holley Esq.
Hampton & Holley, LLP
2101 E. Coast Highway
Suite 100
Corona del Mar, CA   92625
Phone: 949-718-4550
cholley@hamptonholley.com
   Parties Represented:
   Frost Management Company LLC
   Frost Venture Partners GP LLC

Matthew A. Hodel Esq.
Fred L. Wilks Esq.
Ashley E. Merlo Esq.
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
mhodel@hodelwilks.com
fwilks@hodelwilks.com
amerlo@hodelwilks.com
   Parties Represented:
   Hollencrest Bayview Partners, LP
   Robert B. Wolford
   Wolford Family Trust dated July 11, 2006

Peter J. Gimino III Esq.
Gimino Law Office, APC
1 Park Plaza
Suite 600
Irvine, CA   92614
Phone: 949-225-4446
pgimino@giminolaw.com
   Parties Represented:
   Frost Management Company LLC
   Frost Venture Partners GP LLC

Mr. Samuel Z. Hyams
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
shyams@hodelwilks.com
   Parties Represented:
   Hollencrest Bayview Partners, LP
   Robert B. Wolford
   Wolford Family Trust dated July 11, 2006

Andrew D. Stolper Esq.
Frank Sims & Stolper LLP
19800 MacArthur Blvd.
Suite 855

Exhibit 3
Page 264

Irvine, CA  92612
Phone: 949-201-2400
astolper@lawfss.com
    Parties Represented:
    Charles Reynolds, Jr.
    Larry Sheakley
    Lou Lauch


        I declare under penalty of perjury the foregoing to be true and correct. Executed at Orange,

CALIFORNIA on  July 30, 2018.


Carol Edwards
CEdwards@jamsadr.com

Exhibit 3
Page 265

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Frost Management Company, et al. vs. Hollencrest Bayview Partners, LP, et al.
Reference No. 1200052341

I, Carol Edwards, not a party to the within action, hereby declare that on  September 4, 2018, I served the attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Orange, CALIFORNIA, addressed as follows:

Colin C. Holley Esq.
Hampton & Holley, LLP
2101 E. Coast Highway
Suite 100
Corona del Mar, CA   92625
Phone: 949-718-4550
cholley@hamptonholley.com
 Parties Represented:
 Frost Management Company LLC
 Frost Venture Partners GP LLC

Matthew A. Hodel Esq.
Fred L. Wilks Esq.
Ashley E. Merlo Esq.
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
mhodel@hodelwilks.com
fwilks@hodelwilks.com
amerlo@hodelwilks.com
 Parties Represented:
 Hollencrest Bayview Partners, LP
 Robert B. Wolford
 Wolford Family Trust dated July 11, 2006

Peter J. Gimino III Esq.
Gimino Law Office, APC
1 Park Plaza
Suite 600
Irvine, CA   92614
Phone: 949-225-4446
pgimino@giminolaw.com
 Parties Represented:
 Frost Management Company LLC
 Frost Venture Partners GP LLC

Mr. Samuel Z. Hyams
Hodel Wilks LLP
4 Park Plaza
Suite 640
Irvine, CA   92614
Phone: 949-450-4470
shyams@hodelwilks.com
 Parties Represented:
 Hollencrest Bayview Partners, LP
 Robert B. Wolford
 Wolford Family Trust dated July 11, 2006

Andrew D. Stolper Esq.
Frank Sims & Stolper LLP
19800 MacArthur Blvd.
Suite 855

Exhibit 3
Page 266

Irvine, CA   92612
Phone: 949-201-2400
astolper@lawfss.com
    Parties Represented:
    Charles Reynolds, Jr.
    Larry Sheakley
    Lou Lauch


        I declare under penalty of perjury the foregoing to be true and correct. Executed at Orange,

CALIFORNIA on  September 4, 2018.


Carol Edwards
CEdwards@jamsadr.com

Exhibit 3
Page 267

# EXHIBIT 4

MATTHEW A. HODEL (SB# 93962)
Email: mhodel@hodelwilks.com
FRED L. WILKS (SB# 205403)
Email: fwilks@hodelwilks.com
ASHLEY E. MERLO (SB# 247997)
amerlo@hodelwilks.com
HODEL WILKS LLP
4 Park Plaza, Suite 640
Irvine, California 92614
Telephone: (949) 450-4470
Facsimile: (949) 450-4479

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**APR 1 7 2019**

DAVI~ ... .. ...                  .. ..~urt

BY:_____,DEPUTY

Attorneys for Petitioners
HOLLENCREST BAYVIEW PARTNERS, L.P.
and ROBERT B. WOLFORD, Individually and as
Trustee of the Wolford Family Trust, dated July 11, 2006

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| HOLLENCREST BAYVIEW PARTNERS, L.P., a Delaware limited partnership; and ROBERT B. WOLFORD, an individual and as trustee of the WOLFORD FAMILY TRUST, DATED JULY 11, 2006;<br><br>Petitioners,<br><br>vs.<br><br>FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company; FROST VENTURE PARTNERS GP, LLC, a Delaware limited liability company; FROST DATA CAPITAL, LLC, a Delaware limited liability company; FROST VENTURE PARTNERS, LLC, a Delaware limited liability company; STUART FROST, an individual, and DOES 1 through 10, inclusive,<br><br>Respondents,<br><br>and<br><br>FROST VP SEED, LLC, a Delaware limited liability company; and FROST VP EARLY STAGE FUND II, L.P., a Delaware limited partnership,<br><br>Nominal Respondents. | CASE NO. 30-2018-00999822-CU-PA-CJC<br><br>Assigned for all purposes to Dept. C14<br><br>[PROPOSED] **CORRECTED AMENDED JUDGMENT CONFIRMING AND ENTERING FINAL ARBITRATION AWARD NUNC PRO TUNC AS OF OCTOBER 4, 2018**<br><br>Petition Filed: June 18, 2018 |

CORRECTED AMENDED JUDGMENT CONFIRMING AND ENTERING FINAL ARBITRATION AWARD

Exhibit 4
Page 268

## CORRECTED AMENDED JUDGMENT CONFIRMING AND ENTERING FINAL ARBITRATION AWARD NUNC PRO TUNC AS OF OCTOBER 4, 2018

On June 18, 2018, Hollencrest Bayview Partners, L.P. ("Hollencrest") and Robert B. Wolford, individually and as Trustee of the Wolford Family Trust, dated July 11, 2006 ("Wolford"), filed a Petition to Confirm the Partial Final Award (the "Petition") rendered by JAMS Arbitrator, the Honorable Stephen J. Sundvold (Ret.) on June 7, 2018. On September 14, 2018, the Court entered judgment on the Petition.

On August 27, 2018, Judge Sundvold issued a Final Award, pursuant to his reservation of jurisdiction, providing for, among other things, appointment of a replacement manager for nominal respondents Frost VP Seed, LLC and Frost Early Stage Fund II, L.P. and awarding Petitioners additional attorneys' fees and costs. Hollencrest/Wolford filed a Petition to Confirm the Final Award dated August 27, 2018 on September 14, 2018.

Pursuant to the stipulation of the parties, and without prejudice to any appellate rights Respondents may have from the Court's confirmation of the Partial Final Award and September 14, 2018 Judgment thereon, the Court granted Hollencrest/Wolford's Petition to Confirm the Final Award dated August 27, 2018 in its entirety and entered an Amended Judgment Confirming and Entering Final Arbitration Award dated October 4, 2018 (the "Amended Judgment").

Due to a clerical error, the Amended Judgment only refers to Robert B. Wolford, without reference to his role as Trustee of the Wolford Family Trust, dated July 11, 2006, although he has always been a party to the proceedings both individually and as Trustee. Upon stipulation of the Parties, the Court therefore hereby corrects the Amended Judgment by entry of this Corrected Amended Judgment Confirming And Entering Final Arbitration Award Nunc Pro Tunc, dated as of October 4, 2018.

1

The Final Award dated August 27, 2018 attached as Exhibit A, SHALL BE AND IS HEREBY CONFIRMED AND MADE A PART OF THIS CORRECTED AMENDED JUDGMENT.

In accordance with this decision and the September 14, 2018 Judgment, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that this corrected amended judgment shall be entered jointly and severally against respondents Frost Management Company, LLC, Frost Venture Partners GP, LLC, Frost Data Capital, LLC and Stuart Frost as follows:

1.      In favor of nominal respondent, Frost VP Seed, LLC in the amount of $3,385,372.10.

2.      In favor of nominal respondent, Frost VP Early Stage Fund II, L.P. in the amount of $9,869,789.63.

3.      In favor of Hollencrest Bayview Partners, L.P. and Robert B. Wolford, individually and as Trustee of the Wolford Family Trust, dated July 11, 2006, in the amount of $3,466,024.84 for attorney fees and costs incurred through conclusion of the arbitration held before Judge Sundvold.

Hollencrest Bayview Partners, L.P. and Robert B. Wolford, individually and as Trustee of the Wolford Family Trust, dated July 11, 2006, are entitled to recover the costs of these proceedings from the Frost Parties pursuant to Code of Civil Procedure section 1033.5 in the amount of $ 25802.27.

Dated: 4/17/19

_____
Judge of the Superior Court
ROBERT J. MOSS

2

CORRECTED AMENDED JUDGMENT CONFIRMING AND ENTERING FINAL ARBITRATION AWARD

Exhibit 4
Page 270

**EXHIBIT A**

**EXHIBIT A**

Exhibit 4
Page 271

HON. STEPHEN J. SUNDVOLD (RET.)
JAMS
500 N. State College Blvd.
14th Floor
Orange, CA  92868
Tel:  714-939-1300
Fax:  714-939-8710

Arbitrator

### IN THE MATTER OF

### JAMS No. 1200052341

FROST MANAGEMENT COMPANY, ET AL.
        Claimant,

vs.

HOLLENCREST BAYVIEW PARTNERS, LP, ET AL.
        Respondent.

---

### FINAL AWARD

---

THE UNDERSIGNED ARBITRATOR, finds, and having issued the Corrected Interim Award dated April 18, 2018, attached as Exhibit A and incorporated herein by reference, the Partial Final Award dated June 7, 2018, attached as Exhibit B and incorporated herein by reference, and the Order Appointing replacement Manager, Establishing Oversight Committees and Reconfirming the Elimination of Voting Rights of Frost Venture Partner GP LLC, attached as Exhibits C and incorporated herein by reference, concludes and issues this Final Award as follows:

### INTRODUCTION

The above-entitled matter came on for hearing on January 22, 2018 before the Hon. Stephen J. Sundvold (Ret.). Claimants and Counter-Respondents FROST MANAGEMENT COMPANY, LLC and FROST VENTURE PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST DATA CAPITAL, LLC were represented by Hampton & Holley, LLP by Colin Holley and The Gimino Law Office, APC by Peter Gimino III. Respondents and Counter-Claimants HOLLENCREST BAYVIEW PARTNERS, L.P. and ROBERT B. WOLFORD, individually and as Trustee of the WOLFORD FAMILY

1

Exhibit 4
Page 272

TRUST dated July 11, 2006, were represented by Hodel Wilks L.L.P. By Matthew Hodel, Fred Wilks and Samuel Hyams.

Jurisdiction to arbitrate this matter was pursuant to the Operating Agreements of the Seed Fund (EX 840 para. 13.10) and Fund II (EX 2 para. 15.5).

The matter proceeded to hearing from January 15, 2018 daily through February 2, 2018 and again on February 15, 2018 and February 16, 2018. By Order of the Arbitrator, the order of proof at the hearing was determined that the Respondent Counter-Claimants would proceed first with presentation of evidence. Each side presented written arbitration briefs. The sworn testimony of 29 witnesses in person, by deposition and electronically by Face-Time was presented. Exhibits were presented and received. Both sides made oral closing arguments and rebuttals.

The factual findings that follow are necessary to the Award. They are derived from the admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weight of the evidence, both oral and written.

## ANALYSIS AND OPINION

### THE PARTIES

Counter-Claimant Frost VP Seed, LLC (hereinafter "Seed Fund") is a Delaware limited liability company formed for the purpose of investing in technology start-up companies.

The manager of the Seed Fund is Counter-Respondent Frost Management Company, LLC (EX 840).

Counter-Claimant Frost VP Early Stage Fund II, LP (hereinafter "Fund II") is a Delaware limited liability partnership also formed for the purpose of investing in the same early stage companies, known as Portfolio Companies.

The manager of Fund II is Counter-Respondent Frost Venture Partners GP, LLC (EX 2).

Counter-Claimant Hollencrest Bayview Partners. L.P. (hereinafter "Hollencrest") is an investor in, and thus a member of, the Seed Fund.

Counter-Claimant Robert Wolford is a managing director of Hollencrest Securities, LLC, the investment manager of Hollencrest and a registered investment advisor of other non-party investors in the Seed Fund and Fund II.

2

Stuart Frost (hereinafter "Frost") owns and controls Frost Data Capital, LLC, formerly known as Frost Venture Partners, LLC, (hereinafter "FDC" or the "Incubator"). Frost, who had no prior experience as a fund manager, created and controlled the fund managers who distributed the funds' investments into the Portfolio Companies. Frost's experience was as a founder and CEO of data software companies (EX 28).

### THE DERIVATIVE CLAIMS

Hollencrest and Wolford bring these claims pursuant to 6 Del. C. Section 17-1001 and 6 Del. C. Section 18-1001 which allow a limited partner or member of a limited liability company to bring an action on behalf of a limited partnership or limited liability company. The Arbitrator finds that the nature of the alleged injuries sustained by the partnership and LLC, as a whole here, are in fact of the nature required to allow this matter to proceed in a derivative manner. See *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d. 1013 (Del. 2004). The primary harm here was to the Funds. All the investors in these Funds suffered harm as a function of their pro rata investment in these Funds. The procedural pre-lawsuit requirements were satisfied or were futile.

### THE FROST INCUBATOR MODEL

The Incubator model Frost envisioned would take ideas and needs from "big-data" major companies (problems), pass them through the Incubator, which would determine if the problem could be solved. The Incubator would then write up a minimally viable segment or product (as little as 2-3 paragraphs) and then pass the idea into a newly created start-up company which would incubate those ideas into software that would be acquired, sold or "go public" ("Exits") as new publicly-held companies within 2 to 5 years (EX 28, see also Giles depo. P. 68:8 - 69:14).

The Incubator management team would be "world class". The incubated companies would share services with each other creating a lean and highly capital efficient model.

In application, the evidence showed that no capital was invested into the Incubator itself and the Incubator was financially dependent on fees charged to the Portfolio Companies to sustain itself. As the number of incubator employees and their salaries went up, the need to increase the amounts coming into the Incubator increased. The Incubator's payroll expense alone went from $672,514 in 2012 to $5,215,955 in 2015 (Weekly Power Point slide 18).

### THE SEED FUND

The Seed Fund "pitch deck" (EX 28) lays out the pitch that was given to investors to raise a target of fifteen million dollars. The Seed Fund would then invest $750,000 to $1,500,000 into each of 10-15 start-up companies. The Seed Fund would have no management fee or carry cost. All investments would be approved by the "Investment Committee" (EX 28). The Operating Agreement for the Seed Fund (EX 840 para. 6.1(a)) authorized the manager to be reimbursed

3

FINAL AWARD

Exhibit 4
Page 274

for "out of pocket" expenses. It mentions in Paragraph 8.1 (b) the formation of the Incubator, but does not authorize payments to it from the Portfolio Companies. The "bubble" flow chart at slide 11 of Exhibit 28, the Pitch Deck, shows many "$ arrows" going into the Portfolio Companies, but does not show any "$ arrows" going <u>from</u> the Portfolio Companies to the Incubator.

### FUND II

The Fund II Operating Agreement (EX 2) is significantly different from the Seed Fund. It authorizes the manager to be paid a management fee of 2% (EX 2 para. 6.1 (b)). All "normal operating expenses" incurred in connection with the management of Fund II were to be paid from the management fee (EX 2 para. 6.2 (a)).

The Operating Agreement (EX 2 para. 6.1 (d)) addresses that payments for "shared advisory and support services" may be charged by the Incubator to the Portfolio Companies. No method of calculation of those fees is identified. Those fees collected would not reduce the 2% management fee, "so long as such Service Fee does not exceed reasonable market rates." Any excess charges would reduce the management fee.

### THE INVESTMENTS

Hollencrest was provided with the Frost Executive Summary (EX 223) dated October 18, 2011. Importantly, at page 5 of that document, they were told that the services provided by the Incubator to the Portfolio Companies would be decided by their respective individual boards, on a case-by-case basis, and would be adjusted from time to time as needed. The Portfolio Companies would only be charged for services that would be required in the normal course of business and they would receive higher quality services at a lower price than they would otherwise be able to afford. Frost would provide "economies of scale."

In late December and early January, Frost, in emails to Hollencrest, indicated that the first "exits" by Portfolio Companies were on the immediate horizon and they didn't want to miss out and that they should bring others into the opportunity (EXs 250 and 251). They and their clients invested $6.1 M. There were no immediate "exits." When Hollencrest later complained that no exits had occurred, Frost accused them of looking for a "fast buck" (EX. 339).

Wolford testified that the Hollencrest investments were anticipated to be 33 1/3% of the Seed Fund based on discussions with Frost. In actuality, they were approximately 80%. They were told that a Frost entity would invest $6.1M into Fund II. However, Frost did not disclose that $6M of that $6.1M came from an individual named Michael Colaco who had no right to participate in management of, and a "0" membership interest in, the Frost entity (EX 4 at § 5.1, and EX A attached thereto). In reality, Frost only invested $50K.

4

FINAL AWARD

Exhibit 4
Page 275

The investments were made after months of due diligence, vetting and background checks (EX 1385 and 1386), Hollencrest and its related party sophisticated investors invested $6.1M of the total of $7.5M invested in the Seed Fund.

Wolford was the only Hollencrest related party to invest in Fund II. He invested $100K (EX 310). The other Hollencrest investors were displeased that there had been no liquidity events (Exits) in the first two years and there had been a lack of transparency in the management of the Fund. Some of the Hollencrest investors did make direct investments into some of the Portfolio Companies. Those investments did not pass through the Funds. Fund II raised a total of $41.1M.

A later fund, Fund III, which is not a party, derivatively or otherwise to this arbitration, is believed to have invested approximately $13M into the incubator. There also were numerous direct investments into the Portfolio Companies by party and non-party investors in unknown amounts.

### THE INCUBATOR FEES

Incubator fees were imposed upon the Portfolio Companies from the moment of their creation. In most instances, the Service Agreements were signed on their behalf by Frost and Frost CFO William Guerry before the company was officially formed (EX 152, Testimony of Wm. Guerry). Cancellation of the Service Agreement required 180 days' notice. (EX 597 para. 4). Once a CEO was chosen for the new company, he or she was saddled with up to a $40,000 monthly non-negotiable, non-cancellable fee for six months. Fees were imposed even if no CEO had been hired (EX 1011). The imposed Incubator fee was a flat fee regardless of the level of development of the company, the existence of any employees or the number of them (EX 1097). With rare exceptions, they were not negotiable. Frost never did an analysis of the actual costs for the services included in the fees. Some CEOs did the analysis as to value of the services and concluded that they ranged from $8,000 to $12,000 per month (Testimony of John Burke, Paul Myer, Doug Lawson, Cary Breese, Mark Lelinski). The actual fees imposed ranged from approximately $30,000 to $40,000 per month.

With the exception of only two witnesses, Babur Ozden, the CEO of Maana and Miles Mahoney, a Frost insider, who testified that the $40,000 monthly Incubator fee caused him "no heartburn," the record shows that numerous other CEOs for the Portfolio Companies complained about the excessive incubator fees (EX 795, EX 1097) Many tried, with little or no success to negotiate them down. Ozden, who is still the CEO of Maana and closely connected to Frost, testified, incredibly, that the Incubator service fee was a "mere fraction" of its actual worth.

The Incubator fees were to cover things like rent, human resources, mentoring, marketing, and payroll. They were not adjusted as the number of employees went up or down. Companies that had moved physically out of the Incubator offices, were charged the same as companies who resided in the offices. Frost CFO Guerry stated in his testimony that the rent allocations were done without any formula and were arbitrary. Hollencrest's incubator expert, Alexander Maleki,

5

FINAL AWARD

Exhibit 4
Page 276

testified that these mandatory fixed fees were not consistent with industry standards. These fees created a burn-rate for the invested funds that shortened the "runway" for these new companies to get off the ground. For example, a company that was given an investment of $500,000 and was required to pay $40,000 per month in addition to salaries to its CEO and chief technology officer (CTO) would be burned out in well less than 8-10 months. The high fees also discouraged investors and were often hidden from them (EX 1111, EX 936). They were not reported to investors even after the company auditors told them that related party transactions which were not arms-length, needed to be reported to investors (EX 766).

Hollencrest's damages expert, David Weekly, calculated the reasonable incubator charges to be $6,898,381. The actual incubator charges paid by the Portfolio Companies was $21,690,382. After allocating those expenses to the Seed Fund (17%) and Fund II (63%) he calculated the excess fees to be $11,846,575 (EX 1327, power point slide 29-30).

The Incubator itself was undercapitalized and always insolvent (Weekly testimony). The only source of income was incubator fees. The record is clear that, although the original pitch materials contemplated only 2-4 companies being created per year (EX 28), well over 20 were created, twelve in the period April 2014 to February, 2015 alone (EX 152 and 178). The email record also establishes that "new ideas" did not create "new companies," it was the need to meet the cash flow needs of the Incubator. Numerous emails show CFO Guerry advising Frost that new companies and the resultant immediate incubator fees were needed to make ends meet (EXs 773, 152, 774, 780, 798, 157, and 1090). These fees were unreasonable in their amount and application. They also were in violation of Frost's fiduciary obligations to the Funds whose investments were the only source of funds from which the Portfolio Companies could pay the incubator charges.

### SNOW DATA CAPITAL

Snow Data Capital was created by Stuart Frost ostensibly to provide marketing services to the Portfolio Companies. In reality, it was created to provide employment for his friend Anthony Howcroft who needed a job to qualify for a green card for immigration purposes. Frost and Howcroft were friends in England. Rather than pay Howcroft from the already excessive Incubator Fees which included marketing, Frost imposed an additional $5,100 per month on the Portfolio Companies. Again, no Portfolio Company was asked if they wanted or needed additional marketing services. They had no voice in the decision. The additional fees were imposed whether needed or not.

### MANAGEMENT FEES

The Seed Fund was not to be charged a management fee (EX 28). Frost charged the Seed Fund $16,000 per month for his salary (which was called "management services," EX 748) from June 2012 through September 2013 ($256,000 in total). This charge stopped only when Frost began receiving the 2% management fee from Fund II in October of 2013 (EX 1372). The Seed Fund

was also charged a management fee of $122,330 in 2012. The Seed Fund was represented to be a "no management fee" fund. These charges are improper.

Hollencrest additionally claims that $114,000 in shared services fees "may have been charged contrary to industry standards" (Palzer PowerPoint p.15). They have not met their burden of proof on this issue.

The Fund II Limited Partnership Agreement (EX 2) at Paragraph 6.1 allows Frost to collect a management fee of 2%. The Limited Partners also agreed that the Incubator, an affiliate of the General Partner, may receive a "Service Fee" for services rendered to the Portfolio Companies and that such fee would not reduce the General Partner's management fee (2%) "so long as such Service Fee does not exceed reasonable market rates." (EX 2 para. 6.1 (d)). The General Partner, Frost General Partners GP, LLC received management fees of $1,731,099 from 2013 through 2015 (EX 754). The net to the individual General Partners, after expenses of $615,387, was $1,116,171. The total excess Incubator Fees charged by the Incubator to the Portfolio Companies was $14,792,001 (EX 1327, Weekly power point slide 32). The amount of excess Incubator Fees David Weekly allocated to Fund II alone are $9,355,042 (EX 1327, Weekly power point slide 32). Those excess charges would accordingly reduce the GP's right to claim the 2% management fee down to zero. The net reduction would completely cancel the management fee by well over $7M. Accordingly, the GP was not entitled to any of the 2% management fee.

### FROST's PERSONAL EXPENSES

Stuart Frost held a 62.5% interest in the GP. He was entitled to receive 62.5% of the net 2% fees after expenses. These proceeds would arguably have been income to him. Rather than receiving this income, he instructed CFO Guerry to pay hundreds of thousands of dollars of personal expenses ($788,712, EX 754) from "his" 62.5% share of the management fee profits. These expenses included villas in Italy, private schools in Italy for his children, chartered air travel, and vacation expenses. When his expenses in 2014 exceeded his 62.5% share of the fees for that year, he instructed Guerry to pay them from the share of the other GP members. His K-1 for 2014 was only $3,303. His total for K-1s from 2013 through 2015 was $24,385 (EX 754).

The payment of these personal expenses by the Incubator was improper. There was no business purpose for them. With the reduction of the management fee, due to the excessive Incubator fees, there was no management fee from which these expenses could be paid. Fund II is entitled to be reimbursed for these personal expenses that were paid out of Incubator funds. Should the excess Incubator Fees actually be repaid to Fund II, arguably, Frost would have a claim for his 62.5% of the restored 2% management fee. Hollencrest and Wolford can't have it both ways. The Arbitrator is ordering the repayment of the excessive fees as damages.

Frost received compensation and personal benefits totaling more than $5M between 2012 and early 2017 (EX 1327, Weekly testimony, power point slide 21-24).

### BREACHES OF FIDUCIARY OBLIGATIONS

7

Exhibit 4
Page 278

Under the Delaware Limited Liability Corporation Act and the Delaware Revised Limited Partnership Act, the parties can contractually eliminate altogether any fiduciary duties that might be owed by the general partner and managing members to the limited partners, members or the Funds themselves (see *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 BL 100510 (Del. Ch. April 20, 2009).

The Operating Agreements here (EX 840 and EX 2) do not eliminate fiduciary duties altogether. Section 8.6 of the Seed Fund Operating Agreement does limit the Manager's liability for "other activities" which may conflict with the company. The Arbitrator finds no such language in the Fund II Partnership Agreement (EX 2).

Frost owes duties of care and loyalty to the investors in the Seed Fund and Fund II. Those obligations were not contracted away in the Operating Agreements for those entities (EX 2 and EX 840).

It is clear that Frost has failed to live up to those duties and obligations. He imposed excessive Incubator Fees for his own benefit. Those fees and the 2% management fee from Fund II were the only sources of funds to pay him the $5M in salary and benefits he received.

On April 8, 2014, Frost asked the CFO, "just for kicks" to calculate the cash flow that would be generated from twelve new companies being started between April and July (EX 773).

In June of 2014, just after starting five new companies (EX 152), he moved his family to Italy for a year. As valuable as he (and Babur Ozden) claim that his mentoring was to the Portfolio Companies, being physically, and nine time zones, away for one year made it extremely difficult, if not impossible to fulfill this obligation. On June 6, 2014, only two weeks before his departure to Italy, when investor Tom Turney asked about a "rumor" that Frost was moving to Italy, Frost denied the move and indicated that his family was "spending time in Florence this summer" (EX 1135). Frost had already paid the enrollment fees for his children to be schooled in Italy for the following year (EX 653). It is critical to note that Frost did not just indicate that he would be working remotely for the next year! He knew that his physical absence from Incubator would have an effect on the Portfolio Companies. His ability to immediately respond electronically was not a reality (EX 525).

Frost was paid gross wages by FDC of $1.2M in 2014 and $1.118M in 2015 (EX 1327 and Weekly power point slide 23). For one entire year of that time, June 23, 2014 until June 2015, he resided in various villas in Italy.

The relationship with key investors suffered while Frost was away in Italy (EXs 499 and 501).

Perhaps the greatest failure of fiduciary responsibility was the failure to adequately inform the investors about the financial progress or lack thereof by the Portfolio Companies. Some financial reports were never completed or provided. All that were done, were late. Hollencrest

8

FINAL AWARD

Exhibit 4
Page 279

repeatedly chased after reports (EXs 349, 351, 352, 78 and 79). These lapses in reporting are violations of the reporting requirements of the Operating and Partnership Agreements (EX 2 and EX 840) which set out specific deadlines for reporting. Some Portfolio Companies were carried on the books long after they had been dissolved. For example, Adaptive Well was dissolved in August of 2016. On the year-end statements in December 2016 given to investors, it was still shown with a value of $1.3M (EX 87).

### THE FAILED PROMISES

There never were any "EXITS." Notwithstanding all the representations, before during and after all the investments into the Seed Fund and Fund II, that exits were "imminent," there never have been any successful exits that resulted in proceeds being distributed to the investors. There were three "sales" that took place to insiders (Miles Mahoney and John Burke's "Irish Acquisitions" company) in 2017, the terms of which have never been explained to investors or shown in the QuickBooks. A belated breakdown of the proceeds of the sales presented after the close of evidence was not considered by the Arbitrator.

The biggest, monetarily, of all the failed "promises" was the whiteboard in Frost's office which was present at the March 17, 2016 meeting with Hollencrest (Exhibit 18). The photograph of the whiteboard showed ten large corporate investors and the $718M that they were going to invest and eight Portfolio Companies in active acquisition talks. In actuality, only $5M was invested and there were no acquisitions.

On June 24, 2016, John Vigouroux wrote to Frost (EX 829). He attached a list of critical problems. He noted that every Portfolio Company CEO was "panicked" about Frost dissolving. He also indicated that many of the investors were telling others that the Frost "ship is sinking". He also stated that some investors were wanting "to go legal." On June 28, 2016 he wrote again (EX 904) setting out discussions he and Michael Colaco had concerning Frost being removed as manager and re-branding the funds. This all transpired a month before-

### THE JULY 19, 2016 MEETING

In the time period leading up to a meeting held at Frost's office on July 19, 2016, Hollencrest heard reports from various Frost employees and investors concerning allegations about Frost. They met with Carey Breese, a former Frost employee and Portfolio Company CEO, who wanted to "clear the air" about what was happening at the Incubator. They met with John Vigouroux, President of FDC, who told them their concerns were well-founded and he identified other unhappy investors. In emails sent just prior to the meeting, it was clear that the Hollencrest parties had serious concerns (EXs 372 and 383). Frost employees were told not to talk to investors (EX 370). Hollencrest met and talked with several other disgruntled employees and investors.

Hollencrest prepared notes before and following the meeting (EX 21 and EX 448). The meeting started with Frost distributing a status sheet about each of the Portfolio Companies. Greg

9

FINAL AWARD

Exhibit 4
Page 280

Pellizzon, a Hollencrest principle, explained why the meeting was requested. Frost was told that Hollencrest had been contacted by a "whistleblower" on June 27, 2016. A letter from investor Larry Sheakley was read aloud (EX 387). Frost then indicated that he needed legal counsel. Pellizzon read two resolutions from shareholders that outlined restructuring or replacement of FDC as manager of the funds.

The Arbitrator finds that Hollencrest did not circulate or publish to others that Frost was conducting a "Ponzi" scheme. Had such remarks been made among the investors, they would have been privileged. They did not make threats to report Frost to the SEC. They did not accuse him of committing any crime. It is clear from the evidence, that others, inside and outside the Frost entities, both before and after the July 19, 2016 meeting talked about "Ponzi schemes" in connection to Frost. The Portfolio Company CEOs themselves used the term "Ponzi scheme" in discussions about the Incubator (Testimony of Stephen Gotz). Frost himself in his letter to investors on October 2016 told investors that he had been accused of conducting a "Ponzi scheme" (EX 422). This republication itself was much broader in its scope than the previous comments. Frost had an ugly reputation with investors well before the July 19, 2016 meeting (EX 830).

The Arbitrator finds that Hollencrest and Wolford prevail on Frost's claims against them.

### ALTER EGO

In a recent Delaware Court of Chancery opinion, ***Doberstein v. G-P Industries, Inc.*** C.A. No. 9995-VCP (Del. Ch. Oct. 30, 2015), the Court stated that to state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the entity through its alter ego, has created a sham entity designed to defraud investors and creditors. Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking (FDC was not); (2) whether the company was solvent (FDC was not); (3) whether corporate formalities were observed (FDC did not); whether the dominant shareholder siphoned company funds (Stuart Frost did); and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder (it did).

The Frost entities had minimal or no initial capitalization, except for the strange contribution of Michael Colaco who invested $6 million and had no right to participate in the management of the business. His contribution was used as an investment in Fund II. His $6 million was not used as "capital" for any Frost entity.

There were numerous and continuous "related party transactions" that were not reported to the investors, even after the auditors advised that they should be (EX 90 para. 15a, EX 766). Many of these transactions involved the payment of Stuart Frost's personal expenses.

The Frost entities all used the same CFO, bookkeeper, offices, and were all controlled by Stuart Frost (Guerry testimony). The Services Agreements entered into by the Portfolio Companies

were signed by Frost and his CFO, Guerry, and were binding and non-cancellable for 180 days on the newly created companies. Guerry was also the CFO of the Portfolio Companies.

Loans were made to the Portfolio Companies by FDC to allow their continued operations. Those proceeds of those loans then went back to the Incubator in the form of excessive fees (EX 936).

In June 2016, (EX 1117), Frost advised senior FDC management to shift Incubator personnel to the Portfolio Companies to achieve cost savings for FDC. Incubator payrolls were missed and salaries were reduced (Guerry testimony). Simultaneously, he suggested starting more new companies (EX 1117).

Frost paid his own legal fees from the Funds' assets (EX 1393).

The evidence demonstrates Stuart Frost's personal control over these entities and his use of that control to take actions and make decisions to his self-interest to the detriment of the investors.

The Arbitrator finds that Stuart Frost was the alter ego for the Frost entities.

## CONCLUSION

The Incubator (FDC) imposed excessive Incubator Fees on the Portfolio Companies in violation of the Operating and Partnership agreements. The Seed Fund's share of the excessive fees is $2,491,532 and Fund II's share is $9,355,042.

The Seed Fund was wrongfully charged $378,000 in fees for management and services of their fund.

Absent the return of the excessive Incubator Fees, the 2% management fee charged to Fund II is to be reduced by the amount of the excessive Incubator Fees.

Stuart Frost violated his fiduciary duty of care and loyalty to the members of the LLC and limited partners in the funds. He is to be removed as manager of the funds. He is found to be the alter ego of the Frost entities sued here.

An accounting is to be ordered, which will include the proceeds of the recent sale of Portfolio Companies Exara, Ubix Labs, and Source Thought.

Hollencrest and Wolford prevail on the claims of Frost.

Hollencrest and Wolford are the prevailing parties and are entitled to their reasonable attorney fees, witness expenses and costs of this Arbitration (EX 840 section 13.10 (d) and EX 2 section 15.5 (d)).

11

FINAL AWARD

Exhibit 4
Page 282

**FURTHER PARTIAL FINAL AWARD RE (1) REFUND OF FROST PARTIES' LITIGATION EXPENSES PAID FROM THE FUNDS, (2) PREVAILING PARTY ATTORNEY'S FEES AND LITIGATION EXPENSES AND (3) PUNITIVE DAMAGES**

Following the issuance of the initial interim award, which has been corrected as set forth above, the parties briefed additional issues which were reserved until after the initial interim award. The Arbitrator now finds as set forth below.

Frost, the manager of the Seed Fund, and the GP of Fund II, were not entitled to use the Funds' money to pay legal fees incurred in this proceeding where Frost's conduct was "not undertaken in the good faith belief that such act or omission was in the best interests" of the Funds, or his conduct "constitutes recklessness, gross negligence or willful misconduct." (EX 2 at § 15.4(a), EX 840 at § 13.4(a). The arbitrator therefore finds that Counter-Respondents shall refund the following amounts: $130,340.10 to the Seed Fund, and $129,247.63 to Fund II (EX 1393).

The conduct of Stuart Frost was at least reckless. In his fiduciary capacity, he acted with conscious indifference and/or reckless indifference to the consequences of his actions and the rights of investors. At a minimum, Stuart Frost was willfully blind to or consciously disregarded the substantial and unjustifiable risk that his conduct would turn out to violate his fiduciary duties. Therefore, punitive damages against Counter-Respondents are appropriate in the amount of $771,000, to be split equally between the Funds, which approximates the expenses Weekly found Frost incurred in connection with his move to Italy.

Stuart Frost is ordered to provide to Counter-Respondents an up-to-date list of investors in the Seed Fund and Fund II, including the investors' contact information.

Hollencrest and Wolford are awarded their attorney fees, costs and expenses through April 30, 2018 in the amount of $3,257,091.09. The Arbitrator reserves jurisdiction to award additional attorney fees and costs incurred by Hollencrest Wolford after April 30, 2018.

Based on the finding of alter ego relationship, all of Counter-Respondents (Frost Management Company LLC, Frost Venture Partners GP LLC, Frost Data Capital LLC and Stuart Frost) shall be jointly and severally responsible for the damages, attorney fees, costs and expenses awarded.

In sum, the Arbitrator awards:

1. To the Seed Fund: $3,385,372.10 (comprised or $2,491,532 in incubator fees, plus $378,000 for a management fee, plus $130,340.10 in Frost's legal fees charged to the Seed Fund, plus $385,500 one half of punitive damages).

12

FINAL AWARD

Exhibit 4
Page 283

2. To Fund II: $9,869,789.63 (comprised of $9,355,042 in excessive incubator fees, plus $129,247.63 in Frost's legal fees charged to Fund II, plus $385,500 one half of punitive damages).

3. To Hollencrest and Wolford: $3,257,091.09 for attorney fees and costs incurred through April 30, 2018.

## ATTORNEY FEES AND COSTS

A telephonic hearing was held on August 21, 2018 before the Honorable Stephen J. Sundvold (Ret.) on the motion by respondents and counterclaimants, Hollencrest Bayview Partners, L.P. and Robert Wolford, individually and as Trustee for the Wolford Family Trust, seeking a second award of prevailing party attorney's fees and litigation expenses. Present and representing respondents and counterclaimants was Matthew Hodel of Hodel Wilks LLP. Present and representing claimants and counter-respondents Frost Management Company LLC and Frost Venture Partners GP LLC and counter-respondents Stuart Frost and Frost Data Capital, LLC was Colin Holley of HamptonHolley LLP.

After considering all papers filed in connection with this second motion for fees and costs, and oral argument from counsel, the arbitrator granted the motion and awarded respondents and counterclaimants an additional $166,675.65 in attorney's fees and $42,258.10 in costs.

Therefore, the arbitrator awards to respondents and counterclaimants additional prevailing party litigation expenses of $208,933.75 against claimants and counter-respondents.

This Final Award resolves all claims between the parties submitted for decision in this proceeding. This award shall be final for the purpose of awarding such further expenses and seeking confirmation of the same in the Superior Court.

DATED: August 27, 2018

Hon. Stephen J. Sundvold (Ret.)
Arbitrator

13

FINAL AWARD

Exhibit 4
Page 284

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF ORANGE             )

I am employed in the County of Orange, State of California. I am over the age of 18, and not a party to the within action. My business address is Hodel Wilks LLP, 4 Park Plaza, Suite 640, Irvine, CA 92614.

On **April 2, 2019**, I served the foregoing document(s) described as: **PROPOSED CORRECTED AMENDED JUDGMENT CONFIRMING AND ENTERING FINAL ARBITRATION AWARD NUNC PRO TUNC AS OF OCTOBER 4, 2018** on the interested parties by placing a true and correct copy thereof in a sealed envelope(s) addressed as follows:

Colin C. Holley
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
2040 Main Street, Suite 300
Irvine, CA 92614
Telephone: (949) 852-6700
Email: cholley@watttieder.com

Attorney for Respondents

☒    **BY ELECTRONIC SERVICE THRU ONE LEGAL ONLINE COURT SERVICES:** Pursuant to C.R.C. 2.251, I caused a copy of the foregoing document to be uploaded to One Legal Online Court Services for electronic service on the above-referenced individuals.

☐    **BY OVERNIGHT DELIVERY:** I am readily familiar with the practice of Hodel Wilks LLP for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by the overnight delivery carrier.

☒    **STATE:** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **April 2, 2019**, at Irvine, California.

_____
Heather Dorris

Exhibit 4
Page 285

# EXHIBIT 5

Court of Appeal, Fourth Appellate District, Division Three
Kevin J Lane, Clerk/Executive Officer
Electronically FILED on 7/31/2019 by Alex Reynoso, Deputy Clerk

COURT OF APPEAL - STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT
DIVISION THREE

**FILED**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**AUG 0 1 2019**

DAVID H. YAMASAKI, Clerk of the Court

BY:_____L. DURAN_____;DEPUTY

HOLLENCREST BAYVIEW PARTNERS L.P. et al.,
Plaintiffs and Respondents,
v.
FROST MANAGEMENT COMPANY LLC et al.,
Defendants and Appellants.

**G057035**
**Orange County Super. Ct. No. 30-2018-00999822**

Appellants having filed a request for dismissal in this court, the appeal is DISMISSED.   The remittitur shall issue forthwith.   (Cal. Rules of Court, rule 8.244(c)(2).)

**O'LEARY, P.J.**

Presiding Justice

cc:   See attached list

Exhibit 5
Page 286

# EXHIBIT 6

# FROST VP SEED, LLC

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "*Agreement*") is made effective as of the 22nd day of September, 2011 (the "*Effective Date*") by and among FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the "*Manager*"), and each person admitted from time to time as a Member of the Company (each a "*Member*" and collectively, the "*Members*"), with respect to the operation of FROST VP SEED, LLC, a Delaware limited liability company (the "*Company*"), and reads as follows:

## ARTICLE I

### NAME, PURPOSE AND OFFICES OF COMPANY

1.1     **Name.**  The name of the Company is Frost VP Seed, LLC.  The affairs of the Company shall be conducted under the Company name or such other name as the Manager may determine.

1.2     **Purpose.**  The purpose of the Company is to buy, sell, hold, and otherwise invest in Securities (directly or indirectly) of every kind and nature and rights and options with respect thereto and received in exchange or with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings necessary, advisable or desirable with respect to Securities held or owned by the Company; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.  The Company shall have the power to make and perform all contracts and to engage in all actions and transactions determined by the Manager to be necessary or advisable to carry out the purposes of the Company, and all other powers available to it as a limited liability company under the laws of Delaware.

1.3     **Principal Office.**  The principal office of the Company shall be located at 31920 Del Obispo, Suite 260, San Juan Capistrano, CA 92675, or such other place or places as the Manager may from time to time designate by written notice to the Members.

1.4     **Registered Agent and Office.**  The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

## ARTICLE II

### TERM OF COMPANY

2.1     **Term.**  The term of the Company shall commence upon the date of the filing of the certificate of formation (the "*Certificate of Formation*") of the Company with the Office of

1

725167 v1/SD

EXHIBIT
1
S. Frost
2-14-17
G. Kennamer CSR CCRR

Exhibit 6
Page 287

the Secretary of State of the State of Delaware. The term of the Company shall terminate as provided in paragraph 10.1.

**2.2    Events Affecting the Members or the Manager.**   Except as provided in paragraph 10.1(a)(iii) or as required by the Act, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, retirement, resignation, expulsion or dissolution of the Members or the Manager (or any member or partner thereof) shall not dissolve the Company.

## ARTICLE III

### NAMES, ADMISSION, WITHDRAWAL AND QUALIFICATION OF THE MEMBER

**3.1    Name and Address.**   The name and address of the Members and the amount of the Members' Capital Commitments are set forth on the Schedule of Manager and Members attached hereto as EXHIBIT A. The Manager shall cause EXHIBIT A to be amended without the consent of the Members to the extent changes requiring the amendment of EXHIBIT A are made pursuant to the terms of this Agreement from time to time; *provided*, that no Member's Capital Commitments shall be increased without obtaining the prior written consent of the Member. Any such amended EXHIBIT A shall supersede any prior EXHIBIT A and become a part of this Agreement.

**3.2    Admission of Additional Members.**   Additional Members may be admitted with the consent of the Manager, acting alone, until the earlier of [July 1, 2012] or the total Capital Commitments of the Members equal at least $[10,000,000.] Thereafter, additional Members may be admitted to the Company only upon the consent of the Manager and a Majority-in-Interest of the Members.

**3.3    Withdrawal of a Member.**   No Member may withdraw or resign as a Member without the written consent of the Manager.

## ARTICLE IV

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS, AND DEFAULT OF A MEMBER

**4.1    Capital Accounts.**   An individual Capital Account shall be maintained for each of the Members.

**4.2    Capital Contributions; Capital Commitment.**

(a)    The Manager shall have no Capital Commitment and no obligation to contribute capital to the Company.

(b)    Each Member shall make capital contributions in cash installments, by wire transfer upon at least ten (10) days' advance written notice, up to the amount of its *"Capital Commitment"*.

2

725167 v1/SD

Exhibit 6
Page 288

(c)      The Manager shall return to each Member all or any cash capital contribution intended for a proposed investment which is not consummated, or applied to the payment or reimbursement of expenses pursuant to paragraph 6.1, within ten (10) days following the date on which such proposed investment is not consummated or contribution is not otherwise applied; such returned capital shall be added back to the unfunded Capital Commitments of the Member and be subject to recall by the Manager pursuant to this **ARTICLE IV**.

**4.3      Default of a Member.** The Company shall be entitled to enforce the obligation of each Member to make contributions of capital to the Company in accordance with paragraph 4.2, and the Company shall have all remedies available at law or in equity in the event any such contribution is not so made. A defaulting Member shall pay all costs and expenses incurred by the Company in connection with the Member's failure to make a capital contribution as required under this Agreement, including, without limitation, attorneys' fees and all fees and expenses incurred in connection with any legal proceeding relating to the failure of the Member to make such a contribution. In the event that a Member fails to contribute capital to the Company as required under this Agreement and such default shall have continued uncured for thirty (30) or more days after delivery of written notice to the defaulting Member, the Manager shall be permitted to either . (i) withhold distributions to be made to such defaulting Member pursuant to the terms of this Agreement equal to the amount of such unpaid capital contribution and recover such unpaid contribution thereon by setoff against any such distributions so withheld, or (ii) sell the defaulting Member's interest in the Company in a third party transaction and apply the proceeds towards the satisfaction of any Company expenses or other obligations of the Company.

## ARTICLE V

### COMPANY ALLOCATIONS

**5.1      Allocation of Profit and Loss.** Profit and Loss of the Company shall be allocated among the Members in proportion to their aggregate capital contributions.

**5.2      Allocations for Tax Purposes.** Income, gain, loss and deductions shall be allocated for income tax purposes generally in the manner in which the corresponding Profit and Loss is credited or debited (as the case may be) to their respective Capital Accounts; *provided, however*, that any difference between the Adjusted Asset Value and adjusted tax basis of any asset shall be reconciled, solely for income tax purposes, in accordance with the principles of Code Section 704(c) using any method permitted by the Treasury Regulations and selected by the Manager.

## ARTICLE VI

### COMPANY EXPENSES

**6.1      Company Expenses.**

(a)      The Company shall bear all operating expenses reasonably incurred by the Manager, the Incubator or the Company in connection with the management of the Company, the Incubator and the Manager, including but not limited to, all out-of-pocket costs

**3**

and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on and fees and expenses arising out of borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, or other similar charges, travel expenses, legal fees and expenses, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, the Incubator or the Manager, including claims by or against a governmental authority, audit and accounting fees, consulting fees relating to investments or proposed investments, taxes applicable to the Company, the Incubator or the Manager on account of their operations, fees incurred in connection with the maintenance of bank or custodian accounts, all expenses incurred in connection with the registration of the Company's and the Incubator's Securities under applicable securities laws or regulations. The Company shall also bear all out-of-pocket expenses incurred by the Manager in serving as the tax matters partner, any sales or other taxes or government charges which may be assessed against the Company, the cost of liability and other premiums for insurance protecting the Company, the Incubator, the Manager, and their respective partners, members, stockholders, managers, managing directors, officers, directors, trustees, employees, agents or affiliates in connection with their activities, all out-of-pocket expenses of preparing and distributing reports to their respective Members, all out-of-pocket expenses associated with communications with Members, including preparation and distribution of reports to their respective Members, costs associated with Company meetings, all legal, accounting, tax, consulting and professional services fees and expenses (including tax preparation) relating to the Company, the Incubator or the Manager and their activities, out-of-pocket fees and expenses relating to outsourced finance, accounting, and back-office services (or if the Manager performs the accounting function internally, an amount reimbursable to the Manager equal to the then-current market cost of a qualified third party service provider as determined by the Manager in good faith), all out-of-pocket fees, costs and expenses relating to litigation and threatened litigation involving the Company, the Incubator or the Manager, including the Company's indemnification obligation pursuant to this Agreement, and all other expenses properly chargeable to the activities of the Company, the Incubator or the Manager.

(b)    The Company shall bear all out-of-pocket organizational and syndication costs, fees, and expenses incurred by or on behalf of the Manager in connection with the formation and organization of the Company, the Incubator and the Manager (including the definitive agreements related thereto), including legal and accounting fees and expenses incident thereto.

(c)    The Company shall bear all liquidation costs, fees, and expenses reasonably incurred by the Manager (or its designee) in connection with the liquidation of the Company, the Incubator and Manager at the end of their respective terms, specifically including but not limited to reasonable legal and accounting fees and expenses.

4

## ARTICLE VII

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE MEMBER AND MANAGER

**7.1    Interest.** No interest shall be paid to a Member on account of its interest in the capital of or on account of its investment in the Company.

**7.2    Withdrawals by a Member.** No Member shall be permitted to withdraw any amount from its Capital Account without the written consent of the Manager.

**7.3    Members' Obligation to Repay or Restore.** Except as required by law, no Member shall be obligated at any time to repay or restore to the Company all or any part of any distribution made to it from the Company in accordance with the terms of this **ARTICLE VII** or **ARTICLE X**, and shall not be obligated at any time to restore or repay any deficit in the Member's Capital Account.

**7.4    Tax Distributions.** Within ninety (90) days after the end of each calendar year during the Company term, the Company will distribute to the Members, as applicable, in cash an amount equal to the excess, if any of (a) the Applicable Tax Rate multiplied by the net taxable income allocated to the Members, as a result of Members' ownership of an interest in the Company for the current and all prior fiscal years, over (b) all prior cash distributions made to the Members pursuant to this paragraph 7.4 or paragraph 7.5. The *"Applicable Tax Rate"* shall mean the combination of the highest marginal Federal and State income tax rates (plus, to the extent applicable, Medicare taxes) payable by individuals resident in the State of California taking into account the character of the net taxable income to which the rate is being applied and taking into account the deductibility of state and local taxes and any limitations on the ability of a Member to deduct any items of expense or loss under United States federal income tax principles, in each case as determined in good faith by the Manager. Distributions made to a Member pursuant to paragraph 7.4 shall be treated as advances of and as such shall reduce the distributions to be made to the Member under paragraph 7.5.

**7.5    Discretionary Distributions.** (a) The Manager may distribute cash, Securities or other Company assets to the Members in its reasonable discretion. All distributions under this paragraph 7.5 shall be among the Members *pro rata* in accordance with their respective capital contributions.

**(b)**    Securities distributed in kind shall be subject to such conditions and restrictions as the Manager reasonably determines are legally required or appropriate.

**(c)**    Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of the Members as Profit or Loss pursuant to **ARTICLE V**.

**(d)**    Notwithstanding anything contained herein to the contrary, the Manager shall make distributions of Marketable Securities or any proceeds or other amounts received by the Company as soon as reasonably practical (other than amounts necessary to provide for sufficient reserves for present and future obligations of the Company (as reasonably determined by the Manager)).

5

725167 v1/SD

Exhibit 6
Page 291

7.6    **Withholding Obligations.**

(a)    If and to the extent the Company is required by law (as determined in good faith by the Manager) to make payments ("*Tax Payments*") with respect to the Members in amounts required to discharge any legal obligation of the Company or the Manager to make payments to any governmental authority with respect to any federal, state, local or foreign tax liability of such person arising as a result of such person's interest in the Company, then the amount of any such Tax Payments shall be deemed to be a loan by the Company to such person, which loan shall: (i) be secured by such Member's interest in the Company, (ii) bear interest at the prime rate, and (iii) be payable upon demand. Amounts paid in respect of interest on such loan shall be treated as Profit of the Company and shall not be treated as a capital contribution. The Manager shall promptly notify the Member of any Tax Payments made with respect to such Member.

(b)    If and to the extent the Company is required to make any Tax Payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided that* such person's Capital Account shall be adjusted for such person's full proportionate share of the distribution), or (ii) such Member shall promptly pay to the Company prior to such distribution an amount of cash equal to such Tax Payments. In the event a portion of a distribution in kind is retained by the Company pursuant to clause (i), such retained Securities may, in the sole discretion of the Manager, either (1) be distributed to the Members in accordance with the terms of this **ARTICLE VII** including this paragraph 7.6(b), or (2) be sold by the Company to generate the cash necessary to satisfy such Tax Payments.

## ARTICLE VIII

### MANAGEMENT DUTIES AND RESTRICTIONS

8.1    **Management.**

(a)    Except as otherwise set forth herein, the Manager shall have the sole right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company; *provided that*, the Manager shall not, without obtaining the prior written consent of the Member, change the purpose of the Company as set forth in paragraph 1.2. The Manager shall make, in its reasonable discretion, all decisions concerning the assets of the Company, including any acquisition and disposition thereof.

(b)    The Members understand that the Manager has formed the Incubator to provide an operating infrastructure to incubate and develop new business. The Incubator is controlled by the Manager and or its affiliates. It is anticipated that investment opportunities in one or more businesses formed in the Incubator will be offered to the Company but all decisions as to which, if any, such opportunities will be offered to the Company and the terms of any such investments shall be made in the sole and absolute discretion of the Manager.

8.2    **Designation of Manager.** The Manager initially shall be the entity listed as such in the preamble to this Agreement. In the event of a Change of Control of the Manager, a

6

725167 v1/SD

Exhibit 6
Page 292

Majority in Interest of the Members shall have the right to remove the Manager as a Manager only and appoint a replacement Manager. For the avoidance of doubt, the Manager shall continue to be entitled to receive all allocations and distributions to which it would otherwise be entitled to receive had it not been removed as a Manager when, as and if such allocations and distributions are made, in respect of all activities of and investments by the Company. In the event there are no Managers, a new Manager shall be appointed by a Majority in Interest of the Members.

**8.3    Resignation of Manager.** A Manager may resign as such at any time by giving written notice to the Members, in which case, in the event that there is no Manager, a Majority in Interest of the Members shall designate a replacement Manager as set forth in paragraph 8.2 above.

**8.4    Restrictions on the Members.** Except as expressly provided herein or as required by applicable law, no Member (other than a Member acting in its capacity as the Manager) shall:  (a) take any part in the control or management of the Company business, (b) have any power or authority to act for or on behalf of the Company, or (c) have any right to vote on any Company matters.

**8.5    Certain Determinations by the Manager.** All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by the Manager. Such determination shall be final and conclusive.

**8.6    Other Activities.**

(a)    The parties hereto acknowledge and agree that (i) in addition to the Incubator, the Manager Parties have formed and may in the future form other investment vehicles, including those which hold the type of assets which the Company may hold, (ii) no Member shall have any interest in any of the foregoing investment vehicles or the assets thereof arising solely by virtue of this Agreement, (iii)  the Manager may offer the right to participate in investment opportunities available to the Company (in whole or in part), including opportunities provided by the Incubator to other private investors, groups, partnerships, corporations or other entities, including, without limitation, any investment vehicles managed by some or all of the Manager Parties, whenever the Manager, in its sole discretion, so determines, (iv) the Manager Parties shall be under no obligation to offer any particular investment opportunities which they may identify to the Company, and (v) the Manager Parties may charge fees or carried interests with regard to any investment opportunity which the Manager Parties allocate to persons other than the Company.

(b)    The Members:  (i) acknowledge that the Manager Parties are or may be involved in other financial, investment and professional activities, including but not limited to: management of or participation in the Incubator and other investment funds; venture capital, private equity, public equity and real estate investing; purchases and sales of Securities; investment and management counseling; otherwise making investments or presenting investment opportunities to third parties; and serving as officers, directors, advisors,

7

725167 v1/SD

Exhibit 6
Page 293

consultants, and agents of other entities; and (ii) agree that the Manager Parties may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company). Neither the Company nor any Member shall have any right by virtue of this Agreement or the existence of the Company in and to such ventures or activities or to the income or profits derived therefrom, and the Manager Parties shall have no duty or obligation to make any reports to the Member or the Company with respect to any such ventures or activities.

## ARTICLE IX

### INVESTMENT REPRESENTATION AND TRANSFER OF COMPANY INTERESTS

**9.1     Representations of the Members.** Each Member represents: (a) that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act, (b) that it is a "qualified purchaser" as defined in Section 2(51)(A) of the U.S. Investment Company Act of 1940, as amended, (c) that it has sufficient knowledge and experience in business and financial matters to evaluate the Company, its proposed activities and the risks and merits of this investment, (d) that it has the ability to accept the high risk and lack of liquidity inherent in this type of investing, (e) that it is acquiring its interest in the Company for its own account for investment purposes only and not with a view to resale or distribution, (f) that it has had access to such information concerning the Company as it deems necessary to enable it to make an informed decision concerning the purchase an interest in the Company, and (g) that it understands that the interests in the Company have not been registered under the Securities Act, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated.

### 9.2     Restrictions on Transfers of Company Interests.

**(a)**     No Member shall (directly or indirectly) sell, assign, pledge, mortgage, hypothecate, give or otherwise dispose of or transfer its interest in the Company or in its capital assets or property (a *"Transfer"*) without the consent of the Manager (such consent may be granted or withheld in its sole discretion).

**(b)**     A transferee of a Member's interest shall become a substituted Member only with the consent of the Manager, and only if such transferee executes any and all instruments reasonably required by the Manager.

**9.3     Requirements for Transfer.** Notwithstanding the foregoing, the Transfer of a Member's interest in the Company, or any part thereof, shall not be permitted if such Transfer would (a) result in a violation of any law, rule, or regulation, (b) result in a violation of any agreement in which the Company is a party, (c) require the Company to register as an investment company under the U.S. Investment Company Act of 1940, as amended, (d) require the Company or any of the Manager Parties to register as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, (e) result in the Company's assets being considered, in the opinion of counsel for the Company, as "plan assets" within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended, or any regulations proposed or promulgated thereunder, or (f) result in the Company being classified for United

8

725167 v1/SD

Exhibit 6
Page 294

States federal income tax purposes as an association taxable as a corporation. Prior to effecting any such Transfer, the Manager shall have received an opinion satisfactory to it, or shall have waived the requirement of such an opinion, covering the substance of the immediately previous sentence. Any Member who requests or otherwise seeks to effect a Transfer hereby agrees to reimburse the Company, at the request of the Manager, for any expenses reasonably incurred by the Company in connection with such Transfer, including the costs of seeking and obtaining any legal opinion required by this paragraph and any other legal, tax, accounting and miscellaneous expenses, whether or not such Transfer is consummated.

## ARTICLE X

### DISSOLUTION AND LIQUIDATION OF THE COMPANY

### 10.1    Termination.

(a)    The Company shall dissolve, and the affairs of the Company shall be wound up upon the earlier of:

(i)    Upon the mutual consent of both the Manager and a Majority-in-Interest of the Members;

(ii)    Upon the election by the Manager in the event that all Company assets have been distributed in accordance with this Agreement;

(iii)    In the event of the resignation, bankruptcy, dissolution, commencement of liquidation proceedings or insolvency of the Manager unless, within ninety (90) days after the Members are provided with written notice of such event, a Majority-in-Interest of the Members agree in writing to continue the business of the Company and to the appointment, effective as of the date of such event, of a new Manager of the Company;

(iv)    Upon the entry of a decree of judicial dissolution pursuant to the Act; or

(v)    On or after the ten year anniversary following the Effective Date, the affirmative vote of a Majority-in-Interest of the Members.

(b)    In the event that the Company is dissolved pursuant to the provisions of clauses (iii) or (iv) of this paragraph 10.1, the Members shall elect one or more liquidators to manage the liquidation of the Company in the manner described in this ARTICLE X. Except as provided in the immediately preceding sentence, the Manager shall carry out the duties of the liquidator hereunder.

### 10.2    Winding Up Procedures.

(a)    Promptly upon final dissolution of the Company, the affairs of the Company shall be wound up and the Company liquidated. Profits and Losses (and items thereof) with respect to the Company realized during the winding up period shall be allocated among the applicable Capital Accounts of the Members pursuant to ARTICLE V.

9

725167 v1/SD

Exhibit 6
Page 295

**(b)**      Distributions in liquidation may be made in cash or in kind or partly in cash and partly in kind in accordance with the Members' final adjusted Capital Accounts. The Manager or the liquidator shall use its best judgment as to the most advantageous time for the Company to sell investments or to make distributions in kind.

**10.3      Payments in Liquidation.**  The assets of the Company shall be distributed in liquidation of the Company in the following order:

**(a)**      to the creditors of the Company, including the Member if the Member is a creditor, in the order of priority established by law, either by payment or by establishment of reserves; and then

**(b)**      to the Members in respect of the positive balances in their applicable Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

## ARTICLE XI

### FINANCIAL ACCOUNTING AND TAX MATTERS

**11.1      Financial Accounting; Fiscal Year.**  The books and records of the Company shall be kept in accordance with the provisions of this Agreement and otherwise on a tax basis accounting.  The Company's fiscal year shall be the calendar year.

**11.2      Valuation of Investments Owned by Company.**  For purposes of this Agreement, the value of any Security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the immediately preceding business day) shall be determined as follows:

**(a)**      a Security which is listed or quoted on a recognized securities exchange or on The NASDAQ National Market ("*NASDAQ*") shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination;

**(b)**      a Security which is traded over the counter (other than on a recognized securities exchange or NASDAQ) shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination, or if no sales occurred on any such day, be estimated at fair value and shall be determined by the Manager; and

**(c)**      for any other Security or other investments or assets of the Company hereunder shall be estimated at fair value and shall be determined by the Manager.

**11.3      Supervision; Inspection of Books.**  Proper and complete books of account of the business of the Company, copies of the Company's federal, state and local tax returns for each fiscal year, a current Schedule of Members set forth on each updated **EXHIBIT A**, this Agreement and the Company's Certificate of Formation shall be kept under the supervision of the Manager at the principal office of the Manager.  Such books and records shall be open to inspection by the

10

725167 v1/SD

Exhibit 6
Page 296

Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice.

**11.4    Tax Returns and Information.**  The Manager shall use reasonable efforts to cause the Company's U.S. federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by the Members, to be prepared and delivered to the Member within ninety (90) days after the close of the Company's fiscal year.

**11.5    Tax Matters Partner.**  The Manager shall serve as the Company's tax matters partner under the Code and under any comparable provision of state law.  The tax matters partner is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members (in their capacity as such).  Notwithstanding the foregoing, without a Member's consent, the tax matters partner shall neither (i) choose any forum other than the U.S. Tax Court to litigate any proposed adjustment of, or other dispute concerning, any "partnership item" (within the meaning of Section 6231(a)(3) of the Code) nor (ii) extend, beyond one year, the statute of limitations on adjustment of or assessment of tax on any such item.  To the fullest extent permitted by law, the Company agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to (a) all fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the Manager or the Company that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Company, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise or any such claim, action, or demand; *provided* that this indemnity shall not extend to conduct by the tax matters partner adjudged  not to have been undertaken in good faith to promote the best interests of the Company.

**11.6    Reports.**  The Manager shall deliver or cause to be delivered to each Member (i) within 60 days after each fiscal quarter of the Company commencing with the fiscal quarter ending March 31, 2012, a report containing an unaudited balance sheet, statement of operations and statement of changes in members equity of the Company for such fiscal quarter and a valuation of the Securities owned by the Company as of the end of such fiscal quarter pursuant to paragraph 11.2, and (ii) within 120 days after the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2012, a report containing an audited balance sheet, statement of operations, and statement of changes in members equity of the Company for such Fiscal Year to date.

**ARTICLE XII**

**CERTAIN DEFINITIONS**

**12.1    Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the parties respective interests in the Profits or Losses of the Company during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interest shall occur.  Notwithstanding the foregoing, the Manager may from time to time cause allocations to be made to the parties'

11

725167 v1/SD

Exhibit 6
Page 297

Capital Accounts as if an Accounting Period had ended and a new Accounting Period shall commence on the next subsequent day, it being anticipated that such an allocation may be made in connection with Company distributions or at such other times if, in the Manager's reasonable judgment, circumstances make it reasonable to do so.

**12.2    Adjusted Asset Value.** The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

**(a)**    The initial Adjusted Asset Value of any asset contributed by the Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the Member and the Manager.

**(b)**    In the reasonable discretion of the Manager, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member; and (ii) the distribution by the Company to a party of Company assets, unless all parties receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in Company distributions.

**(c)**    The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts of the parties, as of the termination of the Company by expiration of the Company's term.

**12.3    Capital Account.** The Capital Account of each party shall consist of its original capital contribution, if any, (a) increased by any additional capital contributions, its share of Profit that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by it or that are secured by any Company property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of Loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Company or that are secured by any property contributed by it to the Company. The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Manager may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable pursuant to **ARTICLE VII** and **ARTICLE X**.

**12.4    Change of Control.** Change of Control shall mean the transfer (whether directly or indirectly) of voting securities of the Manager, in one transaction or in a series of related transactions, through which a person or "group" who does not currently hold such right, acquires (whether directly or indirectly) the right to cast a majority of the total votes entitled to be cast by

12

725167 v1/SD

Exhibit 6
Page 298

all equity holders of the Manager. The death, disability or incapacitation of Stuart Frost, the principal of the Manager, shall be deemed a Change of Control.

**12.5    Code.** The Code is the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

**12.6    Deemed Gain or Deemed Loss.** The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2), over the aggregate Adjusted Asset Value of the Securities distributed. The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2).

**12.7    Incubator.** Incubator shall mean Frost Venture Partners, LLC, a Delaware limited liability company.

**12.8    Majority in Interest.** Majority in Interest shall mean Members representing a majority of the Capital Commitments.

**12.9    Manager Parties.** The Manager Parties shall mean each of the Manager and their respective direct and indirect managers, members, partners, stockholders, officers, directors, trustees, employees, consultants, agents or any affiliate of the foregoing, including Stuart Frost.

**12.10    Marketable Securities.** Marketable Securities shall refer to Securities that are (a) traded on a recognized securities exchange  or traded on one or more securities exchanges or quoted on the automated screen-based quotation and trade execution system operated by The NASDAQ OMX Group, Inc., or any successor thereto, and not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement.  Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the Manager, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Company within a reasonable time period.

**12.11    Profit or Loss.** Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss arising for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any tax-exempt income of the Company described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury

13

725167 v1/SD

Exhibit 6
Page 299

Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c)    Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for United States federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(d)    In the event that the Adjusted Asset Value of any asset is adjusted under paragraphs 12.2(b) or (c), the amount of such adjustment shall, if positive, be added or, if negative, be subtracted, from such taxable income or loss;

(e)    The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

**12.12  Securities.** Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**12.13  Securities Act.** Securities Act is the United States Securities Act of 1933, as amended.

**12.14  Treasury Regulations.** Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE XIII

### OTHER PROVISIONS

**13.1    Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among the residents of such state made and to be performed entirely within such state.

**13.2    Limitation of Liability of the Members.** Except as required by law, no Member shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Company in excess of its Capital Commitment to the Company. Notwithstanding the foregoing, each Member shall be required to pay to the Company, at such times and subject to the conditions set forth herein, all amounts that the Member has agreed to pay in respect of its Capital Commitment.

**13.3    Exculpation.** Neither the Manager Parties nor the tax matters partner (collectively, the *"Covered Persons"*) shall be liable, responsible or accountable in damages or otherwise to the Members or the Company for honest mistakes of judgment, or for action or inaction, taken in good faith and in the reasonable belief that such action or inaction was in, or not opposed to, the best interest of the Company, or for losses due to such mistakes, action, or

14

725167 v1/SD

Exhibit 6
Page 300

inaction, or to the negligence, dishonesty, or bad faith of any employee, broker, or other agent of the Company, *provided that* such employee, broker, or agent was selected with reasonable care. To the fullest extent permitted by law, no Covered Person shall be liable to the Company or the Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice of legal counsel (as to matters of law), or of accountants (as to matters of accounting), or of investment bankers, accounting firms, or other appraisers (as to matters of valuation), *provided that* any such professional or firm is selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any Covered Person of any liability by reason of such Covered Person's commission of gross negligence, intentionally wrongful conduct or recklessness or a material breach of this Agreement that has an adverse effect on the Company or the Member, determined by arbitration pursuant to paragraph 13.10; *provided, however,* that such alleged material breach of this Agreement (and any resulting Losses (as defined below)) has not been cured (if curable) within sixty (60) days after such time as it may be demonstrated that the Covered Person had actual knowledge of such alleged material breach (*"Uncured Material Breach"*); *provided further* that any liquidator other than the Manager shall be entitled to the benefit of exculpation under this paragraph 13.3 so long as such person acted in good faith. Notwithstanding any other provision of this Agreement, to the extent that, at law or in equity, the Manager Parties have duties (including fiduciary duties) and liabilities relating thereto to the Company, any Manager Party or any other person bound by this Agreement, such Manager Party acting under this Agreement shall not be liable to the Company, the Member or any other person bound by this Agreement for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities (by specifying a duty of care or otherwise) of any Covered Person to the Company or the Member otherwise existing at law or in equity or otherwise, are agreed by the Member to replace such duties and liabilities of such Covered Person.

### 13.4    Indemnification.

(a)    The Company agrees to indemnify, out of the assets of the Company only (including the proceeds of liability insurance and any amounts that the Member may be required to contribute pursuant to the terms of this Agreement), the Manager Parties and the tax matters partner (the *"Indemnified Parties"*) to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, controversy, dispute, judgment or demand against the Indemnified Parties that arise out of or in any way relate to the Company, its properties, business, or affairs and (ii) such claims, actions, controversies, disputes, judgments and demands and any losses, damages or liabilities resulting from such claims, actions, controversies, disputes, judgments and demands, including amounts paid in settlement or compromise of any such claim, action or demand (collectively, *"Losses"*); *provided,* that such Indemnified Party acted in good faith and in the reasonable belief that such Indemnified Party's action or inaction was in, or not opposed to, the best interest of the Company; and *provided further,* that this indemnity shall not extend to any conduct which constitutes gross negligence, intentionally wrongful conduct or recklessness or an Uncured Material Breach.

15

725167 v1/SD

Exhibit 6
Page 301

**(b)**    At the election of the Manager, expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph 13.4 may be paid by the Company in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party undertakes to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified and provided the undertaking shall be in form and substance reasonably acceptable to the Manager.

**(c)**    The Manager may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Indemnified Party or potential Indemnified Party against any liability incurred in any capacity which results in such person being an Indemnified Party (provided that such person is serving in such capacity at the request of the Company or the Manager), whether or not the Company has the power to indemnify such person against such liability. The Manager may purchase and maintain insurance on behalf of and at the expense of the Company for the protection of any officer, director, manager, employee or other agent of any other organization in which the Company directly or indirectly owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify any person against such liabilities.

**(d)**    The provisions of this paragraph 13.4 shall remain in effect as to each Indemnified Party whether or not such Indemnified Party continues to serve in the capacity that entitled such person to be indemnified. The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnified Party.

**(e)**    The rights to indemnification and advancement of expenses conferred in this paragraph 13.4 shall not be exclusive and shall be in addition to any rights to which any Indemnified Party may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.

**(f)**    The Manager may make, execute, record and file on its own behalf and on behalf of the Company all instruments and other documents (including one or more separate indemnification agreements between the Company and individual Indemnified Parties or Covered Persons) that the Manager deems necessary or appropriate in order to extend the benefit of the provisions of this paragraph 13.4 to the Indemnified Parties and Covered Persons; *provided* that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in this paragraph 13.4 except as otherwise may be required by applicable law.

**(g)**    Notwithstanding anything contained herein to the contrary, if the unfunded Capital Commitments of the Company are insufficient to cover all fees, costs and expenses relating to litigation and threatened litigation involving the Company, including the Company's indemnification obligations pursuant to this paragraph 13.4, or expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, including claims by or against a governmental authority, the Manager (or liquidator) may, in its sole discretion, sell some or all of the Securities held by the Company to pay for such bona fide, documented obligations, fees, costs and expenses.

16

725167 v1/SD

Exhibit 6
Page 302

(h)     Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to this paragraph 13.4, the parties hereto intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Company, (ii) the Company, and (iii) the Manager and/or its affiliates, paragraph 13.4 shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Company shall have primary liability; second, the Company shall have secondary liability; and third, the Manager and/or its affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Company. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Company shall not restrict the Company from making indemnification payments to an Indemnified Party that is otherwise eligible for such indemnification payments, but such indemnification payments by the Company are not intended to relieve any investment counterparty of the Company from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Company actually receives indemnification payments from an investment counterparty of the Company or under any insurance policy for the same loss, such Indemnified Party shall repay the Company as soon as practicable to the extent of such duplicative indemnification payments. Indemnification payments (if any) made to an Indemnified Party by the Manager and/or its affiliates in respect of a loss for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Company shall not relieve the Company from its obligation to such Indemnified Party and/or the Manager (or any affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the Manager and/or its affiliates would be reimbursed by such Indemnified Party or directly by the Company with indemnification payments made by the Company under paragraph 13.4). To the extent that the Company is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the Manager and/or its affiliates (other than the Company), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Company. As used in this paragraph 13.4(h), "indemnification payments" made or to be made by an investment counterparty of the Company shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Company, and (z) payments made or to be made by or on behalf of such investment counterparty of the Company (or such successor) pursuant to an insurance policy or similar arrangement.

**13.5    Execution and Filing of Documents.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or by electronic mail in portable document format (PDF) will be effective as delivery of a manually executed signature page of this Agreement.

**13.6    Other Instruments and Acts.** Each Member agrees to execute any other instruments or perform any other acts that are or may be necessary to effectuate and carry on the limited liability company created by this Agreement.

17

725167 v1/SD

Exhibit 6
Page 303

**13.7    Binding Agreement.** This Agreement shall be binding upon the Members, the Manager and any of their transferees, successors, assigns, and legal representatives.

**13.8    Notices.** Any notice or other communication that one party desires to give to another party shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be addressed to the other party at the address shown in the books and records of the Company or at such other address as a party may designate by five (5) days' advance written notice to the other party.

**13.9    Power of Attorney.** By signing this Agreement, each Member designates and appoints the Manager its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Company's Certificate of Formation and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state or jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such states or jurisdictions.

**13.10   Arbitration.**

  **(a)** Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement (*"Claim"*), shall be resolved by final and binding arbitration (*"Arbitration"*) before a single arbitrator (*"Arbitrator"*) selected from and administered by Judicial Arbitration and Mediation Service Inc. (the *"Administrator"*) in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. The arbitration shall be held in San Juan Capistrano, California or vicinity.

  **(b)** Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

  **(c)** The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or

18

725167 v1/SD

Exhibit 6
Page 304

she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(d)    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* that the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)    By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 13.10, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

(f)    This paragraph 13.10 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including, to the extent applicable, the Uniform Arbitration Act (10 Del. C. § 5701 et seq.) (the *"Delaware Arbitration Act"*). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this paragraph 13.10 shall be invalid or unenforceable under the Delaware Arbitration Act, to the extent applicable, or other applicable law, such invalidity shall not invalidate all of this paragraph 13.10. In that case, this paragraph 13.10 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this paragraph 13.10 shall be construed to omit such invalid or unenforceable provision.

### 13.11  Confidentiality of Company Information.

This Agreement and all financial statements, tax reports, valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the entities in which the Company has invested (collectively, the *"Confidential Information"*), that each Member may receive pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Manager, and the Company's portfolio investments (the *"Affected Parties"*). Each Member acknowledges that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. Each Member further acknowledges that the Affected Parties believe that the Confidential Information is a trade secret, the disclosure of which may cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses. Each

19

725167 v1/SD

Exhibit 6
Page 305

Member shall not reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than a disclosure on a need-to-know basis to the Member's direct and indirect equity owners that are subject to a written confidentiality agreement, policy or obligation and each Member's and Member's direct and indirect equity owners' legal, accounting or investment advisers, auditors and representatives (collectively, "*Advisers*") without the prior consent of the Manager, except to the extent required to do so in accordance with applicable law (in which case the Member shall promptly notify the Manager of its obligation to disclose any Confidential Information) or with respect to Confidential Information which otherwise becomes publicly available other than through breach of this provision by the Member. Notwithstanding the foregoing, each Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing shall have the right to disclose Confidential Information to any regulator or governmental supervisory authority having jurisdiction over the Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing, and the Member shall provide notice to the Manager of any such disclosure unless it is legally prohibited from doing so or if it relates to taxes.

**13.12 Amendment.** This Agreement may be amended only upon the consent of the Manager and a Majority in Interest of the Members.

**13.13 Entire Agreement.** This Agreement constitutes the full, complete, and final agreement of the Members and the Manager and supersedes all prior agreements between the Members and the Manager, if any, with respect to the Company.

**13.14 Liability for Third Party Reports.** In no event shall the Company or the Manager Parties have any liability to the Members with respect to any information disseminated to the Member, where such information originated from any third party, including without limitation, any entity in which the Company has made an investment.

**13.15 Anti-Money Laundering.** Notwithstanding any other provision of this Agreement, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any person, including the Members, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated in any subscription agreement related to the Company.

**13.16 Discretion.** Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the Manager is permitted or required to make a decision (a) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests and those of the Company, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any other interest of or factors affecting the Members or any other person, or (b) in its "good faith" or under another expressed standard, the Manager shall act under such express standard and shall not be subject to any other or different standards.

**13.17 Company Legal Matters.** Each Member hereby agrees and acknowledges that:

20

725167 v1/SD

Exhibit 6
Page 306

(a)    Cooley LLP ("*Cooley*") has been retained as legal counsel by the Manager in connection with the formation of the Company and the offering of Company interests and in such capacity has provided legal services to the Manager and the Company. The Manager expects to retain Cooley to provide legal services to the Manager and the Company in connection with the management and operation of the Company.

(b)    Cooley is not and will not represent any Member in connection with the formation of the Company, the offering of Company interests, the management and operation of the Company, or any dispute that may arise between a Member on the one hand and the Manager and the Company on the other (the "*Company Legal Matters*").

(c)    Each Member will, if it wishes counsel on a Company Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)    Each Member hereby agrees that Cooley may represent the Manager and the Company in connection with any and all Company Legal Matters (including any dispute between the Manager or the Company and any Member) and waives any present conflict of interest with Cooley regarding Company Legal Matters arising by virtue of any representation or deemed representation of the Members or the Company on account of Cooley's representation described in paragraph 13.17(a) above; *provided, however,* that the Member is not hereby agreeing to Cooley's representation of (i) the Company in a derivative action on their behalf against the Manager, or (ii) the Manager or any other person in any action against the Company.

**13.18  Tax Classification.**  For United States federal and state income tax purposes only, it is intended that the Company's existence as an entity separate from its sole member be disregarded pursuant to Code Section 7701 and the Treasury regulations thereunder and under applicable state law for so long as the Company has only one Member. The Manager will cause the Company to file such elections and information returns and perform such other actions as may be required under such regulations. If one or more Additional Members is admitted to the Company, the Company shall be treated as a partnership for federal and state income tax purposes.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

21

725167 v1/SD

Exhibit 6
Page 307

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement on the date first above written.

**MANAGER:**                                        **MEMBERS:**

FROST MANAGEMENT COMPANY, LLC

By: _____
    Stuart Frost
Its:  Manager

Stuart Frost

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

## EXHIBIT A

## FROST VP SEED, LLC

## SCHEDULE OF MEMBERS

| NAME AND ADDRESS: | CAPITAL COMMITMENT |
|---|---|
| **MANAGER AND MEMBER:** | |
| **FROST MANAGEMENT COMPANY, LLC**<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $0 |
| **MEMBER:** | |
| Stuart Frost<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $___ |

725167 v1/SD

Exhibit 6
Page 309

# EXHIBIT 7

EXHIBIT
2
S. Frost
2-14-17
G. Kennamer CSR CCRR

# FROST VP EARLY STAGE FUND II, L.P.

## LIMITED PARTNERSHIP AGREEMENT

This **LIMITED PARTNERSHIP AGREEMENT** (the "*Agreement*") is made and entered into as of the 29th day of May, 2013, by and among **FROST VENTURE PARTNERS GP, LLC**, a Delaware limited liability company (the "*General Partner*"), and each of the entities who subscribe hereto as limited partners (the "*Limited Partners*"), who hereby form **FROST VP EARLY STAGE FUND II, L.P.**, a Delaware limited partnership (the "*Partnership*"), pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "*Act*"), as follows:

## ARTICLE 1

### NAME, PURPOSE AND OFFICES OF PARTNERSHIP

**1.1     Name.** The name of the Partnership is Frost VP Early Stage Fund II, L.P. The affairs of the Partnership shall be conducted under the Partnership name, or such other name as the General Partner may, in its discretion, determine.

**1.2     Purpose.** The primary purpose of the Partnership is to provide a limited number of select investors with the opportunity to realize long-term appreciation, generally from venture capital investments in early-stage and emerging private companies, with an emphasis on Big Data and Cloud Computing technology companies that are founded and incubated by, and receive support and services as part of, that certain program operated by Frost Venture Partners, LLC (the "*Incubator*"). The general purposes of the Partnership are to buy, sell, hold and otherwise invest in Securities of every kind and nature and rights and options with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Partnership; to enter into, make, and perform all contracts and other undertakings; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.

**1.3     Principal Office.** The principal office of the Partnership shall be 31910 Del Obispo, Suite 100, San Juan Capistrano, CA 92675, or such other place or places in the United States as the General Partner may from time to time designate. The General Partner shall provide the Limited Partners with prompt written notice of any change in the location of the Partnership's principal office.

**1.4     Registered Agent and Office.** The name of the registered agent for service of process of the Partnership and the address of the Partnership's registered office in the State of Delaware shall be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other agent or office in the State of Delaware as the General Partner may from time to time designate.

1.

## ARTICLE 2

### TERM OF PARTNERSHIP

**2.1    Term.** The term of the Partnership shall commence upon the date of the filing of the Certificate of Limited Partnership of the Partnership with the office of the Secretary of State of the State of Delaware (the *"Commencement Date"*) and shall continue until the fifth anniversary of the Activation Date (the *"Termination Date"*), unless extended pursuant to paragraph 10.1 or sooner dissolved as provided in paragraph 10.2.

**2.2    Events Affecting a Member of the General Partner.** The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, expulsion or removal of any member of the General Partner shall not dissolve the Partnership.

**2.3    Events Affecting a Limited Partner of the Partnership.** The death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of a Limited Partner shall not dissolve the Partnership.

**2.4    Events Affecting the General Partner.** Except as specifically provided in paragraph 10.2, the bankruptcy, expulsion, resignation, removal or withdrawal, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of the General Partner shall not constitute an "event of withdrawal" under the Act, and upon the happening of any such event, the affairs of the Partnership shall be continued by the General Partner or any successor entity thereto.

## ARTICLE 3

### NAME AND ADMISSION OF PARTNERS

**3.1    Name and Address.** The name and address of the General Partner and each Limited Partner (hereinafter the General Partner and the Limited Partners shall be referred to collectively as the *"Partners"* and each individually as a *"Partner"*), the amount of such Partner's Capital Commitment to the Partnership, and such Partner's Partnership Percentage are set forth on a Schedule of Partners (the *"Schedule of Partners"*). The General Partner shall cause the Schedule of Partners to be amended from time to time to reflect the admission of any new Partner, the withdrawal or substitution of any Partner, the transfer of interests among Partners, receipt by the Partnership of notice of any change of address of a Partner or the change in any Partner's Capital Commitment or Partnership Percentage. An amended Schedule of Partners shall supersede any prior Schedule of Partners and become a part of this Agreement. A copy of the most recent amended Schedule of Partners shall be kept on file at the principal office of the Partnership.

806590 v11/SD

2.

Exhibit 7
Page 311

**3.2    Admission of Additional Partners.**

(a)    Except as provided in paragraphs 3.2(b), 4.6(b)(vii)(4) and 9.6, an additional person may be admitted as a Partner only with the consent of the General Partner and a Majority in Interest of the Limited Partners.

(b)    Notwithstanding subparagraph (a) above, additional persons may be admitted as Limited Partners (or existing Limited Partners may increase their Capital Commitments) with the consent of only the General Partner on or before the date twelve (12) months following the Commencement Date.

(c)    Each additional person admitted as a Partner (or an existing Limited Partner that increases its Capital Commitment) subsequent to the Commencement Date shall (i) execute and deliver to the Partnership a counterpart of this Agreement or otherwise take such actions as the General Partner shall deem appropriate in order for such additional Partner to become bound by the terms of this Agreement and (ii) contribute that portion of its Capital Commitment which is equal to the portion of their respective Capital Commitments called to date by the General Partner pursuant to paragraph 4.2(a).  Limited Partners admitted to the Partnership after the Commencement Date will not be entitled to share in any Idle Funds Income accruing prior to or contemporaneously with their admission date.

(d)    Upon the admission of any additional Limited Partner pursuant to this paragraph 3.2, the General Partner may, in its sole discretion, make a special distribution of all or a portion of the initial contribution of capital made by such additional Limited Partner.  Such distribution shall be made to all Partners in accordance with Partnership Percentages (as adjusted to reflect the admission of such additional Limited Partner) and shall be deemed to be a return of capital to such Partners; *provided, however,* that such Partners shall be deemed, for the purposes of paragraph 4.2, not to have contributed the amount of such distribution and the amounts of their respective unfunded Capital Commitments shall be increased accordingly.

## ARTICLE 4

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND NONCONTRIBUTING PARTNERS

**4.1    Capital Accounts.**  An individual Capital Account shall be maintained for each Partner.

**4.2    Capital Contributions of the Limited Partners.**

(a)    Each Limited Partner shall contribute capital to the Partnership from time to time as requested by the General Partner upon ten (10) calendar days' written notice; *provided* that the General Partner expects to request initial capital contributions of the Limited Partners in an amount equal to approximately ten million dollars ($10,000,000) in the aggregate on or about the Commencement Date upon three (3) calendar days' written notice.  The date of the first capital contribution made to the Partnership by any Limited Partner in accordance with this paragraph 4.2(a) shall be referred to herein as the "*Activation Date.*"  Each capital contribution shall be in accordance with Partnership Percentages; provided, however, a Limited Partner may

3.

806590 v11/SD

Exhibit 7
Page 312

contribute such larger percentage of the Partnership's initial capital call, up to the amount of the Limited Partner's Capital Commitment, as may be agreed to by the General Partner. Notwithstanding anything in the foregoing to the contrary, no Limited Partner shall be required to contribute any capital following the fourth anniversary of the Activation Date (the "*Commitment Period*"), except as may be necessary for (1) Partnership expenses, including, but not limited to, payment of any management fee due to the General Partner; (2) completion of transactions with respect to which the Partnership has entered into a binding commitment; (3) follow-on investments in the Securities of issuers in which the Partnership holds a pre-existing interest as of the date of such proposed follow-on investment and (4) fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d). Further, each Limited Partner's obligation to contribute capital shall also be subject to those limitations set forth in paragraph 4.6. Each capital contribution by any Limited Partner shall be made in cash.

   **(b)**    Notwithstanding paragraph 4.2(a), with respect to the Partnership's initial request for capital contributions under paragraph 4.2, no ERISA Partner shall be required to contribute capital pursuant to this Agreement until such time as the General Partner shall have delivered notice (the "*VCOC Notice*"), to such ERISA Partner to the effect that the Partnership's first Portfolio Company investment has qualified or will qualify upon its closing as a "venture capital investment" within the meaning of the U.S. Department of Labor regulations ("*DOL Regulations*") such that the Partnership will qualify as a "venture capital operating company" (a "*VCOC*") under applicable DOL Regulations, or that less than twenty-five percent (25%) of the Partnership's Committed Capital is from Limited Partners who are "benefit plan investors" for purposes of the DOL Regulations. In the event that an ERISA Partner has not received the VCOC Notice prior to the date on which any capital contribution would otherwise be due under paragraph 4.2(a), the General Partner, at its discretion, may either (i) defer the contribution obligation of such ERISA Partner until the VCOC Notice has been delivered (which shall, in any case, be within fifteen (15) calendar days of the corresponding contributions from non-ERISA Partners) or (ii) cause such ERISA Partner to pay such capital contribution into an interest-bearing escrow account designated by the General Partner. The terms of any such escrow account shall be reasonably satisfactory to such ERISA Partner and in compliance with ERISA (including Dept. of Labor Adv. Op. 95-04A). Upon delivery of the VCOC Notice, all amounts in the escrow account shall be delivered to the Partnership in fulfillment of the ERISA Partner's obligation under paragraph 4.2(a).

   **(c)**    At any time within ninety (90) days of its initial contribution, the General Partner may, in its sole discretion, return to the Partners all or a portion of any capital contribution intended for a proposed investment which is not consummated as anticipated pro rata in accordance with their respective capital contributions; *provided that* such returned capital shall be added back to unfunded Capital Commitments and be subject to recall by the General Partner pursuant to this Article 4.

   **(d)**    **(i)** If, in the discretion of the General Partner, Partnership assets are insufficient to fulfill any indemnification obligation of the Partnership pursuant to paragraph 15.4, prior to the termination of the Partnership the General Partner may require each Partner to contribute capital to the Partnership in an amount up to such Partner's unfunded Capital Commitment, if any.

4.

806590 v11/SD

Exhibit 7
Page 313

**(ii)** If, in the discretion of the General Partner, Partnership assets remain insufficient to fulfill (i) any indemnification obligation of the Partnership pursuant to paragraph 15.4 following the contribution to the Partnership of the maximum amount permitted by paragraph 4.2(d)(i) and/or (ii) any obligation of the Partnership to pay amounts in respect of claims associated with prior Portfolio Company dispositions (including, without limitation, amounts associated with the terms of any transaction documents relating to the acquisition of any Portfolio Company Securities), the General Partner may recall distributions previously made to the Partners solely for the purpose of fulfilling or satisfying such an obligations or liabilities. The obligation to recontribute distributions under this paragraph 4.2(d)(ii) shall be applied pro rata in proportion to aggregate distributions from the Partnership (in each case, with any in kind distributions valued as of the date of distribution). In no event shall any Limited Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the Limited Partner from the Partnership or (2) twenty-five percent (25%) of such Limited Partner's Capital Commitment. In no event shall the General Partner be required to contribute capital pursuant to this paragraph 4.2(d)(ii) in an amount in excess of the lesser of (1) distributions previously received by the General Partner from the Partnership or (2) one hundred percent (100%) of amounts distributed to the General Partner with respect to its Carry Percentage in Partnership Profit or Loss. In no event will the General Partner be permitted to call capital pursuant to this paragraph 4.2(d)(ii) after the date one (1) year from the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1).

**4.3    Capital Contributions of the General Partner.** The General Partner shall contribute capital to the Partnership in an aggregate amount equal to $6,100,000 on the same terms under which any Limited Partner is required to contribute capital pursuant to paragraph 4.2(a). Each capital contribution made by the General Partner shall be made in cash; *provided*, that the General Partner may reduce its contribution obligation on a dollar-for-dollar basis by electing to reduce the amount of management fee that it would otherwise receive pursuant to paragraph 6.1 (each such reduction, a *"Fee Adjustment"*); provided that the aggregate amount of all Fee Adjustments over the term of the Partnership shall not exceed eighty percent (80%) of the General Partner's Capital Commitment. In the event that the General Partner elects to make a Fee Adjustment, the General Partner shall provide, prior to the first day of the fiscal year in which such reductions shall occur (for the Partnership's first fiscal year, such notice shall be provided prior to the Partnership's initial request for capital contributions under paragraph 4.2(a)), written notice (a *"Fee Adjustment Notice"*) to the Partnership of the amount of such reduction (each such amount, a *"Fee Adjustment Amount"*), which amount may be expressed for a specified period as a percentage of the amount the General Partner would otherwise be obligated to contribute in cash or as a specific dollar amount. Once made, any such election shall be irrevocable for the year to which it applies. If the General Partner delivers a Fee Adjustment Notice, such election shall apply to each succeeding year unless revoked or modified prior to the year to which the revocation or modification applies. For the avoidance of doubt, the General Partner's capital contributions deemed to have been made to the Partnership pursuant to this paragraph 4.3 shall increase its capital contribution and reduce its unpaid Capital Commitment, but shall not increase the General Partner's Capital Account.

**4.4    Acquisition of an Additional Interest by the General Partner.** In the event that the General Partner acquires a Limited Partner's interest pursuant to the terms of this

5.

806590 v11/SD

Exhibit 7
Page 314

Agreement, the General Partner shall have two Partnership Percentages and two Capital Account balances for purposes of making Partnership allocations, as if such subsequently acquired interest were held by a separate entity which is a Limited Partner, although for all other purposes the General Partner shall have only one Capital Account.

### 4.5    Noncontributing Partners.

**(a)**    The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions to capital set forth in paragraph 4.2, and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made. If any legal proceedings relating to the failure of a Limited Partner to make such a contribution are commenced, such Limited Partner shall pay all costs and expenses incurred by the Partnership, including attorneys' fees, in connection with such proceedings.

**(b)**    Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.5(a), should any Limited Partner fail to make any of the capital contributions required of it under this Agreement and such failure shall have continued uncured for ten (10) or more days after delivery of written notice by the General Partner to such Limited Partner, such Limited Partner shall be in default (a *"Defaulting Limited Partner"*).    In the event of such default, the General Partner may, in carrying out what it determines to be in the best interests of the nondefaulting Limited Partners, elect to enforce one or more of the provisions of this paragraph 4.5(b) in connection with such a default, to which each Limited Partner hereby expressly consents.  The General Partner shall deliver written notice to such Defaulting Limited Partner in the event that it determines to utilize one or more of the powers set forth in paragraph 4.5(a) or this paragraph 4.5(b) (a *"Default Notice"*).    Upon delivery of the Default Notice, the Defaulting Limited Partner may not make any additional contributions of capital against such Defaulting Limited Partner's Capital Commitment (other than to fund management fees and other expenses of the Partnership) without the written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner.

**(i)**    The General Partner may waive, in whole or in part, the requirement of payment with respect to any due and unpaid capital contributions by a Defaulting Limited Partner pursuant to this Agreement and reduce such Defaulting Limited Partner's Capital Commitment accordingly.  The General Partner shall disclose any waiver made pursuant to this paragraph 4.5(b)(i) to the Advisory Committee; *provided, however*, the General Partner may not waive the capital contribution requirements of any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

**(ii)**    The General Partner may extend the time of payment for a Defaulting Limited Partner of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement.  The General Partner shall disclose any extension made pursuant to this paragraph 4.5(b)(ii) to the Advisory Committee; *provided, however*, the General Partner may not extend the time of payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee.

6.

Exhibit 7
Page 315

(iii)    The General Partner may declare the entire amount of a Defaulting Limited Partner's then unfunded Capital Commitment to be immediately due and payable.

(iv)    On behalf of the Partnership, the General Partner may enforce, by appropriate legal proceedings, the Defaulting Limited Partner's obligation to make payment on the amount of any due and unpaid capital contributions by such Defaulting Limited Partner pursuant to this Agreement or to pay the entire amount of such Defaulting Limited Partner's then unfunded Capital Commitment.

(v)    The General Partner shall deny the Defaulting Limited Partner the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the Capital Commitment of such Defaulting Limited Partner shall not be included for purposes of calculating a Majority in Interest or other Percentage in Interest of the Limited Partners for purposes of this Agreement.

(vi)    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vi), such Defaulting Limited Partner shall pay all expenses to be incurred or anticipated to be incurred by the Partnership in connection with the default and the interest on the amount of the contribution to the Partnership then due at the Prime Rate plus one hundred (100) basis points per annum (or if less, the highest rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to this Agreement until the date the contribution is made by such Defaulting Limited Partner, unless such payment is waived by the General Partner; *provided, however*, the General Partner may not waive such payment for any Defaulting Limited Partner that is an Affiliate of the General Partner without the consent of the Advisory Committee. The accrued interest shall be paid by the Defaulting Limited Partner to the Partnership upon payment of such contribution. The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income to the Partnership; *provided that* such income shall not be allocated to the Capital Account of the Defaulting Limited Partner. Until such time as the unpaid contribution and accrued interest thereon shall have been paid by the Defaulting Limited Partner, the General Partner may elect to withhold any or all distributions to be made to such Defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by set off against any such distribution withheld.

(vii)    Should the General Partner, in its sole discretion, elect to exercise the provisions of this paragraph 4.5(b)(vii), the General Partner and the nondefaulting Limited Partners (the "*Optionees*"), shall have the right and the option, but not the obligation, to acquire the Partnership interest of the Defaulting Limited Partner (the "*Optionor*"), as follows:

(1)    The General Partner shall notify the Optionees of the default within twenty (20) days of the expiration of the ten (10) day notice period commencing upon delivery of the Default Notice. Such notice shall advise each Optionee of the portion and the price of the Optionor's interest available to it. Each Optionee shall be offered a *pro rata* portion (in accordance with capital contributions to the Partnership) of the available Optionor's interest. The aggregate price for the Optionor's interest shall be the lesser of fifty percent (50%) of (A) the amount of the Optionor's Capital Account calculated as of the due date of the

7.

806590 v11/SD

Exhibit 7
Page 316

additional contribution and adjusted to reflect the allocation of the appropriate proportion of the Partnership's unrealized gains and losses as of the due date of such defaulted contribution, and (B) the aggregate amount of the Optionor's capital contributions actually made less any distributions (valued at their fair market value on the date of distribution in accordance with paragraph 12.1) on or prior to such due date. The price for each Optionee shall be prorated according to the portion of the Optionor's interest purchased by each such Optionee. The option granted hereunder shall be exercisable at any time after the date thirty (30) days following the date of the initial notice of default from the General Partner to the Optionor by delivery to the Optionor of a notice of exercise of option together with a nonrecourse promissory note for the purchase price and a security agreement in accordance with subparagraph (5) below, which notice and documents the General Partner shall promptly forward to the Optionor.

(2)     Should any Optionee not exercise its option within said thirty (30) day period provided in subparagraph (1), the General Partner shall immediately notify the other Optionees who have elected to exercise their option, which Optionees shall have the right and option ratably among them to acquire the portion of the Optionor's interest not so acquired (the "*Remaining Portion*") within thirty (30) days of the date of the notice specified in this subparagraph (2) on the same terms as provided in subparagraph (1).

(3)     Any amount of the Remaining Portion not acquired by the Optionees pursuant to subparagraph (2) may be acquired by the General Partner within thirty (30) days of the expiration of the thirty (30) day period specified in subparagraph (2) on the same terms as set forth in subparagraph (1).

(4)     Any amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subparagraphs (2) or (3) may, if the General Partner deems it in the best interest of the Partnership, be sold by the General Partner to any other investor, on terms not more favorable to such parties than those applicable to the Optionees' option, and upon the consent of the General Partner, any such third party purchaser may become a Limited Partner to the extent of the interest purchased hereunder.

(5)     The price due from each of the General Partner and the Optionees (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be payable by a noninterest bearing, nonrecourse promissory note (in such form as the General Partner shall designate) due upon final liquidation of the Partnership. Each such note shall be secured by the portion of the Optionor's Partnership interest so purchased by its maker pursuant to a security agreement in a form designated by the General Partner and shall be enforceable by the Optionor only against such security.

(6)     Upon exercise of any option hereunder, each Optionee (and, if applicable, any third party purchaser pursuant to subparagraph (4)) shall be obligated (A) to contribute to the Partnership that portion of the additional capital then due from the Optionor equal to the percentage of the Optionor's interest purchased by such person and (B) to pay the same percentage of any further contributions otherwise due from such Optionor on the date such contributions are otherwise due. Each person who purchases a portion of the Optionor's Partnership interest shall be deemed to have acquired such portion as of the due date of the additional capital contribution with respect to which the Optionor defaulted, and any

8.

806590 v11/SD

Exhibit 7
Page 317

distributions made after the due date on account of the Optionor's interest shall be distributed among such purchasers (and, unless the entire interest was purchased, the Optionor) in accordance with their ultimate respective interests in the Optionor's interest. Distributions otherwise allocable to the Optionor under the preceding sentence shall first be used to offset any defaulted contribution of the Optionor still due to the Partnership. Upon completion of any transaction hereunder, the General Partner shall cause the Schedule of Partners to be amended to reflect all necessary changes resulting therefrom including, without limitation, admission of a purchaser as a Limited Partner, and adjustment of Capital Account balances, Capital Commitment amounts and Partnership Percentages as of the date of Optionor's default to reflect the acquisition from Optionor of the appropriate pro rata portion of each such item. The purchase and transfer of the Partnership interest of the Optionor shall occur automatically upon exercise by any Optionee or the General Partner of its option hereunder, without any action by Optionor.

(7)     Notwithstanding the sale of any portion of an Optionor's interest pursuant to this paragraph 4.5(b)(vii), such Optionor shall not be released from its unfunded Capital Commitment except as actually funded by the acquirer of any such portion of Optionor's interest.

(8)     In the event that any amount of the Remaining Portion is not acquired by the Optionees, the General Partner and any third party purchasers pursuant to paragraphs 4.5(b)(vii)(1)-(4), then, in its sole discretion, the General Partner may apply any of the remedies described in paragraphs 4.5(a) and (b) to such unsold portion.

(viii)     The General Partner may, in its sole discretion, elect to remove such Defaulting Limited Partner from the Partnership, in which such event (1) one hundred percent (100%) of the Defaulting Limited Partner's Capital Account balance shall be forfeited and reallocated to the Capital Accounts of the nondefaulting Partners proportionally, based on, with respect to each such Partner, the ratio that its Partnership Percentage immediately prior to such calculation bears to the aggregate Partnership Percentages of all Partners (other than the Defaulting Limited Partner) and (2) the Defaulting Limited Partner's Partnership Percentage shall be reduced to zero.

(ix)     Notwithstanding anything to the contrary in this Agreement, each Limited Partner (1) agrees that it will execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 4.5, and (2) designates and appoints the General Partner its true and lawful attorney, in its name, place and stead to make, execute and sign any and all instruments, documents or certificates on behalf of any Defaulting Limited partner in order to give effect to any remedy against such Defaulting Limited Partner (including, but not limited to, the remedies set forth in this paragraph 4.5(b)).

(x)     The Partners agree that the General Partner's authority and discretion to enforce any remedy against a Defaulting Limited Partner (including but not limited to the remedies set forth in this paragraph 4.5(b)) supersede any fiduciary duties of the General Partner to such Defaulting Limited Partner. The Partners further agree that the remedies set forth in this paragraph 4.5(b) are fair and reasonable in light of the difficulty in ascertaining the actual

9.

806590 v11/SD

Exhibit 7
Page 318

damages that would be incurred by the Partnership and the nondefaulting Partners as a result of the Defaulting Limited Partner's failure to contribute capital when due pursuant to the terms of this Agreement.

(xi)    Notwithstanding anything to the contrary in this paragraph 4.5, a Limited Partner shall not be declared to be in default by the General Partner with respect to any due and unpaid capital contributions in the event that such Limited Partner is entitled to withdraw from the Partnership (or the General Partner has requested such withdrawal) pursuant to Article 13 and the failure to make such due and unpaid capital contributions is the consequence of or attributable to such withdrawal.

4.6    **Suspension Period.**

(a)    Notwithstanding any other provision of this Agreement to the contrary, no Limited Partner shall be required to contribute capital to the Partnership in respect of its Capital Commitment during any suspension of the Commitment Period pursuant to paragraph 4.6(b) except for:

(i)    Partnership expenses, including payment of any management fee due to the General Partner;

(ii)    follow-on investments in portfolio companies in which the Partnership had invested prior to commencement of the Suspension Period;

(iii)    completion of transactions with respect to which the Partnership has entered into a binding commitment prior to commencement of the Suspension Period; and

(iv)    fulfillment of such Limited Partner's obligations pursuant to paragraph 4.2(d).

(b)    In the event that Stuart Frost (i) fails to meet the devotion of time requirements in paragraph 8.3(a) or (ii) is no longer a manager of the General Partner (each, a "*Suspension Event*"), the General Partner shall promptly deliver written notice to each Limited Partner of such Suspension Event (a "*Suspension Event Notice*"). At any time within the period commencing with the effective date of the Suspension Event Notice and ending on the date sixty (60) days thereafter, the Limited Partners shall have the right to commence a "*Suspension Period*" upon the affirmative vote of a Majority in Interest of the Limited Partners.

(c)    Any Suspension Period may be terminated at any time upon the affirmative vote of a Majority in Interest of the Limited Partners; *provided, however*, that unless within one hundred eighty (180) days after the commencement of a Suspension Period, a Majority in Interest of the Limited Partners has elected to terminate such Suspension Period and re-commence normal Partnership operations, the remaining managers of the General Partner shall be permitted to form a new private equity fund or similar entity with objectives substantially similar to the Partnership.

806590 v11/SD

Exhibit 7
Page 319

# ARTICLE 5

## PARTNERSHIP ALLOCATIONS

**5.1    Allocation of Profit or Loss.** Except as otherwise provided in this Article 5, Profit and Loss of the Partnership for each Accounting Period shall be allocated as follows:

(a)    Profit shall be allocated:

(i)    First, allocated as a Priority Allocation, one hundred percent (100%) to the General Partner until the cumulative Profit allocated to the General Partner pursuant to this paragraph 5.1(a)(i) in such Accounting Period and all prior Accounting Periods is equal to the aggregate Fee Adjustment Amounts (as defined in paragraph 4.3) for fiscal quarters beginning during or prior to such Accounting Period; *provided, however,* that for each separate Fee Adjustment amount the General Partner shall only receive an allocation pursuant to this paragraph 5.1(a)(i) in respect of the Fee Adjustment Amounts for a fiscal quarter to the extent that the Profit for the Accounting Period is (A) realized after the beginning of the fiscal quarter to which the corresponding Fee Adjustment Amount applies and (B) not attributable to unrealized appreciation inherent in the Partnership's assets as of the date of such election for the related fiscal quarter; and *provided further,* that such Priority Allocation shall only be allocated from Profit consisting of qualified dividend income and gains on Securities, including, without limitation, gains from the sale of Securities, any Deemed Gain allocable to the Partners in connection with a distribution or other disposition of Securities, and any Deemed Gain allocable in connection with a revaluation of Securities for any reason;

(ii)    Second, to the Limited Partners, until the cumulative amount of Profit allocated to the Limited Partners pursuant to this paragraph 5.1(a)(ii) for the current Accounting Period and all prior Accounting Periods equals the cumulative amount of management fees allocated to the Limited Partners pursuant to paragraph 5.1(c) for the current Accounting Period and all prior Accounting Periods;

(iii)    Third, among the Partners to reverse the cumulative amount of Losses allocated to the Partners pursuant to paragraph 5.1(b)(ii) for the current Accounting Period and all prior Accounting Periods; and

(iv)    Thereafter, any remaining Profit shall initially be allocated among the Partners in proportion to their respective Partnership Percentages. The share of each Partner in such initial allocation shall be divided between such Partner and the General Partner and allocated as follows:

(1)    The Carry Percentage (as defined below) to the General Partner; and

(2)    The difference between one hundred percent (100%) and the Carry Percentage to such Partner.

For the purposes of this Agreement, the "*Carry Percentage*" shall mean a percentage equal to (i) in the case of Limited Partners admitted after the Activation Date, twenty percent

806590 v11/SD

Exhibit 7
Page 320

(20%) and (ii) in the case of each Limited Partner admitted on or prior to the Activation Date, the Carry Percentage shall be 10% on the capital contributions made by such Limited Partner at the Activation Date and 20% on any capital contributions made after the Activation Date, which Carry Percentage shall be calculated as, ten percent (10%) plus the product of the percentage of the Limited Partner's Capital Commitment not contributed on or prior to the Activation Date times ten (10) percentage points (for example, a Limited Partner who contributed fifty percent (50%) of its Capital Commitment on the Activation Date would have a Carry Percentage of fifteen percent (15%)).

(b)  Loss shall be allocated:

(i)  First, Losses shall be allocated among the Partners in reverse order of the Profit previously allocated in paragraph 5.l(a)(iv) above and not previously reversed pursuant to this paragraph 5.1(b)(i) for the current Accounting Period and all prior Accounting Periods; and

(ii)  Thereafter, any remaining Loss shall be allocated among the Partners in proportion to their respective Partnership Percentages.

(c)  Management fees paid pursuant to paragraph 6.1 below shall be allocated to the Limited Partners in proportion to their respective Partnership Percentages.

(d)  All Idle Funds Income (net of directly associated expenses) shall be allocated to the Capital Accounts of all of the Partners in proportion to their respective Partnership Percentages.

5.2  **Special Allocations.**

(a)  To the extent the Partnership has taxable interest income or expense with respect to any promissory note between any Partner and the Partnership as holder and maker or maker and holder pursuant to Section 483, Sections 1271 through 1288, or Section 7872 of the Code, such interest income or expense shall be specially allocated to the Partner to whom such promissory note relates, and such Partner's Capital Account adjusted if appropriate.

(b)  If additional persons are admitted to the Partnership as Limited Partners subsequent to the Commencement Date, then organizational costs, fees (including the management fee set forth in paragraph 6.1), and expenses of the Partnership that are allocated to the Partners on or after the effective date of such admission shall be allocated first to such new Partners to the extent necessary to cause such persons to be treated with respect to such items as if they had been Partners from the Commencement Date.

5.3  **Regulatory Allocations.**

(a)  This Agreement is intended to comply with the safe harbor provisions set forth in Treasury Regulation 1.704-1(b) and the allocations set forth in paragraph 5.4(b) (the *"Regulatory Allocations"*) are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  In the event the Regulatory Allocations result in allocations being made that are inconsistent with the manner in which the Partners intend to divide

12.

806590 v11/SD

Exhibit 7
Page 321

Partnership Profit and Loss as reflected in paragraphs 5.1 and 5.2, the General Partner shall use its best efforts to adjust subsequent allocations of any items of profit, gain, loss, income or expense such that the net amount of the Regulatory Allocations and such subsequent special adjustments to each Partner is zero.

(b)     The allocations provided in this Article 5 shall be subject to the following exceptions:

(i)     Any loss or expense otherwise allocable to a Limited Partner which exceeds the positive balance in such Limited Partner's Capital Account shall instead be allocated first to all Partners who have positive balances in their Capital Accounts in proportion to their respective Partnership Percentages, and when all Partners' Capital Accounts have been reduced to zero, then to the General Partner; income shall first be allocated to reverse any loss allocated under this paragraph 5.3(b)(i), in reverse order of such loss allocations, until all such prior loss allocations have been reversed.

(ii)     In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6), which causes or increases a deficit balance in such Limited Partner's Capital Account, items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible.

(iii)     For purposes of this paragraph 5.3(b), the balance in a Partner's Capital Account shall take into account the adjustments provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6).

5.4     **Income Tax Allocations.**

(a)     Except as otherwise provided in this paragraph or as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Partner's distributive share of Partnership income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in the Partner's Capital Account pursuant to this Agreement.

(b)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any asset contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Adjusted Asset Value.

(c)     In the event the Adjusted Asset Value of any Partnership asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Adjusted Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

13.

806590 v11/SD

Exhibit 7
Page 322

## ARTICLE 6

### MANAGEMENT FEE; PARTNERSHIP EXPENSES

**6.1    Management Fee.**

(a)    Commencing as of the Activation Date, the General Partner (or its designee) shall be compensated on a quarterly basis for services rendered during the term of the Partnership by the payment in advance by the Partnership in cash to the General Partner (or its designee) on the first day of each fiscal quarter (or portion thereof) of a management fee.

(b)    The management fee for each fiscal quarter (prior to the adjustments described in paragraphs 6.1(c) and (d)) shall be an amount equal to the aggregate Capital Commitments of all Limited Partners as of the first day of each such quarter multiplied by 0.5% (the percentage applicable for any period referred to herein as the *"Management Fee Percentage"*).    Notwithstanding the foregoing, (i) the management fee for each of the Partnership's first and last fiscal quarters with respect to which any management fee is due shall be proportionately reduced based upon the ratio of the number of days in each such period bears to ninety (90), (ii) an additional management fee shall be payable upon the date of admission of any Limited Partner admitted subsequent to the Commencement Date to reflect the increased Capital Commitments calculated as if such Limited Partner had been admitted to the Partnership as of the Commencement Date and (iii) commencing on the expiration, termination, or suspension of the Commitment Period, and on each anniversary thereafter, the Management Fee Percentage shall be reduced by an amount equal to ten percent (10%) of the base Management Fee Percentage (i.e., by 0.2%); *provided, however*, if the suspension of the Commitment Period is terminated pursuant to paragraph 4.6(c), the base Management Fee Percentage shall be restored to the level applicable prior to suspension of the Commitment Period as of the commencement of the next fiscal quarter.

(c)    The management fee otherwise payable by the Partnership to the General Partner (or its designees) pursuant to paragraph 6.1(b) for a fiscal quarter shall be offset by the amount of capital that the General Partner elected not to contribute in cash (as permitted by paragraph 4.3) with respect to the immediately preceding quarter.  In the event that there exists at the time of the liquidation of the Partnership any excess of fees not offset by the reduction of management fees pursuant to the preceding sentence, such excess shall be paid over to the Partnership by the General Partner and allocated among all Limited Partners in accordance with their respective Partnership Percentages (unless a Limited Partner provides written notice to the General Partner that it elects not to receive an allocation of any such excess fees).

(d)    Each Limited Partner hereby agrees and acknowledges that the Incubator may receive a monthly fee from the companies in which the Partnership holds an investment (each, a *"Portfolio Company"*) in exchange for certain shared advisory and support services provided to the Portfolio Company (a *"Service Fee"*).  For the avoidance of doubt, any Service Fee paid by a Portfolio Company to an affiliate of the General Partner will not reduce the management fee payable to the General Partner by the Partnership pursuant to paragraph 6.1(a), so long as such Service Fee does not exceed reasonable market rates.

14.

806590 v11/SD

Exhibit 7
Page 323

6.2    **Expenses.**

(a)    From the management fee, the General Partner shall bear all normal operating expenses incurred in connection with the management of the Partnership, the General Partner, except for those expenses borne directly by the Partnership as set forth in subparagraphs (b), (c) and (d) below and elsewhere herein. Such normal operating expenses to be borne by the General Partner (or its designee) shall include, without limitation, expenditures on account of salaries, wages, travel, entertainment, and other expenses of employees, consultants and agents of the Partnership or the General Partner, overhead and rentals payable for space used by the General Partner (or its designee) or the Partnership, office expenses and in managing investments of the Partnership.

(b)    The Partnership shall bear all costs and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, legal fees, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Partnership, including claims by or against a governmental authority, audit and accounting fees, tax return preparation and related fees, consulting fees relating to investments or proposed investments (including the cost of independent valuations, if any), back-office services in respect of the Partnership or the General Partner (or if the Management Company or Incubator performs such functions internally, an amount reimbursable to the Management Company or Incubator, as applicable, equal to the then-current market cost of a qualified third party service provider as determined by the General Partner in good faith), third party accounting and/or consulting fees, market research subscription or consulting fees, taxes applicable to the Partnership on account of its operations, fees incurred in connection with the maintenance of bank or custodian accounts, fees and expenses incurred in connection with the Management Company's, the General Partner's and/or their Affiliates' compliance with applicable law and regulations associated with the Partnership, and all expenses incurred in connection with the registration of the Partnership's Securities under applicable securities laws or regulations. The Partnership shall also bear expenses incurred by the General Partner in serving as the tax matters partner (as described in paragraph 11.8), the reasonable cost of liability and other premiums for insurance protecting the Partnership, the General Partner, its managers and members, and the Management Company and its employees from liability to third parties, all out-of-pocket expenses of preparing and distributing reports to Partners, out-of-pocket expenses associated with Partnership communications with Partners, including preparation of annual or other reports to the Limited Partners, out-of-pocket costs associated with Partnership meetings or Advisory Committee matters, all out-of-pocket fees and expenses incurred by the Management Company related to regulatory compliance in connection with the management of the Partnership, all legal and accounting fees relating to the Partnership and its activities, all costs and expenses arising out of the Partnership's indemnification obligation pursuant to this Agreement, and all expenses that are properly chargeable to the activities of the Partnership.

(c)    The Partnership shall bear all organizational and syndication costs, fees, and expenses incurred by or on behalf of the General Partner in connection with the formation

15.

806590 v11/SD

Exhibit 7
Page 324

and organization of the Partnership and the General Partner, including legal and accounting fees and expenses incident thereto.

(d)    The Partnership shall bear all liquidation costs, fees, and expenses incurred by the General Partner (or its designee) in connection with the liquidation of the Partnership at the end of the Partnership's term, specifically including but not limited to legal and accounting fees and expenses.

(e)    Each of the Partnership and the General Partner agree to reimburse the other as appropriate to give effect to the provisions of this paragraph 6.2 in the event that either such party pays an obligation that is properly the responsibility of the other.

(f)    To the extent that any expenses borne by the Partnership pursuant to subparagraphs (b) and (c) above also benefit a Parallel Fund, such expenses shall be allocated among the Partnership and the applicable Parallel Funds pro rata in proportion to the aggregate capital commitments of the Partnership together with any such Parallel Funds.

## ARTICLE 7

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE PARTNERS

7.1    **Interest.**  Except as otherwise provided in this Agreement, no interest shall be paid to any Partner on account of its interest in the capital of or on account of its investment in the Partnership.

7.2    **Withdrawals by the Partners.**  No Partner may withdraw any amount from its Capital Account unless such withdrawal is made pursuant to this Article 7, Article 10 or Article 13.

7.3    **Partners' Obligation to Repay or Restore.**  Except as required by law or paragraphs 4.2(c) and 4.2(d) of this Agreement, no Limited Partner shall be obligated at any time to repay or restore to the Partnership all or any part of any distribution made to it from the Partnership in accordance with the terms of this Article 7.

7.4    **Mandatory Distributions.**  Each Partner shall be paid in cash within ninety (90) days after the end of each fiscal year during the term of the Partnership an amount equal to the excess, if any, of (i) the Applicable Tax Rate multiplied by the net taxable income allocated to such Partner as a result of such Partner's ownership of an interest in the Partnership for the current fiscal year (excluding, for this purpose and purposes of clause (y) of this paragraph 7.4, any allocations to the General Partner pursuant to paragraph 5.1(a)(i)), over (ii) all cash prior distributions made pursuant to this paragraph 7.4 or paragraph 7.5 during such fiscal year (other than amounts distributed pursuant to this paragraph 7.4 during such fiscal year in respect of net taxable income allocated to the General Partner during the preceding fiscal year); *provided, however*, that (x) the General Partner shall not be required to make any such distribution if the total amount to be distributed to all Partners is less than five hundred thousand dollars ($500,000), and (y) the General Partner shall have the authority, in its sole discretion, to make good faith estimates of amounts expected to be distributed pursuant to this paragraph 7.4 with respect to a given calendar year and to distribute such estimated amounts to all Partners as

16.

806590 v11/SD

Exhibit 7
Page 325

advances from time to time during such calendar year. The provisions of this paragraph 7.4 shall apply equally to all Partners, without regard to their tax-exempt status under the Code. For purposes of this paragraph 7.4, the "*Applicable Tax Rate*" shall refer to the highest federal, state and local income, self-employment and Medicare tax rates then applicable to individuals resident of the State of California, applied by taking into account the character of the taxable income in question (i.e., long-term capital gains, ordinary income, etc.).

**7.5** **Discretionary Distributions.** The General Partner may make distributions of cash or Marketable Securities as follows:

(a) If at the time of a proposed distribution the Limited Partners have not previously received aggregate distributions pursuant to paragraph 7.4 and this paragraph 7.5 or otherwise (with any in-kind distributions valued at the time of distribution in accordance with paragraph 12.1) equal to the sum of their capital contributions to the Partnership ("*Payback*"), such distribution shall be made to all Partners in proportion to their respective unreturned capital contributions;

(b) Subsequent to Payback, all such distributions may be made to the Partners in proportion to the relative undistributed net Profits standing in their respective Capital Accounts immediately prior to such distribution (including in such Capital Accounts for purposes of determining the proportions of such distribution the Deemed Gain or Deemed Loss described in paragraph 7.5(g)). For the avoidance of doubt, with respect to each Partner, the phrase "undistributed net Profit" as used in the first sentence of this paragraph 7.5(b) shall refer to aggregate allocations of Profit (as modified by the parenthetical in such first sentence) less aggregate allocations of Loss, as reduced by prior distributions of net Profit.

(c) Notwithstanding paragraph 7.5(b) above, the General Partner may at any time subsequent to Payback make distributions to all Partners in proportion to their respective Partnership Percentages. Any distributions which may be made to the General Partner under paragraph 7.5(b) (excluding for this purpose distributions in respect of the General Partner's Partnership Percentage) shall be reduced dollar-for-dollar by the amount of distributions previously received by the General Partner pursuant to paragraph 7.4 in respect of amounts allocated to the General Partner (excluding for this purpose amounts allocated to the General Partner in respect of the General Partner's Partnership Percentage) to the extent such amounts have not previously been taken into account to reduce prior distributions under paragraph 7.5(b). In no event may a proposed distribution described in this Article 7 cause the Capital Account of the General Partner to go below zero (0).

(d) Whenever more than one type of Securities is being distributed in kind in a single distribution or whenever more than one class of Securities of a Portfolio Company (or a portion of a class of such Securities having a tax basis per share or unit different from other portions of such class) are distributed in kind by the Partnership, each Partner shall receive its ratable portion of each type, class or portion of such class of Securities distributed in kind (except to the extent that a disproportionate distribution is necessary to avoid distributing fractional shares).

17.

806590 v11/SD

Exhibit 7
Page 326

(e)    Securities distributed in kind shall be subject to such conditions and restrictions as the General Partner determines are legally required or appropriate. Subject to paragraph 7.5(h), whenever types or classes of Securities are distributed in kind, each Partner shall receive its ratable portion of each type or class of Securities distributed in kind.

(f)    Notwithstanding any other provision of this paragraph 7.5, prior to the dissolution of the Partnership, the Partnership shall not, without the prior approval of a Majority in Interest of the Limited Partners, make a distribution of Nonmarketable Securities.

(g)    Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of all Partners as Profit or Loss pursuant to Article 5.

(h)    In order to comply with regulatory or legal restrictions on the amount of any Security that a Partner may be permitted to directly own or control (a "*Regulatory Limitation*"), in the event that any Partner would be entitled to receive a distribution of Securities from the Partnership that would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates).  Such engagement shall be separate from and outside of the structure of the Partnership.

(i)    No distribution shall be made to a Partner to the extent it would create or increase a deficit in its Capital Account.

7.6    **Withholding Obligations.**

(a)    If and to the extent the Partnership is required by law (as determined in good faith by the General Partner) to make payments ("*Tax Payments*") with respect to any Partner in amounts required to discharge any legal obligation of the Partnership or the General Partner, including any obligation pursuant to FATCA, to make payments to any governmental authority with respect to any federal, state or local income, self-employment, foreign or Medicare  tax liability of such Partner arising as a result of such Partner's interest in the Partnership, then the General Partner shall provide prompt notice to such Partner of such Tax Payments and the amount of any such Tax Payments shall be deemed to be a loan by the Partnership to such Partner, which loan shall: (i) be secured by such Partner's interest in the Partnership, (ii) bear interest at the Prime Rate (as defined in paragraph 4.5(b)(vi)), and (iii) be payable upon demand.

(b)    If and to the extent the Partnership is required to make any Tax Payments with respect to any Partner, either (i) such Partner's proportionate share of distributions shall be reduced by the amount of such Tax Payments (*provided that* such Partner's Capital Account shall be adjusted pursuant to paragraph 14.5 for such Partner's full proportionate share of the distribution), or (ii) such Partner shall promptly pay to the Partnership an amount of cash equal

18.

806590 v11/SD

Exhibit 7
Page 327

to such Tax Payments plus interest, if applicable. In the event a portion of a distribution in kind is retained by the Partnership pursuant to clause (i), such retained Securities may, in the discretion of the General Partner, either (1) be distributed to the Partners in accordance with the terms of this Article 7 including this paragraph 7.6(b), or (2) be sold by the Partnership to generate the cash necessary to satisfy such Tax Payments. If the Securities are sold, then for purposes of income tax allocations only under this Agreement, any gain or loss on such sale or exchange shall be allocated to the Partner to whom the Tax Payments relate.

(c)     Each Limited Partner will, as applicable, take such actions as are required to establish to the reasonable satisfaction of the General Partner that the Limited Partner is (i) not subject to the withholding tax obligations imposed by Section 1471 of the Code and (ii) not subject to withholding tax obligations imposed by Section 1472 of the Code. In addition, each Limited Partner will assist the Partnership and the General Partner with any applicable information reporting or other obligation imposed on the Partnership, the General Partner or their respective affiliates, pursuant to FATCA. As used herein, "*FATCA*" means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, and all administrative and judicial interpretations thereof.

(d)     The General Partner shall make (or cause the Partnership to make) any filings, applications or elections, and shall use all other commercially reasonable efforts, to obtain any available exemption from, or refund of, any withholding or other taxes imposed by any non-U.S. (whether sovereign or local) taxing authority with respect to amounts distributable to any Limited Partner under this Agreement. Each Limited Partner agrees that it will cooperate with the General Partner in making any such filings, applications or elections to the extent the General Partner reasonably determines that such cooperation is necessary or desirable. Notwithstanding the foregoing, if a Limited Partner must make any such filings, applications or elections directly, the General Partner, at the request of the affected Limited Partner, shall (or shall cause the Partnership to) provide such information and take such other action as may commercially reasonably be necessary to complete or make such filings, applications or elections.

## ARTICLE 8

### MANAGEMENT DUTIES AND RESTRICTIONS

**8.1     Management.** The General Partner shall have the sole and exclusive right to manage, control, and conduct the affairs of the Partnership and to do any and all acts on behalf of the Partnership, including exercise of rights to elect to adjust the tax basis of Partnership assets and to revoke such elections and to make such other tax elections as the General Partner shall deem appropriate. The General Partner is hereby authorized to enter, by itself or on behalf of the Partnership, into an agreement with a firm designated by the General Partner (the "*Management Company*") for the provision of certain management, administrative, operational and other services with respect to the Partnership on terms to be determined and agreed to by the General Partner, *provided that* the General Partner shall remain ultimately responsible for the overall management of the Partnership and for its duties and responsibilities hereunder.

19.

Exhibit 7
Page 328

**8.2    No Control by the Limited Partners; No Withdrawal.**  No Limited Partner shall take part in the control or management of the affairs of the Partnership nor shall any Limited Partner have any authority to act for or on behalf of the Partnership or to vote on any matter relative to the Partnership and its affairs, except as is specifically permitted by this Agreement.   Except as specifically set forth in this Agreement, no Limited Partner shall withdraw or be required to withdraw from the Partnership.

**8.3    Existing Funds; Follow On Funds; Parallel Funds.**

**(a)**    Except as provided below, each Managing Director shall, so long as each shall remain a manager of the General Partner, devote such business time as is necessary and appropriate to the affairs of (i) the Partnership, (ii) the Fund Affiliates (as defined below), (iii) any Parallel Funds (as defined below), (iv) those entities formed for the purpose of managing any of the foregoing and (v) any successor private equity fund (a "*Successor Fund*") formed on or after such time as at least seventy percent (70%) of the Partnership's Committed Capital has been invested, committed for investment or reserved for follow-on investment in portfolio companies, or applied, committed or reserved for Partnership working capital or expenses.  The restriction set forth in the first sentence of this paragraph 8.3(a) shall not apply following the end of the Commitment Period; *provided that* in such event the Managing Directors shall devote such business time to the Partnership as is necessary and appropriate for the effective management and liquidation of the Partnership's investments.  For the purposes of this Agreement, "*Fund Affiliates*" shall mean any investment partnership or similar entity managed directly or indirectly by, Stuart Frost (each, a "*Frost Fund*"), their respective general partners and portfolio companies, the Management Company, the Incubator and any Incubator Company (as defined below).

**(b)**    Each Limited Partner hereby acknowledges that (i) the Incubator was formed to provide an operating infrastructure to incubate and develop new business (each, an "*Incubator Company*"), (ii) the General Partner expects to, but is under no obligation to, cause the Partnership to invest primarily in Incubator Companies, (iii) the Incubator is controlled by one or more Managing Directors and (iv) the Managing Directors may hold board seats and/or "founder" positions in one or more Incubator Companies and in connection with such positions, a founder's equity interest, directly or indirectly, in such Incubator Company.  Each of the Limited Partners hereby consents and agrees to the activities and investments described in this paragraph 8.3(b).

**(c)**    Pursuant to paragraph 8.3(a)(ii), the General Partner and its managers may form and serve as general partner (or in a similar management role) of (i) one or more entities organized to accommodate the capital investments of entities and persons having strategic or other important relationships with the Partnership and (ii) one or more investment partnerships or similar entities to accommodate the tax, regulatory or legal needs of investors who otherwise would invest as Limited Partners of the Partnership on substantially similar terms, including economic terms, as the Partnership (collectively, the "*Parallel Funds*").  The terms of any such Parallel Fund formed for the purposes described in subsection (i) of the immediately preceding sentence may vary from those of the Partnership.  No Parallel Fund may admit a Limited Partner or other investor (except in connection with transfers of interests) after the date twelve (12) months from the Activation Date.  In the event that any Parallel Fund is formed, upon each purchase of Securities (other than short term obligations such as money market instruments) by

20.

806590 v11/SD

Exhibit 7
Page 329

the Partnership, each Parallel Fund will simultaneously invest in the same Securities on the same terms and at the same price as the Partnership; *provided, however,* that a Parallel Fund shall not be required to make any such investment in a Security if (i) the General Partner receives from the issuer thereof a written notice to the effect that the issuer will not permit such Parallel Fund to invest on the same terms as the Partnership and the General Partner provides a copy of such written notice to the Advisory Committee, or (ii) such investment is not permitted by applicable law or by the terms of the governing agreement of the Parallel Fund. Each Parallel Fund shall also dispose of each such Security at substantially the same time and on substantially the same terms as the Partnership. Each of the Limited Partners hereby consents and agrees to such activities and investments and further consents and agrees that neither the Partnership nor any of its Partners shall have any rights in or to such activities or investments, or any profits derived therefrom.

### 8.4    Investment Opportunities and Restrictions.

(a)    Each Limited Partner hereby agrees that the General Partner may offer the right to participate in investment opportunities of the Partnership (each, a *"Co-Investment Opportunity"*) to other private investors, groups, partnerships or corporations, including, without limitation, any Limited Partner, any Frost Funds and any Successor Funds managed by some or all of the managers of the General Partner, whenever the General Partner, in its discretion, so determines. Investments by Frost Funds made in connection with any Co-Investment Opportunity will generally be allocated among the Frost Funds based on the available capital of each such fund.

(b)    Except upon the prior consent of the Advisory Committee, for so long as the Partnership may call capital pursuant to paragraph 4.2 for purposes of investing in Securities of issuers in which it does not yet hold an investment, neither the General Partner, the Managing Directors, nor the Management Company shall invest more than fifty thousand dollars ($50,000) in any Securities of any private company that is not an Incubator Company in which neither such party nor the Partnership then holds an investment where such Securities would be within the Partnership's investment criteria.

(c)    Without the consent of the Advisory Committee, the Partnership may not purchase Securities of any non-Incubator Company from or sell Securities of any non-Incubator Company to or borrow money from the General Partner, the Management Company or any of the Managing Directors; *provided, however,* following the final admission of Limited Partners pursuant to paragraph 3.2(b), the Partnership may purchase Securities from or sell Securities to a Parallel Fund at cost for the purpose of allocating then existing Securities between such entities in proportion to their respective available capital.

(d)    Without the consent of the Advisory Committee, the Partnership may not invest for the first time in any Portfolio Company that is not an Incubator Company in which the General Partner, the Managing Directors, or any of their Affiliates, or any entity managed or operated or controlled by any of them, holds an interest with a cash basis of more than fifty thousand dollars ($50,000).

(e)    The General Partner may not incur indebtedness on behalf of the Partnership, or guaranty indebtedness of companies in which the Partnership has invested, in an

21.

806590 v11/SD

Exhibit 7
Page 330

aggregate amount exceeding ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment).

        **(f)**     Without the prior approval of the Advisory Committee, no more than the greater of (i) four million dollars ($4,000,000) and (ii) twenty percent (20%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in the Securities of any one Portfolio Company.

        **(g)**     At least seventy-five percent (75%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) shall be invested in Incubator Company investments, unless otherwise approved by the Advisory Committee.

        **(h)**     Without the prior approval of the Advisory Committee, no more than ten percent (10%) of the Partnership's Committed Capital (determined on a cost basis at the time of investment) may be invested in publicly-traded securities (excluding (i) private placements of public company securities, (ii) securities which were not publicly traded at the time of such investment, (iii) securities acquired in a "going private" transaction or series of transactions and (iv) short-term investments such as money market investments).

        **(i)**     The aggregate cost basis of Portfolio Company investments made by the Partnership, whether or not realized, may not exceed one hundred twenty percent (120%) of the aggregate Capital Commitments of the Partners.

## ARTICLE 9

### INVESTMENT REPRESENTATION AND TRANSFER
### OF PARTNERSHIP INTERESTS

    **9.1**    **Investment Representation of the Limited Partners.** This Agreement is made with each of the Limited Partners in reliance upon each Limited Partner's representation to the Partnership, which by executing this Agreement each Limited Partner hereby confirms, that its interest in the Partnership is to be acquired for investment, and not with a view to the sale or distribution of any part thereof, and that it has no present intention of selling, granting participation in, or otherwise distributing the same, and each Limited Partner understands that its interest in the Partnership has not been registered under the Securities Act and that any transfer or other disposition of the interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom. Each Limited Partner further represents that it does not have any contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participations to such person, or to any third person, with respect to its interest in the Partnership.

    **9.2**    **Qualifications of the Limited Partners.** Each Limited Partner represents that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act.

    **9.3**    **Transfer by General Partner.** The General Partner shall not sell, assign, mortgage, pledge or otherwise dispose of its interest in the Partnership or in its capital assets or property without the prior written consent of a Majority in Interest of the Limited Partners.

22.

806590 v11/SD

Exhibit 7
Page 331

Except as otherwise provided in the previous sentence, the Managing Directors (including for this purpose, trusts or investment vehicles formed for the benefit of such Managing Director or his family members or entities affiliates with such Managing Director) shall at all times collectively retain direct ownership and control over at least a majority of both the equity and economic interests in the General Partner, and transfers of equity interests by the Managing Directors shall be permitted only to (a) third parties who become members of the General Partner and (b) trusts or investment vehicles formed for the benefit of a Managing Partner or his family members. Notwithstanding the foregoing, in no event shall the General Partner make any transfer of an interest in the Partnership prohibited by the events described in paragraphs 9.5(a) through 9.5(h).

**9.4    Transfer by Limited Partner.** No Limited Partner shall sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without the prior written consent of the General Partner, which consent may be granted or denied in the sole discretion of the General Partner. Notwithstanding the foregoing, after delivery of the opinion of counsel hereinafter required by this Article 9, (*provided, however*, that the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel), a Limited Partner may sell, assign, pledge, mortgage, or otherwise dispose of or transfer its interest in the Partnership, directly or indirectly, without such consent (a) to any entity directly or indirectly holding eighty percent (80%) or more of the ownership interests of the Limited Partner (including profits or other economic interests) or any entity of which eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests) are held directly or indirectly by such entity, including any entity of which the Limited Partner holds, directly or indirectly, eighty percent (80%) or more of the beneficial ownership (including profits or other economic interests), (b) pursuant to a merger, plan of reorganization, sale or pledge of, or other general encumbrance on all or substantially all of the Limited Partner's assets, (c) to certain affiliated corporations or business entities of a Limited Partner, (d) as may be required by any law or regulation, (e) by testamentary disposition or intestate succession, or (f) to a trust, profit sharing plan or other entity controlled by, or for the benefit of, such Limited Partner or one or more family members. A change in any trustee or fiduciary of the Limited Partner shall not be considered to be a transfer, sale, assignment, mortgage, pledge or other disposition under this paragraph 9.4, *provided* written notice of such change is given to the General Partner within a reasonable period of time after the effective date thereof.

**9.5    Requirements for Transfer.** No transfer or other disposition of the interest of the Limited Partner shall be permitted until the General Partner shall have received an opinion of counsel satisfactory to it (or waived such opinion requirement) that the effect of such transfer or disposition would not:

**(a)**    result in the Partnership's assets being considered, in the opinion of counsel for the Partnership, as "plan assets" within the meaning of the Employment Retirement Income Security Act of 1974, as amended ("*ERISA*"), or any regulations proposed or promulgated thereunder;

**(b)**    result in violation of the Securities Act or any comparable state law;

23.

806590 vi1/SD

Exhibit 7
Page 332

(c)     require the Partnership to register as an investment company under the Investment Company Act of 1940, as amended;

(d)     require the Partnership, the General Partner, or any member of the General Partner to register as an investment adviser under the Investment Advisers Act of 1940, as amended;

(e)     result in a termination of the Partnership's status as a partnership for tax purposes;

(f)     result in a violation of any law, rule, or regulation by the Limited Partner, the Partnership, the General Partner, or any member of the General Partner;

(g)     cause the Partnership to be deemed to be a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code; or

(h)     result in a violation of this Agreement.

Such legal opinion shall be provided to the General Partner by the transferring Limited Partner or the proposed transferee. Any costs associated with such opinion shall be borne by the transferring Limited Partner or the proposed transferee. Upon request the General Partner will use its good faith diligent efforts to provide any information possessed by the Partnership and reasonably requested by a transferring Limited Partner to enable it to render the foregoing opinion. Notwithstanding any provision of this Article 9 to the contrary, the General Partner may, in its sole discretion, waive the requirement of an opinion of counsel provided for in this paragraph 9.5.

**9.6     Substitution as a Limited Partner.** A transferee of a Limited Partner's interest pursuant to this Article 9 shall become a substituted Limited Partner only with the consent of the General Partner and only if such transferee (a) elects to become a substituted Limited Partner and (b) executes, acknowledges and delivers to the Partnership such other instruments as the General Partner may deem necessary or advisable to effect the admission of such transferee as a substituted Limited Partner, including, without limitation, the written acceptance and adoption by such transferee of the provisions of this Agreement. No assignment by a Limited Partner of its interest in the Partnership shall release the assignor from its liabilities to the Partnership, including but not limited to paragraph 4.2; *provided that* if the assignee becomes a Limited Partner as provided in this paragraph 9.6, the assignor shall thereupon so be released (in the case of a partial assignment, to the extent of such assignment).

## ARTICLE 10

### DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

**10.1     Extension of Partnership Term.** Upon the Termination Date, the General Partner may in its sole discretion extend the Partnership term for up to two (2) additional one (1) year periods, and upon the conclusion of the two extension periods, with the consent of a Majority in Interest of the Limited Partners, the General Partner may extend the Partnership term for additional one (1) year periods. During such one (1) year extension periods, the General

24.

Exhibit 7
Page 333

Partner shall use its reasonable efforts to convert the Partnership's Nonmarketable Securities into Marketable Securities or cash, and all Securities that become Marketable Securities during such period or periods. The General Partner shall not purchase the Securities of any new issuer in which the Partnership does not already hold an interest during such period; *provided, however,* that the General Partner may (a) purchase additional Securities of a Portfolio Company if it deems such a purchase to be in the best interests of the Partnership, and (b) exchange the Securities of a Portfolio Company for other Securities if it deems such exchange to be in the best interests of the Partnership. The management fee during any extension period shall be as set forth in Article 6.

**10.2    Early Termination of the Partnership.**

(a)    The Partnership shall dissolve, and the affairs of the Partnership shall be wound up prior to the Termination Date (or any subsequent date to which the Partnership term has previously been extended pursuant to paragraph 10.1):

(i)    ninety (90) days after the withdrawal, bankruptcy, or dissolution of the General Partner, unless a Majority in Interest of the Limited Partners elect to continue the Partnership within such ninety (90) day period; or

(ii)    at any time upon the election of Eighty Percent (80%) in Interest of the Limited Partners.

(b)    In the event that the Partnership is dissolved pursuant to the provisions of this paragraph 10.2, a Majority in Interest of the Limited Partners shall elect one or more liquidators to manage the liquidation of the Partnership in the manner described in paragraphs 10.3, 10.4 and 10.5.

**10.3    Winding Up Procedures.**

(a)    Promptly upon dissolution of the Partnership (unless the Partnership is continued in accordance with this Agreement or the provisions of the Act), the affairs of the Partnership shall be wound up and the Partnership liquidated.

(b)    Distributions during the winding up period may be made in cash or in kind or partly in cash and partly in kind. The General Partner or the liquidator shall use its best judgment as to the most advantageous time for the Partnership to sell Securities or to make distributions in kind. All cash and each Security distributed in kind after the date of dissolution, but prior to the final liquidation, of the Partnership shall be distributed in accordance with the provisions of Article 7. Each Security so distributed shall be subject to reasonable conditions and restrictions necessary or advisable in order to preserve the value of such Security or for legal reasons.

**10.4    Payments in Liquidation.** The assets of the Partnership shall be distributed in final liquidation of the Partnership in the following order:

(a)    to the creditors of the Partnership, other than Partners, in the order of priority established by law, either by payment or by establishment of reserves;

806590 v11/SD

Exhibit 7
Page 334

**(b)** to the Partners, in repayment of any loans made to, or other debts owed by, the Partnership to such Partners; and

**(c)** the balance, if any, to the General Partner and the Limited Partners in respect of the positive balances in their Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

**10.5    Return of Excess Distributions.**

**(a)** Notwithstanding paragraphs 7.4, 7.5 and 10.4, upon liquidation of the Partnership pursuant to this Article 10, the General Partner shall be required to pay back to the Partnership the amount by which the cumulative net distributions received by the General Partner over the life of the Partnership (excluding amounts received by the General Partner in respect of its Partnership Percentage and amounts returned to the Partnership by the General Partner pursuant to paragraph 15.4(b) prior to final liquidation of the Partnership) exceeds the amount equal to the Partnership's cumulative Profits allocated to the General Partner pursuant to paragraph 5.1(a)(iv)(1) minus the Partnership's cumulative Losses allocated to the General Partner pursuant to paragraph 5.1(b)(i); *provided, however*, that the amount of the repayment described in this paragraph 10.5(a) shall be reduced by the federal, state and other taxes payable on such amount by the members of the General Partner (assuming for this purpose that all in kind distributions were immediately sold upon receipt and such taxes were paid at the Applicable Tax Rate).

**(b)** In the event that the assets of the General Partner are insufficient to satisfy the obligation described in the preceding sentence, each member of the General Partner shall be severally, but not jointly, responsible for his pro rata share of the General Partner's remaining obligation to the Partnership under this paragraph 10.5. The pro rata shares described in the preceding sentence shall be based on relative distributions received by each member of the General Partner from the General Partner.

**(c)** If Partners are required to recontribute distributions pursuant to paragraph 4.2(d)(ii) after the final liquidation and winding up of the Partnership, the amount of the General Partner's obligation under paragraph 10.5(a) shall be recomputed by treating the expense giving rise to the return of distributions pursuant to paragraph 4.2(d)(ii) as if it had occurred prior to final liquidation. The difference between the amount originally computed pursuant to paragraph 10.5(a) as of the final liquidation and winding up of the Partnership and the amount described in the immediately preceding sentence shall reduce dollar for dollar the aggregate amount otherwise required to be recontributed by the Partners pursuant to paragraph 4.2(d)(ii).

## ARTICLE 11

### FINANCIAL ACCOUNTING, REPORTS AND MEETINGS

**11.1    Financial Accounting; Fiscal Year.** The books and records of the Partnership shall be kept in accordance with the provisions of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles consistently applied, and shall be audited at the end of each fiscal year by an independent public accountant of recognized national or

26.

806590 v11/SD

Exhibit 7
Page 335

regional standing selected by the General Partner; *provided, however,* that if the audit requirement for the first fiscal year that began on the Commencement Date and ended on December 31, 2013 is waived pursuant to paragraph 11.4, such period shall be covered in the audit of the books and records of the Partnership for the fiscal year ending December 31, 2014. The Partnership's fiscal year shall be the calendar year.

**11.2    Supervision; Inspection of Books.**  Proper and complete books of account of the Partnership, copies of the Partnership's federal, state and local tax returns for each fiscal year, the Schedule of Partners, this Agreement and the Partnership's Certificate of Limited Partnership shall be kept under the supervision of the General Partner at the principal office of the Partnership.  Such books and records shall be open to inspection by the Limited Partners, or their accredited representatives, at any reasonable time during normal business hours after reasonable advance notice.  Such books and records shall be maintained by the General Partner or its designee for a period of five (5) years following final liquidation of the Partnership.

**11.3    Quarterly Reports.**  The General Partner shall transmit to the Limited Partners within sixty (60) days after the close of each of the first three quarters of each fiscal year, a summary of acquisitions and dispositions of investments made by the Partnership during such quarter together with a valuation of the investments then held.

**11.4    Annual Report; Financial Statements of the Partnership.**  Beginning with the fiscal year that ends December 31, 2013, the General Partner shall use reasonably commercial efforts to transmit to the Limited Partners within one hundred twenty (120) days after the close of the Partnership's fiscal year audited financial statements of the Partnership prepared in accordance with the terms of this Agreement and otherwise in accordance with U.S. generally accepted accounting principles, including an income statement for the year then ended and a balance sheet as of the end of such year, a statement of changes in the Partners' Capital Accounts, and a list of investments then held; *provided,* that (1) the Advisory Committee may waive such requirement solely for the fiscal year that ends December 31, 2013 if it determines in its sole discretion that the aggregate capital contributions of the Partners to the Partnership during such fiscal year is not material, and (2) such requirement shall be automatically waived solely for the fiscal year that ends December 31, 2013 if the General Partner has not required the Partners to contribute capital to the Partnership during such year.  The financial statements shall be accompanied by a report from the General Partner to the Limited Partners, which shall include a status report on investments then held, a summary of acquisitions and dispositions of investments made by the Partnership during the preceding quarter and a valuation of each such investment.

**11.5    Electronic Reporting.**  The General Partner shall be entitled, in its sole discretion, to transmit the reports and statements described in paragraphs 11.3 and 11.4 (the "*Subject Reports*") to one or more Limited Partners solely (i) by electronic mail or (ii) by means of granting such Limited Partners access to a database or other forum hosted on a website designated by the General Partner (the "*Reporting Site*"), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein (including, but not limited to, establishing password protections for access to the Reporting Site, preventing the Subject Reports posted on the Reporting Site from being copied or otherwise print capable

27.

806590 v11/SD

Exhibit 7
Page 336

and having such Subject Reports available for review for a restricted period of time (but in no event less than thirty (30) days from the first date such Subject Reports are posted on the Reporting Site)). The General Partner shall provide each Limited Partner to which it will transmit Subject Reports pursuant to this paragraph 11.5 two (2) days advance notice of the first date on which a new Subject Report will be posted on the Reporting Site for such Limited Partner's review. Unless the General Partner exercises its discretion pursuant to and in compliance with paragraph 15.15(c) to restrict access to certain Confidential Information that may be included in a Subject Report posted on the Reporting Site, the Subject Reports posted on the Reporting Site shall contain all of the material information included in those Subject Reports transmitted to Limited Partners other than pursuant to this paragraph 11.5. Subject to the provisions of paragraph 15.15(c), the Subject Reports shall be posted on the Reporting Site within the same number of days after the end of the applicable fiscal quarter or Fiscal Year as is required pursuant to paragraphs 11.3 and 11.4 and shall remain accessible to and downloadable or printable by the Limited Partners for at least twelve (12) months.

### 11.6   Tax Returns.

**(a)** The General Partner shall cause the Partnership's federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by a Limited Partner, to be prepared and delivered to the Limited Partners within ninety (90) days after the close of the Partnership's fiscal year, or as soon as reasonably practicable thereafter.

**(b)** Each Limited Partner hereby agrees and covenants that it shall not make an election under Section 732(d) of the Code with respect to property distributed to it by the Partnership without the prior written consent of the General Partner. The General Partner may, but shall not be obligated to, cause the Partnership to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" within the meaning of Section 743(e) of the Code. If the Partnership elects to be treated as an electing investment partnership, each Limited Partner shall (i) reasonably cooperate with the Partnership to maintain such status, (ii) shall not take any action that would be inconsistent with such election, (iii) provide the General Partner with any information necessary to allow the Partnership to comply with its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and its tax reporting and other obligations as an electing investment partnership, and (iv) provide the General Partner and such Limited Partner's transferee, promptly upon request, with the information required under Section 6031(b) of the Code or otherwise to be furnished to the Partnership or such transferee, including such information as is necessary to enable the Partnership and such transferee to compute the amount of losses disallowed under Section 743(e) of the Code, but in no event shall such Limited Partner be required to provide such information prior to its receipt of its Schedule K-1 for such taxable year, except to the extent of information, if any, required by the Partnership to complete its Schedule K-1s. Whether or not the Partnership makes such election, promptly upon request, each Limited Partner shall provide the General Partner with any information related to such Partner necessary to allow the Partnership to comply with (a) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (b) any other U.S. federal income tax reporting obligations of the Partnership.

### 11.7   Tax Matters Partner. 
The General Partner shall be the Partnership's tax matters partner under the Code and under any comparable provision of state law. The General Partner

28.

806590 v11/SD

Exhibit 7
Page 337

shall have the right to resign as tax matters partner by giving thirty (30) days' written notice to each Partner. Upon such resignation a successor tax matters partner shall be selected by a Majority in Interest of the Limited Partners. The tax matters partner shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Internal Revenue Service and in connection with all subsequent administrative and judicial proceedings arising out of such audit. The tax matters partner shall periodically consult with all tax exempt Limited Partners during the course of any tax audit primarily affecting the tax exempt Limited Partners. The tax matters partner shall periodically consult with all foreign Limited Partners during the course of any tax audit primarily affecting the foreign Limited Partners. If the tax matters partner is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Partners, then the Partnership shall be entitled to reimbursement from those Partners on whose behalf such fees and expenses were incurred. The tax matters partner shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, and shall furnish to each Partner, if such Partner so requests in writing, a copy of each notice or other communication received by the tax matters partner from the Internal Revenue Service, except such notices or communications as are sent directly to such requesting Partner by the Internal Revenue Service. The relationship of the tax matters partner to the Limited Partners is that of a fiduciary, and the tax matters partner has fiduciary obligations to perform its duties as tax matters partner in such manner as will serve the best interests of the Partnership and all of the Partnership's Partners. Without the consent of a Majority in Interest of the tax exempt Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind the Limited Partners (other than in their capacities as Limited Partners). Without the consent of a Majority in Interest of the foreign Limited Partners, the tax matters partner shall not enter into a settlement agreement with the Internal Revenue Service which purports to bind such foreign Limited Partners with respect to the outcome of any audit primarily affecting the foreign Limited Partners. To the fullest extent permitted by law, but subject to the limitations and exclusions of paragraph 15.4, the Partnership agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to all (a) fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the General Partner or the Partnership that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Partnership, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action, or demand.

## ARTICLE 12

### VALUATION; ADVISORY COMMITTEE

**12.1    Valuation.** Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value. Except as may be required under applicable Treasury Regulations, no value shall be placed on the goodwill or the name of the Partnership in determining the value of the interest of any Partner or in any accounting among the Partners.

**(a)**    The following criteria shall be used for determining the fair market value of Securities:

29.

806590 v11/SD

Exhibit 7
Page 338

(i)    If traded on one or more securities exchanges or the NASDAQ National Market System, the value shall be deemed to be the average of the Securities' closing price on the principal of such exchanges during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

(ii)    If actively traded over the counter (other than on the NASDAQ National Market System), the value shall be deemed to be the average of the average closing bid and ask prices of such Securities during the period which includes the valuation date and the three (3) trading days immediately preceding the valuation date.

(iii)    If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the General Partner, taking into consideration the purchase price of the Securities, developments concerning the investee company subsequent to the acquisition of the Securities, any financial data and projections of the investee company provided to the General Partner, and such other factor or factors as the General Partner may deem relevant.

(b)    If the General Partner in good faith determines that, because of special circumstances, the valuation methods set forth in this Article 12 do not fairly determine the value of a Security, the General Partner shall make such adjustments or use such alternative valuation method as it reasonably deems appropriate.

(c)    The General Partner shall have the power at any time to determine, for all purposes of this Agreement, the fair market value of any assets and liabilities of the Partnership.

12.2    Advisory Committee. The General Partner may appoint an Advisory Committee (the "*Advisory Committee*"), that shall consist of not less than three (3) representatives of the Limited Partners (none of whom shall be an Affiliate of the General Partner) selected by the General Partner from time to time in its reasonable judgment. The duties of the Advisory Committee will include (a) consideration of any approvals sought by the General Partner pursuant to the terms of this Agreement; (b) advice regarding matters pertaining to conflicts of interest by the Partnership, the General Partner or any of the members of the General Partner (excluding matters otherwise expressly addressed pursuant to the terms of this Agreement); and (c) such advice and counsel as is requested by the General Partner in connection with the Partnership's investments and other Partnership matters. The Partnership will reimburse each member for his or her reasonable out-of-pocket expenses. All actions, consents or approvals of the Advisory Committee shall require a majority of its members serving at the time such action, consent or approval is taken, which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the General Partner. To the fullest extent permitted by law, neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Partner in respect of the activities of the Advisory Committee, except to refrain from bad faith violations of the implied contractual obligation of good faith. To the fullest extent permitted by law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Limited Partner represented by such member and, in so doing, shall not be considered to have acted in bad faith.

30.

Exhibit 7
Page 339

# ARTICLE 13

## PARTNERS SUBJECT TO SPECIAL REGULATION

### 13.1   ERISA Partners.

(a)   Each Limited Partner that is, or whose equity interests are at least partially owned by, an "employee benefit plan" (each, an *ERISA Partner*") within the meaning of, and subject to the provisions of, ERISA hereby (i) acknowledges that it is its understanding that neither the Partnership, the General Partner, nor any of the Affiliated entities of the General Partner, are "fiduciaries" of such Limited Partner within the meaning of ERISA by reason of the Limited Partner investing its assets in, and being a Limited Partner of, the Partnership; (ii) acknowledges that it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (iii) acknowledges that it is aware of the provisions of Section 404 of ERISA relating to the requirements for investment and diversification of the assets of employee benefit plans and trusts subject to ERISA; (iv) represents that it has given appropriate consideration to the facts and circumstances relevant to the investment by that ERISA Partner's plan in the Partnership and has determined that such investment is reasonably designed, as part of such portfolio, to further the purposes of such plan; (v) represents that, taking into account the other investments made with the assets of such plan, and the diversification thereof, such plan's investment in the Partnership is consistent with the requirements of Section 404 and other provisions of ERISA; (vi) acknowledges that it understands that current income will not be a primary objective of the Partnership; and (vii) represents that, taking into account the other investments made with the assets of such plan, the investment of assets of such plan in the Partnership is consistent with the cash flow requirements and funding objectives of such plan.

(b)   Notwithstanding any provision contained herein to the contrary, each ERISA Partner may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, at the time and in the manner hereinafter provided, if either the ERISA Partner or the General Partner shall obtain an opinion of counsel (which counsel and which opinion shall be reasonably acceptable to both the ERISA Partner and the General Partner) to the effect that, as a result of applicable statutes, regulations, case law, administrative interpretations, or similar authority (i) the continuation of the ERISA Partner as a Limited Partner of the Partnership or the conduct of the Partnership will result, or there is a material likelihood the same will result, in a material violation of ERISA, or (ii) all or any portion of the assets of the Partnership constitute assets of the ERISA Partner and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the ERISA Partner. In the event of the issuance of such opinion of counsel, a copy of such opinion shall be given to all the ERISA Partners, together with the written notice of the election of the ERISA Partner to withdraw or the written demand of the General Partner for withdrawal, whichever the case may be (and in the case of a written demand of the General Partner, such requirement shall be imposed on all benefit plan investors as defined in DOL Regulation 2510.3-101(f) on a pro rata basis and only to the extent necessary to prevent or cure the violation or plan asset problem). Thereupon, unless within ninety (90) days after receipt of such written notice and opinion the General Partner is able to eliminate the necessity for such withdrawal to the reasonable satisfaction of the ERISA Partner and the General Partner, whether by correction of the condition

31.

806590 v11/SD

Exhibit 7
Page 340

giving rise to the necessity of the ERISA Partner's withdrawal, or the amendment of this Agreement, or otherwise, such ERISA Partner shall withdraw its entire interest in the Partnership, such withdrawal to be effective upon the last day of the fiscal quarter during which such ninety (90) day period expired.

(c)     The withdrawing ERISA Partner shall be entitled to receive within ninety (90) days after the date of such withdrawal an amount equal to the fair market value of such Partner's interest as of the effective date of such withdrawal (calculated by treating all Partnership assets as though sold at fair market value). The fair market value of such Partner's interest shall be determined in accordance with paragraph 12.1 with any resulting net Profit or Loss allocated in accordance with the provisions of Article 5.

(d)     Any distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph may, in the sole discretion of the General Partner, be made in cash, in securities, in the form of a promissory note, the terms of which shall be mutually agreed upon by the General Partner and the withdrawing ERISA Partner, or any combination thereof; *provided*, that (i) a withdrawing ERISA Partner shall not be required to accept more than its *pro rata* share of any Securities held by the Partnership, and (ii) if a distribution in kind would create a material likelihood of a Regulatory Limitation, the Partnership shall accept written instructions from the Partner subject to such Regulatory Limitation designating an account, brokerage or adviser and the General Partner shall, if requested by such Partner, assist the parties controlling such account, brokerage or adviser in connection with post-distribution liquidation of such Securities upon mutually agreeable terms (including exculpation and indemnification of the General Partner and its Affiliates). Such engagement shall be separate from and outside of the structure of the Partnership.

(e)     Any valuation necessary for the purposes of a distribution or payment to a withdrawing ERISA Partner pursuant to this paragraph shall be made by the General Partner in good faith pursuant to paragraph 12.1; *provided, however*, the General Partner shall provide thirty (30) days notice to a withdrawing ERISA Partner of the valuation of any proposed distribution, and the withdrawing ERISA Partner may object to the valuations made by the General Partner by providing written notice to the General Partner at any time prior to the first payment to the withdrawing ERISA Partner in respect of its former interest in the Partnership. In the event that the General Partner and the withdrawing ERISA Partner cannot reach a satisfactory resolution of such valuation dispute, the valuation shall be determined by a mutually acceptable, independent securities expert selected by the General Partner and the withdrawing ERISA Partner.

13.2    **Governmental Plan Partners.** Notwithstanding any provision of this Agreement to the contrary, any Limited Partner that is either a "governmental plan" as defined in Title 29, Section 1002(32) of the United States Code or an employee benefit plan subject to regulation under applicable state laws that are similar in purpose and intent to ERISA (a "*Governmental Plan Partner*") may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Governmental Plan Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Governmental Plan Partner and the General Partner) to the effect that the Governmental Plan Partner, the Partnership, or the General Partner would be in violation, or

32.

806590 v11/SD

Exhibit 7
Page 341

there is a material likelihood the same would result, of any statute or regulation of the state of residence of the Government Plan Partner or any political subdivision of such state, enacted or promulgated after the date of formation of the Partnership, as a result of the Governmental Plan Partner continuing as a Limited Partner, and, in the case of an opinion obtained by the General Partner, that such violation would have a material adverse effect on the General Partner or the Partnership. In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Governmental Plan Partner's interest in the Partnership shall be governed by paragraph 13.1 of the Agreement, as if the Governmental Plan Partner were an ERISA Partner.

**13.3   Private Foundation Partners.**  Notwithstanding any provision of the Agreement to the contrary, any Limited Partner that is, or whose equity interests are at least partially owned by, a "private foundation" as described in Section 509 of the Code (a *"Private Foundation Partner"*), may elect to withdraw from the Partnership, or upon demand by the General Partner shall withdraw from the Partnership, if either the Private Foundation Partner or the General Partner shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the Private Foundation Partner and the General Partner) to the effect that such withdrawal is necessary in order for the Private Foundation Partner to avoid (a) excise taxes imposed by Subchapter A of Chapter 42 of the Code (other than Sections 4940 and 4942 thereof), or (b) a material breach of the fiduciary duties of its trustees under any federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission, or authority having jurisdiction. In the event of the issuance of the opinion of counsel referred to in the preceding sentence, the withdrawal of and disposition of the Private Foundation Partner's interest in the Partnership shall be governed by paragraph 13.1, as if the Private Foundation Partner were an ERISA Partner.

**13.4   Media Companies.**

(a)   In addition to any other restrictions applicable to Limited Partners set forth in this Agreement and notwithstanding any other provisions hereof, at any time the Partnership holds an Attributable Interest in a Media Company, no Limited Partner shall be materially involved in the management or operations of the media-related activities of the Partnership. Without limiting the generality of the foregoing, no Limited Partner or Other Restricted Person shall:

(i)   act as an employee of the Partnership or any Media Company if such Limited Partner's or Other Restricted Person's functions, directly or indirectly, relate to the media enterprises of the Partnership or any Media Company;

(ii)   serve, in any material capacity, as an independent contractor or agent with respect to any media enterprises of the Partnership or any Media Company;

(iii)   communicate on matters pertaining to the day-to-day operations of a Media Company with (A) an officer, director, partner, agent, representative or employee of such Media Company or (B) the General Partner;

33.

806590 v11/SD

Exhibit 7
Page 342

(iv)    perform any services for the Partnership relating to its media enterprises or any Media Company materially relating to such Media Company's media activities, except that any Limited Partner may make loans to or act as a surety for the Partnership or any such Media Company;

(v)    vote on the admission of any new General Partner to the Partnership unless such admission is approved by each General Partner then existing;

(vi)    vote on the removal of the General Partner, unless the General Partner is (A) subject to bankruptcy proceedings, as described in Sections 17-402(a)(4) or (5) of the Act, (B) adjudicated incompetent by a court of competent jurisdiction (provided that this clause (B) shall only apply to a general partner that is a natural person) or (C) determined by a court of competent jurisdiction or the Arbitrators to have engaged in conduct constituting "cause," as that term has been used by the FCC in the context of the removal authority of limited partners, for purposes of the insulation of limited partnership interests from attribution of Media Companies; or

(vii)    become actively involved in the management or operation of the media activities of the Partnership or any Media Company.

(b)    The foregoing restrictions are intended to conform the rights and powers of Limited Partners to the criteria for non-attribution of limited partnership interests established by the FCC Attribution Orders; *provided, however*, that the foregoing shall not be deemed to prevent a Limited Partner or any Other Restricted Person from engaging in any activities that are not inconsistent with the FCC's then-prevailing policies with respect to the insulation from attribution of limited partners, as set forth in the FCC Attribution Orders. The Partners agree that, notwithstanding anything to the contrary herein, the activities of the Advisory Committee and each member and observer thereof (acting in such capacity) shall be limited to those permitted under FCC Rules, the Ownership Rules and the FCC Attribution Orders without causing any Limited Partner or Other Restricted Person to have an interest in the Partnership that would constitute an Attributable Interest in a Media Company. Moreover, if the Partnership receives an opinion of counsel reasonably acceptable to the General Partner to the effect that one or more of the restrictions contained in Paragraph 13.4(a) above is no longer required in order to assure that Limited Partners are not attributed with ownership interests based on the Ownership Rules and the FCC Attribution Orders, then such restriction or restrictions shall be deemed waived by virtue of such opinion.

(c)    Notwithstanding the foregoing, the provisions of Paragraph 13.4(a) shall not apply to any Limited Partner who (i) affirmatively elects by written notice to the General Partner not to be bound by such provisions and acknowledges that as a result of such election such Limited Partner may be deemed to hold an Attributable Interest in a Media Company and be subject to the Ownership Rules, and (ii) receives the prior written consent of the General Partner to make such election, which consent shall not be unreasonably withheld. It is understood that it would be reasonable for the General Partner to withhold its consent if the holding by such Limited Partner of an Attributable Interest in a Media Company would be reasonably likely to result in a violation on the part of the Partnership of any Ownership Rule or FCC Rule or in the imposition on the Partnership of burdensome regulatory or other legal

34.

806590 v11/SD

Exhibit 7
Page 343

requirements, or limit the Partnership's ability to acquire an Attributable Interest in any Media Company.  The General Partner agrees to give the Limited Partners reasonable prior notice of any proposed acquisition of an Attributable Interest in a Media Company.

## ARTICLE 14

### CERTAIN DEFINITIONS

**14.1    Accounting Period.**  An Accounting Period shall be (a) a calendar year if there are no changes in the Partners' respective interests in the Profits or Losses of the Partnership during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interests shall occur.

**14.2    Adjusted Asset Value.**  The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

**(a)**    The initial Adjusted Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset at the time of contribution, as determined by the contributing Partner and the Partnership.

**(b)**    In the discretion of the General Partner, the Adjusted Asset Values of all Partnership assets may be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the following times: (i) upon distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership assets, unless all Partners receive simultaneous distributions of either undivided interests in the distributed property or identical Partnership assets in proportion to their interests in Partnership distributions as provided in paragraphs 7.4, 7.5 and 7.6 and (ii) the grant of an additional interest in the Partnership to any new or existing Partner.

**(c)**    The Adjusted Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, and the resulting unrealized profit or loss allocated to the Capital Accounts of the Partners pursuant to Article 5, as of the termination of the Partnership either by expiration of the Partnership's term or the occurrence of an event described in paragraph 10.2.

**14.3    Affiliate.**  An Affiliate of any person shall mean (a) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the person specified or (b) such person's immediate family members (excluding family members who do not reside in the same household).

**14.4    Attributable Interest.**    Attributable Interest shall mean an ownership or managerial interest in a Media Company that is sufficient under the Ownership Rules to cause the Partnership to be deemed to hold a "cognizable" or "attributable" interest for purposes of any one or more of such Ownership Rules.

35.

806590 v11/SD

Exhibit 7
Page 344

**14.5   Capital Account.** The Capital Account of each Partner shall consist of its original capital contribution, (a) increased by any additional capital contributions, its share of income or gain that is allocated to it pursuant to this Agreement, and the amount of any Partnership liabilities that are assumed by it or that are secured by any Partnership property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of expense or loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Partnership or that are secured by any property contributed by it to the Partnership. The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable to any Partner pursuant to Article 7 and Article 10.

**14.6   Capital Commitment; Committed Capital.** A Partner's Capital Commitment shall mean the amount that such Partner has agreed to contribute to the capital of the Partnership as set forth opposite such Partner's name on the Schedule of Partners. The Partnership's Committed Capital shall equal the sum of the aggregate Capital Commitments of all Partners.

**14.7   Code.** The Code is the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

**14.8   Deemed Gain or Deemed Loss.** The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1), over the aggregate Adjusted Asset Value of the Securities distributed. The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 12.1).

**14.9   FCC.** FCC means the United States Federal Communications Commission, or any successor governmental agency, commission, bureau or other governmental entity.

**14.10   FCC Attribution Orders.** FCC Attribution Orders means the FCC's decisions in Corporate Ownership Reporting and Disclosure by Broadcast Licensees, 97 FCC 2d 997 (1984), on recon., 58 Rad. Reg. 2d (P&F) 604 (1985), on further recon., 1 FCC Rcd 802 (1986); Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, 14 FCC Rcd 12559 (1999), on recon., 16 FCC Rcd 1097 (2001); Implementation of the Cable Television Consumer Protection and Competition Act of 1992, 14 FCC Rcd 19014 (1999); and any other FCC Rules substantially incorporating, duplicating or otherwise relying upon the policies in such decisions, as any of such policies may be further modified by the FCC from time to time.

36.

806590 v11/SD

Exhibit 7
Page 345

**14.11  FCC Rules.**  FCC Rules means the rules, regulations and policies of the FCC, as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder.

**14.12  Idle Funds Income.**  Idle Funds Income shall mean all income received by the Partnership from commercial paper, certificates of deposit, treasury bills, and other money market investments with maturities of less than twelve (12) months.

**14.13  Managing Directors.**  Managing Directors shall refer to Stuart Frost, John Vigouroux and Jack Kreindler.

**14.14  Marketable; Marketable Securities; Marketability.**  These terms shall refer to Securities that are (a) traded on a national securities exchange or over the counter, and (i) freely transferable pursuant to either Rule 144 of the Securities Act (without being subject to any volume restrictions set forth in Rule 144(e)) or Rule 145 of the Securities Act and (ii) not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement.  Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the General Partner, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Partnership within a reasonable time period.

**14.15  Media Company.**  Media Company means any Portfolio Company of the Partnership that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, a "daily newspaper" (as such term is defined in Note 6 to Section 73.3555 of the FCC Rules) or any other communications facility or enterprise subject to multiple ownership, cross-ownership or other ownership restrictions set forth in the Communications Act of 1934 and the Telecommunications Act of 1996, each as then in effect and as thereafter amended from time to time, or any successor statute, including the rules and regulations promulgated thereunder, or in the FCC Rules, but only to the extent that the FCC Attribution Orders or any comparable FCC Rules setting forth limitations on the involvement of a limited partner in the business of the facility or enterprise are relevant to determining the application of such ownership restrictions to direct or indirect ownership, managerial or comparable interests in such facility or enterprise.

**14.16  Nonmarketable Securities.**  Nonmarketable Securities are all Securities other than Marketable Securities.

**14.17  Other Restricted Person.**  Other Restricted Person means: (i) any officer, director, partner or equivalent non-corporate official of a Limited Partner; (ii) any five percent or greater voting shareholder or any other direct or indirect owner of a Limited Partner whose ownership interest in the Limited Partner constitutes an Attributable Interest; and (iii) any officer, director, partner or equivalent non-corporate official of any such shareholder or other owner who is deemed to hold a "cognizable" interest in the Limited Partner under the FCC Rules.

**14.18  Ownership Rules.**  Ownership Rules shall mean the attribution rules and the multiple and cross-ownership rules of the FCC applicable to Media Companies including,

806590 v11/SD

Exhibit 7
Page 346

without limitation, 47 C.F.R. Sections 21.912, 26.101(a), 73.3555, 74.931(i), 76.501, 76.503,76.504 and 76.505, the FCC Attribution Orders and related provisions, and in decisions and opinions interpreting and applying such provisions.

**14.19  Partnership Percentage.**  The Partnership Percentage for each Partner shall equal the quotient of the amount of such Partner's capital contributions divided by the amount of capital contributions of all the Partners, as determined from time to time.

**14.20  Percentage in Interest; Majority in Interest.**  A specified fraction or percentage in interest of the Partners or of the Limited Partners shall mean Partners or Limited Partners of the Partnership whose Capital Commitments, stated as a percentage of the aggregate Capital Commitments of the Partnership, equal or exceed the required fraction or percentage in interest of all such Partners or Limited Partners.  A Majority in Interest shall mean more than fifty percent (50%) in interest.  Any limited partnership interest owned or controlled by the General Partner, an Affiliate of the General Partner, or a Defaulting Limited Partner shall be deemed not to be outstanding for purposes of any determination under this Agreement of a particular percentage in interest of the Limited Partners.

**14.21  Profit or Loss.**  Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Partnership's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)  Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(b)  Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c)  Gain or loss resulting from any disposition of a Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(d)  The difference between the gross fair market value of all Partnership assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 14.2;

(e)  Items which are specially allocated pursuant to paragraphs 3.2(c), 4.5(b)(vi), 5.1(c), 5.1(d), 5.2 and 5.3 shall not be taken into account in computing Profit or Loss; and

(f)  The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

38.

806590 v11/SD

Exhibit 7
Page 347

**14.22 Securities.** Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**14.23 Securities Act.** Securities Act shall mean the Securities Act of 1933, as amended.

**14.24 Treasury Regulations.** Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

## ARTICLE 15

### OTHER PROVISIONS

**15.1 Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware as such law would be applied to agreements among the residents of such state made and to be performed entirely within such state.

**15.2 Limitation of Liability of the Limited Partners.** Except as required by law and except for (a) liability for loans to a Limited Partner in respect of withholding or taxes paid by the Partnership on behalf of such Partner pursuant to paragraph 7.6 and (b) obligations to return distributions pursuant to paragraphs 4.2(c) and 4.2(d), no Limited Partner shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Partnership in excess of its Capital Commitment to the Partnership. No Limited Partner shall owe any fiduciary duty to the Partnership or the Partners, except to refrain from bad faith violations of the implied contractual obligation of good faith.

**15.3 Exculpation.** Neither the tax matters partner, the General Partner, the Management Company, the members of the Advisory Committee nor their respective managers, members, partners, principals, officers, employees, Affiliates or agents shall be liable, responsible or accountable in damages or otherwise to the Limited Partners or the Partnership for honest mistakes of judgment, or for action or inaction, taken in good faith and in the best interest interests of the Partnership, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any third party brokers or other agent of the Partnership, *provided that* such broker or agent was selected, engaged, and retained with reasonable care. The General Partner and such persons may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, *provided that* they (i) shall have been selected with reasonable care, (ii) are provided with all material information relevant to the matter at hand, and (iii) receive such advice in writing. Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any person of any liability by reason of recklessness, gross negligence or willful misconduct or to the extent (but only to the extent) that such liability may not be waived, modified, or limited under applicable law, but shall be construed so as to effectuate the provisions of such paragraphs to the fullest extent permitted by law. Notwithstanding anything to the contrary in this Agreement, to the extent that at law or

39.

806590 v11/SD

Exhibit 7
Page 348

in equity, an Indemnified Party has duties (including fiduciary duties) and liabilities relating thereto to the Partnership, any Partner or any other person, such Indemnified Party acting under this Agreement shall not be liable to the Partnership, any Partner or any other person for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities relating thereto of an Indemnified Party otherwise existing at law or in equity, are agreed by each Partner and the Partnership to so modify such other duties and liabilities of such Indemnified Party. Notwithstanding any of the foregoing to the contrary, members of the Advisory Committee (including solely with respect to the conduct of any member of the Advisory Committee, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.3 so long as they acted in good faith. This paragraph 15.3 is intended to apply solely for the benefit of the Limited Partners, and in no way shall be construed or interpreted as inuring to the benefit of any other person or entity, including, without limitation, creditors of the Partnership, of the General Partner or of the members of the General Partner or other third parties.

    **15.4    Indemnification.**

806590 v11/SD

Exhibit 7
Page 349

(a) The Partnership agrees to indemnify, out of the assets of the Partnership only (but including amounts that the Partners may be required to contribute pursuant to paragraph 4.2(d)), the General Partner, the Management Company, the members of the Advisory Committee, the tax matters partner and their respective managers, members, partners, principals, officers, employees, Affiliates or agents (the "*Indemnified Parties*") to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, or demand against the Indemnified Parties that arise out of or in any way relate to the Partnership, its properties, business, or affairs (but excluding matters solely between or among members of the General Partner) and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Partnership) of any such claim, action or demand; *provided, however*, that this indemnity shall not extend to (1) conduct not undertaken in the good faith belief that such act or omission was in the best interests of the Partnership or (2) any conduct which constitutes recklessness, gross negligence or willful misconduct. Notwithstanding the proviso set forth in the immediately preceding sentence, members of the Advisory Committee (including solely with respect to the conduct of any Advisory Committee member, the Limited Partner responsible for the appointment of such member of the Advisory Committee) shall be entitled to the benefit of this paragraph 15.4(a) so long as they acted in good faith. Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph shall be paid by the Partnership in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party provides a written undertaking to the Partnership to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified; *provided, further*, that no such advance shall be paid in the case of a claim or proceeding brought against any Indemnified Parties by a Majority in Interest or greater of the Limited Partners. The provisions of this paragraph 15.4 shall remain in effect as to each Indemnified Party whether or not such indemnified person continues to serve in the capacity that entitled such person to be indemnified.

(b) Notwithstanding anything in this paragraph 15.4 to the contrary, the Partnership shall not be permitted to indemnify an Indemnified Party serving as an officer and/or director of a Portfolio Company for liabilities that relate to a period after the Partnership has disposed of its investment in the Portfolio Company.

(c) Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to paragraph 15.4(a) (as limited by paragraph 15.4(b)), the Partners intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Partnership, (ii) the Partnership, and (iii) the General Partner and/or its Affiliates, paragraph 15.4(a) shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Partnership shall have primary liability; second, the Partnership and any Parallel Fund (as applicable) shall have secondary liability; and third, the General Partner and/or its Affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Partnership and the Partnership, and/or any Parallel Fund, as applicable. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Partnership shall not restrict the Partnership from making indemnification payments to an Indemnified Party that is otherwise

41.

806590 v11/SD

Exhibit 7
Page 350

eligible for such indemnification payments, but such indemnification payments by the Partnership are not intended to relieve any investment counterparty of the Partnership from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Partnership actually receives indemnification payments from an investment counterparty of the Partnership or under any insurance policy for the same loss or expense, such Indemnified Party shall repay the Partnership as soon as practicable to the extent of such duplicative indemnification payments. Indemnification payments (if any) made to an Indemnified Party by the General Partner and/or its Affiliates in respect of a loss or expense for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Partnership and/or any Parallel Fund under the limited partnership agreement or other governing agreements of such Parallel Fund shall not relieve the Partnership and/or any Parallel Fund from its obligation to such Indemnified Party and/or the General Partner (or any Affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the General Partner and/or its Affiliates would be reimbursed by such Indemnified Party or directly by the Partnership with indemnification payments made by the Partnership under paragraph 15.4(a)). To the extent that the Partnership is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the General Partner and/or its Affiliates (other than the Partnership, or any Parallel Fund), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Partnership. As used in this paragraph 15.4(b), "indemnification payments" made or to be made by an investment counterparty of the Partnership shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Partnership, and (z) payments made or to be made by or on behalf of such investment counterparty of the Partnership (or such successor) pursuant to an insurance policy or similar arrangement.

### 15.5   Arbitration.

(a)   Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("*Claim*"), shall be resolved by final and binding arbitration ("*Arbitration*") before a panel of three (3) arbitrators ("*Arbitrators*") selected from and administered by Judicial Arbitration and Mediation Service Inc. (the "*Administrator*") in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. Each party shall select one arbitrator and the two parties shall then agree on a third arbitrator, who shall be selected from a list provided by the Administrator. The arbitration shall be held in San Juan Capistrano, California.

(b)   Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)   The Arbitrators shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrators shall be authorized to award compensatory damages, but

42.

806590 v11/SD

Exhibit 7
Page 351

shall *not* be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrators also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

        **(d)**    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrators; *provided, however,* the Arbitrators shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrators. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

        **(e)**    By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 15.5, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

    **15.6**    **Execution and Filing of Documents.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.

    **15.7**    **Other Instruments and Acts.** The Partners agree to execute any other instruments or perform any other acts that are or may be reasonably necessary to effectuate and carry on the partnership created by this Agreement.

    **15.8**    **Binding Agreement.** This Agreement shall be binding upon the transferees, successors, assigns, and legal representatives of the Partners.

    **15.9**    **Notices; Electronic Transmission of Reports.** Any notice or other communication that one Partner desires to give to another Partner shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the Partner to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be addressed to the other Partner at the address shown on the Schedule of Partners or at such other address as a Partner may designate by ten (10) days' advance written notice to the other Partners. In addition to the provisions of

43.

806590 v11/SD

Exhibit 7
Page 352

paragraph 11.5, the General Partner shall be entitled to transmit to the Limited Partners by e-mail the reports required by paragraphs 11.3, 11.4, and 11.7.

**15.10  Power of Attorney.**  By signing this Agreement, each Limited Partner designates and appoints the General Partner its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Certificate of Limited Partnership and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Partnership by the laws of the United States of America, the laws of the state of the Partnership's formation, or any other state in which the Partnership shall conduct its affairs in order to qualify or otherwise enable the Partnership to conduct its affairs in such jurisdictions. Such attorney is not hereby granted any authority on behalf of the Limited Partners to amend this Agreement except that as attorney for each of the Limited Partners, the General Partner shall have the authority to amend this Agreement and the Certificate of Limited Partnership (and to execute any amendment to the Agreement or the Certificate of Limited Partnership on behalf of itself and as attorney in fact for each of the Limited Partners) as may be required to effect:

> **(a)**  Admission of additional Partners pursuant to Article 3;
>
> **(b)**  Additional capital commitments pursuant to Article 4;
>
> **(c)**  Transfers of Limited Partnership interests pursuant to Article 9; and
>
> **(d)**  Extensions of the Partnership term pursuant to Article 10.

This power of attorney and the power of attorney referenced in paragraph 4.5(b)(ix) granted by each Limited Partner shall expire as to such Partner immediately after the dissolution of the Partnership or the amendment of the Partnership's Schedule of Partners to reflect the complete withdrawal of such Partner as a Partner of the Partnership.

**15.11  Amendment.**

> **(a)**  Except as provided by the immediately preceding paragraph and subject to paragraph 15.11(b), this Agreement may be amended only with the written consent of the General Partner and a Majority in Interest of the Limited Partners.
>
> **(b)**  Notwithstanding paragraph 15.11(a), no amendment to the provisions of Article 13 may be made without the consent of each ERISA Partner, Governmental Plan Partner and Private Foundation Partner who may be adversely affected by such amendment.
>
> **(c)**  Notwithstanding paragraphs 15.11(a) and (b), no amendment of this Agreement may modify the method of making Partnership allocations or distributions, modify the method of determining the Partnership Percentage of any Partner, reduce any Partner's Capital Account, modify any provision of this Agreement pertaining to limitations on liability of the Limited Partners, or change the restrictions contained herein, unless each Partner adversely affected thereby in a manner different than the other Partners has expressly consented in writing to such amendment.

44.

Exhibit 7
Page 353

**(d)**    The Partnership's or General Partner's (or its managers', members' or employees') noncompliance with any provision hereof in any single transaction or event may be waived prospectively or retroactively in writing by the same Percentage in Interest of the Limited Partners that would be required to amend such provision pursuant to paragraphs 15.11(a), (b) or (c). No waiver shall be deemed a waiver of any subsequent event of noncompliance except to the extent expressly provided in such waiver.

**(e)**    The General Partner shall provide a copy of any amendment to (or waiver of any provision of) this Agreement to each Limited Partner for its records within a reasonable period of time following its adoption or approval.

**15.12  Entire Agreement.**  This Agreement constitutes the full, complete, and final agreement of the Partners and supersedes all prior agreements between the Partners with respect to the Partnership.    Notwithstanding the provisions of this Agreement, including paragraph 15.11, or of any subscription agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership, without the approval of any Limited Partner or any other person, may enter into a side letter or similar agreement to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement.  The parties hereto agree that any terms contained in a side letter or similar agreement to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any subscription agreement.

**15.13  Titles; Subtitles.**  The titles and subtitles used in this Agreement are used for convenience only and shall not be considered in the interpretation of this Agreement.

**15.14  Partnership Name.**  The Partnership shall have the exclusive right to use the Partnership name as long as the Partnership continues.  Upon termination of the Partnership, the Partnership shall assign whatever rights it may have in such name to the General Partner.  No value shall be placed upon the name or the goodwill attached to it for the purpose of determining the value of any Partner's Capital Account or interest in the Partnership.

**15.15  Confidentiality.**

**(a)**    This Agreement and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Partnership and its investments, including, without limitation, information about the portfolio companies of the Partnership (collectively, the *"Confidential Information"*), that any Limited Partner may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Limited Partner or its representatives, including Confidential Information disclosed to members of the Advisory Committee, pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Partnership, constitute proprietary and confidential information about the Partnership, the General Partner and its Affiliates and the Partnership's portfolio companies (the *"Affected Parties"*).  Each Limited Partner acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential

45.

806590 v11/SD

Exhibit 7
Page 354

Information is the subject of reasonable efforts to maintain its secrecy. Each Limited Partner further acknowledges and agrees that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.

(b)     Each Limited Partner agrees to hold all Confidential Information in confidence, and not to disclose any Confidential Information to any third party without the prior written consent of the General Partner. Notwithstanding the preceding sentence, each Limited Partner may disclose such Confidential Information: (i) to its officers, directors, trustees, equity owners, wholly-owned subsidiaries, employees and outside experts (including but not limited to its attorneys and accountants) on a "need to know" basis, so long as such persons are bound by the same duties of confidentiality to the Partnership as such Limited Partner, and so long as such Limited Partner shall remain liable for any breach of this paragraph 15.15 by such persons; (ii) to the extent that such information is required to be disclosed in connection with any civil or criminal proceeding; (iii) to the extent that such information is required to be disclosed by applicable law or requested in connection with any governmental, administrative or regulatory proceeding or filing (including any inspection or examination or any disclosure necessary in connection with a request for information made under a state or federal freedom of information act or similar law), after reasonable prior written notice to the General Partner (except where such notice is expressly prohibited by law); (iv) to the extent that such information was received from a third party not subject to confidentiality limitations and such Limited Partner can establish that it rightfully received such information from such party other than as a result of the breach of this paragraph 15.15; (v) to the extent such information was rightfully in such Limited Partner's possession prior to the Partnership's conveyance of such information to such Limited Partner, as evidenced by the Limited Partner's prior written records; or (vi) to the extent that the information provided by the Partnership is otherwise available in the public domain in the absence of any improper or unlawful action on the part of such Partner. Any Limited Partner seeking to make disclosure in reliance on the foregoing clauses (ii) and (iii) above, such Limited Partner shall use its commercially reasonable efforts to claim any relevant exception under such laws or obligations which would prevent or limit public disclosure of the Confidential Information and provide the General Partner with prompt notice upon the Limited Partner's receipt of a request for disclosure of any Confidential Information pursuant to such laws or obligations.

(c)     Each Limited Partner also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Partnership upon the General Partner's request. Notwithstanding any provision of this Agreement to the contrary, the General Partner may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any particular Limited Partner if the General Partner reasonably determines that the disclosure of such Confidential Information to such Limited Partner may result in the general public gaining access to such Confidential Information or that such disclosure is not in the best interests of the Partnership or its investments; provided, however, that to the extent that any information is not delivered to a Limited Partner based on the General Partner's exercise of its discretion under this sentence, such information shall be made available for review, but not copying, during regular business hours at a location mutually determined by the General Partner and such Limited Partner. In no

46.

806590 v11/SD

Exhibit 7
Page 355

event shall a Limited Partner be denied access to information deliverable pursuant to paragraph 11.7 of this Agreement.

(d)     In addition, with respect to each Limited Partner that is subject to any "freedom of information," "sunshine" or other law, rule or regulation that imposes upon such Limited Partner an obligation to make information available to the public (a "*FOIA Limited Partner*"), the Partnership hereby requests confidential treatment of the Confidential Information, and such Limited Partner shall use commercially reasonable efforts to take such action as necessary for such Confidential Information to be exempt from disclosure, to the maximum extent permitted under such law, rule or regulation.  Notwithstanding anything contained in this paragraph 15.15 to the contrary, each FOIA Limited Partner may publicly disclose the following: (i) the FOIA Limited Partner's status as a Limited Partner of the Partnership, (ii) the amount of such FOIA Limited Partner's Capital Commitment, (iii) the total amount of such FOIA Limited Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the FOIA Limited Partner from the Partnership, and (v) the FOIA Limited Partner's net internal rate of return with respect to the Partnership's performance as prepared by such FOIA Limited Partner (collectively, the "*Fund Level Information*").  Only with respect to FOIA Limited Partners, for purposes of this paragraph 15.15, Confidential Information shall be deemed not to include Fund Level Information.

(e)     In addition, with respect to each Limited Partner that is a "fund of funds" or a similar pooled investment vehicle (but specifically excluding any pension, retirement or similar benefit plan) (a "*Pooled Vehicle Partner*"), the Pooled Vehicle Partner shall be permitted to make disclosure to its direct equity owners (expressly excluding permission to make disclosure to any indirect or other beneficial owners), that are subject to a written confidentiality agreement or obligation that provides a degree of protection to the Partnership comparable to that provided in this paragraph 15.15 of solely the following Confidential Information: (i) the Pooled Vehicle Partner's status as a Limited Partner of the Partnership, (ii) the amount of such Pooled Vehicle Partner's Capital Commitment, (iii) the total amount of such Pooled Vehicle Partner's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the Pooled Vehicle Partner from the Partnership, (v) the Pooled Vehicle Partner's net internal rate of return with respect to the Partnership's performance as prepared by such Pooled Vehicle Partner, (vi) the net asset value of the Pooled Vehicle Partner's interest in the Partnership (both cost and market value), (vii) such ratios and performance information calculated by the Pooled Vehicle Partner using the information in clauses (ii) through (vi) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple"), (viii) quarterly and annual reports summarizing the status of the Pooled Vehicle Partner's investment in the Partnership (without disclosure of any information concerning a Portfolio Company, other than the name of such Portfolio Company, a description of the business of such Portfolio Company and information regarding the industry and geographic location of such Portfolio Company, the Partnership's cost basis in each such Portfolio Company, the Partnership's carry value of each investment in such Portfolio Company and, upon liquidity of any such Portfolio Company, the Partnership's rate of return related to such investment (the "*Portfolio Confidential Information*")), and (ix) the name and address of the Partnership and the names of the principals of the General Partner; provided, however, that no Pooled Vehicle Partner may provide Portfolio Confidential Information to an equity owner of such Pooled

47.

Exhibit 7
Page 356

Vehicle Partner that would be a FOIA Limited Partner of the Partnership if such equity owner of the Pooled Vehicle Partner were a Limited Partner of the Partnership; other than the Fund Level Information that the Pooled Vehicle Partner would be able to disclose if it were a FOIA Limited Partner.

(f)     Each Limited Partner agrees to notify such Limited Partner's attorneys, accountants and other similar advisers about their obligations in connection with this paragraph 15.15 and will further cause such advisers to abide by the aforesaid provisions of this paragraph 15.15. Notwithstanding the foregoing, no Limited Partner shall be liable to the Partnership for any breach of this paragraph 15.15 by any adviser of such Limited Partner if the adviser is bound by an obligation to keep such Confidential Information confidential and such Limited Partner agrees to enforce such obligation.

15.16   **Partnership Legal Matters.** Each Partner hereby agrees and acknowledges that:

(a)     Cooley LLP ("*Cooley*") has been retained as Legal Counsel by the General Partner in connection with the formation of the Partnership and the offering of Limited Partner interests and in such capacity has provided legal services to the General Partner and the Partnership. The General Partner expects to retain Cooley to provide legal services to the General Partner and the Partnership in connection with the management and operation of the Partnership.

(b)     Cooley is not and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one hand and the General Partner and the Partnership on the other (the "*Partnership Legal Matters*").

(c)     Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)     Each Limited Partner hereby agrees that Cooley may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner or the Partnership and one or more Limited Partners) and waives any present conflict of interest with Cooley regarding Partnership Legal Matters arising by virtue of any representation or deemed representation of such Limited Partner or the Partnership on account of Cooley's representation described in paragraph 15.16(a) above; *provided, however,* that the Limited Partners are not hereby agreeing to Cooley's representation of the Partnership in a derivative action on their behalf against the General Partner.

**[THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

48.

806590 v11/SD

Exhibit 7
Page 357

IN WITNESS WHEREOF, the Partners have executed this Limited Partnership Agreement as of the date first written above.

**GENERAL PARTNER:**                              **LIMITED PARTNER:**

**FROST VENTURE PARTNERS GP, LLC**

_____
*(Print name of investing entity)*

By:_____          By:_____
      Managing Director                                    *(signature)*

Name:_____
             *(print name)*

Title:_____

"THE SECURITIES EVIDENCED BY THIS PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT COVERING SUCH SECURITIES OR THE GENERAL PARTNER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE GENERAL PARTNER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE 1933 ACT."

SIGNATURE PAGE TO LIMITED PARTNERSHIP AGREEMENT
OF FROST VP EARLY STAGE FUND II, L.P.

Exhibit 7
Page 358

# FROST VP EARLY STAGE FUND II, L.P.

# LIMITED PARTNERSHIP AGREEMENT

806590 v11/SD

Exhibit 7
Page 359

## TABLE OF CONTENTS

PAGE

ARTICLE 1     NAME, PURPOSE AND OFFICES OF PARTNERSHIP ...............................1
    1.1     Name........................................................................................................1
    1.2     Purpose ...................................................................................................1
    1.3     Principal Office .....................................................................................1
    1.4     Registered Agent and Office ................................................................1

ARTICLE 2     TERM OF PARTNERSHIP ......................................................................2
    2.1     Term .......................................................................................................2
    2.2     Events Affecting a Member of the General Partner .............................2
    2.3     Events Affecting a Limited Partner of the Partnership ........................2
    2.4     Events Affecting the General Partner....................................................2

ARTICLE 3     NAME AND ADMISSION OF PARTNERS............................................2
    3.1     Name and Address.................................................................................2
    3.2     Admission of Additional Partners ........................................................3

ARTICLE 4     CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS AND
                NONCONTRIBUTING PARTNERS .....................................................3
    4.1     Capital Accounts ..................................................................................3
    4.2     Capital Contributions of the Limited Partners.....................................3
    4.3     Capital Contributions of the General Partner .......................................5
    4.4     Acquisition of an Additional Interest by the General Partner...............6
    4.5     Noncontributing Partners......................................................................6
    4.6     Suspension Period .................................................................................10

ARTICLE 5     PARTNERSHIP ALLOCATIONS ..........................................................11
    5.1     Allocation of Profit or Loss..................................................................11
    5.2     Special Allocations ...............................................................................13
    5.3     Regulatory Allocations .........................................................................13
    5.4     Income Tax Allocations ........................................................................14

ARTICLE 6     MANAGEMENT FEE; PARTNERSHIP EXPENSES ............................14
    6.1     Management Fee ...................................................................................14
    6.2     Expenses ................................................................................................15

ARTICLE 7     WITHDRAWALS BY AND DISTRIBUTIONS TO THE
                PARTNERS............................................................................................17

i.

TABLE OF CONTENTS
(Continued)

PAGE

| | | |
|---|---|---|
| 7.1 | Interest | 17 |
| 7.2 | Withdrawals by the Partners | 17 |
| 7.3 | Partners' Obligation to Repay or Restore | 17 |
| 7.4 | Mandatory Distributions | 17 |
| 7.5 | Discretionary Distributions | 18 |
| 7.6 | Withholding Obligations | 19 |
| ARTICLE 8 | MANAGEMENT DUTIES AND RESTRICTIONS | 20 |
| 8.1 | Management | 20 |
| 8.2 | No Control by the Limited Partners; No Withdrawal | 21 |
| 8.3 | Existing Funds; Follow On Funds; Parallel Funds | 21 |
| 8.4 | Investment Opportunities and Restrictions | 22 |
| ARTICLE 9 | INVESTMENT REPRESENTATION AND TRANSFER OF PARTNERSHIP INTERESTS | 23 |
| 9.1 | Investment Representation of the Limited Partners | 23 |
| 9.2 | Qualifications of the Limited Partners | 24 |
| 9.3 | Transfer by General Partner | 24 |
| 9.4 | Transfer by Limited Partner | 24 |
| 9.5 | Requirements for Transfer | 25 |
| 9.6 | Substitution as a Limited Partner | 25 |
| ARTICLE 10 | DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP | 26 |
| 10.1 | Extension of Partnership Term | 26 |
| 10.2 | Early Termination of the Partnership | 26 |
| 10.3 | Winding Up Procedures | 26 |
| 10.4 | Payments in Liquidation | 27 |
| 10.5 | Return of Excess Distributions | 27 |
| ARTICLE 11 | FINANCIAL ACCOUNTING, REPORTS AND MEETINGS | 28 |
| 11.1 | Financial Accounting; Fiscal Year | 28 |
| 11.2 | Supervision; Inspection of Books | 28 |
| 11.3 | Quarterly Reports | 28 |
| 11.4 | Annual Report; Financial Statements of the Partnership | 28 |
| 11.5 | Electronic Reporting | 29 |
| 11.6 | Tax Returns | 29 |

ii.

## TABLE OF CONTENTS
### (Continued)

PAGE

11.7    Tax Matters Partner .................................................................................. 30

ARTICLE 12    VALUATION; ADVISORY COMMITTEE .......................................... 31

12.1    Valuation .................................................................................................... 31

12.2    Advisory Committee ................................................................................. 32

ARTICLE 13    PARTNERS SUBJECT TO SPECIAL REGULATION ........................ 32

13.1    ERISA Partners ......................................................................................... 32

13.2    Governmental Plan Partners .................................................................... 34

13.3    Private Foundation Partners .................................................................... 35

13.4    Media Companies ...................................................................................... 35

ARTICLE 14    CERTAIN DEFINITIONS ..................................................................... 37

14.1    Accounting Period .................................................................................... 37

14.2    Adjusted Asset Value ................................................................................ 37

14.3    Affiliate ....................................................................................................... 37

14.4    Attributable Interest ................................................................................. 38

14.5    Capital Account ......................................................................................... 38

14.6    Capital Commitment; Committed Capital ............................................. 38

14.7    Code ............................................................................................................. 38

14.8    Deemed Gain or Deemed Loss ................................................................ 38

14.9    FCC .............................................................................................................. 38

14.10   FCC Attribution Orders ........................................................................... 38

14.11   FCC Rules ................................................................................................... 39

14.12   Idle Funds Income .................................................................................... 39

14.13   Managing Directors .................................................................................. 39

14.14   Marketable; Marketable Securities; Marketability .............................. 39

14.15   Media Company ........................................................................................ 39

14.16   Nonmarketable Securities ....................................................................... 39

14.17   Other Restricted Person ........................................................................... 39

14.18   Ownership Rules ....................................................................................... 40

14.19   Partnership Percentage ............................................................................ 40

14.20   Percentage in Interest; Majority in Interest .......................................... 40

14.21   Profit or Loss ............................................................................................. 40

14.22   Securities .................................................................................................... 41

iii.

Exhibit 7
Page 362

## TABLE OF CONTENTS
### (Continued)

PAGE

14.23  Securities Act..............................................................................................41

14.24  Treasury Regulations...................................................................................41

ARTICLE 15    OTHER PROVISIONS ......................................................................41

15.1  Governing Law...........................................................................................41

15.2  Limitation of Liability of the Limited Partners ..........................................41

15.3  Exculpation................................................................................................41

15.4  Indemnification..........................................................................................42

15.5  Arbitration .................................................................................................44

15.6  Execution and Filing of Documents ...........................................................45

15.7  Other Instruments and Acts........................................................................45

15.8  Binding Agreement ....................................................................................45

15.9  Notices; Electronic Transmission of Reports .............................................45

15.10  Power of Attorney ....................................................................................46

15.11  Amendment ..............................................................................................46

15.12  Entire Agreement......................................................................................47

15.13  Titles; Subtitles ........................................................................................47

15.14  Partnership Name .....................................................................................47

15.15  Confidentiality .........................................................................................47

15.16  Partnership Legal Matters.........................................................................50

806590 v11/SD

iv.

Exhibit 7
Page 363

# INDEX OF DEFINITIONS

| Term | Paragraph | Page |
|---|---|---|
| Accounting Period | 14.1 | 37 |
| Act | Preamble | 1 |
| Activation Date | 4.2(a) | 4 |
| Adjusted Asset Value | 14.2 | 37 |
| Administrator | 15.5(a) | 44 |
| Advisory Committee | 12.2 | 32 |
| Affected Parties | 15.15(a) | 47 |
| Affiliate | 14.3 | 37 |
| Agreement | Preamble | 1 |
| Applicable Tax Rate | 7.4 | 17 |
| Arbitration | 15.5(a) | 44 |
| Arbitrators | 15.5(a) | 44 |
| Attributable Interest | 14.4 | 37 |
| Capital Account | 14.5 | 38 |
| Capital Commitment | 14.6 | 38 |
| Carry Percentage | 5.1(b) | 12 |
| Claim | 15.5(a) | 44 |
| Code | 14.7 | 38 |
| Commencement Date | 2.1 | 2 |
| Commitment Period | 4.2(a) | 4 |
| Committed Capital | 14.6 | 38 |
| Confidential Information | 15.15(a) | 47 |
| Deemed Gain | 14.8 | 38 |
| Deemed Loss | 14.8 | 38 |
| Default Notice | 4.5(b) | 6 |
| Defaulting Limited Partner | 4.5(b) | 6 |
| DOL Regulations | 4.2(b) | 4 |
| ERISA | 9.5(a) | 24 |
| ERISA Partner | 13.1(a) | 32 |
| FCC | 14.9 | 38 |
| FCC Attribution Orders | 14.10 | 38 |
| FCC Rules | 14.11 | 39 |
| Fee Adjustment | 4.3 | 5 |
| Fee Adjustment Amount | 4.3 | 5 |
| Fee Adjustment Notice | 4.3 | 5 |
| FOIA Limited Partner | 15.15(d) | 49 |
| Frost Fund | 8.3(a) | 21 |
| Fund Affiliates | 8.3(a) | 21 |
| Fund Level Information | 15.15(d) | 49 |
| General Partner | Preamble | 1 |
| Governmental Plan Partner | 13.2 | 34 |

Exhibit 7
Page 364

| Term | Paragraph | Page |
|------|-----------|------|
| Incubator | 1.2 | 1 |
| Incubator Company | 8.3(b) | 20 |
| Idle Funds Income | 14.12 | 39 |
| Indemnified Parties | 15.4(a) | 42 |
| Limited Partners | Preamble | 1 |
| Loss | 14.23 | 40 |
| Majority in Interest | 14.21 | 40 |
| Management Company | 8.1 | 20 |
| Management Fee Percentage | 6.1(b) | 14 |
| Managing Directors | 14.13 | 39 |
| Marketable | 14.14 | 39 |
| Marketable Securities | 14.14 | 39 |
| Marketability | 14.14 | 39 |
| Media Company | 14.15 | 39 |
| Nonmarketable Securities | 14.16 | 39 |
| Optionees | 4.5(b)(vii) | 8 |
| Optionor | 4.5(b)(vii) | 8 |
| Other Restricted Person | 14.17 | 39 |
| Ownership Rules | 14.18 | 40 |
| Parallel Funds | 8.3(c) | 21 |
| Partner(s) | 3.1 | 2 |
| Partnership | Preamble | 1 |
| Partnership Percentage | 14.19 | 40 |
| Payback | 7.5(a) | 18 |
| Percentage in Interest | 14.20 | 40 |
| Pooled Vehicle Partner | 15.15(e) | 49 |
| Portfolio Company | 6.1(e) | 15 |
| Portfolio Confidential Information | 15.15(e) | 50 |
| Private Foundation Partner | 13.3 | 35 |
| Profit | 14.22 | 40 |
| Regulatory Allocations | 5.4(a) | 13 |
| Regulatory Limitation | 7.5(h) | 19 |
| Remaining Portion | 4.6(b)(vii)(2) | 8 |
| Reporting Site | 11.5 | 29 |
| Schedule of Partners | 3.1 | 2 |
| Securities | 14.22 | 41 |
| Securities Act | 14.23 | 41 |
| Service Fee | 6.1(e) | 15 |
| Subject Reports | 11.5 | 29 |
| Successor Fund | 8.3(a) | 20 |
| Suspension Event | 4.6(b) | 11 |
| Suspension Event Notice | 4.6(b) | 11 |
| Suspension Period | 4.6(b) | 11 |
| Tax Payments | 7.6(a) | 19 |
| Termination Date | 2.1 | 2 |

ii.

806590 v11/SD

Exhibit 7
Page 365

| Term | Paragraph | Page |
|------|-----------|------|
| Treasury Regulations | 14.24 | 41 |
| VCOC | 4.2(b) | 4 |
| VCOC Notice | 4.2(b) | 4 |

806590 v11/SD

iii.

Exhibit 7
Page 366

# EXHIBIT 8

# FROST VENTURE PARTNERS GP, LLC

## OPERATING AGREEMENT

### DATED MAY 29, 2013

EXHIBIT
4
S. Frost
2-14-17
G. Kennamer CSR CCRR

832770 v9/SD

CONFIDENTIAL

F000193

Exhibit 8
Page 367

F000193

## TABLE OF CONTENTS

**Page**

ARTICLE 1    CERTAIN DEFINITIONS ................................................................................ 1

   1.1    Certain Definitions .................................................................................... 1

ARTICLE 2    NAME, PURPOSES AND PLACE OF BUSINESS OF COMPANY ............ 5

   2.1    Company Name .......................................................................................... 5

   2.2    Company Purposes .................................................................................... 6

   2.3    Principal Place of Business ....................................................................... 6

   2.4    Registered Agent ....................................................................................... 6

ARTICLE 3    PERIOD OF DURATION ............................................................................ 6

   3.1    Period of Duration ..................................................................................... 6

   3.2    Events Affecting a Manager ...................................................................... 6

   3.3    Events Affecting a Member ....................................................................... 6

ARTICLE 4    NAMES, ADMISSION AND REMOVAL OF MEMBERS ....................... 6

   4.1    Names and Addresses ................................................................................ 6

   4.2    Admission of Members .............................................................................. 6

   4.3    Removal of a Member or Economic Assignee ........................................... 7

ARTICLE 5    MANAGEMENT, DUTIES AND RESTRICTIONS .................................. 7

   5.1    Management ................................................................................................ 7

   5.2    Time Commitments .................................................................................... 7

   5.3    Designation of Managers ........................................................................... 7

   5.4    Resignation and Removal of Managers ..................................................... 7

   5.5    Restrictions on Transfers of Company Interests ........................................ 7

   5.6    Determination by the Managers ................................................................. 8

   5.7    Restrictions on the Members and Managers .............................................. 8

   5.8    Nonliability ................................................................................................ 8

ARTICLE 6    CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS ......................... 9

   6.1    Capital Accounts ........................................................................................ 9

   6.2    Capital Contributions ................................................................................. 9

   6.3    Noncontributing Members ......................................................................... 9

ARTICLE 7    ALLOCATIONS; PRINCIPAL PARTICIPATION .................................. 12

   7.1    Allocation of Capital Interest Gain or Loss ............................................... 12

   7.2    Allocation of Carried Interest Gain or Loss ............................................... 12

   7.3    Special Allocation Relating to Fee Adjustment Income ............................. 12

   7.4    Allocation of Company Income or Loss ..................................................... 12

   7.5    Income Tax Allocations ............................................................................. 12

   7.6    Designation of Economic Assignees .......................................................... 13

832770 v9/SD

CONFIDENTIAL                                                              F000194

Exhibit 8
Page 368

F000193

TABLE OF CONTENTS
(CONTINUED)

| | | | Page |
|---|---|---|---|
| ARTICLE 8 | | SALARIES, EXPENSES AND FEES | 13 |
| | 8.1 | Salaries, Bonuses | 13 |
| | 8.2 | Expense Reimbursement | 13 |
| | 8.3 | Directors' and Consulting Fees and Options | 13 |
| ARTICLE 9 | | DISTRIBUTIONS TO AND WITHDRAWALS BY MEMBERS | 14 |
| | 9.1 | Interest | 14 |
| | 9.2 | Withdrawals by Members | 14 |
| | 9.3 | Distributions | 14 |
| | 9.4 | Obligation to Return Distributions | 15 |
| ARTICLE 10 | | CHANGE IN STATUS OF MEMBERS | 16 |
| | 10.1 | Change in Status | 16 |
| ARTICLE 11 | | DISSOLUTION OF COMPANY | 18 |
| | 11.1 | Early Termination of the Company | 18 |
| | 11.2 | Dissolution Procedures | 18 |
| ARTICLE 12 | | REPORTS AND FINANCIAL ACCOUNTING | 18 |
| | 12.1 | Financial Records | 18 |
| | 12.2 | Annual Reports | 18 |
| | 12.3 | Tax Matters Member | 18 |
| | 12.4 | Safe Harbor Election and Forfeiture Allocations | 18 |
| | 12.5 | Confidentiality | 19 |
| ARTICLE 13 | | VALUATION | 20 |
| | 13.1 | Valuation | 20 |
| ARTICLE 14 | | AMENDMENT | 20 |
| | 14.1 | Amendment | 20 |
| ARTICLE 15 | | OTHER PROVISIONS | 20 |
| | 15.1 | Loans | 20 |
| | 15.2 | Notice | 21 |
| | 15.3 | Counterparts | 21 |
| | 15.4 | Binding Agreement | 21 |
| | 15.5 | Entire Agreement; Captions | 21 |
| | 15.6 | Name and Mark | 21 |
| | 15.7 | Arbitration | 21 |
| | 15.8 | Indemnification | 22 |
| | 15.9 | Power of Attorney | 23 |

ii.

832770 v9/SD
CONFIDENTIAL

**TABLE OF CONTENTS**
(CONTINUED)

**Page**

15.10    No Employment or Other Implied Rights................................................................23

15.11    Company Legal Matters.........................................................................................23

iii.

832770 v9/SD
CONFIDENTIAL

F000196

Exhibit 8

F000193

## INDEX OF DEFINITIONS

| Defined Term | Paragraph | Page |
|---|---|---|
| Accounting Period | 1.1(a) | 1 |
| Act | Preamble | 1 |
| Additional Member | 1.1(b) | 1 |
| Adjusted Asset Value | 1.1(c) | 1 |
| Administrator | 15.7(a) | 22 |
| Affected Parties | 12.5 | 19 |
| Affiliate | 1.1(d) | 2 |
| Agreement | Preamble | 1 |
| Arbitration | 15.7(a) | 21 |
| Arbitrator | 15.7(a) | 22 |
| Bankruptcy | 1.1(e) | 2 |
| Capital Account | 1.1(f) | 2 |
| Capital Commitment | 1.1(g) | 2 |
| Capital Interest Gain or Loss | 1.1(h) | 2 |
| Capital Interest Percentage | 1.1(i) | 2 |
| Carried Interest Gain or Loss | 1.1(j) | 2 |
| Carried Interest Percentage | 1.1(k) | 2 |
| Claim | 15.7(a) | 21 |
| Code | 1.1(l) | 3 |
| Company | Preamble | 1 |
| Company Income or Loss | 1.1(m) | 3 |
| Company Legal Matters | 15.11(b) | 24 |
| Compensatory Interest | 12.4(a) | 18 |
| Conversion Date | 10.1(b)(i) | 16 |
| Converted Member | 1.1(n) | 3 |
| Cooley | 15.11(a) | 24 |
| Default Notice | 6.3(b) | 9 |
| Defaulting Member | 6.3(b) | 9 |
| Economic Assignee | 7.6 | 13 |
| Family Entity | 1.1(o) | 3 |
| Fee Adjustment | 1.1(p) | 3 |
| Fee Adjustment Amount | 1.1(q) | 3 |
| Fee Adjustment Income | 1.1(r) | 4 |
| Fee Adjustment Participation Amount | 1.1(s) | 4 |
| Fiscal Year | 1.1(t) | 4 |
| Forfeiting Member | 6.3(b)(viii) | 11 |
| Fund | 1.1(u) | 4 |
| Fund Agreement | 1.1(v) | 4 |
| Incompetence | 1.1(w) | 4 |
| Incompetency | 1.1(w) | 4 |
| Insanity | 1.1(x) | 4 |
| Management Action | 1.1(y) | 4 |
| Management Company | 1.1(z) | 4 |
| Management Services Agreement | 1.1(aa) | 5 |
| Manager | 1.1(bb) | 5 |
| Managers | 1.1(bb) | 5 |
| Managing Director | 1.1(bb) | 5 |

i.

832770 v9/SD
CONFIDENTIAL

| Managing Directors | 1.1(bb) | 5 |
| Member | 1.1(cc) | 5 |
| Membership Percentage | 1.1(dd) | 5 |
| Name and Mark | 1.1(ee) | 5 |
| Optionees | 6.3(b)(vii) | 10 |
| Overcontributed Amount | 10.1(g) | 17 |
| Parallel Fund | 1.1(ff) | 5 |
| Permanent Incapacitation | 1.1(gg) | 5 |
| Permanent Incapacity | 1.1(gg) | 5 |
| Person | 1.1(hh) | 5 |
| Proposed Rules | 12.4(a) | 18 |
| Regulatory Allocations | 7.5(b) | 12 |
| Safe Harbor Election | 12.4(a) | 18 |
| Securities | 1.1(ii) | 5 |
| Tax Matters Member | 12.3 | 18 |
| Term Percentage | 10.1(c)(i) | 17 |
| Treasury Regulations | 1.1(jj) | 5 |

ii.

832770 v9/SD
CONFIDENTIAL

F000198

Exhibit 8
Page 372

F000193

## FROST VENTURE PARTNERS GP, LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the *"Agreement"*) of FROST VENTURE PARTNERS GP, LLC, a Delaware limited liability company (the *"Company"*) is made and entered into as of the 29th day of May, 2013, by and among the parties set forth on the signature page hereof, in accordance with the provisions of the Delaware Limited Liability Company Act (the *"Act"*), as follows:

### ARTICLE 1

### CERTAIN DEFINITIONS

1.1    **Certain Definitions.**    For purposes of this Agreement, certain terms used in this Agreement shall be defined as follows:

(a)    *"Accounting Period"*.    An Accounting Period shall be (i) a calendar year if there are no changes in the Members' respective interests in Company income, gain, loss or deductions during such calendar year except on the first day thereof, (ii) any other period beginning on the first day of a calendar year, or any other day during a calendar year, upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interest shall occur, or (iii) such other period determined by Management Action.

(b)    *"Additional Member"*.    Additional Member shall mean any Person or entity, who or which is admitted to the Company as a Member pursuant to the terms of this Agreement after the date hereof.

(c)    *"Adjusted Asset Value"*.    The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Adjusted Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the contributing Member and the Company.

(ii)    In the discretion of the Managers, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by Management Action, and the resulting unrecognized profit or loss allocated to the Capital Accounts of the Members pursuant to Article 7, as of the following times:  (1) the acquisition of an additional interest in the Company by any new or existing Member; and (2) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets, unless all Members receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in the Company.

(iii)    The Adjusted Asset Values of the Company's assets shall not be adjusted upon the conversion of a Member to a Converted Member, unless otherwise determined by Management Action.

(iv)    The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by Management Action, and the resulting unrecognized profit or loss allocated to the Capital Accounts of the Members pursuant to Article 7, as of the termination of the Company either by expiration of the Company's term or otherwise.

1.

832770 v9/SD
CONFIDENTIAL                                                                      F000199

Exhibit 8
Page 373                                                                        F000193

(d)  "*Affiliate*".  Affiliate shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled.  For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

(e)  "*Bankruptcy*".  Shall mean, with respect to any Person, if (i) any proceeding is commenced against such Person for any relief under bankruptcy or insolvency laws, or laws relating to the relief of debtors, reorganizations, arrangements, compositions, or extensions and is not dismissed within ninety (90) days after such proceedings have been commenced, or (ii) such Person commences any proceeding for relief under bankruptcy or insolvency laws or law relating to the relief of debtors, reorganizations, arrangements, compositions, or extensions.

(f)  "*Capital Account*".  The Capital Account of each Member shall consist of such Member's original capital contribution, if any, (i) increased by any additional capital contributions, such Member's share of income or gain that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member, and (ii) decreased by the amount of any distributions to, or withdrawals by, such Member, such Member's share of any loss or expense allocations pursuant to this Agreement, and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.  The foregoing provision relating to the maintenance of Capital Accounts is intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv) and shall be interpreted and applied in a manner consistent with such Regulation.

(g)  "*Capital Commitment*".  A Member's Capital Commitment, if any, shall mean the amount that such Member has agreed to contribute to the capital of the Company, as set forth opposite such Member's name on EXHIBIT A hereto.

(h)  "*Capital Interest Gain or Loss*".  Capital Interest Gain or Loss shall be an amount computed for each Accounting Period that is equal to the sum of (i) all items allocated to the Company pursuant to the Fund Agreement, by reason of, and in proportion to, the Company's capital commitment to the Fund, and (ii) any gains or losses realized (or deemed realized) by the Company upon the sale or in-kind distribution of Securities received in respect of those items described in the foregoing clause (i).

(i)  "*Capital Interest Percentage*".  A Capital Interest Percentage shall be established for each Member which shall be equal to the Capital Commitment of the Member divided by the Capital Commitments of all Members.  The sum of the Members' Capital Interest Percentages shall be one hundred percent (100%).

(j)  "*Carried Interest Gain or Loss*".  Carried Interest Gain or Loss shall be an amount computed for each Accounting Period that is equal to the sum of (i) the Company's allocated share of all items allocated to the capital account of the Company pursuant to paragraph 5.1(a)(iv)(1) of the Fund Agreement in respect of the Company's carried interest profits in the Fund (other than allocations made in respect of the Company's capital commitment to the Fund and allocations made to the Company pursuant to paragraph 5.1(a)(i) of the Fund Agreement) and (ii) any gains or losses realized (or deemed realized) by the Company upon the sale or in-kind distribution of Securities received in respect of an allocation of income or loss described in the foregoing clause (i).

(k)  "*Carried Interest Percentage*".  The Carried Interest Percentage for each Member shall be as set forth on EXHIBIT A hereto, as amended from time to time in accordance with the terms of this Agreement.  Any reallocation of Carried Interest Percentage due to the admission or removal

2.

832770 v9/SD
CONFIDENTIAL

F000200

Exhibit 8
Page 374

F000193

of members shall be reallocated only among those Members then serving as Managers. The sum of the Member's Carried Interest Percentages shall be one hundred percent (100%).

(l)    *"Code"*.  The Code is the Internal Revenue Code of 1986, as it may be amended from time to time (or any corresponding provisions of succeeding law).

(m)    *"Company Income or Loss"*.  Company Income or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Company Income or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Company Income or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(iii)    Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

(iv)    The difference between the gross fair market value of all Company assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 1.1(c);

(v)    Upon any distribution in kind, the difference between the fair market value and the Adjusted Asset Value of the assets distributed shall be added to such taxable income or loss; and

(vi)    Items which are specially allocated pursuant to paragraphs 7.1, 7.2 or 7.3 hereof shall not be taken into account in computing Company Income or Loss.

(n)    *"Converted Member"*.  Converted Member shall mean any former Member who has ceased to be a Member pursuant to paragraph 10.1.

(o)    *"Family Entity"*.  Family Entity shall mean a family partnership, trust, profit sharing plan or other entity controlled by or formed for the benefit of a Member or a member of his immediate family.

(p)    *"Fee Adjustment"*.  Fee Adjustment means any reduction of management fee expense otherwise payable to the Company by the Fund pursuant to paragraph 4.3 of the Fund Agreement.

(q)    *"Fee Adjustment Amount"*.  Fee Adjustment Amount shall be calculated for each Accounting Period and shall be the amount of management fee reductions incurred by the Company from the Fund during such Accounting Period as a result of the amount of capital the Company elected

3.

832770 v9/SD
CONFIDENTIAL

F000201

Exhibit 8
Page 375

F000193

not to contribute to the Fund in lieu of management fee offsets pursuant to paragraphs 4.3 and 6.1(c) of the Fund Agreement.

(r)    *"Fee Adjustment Income"*.    Fee Adjustment Income means an amount calculated for each Accounting Period that is equal to the sum of (i) all items allocated to the Company pursuant to paragraph 5.1(a)(i) of the Fund Agreement, and (ii) any interest income or gains or losses realized (or deemed realized) from the holding or disposition of assets received from the Fund in respect of those items described in clause (i).

(s)    *"Fee Adjustment Participation Amount"*.    Fee Waiver Participation Amount shall be calculated for each Member for each Accounting Period and shall be equal to the product of the Fee Adjustment Amount for such Accounting Period multiplied by the Member's Membership Percentage as of the last day of such Accounting Period and (ii) the aggregate amounts of Fee Adjustment Income previously allocated to such Member pursuant to paragraph 7.3.

(t)    *"Fiscal Year"*.    The Company's fiscal year for the period between the date hereof and December 31, 2013 shall be such period, and for all years thereafter shall commence on January 1 of each such year and end on December 31 of such year (the *"Fiscal Year"*), except for the final fiscal year of the Company, which shall begin on January 1 of such final fiscal year and end on the date of termination of the Company.

(u)    *"Fund"*.    Fund shall mean Frost VP Early Stage Fund II, L.P., a Delaware limited partnership formed under the Delaware Revised Uniform Limited Partnership Act, and as applicable, any other Parallel Fund.

(v)    *"Fund Agreement"*.    Fund Agreement shall mean the Limited Partnership Agreement of Frost VP Early Stage Fund II, L.P., as it may be amended from time to time, and, as applicable, the operative agreement of each Parallel Fund, as such may be amended from time to time. Except as otherwise specifically provided herein, references to provisions of the Fund Agreement shall refer to specific provisions of the Limited Partnership Agreement of Frost VP Early Stage Fund II, L.P., as it may be amended from time to time, and, as applicable, corresponding provisions of the Parallel Fund agreements.

(w)    *"Incompetency"* or *"Incompetence"*.    Incompetency or Incompetence shall mean the condition of having been adjudged incompetent by a decree of a court of competent jurisdiction.

(x)    *"Insanity"*.    Insanity shall mean the condition of having been adjudged insane by a decree of a court of competent jurisdiction.

(y)    *"Management Action"*.    Management Action shall mean the consent or approval of at least a majority of the Managers; *provided, however,* that (i) if there are an even number of duly authorized Managers and an equal number of Managers consent to an action as dissent to such action (i.e., a tie), then Management Action shall be deemed to be effective upon the consent or approval of Stuart Frost and (ii) if there are two or fewer duly authorized Managers, the unanimous consent of all the Managers shall be required. In the event that there are no Managers, Management Action shall be deemed to be effective upon the consent of the Members who hold at least a majority of the Carried Interest Percentages of the Members.

(z)    *"Management Company"*.    A firm designated by the Company for the provision of certain management, administrative, operational and other services with respect to the Fund on terms to be determined and agreed to by the Company.

4.

832770 v9/SD
CONFIDENTIAL                                                                                                    F000202

Exhibit 8
Page 376

F000193

(aa) *"Management Services Agreement"*. Management Services Agreement shall mean the Management Services Agreement entered into between the Company and the Management Company as of the Effective Date, as it may be amended from time to time.

(bb) *"Manager"*. Manager shall mean one or more managers designated or elected by the unanimous consent of the Managers pursuant to the terms of this Agreement or the Act, but in all cases only if such Manager has not become a Converted Member or otherwise withdrawn from the Company as a Manager. As of the effective date of this Agreement, Stuart Frost, John Vigouroux and Jack Kreindler are hereby designated as the Managers (collectively, the *"Managers"*). Each Manager shall be referred to as a *"Managing Director"* of the Company (collectively, the *"Managing Directors"*), or such other title as the Managers may designate.

(cc) *"Member"*. Member shall mean each of the Members set forth on EXHIBIT A hereto and Additional Members as of a given time. The term *"Member"* shall also include Converted Members.

(dd) *"Membership Percentage"*. The Membership Percentage for each Member shall be set forth on EXHIBIT A hereto, as amended from time to time in accordance with the terms of this Agreement. The sum of the Members' Membership Percentages shall be one hundred percent (100%).

(ee) *"Name and Mark"*. Name and Mark shall mean the names and service marks "Frost Venture Partners," together with any associated logotype and website address.

(ff) *"Parallel Fund"*. Parallel Fund shall have the meaning given to it in paragraph 8.3(b) of the Fund Agreement.

(gg) *"Permanent Incapacity"* or *"Permanent Incapacitation"*. A Person shall be deemed to have a Permanent Incapacity whenever such Person is determined by competent medical authority selected by Management Action by Management Action to be permanently incapable of carrying out his functions as a Manager hereunder. Permanent Incapacitation shall mean the condition of have a Permanent Incapacity.

(hh) *"Person"*. Person shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

(ii) *"Securities"*. Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, warrants, notes, bonds, debentures, evidences of indebtedness, and other business interests of every type, including interests in partnerships, joint ventures, proprietorships, and other business entities.

(jj) *"Treasury Regulations"*. Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

## ARTICLE 2

### NAME, PURPOSES AND PLACE OF BUSINESS OF COMPANY

2.1 **Company Name.** The Company shall conduct its activities under the name Frost Venture Partners GP, LLC or such other name as the Managers may designate.

5.

**2.2    Company Purposes.** The purpose of the Company is to (i) act as general partner of the Fund and any other partnerships or entities permitted to be formed by the Company under the Fund Agreement, (ii) deal with any Securities and other assets that the Company may receive from time to time from any Fund or otherwise, and (iii) engage in any lawful act or activity for which a limited liability company may be organized under the laws of the State of Delaware. The Company shall have the power to make and perform all contracts and to engage in all actions and transactions necessary or advisable to carry out the purposes of the Company, and all other powers available to it as a limited liability company under the Act.

**2.3    Principal Place of Business.** The principal place of business of the Company shall be at 31910 Del Obispo, Suite 100, San Juan Capistrano, CA 92675, or at such other place or places as determined by Management Action.

**2.4    Registered Agent.** The name of the registered agent for service of process of the Company and the address of the Company's registered office in the State of Delaware shall be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other agent or office in the State of Delaware as the Managers may from time to time designate.

## ARTICLE 3

### PERIOD OF DURATION

**3.1    Period of Duration.** The Company shall commence upon of the filing with the Secretary of the State of Delaware of the Company's Certificate of Formation and shall continue until six (6) months after the date of dissolution of the Fund, unless sooner dissolved as provided in paragraph 11.1 below or unless the term of the Company is extended by Management Action (including Stuart Frost).

**3.2    Events Affecting a Manager.**    The death, bankruptcy, withdrawal, Insanity, Incompetency, temporary or Permanent Incapacity, expulsion or removal of a Manager shall not dissolve the Company.

**3.3    Events Affecting a Member.**    Except as provided in paragraph 11.1, the death, Bankruptcy, withdrawal, Insanity, Incompetency, temporary or Permanent Incapacity, dissolution, expulsion or removal of a Member shall not dissolve the Company.

## ARTICLE 4

### NAMES, ADMISSION AND REMOVAL OF MEMBERS

**4.1    Names and Addresses.** The names and addresses of the Members, the amount of each Member's respective Capital Commitment to the Company, Membership Percentage, Capital Interest Percentage and Carried Interest Percentage are set forth on EXHIBIT A hereto. The Managers shall cause EXHIBIT A to be amended from time to time to reflect the admission of any Additional Member, the withdrawal of any Member, receipt by the Company of notice of any change of address of a Member, the change in any Member's Membership Percentage, Carried Interest Percentage or Capital Interest Percentage, or the occurrence of any other event requiring amendment of EXHIBIT A.

**4.2    Admission of Members.** Additional Members may be admitted to the Company only by the unanimous consent of the Managers. Additional Members shall execute any document(s) deemed advisable by Management Action, including but not limited to, an Admission Agreement and a counterpart of this Agreement.

6.

832770 v9/SD
CONFIDENTIAL

F000204

Exhibit 8
Page 378

F000193

**4.3    Removal of a Member or Economic Assignee.**   Removal of a Member (other than Stuart Frost) or Economic Assignee (as defined in paragraph 7.6) from the Company shall require the unanimous consent of the Managers.   Such removal may be with or without cause.

## ARTICLE 5

## MANAGEMENT, DUTIES AND RESTRICTIONS

**5.1    Management.**   Except as otherwise set forth herein, the Managers shall have the sole right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company, and to exercise all rights and powers under the Fund Agreement.   Without limiting the generality of the foregoing, the Managers are hereby authorized to enter into, on behalf of the Company, an agreement with the Management Company or another affiliated service company for the provision of management, administrative and other services to the Company and/or any the Fund on terms to be determined and agreed to by Management Action.   Upon Management Action, each Manager shall have the power to carry out such action on behalf of the Company, and upon Management Action the Managers may delegate matters to one or more of the Managers or to a Chief Financial Officer, Chief Operating Officer or other employee of the Company or the Management Company.   Except as expressly set forth herein, any vote, consent, or determination of the Managers shall require Management Action.

**5.2    Time Commitments.**   Each Manager of the Company shall comply with the time commitment obligations for Managers set forth in paragraph 8.3 of the Fund Agreement; *provided, however*, that a Manager may participate in outside business activities that (i) are not competitive with the activities of the Company or the Fund and (ii) do not conflict with the time commitment obligations set forth in paragraph 8.3 of the Fund Agreement.

**5.3    Designation of Managers.**   The Managers shall initially be as designated in paragraph 1.1(cc) and, thereafter, any new Manager shall be designated only by the unanimous consent of the Managers.   Every Manager shall be a Member of the Company.   In no instance shall there be less than one Manager.

**5.4    Resignation and Removal of Managers.**   Any Manager may resign at any time by giving written notice to each of the other Managers.   Any Manager (other than Stuart Frost) may be removed for any reason whatsoever upon the unanimous consent of the Managers (other than, in the case of a Manager, such Manager proposed to be removed).   A Manager who is also a Member (including a Manager who has transferred all of his interest to a Family Entity) shall cease to be a Manager upon the date on which such Manager (or such Family Entity) is removed as a Member or is otherwise deemed to be a Converted Member pursuant to paragraph 10.1(a).

**5.5    Restrictions on Transfers of Company Interests.**

(a)    In the event of any voluntary or involuntary transfer of a Member's interest in the Company (including without limitation, the transfer of a Member's interest to such Member's former spouse), or any part thereof, the transferee shall receive only the transferor's economic interest in the Company, and the transferee shall not be admitted as a Member or have any right as a result of such transfer to participate in the affairs of the Company, except as provided by written consent of the Managers pursuant to Management Action, which consent may be granted or withheld in the sole discretion of the Managers.   Notwithstanding any other provision of this Agreement to the contrary, for purposes of votes or decisions by the Managers pursuant to this Agreement, a transferee of a Manager's interest pursuant to this paragraph 5.5(a) shall not be entitled to any vote with respect to such transferred

7.

832770 v9/SD
CONFIDENTIAL

F000205

Exhibit 8
Page 379

F000193

interest, nor shall the Manager who shall have transferred such interest have any right to vote on account of such transferred interest, unless otherwise agreed to by Management Action.

(b)     Without Management Action, no Member shall sell, assign, mortgage, pledge or otherwise dispose of such Member's share in the Company or in its capital assets or property, except (i) to any other Member, (ii) to a Family Entity, or (iii) by testamentary disposition or intestate succession.

(c)     Notwithstanding anything to the contrary herein, no transfer shall be effective unless the transferring Member and the proposed transferee shall have agreed in writing (i) not to make an election under 732(d) of the Code without the prior written consent of the Managers, (ii) that in the event an election is made either (x) under Section 754 of the Code or (y) to be treated as an "electing investment partnership" within the meaning of Section 743(e) of the Code (it being understood and agreed that the Managing Directors may, but shall not be obligated to, cause the Company to make either election), (1) to cooperate with the Managing Directors to maintain that status, (2) that such parties will not take any action that would be inconsistent with such election, (3) to provide the Managing Directors with any information necessary to allow the Company to comply with its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and its tax reporting and other obligations as an electing investment partnership and (D) to provide the Managing Directors, promptly upon request, with the information required under Section 6031(b) of the Code or otherwise to be furnished to the Managing Directors, including such information as is necessary to enable the Managing Directors to compute the amount of losses disallowed under Section 743(e) of the Code, (iii) that the transferring Member shall, within 30 days after receipt of Form K-1 from the Company, provide the proposed transferee with a written notice setting forth the amount of loss, if any, being recognized by the transferring Member for United States income tax purposes with respect to the transfer, and (iv) that promptly upon request, they shall provide the Managing Directors with any information necessary to allow the Company to comply with (x) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (y) any other tax reporting obligations of the Company.

5.6     **Determination by the Managers.** All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by Management Action. Such determination shall be final and conclusive as to all of the Members.

5.7     **Restrictions on the Members and Managers.**

(a)     Other than Members who are acting in their capacities as Managers under the terms of this Agreement, the Members shall take no part in the control or management of the Company business nor shall the Members have any power or authority to act for or on behalf of the Company. Except as expressly provided herein or as required by law, the Members shall have no right to vote on any Company matters.

(b)     Each Member agrees to act in accordance with all restrictions on the Company, or the Managers or Members of the Company, which are set forth in the Fund Agreement.

5.8     **Nonliability.** No Manager or Member shall be liable to any Member or Manager for any conduct or actions or for failure not to act, except for conduct, actions or inactions determined by a court of competent jurisdiction (i) not to have been undertaken in good faith for a purpose that was reasonably believed to be in the best interests of the Company or (ii) to constitute gross negligence, recklessness or intentional wrongdoing. Further, except as otherwise set forth herein, it is acknowledged and agreed by the Members and Managers that the capital interest of the Designated Member (as defined below) in the Company (and the proportionate share of Company assets pertaining thereto) shall not be liable with

8.

832770 v9/SD
CONFIDENTIAL

F000206

Exhibit 8
Page 380

F000193

respect to or used as the source of repayment for the debts and other obligations of the other Members' interests in the Company (including any obligations of the Designated Member with respect to the carried interest received by the Company from the Fund).

## ARTICLE 6

## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS

**6.1    Capital Accounts.**    An individual Capital Account shall be maintained on the Company's books for each Member in accordance with paragraph 1.1(f).

**6.2    Capital Contributions.**    Unless otherwise agreed to by Management Action, each Member shall contribute capital to the Company in respect of such Member's Capital Commitment in cash as requested upon ten (10) business days written notice given by Management Action, on the same schedule as the Company's capital commitment to the Fund becomes due.  Such contributions shall be made in proportion to the Members' relative Capital Interest Percentages at the time such notice is given; *provided, however,* that (i) the total amount of a Member's capital contributions shall not exceed the Member's Capital Commitment and (ii) the Managers shall have the authority to adjust the amount of capital due from each Member in order to take into account any application of Article 10 which adjusts the Members' relative Capital Interest Percentages.

**6.3    Noncontributing Members.**

(a)    The Company shall be entitled to enforce the obligations of each Member to make the contributions to capital set forth in paragraphs 6.2 and 9.5, and the Company shall have all remedies available at law or in equity in the event any such contribution is not so made.  If any legal proceedings relating to the failure of a Member to make such a contribution are commenced, such Member shall pay all costs and expenses incurred by the Company, including attorneys' fees, in connection with such proceedings.

(b)    Additionally, without in any way limiting any remedy which the Company may pursue, should any Member fail to make any of the capital contributions required of it under this Agreement, such Member shall be in default (a *"Defaulting Member"*).  In the event of such default, the Managers may, in their sole discretion, elect to enforce one or more of the provisions of this paragraph 6.3(b) in connection with such a default, to which each Member hereby expressly consents, provided such default shall have continued uncured for ten (10) or more days after delivery of the Default Notice described in the following sentence.  The Managers shall deliver notice to such Defaulting Member in the event that it determines to utilize one or more of the powers set forth in this paragraph 6.3(b) (a *"Default Notice"*).

(i)    The Managers may waive, in whole or in part, the requirement of payment with respect to any due and unpaid capital contributions by a Defaulting Member pursuant to this Agreement and reduce such Defaulting Member's Capital Commitment accordingly.

(ii)    The Managers may extend the time of payment for a Defaulting Member of any due and unpaid capital contributions by such Defaulting Member pursuant to this Agreement.

(iii)    The Managers may declare the entire amount of a Defaulting Member's then unfunded Capital Commitment to be immediately due and payable.

9.

832770 v9/SD
CONFIDENTIAL

F000207

Exhibit 8
Page 381

F000193

(iv)     On behalf of the Company, the Managers may enforce, by appropriate legal proceedings, the Defaulting Member's obligation to make payment on the amount of any due and unpaid capital contributions by such Defaulting Member pursuant to this Agreement or to pay the entire amount of such Defaulting Member's then unfunded Capital Commitment.

(v)     The Managers may deny the Defaulting Member the right to participate in any vote or consent of the Members required under this Agreement or permitted under the Act, whereby the Defaulting Member shall be deemed to be a Non-Voting Member during such period of default.

(vi)     Should the Managers, in their sole discretion, elect to exercise the provisions of this paragraph 6.3(b)(vi), such Defaulting Member shall pay the interest on the amount of the contribution to the Partnership then due at an interest rate equal to the prime rate quoted by the Company's primary bank plus four percent (4%) per annum (or if less, the highest rate permitted by applicable law), such interest to accrue from the date the contribution to the Company was required to be made pursuant to this Agreement until the date the contribution is made by such Defaulting Member. The accrued interest shall be paid by the Defaulting Member to the Company upon payment of such contribution. The accrued interest so paid shall not be treated as an additional contribution to the capital of the Company, but shall be deemed to be income to the Company; provided that such income shall not be allocated to the Capital Account of the Defaulting Member. Until such time as the unpaid contribution and accrued interest thereon shall have been paid by the Defaulting Member, the Managers may elect to withhold any or all distributions to be made to such Defaulting Member pursuant to Article 9 or Article 11 and recover any such unpaid contribution and accrued interest thereon by set off against any such distribution withheld.

(vii)     Should the Managers, in their sole discretion, elect to exercise the provisions of this paragraph 6.3(b)(vii), the other non-defaulting Members who are then Managers (the "*Optionees*") shall have the right and the option, but not the obligation, to acquire the Partnership interest of the Defaulting Member, as follows:

(1)     The portion of the Defaulting Member's interest available to each Optionee shall be that portion which bears the same ratio to the Defaulting Member's entire interest as each Optionee's Membership Percentage bears to the aggregate Membership Percentages of all of the Optionees.

(2)     The price for the Defaulting Member's entire interest shall be the lesser of (i) the excess, if any, of the amount of the positive balance, if any, that would exist in the Defaulting Member's Capital Account as of the close of the due date of the additional contribution if (A) such due date were treated as the last day of an Accounting Period and as of such due date the carrying value of all of the Company's assets and liabilities were adjusted to equal their respective fair market values and the resulting unrecognized gain or loss allocated to the Capital Accounts of the Members (in accordance with Article 7 hereof), and (B) all of the Company's liabilities (including contingent liabilities) were satisfied by the Company by payment of an amount of cash equal to the fair market value of such liabilities, over the fair market value of any distributions (valued pursuant to paragraph 13.1 as of the date of such distributions) made to the Defaulting Member from the Company after the due date of such additional contribution to the date of purchase, or (ii) the aggregate amount of any cash contributed by the Defaulting Member to the Company pursuant to Article 6 less the aggregate fair market value of any distributions (valued pursuant to paragraph 13.1 as of the date of such distributions) made to the Defaulting Member from the Company through the date of purchase from the Defaulting Member hereunder, but in no event less than zero.

10.

832770 v9/SD
CONFIDENTIAL

F000208

Exhibit 8
Page 382

F000193

(3)     The price for each Optionee's portion of the Defaulting Member's interest shall be prorated according to the portion of the Defaulting Member's interest purchased by the Optionee.

(4)     The option granted hereunder shall be exercisable at any time within sixty (60) days of delivery of notice from the Company to the Optionees informing them of the default.  Each Optionee may purchase all or any portion of the Defaulting Member's interest made available to him.

(5)     Should any Optionee not exercise his option in full as provided herein, the other Optionees, if any, shall have the right and option ratably among them to acquire the portion of the Defaulting Member's interest not so acquired within sixty (60) days after notice of such right and option on the same terms as provided above.

(6)     The price due from each of the Optionees shall be payable by a noninterest bearing, nonrecourse promissory note (in such form as the Managers may reasonably determine) secured only by the portion of the Defaulting Member's interest purchased by such Optionee. The principal amount of any note issued pursuant this clause (vii) shall be payable upon liquidation of the Company in accordance with Article 11 below.

(7)     Upon exercise of any option hereunder, each Optionee so exercising the option shall be obligated to contribute to the Company that portion of the additional contributions of capital then and thereafter due from the Defaulting Member pursuant to paragraph 6.2 equal to the percentage of the Defaulting Member's interest purchased by such Optionee.

(viii)     Should any Member fail to make one of the contributions required of it under this Agreement, and if such Member fails to make such contribution within ten (10) days following delivery of the Default Notice by Management Action, then the Managers may, in their sole discretion, elect to declare such Member to be a "*Forfeiting Member*". The Forfeiting Member's entire interest shall be forfeited such that the Capital Account, Capital Interest Percentage, Carried Interest Percentage and Membership Percentage of such Forfeiting Member shall be reduced to zero and the Capital Accounts, Capital Interest Percentages, Carried Interest Percentages and Membership Percentages of all other nondefaulting Members who are then Managers shall be increased proportionally, based on, with respect to each such Member, their relative interests immediately prior to such calculation.

(ix)     Notwithstanding anything to the contrary in this Agreement, each Member (1) agrees that it will execute any instruments or perform any other acts that are or may be necessary to effectuate and carry out the transactions contemplated by this paragraph 6.3, and (2) designates and appoints the Managers its true and lawful attorneys, in its name, place and stead to make, execute and sign any and all instruments, documents or certificates on behalf of any Defaulting Member in order to give effect to any remedy against such Defaulting Member (including, but not limited to, the remedies set forth in this paragraph 6.3(b)).

(x)     The Members agree that the Managers' authority and discretion to enforce any remedy against a Defaulting Member (including but not limited to the remedies set forth in this paragraph 6.3(b)) supersede any fiduciary duties of the Managers to such Defaulting Member. The Members further agree that the remedies set forth in this paragraph 6.3(b) are fair and reasonable in light of the difficulty in ascertaining the actual damages that would be incurred by the Company and the nondefaulting Members as a result of the Defaulting Member's failure to contribute capital when due pursuant to the terms of this Agreement.

11.

832770 v9/SD
CONFIDENTIAL

F000209

Exhibit 8
Page 383

F000193

(xi)    No provision hereof shall be interpreted to relieve any Defaulting Member of any liability to the Company or the Fund, including, without limitation, any note provided to the Company by such Defaulting Member, except as expressly determined by Management Action.

ARTICLE 7

ALLOCATIONS; PRINCIPAL PARTICIPATION

7.1    **Allocation of Capital Interest Gain or Loss.** Capital Interest Gain or Loss for each Accounting Period shall be allocated to the Capital Accounts of the Members in proportion to their respective Capital Interest Percentages.

7.2    **Allocation of Carried Interest Gain or Loss.** Carried Interest Gain or Loss for each Accounting Period shall be allocated to the Capital Accounts of the Members in proportion to their respective Carried Interest Percentages.

7.3    **Special Allocation Relating to Fee Adjustment Income.** Fee Adjustment Income for each Accounting Period shall be allocated to the Capital Accounts of all Members in proportion to their respective Fee Adjustment Participation Amounts.

7.4    **Allocation of Company Income or Loss.** Company Income or Loss for each Accounting Period shall be allocated to the Capital Accounts of all Managers in proportion to their respective Membership Percentages; *provided, however,* that by Management Action the Managers may make special allocations of Company Income or Loss to particular Managers, so long as such allocations are made for any particular Fiscal Year on or before the due date of the Company's federal income tax return for such Fiscal Year.

7.5    **Income Tax Allocations.**

(a)    Except as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Member's distributive share of Company income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in the Member's Capital Account pursuant to this Agreement.

(b)    This Agreement is intended to comply with the safe harbor provisions set forth in Treasury Regulation 1.704-1(b) and the allocations set forth in paragraph 7.5(c) (the "*Regulatory Allocations*") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b). In the event the Regulatory Allocations result in allocations being made that are inconsistent with the manner in which the Members intend to divide profit and loss as reflected in paragraphs 7.1, 7.2, 7.3, and 7.4 the Managers shall use their best efforts to adjust subsequent allocations of any items of profit, gain, loss, income or expense such that the net amount of the Regulatory Allocations and such subsequent special adjustments to each Member is zero.

(c)    The allocations provided in this Article 7 shall be subject to the following exceptions:

(i)    Any loss or expense otherwise allocable to a Member which exceeds the positive balance in such Member's Capital Account (by more than the amount of such Member's obligation to return capital pursuant to paragraph 9.4 in the case of Carried Interest Loss) shall instead be allocated first to all Members who have positive balances in their Capital Accounts in proportion to their respective Capital Interest Percentages, and income shall first be allocated to reverse any loss allocated

12.

832770 v9/SD
CONFIDENTIAL                                                F000210

Exhibit 8
Page 384                                        F000193

under this paragraph 7.5(c)(i), in reverse order of such loss allocations, until all such prior loss allocations have been reversed.

(ii)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6), which causes or increases a deficit balance in such Member's Capital Account, items of income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible.

(iii)    For purposes of this paragraph 7.5(c), the balance in a Member's Capital Account shall take into account the adjustments provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (d)(6).

7.6    **Designation of Economic Assignees.**  Certain employees or agents of the Company or its Affiliates ("*Economic Assignees*") as designated by the Managing Directors from time to time shall be entitled to participate in Capital Interest Gain and Loss and Carried Interest Gain or Loss. Economic Assignees shall execute any document(s) deemed advisable by Management Action, including but not limited to, an Admission Agreement and a counterpart of this Agreement.

(a)    **Economic Participation.**  Except as specifically provided for in this Agreement, an Economic Assignee who has been awarded a Capital Interest Percentage and a Carried Interest Percentage shall, solely for income tax purposes and obligations and rights to allocations of Capital Interest Gain and Loss and Carried Interest Gain or Loss, including obligations to return distributions, be treated as if such Economic Assignee were a Member. Each Economic Assignee accepting an award of a Capital Interest Percentage and Carried Interest Percentage shall be required to agree to contribute capital to the Company determined on the same basis as if such Economic Assignee were a Member, in proportions to be determined on a case by case basis by Management Action.

(b)    **Economic Assignees Not Members.**  Establishment of Capital Interest Percentages and Carried Interest Percentages for Economic Assignees, while entitling Economic Assignees to the full economic benefits of the resulting interests as directed in this paragraph 7.6 (and direct K-1 reporting of those benefits for tax purposes), shall not entitle Economic Assignees to status as Members or to any rights associated with such status, including, without limitation, voting rights.

(c)    **Vesting.**  In connection with the grant of a Capital Interest Percentage or Carried Interest Percentage to an Economic Assignee, the Managers may establish such vesting terms as they may deem in their sole discretion to be appropriate.

## ARTICLE 8

## SALARIES, EXPENSES AND FEES

8.1    **Salaries, Bonuses.**  Each Manager or employee may receive a salary or bonus from the Company, as determined from time to time by Management Action.

8.2    **Expense Reimbursement.**  Any Member who incurs expenses on the Company's behalf shall be reimbursed by the Company therefor as deemed appropriate by Management Action.

8.3    **Directors' and Consulting Fees and Options.**  Any directors', consulting, syndication, break-up or broken-deal fees (including compensation in the form of options, warrants or other rights to

13.

purchase Securities) or other similar compensation or any other fee paid to a Manager by or relating to a company or other business entity in which the Fund has or is considering an investment that arises out of the investment or contemplated investment relationship (other than in respect of a founder's equity interest directly or indirectly in an Incubator Company (as defined in the Fund Agreement) and any salary compensation paid by the Incubator as approved by Management Action), shall be deemed to be property of the Management Company (to the extent not otherwise payable to the Fund); *provided* that appropriate adjustments shall be made to the extent such fees or other compensation may also related to investments held by Parallel Funds or investment entities managed by any of the Managers or their affiliates. All such fees and other compensation described in this paragraph 8.3 and collected by a Manager shall be promptly delivered to the Management Company and each Manager agrees to cooperate and take all actions necessary or advisable in order to implement the provisions of this paragraph 8.3.

## ARTICLE 9

## DISTRIBUTIONS TO AND WITHDRAWALS BY MEMBERS

**9.1**    **Interest.** No interest shall be paid to any Member on account of its interest in, or capital contributions to, the Company.

**9.2**    **Withdrawals by Members.** Except as provided herein or as determined by Management Action, no Member may withdraw any amount from such Member's Capital Account.

**9.3**    **Distributions.**

(a)    Except as set forth elsewhere in this paragraph 9.3 or in 11.2, distributions of cash, Securities or other property shall be made at such times and in such amounts as deemed appropriate by Management Action, in their sole and absolute discretion, in accordance with the following:

(i)    Any such distribution representing Company Income (as determined in good faith by Management Action) shall be distributed to the Members and Economic Assignees ratably in proportion to their respective Membership Percentages.

(ii)    Any such distribution representing Carried Interest Gain (as determined in good faith by Management Action) shall be distributed to the Members and Economic Assignees ratably in proportion to their respective Carried Interest Percentages.

(iii)    Any such distribution representing Capital Interest Gain or a return of capital (as determined in good faith by Management Action) shall be distributed to the Members and Economic Assignees ratably in proportion to their respective Capital Interest Percentages.

(iv)    Any such distribution representing Fee Adjustment Income (as determined in good faith by Management Action) shall be distributed to the Members ratably in proportion to their respective shares of previously allocated but undistributed Fee Adjustment Income.

(v)    Notwithstanding the foregoing, the Managers shall have the discretion to make such adjustments to the amounts distributable pursuant to clauses (i), (ii), (iii) and (iv) of this paragraph 9.3(a) as they deem appropriate, in their good faith judgment, to account for adjustments of Members' and Economic Assignees' Capital Interest Percentages, Carried Interest Percentages, interests in the Company Income or Fee Adjustment Income pursuant to paragraph 10.1.

14.

832770 v9/SD
CONFIDENTIAL

F000212

Exhibit 8
Page 386

F000193

(b)     Unless otherwise determined by Management Action, the Company shall be required to distribute to the Members for each Fiscal Year the amount of anticipated federal and state taxes with respect to such Member's distributive share of Company Income or Loss for such Fiscal Year (as reduced by the amount of any discretionary distributions received by such members during such Fiscal Year).

(c)     Notwithstanding paragraph (a) above, by Management Action the Managers shall have the discretion:

(i)     To cause distributions made pursuant to paragraph 9.3(a) to be made in proportions other than those specified therein to the extent necessary to give account of changes in relative Membership Percentages, Carried Interest Percentages, Capital Interest Percentages or Fee Adjustment Participation Amounts arising between the time of income allocations and subsequent distributions of any related cash or Securities as a result of paragraph 10.1 or otherwise; and

(ii)     To create reserves against amounts distributable to any Member or Economic Assignee, on a case-by-case basis, in order to address any credit risk presented by such Member's or Economic Assignee's obligations to return distributions under paragraph 9.4; *provided that,* with respect to any Designated Member, no such reserves shall be withheld from any distribution to such Designated Member pursuant to paragraph 9.3(a)(iii). Any distributions retained pursuant to the preceding sentence shall be held in an account mutually determined by Management Action and the Member or Economic Assignee subject to such retention.  Such Member or Economic Assignee shall have investment decision making authority to reduce any securities held in such account to cash.  Further, distributions from such account to such Member or Economic Assignee shall be permitted as necessary to pay taxes arising from the sale of securities.

(d)     Notwithstanding any other provision of this Article 9, with Management Action, the Managers shall have the authority to place such conditions or restrictions on distributions as they deem necessary or appropriate in their sole discretion.

9.4     **Obligation to Return Distributions.**     Upon Management Action, each Member (including any Converted Member) and Economic Assignee shall return distributions received by such Member or Economic Assignee from the Company to the extent necessary to cover the Company's obligations under paragraph 10.5 or paragraph 4.2(d) of the Fund Agreement, with such capital to be contributed *pro rata* in accordance with the respective amount of distributions in respect of Carried Interest Gain received by such Member or Converted Member or Economic Assignee from the Company (with any Securities distributed in kind valued in accordance with paragraph 12.1 as of the date of distribution).  Notwithstanding the foregoing, no Member or Economic Assignee shall be required to contribute to the Company under this paragraph 9.5 any amount in excess of the value of distributions actually made to such Member or Economic Assignee hereunder.  Returns to the Company made by Members pursuant to this paragraph 9.5 shall be in cash or, at each Member's or Economic Assignee's option, in previously distributed assets valued as of the date of such return.  Each Member and Economic Assignee hereby agrees to execute such documents as may be reasonably requested by the Mangers by Management Action including, but not limited to a guarantee of such Member of Economic Assignees portion of the Company's obligations under paragraph 10.5 of the Fund Agreement, in order to affect the intention and purposes of the obligations contemplated by this paragraph 9.4.  Notwithstanding anything to the contrary herein, the obligation of any Member with a Capital Commitment equal to, or greater than, six million dollars ($6,000,000.00) (a *"Designated Member"*) to return distributions pursuant to this paragraph 9.4 in respect of the Company's obligations under paragraph 4.2(d)(ii) of the Fund Agreement (i) shall be subject to the limitation on such obligations of the Company set forth in the penultimate sentence of paragraph 4.2(d)(ii) of the Fund Agreement with respect to distribution recalls relating to the

15.

832770 v9/SD
CONFIDENTIAL

F000213

Exhibit 8
Page 387

F000193

carried interest received by the Company from the Fund (applied on a proportionate basis with respect to such Designated Member) and (ii) shall be subject to the limitations on such obligations of the Company set forth in the third sentence of paragraph 4.2(d)(ii) of the Fund Agreement with respect to distribution recalls relating to the Company's capital commitment to the Fund (applied on a proportionate basis with respect to such Designated Member).

## ARTICLE 10

## CHANGE IN STATUS OF MEMBERS

**10.1    Change in Status.**

(a)    Any Manager or Member shall become a Converted Member upon such Manager's or Member's death, withdrawal, Bankruptcy, Incompetence, Permanent Incapacitation or removal pursuant to paragraph 4.3 or voluntarily resignation pursuant to paragraph 5.4.

(b)    In the event a Manager or Member becomes a Converted Member:

(i)    the Capital Account balance of such Converted Member shall be the same Capital Account balance as of the date such Manager became a Converted Member (the *"Conversion Date"*) without adjusting such Capital Account for any unrealized gains or losses;

(ii)    the Carried Interest Percentage for the Converted Member shall be equal to the product of the Carried Interest Percentage of such Converted Member immediately prior to the date of withdrawal multiplied by such Converted Member's Term Percentage. Such amended Carried Interest Percentage shall apply to all items of Carried Interest Gain or Loss to be allocated or distributed after the Conversion Date; *provided, however,* a Converted Member's Carried Interest Percentage immediately prior to the date he or she became a Converted Member shall apply to Carried Interest Loss allocation to the Converted Member after such date up to the amount of Carried Interest Gain allocated to the Converted Member prior to the date he or she became a Converted Member;

(iii)    the Converted Member shall be responsible for any unpaid Capital Commitment; *provided, however,* the Capital Commitment of the Converted Member may be reduced to equal the product of the Capital Commitment of such Converted Member immediately prior to the Conversion Date multiplied by such Converted Member's Term Percentage, except as modified by paragraph 10.1(g)(i) below, as determined by Management Action;

(iv)    the Capital Interest Percentage for the Converted Member shall be equal to the Capital Commitment of such Converted Member, if applicable, as of the Conversion Date (as determined pursuant to paragraph 10.1(b)(iii) above), divided by the Capital Commitments of all Members (determined on the date immediately prior to the conversion of such Manager or Member to a Converted Member, and as adjusted from time to time to take into account changes in the Capital Commitments to the Partnership). Such Capital Interest Percentage, as determined in the immediately preceding sentence, if applicable, shall apply to all items of Capital Interest Gain or Loss allocated or distributed after the Conversion Date;

(v)    The Membership Percentage for the Converted Member shall be equal to zero percent (0%);

16.

832770 v9/SD
CONFIDENTIAL

F000214

Exhibit 8
Page 388

F000193

(vi)    Such Converted Member shall have no right to vote or consent to any matter relating to, or taking any action on behalf of, the Company, and such Converted Member shall cease to be either a Manager or Member of the Company;

(vii)    For the avoidance of doubt, a Converted Member shall retain the economic rights applicable to such Converted Member as set forth in this paragraph 10.1 following the conversion from a Member to a Converted Member; and

(viii)    **EXHIBIT A** hereto shall be amended appropriately to give effect to the foregoing.

(c)    (i)    In the event a Member becomes a Converted Member, his or her *"Term Percentage"* shall be as set forth on **EXHIBIT B** hereto; *provided, however,* by Management Action, the Manager's shall have the authority to accelerate vesting of the Term Percentage for any Converted Member as they shall deem appropriate, including without limitation upon any Member's death, Incompetence or Permanent Incapacitation.

(ii)    The Term Percentage of any Person who is admitted as a Member of the Company after the date of this Agreement shall be determined by Management Action, and **EXHIBIT B** shall be amended to reflect such determination. In no event shall the Term Percentage of any Member exceed one hundred percent (100%).

(d)    Upon reduction of the Carried Interest Percentage of a Converted Member, the Carried Interest Percentages of all remaining Managers shall be increased by the amount of that reduction in proportion to their respective Carried Interest Percentage and **EXHIBIT A** shall be amended to reflect such changes, except as the Managers may determine by Management Action.

(e)    Upon reduction of the Membership Percentage of a Converted Member, the Membership Percentages of all remaining Managers shall be increased by the amount of that reduction in proportion to their respective Membership Percentages and **EXHIBIT A** shall be amended to reflect such changes, except as the Managers may determine by Management Action.

(f)    In the event of any reduction of the Capital Commitment and Capital Interest Percentage of a Converted Member with respect to capital contributions payable by the Members after such Conversion Date, the Capital Commitments and Capital Interest Percentages of all remaining Managers shall be correspondingly increased in proportion to such Managers relative Capital Commitments and Capital Interest Percentages with respect to such required contributions, except as the Managers may determine by Management Action.

(g)    To the extent that any Converted Member has contributed capital to the Company, as of the Conversion Date, in an amount which exceeds such Converted Member's revised Capital Commitment (as determined pursuant to paragraph 10.1(b)(iii)), the remaining Managers shall have the option to do any of the following: (i) notwithstanding paragraph 10.1(b)(iii), with the approval of such Converted Member, deem such Converted Member's Capital Commitment to equal the amount contributed by such Converted Member as of the Conversion Date, (ii) make a special distribution to such Converted Member of the amount by which the amount contributed as of the Conversion Date exceeds the revised Capital Commitment of such Converted Member as determined pursuant to paragraph 10.1(b)(iii) (the *"Overcontributed Amount"*), or (iii) deliver a promissory note to such Converted Member for the Overcontributed Amount, such note to be payable from time to time as the Company makes distributions to its Members in respect of their Capital Interest Percentages.

17.

## ARTICLE 11

### DISSOLUTION OF COMPANY

**11.1    Early Termination of the Company.** Upon Management Action (including Stuart Frost), the Company shall dissolve and the affairs of the Company wound up prior to the term provided in paragraph 3.1.

**11.2    Dissolution Procedures.** Upon dissolution of the Company at the expiration of the Company term or as set forth in paragraph 11.1:

(a)    The affairs of the Company shall be wound up and terminated under the direction of the Managers. All matters relating to the liquidation of the Company shall be determined by Management Action.

(b)    The proceeds of liquidation shall be distributed by the Company in payment of its liabilities in the following order:

(i)    to creditors, other than Members and Economic Assignees, in the order of priority established by law;

(ii)    to Members, Converted Members and Economic Assignees in repayment of loans made to the Company; and

(iii)    to all the Members, Converted Members and Economic Assignees in accordance with the positive balances in their Capital Accounts.

## ARTICLE 12

### REPORTS AND FINANCIAL ACCOUNTING

**12.1    Financial Records.** The books of the Company shall be kept in accordance with the terms of this Agreement. The records and books of account of the Company shall be kept at the principal place of business of the Company.

**12.2    Annual Reports.** Within one hundred twenty (120) days of the end of each Fiscal Year, the Company shall deliver to each Member, Economic Assignee or any Person who was a Member or Economic Assignee during any part of the Fiscal Year in question a Schedule K-1 showing such Member's or Economic Assignee's taxable income from the Company for such Fiscal Year.

**12.3    Tax Matters Member.** The Company's tax matters member under the Code and under any comparable provision of state law (the "*Tax Matters Member*") shall be designated from time to time by Management Action. The Tax Matters Member shall initially be Stuart Frost.

**12.4    Safe Harbor Election and Forfeiture Allocations.**

(a)    The Tax Matters Member is hereby authorized and directed to cause the Company to make an election to value the membership interests of the Members as compensation for services to the Company (a "*Compensatory Interest*") at liquidation value (the "*Safe Harbor Election*"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(l) and IRS Notice 2005-43 (collectively, the "*Proposed*

18.

*Rules*"). The Managers shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

(b) Any such Safe Harbor Election shall be binding on the Company and on all of its Members with respect to all transfers of Compensatory Interests thereafter made by the Company while a Safe Harbor Election is in effect. A Safe Harbor Election once made may be revoked by the Tax Matters Member as permitted by the Proposed Rules or any applicable rule.

(c) Each Member, by signing this Agreement or by accepting such transfer, hereby agrees to comply with all requirements of the Safe Harbor Election with respect to his or her Compensatory Interest while the Safe Harbor Election remains effective.

(d) The Tax Matters Member shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to transfers of Compensatory Interests.

(e) The Managers are hereby authorized and empowered, without further vote or action of the Members, to amend this Agreement as necessary to comply with the Proposed Rules or any rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member. Any undertakings by the Members necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and to the extent so reflected shall be binding on each Member, respectively.

(f) Each Member agrees to cooperate with the Managers to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by Management Action or the Tax Matters Member.

(g) No transfer, assignment or other disposition of any interest in the Company by a Member shall be effective unless prior to such transfer, assignment or disposition the transferee, assignee or intended recipient of such interest shall have agreed in writing to be bound by the provisions of this paragraph 12.4 in form satisfactory to the Managers.

12.5    **Confidentiality.** This Agreement and all other documents and information prepared or produced by or on behalf of the Company, the Management Company, the Fund and their respective portfolio companies and affiliates (the "*Affected Parties*") or concerning their affairs and investments (whether or not consummated) (all of the foregoing collectively, the "*Confidential Information*") that any Manager or Member (a reference to a Member in this paragraph 12.5 shall include any assignee) may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Manager, Member or its representatives, in each case pursuant to or in accordance with this Agreement, or otherwise as a result of such Manager or Member's ownership of an interest in the Company, are confidential, proprietary and the property of the Affected Parties. Each Manager and Member acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy and a trade secret. Each Manager and Member agrees to hold in confidence, and not to disclose to any third party without the prior written consent of the Company pursuant to Management Action, all Confidential Information. Notwithstanding the foregoing, each Manager and Member may disclose such Confidential Information (a) in connection with any governmental, administrative or regulatory proceeding (including any inspection or examination), after reasonable prior written notice to the Company (except where such notice is expressly prohibited by law), (b) in connection with any required governmental, administrative or regulatory filing, after reasonable

19.

832770 v9/SD
CONFIDENTIAL

F000217

Exhibit 8
Page 391

F000193

prior written notice to the Company (except where such notice is expressly prohibited by law), (c) to the extent that the information can be established by such Manager or Member to have been rightfully received by such Manager or Member from a third party without confidential limitations or to have been rightfully in such Manager or Member's possession prior to the Company's conveyance of such information to such Manager or Member, or (d) to the extent that the information provided by the Company is otherwise generally available in the public domain. Each Manager or Member also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Company upon its request. Notwithstanding any provision of this Agreement to the contrary, the Company may withhold disclosure of any Confidential Information (other than the terms of this Agreement or the Schedules K-1 prepared and provided pursuant to paragraph 12.2) to any particular Manager or Member if the Company reasonably determines, in good faith, that the disclosure of such Confidential Information to such Manager or Member may result in the disclosure of such Confidential Information to the general public or that such disclosure is not in the best interests of the Company. The Company may withhold disclosure of any Confidential Information regarding the other Members (including, but not limited to, such Members' information on Exhibit A hereto and Schedule K-1 information) to any Converted Member.

## ARTICLE 13

## VALUATION

**13.1** **Valuation.** For purposes of determining the value of the assets of the Company, Securities and other Company assets shall be valued in good faith by Management Action in accordance with paragraph 12.1 of the Fund Agreement.

## ARTICLE 14

## AMENDMENT

**14.1** **Amendment.** This Agreement may be amended by Management Action (including the affirmative consent of Stuart Frost). Notwithstanding the foregoing, except as otherwise provided in this Agreement, no amendment of this Agreement may (i) increase the Capital Commitment of a Member, or reduce a Member's Capital Account without the consent of such Member, (ii) reduce a Member's Capital Interest Percentage or Carried Interest Percentage without the written consent of such Member, other than on a *pro rata* basis in connection with the admission of new Members pursuant to paragraph 4.2 above, (iii) modify the method of making allocations without the consent of each Member adversely affected in a manner different or disproportionate to the other Members, (iv) amend Article 10 or Article 14 without the consent of each Member adversely affected in a manner different or disproportionate to the other Members, (v) amend or modify any provision requiring the consent of all Members or Managers (or a specified percentage in interest of the Members or Managers) to a specified action unless such amendment or modification is approved by all Members or Managers (or by the percentage in interest specified by the provision in question), or (vi) amend or modify any provision requiring the consent of a particular Member without the consent of such Member.

## ARTICLE 15

## OTHER PROVISIONS

**15.1** **Loans.** Members may make loans to the Company, and the Company may make loans to Members, upon such terms and conditions as the Managers may determine.

20.

832770 v9/SD
CONFIDENTIAL

F000218

Exhibit 8
Page 392

F000193

**15.2     Notice.** All notices given hereunder shall be in writing. Any notice herein required to be given to the Company by any of the Members shall be deemed to have been given (i) upon personal delivery to the Company, (ii) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, addressed to the Company at the address set forth in paragraph 2.3, (iii) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Any written notice herein required to be given to a Member shall be deemed to have been given (i) upon personal delivery to the Member, (ii) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, addressed to such Member at such Member's address listed on **EXHIBIT A** hereto, (iii) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.

**15.3     Counterparts.** This Agreement may be executed in more than one counterpart with the same effect as if the Members executing the several counterparts had all executed one counterpart.

**15.4     Binding Agreement.** This Agreement shall be binding on the assignees and legal successors of the Members, and shall be governed by, and construed in accordance with the laws of the State of Delaware as applied to contracts between Delaware residents entered into and to be performed entirely within Delaware.

**15.5     Entire Agreement; Captions.** This Agreement constitutes the entire agreement of the parties and supersedes all prior written and verbal agreements among the Members with respect to the Company. Descriptive titles are used herein for convenience only and shall not be considered in the interpretation of this Agreement.

**15.6     Name and Mark.** The Members acknowledge that pursuant to the Management Services Agreement, the Management Company authorizes the Company to use the Name and Mark. Notwithstanding any provision of this Agreement to the contrary, the Members acknowledge and agree that, except as otherwise specifically provided in the Management Services Agreement: (i) the Name and Mark are the property of the Management Company and in no respect shall the right to use the Name and Mark be deemed an asset of the Company; (ii) the Company's authority to use the Name and Mark may be withdrawn by the Management Company at any time without compensation to the Company; (iii) the Company has no right to license, sublicense, assign, or otherwise transfer any right, title or interest in or to the Name and Mark; (iv) no Member shall, by virtue of its ownership of an interest in the Company, hold any right, title or interest in or to the Name and Mark; (v) all goodwill and similar value associated with the Name and Mark are owned by, and shall accrue solely for the benefit of, the Management Company; and (vi) following the dissolution and liquidation of the Company, all right, title and interest in and to the Name and Mark shall be held solely by the Management Company. Except as specifically authorized by the Management Company in writing, in no event shall a Member use the Name and Mark for its own account. Upon termination of the Company, all right, title, claim and interest to the Name and Mark shall revert to the Management Company.

**15.7     Arbitration.**

(a)     Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement (*"Claim"*), shall be resolved by final and binding arbitration.

21.

832770 v9/SD
CONFIDENTIAL

F000219

Exhibit 8
Page 393

F000193

("*Arbitration*") before a single arbitrator ("*Arbitrator*") selected from and administered by Judicial Arbitration and Mediation Service Inc. (the "*Administrator*") in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. The arbitration shall be held in San Juan Capistrano, California.

(b)    Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)    The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; provided, however, that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed. The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(d)    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; provided, however, the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator. Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)    By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 15.7, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

15.8    **Indemnification.**

(a)    The Company agrees to indemnify, out of the assets of the Company only (of which the Members shall only be required to contribute up to the unfunded amount of such Member's Capital Commitment), the Managers, the Members, the Tax Matters Member and their agents to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses paid in connection with or resulting from any claim, action, or demand against the Managers, the Members, the Tax Matters Member, the Company, or their agents that arise out of or in any way relate to the Company, its properties, business, or affairs and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Company) of any such claim, action or demand; *provided, however*, that this indemnity shall not extend to conduct or inaction not undertaken in good faith for a purpose that was reasonably believed to be in the best interests of the Company or by reason of gross negligence, recklessness or willful misconduct. A Converted

22.

832770 v9/SD
CONFIDENTIAL

F000220

Exhibit 8
Page 394

F000193

Member shall be indemnified pursuant to this paragraph to the extent of any action or inaction taken on behalf of the Company prior to the date of such Converted Member's withdrawal.

(b)    Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph 15.8 shall be paid by the Company in advance of the final disposition of such claim or proceeding provided that the Indemnified Party (i) uses his or her diligent good faith efforts to seek indemnification from all other sources, (ii) undertakes to repay such amount if such Indemnified Party receives indemnification from other sources, and (iii) undertakes to repay such amount if it is ultimately determined that such Indemnified Party was not entitled to be indemnified.

(c)    Notwithstanding the foregoing, indemnification shall be provided only to the extent that an Indemnified Party has not been made whole by (i) the proceeds of insurance maintained by the Fund, the Company or by any other enterprise that the Indemnified Party is or was serving at the request of the Company or (ii) indemnification provided by any such other enterprise. The Company shall use its commercially reasonable efforts to obtain such proceeds of insurance and to enforce its rights to indemnification from any such other enterprise.

15.9    **Power of Attorney.** By signing this Agreement, each Member designates and appoints the Managers its true and lawful attorneys, in its name, place, and stead to make, execute, sign, and file the Certificate of Formation and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state in which the Company shall conduct its affairs in order to qualify or otherwise enable the Company to conduct its affairs in such jurisdictions. Such attorneys are not hereby granted any authority on behalf of the Members to amend this Agreement except that as attorney for each of the Members, the Managers shall have the authority to amend this Agreement and the Certificate of Formation (and to execute any amendment to the Agreement or the Certificate of Formation on behalf of itself and as attorneys-in-fact for each of the Members) as may be required to effect:

(a)    Admission of Additional Members pursuant to paragraph 4.2;

(b)    Transfers of Members interests pursuant to paragraph 5.5; or

(c)    Withdrawal of Members pursuant to Article 10.

This power of attorney granted by each Member shall expire as to such Member immediately after the dissolution of the Company or the amendment of the Company's **EXHIBIT A** to reflect the complete withdrawal of such Member as a Member of the Company.

15.10    **No Employment or Other Implied Rights.** Each Member and Manager hereby agrees that (a) this Agreement is not intended to confer any rights of employment by the Company to such Member or Manager and that nothing herein shall be construed as an agreement of employment and (b) nothing herein shall be construed to establish (i) any ownership interest or other right to participate in any other entity affiliated with the organization doing business as Frost, Frost Venture Partners or Frost Ventures Partners GP, or any derivation thereof or (ii) any express or implied partnership between such Member or Manager and any other entity affiliated with the organization doing business as Frost, Frost Venture Partners or Frost Ventures Partners GP, or any derivation thereof or any of their respective partners, members, directors, shareholders, managers, employees, agents or representatives.

15.11    **Company Legal Matters.** Each Member, Economic Assignee and Manager hereby agrees and acknowledges that:

23.

832770 v9/SD
CONFIDENTIAL                                                                                                 F000221

Exhibit 8
Page 395

F000193

(a)    Cooley LLP ("*Cooley*") has been retained by the Company in connection with the formation of the Company and the Fund and in such capacity has provided legal services to the Company and the Fund. The Company expects to retain Cooley to provide legal services to the Company and the Fund in connection with the management and operation of the Company and the Fund.

(b)    Cooley is not and will not represent the Members, Economic Assignees or Managers in connection with the formation of the Company and the Fund, the management and operation of the Company and the Fund, or any dispute that may arise between the Members, Economic Assignees or Managers on the one hand and the Company and the Fund on the other hand (the "*Company Legal Matters*").

(c)    Each Member, Economic Assignee and Manager will, if it wishes counsel on a Company Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d)    Each Member, Economic Assignee and Manager hereby agrees that Cooley may represent the Company and the Fund in connection with any and all Company Legal Matters (including any dispute among the Company or the Fund and one or more Members) and waives any present conflict of interest with Cooley regarding Company Legal Matters arising by virtue of any representation or deemed representation of such Member, Economic Assignee, Manager or the Company or the Funds on account of Cooley's representation described in paragraph 15.11(a) above.

[THIS SPACE INTENTIONALLY LEFT BLANK]

24.

IN WITNESS WHEREOF, the parties hereto have executed this FROST VENTURE PARTNERS GP, LLC OPERATING AGREEMENT as of the date first above written.

MEMBERS AND MANAGERS:

STUART FROST

JACK KREINDLER

JOHN VIGOUROUX

MEMBER:

MIKE COLACO

CONFIDENTIAL

FROST VENTURE PARTNERS GP, LLC
OPERATING AGREEMENT
SIGNATURE PAGE

F000223

Exhibit 8
Page 397

F000193

IN WITNESS WHEREOF, the parties hereto have executed this FROST VENTURE PARTNERS GP, LLC OPERATING AGREEMENT as of the date first above written

MEMBERS AND MANAGERS:

_____
STUART FROST

_____
JACK KREINDLER

_____
JOHN VIGOUROUX

MEMBER:

_____
MIKE COLACO

FROST VENTURE PARTNERS GP, LLC
OPERATING AGREEMENT
SIGNATURE PAGE

CONFIDENTIAL                                                                F000224

Exhibit 8
Page 398

F000193

In Witness Whereof, the parties hereto have executed this Frost Venture Partners GP, LLC
Operating Agreement as of the date first above written.

MEMBERS AND MANAGERS:

Stuart Frost

Jack Kreindler

John Vigouroux

MEMBER:

Mike Colaco

CONFIDENTIAL                                                      F000225

Exhibit 8
Page 399

F000193

IN WITNESS WHEREOF, the parties hereto have executed this FROST VENTURE PARTNERS GP, LLC OPERATING AGREEMENT as of the date first above written.

MEMBERS AND MANAGERS:

_____

STUART FROST

_____

JACK KREINDLER

_____

JOHN VIGOUROUX

MEMBER:

MSG INVESTMENT, INC.

MIKE COLACO, PRESIDENT

FROST VENTURE PARTNERS GP, LLC
OPERATING AGREEMENT
SIGNATURE PAGE

832770 v9/SD
CONFIDENTIAL

F000226

Exhibit 8
Page 400

F000193

# FROST VENTURE PARTNERS GP, LLC

## EXHIBIT A[1]

### SCHEDULE OF MEMBERS AND ECONOMIC ASSIGNEES
(effective as of May 29, 2013)

| NAME AND ADDRESS | CARRIED INTEREST PERCENTAGE | CAPITAL INTEREST PERCENTAGE | MEMBERSHIP PERCENTAGE | CAPITAL COMMITMENT |
|---|---|---|---|---|
| STUART FROST | 42.00% | 0.82% | 62.50% | $50,000.00 |
| JOHN VIGOUROUX | 33.00% | 0.82% | 25.00% | $50,000.00 |
| JACK KREINDLER | 15.00% | 0.00% | 12.50% | $0.00 |
| MIKE COLACO | 10.00% | 98.36% | 0.00% | $6,000,000.00 |
| UNALLOCATED RESERVE[2] | 0.00% | 0.00% | 0.00% | $0.00 |
| TOTAL: | **100.00%** | **100.00%** | **100.00%** | **$6,100,000.00** |

---

[1] All numbers contained within this exhibit are rounded to the nearest hundredth.

[2] An unallocated portion of the interests may be reserved for future issuances to economic assignees. If the Unallocated Reserve (with respect to any of the Carried Interest Percentage, Capital Interest Percentage or Capital Commitment) has not otherwise been assigned for a particular year prior to the due date of the Company's tax return for such year, then all remaining Managers shall be deemed to own equal shares of the Unallocated Reserve for such year.

A-1.

832770 v9/SD
CONFIDENTIAL

F000227

Exhibit 8
Page 401

F000193

## EXHIBIT B

## SCHEDULE OF TERM PERCENTAGE

| NAME | VESTING COMMENCEMENT DATE | TERM PERCENTAGE |
|---|---|---|
| STUART FROST | N/A | 100% |
| JOHN VIGOUROUX | Initial closing date of the Fund | 0%, plus five percent (5%) per quarter (with each such increment to accrue on the last day of such quarter) for five (5) years. |
| JACK KREINDLER | Initial closing date of the Fund | 0%, plus five percent (5%) per quarter (with each such increment to accrue on the last day of such quarter) for five (5) years. |
| MIKE COLACO | Initial closing date of the Fund | 0%, plus five percent (5%) per quarter (with each such increment to accrue on the last day of such quarter) for five (5) years. |

B-1.

832770 v9/SD
CONFIDENTIAL

F000228

Exhibit 8
Page 402

F000193

# EXHIBIT 9

HAMPTONHOLLEY LLP
George L. Hampton IV (State Bar No. 144433)
Colin C. Holley (State Bar No. 191999)
2101 East Coast Highway, Suite 100
Corona del Mar, California 92625
Telephone:  949.718.4550
Facsimile:  949.718.4580
E-mail: cholley@hamptonholley.com

Attorneys for Claimants and Counter-Respondents
FROST MANAGEMENT COMPANY, LLC and FROST
VENTURE PARTNERS GP, LLC and Counter-Respondents
STUART FROST and FROST DATA CAPITAL, LLC f/k/a
FROST VENTURE PARTNERS, LLC

**JAMS**

**ORANGE, CALIFORNIA**

| | |
|---|---|
| FROST MANAGEMENT COMPANY, LLC, et al., <br><br> Claimants, <br><br> v. <br><br> HOLLENCREST BAYVIEW PARTNERS, L.P., et al., <br><br> Respondents. <br><br>———————————————— <br><br> AND RELATED COUNTERCLAIMS. | Casc No. 1200052341 <br><br> **NOTICE OF DEPOSITION OF RESPONDENT AND COUNTER-CLAIMANT ROBERT WOLFORD** <br><br> DATE:  April 10, 2017 <br> TIME:  10:00 a.m. <br> PLACE:  HamptonHolley, LLP <br>     2101 East Coast Hwy., Suite 100 <br>     Corona del Mar, CA 92625 |

TO ALL PARTIES AND TO THEIR ATTORNEYS' OF RECORD:

PLEASE TAKE NOTICE THAT Claimants and Counter-Respondents Frost Management Company, LLC and Frost Venture Partners GP, LLC, and Counter-Respondents Stuart Frost and Frost Data Capital, LLC (collectively, "Counter-Respondents"), by and through their attorneys of record, will take the deposition, on oral examination, of Respondent and Counter-Claimant Robert Wolford.  The deposition shall commence on April 10, 2017 at 10:00 a.m., at the law offices of HamptonHolley LLP, located at 2101 E. Coast Highway, Suite 100, Corona del Mar, California

Exhibit 9
Page 403

92625, telephone 949.718.4550. If the examination is not completed, it will continue from day to day, excluding weekends and holidays, until completed.

The above-described deposition will be taken before a certified shorthand reporter or other person authorized by law to administer oaths. The oral examination will be recorded stenographically, including the use of instant visual display.

Dated: March 15, 2017

HAMPTONHOLLEY LLP

By: _____
Colin C. Holley
Attorneys for Claimants and Counter-Respondents FROST MANAGEMENT
COMPANY, LLC and FROST VENTURE
PARTNERS GP, LLC and Counter-Respondents STUART FROST and FROST
DATA CAPITAL, LLC

Exhibit 9
Page 404

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 2101 East Coast Highway, Suite 100, Corona del Mar, California 92625.

On March 15, 2017, I served the within document(s) described as:

**NOTICE OF DEPOSITION OF RESPONDENT AND COUNTER-CLAIMANT ROBERT WOLFORD**

on the interested parties in this action as stated below:

Matthew A. Hodel
Fred L. Wilks
Ashley E. Merlo
HODEL WILKS LLP
4 Park Plaza, Suite 640
Irvine, CA 92614
mhodel@hodelwilks.com
fwilks@hodelwilks.com
amerlo@hodelwilks.com

[X]  (BY ELECTRONIC MAIL) I electronically mailed a true copy of the foregoing document to the email address(es) as noted above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 15, 2017, at Corona del Mar, California.

_____
Colin C. Holley
(Type or print name)

_____
(Signature)

- 1 -

Exhibit 9
Page 405

# EXHIBIT 10

Introductions – who is Hollencrest Capital Management?

We are a registered investment advisor (RIA). We have clients that have invested in the Frost Funds.

As a RIA we have a duty to:

Monitor the performance of these funds,

To periodically meet with the fund managers

To ensure that the manager is doing what they are supposed to do i.e. Staying consistent with their strategy and not drifting away from their style or game plan

And we have a duty to investigate any allegations of impropriety that have come to our attention.

On June 27th we were contacted by a whistleblower on Frost Data Capital

Since that time several other whistleblowers have contacted us and we have heard many allegations

We have met with many differ stakeholders in FDC particularly LPs and members of the LLC

1.  Handout Larry's letter to all participants and read the letter
2.  Share Chuck Reynolds e mail

We have been concerned about the performance of these funds

We believe as Larry Sheakley does, as Mike does and other investors that represent the majority of the funds capital that it is time for a change. We all stand to lose a lot if a change is not made.

We believe we gave the Frost organization ample time to execute on their strategy, it is now painfully apparent that that strategy did not work.

The failure to produce a liquidity event, the failure to have a few exits was the flaw in your model.

It is now time to make a change and salvation any capital that we can.

We want to come to an understanding today on how to implement those changes and get on a path to success



Exhibit 10
Page 406

HOL 0000001

1. Reorganize manager install governance committee and restructure ownership of companies and compensation to all stakeholders
2. Replace manger with new manager

Exhibit 10
Page 407

HOL0000002

3

Thank you for the meeting today.   As I mentioned in my email to you requesting this meeting we are concerned about our investments in

FROST VP SEED FUND, LLC

FROS VP EARLY STAGE FUND II, LP

FROST VP FUND III

1.  There is a very important distinction we would like to recognize  about the relationship between the members/LPs of these two funds and  "the managers" who are:

Frost Management Company LLC  the managing member
Frost Ventures GP , LL the general partner
And any of the Frost affiliates

The authority to act granted to the manager(s) in the operating agreement(s) gives them control and

custody of the assets. While you may believe that protects you,  it in fact establishes that you are

**engaged in a fiduciary relationship and as such you are subject to "FIDUCIARY STANDARD OF CARE'**

**and the rules and regulations pertaining to that distinction from the SEC , the State of CA**

**and the DOL (should any your of investors be ERISA qualitied ie pension plans, defined benefit, IRA,**

**401k)**

2.  Our concerns fall into 2 categories:

   i.      Information that has come to our attention about the operation of the funds and the operation of the mangers' companies
   ii.     Information that has come to our attention about the condition/performance of the investments in each of the fund

3.  I would also say that contributing to our concerns is the number of stakeholders that have contacted us and the diversity of their positions. This includes LPs, former operating partners, members of the founders group, members of the advisory board of the funds, former employees, former CEOs of the portfolio companies and direct investors in the sidecars.

Exhibit 10
Page 408

HOI 0000003



# ALLEGATIONS FROM CREDIBLE AND REPUTABLE PEOPLE

From LPs, former operating partners, members of the founders group, investment committee members, former employees, former CEOs of portfolio companies and direct investors in the companies,

**Information that has come to our attention about the operation of the funds and the operation of the mangers' companies**

We have been informed that:

i.     Several of you key employees have not received their salaries for at least 6 months

ii.    Your company has laid off key staff members

iii.   That some remaining staff members are not being compensated

iv.    That your company is insolvent

v.     That the valuation of some of the portfolio investments is overstated and that in fact some incubator portfolio companies have not received funding for long periods of time

vi.    That the incubator portfolio companies may have been overcharged fees for your companies services. Some incubator companies were dormant or abandoned but still were paying fees to FDC

vii.   Portfolio companies have run out of funds and are having to do "down-rounds" under very adverse circumstances to survive – all to the determent of Fund investors. That during this critical time you were out of the office for 8 weeks.

viii.  Of the $700 million + that you have constantly told LPs was forthcoming from institutional investors only a small portion may be realized.

ix.    During this time when you were failing to execute this critical aspect of your business model. LPs were never contacted by anybody from the manager to inform us of the current impending emergency. Fund investors were never given the chance to provide needed capital to protect their existing investments.

x.     That you as the name partner and manager have been absent from the office for 12 of the last 24 months. During said time, you failed to thoroughly conduct your duties as "a managing director" and as a fiduciary. Moreover, the fact that you chose to move out of the country after raising capital for Fund II is a very MATERIAL FACT that was not adequately disclosed to investors contemplating said investment. Fund II investors were fraudently induced to invest when in fact the named general partner was immediately moving out of the country.

Exhibit 10
Page 409

HOI 0000004

xi.     That you or your personal entities have invested in the incubator companies via loans that that are in direct conflict with the funds positions. In fact these loans have served to dilute and harm the position of the funds.

xii.    That your finance department and CFO keep the books and records on the funds. FDC and its affiliates and the portfolio companies. There was no segregation of duties.

xiii.   That the same legal counsel was used by the funds, FDC and its affiliates and the portfolio companies of the funds.

xiv.    That conflicts of interest exist between your decisions made on which companies to fund, versus what was best for the investors. Fund investors potentially failed to fully participate in the best opportunities because capital may have been allocated to other companies in which you had higher ownership stake or companies that paid FDC more monthly fees.

xv.     Offers may have been received and rejected for portfolio companies – companies that have subsequently imploded due to running out of capital. We have not been able to identify any decision making process other than Stuart saying yes or no. This is particularly disturbing given the failure of FDC to generate one single exit to date.

xvi.    That at your direction your company used the funds' capital to incubate companies that were solely created to  generate fees for the managers. That a significant amount of the capital contributed to these new incubator companies went directly back to your company and was used for the direct benefit of you. These companies were then shutter or abandoned.

xvii.   The sum total of Fund capital upstreamed to FDC in fees is likely too large relative to the total capital committed to pass any kind of regulatory test.

xviii.  That you failed to disclose material information that you are required and compelled to as a fiduciary.

In an adverse action these issues generally get distilled down into the following buckets:

## Conflict of interest to the determent of fund investors

## Failure to fully disclose material information about the fund

## Failure to fulfill your fiduciary duty to fund investors

## Failed on your duty of transparency

## Failed on your duty od care

## Failed on your duty to operate in good faith and fair dealing

Exhibit 10
Page 410

HOI 0000005

Exhibit 10
Page 411

HOI 0000006

# EXHIBIT 11





Exhibit 11
Page 412

HOL0015082

2



**Disclaimer: Please read**

The information is not intended to be and should not be relied or acted upon without consulting with and obtaining specific advice from your financial or tax advisor.

The Information does not constitute an offer to sell, or a solicitation of an offer to buy, an interest in any Fund.  No such offer or solicitation may be made prior to the delivery of a Fund's confidential offering materials. Neither the SEC nor any other federal or state agency or non-U.S. commission has confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is unlawful.

Each prospective investor should make his or her own investigation and evaluation of the investments and investment strategies described herein, including the merits and risks thereof. Each prospective investor should inform himself or herself as to the tax consequences of the investments and services described herein. Prospective investors should have the financial ability and willingness to accept the risks associated with the investments made by the Adviser. The Adviser reserves the right to modify any of the terms described herein.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 413

HOL0015083

3



### Disclaimer: Please read (continued)

There is a high degree of risk and in fact, you may lose some or all of your investment. No assurance can be given that the investment objectives will be achieved or that investors will receive a return of any capital. In considering any prior performance information, historical or hypothetical, contained herein, prospective investors should bear in mind that prior performance does not guarantee nor is it indicative of future results. There can be no assurance that the investments made by the Adviser will achieve any particular results. No representation is made that any investor in a Fund will or is likely to achieve results comparable to those shown or will make any profit at all or will be able to avoid incurring substantial losses. The performance and other information shown are provided to you for your informational purposes only and are not intended to be and do not constitute investment nor an opinion or recommendation regarding the appropriateness of any investment. Net asset value and return on an actual investment will fluctuate, and an investor may have a gain or loss upon disposition of his or her investment.

Each recipient of this presentation acknowledges and agrees that the contents hereof constitute proprietary and confidential information that the Adviser derives independent economic value from not being generally known and are the subject of reasonable efforts to maintain their secrecy. The recipient further agrees that the contents of this presentation are a trade secret, any reproduction or distribution of this presentation, in whole or in part, or the disclosure of its contents, without the prior written consent of the Adviser, is prohibited, and the disclosure of this presentation or its contents is likely to cause substantial and irreparable competitive harm to the Adviser. This presentation will be returned to the Adviser upon request. By accepting this presentation, each recipient agrees to the foregoing.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 414

HOL0015084

4



# Frost VP Seed Fund

- **Raising $15m venture seed fund for incubated companies**
- **Investing $0.75 - $1.5m in 10-15 software startups**
- **Solving technology gaps in Cloud Computing and Big Data**
- **No management fee**
- **No carry**
- **3 year capital deployment**
- **Company exits expected in 2 to 5 years from startup**
- **10 year fund life**
- **Managed by entrepreneurs: Stuart Frost, Cary Breese, Dave Salch, Mark Theissen, Dr. Jack Kreindler, Dave Shackleton, Cliff Currie**

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 415

HOL0015085



# Introduction

- **The bulk of the $500bn enterprise IT market will move to the 'Cloud'**
- **All the major players are vying for position**

    

    

- **The management and analysis of 'big data' is one of the key areas of technology they all need**
    - But (as usual) they are struggling to build the required disruptive technologies
- **Frost VP is ideally placed to exploit this opportunity**
    - World class management team with deep sector experience
    - A new kind of incubator, laser focused on 'big data'
    - Raising a $15m seed fund to invest in the incubated companies

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 416

HOL0015086



# Management

- **Stuart Frost – Managing Partner**



  - Highly successful serial Founder & CEO

  - Electronics Engineering degree, Nottingham, England

  - 66% success rate

    ✔ Founded SELECT Software Tools in England, began operations in 1988, IPO in 1996, 83X return for seed investors

    ✖ Founded InvestorIQ.com in 1999. Launched tech investment research website in April 2000 with impeccable timing! Closed business down with approx $2m invested in August 2000.

    ✔ Founded DATAllegro in 2003, MSFT acquired 2008, 36X return for seed investors

  - Ran $1b data warehouse group at MSFT post-acquisition

  - Left MSFT in Oct 2010 to start Frost Venture Partners

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 417

HOI 0015087



# Management – cont'd



### Cary Breese
**CFO, ICM & Fund Administrator**

Software engineer, successful entrepreneur and financial executive, with proven achievements in technology, financial risk management and operations.



### Dr Jack Kreindler MD
**ICM**

A physician & physiologist with a parallel career in database technology spanning 18 years. Founder/Architect of CIGNA Vielife, Dictate.IT, VisualDNA. GenieDB.



### Mark Theissen
**ICM**

22+ years BI/DW experience. Strong & proven technical, sales & marketing skills. COO at DATAllegro, VP Enterprise Analytics at Meta Group. Currently CEO at Cirro



### Dave Salch
**CTO & ICM**

Builder of innovative technologies and teams for more than 30 years. Most recently CTO at DATAllegro. Responsible for tech strategy & architecture across the incubated companies.



### Cliff Currie
**VP Business Development**

VP Bus Dev at DATAllegro responsible for EMC relationship, SI partners and $15M Dell account. Currently responsible for strategic partners across the incubated companies



### Dave Shackleton
**VP Product Management**

VP of Product Definition/Product Management for iRise. Also at Idealab. Specializes in Lean Startup processes for software companies.

**ICM = Investment Committee Member**

Frost Venture Partners, LLC Confidential

7

Exhibit 11
Page 418

HOL0015088



## Big Data

**Everyone is talking about 'big data'... but what does it mean?**

- **Volume**
  - Petabytes of data; more than traditional databases can handle
    - A petabyte is a 1 followed by 15 zeroes
  - Machine generated or from social media
    - Facebook, Twitter, cell phones, healthcare, high frequency stock trading, etc.
- **Velocity**
  - More than traditional databases can handle
    - Twitter generates 8 terabytes of data per day (a terabyte is a 1 followed by 12 zeroes)
- **Variety**
  - Traditional databases store and analyze structured data (names, numbers) in a single location
  - Big data is text (documents), graphics (e.g., x-rays, MRIs), video, and structured data all around the globe, 24x7
- **Value**
  - Value density might be low, but value is high when you find it
  - "Needle in a haystack"

Frost Venture Partners, LLC. Confidential

Big data isn't just about scale. It also refers to complexity (e.g., text, graphics, etc.) and the incoming velocity. The combination overwhelms traditional data management solutions such as Oracle and SQL Server – hence there is a need for new, disruptive technologies.

Examples include the feed of Twitter data, Facebook, cell phone calls, computer network traffic, etc.

Exhibit 11
Page 419

HOL0015089

9



Exhibit 11
Page 420

HOI 0015090

10



Exhibit 11
Page 421

HOL0015091



Frost VP maintains close relationships with major cloud players and potential customers.

From this, needs and ideas for new companies are discovered.

Frost VP maps out the vision for the new company and forms the startup as a Delaware C corp.

Initial seed funding comes from Frost VP Seed and (potentially) seed stage VCs that we've worked with over the years.

As the startup grows, further rounds of funding are secured from the VC community and Frost VP Early Stage.

Goal is to add 2-4 new companies per year for next 5-7 years.

Exhibit 11
Page 422

HOL0015092

12



# Major players are spending big

- Microsoft acquired DATAllegro for $275m in 2008
- IBM acquired Netezza for $1.7b in 2010
- HP acquired Vertica for more than $200m in 2011
- Salesforce acquires Heroku for $212m in 2010
- Riverbed acquired Zeus for $140m in 2011
- Citrix acquired Cloud.com for $190m in 2011
- "EMC announces $3b budget to acquire big data startups"
- "IBM is on an acquisition spree for Big Data Software" – SiliconAngle, September 2011
- "Need for big data analytics drives vendors' acquisitions" – ComputerWorld, March 2011

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 423

HOI 0015093

13



## General investment process

1.  **Startup ideas come from Frost VP, a partner (e.g., EMC, HP, NetApp, IBM) or (more rarely) an outside technical founder**

2.  **Startup founded**
    - Founders stock split between Frost VP & technical founder (where relevant)
    - Frost VP: 25%-100% of founders stock

3.  **Seed investment from FVP Seed Fund**
    - Every investment must be approved by a majority of the Investment Committee
        - S. Frost, C. Breese, M. Theissen, D. Salch, J. Kreindler
    - $2.5m pre-money valuation, including option pool is based on venture capital best practices and comparable software startups

4.  **Management team assembled**

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 424

HOL0015094

14



## General investment process (cont'd)

5. **Startup Incubation**
   - Frost VP provides high quality shared executives (e.g., Chmn, CFO, Bus Dev) to efficiently guide company through critical early stages
   - Strategy and product are developed and tested
   - Consistent 'Lean Startup' process used across all companies
   - High engagement with customers and partners
   - Strategy refinement based on early and repeated customer validation
6. **Further funding rounds come from partners or other VCs**
   - FVP Seed Fund may invest in later rounds
7. **Most likely exit via acquisition by major partner or strategic IT vendor**
   - IBM, HP, Microsoft, Oracle, EMC, Dell, SAP, NetApp, Salesforce, etc.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 425

HOI 0015095

15



**Exits**

- **The most likely exit path is via acquisition by one of the major players**
- **All have billions on their balance sheets and huge market caps**
- **Small technology acquisitions up to $100m or more are very common**
  - Can generate huge returns
- **Technology must be viewed as strategic**
  - Startup ideas are initially developed to fill technology gaps of Partners who are themselves potential acquirers
  - Management and Incubator teams ensure strategic direction; tactical plays are avoided
  - Open source business models are avoided (most acquirers prefer commercial software)
  - Strategic value demonstrated via joint customers
- **Revenue does not have to be significant**
  - e.g., DATAllegro acquired by MSFT for 26X revenues

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 426

HOI 0015096



Exhibit 11
Page 427

HOI 0015097

17



# Fund life cycle

- **Targeting $15m**
- **10 year life**
- **10-15 investments**
- **3 capital calls**
  - 40% initial, 30% in first year, 30% in second year
- **Focus on seed investments in incubated companies**
  - $750k-$1.5m in each company
  - May also invest in later rounds
- **Capital deployed in <3 years**
- **Exits projected in 2-5 years from startup**
  - Distributions as soon as reasonably practicable

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 428

HOL_0015098

18



**Fund details**

- **No fee**
- **No carry**
- **Stuart Frost has committed $250k to the Seed Fund**
- **Companies will be valued at the post-money of the most recent round of funding unless written off or exited**
- **K1s will be issued no later than March 15th**
- **Auditor:**
  - Marcum, LLP.  www.marcumllp.com
- **Administrator:**
  - Cary Breese

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 429

HOL0015099

19



# What makes us different?

- **We are not VCs**
- **We are technologists, visionaries & company builders**
- **Deep relationships with major players & customers give us amazing insight into the needs of the market**
- **Strong focus on the very hot Big Data space**

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 430

HOL0015100



## Summary

- **Huge opportunity as Enterprise IT moves to the cloud**
- **Major players are moving quickly to fill out their technology stacks so they can win market share**
- **Big data is one of the most difficult areas for them to handle**
  - Frost VP has deep expertise & contacts
  - 3 companies already started, 3 in the pipeline
- **Raising $15m seed fund to start & incubate 10-15 big data startups**
- **Most likely exits are via acquisitions by major players**

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 431

HOL0015101



# Legend

THE INFORMATION SET FORTH IN THIS DOCUMENT (THIS *"DOCUMENT"*) HAS BEEN PREPARED SOLELY FOR USE BY THE PROSPECTIVE INVESTORS OF FROST VP SEED, LLC. (THE *"PARTNERSHIP"* OR THE *"FUND"*) AND SHALL BE MAINTAINED IN STRICT CONFIDENCE.

EACH RECIPIENT HEREOF ACKNOWLEDGES AND AGREES THAT THE CONTENTS OF THIS DOCUMENT (I) CONSTITUTE PROPRIETARY AND CONFIDENTIAL INFORMATION THAT FROST MANAGEMENT COMPANY (TOGETHER WITH ITS AFFILIATE MANGEMENT COMPANY(IES), *"GENERAL PARTNER"*), FROST VENTURE PARTNERS, FROST VP SEED AND FROST VP EARLY STAGE (TOGETHER, *"FROST VENTURES"*) DERIVE INDEPENDENT ECONOMIC VALUE FROM NOT BEING GENERALLY KNOWN AND (II) ARE THE SUBJECT OF REASONABLE EFFORTS TO MAINTAIN THEIR SECRECY.  THE RECIPIENT FURTHER AGREES THAT THE CONTENTS OF THIS DOCUMENT ARE A TRADE SECRET, THE DISCLOSURE OF WHICH IS LIKELY TO CAUSE SUBSTANTIAL AND IRREPARABLE COMPETITIVE HARM TO FROST VENTURES.  ANY REPRODUCTION OR DISTRIBUTION OF THIS DOCUMENT, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER, IS PROHIBITED.  THIS DOCUMENT WILL BE RETURNED TO THE GENERAL PARTNER UPON REQUEST. THE EXISTENCE AND NATURE OF ALL CONVERSATIONS REGARDING THE PARTNERSHIP AND THIS OFFERING MUST BE KEPT CONFIDENTIAL.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 432

HOL0015102

22



THIS DOCUMENT HAS BEEN PREPARED IN CONNECTION WITH A PRIVATE OFFERING TO ACCREDITED INVESTORS OF LIMITED PARTNERSHIP INTERESTS IN THE PARTNERSHIP (THE *"INTERESTS"*).  THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE *"SECURITIES ACT"*), OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION.  THE INTERESTS WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE.  THE PARTNERSHIP WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE *"INVESTMENT COMPANY ACT"*).  CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE PARTNERSHIP'S INVESTMENTS WILL BE CHARACTERIZED BY A HIGH DEGREE OF RISK, VOLATILITY AND ILLIQUIDITY. A PROSPECTIVE PURCHASER SHOULD THOROUGHLY REVIEW THE INFORMATION CONTAINED HEREIN AND THE TERMS OF THE PARTNERSHIP'S LIMITED PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENT, AND CAREFULLY CONSIDER WHETHER AN INVESTMENT IN THE PARTNERSHIP IS SUITABLE TO THE INVESTOR'S FINANCIAL SITUATION AND GOALS.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 433

HOL0015103

23



IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, PROSPECTIVE INVESTORS SHOULD BEAR IN MIND THAT PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS, AND THERE CAN BE NO ASSURANCE THAT THE PARTNERSHIP WILL ACHIEVE COMPARABLE RESULTS.

CERTAIN STATEMENTS IN THIS DOCUMENT CONSTITUTE FORWARD-LOOKING STATEMENTS.  WHEN USED HEREIN, THE WORDS "PROJECT," "ANTICIPATE," "BELIEVE," "ESTIMATE," "EXPECT," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS.  SUCH FORWARD-LOOKING STATEMENTS, INCLUDING THE INTENDED ACTIONS AND PERFORMANCE OBJECTIVES OF THE RELEVANT PARTY REFERENCED HEREIN, INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS OF SUCH PARTY TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE, OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.  ALL FORWARD-LOOKING STATEMENTS IN THIS DOCUMENT SPEAK ONLY AS OF THE DATE HEREOF.  THE GENERAL PARTNER AND ITS AFFILIATES EXPRESSLY DISCLAIM ANY OBLIGATION OR UNDERTAKING TO DISSEMINATE ANY UPDATES OR REVISIONS TO ANY FORWARD-LOOKING STATEMENT CONTAINED HEREIN TO REFLECT ANY CHANGE IN ITS EXPECTATION WITH REGARD THERETO OR ANY CHANGE IN EVENTS, CONDITIONS, OR CIRCUMSTANCES ON WHICH ANY SUCH STATEMENT IS BASED.  FURTHERMORE, NOTHING CONTAINED HEREIN IS, OR SHOULD BE RELIED UPON AS, A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF ANY FUND SPONSORED BY THE GENERAL PARTNER.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 434

HOL0015104



INVESTORS SHOULD MAKE THEIR OWN INVESTIGATIONS AND EVALUATIONS OF THE PARTNERSHIP, INCLUDING THE MERITS AND RISKS INVOLVED IN AN INVESTMENT THEREIN.  PRIOR TO ANY INVESTMENT, THE GENERAL PARTNER WILL GIVE INVESTORS THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS AND ADDITIONAL INFORMATION FROM IT CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND OTHER RELEVANT MATTERS.  INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS APPLICABLE TO THEM IN RESPECT OF THE ACQUISITION, HOLDING AND DISPOSITION OF THE INTERESTS IN THE PARTNERSHIP, AND AS TO THE INCOME AND OTHER TAX CONSEQUENCES TO THEM OF SUCH ACQUISITION, HOLDING AND DISPOSITION.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, AN INTEREST IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AGENCY HAS APPROVED AN INVESTMENT IN THE PARTNERSHIP.  FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS DOCUMENT AS INVESTMENT, LEGAL OR TAX ADVICE, AND THIS DOCUMENT IS NOT INTENDED TO PROVIDE THE SOLE BASIS FOR ANY EVALUATION OF AN INVESTMENT IN AN INTEREST.  PRIOR TO ACQUIRING AN INTEREST, A PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN LEGAL, INVESTMENT, TAX, ACCOUNTING, AND OTHER ADVISORS TO DETERMINE THE POTENTIAL BENEFITS, BURDENS, AND OTHER CONSEQUENCES OF SUCH INVESTMENT.

Frost Venture Partners, LLC. Confidential

Exhibit 11
Page 435

HOL0015105