# EXHIBIT 36

| | |
|---|---|
| From: | Stuart Frost (stuart@frostdatacapital.com) |
| Sent: | Saturday, January 10, 2015 9:54:52 AM |
| To: | Jim Greene (jimg@frostdatacapital.com); John Vigouroux (john@frostdatacapital.com); Miles Mahoney (miles@frostdatacapital.com); Bill Guerry (bill@frostdatacapital.com) |
| Cc: | George Ugras (george@frostdatacapital.com) |
| Subject: | Re: Greene-s Chat Today With Brett May |
| Attachments: | B823AF16-742D-4775-A928-465C51328F46.png; Frost Logo 80x183-1--28-.png |

So, let me get this straight:

1. GE is unwilling or unable to perform any of its material obligations under the MoU.
2. GE is unwilling to revisit a fund investment.
3. GE would appreciate it if we could start a few more Maanas, so Brett gets incredibly high quality deal flow that he clearly can t find anywhere else. He might even invest in a few of those.
4. GE expects us to continue to operate under the restrictions in the MoU.
5. HaHaHaHaHa.

If this was the 90s and the MoU was with Microsoft, we d be considering a huge lawsuit on the basis that they signed an agreement they had no intention of honoring, simply to take us out of the market for at least 12 months. And we d win.

Let s work on the assumption that we re going to terminate the MoU on June 5th under clause 4.04 (b)(i). We ll do this in a very friendly way with a view to continuing the FrostI3 ideation and later stage funding relationship, but we really have no choice.

In the meantime:

1. We ll continue to do ideation etc. with GE, but we ll have to make it clear that the formation of new companies will be limited until we address our need for further funding.
2. We ll continue to put Seed B and later rounds in front of GEV.
3. Let s make full use of Bill Ruh s offer to be a reference.
4. We ll continue our conversation with Siemens given that the deal as currently envisaged is allowed by the MoU i.e. It is a funding relationship between Siemens, Fund 2 and portfolio companies and it does not involve ideation or incubation. If that changes, any formal agreement with the incubator will have to wait until after June 5th, which is only 5 months away.

Exhibit 36
Page 628

F 008907 (Confidential)
F 008907
Exhibit501

5. We should consider starting a dialog with other similar partners (IBM?), on the assumption that any formal agreements will take longer than 5 months.

Stuart

Stuart Frost
Managing Partner | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: +1 (949) 338-6312
Skype: stuartfrost62



From: Jim Greene <jimg@frostdatacapital.com>
Date: Saturday, January 10, 2015 at 6:23 AM
To: John Vigouroux <john@frostdatacapital.com>, Stuart Frost <stuart@frostdatacapital.com>, Miles Mahoney <miles@frostdatacapital.com>, Jim Greene <jimg@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>
Subject: Greene's Chat Today With Brett May

Hello guys. Purpose of this note is to provide the highlights from the 90 minute face to face chat I had this morning with Brett May. Earlier today I gave JV and MM the more enhanced voice version. I will of course do the same this weekend if you Stuart of Bill wish to do so. Alternatively, we do so face to face when you in town next week Stuart.

The first part of the conversation was catch-up on the holidays, people we know at Cisco, how we each are doing at GE and FDC respectively, blah, blah, blah. All good as you would expect.

I then moved to the topic of FDC/GE. More specifically, framing the conversation around the following topics:

<> reiterate and confirm what Stuart should have heard and taken from the December meeting with Bill, Brett, Marianne and Sam

<> the FDC desire for bringing back to the Bill Ruh table, GE's investment in an FDC fund

<> in light of the above realities, how to optimize GE and FDC priorities, expectations and needs

Exhibit 36
Page 629

F 008908 (Confidential)
F 008907
Exhibit501

<> Siemens initial call with FDC

I will give you the key points from each of the above topics.

WHAT STUART AND I SHOULD HAVE HEARD FROM THE DECEMBER BRIEFING WITH BILL RUH. SPECIFICALLY THAT GE:

^ values the relationship to date with FDC. FDC portfolio companies have more 'share of GE venture investment in terms of number of companies, than any other third-party'

^ continues to believe that GE will benefit from a multiple play playbook with FDC. plays including GE investing at the Seed B, Seed C, A Round. GE as a petri dish for ideation of potential to be started FDC companies. GE as an enterprise customer for FDC current and future companies -- POCs, license arrangements. GE as a potential GTM partner with FDC company(ies). GE as a possible acquirer of FDC company(ies).

^ continues to see the relationship with FDC as a key part to the GE agenda for innovation as they morph more to a data driven services company over the next 5-10 years

^ will NOT take on early stage, aka Seed A investments. not now. not in the near future. not with FDC. not with other like type third-parties. end of story.

^ Bill out of 'his own pocket' could possibly do in calendar year 2015, 2 to 3 Seed A investments

^ will, Bill Ruh specifically, be an advocate for FDC the incubator, for FDC companies, to GE internal BU's and other key stakeholders. in addition, Bill Ruh will be an enthusiastic and positive reference to third-parties -- potential investors, potential strategic customers, potential strategic corporate investors

^ therefore no longer sees the end game as 30 new companies started from scratch, co-funded from the Seed A round, with GE

^ sees success primarily as the plays described above. i asked do they not agree that this revised model of commercial agreement greatly reduces the ambition of 'needle moving' impact that comes from starting, growing and scaling into their BU's, many start-ups. he reiterated what Bill said to us on this question -- less about the number of companies and more about having a few make a big impact. reference was made to Maana.

OPPORTUNITY FOR GE TO MAKE AN INVESTMENT INTO AN FDC FUND

Exhibit 36
Page 630

F 008909 (Confidential)
F 008907
Exhibit501

^ no. in no uncertain terms -- NO. Brett acknowledges that GE lawyers said there is a remote possibility, very remote that perhaps it could be done. he and Bill vetted this remote possibility with others at GE. Bill took the decision that it a fight not worth fighting and one that he would lose.

^ Brett and Bill clearly understand our desire for funding for current and future companies. that said, getting that funding in the form of a meaningful investment into an FDC fund(s) is not going to happen. capital from GE to FDC could come in other forms, notably potential portfolio company acquisition.

HOW TO OPTIMIZE GOING FORWARD THE VALUE FOR BOTH PARTIES

^ they believe their value, great value potential in fact, for both parties by running the plays described above that Bill walked us through in December

^ i continue to believe that Bill and Brett are genuine in their commitment to and desire for the success of this relationship. big companies. things change. as Bill said to us in December, this new reality of expectations and plays to run together, we need to feel good about. if so, great. if not, we move on.

SIEMENS CALL WITH FDC

^ big thank you to FDC from Brett to have FDC give him the heads up on what he surely would have heard eventually from the fellow at Siemens

^ expects and knows that separate from the relationship risk of any GE partner doing something with Siemens, we FDC will act in a way fully compliant with the current i3 commercial understanding

My two cents for discussion with some or all of us live:

^ i continue to believe that Brett and Bill have had and still do have, FDCs best interests at heart. they know the 'cannot do Seed A' is a major disappointment for us. they also believe that value in this relationship as described above, can be generated for both parties over time.

^ in some ways this relationship is a start-up. like many start-ups, we pivot, we invest more initially than we otherwise thought, we stay the course because we believe in the opportunity. this is the decision we need to make -- go/no-go in light of investment into the fund is NOT going to

Exhibit 36
Page 631

F 008910 (Confidential)
F 008907
Exhibit501

happen. i personally believe we have much to gain from this relationship in spite of the absence of the capital investment not coming to fruition in terms of $$ to the fund(s).

^ Bill relies heavily, very heavily, on Brett. hence, why Bill has and likely will continue to have full transparency with Brett on our communications informal or formal with Bill.

Anyway, I am happy to chat live this weekend with some or all. My suggestion, so that we can have version control of what was said during the meeting this morning and how we want to proceed, is that we all get on a conference call the weekend or connect when Stuart with us in SJC early in the week.

Don't shoot the messenger.

Good night. Have a good weekend.

Thanks.

jim


James S. Greene
General Partner -- Frost Data Capital
Orange County/Silicon Valley
+1.415.298.1137
jimg@frostdatacapital.com
www.frostdatacapital.com

Sent from my iPad

Exhibit 36
Page 632

F 008911 (Confidential)
F 008907
Exhibit501

Exhibit 36
Page 633

F 008912 (Confidential)
F 008912
Exhibit501



Exhibit 36
Page 634

F 008913 (Confidential)
F 008913
Exhibit501

# EXHIBIT 37

| From: | Joseph A. Kann (jakann@ra.rockwell.com) |
|---|---|
| Sent: | Friday, February 26, 2016 10:03:25 PM |
| To: | Stuart Frost (stuart@frostdatacapital.com); Bill Guerry (bill@frostdatacapital.com) |
| Cc: | Miles Mahoney (miles@frostdatacapital.com); Doug Lawson (doug@frostdatacapital.com); Edward A. Hill (eahill@ra.rockwell.com) |
| Subject: | Feedback from Ted Crandall |

Stuart and Bill

I had a chance to talk to Ted Crandall right after we got off our call. All of what I shared with you is consistent with his expectations for the meeting.

He did put a particular emphasis on the following two topics [I m paraphrasing Ted here]:

- Is FDC management as motivated to not fail as the strategic investors? It seems like FDC and its leadership will be well compensated if the overall fund succeeds or not. (Here failure is not about FDCs willingness to shut down a given startup quickly. It s more about a scenario where few if any of the startups are ultimately successful).
- Why is FDC management compensated in as many ways as they are throughout the life of the fund? The model feels expensive.

Obviously both of these topics you have covered with me in various meetings in the past. I m sure you can appreciate that I can t be an effective proxy for you on these topics so you ll need to be prepared to cover this ground in detail again.

Regards and safe travels

Joe Kann | VP Global Business Development
Office: +1 414 382 2252 | Email: jakann@ra.rockwell.com
Rockwell Automation | 1201 S Second Street | Milwaukee, WI  53204 USA

Exhibit 37
Page 635

F 016916 (Confidential)
F 016916
Exhibit507

# EXHIBIT 38

| From: | Tom Giles (tom@frostdatacapital.com) |
| --- | --- |
| Sent: | Friday, November 04, 2016 5:31:05 PM |
| To: | Stuart Frost (stuart@frostdatacapital.com); Bill Guerry (bill@frostdatacapital.com) |
| Subject: | Dst follow up |

Just got off with Ji. Longer than I thought. He wants some clarity on a few items:
- how did NewCo 25 get created? Clarification on the process since it didn't go through a strategic partner like DST.
- can they see financial for Fund I and II as it relates to Fund III? Wants to see the valuation because it should be the same.
- can we confirm Nov 22 date for next steps mtg?
- what is the progress for Mark replacement?
--hey want assurances that we are starting a company till we completed the process .
Worries that we are spending their money on companies they know nothing about.

Also got a call from Johnathan asking the same and to remind me of our strategy of building these together . .. was upset with me..

Tom Giles

General Partner Healthcare

Frost Data Capital

www.frostdatacapital.com

tom@frostdatacapital.com

858-449-8131

Sent from my T-Mobile 4G LTE Device

Exhibit 38
Page 636

F 021191 (Confidential)
F 021191
Exhibit514

# EXHIBIT 39

| From: | John Vigouroux (john@frostdatacapital.com) |
|---|---|
| Sent: | Wednesday, October 01, 2014 2:14:56 AM |
| To: | Bill Guerry (bill@frostdatacapital.com); Luis Vasquez (luis@frostdatacapital.com) |
| Subject: | Fwd: Catch-up |
| Attachments: | B823AF16-742D-4775-A928-465C51328F46-1-.png; Frost Logo 80x183-1--1-.png |

Do not forward.  We r going to have fun Thursday :-)

Sent from my iPhone
Please excuse typos

Begin forwarded message:

**From:** "Kramer, Michael" <Michael.Kramer@nb.com>
**Date:** September 30, 2014 at 6:51:42 PM PDT
**To:** 'Stuart Frost' <stuart@frostdatacapital.com>
**Cc:** 'David Kramer' <dkramer@bsonoma.com>, "'John  Vigouroux'" <john@frostdatacapital.com>
**Subject: RE: Catch-up**

Let me see if I can free my schedule at the later time

Sent with Good (www.good.com)

-----Original Message-----
**From:** Stuart Frost [stuart@frostdatacapital.com]
**Sent:** Tuesday, September 30, 2014 09:26 PM Eastern Standard Time
**To:** Kramer, Michael
**Cc:** David Kramer; John Vigouroux
**Subject:** Re: Catch-up

Michael,

While I can understand how your concerns have arisen, I believe they are misplaced.

My primary role is not that of a traditional investment fund manager and I don t believe it should be. I add the most value and spend most of my time in the following areas:

Exhibit 39
Page 637

F 008187 (Confidential)
F 008187
Exhibit525

1. Coming up with new ideas for startups. Over the last four years, I ve been instrumental in creating 22 new companies from scratch under the FDC umbrella, including several in the last few months. There are also several more in the pipeline that I ve been working on this Summer.
2. Designing and helping to implement our incubation strategy, which is widely recognized as a significant breakthrough in the development of software startups.
3. Securing, launching and building strategic relationships with companies such as GE, Cisco, Deloitte and Wellpoint.
4. Hiring and mentoring the CEOs across the portfolio, which is obviously a time consuming and ever growing task.
5. Being deeply engaged in the strategies of all of the companies in the portfolio. Ditto.
6. Helping the companies to secure external investors alongside our fund. Note that two Series A rounds are closing this week and I ve been intimately involved in both.

I can assure you that the above adds up to significantly more than a normal full-time position, irrespective of where I am in the world. As a result, I have found it difficult to respond to requests for general updates from individual investors in a timely fashion. That s why we hired Luis. Having said that, I do apologize for my tardy responses to both you and David over the Summer.

You questioned my commitment. I can assure you that I am fully committed to FDC and to the funds we have under management. As a direct result of my ongoing involvement, I can confidently say that we have never been in a stronger position.

I can take a call at either 10:45am or 1pm CA on Thursday, although my preference would be for the latter.

Regards,


Stuart

Stuart Frost

Managing Partner | Frost Data Capital

31910 Del Obispo, Ste 100

San Juan Capistrano, CA 92675

M: +1 (949) 338-6312
Skype: stuartfrost62




Exhibit 39
Page 638

F 008188 (Confidential)
F 008187
Exhibit525

From: <Kramer>, Michael <Michael.Kramer@nb.com>
Date: Monday, September 29, 2014 at 9:12 AM
To: Stuart Frost <stuart@frostdatacapital.com>
Cc: Dave Kramer <dkramer@bsonoma.com>
Subject: RE: Catch-up

Stuart

I am reflecting on your response to my email below.  I consider your response quite flippant and  patchy connectivity   is neither an adequate nor credible explanation.  I manage an investment fund with a diverse base of LPs and I consider any communication from them to be of the highest priority and I would expect you to do the same.  I have entrusted you with a million dollars of my money with the understanding that your name was on the door and your involvement level would be extremely high.  Unequivocally you could add more value being on the ground rather than a continent away.  You took two weeks to respond to my email in June and a month to arrange a call with David so I consider this a pattern.  I am concerned about your commitment level.

-Michael



From: Stuart Frost [mailto:stuart@frostdatacapital.com]
Sent: Sunday, September 28, 2014 11:44 PM
To: Kramer, Michael
Subject: Re: Catch-up

Michael,

I was hardly ignoring you, just traveling with patchy connectivity. It s only been a few days after all.

Does Thursday morning CA time work for you?

Exhibit 39
Page 639

F 008189 (Confidential)

F 008187
Exhibit525

# Stuart

Stuart Frost

Managing Partner | Frost Data Capital

31910 Del Obispo, Ste 100

San Juan Capistrano, CA 92675

M: +1 (949) 338-6312

Skype: stuartfrost62



---

**From:** < Kramer>, Michael <Michael.Kramer@nb.com>
**Date:** Monday, September 29, 2014 at 2:25 AM
**To:** Stuart Frost <stuart.frost@frostvp.com>
**Subject:** FW: Catch-up

Stuart

I would appreciate a timely response to my inquiry. I don't think you should ignore emails from your investors.

-Michael

Sent with Good (www.good.com)

-----Original Message-----

Exhibit 39
Page 640

F 008190 (Confidential)
F 008187
Exhibit525

**From:** Kramer, Michael
**Sent:** Wednesday, September 24, 2014 04:36 PM Eastern Standard Time
**To:** Stuart Frost (stuart.frost@frostvp.com)
**Subject:** Catch-up

Stuart

Hope all is well.  I d like to arrange a time to catch up on the portfolio.  Please let me know some times that would work for you.

Thanks

Michael Kramer | Managing Director
Neuberger Berman | New York
T: 212.476.5918 | M: 917.301.1548
Michael.Kramer@nb.com

Serious Investing for 75 Years
www.nb.com

---------
If you are not an intended recipient of this e-mail, you are not authorized to duplicate, copy, retransmit or redistribute it by any means. Please delete it and any attachments immediately and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Neuberger Berman. Any views or opinions presented are solely those of the author and do not necessarily represent those of Neuberger Berman. This e-mail is subject to terms available at the following link: www.nb.com/disclaimer/usa.html. By messaging with Neuberger Berman you consent to the foregoing.

To unsubscribe: www.nb.com/unsubscribe-email

Exhibit 39
Page 641

F 008191 (Confidential)
F 008187
Exhibit525

Exhibit 39
Page 642

F 008192 (Confidential)
F 008192
Exhibit525



Exhibit 39
Page 643

F 008193 (Confidential)
F 008193
Exhibit525

# EXHIBIT 40

# SERVICES AGREEMENT

This SERVICES AGREEMENT ("Agreement") is made and entered into as of September 4, 2013 (the "Effective Date"), between Frost Venture Partners LLC ("Service Provider") and SegOne, Inc. ("Company").

1. **Services and Term.** The Service Provider shall, pursuant to the terms and conditions of this Agreement and under the supervision and authority of the Company, provide strategic support, corporate governance support, and financial, operational, management and administrative personnel and services to on behalf of and as directed by the Company. The Service Provider agrees to perform its services hereunder in a commercially reasonable fashion subject to the terms and conditions of this Agreement, as amended from time to time. The Service Provider may also incur certain costs on behalf of and as authorized by the Company, including but not limited to, office rental costs.

2. **Compensation.** The Service Provider shall be solely responsible for providing the personnel and other resources necessary to provide the services hereunder. The Company shall pay the Service Provider for its reasonable costs and out of pocket expenses in providing the personnel and performing the services hereunder. The Service Provider shall invoice the Company monthly in advance for the personnel and services provided hereunder.

3. **Indemnification.** The Company agrees to indemnify the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents, to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses paid in connection with or resulting from any claim, action, or demand against such persons or entities that arise out of or in any way relate to the services provided in good faith by Service Provider or the Company, its properties, businesses, or affairs and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Service Provider) of any such claim, action or demand; *provided, however*, that this indemnity shall not extend to any conduct by Service Provider which constitutes gross negligence, recklessness or intentional wrongdoing. Moreover, to the extent the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents would be eligible for indemnification by the Company pursuant to its articles and bylaws, the Company shall use its best efforts to facilitate any claim for such indemnification.

4. **Term and Termination.** This Agreement shall become effective on the Effective Date and shall continue in effect until termination by a party to this Agreement with or without cause upon one hundred eighty (180) days' prior written notice.

5. **General.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to such state's conflicts of law principles. Except as specifically set forth in this Agreement, all notices shall be in writing and deemed duly given if delivered in person or sent by registered or certified mail, postage prepaid, addressed to the respective party's address as stated on the signature page to this Agreement, or to such other address as may be provided by written notice in accordance with the foregoing. No modification of this Agreement will be binding upon either party unless made in writing and signed by both parties. This Agreement contains the entire agreement and understanding of the

Exhibit 40
Page 644

F 036648 (Confidential)

Exhibit597

parties hereto with respect to the subject matter hereof, and merges and supersedes all prior agreements, discussions and writings with respect thereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes. This Agreement may be executed by a party's signature transmitted by facsimile or email and copies of this Agreement executed and delivered by means of such means shall have the same force and effect as copies hereof executed and delivered with original signatures.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

Frost Venture Partners LLC

By: _____

Name:    Stuart Frost

Title:    Managing Partner

SegOne, Inc.

By: _____

Name:    John T. Burke

Title:    CEO

Exhibit 40
Page 645

F 036649 (Confidential)
Exhibit597

# EXHIBIT 41



# THE INTERNATIONAL SCHOOL OF FLORENCE
www.isfitaly.org

Florence, January 30th,2014

Mr. & Mrs. Stuart Frost
14 O'Hill Ridge
92677 Laguna Niguel, CA
USA

Dear Mr. & Mrs. Frost,

I am pleased to inform you that on the basis of their applications and school records, your children, Delaney and Kieran, have been accepted for admission to the grade 6 and grade 8 classes respectively at the International School of Florence, beginning in September 2014. Their acceptance to grade 6 and 8 presumes that they have successfully completed the school year at their current school.

Due to the increasing number of applicants and to guarantee your child's place at our school, you are requested to pay the Registration & Capital Fund fees upon receipt of this letter. Billing information is enclosed.

We are delighted that your family will be joining the ISF community and look forward to getting to know you during the year.

Sincerely,

Dr. Lawrence Hobdell
*Head of School*

Enc:
1.  Bill information

Junior School
VILLA LE TAVERNULE - Via del Carota, 23/25 - 50012 BAGNO A RIPOLI (FLORENCE) - Tel. +39 055 6461007 - Fax +39 055 644226

Upper School
VILLA TORRI DI GATTAIA - Viuzzo di Gattaia, 9 - 50125 FLORENCE - Tel. +39 055 2001515 - Fax +39 055 2008400

Ragione Sociale: AMERICAN SCHOOLS ABROAD, INC. - Via del Carota, 23/25 - 50012 BAGNO A RIPOLI (FI) - c.f. 80028490482 - p.i. IT04029392483 - C.C.I.A.A. (FI) r.e.a. 488815

653

Exhibit 41
Page 646



# THE INTERNATIONAL SCHOOL OF FLORENCE
www.isfitaly.org

Feb 3, 2014

Dear Mr. and Mrs. Frost

Please pay the following school fees now for the 2014/2015 school year for
**Delaney Gr 6 and Kieran Gr 8**

| | | |
|---|---|---|
| Application Fee- €300 per child | *non -refundable* | € 600,00 |
| Registration Fee- € 1500,00  per child | *non -refundable* | € 3.000,00 |
| Capital Fund Fee- € 3500,00  per child | *non -refundable* | € 7.000,00 |
| | | |
| Revenue stamp | | € 2,00 |
| Total | | € 10.602,00 |
| Paid on account | | € 600,00 |
| **TOTAL DUE** | | **€ 10.002,00** |

Please, mail a check payable to The International School of Florence or  make a bank transfer
*to  Cassa di Risparmio di Firenze, Bagno a Ripoli branch, acc. n° 7332/00, abi 6160, cab 37720,*
SWIFT  CRFI-IT-3F, IBAN IT 21 W06160 37720 000007332C00, indicating student(s) name(s).
Yours sincerely

Business Office

*bollo ass- lto sull'originale*

---

Junior School
VILLA LE TAVERNULE - Via del Carota, 23/25 - 50012 BAGNO A RIPOLI (FLORENCE) - Tel. +39 055 6461007 - Fax +39 055 644226
Upper School
VILLA TORRI DI GATTAIA - Viuzzo di Gattaia, 9 - 50125 FLORENCE  - Tel. +39 055 2001515 - Fax +39 055 2008400
Ragione Sociale: AMERICAN SCHOOLS ABROAD, INC. - Via del Carota, 23/25 - 50012 BAGNO A RIPOLI (FI) - c.f. 80028490482 - p.i. IT04029390483 - C.C.I.A.A. (FI) r.e.a. 488815

Exhibit 41
Page 647

# EXHIBIT 42



Frost Venture Partners, LLC.
31920 Del Obispo, Suite 260
San Juan Capistrano, CA  92675

(949)525-2909
jim@frostvp.com

# Invoice

| Date | Invoice # |
|---|---|
| 10/01/2012 | 1034 |
| Terms | Due Date |
| Due on receipt | 10/01/2012 |

**Bill To**

Frost Management Company, LLC.
31920 Del Obispo
Suite 260
San Juan Capistrano, CA  92675

| Amount Due | Enclosed |
|---|---|
| $32,000.00 | |

Please detach top portion and return with your payment.

| Activity | Amount |
|---|---|
| • November 2012 Management Services | 16,000.00 |
| • December 2012 Management Services | 16,000.00 |
| **Total** | **$32,000.00** |

Exhibit 42
Page 648

EXHIBIT NO. 748

Wit:  W. Guerry

Date:  6/30/17

Janet M. Taylor, CSR 9463

748



Frost Venture Partners, LLC.
31920 Del Obispo, Suite 260
San Juan Capistrano, CA  92675

(949)525-2909
jim@frostvp.com

# Invoice

| Date | Invoice # |
| --- | --- |
| 10/01/2012 | 1034 |
| Terms | Due Date |
| Due on receipt | 10/01/2012 |

**Bill To**

Frost Management Company, LLC.
31920 Del Obispo
Suite 260
San Juan Capistrano, CA  92675

| Amount Due | Enclosed |
| --- | --- |
| $16,000.00 | |

✂ Please detach top portion and return with your payment. ✂

| Activity | Amount |
| --- | --- |
| • November 2012 Management Services | 16,000.00 |
| | |
| Total | $16,000.00 |

Exhibit 42
Page 649

# EXHIBIT 43

EXHIBIT NO. 754

Wit: W. Guerry

Date: 6/30/17

Janet M. Taylor, CSR 9463

**Management Fee**

| Investment | Commitment | Commitment | Total | |
|---|---|---|---|---|
| 1st Closing | 4,110,000 | 4,081,811 | 28,189 | |
| 2nd Closing | 6,800,000 | 6,800,000 | - | |
| 3rd Closing | 6,782,710 | 6,782,710 | - | |
| 4th Closing | 14,615,000 | 14,615,000 | - | |
| Agreed to reduction | -350,000 | -350,000 | - | Kramer reduction effective end of October 2014 |
| 5th Closing | 1,000,000 | 1,000,000 | - | December 2014 |
| 6th Closing | 2,500,000 | 2,500,000 | - | |
| Agreed to reduction | | -90,000 | | Dynamic reduction effective June 2014 |
| Commitment error | | -250,000 | | Jim Greene error |
| **Total** | **35,457,710** | **35,089,521** | **28,189** | |

| | Q2-13 | Q3-13 | Q4-13 | 2013 | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | CASH BASIS | | | | | | | | | CASH BASIS | | | | |
| Management fee | | | | | | | | | | | | | | | | | | | | | | | | | | |
| First close | 7,483 | 20,409 | 20,409 | 48,301 | | 20,409 | 20,409 | 20,409 | 20,409 | 81,636 | | 20,409 | 20,409 | 20,409 | 20,409 | 81,636 | 211,574 | | | | 20,409 | 20,409 | 20,409 | 20,409 | 81,636 | | |
| Second close | | | 80,467 | 80,467 | | 34,000 | 34,000 | 34,000 | 34,000 | 136,000 | | 34,000 | 34,000 | 34,000 | 34,000 | 136,000 | 352,467 | | | | 34,000 | 34,000 | 34,000 | 34,000 | 136,000 | | |
| Third close | | | | - | | - | 148,089 | 33,914 | 33,914 | 215,916 | | 33,914 | 33,914 | 33,914 | 33,914 | 135,654 | 351,570 | | | | 33,914 | 33,914 | 33,914 | 33,914 | 135,654 | | |
| Fourth close | | | | - | | - | 319,094 | 73,075 | 73,075 | 465,244 | | 73,075 | 73,075 | 73,075 | 73,075 | 292,300 | 757,544 | | | | 73,075 | 73,075 | 73,075 | 73,075 | 292,300 | | |
| Fifth close (net) | | | | | | | | | 27,167 | 27,167 | | 3,250 | 3,250 | 3,250 | 3,250 | 13,000 | 40,167 | | | | 3,250 | 3,250 | 3,250 | 3,250 | 13,000 | | |
| Sixth close | | | | | | | | | | | | | 79,583 | 10,800 | 10,800 | 101,183 | 101,183 | | | | 10,800 | 10,800 | 10,800 | 10,800 | 43,200 | | |
| Error | | | | | | | | | | | | | | | | | - | | | | | | | | - | | |
| Unpaid | | | | | | | | | | | | | 42,000 | (42,000) | (75,448) | (75,448) | (75,448) | | | | (145,448) | (160,448) | (175,448) | (175,448) | (656,791) | | |
| | 7,483 | 20,409 | 100,876 | 128,768 | | 54,409 | 521,592 | 161,398 | 188,564 | 925,963 | | 164,648 | 286,231 | 125,489 | 100,000 | 676,367 | 1,731,099 | 75,448 | 751,815 | | 30,000 | 15,000 | (0) | (0) | 45,000 | 732,239 | 777,238 |
| | | | | 81,435 | | | | | | 892,963 | | | | | | | | | | | | | | | | | |
| Expenses | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| General expenses to be shared by all GPs | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GP contribution offset | 7,333 | 20,000 | 20,000 | 47,333 | | 20,000 | 12,667 | | | 32,667 | | | | | | - | 80,000 | | - | | | | | | - | | |
| Luis payroll | | 33,447 | 33,447 | 66,894 | | 33,447 | 33,447 | 33,447 | 33,447 | 133,788 | | 11,149 | 44,596 | 44,496 | 33,447 | 133,688 | 334,370 | | 133,688 | | 11,149 | 5,574 | 5,575 | | 22,298 | | 22,298 |
| Luis travel | | | | - | | - | 10,964 | 3,018 | 2,247 | 16,229 | | | | | 100 | 100 | 16,329 | 7,194 | 7,294 | | 8503 | | | | 8,503 | | 8,503 |
| Luis bonus | | | | | | | 40,000 | 1,984 | | 41,984 | | | | | 6,000 | 6,000 | 47,984 | | 6,000 | | | | | | - | | |
| Accounting | | | | | | | | | | | | 2,000 | 10,300 | 8,000 | 6,000 | 26,300 | 26,300 | 5,100 | 31,400 | | 5,100 | 2,500 | | | 7,600 | 17000 | 24,600 |
| Alpha Strategies | | 5,000 | 10,000 | 15,000 | | - | 5,000 | | | 5,000 | | | | | | - | 20,000 | | - | | | | | | - | | |
| Tax returns | | | | | | | 4,700 | | 82 | 4,782 | | 700 | 5,000 | | 1,705 | 7,405 | 12,187 | | 7,405 | | | 1,100 | | | 1,100 | | 1,100 |
| Legal (Cooley) | | | | | | | 20,368 | | 15,502 | 35,869 | | 1,019 | | | - | 1,019 | 36,888 | 4,000 | 5,019 | | 4,000 | | | | 4,000 | | 4,000 |
| Open House | | | | | | | 9,907 | | | 9,907 | | | | | - | - | 9,907 | 2,500 | 2,500 | | 2,500 | | | | 2,500 | | 2,500 |
| Other travel/fundraising costs (Vegas funding trip) | | | | | | | 8,000 | | | 8,000 | | | | | | - | 8,000 | | - | | | | | | - | | |
| Other travel/fundraising costs (Stuart travel to UK) | | | | | | | - | 12,950 | | 12,950 | | | | | | - | 12,950 | | - | | | | | | - | | |
| Opal Financial Group (investor conf) | | | | - | | | 10,000 | | | 10,000 | | | | | | - | 10,000 | | 0 | | | | | | - | | |
| Davidson expenses | | | | | | | | | | | | | | | | | | | | | 21171 | -20411 | | | 760 | | 760 |
| Miscellenous/Jack Kreindler Error (Q2 2015) | | | | | | 459 | | | 13 | (12,332) | (11,860) | 7,332 | 5,000 | | | 12,332 | 472 | 18,794 | 12332 | | 488 | | | | 488 | | 488 |
| | 7,333 | 58,447 | 63,447 | 129,227 | | 53,906 | 155,052 | 51,412 | 38,946 | 299,316 | | 22,200 | 64,896 | 58,496 | 41,252 | 186,844 | 615,387 | 18,794 | 205,638 | | 52,911 | (11,237) | 5,575 | - | 47,249 | 17,000 | 64,249 |
| Management fee allocable after general expenses | 150 | (38,038) | 37,429 | (459) | | 503 | 366,541 | 109,986 | 149,618 | 626,647 | | 142,448 | 221,335 | 66,993 | 58,748 | 489,523 | 1,116,171 | 56,654 | 546,177 | | (22,911) | 26,237 | (5,575) | (0) | (2,249) | 715,239 | 712,989 |

**Stuart Frost (62.5%)**

| | Q2-13 | Q3-13 | Q4-13 | 2013 | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stuart Frost (62.5%) | | | | | | 314 | 229,088 | 68,741 | 93,511 | 391,655 | | 89,030 | 138,334 | 41,871 | 36,717 | 305,952 | 697,607 | 35,409 | 341,361 | | (14,320) | 16,398 | (3,484) | (0) | (1,406) | 476,826 | 475,420 |
| Income Redistribution | | | | | | | | | 49,602 | 49,602 | | (49,602) | - | | 115,490 | 65,888 | 115,490 | (31,721) | 34,167 | | - | | | | - | (115,490) | (115,490) |
| **Total Income Stuart Frost** | | | | | | 314 | 229,088 | 68,741 | 143,113 | 441,257 | | 39,428 | 138,334 | 41,871 | 152,207 | 371,840 | 813,097 | 3,688 | 375,528 | | (14,320) | 16,398 | (3,484) | (0) | (1,406) | 361,336 | 359,930 |
| Ferrari and other (Stuart Auto Lease) | - | - | - | - | | - | 51,725 | 12,645 | 12,645 | 77,015 | | | 25,289 | 12,645 | 12,645 | 50,579 | 127,594 | - | 50,579 | | 17,295 | 10,755 | 2,325 | | | | |
| Debuntures (Stuart bungalow deposit) | - | - | - | - | | - | 45,431 | | | 45,431 | | | | | | - | 45,431 | | - | | | | | | | | |
| Ozturhan (Stuart yacht deposit) | - | - | - | - | | - | 14,078 | 25,553 | | 39,631 | | | | | | - | 39,631 | | - | | | | | | | | |
| International School of Florence | - | - | - | - | | - | 14,026 | | | 14,026 | | | | | | - | 14,026 | | - | | | | | | | | |
| Exclusive S.a.S. (Guest house deposit) | | | | | | | 1,496 | | | 1,496 | | | | | | - | 1,496 | | - | | | | | | | | |
| Exclusive S.a.S. (Bungalow and guest house payment) | | | | | | | 51,263 | 29,655 | 13,343 | 94,261 | | | | | | - | 94,261 | | - | | | | | | | | |
| Pitcher (New bungalow) | | | | | | | | | | - | | 76,980 | 58,400 | | | 135,380 | 135,380 | | 135,380 | | | | | | | | |
| Italian Moving Company | | | | | | | 7,275 | | | 7,275 | | | 8,578 | | | 8,578 | 15,853 | | 8,578 | | | | | | | | |
| Air Partners | | | | | | | 125,000 | | | 125,000 | | | | | | - | 125,000 | | - | | | | | | | | |
| CC Expenses | | | | | | | | 3,204 | | 3,204 | | 38,853 | 85,453 | 11,590 | | 135,896 | 139,100 | | 135,896 | | | | | | | | |
| Black Card Expenses | | | | | | | | 221 | | 221 | | 2,317 | 19 | | | 2,336 | 2,557 | | 2,336 | | | | | | | | |
| SVB CC | | | | | | | | 20,546 | 9,847 | 30,393 | | 1,898 | 2,644 | | 10,657 | 15,199 | 45,592 | 3,500 | 18,699 | | | | | | | | |
| Shipping | | | | | | | | | | - | | | 1,409 | 1,381 | | 2,790 | 2,790 | 1,308 | 4,098 | | | | | | | | |
| Other GP expenses reimbursed to incubator | | | | | | | | | | | | | | | | | | | | | 9,614 | 6,348 | 6,523 | | | | |
| **Total direct expenses** | - | - | - | - | | - | 310,295 | 91,824 | 35,835 | 437,953 | | 120,048 | 181,792 | 25,617 | 23,302 | 350,759 | 788,712 | 4,808 | 355,567 | | 26,905 | 17,103 | 8,848 | - | - | - | 355,567 |
| Net distributable income | | | | | | 314 | (81,207) | (23,082) | 57,676 | 3,303 | | (80,620) | (43,458) | 16,254 | 128,905 | 21,081 | 24,385 | (1,120) | 19,961 | | (41,225) | (705) | (12,332) | (0) | (1,406) | 361,336 | 4,363 |

**John Vigouroux (25%)**

| | | | | | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| John Vigouroux (25%) | | | | | | 126 | 91,635 | 27,496 | 37,405 | 156,662 | | 35,612 | 55,334 | 16,748 | 14,687 | 122,381 | 279,043 | 14,164 | 136,544 | | (5,728) | 6,559 | (1,394) | (0) | (562) | 158,942 | 158,942 |
| Income Redistribution | | | | | | | | | (16,271) | (16,271) | | 16,271 | | | (76,667) | (60,396) | (76,667) | 21,147 | | | - | | | | - | 76,667 | 76,667 |
| **Total Income John Vigouroux** | | | | | | 126 | 91,635 | 27,496 | 21,134 | 140,391 | | 51,883 | 55,334 | 16,748 | (61,980) | 61,985 | 202,376 | 35,311 | 97,296 | | (5,728) | 6,559 | (1,394) | (0) | (562) | 235,609 | 235,609 |
| Virgin America | | | | | | | 2,008 | | | 2,008 | | | | | | - | 2,008 | | - | | | | | | - | | |
| Thy.com - Istanbul | | | | | | | 15,433 | | | 15,433 | | | | | | - | 15,433 | | - | | | | | | - | | |
| Alisal Guest Ranch | | | | | | | 2,979 | | | 2,979 | | | | 3,443 | | 3,443 | 6,422 | | 3,443 | | | | | | - | | |
| The House Hotel - Istanbul | | | | | | | 2,561 | | | 2,561 | | | | | | - | 2,561 | | - | | | | | | - | | |
| Ozturhan (Stuart yacht deposit) | | | | | | | | 25,553 | | 25,553 | | | | | | - | 25,553 | | - | | | | | | - | | |
| Taxi | | | | | | | | 1,757 | | 1,757 | | | | | | - | 1,757 | | - | | | | | | - | | |
| SVB CC | | | | | | | | 19,492 | 2,608 | 22,100 | | | | | | - | 22,100 | | - | | | | | | - | | |
| Other Expenses | | | | | | | | | 8,000 | 8,000 | | | | 3,044 | | 3,044 | 11,044 | | 3,044 | | | | | | - | | |
| Income Distribution | | | | | | | | | 60,000 | 60,000 | | 15,000 | 25,000 | | | 40,000 | 100,000 | | 40,000 | | | | | | - | | |
| **Total direct expenses** | - | - | - | - | | - | 22,980 | 46,802 | 70,608 | 140,391 | | 15,000 | 25,000 | 6,488 | - | 46,488 | 186,878 | - | 46,488 | | - | - | - | - | - | - | - |
| Net distributable income | | | | | | 126 | 68,655 | (19,306) | (49,474) | 0 | | 36,883 | 30,334 | 10,261 | (61,980) | 15,497 | 15,498 | 35,311 | 50,808 | | (5,728) | 6,559 | (1,394) | (0) | (562) | 235,609 | |

**Jack Kriendler (12.5%)**

| | | | | | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jack Kriendler (12.5%) | | | | | | 63 | 45,818 | 13,748 | 18,702 | 78,331 | | 17,806 | 27,667 | 8,374 | 6,854 | 60,701 | 139,521 | 6,610 | 67,310 | | - | - | - | - | - | 38,333 | - |
| Income Redistribution | | | | | | | | | (33,331) | (33,331) | | 33,331 | | | (38,333) | (5,002) | (38,333) | 10,084 | | | - | | | | - | | |
| **Total Income Jack Kreindler** | | | | | | 63 | 45,818 | 13,748 | (14,629) | 45,000 | | 51,137 | 27,667 | 8,374 | (31,479) | 55,699 | 101,188 | 16,693 | 72,392 | | - | - | - | - | - | 38,333 | 38,333 |
| Income Distribution | | | | | | | | 10,000 | 35,000 | 45,000 | | 10,000 | 15,000 | 10,000 | | 35,000 | 80,000 | | 35,000 | | 5,000 | | | | 5,000 | | 5,000 |
| Total direct expenses | - | - | - | - | | - | - | 10,000 | 35,000 | 45,000 | | 10,000 | 15,000 | 10,000 | - | 35,000 | 80,000 | - | 35,000 | | 5,000 | - | - | - | 5,000 | | 5,000 |
| Net Distributable income | | | | | | 63 | 45,818 | 3,748 | (49,629) | (0) | | 41,137 | 12,667 | (1,626) | (31,479) | 20,699 | 21,188 | 16,693 | 37,392 | | (5,000) | - | - | - | (5,000) | 38,333 | 33,333 |

**Bill Guerry (12.5%)**

| | | | | | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill Guerry (12.5%) | | | | | | - | - | - | - | - | | - | - | - | 490 | 490 | 490 | 472 | 962 | | (2,864) | 3,280 | (697) | (0) | (281) | 79,471 | 79,471 |
| Income Redistribution | | | | | | | | | - | - | | | | | (490) | (490) | (490) | 490 | | | - | | | | - | 490 | |
| **Total Income Bill Guerry** | | | | | | - | - | - | - | - | | - | - | - | (0) | (0) | (0) | 962 | 962 | | (2,864) | 3,280 | (697) | (0) | (281) | 79,961 | 79,961 |
| Expenses | | | | | | | | | - | - | | | | | | - | (0) | | | | | | | | - | | |
| Total direct expenses | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | - | - | - | | - | - | - | - | - | | - |
| Net Distributable income | | | | | | - | - | - | - | - | | - | - | - | (0) | (0) | - | 962 | 962 | | (2,864) | 3,280 | (697) | (0) | (281) | 79,961 | 79,961 |

| | Q2-13 | Q3-13 | Q4-13 | 2013 | | Q1-14 | Q2-14 | Q3-14 | Q4-14 | 2014 | | Q1-15 | Q2-15 | Q3-15 | Q4-15 | 2015 | Cumalative | Accrued | 2015 Accrued | | Q1-16 | Q2-16 | Q3-16 | Q4-16 | 2016 | Accrued | 2016 Accrued |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount avaiable to GPs | 150 | (38,038) | 37,429 | (459) | | 503 | 33,266 | (38,640) | (41,427) | 3,304 | | (2,600) | (457) | 24,889 | 35,445 | 57,277 | 61,071 | 51,846 | 109,123 | | (54,816) | 9,134 | (14,423) | (0) | (7,249) | 715,239 | 352,423 |
| CASH IN BANK | | | | | | | | | | 7,332 | | | | | | | | | | | 6,254 | 15,388 | 966 | 966 | | | |

F 031963

Exhibit 43
Page 650

754

# EXHIBIT 44

**To:**       Rapattoni, Steve[Steve.Rapattoni@marcumllp.com]; McConnell, Kellan[Kellan.McConnell@marcumllp.com]
**From:**     Brown, Arthur
**Sent:**     Wed 2/8/2017 9:11:41 PM
**Importance:**      Normal
**Subject:**  RE: Incubator Fees / Hollencrest

Another thought regarding my overview below of what constitutes a *related party transaction* when a fund adviser/GP affiliate is indirectly receiving payments from underlying investee portfolio companies. In the context of VC funds in particular, most of the investee companies are pre-revenue and therefore have no ability to make such payments absent the funds provided by the fund. Secondly, it's clear that such transactions are not arms-length likely at all because in reality the companies are indifferent when paying such amounts with *someone else's* money.

I look forward to hearing your thoughts.



*Arthur Brown Profile*
*Partner*
Marcum LLP
2049 Century Park East, Suite 300
Los Angeles, CA 90067
P: (310) 432-7424
F: (310) 432-7502
Arthur.Brown@marcumllp.com



From: Brown, Arthur
Sent: Wednesday, February 08, 2017 12:55 PM
To: Rapattoni, Steve <Steve.Rapattoni@marcumllp.com>; McConnell, Kellan <Kellan.McConnell@marcumllp.com>
Subject: RE: Incubator Fees / Hollencrest

Related party defined: "any person, directly or indirectly, controlling or controlled by the investment adviser and any person who is under common control with the investment adviser."

Regarding the investee portfolio companies: they do *not* themselves need to be *related parties* (as defined above) in order for payments made <u>by them</u> to be *related party transactions*. The important distinction is the fact that the funds are indirectly transacting with *related parties* (i.e. the incubator) which is resulting in the required *related party transaction* disclosures. All transactions between the fund and affiliates of the investment adviser or general partner, directly or indirectly, are inarguably *related party transactions* requiring full disclosure or separate presentation on the face of one or more of the financial statements themselves.



*Arthur Brown Profile*
*Partner*
Marcum LLP
2049 Century Park East, Suite 300
Los Angeles, CA 90067
P: (310) 432-7424
F: (310) 432-7502
Arthur.Brown@marcumllp.com



EXHIBIT
766
L. Vasquez
7-11-17
G. Kennamer CSR CCRR

Exhibit 44
Page 651



**From:** Rapattoni, Steve
**Sent:** Tuesday, February 07, 2017 5:08 PM
**To:** Brown, Arthur <Arthur.Brown@marcumllp.com>; McConnell, Kellan <Kellan.McConnell@marcumllp.com>
**Subject:** FW: Incubator Fees / Hollencrest

The sleeping giant has awoken....read below and let me know when you have a minute to discuss.

He makes some valid points but not necessarily about the fact that a related party as implied with Frost Data is not sensible disclosure. It may not be technically required but may be smart at this point given the pending litigation.

Interested in your comments



*Steve Rapattoni, CPA* Profile
*Partner-in-Charge, Irvine Office*
Marcum LLP
1920 Main Street, Suite 950
Irvine, CA 92614
P: (949) 236-5670
F: (949) 236-5601
Steve.Rapattoni@marcumllp.com



**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Tuesday, February 07, 2017 4:50 PM
**To:** Rapattoni, Steve <Steve.Rapattoni@marcumllp.com>
**Cc:** McConnell, Kellan <Kellan.McConnell@marcumllp.com>; Luis Vasquez <luis@frostdatacapital.com>
**Subject:** Re: Incubator Fees / Hollencrest

Let's not confuse the question raise by the arbitration as be all end all driving disclosure requirements. There are many nuances to their position most of which do not involve the amount of incubator fees paid. It is part of the model we created.

It is an interesting question, whether or not there should be disclosure. Many of our companies are not under common control. For instance, Maana has a separate board, where we are not a majority and they have outside investors who hold more in total than all of the frost related parties. Accordingly, I don't think there is any argument for such a disclosure. Same for Sentrian. Further, others have outside board members who are responsible for making sure that the Companies are utilizing their resources in a prudent way. Each company's management and board of directors evaluates the propriety of their expenses as part their responsibility to the company. Note also that when we described the incubation cost philosophy to prospective fund investors, we have stated the at the cost per company is about the fully burdened cost of a senior executive (salary, taxes, benefits, facilities, travel, etc.) We have had similar discussions with DST, our strategic investor and they were comfortable with the model. We believe the amount we charge is within this set expectation. These are not related party transactions between the Funds and a related party of the Funds. Where do we draw the line on disclosure or not? Let's discuss before we provide a schedule.

We believe that what we charge the companies is no greater than the fair market value of the services provided. Note that the fee is a monthly fixed amount generally that starts at about $40,000 per month. As some companies raise outside funding, some outside investors have negotiated changes to these amounts, or for reasons outside of the economics, have the companies have moved from the incubator support. In a few of these cases, these companies have had to engage current or former incubator

Exhibit 44
Page 652

personnel directly and hired them to perform some of the duties that were previously performed by the incubator. Attached is a summary of the types of services included.  The time and effort varies from month to month, but overall, we believe approximately the value in the services and support received.  Accordingly, we do not believe there should be any offset against the mgt. fee.

---

**From:** "Rapattoni, Steve" <Steve.Rapattoni@marcumllp.com>
**Date:** Thursday, February 2, 2017 at 11:14 AM
**To:** Bill Guerry <bill@frostdatacapital.com>, Luis Vasquez <luis@frostdatacapital.com>
**Cc:** "McConnell, Kellan" <Kellan.McConnell@marcumllp.com>
**Subject:** RE: Incubator Fees / Hollencrest

Bill and Luis,

In reviewing the legal letter it appears that much of the issue relates to the incubator fees being charged to the various companies. With that said, we believe due to common control/related party issues, we will likely disclose additional information relative to these fees paid to Frost Data impacting the various investments the funds made into the platform companies.

A few questions remain as follows:

1. Per the LP Agreement, incubator fees will not offset management fees so long as the incubator fees are at "market-rate". Please provide documentation to support your assertion that none of the incubator fees have exceeded "market". For example, since Maana has left the incubator (they have their own rent, payroll, accounting, etc.) how/why is $35k/month reasonable or considered "market"?  What services are being provided by the incubator?  Should any of these fees have offset the management fees?

2. What are the projected incubator fees going forward?  What is the methodology/rationale for charging incubator fees to the portfolio companies?

3.  A schedule of fees Frost Data Capital has received in incubator fees since inception, by year and by portfolio company.

Thanks, Steve



*Steve Rapattoni, CPA* Profile
*Partner-in-Charge, Irvine Office*
Marcum LLP
1920 Main Street, Suite 950
Irvine, CA 92614
P: (949) 236-5670
F: (949) 236-5601
Steve.Rapattoni@marcumllp.com



**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Wednesday, February 01, 2017 9:45 AM
**To:** McConnell, Kellan <Kellan.McConnell@marcumllp.com>; Luis Vasquez <luis@frostdatacapital.com>
**Cc:** Rapattoni, Steve <Steve.Rapattoni@marcumllp.com>
**Subject:** Re: Hollencrest Issue

Kellan,

Exhibit 44
Page 653

Please see attached prepared by counsel. If you would like to speak with counsel, we can arrange a call. Please let us know if this is what you need.

Bill

---

From: "McConnell, Kellan" <Kellan.McConnell@marcumllp.com>
Date: Tuesday, January 24, 2017 at 1:44 PM
To: Bill Guerry <bill@frostdatacapital.com>, Luis Vasquez <luis@frostdatacapital.com>
Cc: "Rapattoni, Steve" <Steve.Rapattoni@marcumllp.com>
Subject: Hollencrest Issue

Bill & Luis,

Given the issues with Hollencrest, we are required to run Funds I and II back through our client acceptance/continuance committee. We sent them a brief synopsis of the issue based on our meeting last month, but they are requesting something a little more detailed to fully understand the situation and current status.

Can you please provide a memo describing the genesis of the issue, claims made by the LP's, and current status of any arbitration or pending litigation?

Thank you,

Kellan

**MARCUM**
ACCOUNTANTS • ADVISORS

*Kellan McConnell, CPA*
*Senior Manager*
Marcum LLP
1920 Main Street, Suite 950
Irvine, CA 92614
P: (949) 236-5618
F: (949) 236-5601
Kellan.McConnell@marcumllp.com



CONFIDENTIALITY NOTICE:
This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of the message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (631) 414-4000 or (212) 485-5500 and destroy this message.

DISCLAIMER:
This communication has been prepared for informational purposes only and is not intended to constitute advertising or solicitation. It should not be used or interpreted as tax or professional advice, unless otherwise stated. Those seeking such advice should contact a member of our firm. Transmission of this information is not intended to create, and receipt does not constitute, any client-firm relationship. Personal or confidential information should not be sent to our firm without first communicating directly with a member of our firm about establishing a client relationship.

Exhibit 44
Page 654

CONFIDENTIALITY NOTICE:

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of the message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (631) 414-4000 or (212) 485-5500 and destroy this message.

DISCLAIMER:

This communication has been prepared for informational purposes only and is not intended to constitute advertising or solicitation. It should not be used or interpreted as tax or professional advice, unless otherwise stated. Those seeking such advice should contact a member of our firm. Transmission of this information is not intended to create, and receipt does not constitute, any client-firm relationship. Personal or confidential information should not be sent to our firm without first communicating directly with a member of our firm about establishing a client relationship.

Exhibit 44
Page 655

# EXHIBIT 45

| | |
|---|---|
| **From:** | Bill Guerry (-O-MEX06-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-DBBFA8E15DC04840A56B66CA02D1BF6C-BILL) |
| **Sent:** | Wednesday, April 9, 2014 5:55:28 PM |
| **To:** | Stuart Frost (stuart@frostvp.com) |
| **Cc:** | |
| **Bcc:** | |
| **Subject:** | Re: Update and questions |
| **Attachments:** | C06CA55F-D54A-4723-ACCE-996F9CB96F12-64-.png; Fund Forecast - 4-8-14.xlsx |

Here is the fund forecast. I have not include any particular investment for Jointly, Maana or Osprey.


Given the current expect closing, I would be hesitant in doing more than 6-8 companies at this time. I think 12 would be a big stretch for us.


Bill


Bill Guerry
Chief Financial Officer | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
O: 949.373.9643



---

**From:** Stuart Frost <stuart@frostvp.com>
**Date:** Tuesday, April 8, 2014 at 12:15 PM
**To:** Bill Guerry <bill@frostvp.com>
**Subject:** Re: Update and questions

I'll get back to you on all of the share related issues on Monday.

The pre should now be $3.5m.

Just for kicks - Can you do a refresh of the fund cashflow assuming 12 new companies between now and July?

Sent from my iPad



EXHIBIT
773
W. Guerry
7-18-17
G. Kennamer CSR CCRR

Exhibit 45
Page 656

F 0112759

On Apr 7, 2014, at 12:59 PM, "Bill Guerry" <bill@frostvp.com> wrote:

Stuart,

Couple of brief updates and questions I need your input on.

We started three companies this week.  One has already been registered and two are in process.

> Medical analytics    this is the one that we put Jayant into.  He is starting on the 14th when you come back.
> Security    verbal offer accepted.  Need to prepare written offer.
> Osprey 2    This the first of the Osprey verticals that Rich Sootkoos and Jerry Schuman will be leading.  Again we will be making an offer shortly.

I am awaiting documentation from Shack to formalize an exec committee meeting.

Need your input on the following for the new set of companies:

> Founders shares split between GPs, Interest Plan, etc. (miles or others?)  With regard to Miles, what should we be doing with his shares in Osprey since we have to give shares to his replacement John Burke?
> Pre-money valuation of Seed round.  (are we staying with the $3.5 million level)
> Standard structure with 5 million common and 1 million option pool


Incubator Resources:

A draft tentative offer has been presented to Suzie Clark    VP of Business Development
A draft offer was presented to Deehraj (trying to see if we can attract him at a VP level of comp)



Bill Guerry
Chief Financial Officer | Frost Venture Partners, LLC
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
O: 949.373.9643

<8E5A1A25-728A-450C-B963-8CA40A21522D[54].jpg>

Exhibit 45
Page 657

F 0112760

# EXHIBIT 46

| | |
|---|---|
| **From:** | Bill Guerry (-O-MEX05-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-BILL25F) |
| **Sent:** | Tuesday, May 20, 2014 11:14:15 PM |
| **To:** | Stuart Frost (stuart@frostvp.com) |
| **Cc:** | |
| **Bcc:** | |
| **Subject:** | latest forecasts |
| **Attachments:** | Frost Forecast 5-8-14.xlsx; Fund Forecast - 5-12-14.xlsx |

Here is the most recent forecasts for the funds and incubator.

Funds:
Assumes we put in $1 million for Jointly, Maana and Osprey, but second million not reflected.
 Assumes we add 2 more companies 18 and 19.

Incubator
Assumes we add 2 more companies 18 and 19.
Includes allocation for Colaco starting in June. ($200K annual or $116K remainder of year)
Does not include Oren analyst position
Does not include any CFO addition, would push this out until early next year.
Assumes one additional incubator headcount    Miles CTO in June
Assumes Luis will continue to be charged to the GP as fundraising cost
Does not include a reduction for SegOne fee.
Right now we need 2 more companies to cover out costs (with Genie coming out in June)



EXHIBIT
774
W. Guerry
7-18-17

G. Kennamer CSR CCRR

Exhibit 46
Page 658

F 0117522

# EXHIBIT 47

From: Bill Guerry (-O-MEX06-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-E8879F3BFE69472FAB72DFA7E072D231-BILL)
Sent: Friday, July 25, 2014 2:47:21 PM
To: Stuart Frost (stuart@frostdatacapital.com)
Cc:
Bcc:
Subject: Re: K. Guneri 5
Attachments: BB23AF16-742D-4775-A928-465C51328F46-9-.png; Frost Logo 80x183-1--9-.png; GP Management Fee 7-24-14.xlsx

See attached expenses. Here is an excerpt of your expenses.

| | Q2-13 | Q3-13 | Q4-13 | 2013 | Q1-14 | Q2-14 | Cumulative | Q3-14 |
|---|---|---|---|---|---|---|---|---|
| Stuart Frost (62.5%) | | | | | 601 | 229,088 | 229.402 | 71,875 |
| | | | | | | | | |
| Ferrari (Stuart Auto Lease) | - | - | - | - | - | 51,725 | 51,725 | 12,645 |
| Debentures (Stuart bungalow deposit) | - | - | - | - | - | 45,431 | 45,431 | |
| Ozturhan (Stuart yacht deposit) | - | - | - | - | - | 14,078 | 14,078 | |
| International School of Florence | - | - | - | - | - | 14,026 | 14,026 | |
| Exclusive S.a.S. (Guest house deposit) | | | | | | 1,496 | 1,496 | |
| Exclusive S.a.S. (Bungalow and guest house payment) | | | | | | 51,263 | 51,263 | 44,901 |
| Italian Moving Company | | | | | | 7,275 | 7,275 | |
| Air Partners | | | | | | 125,000 | 125,000 | |
| June 2014 - Barclays CC Expenses | | | | | | | | 3,204 |
| | | | | | | z | z | z |
| Total direct expenses | - | - | - | - | - | 310,295 | 310,295 | 60,750 |
| Net distributable income | | | | | 601 | (81,207) | (80,892) | 11,125 |

From: Stuart Frost <stuart@frostdatacapital.com>
Date: Friday, July 25, 2014 at 7:31 AM
To: William Guerry <bill@frostdatacapital.com>
Subject: Re: K. Guneri 5

What's included in the $371k?

*Stuart*

Stuart Frost
Managing Partner | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: +1 (949) 338-6312
Skype: stuartfrost62



---

From: Bill Guerry <bill@frostdatacapital.com>
Date: Friday, July 25, 2014 at 3:54 PM
To: Stuart Frost <stuart@frostdatacapital.com>
Subject: Re: K. Guneri 5

Total management fees earned thru Q3 was $737K. There were $255K of general GP expenses (mostly fundraising and legal), leaving $482K to be allocated to the Gps. Your share $62.5% is $301K

---

From: Stuart Frost <stuart@frostdatacapital.com>
Date: Friday, July 25, 2014 at 6:44 AM
To: William Guerry <bill@frostdatacapital.com>
Subject: Re: K. Guneri 5

Surely I haven't used the backlog too?

Sent from my mobile

On Jul 25, 2014, at 3:01 PM, "Bill Guerry" <bill@frostdatacapital.com> wrote:

I will have this paid today. Note that currently you have already used up your GP fee allocation for the year with the $125K deposit last month for the airplane. Attached you can see the cu

Did you see my email re: blackcard? I assume there was some one-time travel related costs and that level of expense won't be recurring as we won't have enough in the incubator to cover

Bill

From: Stuart Frost <stuart@frostdatacapital.com>
Date: Friday, July 25, 2014 at 3:57 AM
To: William Guerry <bill@frostdatacapital.com>
Subject: FW: K. Guneri 5

Bill,

We need to pay the balance for the boat. This should be split equally between John and me.

EXHIBIT
776
W. Guerry
7-18-17
G. Kennainer CSR CCRR

Exhibit 47
Page 659

F 0119956

*Stuart*

Stuarl Frost
Managing Partner | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: +1 (949) 338-6312
Skype: stuartfrost62

<B823AF16-742D-4775-A928-465C51328F46[7].png><Frost Logo 80x183[1][7].png>

---

From: Levent Thyen <leventthyen@outlook.com>
Date: Friday, February 14, 2014 at 11:24 AM
To: Stuart Frost <stuart@frostvp.com>
Subject: RE: K. Guneri 5

Dear Mr. Frost,

I've attached the contract for you. Bank details are as below. I will be standing by for any further information.

Best regards,
Levent

Name : OZTURHAN LTD. STI.
Bank : AkBank
Location : Marmaris
Euro Account Number : 84806
Swift Code : AKBKTRI5
IBAN : TR150004600615036000084806

---

From: stuart@frostvp.com
To: leventthyen@outlook.com
Subject: Re: K. Guneri 5
Date: Thu, 13 Feb 2014 15:03:34 +0000

Yes, that should work out fine for us.

*Stuart*

*Stuart Frost*

Managing Partner | Frost Venture Partners, LLC.
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: 949.338.6312
Skype: stuartfrost62

<2797FB74-8243-414D-AAAD-B6237326B2AF[150].jpg>

---

From: Levent Thyen <leventthyen@outlook.com>
Date: Thursday, February 13, 2014 at 12:53 AM
To: Stuart Frost <stuart@frostvp.com>
Subject: RE: K. Guneri 5

Hello Mr. Frost,

I would like to know if you have news yet on the dates for Kaptan Kadir.

Hoping to hear from you.
Best wishes
Levent

---

From: stuart@frostvp.com
To: leventthyen@outlook.com
Subject: Re: K. Guneri 5
Date: Fri, 7 Feb 2014 00:51:07 +0000

Levent,

I'm still working on final dates, but right now, it looks like Aug 2-9 on Kadir is the best option for us. Am I right in assuming there is an outside dining area?

*Stuart*

*Stuart Frost*

Exhibit 47
Page 660

F 0119957

Managing Partner | Frost Venture Partners, LLC
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: 949.338.6312
Skype: stuartfrost62

<2797FB74-8243-414D-AAAD-B6237326B2AF[81].jpg>

---

From: Levent Thyen <leventthyen@outlook.com>
Date: Thursday, February 6, 2014 at 12:53 AM
To: Stuart Frost <stuart@frostvp.com>
Subject: RE: K. Guneri 5

Hello Mr. Frost,

Guneri 5 is still available for 12 July.  We also have an option for the Nurten A that may be cancelled for this same period. You may browse through photos in the link:
All gulets have 6 cabins and can take one extra guest as a child without any problems.

Here is the latest situation on availabilities :
12-19 July : Guneri 5 / Nurten A (option)
19-26 July : Mare Nostrum
26 July - 09 August : Kaptan Kadir

Hope to hear from you soon.
Best wishes
Levent


Rates are as follows :
MARE NOSTRUM http://aegeancharters.com/guletdetaykullanici.aspx?id=21

Length: 43m
Beam: 8.40m
Cabin: 5 master cabins 1 twin cabin  with air condition, TV, mini bar and Jacuzzi
1 Windsurf, 2 canoes, Zodiac Inflatable dinghy, jet ski

One week rent all season : 50,000 Euro all inclusive (food, soft drinks and local alcohol drinks). Your discount is 45,000 euros.

Prices are on a weekly basis and exclude airport transfers, private and Bodrum marina fees, delivery fees other than Marmaris or Gocek and formalities and exit/entr

Embarkation : 15:00
Disembarkation : 10:00
..............................

KAPTAN KADIR http://aegeancharters.com/guletdetaykullanici.aspx?id=51

Length: 37m
Beam: 8.40m
Cabin: 5 master cabins 1 twin cabin with air condition, TV, mini bar and Jacuzzi
1 Windsurf, 2 canoes,  Zodiac Inflatable dinghy, jet ski

One week rent all season : 40,000 Euro all inclusive (food, soft drinks and local alcohol drinks).  Your discount is 35,000 euros.

Prices are on a weekly basis and exclude airport transfers, private and Bodrum marina fees, delivery fees other than Marmaris or Gocek and formalities and exit/entr

Embarkation : 15:00
Disembarkation : 10:00
...............................

NURTEN A http://aegeancharters.com/guletdetaykullanici.aspx?id=67
Length: 31m
Beam: 7.40m
Cabin: 2 master, 2 double, 2 twin ensuite /  Fully Air conditioned
1 Wind surf, 2 canoes, Zodiac Inflatable dinghy

One week rent all season : 25,000 Euro all inclusive (food, soft drinks and local alcohol drinks).  Your discount is 23,000 euros.

Prices are on a weekly basis and exclude airport transfers, private and Bodrum marina fees, delivery fees other than Marmaris or Gocek and formalities and exit/entr

Embarkation : 15:00
Disembarkation : 10:00
..............................

Exhibit 47
Page 661

F 0119958

Turhan Yachting
Adnan Menderes Blvd. 101
Armutalan
Marmaris, 48700, Turkey
Tel: +90 252 417 46 50
Fax: +90 252 417 30 01
Email : info@bluevoyagegulet.com
leventthyen@outlook.com
Web : www.marenostrum.com.tr
www.bluevoyagegulet.com

---

From: stuart@frostvp.com
To: leventthyen@outlook.com
Subject: Re: K. Guneri 5
Date: Thu, 6 Feb 2014 02:53:24 +0000

Is Guneri 5 still available July 12th? Our other options are July 19th or August 2nd, so Kadir might work also.

*Stuart*

*Stuart Frost*

Managing Partner | Frost Venture Partners, LLC
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: 949.338.6312
Skype: stuartfrost62

<2797FB74-8243-414D-AAAD-B6237326B2AF[64].jpg>

From: Levent Thyen <leventthyen@outlook.com>
Date: Wednesday, January 22, 2014 at 4:56 AM
To: Stuart Frost <stuart@frostvp.com>
Subject: K. Guneri 5

---

From: stuart@frostvp.com
To: leventthyen@outlook.com
Subject: Re: Gulet Charter Turkey 2014
Date: Tue, 21 Jan 2014 16:55:34 +0000

Levent,

I'm afraid it will need to be in July/August to fit in with school holidays. I'd appreciate any introductions you can make.

*Stuart*

*Stuart Frost*

Managing Partner | Frost Venture Partners, LLC
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: 949.338.6312
Skype: stuartfrost62

<2797FB74-8243-414D-AAAD-B6237326B2AF[77].jpg>

From: Levent Thyen <leventthyen@outlook.com>
Date: Tuesday, January 21, 2014 at 12:32 AM
To: Stuart Frost <stuart@frostvp.com>
Subject: RE: Gulet Charter Turkey 2014

Dear Mr. Frost,

Thank you very much for your interest.  With reference our fleet is fully booked for July and August.  Should you consider June Or September, it would then be a plea

If you still wish only for July or August, I can be happy to offer a few trusted alternatives that we work with for tandem charters and when our gulets are booked.  The

Hoping to keep in touch.

Exhibit 47
Page 662

F 0119959

Best wishes
Levent

From: stuart@frostvp.com
To: leventthyen@outlook.com
Subject: Re: Gulet Charter Turkey 2014
Date: Mon, 20 Jan 2014 18:18:48 +0000

Hi Levent,

We are thinking about a Gulet trip this summer. What are the weekly prices in July/August?

*Stuart*

*Stuart Frost*

Managing Partner | Frost Venture Partners, LLC.
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: 949.338.6312
Skype: stuartfrost62

<2797FB74-8243-414D-AAAD-B6237326B2AF[66].jpg>

From: Levent Thyen <leventthyen@outlook.com>
Date: Monday, January 20, 2014 at 4:20 AM
Subject: Gulet Charter Turkey 2014
Resent-From: Stuart Frost <stuartfrost@live.com>
Resent-To: Stuart Frost <stuart@frostvp.com>
Resent-Date: Monday, January 20, 2014 at 4:20 AM

Turhan Yachting

The most prominent and successful charter company in Turkey.  Gulets that are solely owned by us are listed as below.  Please do not hesitate to request any week fi

Looking forward to your interest.

Levent Thyen

  <Turhan Logo.jpg>
Adnan Menderes Blvd. 101
Armutalan
Marmaris, 48700, Turkey
Tel: +90 252 417 46 50
Fax: +90 252 417 30 01
Email : info@bluevovagegulet.com
leventthyen@outlook.com
Web : www.marenostrum.com.tr
www.bluevovagegulet.com

  <Marenostrumlogo.jpg>

Mare Nostrum
http://aegeancharters.com/guletdetavkullanici.aspx?id=21

Kaptan Kadir
http://aegeancharters.com/guletdetavkullanici.aspx?id=51

Nurten A
http://aegeancharters.com/guletdetavkullanici.aspx?id=67

Exhibit 47
Page 663

F 0119960

<2797FB74-8243-414D-AAAD-B6237326B2AF[150].jpg>

<2797FB74-8243-414D-AAAD-B6237326B2AF[81].jpg>

<2797FB74-8243-414D-AAAD-B6237326B2AF[64].jpg>

<2797FB74-8243-414D-AAAD-B6237326B2AF[77].jpg>

<2797FB74-8243-414D-AAAD-B6237326B2AF[66].jpg>

<Turhan Logo.jpg>

<Marenostrumlogo.jpg>

<BB23AF16-742D-4775-A928-465C51328F46[7].png>

<Frost Logo 80x183[1][7].png>

<GP Management Fee 7-24-14.xlsx>

Exhibit 47
Page 664

F 0119961

# EXHIBIT 48

| | |
|---|---|
| **From:** | Shital Patel (-O-MEX06-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-473A23AFB3044D4BB6EB888769887BB1-SHITAL) |
| **Sent:** | Tuesday, August 26, 2014 5:14:12 PM |
| **To:** | Bill Guerry (bill@frostdatacapital.com) |
| **Cc:** | |
| **Bcc:** | |
| **Subject:** | Re: Incubator Cash |
| **Attachments:** | FCF1B825-2B72-4FA0-8CF2-9025E11CA7C8-22-.png; 2E367FBE-662C-4178-A645-703E469BB15B-22-.png; FCF1B825-2B72-4FA0-8CF2-9025E11CA7C8-1-.png; 2E367FBE-662C-4178-A645-703E469BB15B-1-.png; FCF1B825-2B72-4FA0-8CF2-9025E11CA7C8-20-.png; 2E367FBE-662C-4178-A645-703E469BB15B-20-.png; FCF1B825-2B72-4FA0-8CF2-9025E11CA7C8-23-.png; 2E367FBE-662C-4178-A645-703E469BB15B-23-.png; GP Management Fee_2014_Q3_V4.xlsx |

The incubator doesn t have more cash because we picked up the $100K expense for air partners. This expense was not reflected in the forecast previously.

Cash balance in GP is $49K. Please refer to cell K111. I updated the spreadsheet to show the formula pulling over cumulatively for the $10K payment made to Jack which leaves $15K net available. The spreadsheet is considering the $11K payment for Luis s September payroll and Stuart s $15K September villa in payment. That still leaves me off $8K or so (more cash than spreadsheet). I ll need to keep digging to find the answer to that.

Shital Patel
Controller | Frost Data Capital, LLC
120 Vantis, Suite 570
Aliso Viejo, CA 92656
Office: +1.949.373.4915 | Mobile: +1.714.658.5395 | Fax: +1.949.373.3389



---

**From:** Bill Guerry <bill@frostdatacapital.com>
**Date:** Tuesday, August 26, 2014 at 9:49 AM
**To:** Shital Patel <shital@frostdatacapital.com>
**Subject:** Re: Incubator Cash

A few questions    I thought with the transfer of $60K from the GP to the incubator we would have had more cash in the incubator. Why isn t that the case?

Also, I thought we would have $50K ish in cash in the GP but it is half that. Any ideas?



EXHIBIT
777
W. Guerry
7-18-17
G. Kennamer CSR CCRR

Exhibit 48
Page 665

**F 0120613**

**From:** Shital Patel <shital@frostdatacapital.com>
**Date:** Tuesday, August 26, 2014 at 9:42 AM
**To:** William Guerry <bill@frostdatacapital.com>
**Subject:** Re: Incubator Cash

Hi Bill,

Please find both updated spreadsheets. Please note that I have shown that Incubator incurs the $100K expense for air partners.

Regards,
Shital

Shital Patel
Controller | Frost Data Capital, LLC
120 Vantis, Suite 570
Aliso Viejo, CA 92656
Office: +1.949.373.4915 | Mobile: +1.714.658.5395 | Fax: +1.949.373.3389



---

**From:** Bill Guerry <bill@frostdatacapital.com>
**Date:** Monday, August 25, 2014 at 9:10 AM
**To:** Shital Patel <shital@frostdatacapital.com>
**Subject:** Re: Incubator Cash

Is the $60K that was moved reflected on the spreadsheet?

---

**From:** Shital Patel <shital@frostdatacapital.com>
**Date:** Monday, August 25, 2014 at 8:57 AM
**To:** William Guerry <bill@frostdatacapital.com>
**Subject:** Re: Incubator Cash

GP had $124K in cash before the $60K we discussed was moved. They now have $64K.

The GP owed the Incubator $148K of expenses (there was a wire for the yacht that I had missed when we spoke). After the transfer of $60K, $88K is still due.

Shital Patel
Controller | Frost Data Capital, LLC
120 Vantis, Suite 570
Aliso Viejo, CA 92656
Office: +1.949.373.4915 | Mobile: +1.714.658.5395 | Fax: +1.949.373.3389



Exhibit 48
Page 666

F 0120614

**From:** Bill Guerry <bill@frostdatacapital.com>
**Date:** Sunday, August 24, 2014 at 4:16 PM
**To:** Shital Patel <shital@frostdatacapital.com>
**Subject:** Re: Incubator Cash

Didn t you say the GP owed the incubator $100K and that there was $120K in cash in the bank for the GP, or something like that? Did you move the cash as we discussed?

---

**From:** Shital Patel <shital@frostdatacapital.com>
**Date:** Thursday, August 21, 2014 at 4:08 PM
**To:** William Guerry <bill@frostdatacapital.com>
**Subject:** Incubator Cash

Hi Bill,

Please find the updated cash forecast. All changes I made are in red.

I think we should incorporate the outstanding A/P that we owe Jack. We still owe him $82K from previous fees.

Regards,

Shital Patel
Controller | Frost Data Capital, LLC
120 Vantis, Suite 570
Aliso Viejo, CA 92656
Office: +1.949.373.4915 | Mobile: +1.714.658.5395 | Fax: +1.949.373.3389



Exhibit 48
Page 667

F 0120615

# EXHIBIT 49

| From: | Bill Guerry (-O-MEX06-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-E8879F3BFE69472FAB72DFA7E072D231-BILL) |
|---|---|
| Sent: | Sunday, March 29, 2015 3:48:45 PM |
| To: | Stuart Frost (stuart@frostdatacapital.com) |
| Cc: | |
| Bcc: | |
| Subject: | Updated Forecasts |
| Attachments: | Incubator forecast 3-29-15.xlsx; Fund Forecast - 3-29-15.xlsx |

Attached are the updated forecasts.

We are still a bit stretched in the incubator.  We need one more company in order to cover the plan for the rest of the year (which has us bringing on another finance person and brining Jesse on full time).  The split between the incubator and Snow has the incubator making enough to cover the shortfall in Snow.

On the fund plan, I have made certain assumptions on likely financing received from outside sources.  If we get a reasonable contribution from third parties (or our other funds), we may be able to get through year-end with Fund II.  This assumes we close 3/31 at $2 million.

Bill



EXHIBIT
780
W. Guerry
7-18-17
G. Kennamer CSR CCRR

Exhibit 49
Page 668

F 0135488

# EXHIBIT 50

# Fwd: DST follow-up questions



EXHIBIT
794
W. Guerry
7-18-17
G. Kennamer CSR CCRR

## Tom Giles

Fri 5/12/2017 10:00 AM

To:Bill Guerry <bill@frostdatacapital.com>;

Importance: High

Additional email for depose

Tom Giles
General Partner Healthcare
Frost Data Capital
www.frostdatacapital.com
tom@frostdatacapital.com
858-449-8131

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Tom Giles <tom@frostdatacapital.com>
Date: 2/8/17 10:10 AM (GMT-08:00)
To: Bill Guerry <bill@frostdatacapital.com>, Stuart Frost <stuart@frostdatacapital.com>, Luis Vasquez <luis@frostdatacapital.com>
Subject: RE: DST follow-up questions

Follow up on DST conversation with Marc from yesterday. After you ask me to reach out to them Feedback that I received

Okay, I think they have a completely different view of the call then what you shared with me Stuart.

(just relaying the message)

Very Pissed about investment and starting 2 Newco's without their knowledge feels very sneaky to them. Kyle and Jonathan ready to dissolve over this. Didn't feel your answers yesterday defended your position very well in the spirt of the partnership.
Lots of money spent and they do not have a clear picture on what. Feel you didn't give very good answers yesterday on funding and allocation. They ask me a lot about how many people are remaining in incubator
Only one person on IC, not happy about that, no governance of process and they feel they were told they would get that by you Stuart.
Wanted to know why I was not aware of funding of 2 Newcos, (not on IC was my answer)
No additional funds raised since John was let go.

Exhibit 50
Page 669

F 0206865

No replacement for Matt as CTO worried no leading technology discussion
not sure why you think they are slowing the process down when you are the one that pitched maana to the DST team.
Marc is really the only one in our corner at this very moment (thinks I can help repair)
Very Happy with my progress with PHS, Baylor pinscriptive and managing through their issues with schedules and meetings.
Mentioned GE several times having issues with FDC on some of same topics (no idea if they talked to them or not, but they have been at the JP conference together)
Teri and Stan and most of the team have no idea any of this happening.

They are meeting with Steve Hooley today and will follow up with you Stuart directly.

Again just sharing the info that was shared with me.

Tom Giles
General Partner Healthcare
Frost Data Capital
www.frostdatacapital.com
tom@frostdatacapital.com
858-449-8131

**Frost Data Capital Healthcare:**
http://pinscriptive.com/
http://mindsharemed.com/
http://www.tellithealth.com/
http://sentrian.com/

---

**From:** Bill Guerry
**Sent:** Monday, February 6, 2017 3:22 PM
**To:** Stuart Frost <stuart@frostdatacapital.com>; Tom Giles <tom@frostdatacapital.com>; Luis Vasquez <luis@frostdatacapital.com>
**Subject:** FW: DST follow-up questions

See further question and response from Erik at DST.

Bill

---

**From:** "Sisel, Erik M" <EMSisel@dstsystems.com>
**Date:** Monday, February 6, 2017 at 2:07 PM
**To:** Bill Guerry <bill@frostdatacapital.com>
**Subject:** RE: DST follow-up questions

Great. Thanks again-

---

**From:** Bill Guerry [mailto:bill@frostdatacapital.com]

Exhibit 50
Page 670

F 0206866

Fwd: DST follow-up questions - Bill Guerry                                                          6/19/17, 11:44 AM

**Sent:** Monday, February 06, 2017 4:07 PM
**To:** Sisel, Erik M
**Subject:** Re: DST follow-up questions

We funded $250K to each of these new companies.

Bill

---

**From:** "Sisel, Erik M" <EMSisel@dstsystems.com>
**Date:** Monday, February 6, 2017 at 1:54 PM
**To:** Bill Guerry <bill@frostdatacapital.com>
**Subject:** RE: DST follow-up questions

Thanks Bill.

To make sure my short summary is accurate, was there fund III capital used to seed either of the 2 new companies during Q4-16? I'm just trying to put together a rough snap shot of what the available capital of fund III capital looks like as of the end of the calendar year.

Thanks again for the help-

Erik

---

**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Monday, February 06, 2017 11:18 AM
**To:** Sisel, Erik M
**Cc:** Fleming, Douglas W; Mallot, Kyle M; Tom Giles; Bill Guerry
**Subject:** Re: DST follow-up questions

Erik,  See answers below.  If you have any further questions, please let me know.

Regards,

Bill

---

**From:** "Sisel, Erik M" <EMSisel@dstsystems.com>
**Date:** Thursday, February 2, 2017 at 6:27 AM
**To:** Bill Guerry <bill@frostdatacapital.com>
**Cc:** Douglas W Fleming <DWFleming@dstsystems.com>, Tom Giles <tom@frostdatacapital.com>, "Mallot, Kyle M" <KMMallot@dstsystems.com>
**Subject:** RE: DST follow-up questions

Bill,

Exhibit 50
Page 671                                                          **F 0206867**

We are preparing a summary of our Frost investment for management and wanted to see if there were any financial updates to provide subsequent to the last quarterly report we received for Fund III as of September 30, 2016. Can you please assist with the questions below?  Thanks in advance-

Have there been any new investments made by Fund III subsequent to September 30, 2016 to date?

In December, we created two new companies, Frost Newco26 and Frost Newco27 for two healthcare companies to pursue the opportunities we have incubated with DST.  We are currently recruiting the management teams for these companies and working to further validate the technologies and their business hypotheses.

We also made several smaller investments in existing portfolio companies.

Current DST ownership %: Is 37% still accurate, or has there been any new capital invested into Fund III subsequent to September 30, 2106 to date?

The ownership is still 37%.  We are looking to get our Fund III limited partners approval to allow for further fundraising into the Fund by extending the fundraising date through November 30, 2017.  We are happy to provide an update on our fundraising efforts.

Have there been any additional write-offs of Fund III investments subsequent to September 30, 2016 to date?

We have not incurred any further write-offs of Fund III investments at this time.

**Erik Sisel**

Corporate Finance Manager | DST Systems, Inc.

333 W. 11th Street, Kansas City, MO 64105

P 816.435.8671 | M 816.719-8006 | E emsisel@dstsystems.com

---

**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Friday, November 18, 2016 12:48 PM
**To:** Sisel, Erik M
**Cc:** Fleming, Douglas W; Tom Giles
**Subject:** Re: DST follow-up questions

Exhibit 50
Page 672

F 0206868

Erik,  We are in the process of compiling it.  It is possible we have it by Wed, but it may be early the following week.
Bill

---

**From:** "Sisel, Erik M" <EMSisel@dstsystems.com>
**Date:** Friday, November 18, 2016 at 10:34 AM
**To:** Bill Guerry <bill@frostdatacapital.com>
**Cc:** Douglas W Fleming <DWFleming@dstsystems.com>, Tom Giles <tom@frostdatacapital.com>
**Subject:** RE: DST follow-up questions

Hi Bill.  I'm just checking in to see if you have an estimate of when the Q3 Fund III quarterly report might be
available.  Can we expect to receive prior to the Thanksgiving holiday?

Thanks-

Erik

## Erik Sisel

Corporate Finance Manager | DST Systems, Inc.
333 W. 11th Street, Kansas City, MO 64105
P 816.435.8671 | M 816.719-8006 | E emsisel@dstsystems.com

---

**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Tuesday, October 25, 2016 7:32 PM
**To:** Sisel, Erik M
**Cc:** Fleming, Douglas W; Tom Giles; Bill Guerry
**Subject:** FW: DST follow-up questions

Erik,

See reconciliation below.  Most of the difference is related to an investment written off during the quarter.  There was
an early investment for a portfolio company (Cirro) that was going through a sale process.  We had expected a positive
outcome from that process, however, the ultimate sale price was not sufficient to provide any return to the fund (less
than the liabilities of the company) and as a result the investment was written off.

Please let me know if you have any further questions.

Best,


Bill

Exhibit 50
Page 673

F 0206869

**From:** Luis Vasquez <luis@frostdatacapital.com>
**Date:** Tuesday, October 25, 2016 at 10:26 AM
**To:** Bill Guerry <bill@frostdatacapital.com>
**Cc:** Tom Giles <tom@frostdatacapital.com>
**Subject:** Re: DST follow-up questions

1) Fund III initial capital contribution date 9/18/2016. However, the Initial Closing (the date that the aggregate Capital Commitments exceed $5,000,000 was November 30, 2016).
2)

|  | Amounts as of June 30, 2016 in 000's |
|---|---|
| Total Capital invested in Fund III | $8,440 |
| Total investments made by Fund III (at cost) | 7,198 |
| Sub-total | 1,242 |
| Expenses (net of Accounts Payable and Interest Earned) | 165 |
| Realized losses on investments (not included in cost) | 923 |
| Available cash | 154 |

On Oct 25, 2016, at 6:50 AM, Sisel, Erik M <EMSisel@dstsystems.com> wrote:

> Bill,
>
> We have 2 additional items we need to confirm for purposes of the Frost update meeting with Steve & Gregg. Thanks again for the information provided and certainly appreciate your responses to the items below. I've also attached a draft of the slide deck that we are planning on sharing with Steve and Gregg for reference.
>
> · What was Fund III's inception date (date of initial capital investment into the fund)?
> · We put together a brief reconciliation of fund activity below. Is the difference between the and available fund cash as of Q2-16 simply related to normal/recurring administrative expenses as well as Frost management fees, or were there any large one-time expenses recorded?

| Amounts as of June 30, 2016 | in 000's |
|---|---|
| Total capital invested in Fund III | $   8,440 |
| Total investments made by Fund III | (7,198) |
| Sub-total | 1,242 |
| Available Fund III cash | 154 |
| Difference | (1,088) |

Exhibit 50
Page 674

**F 0206870**

Thank you-

Erik

# Erik Sisel

Corporate Finance Manager | DST Systems, Inc.
333 W. 11th Street, Kansas City, MO 64105
P 816.435.8671 | M 816.719-8006 | E emsisel@dstsystems.com

---

**From:** Bill Guerry [mailto:bill@frostdatacapital.com]
**Sent:** Wednesday, October 19, 2016 4:45 PM
**To:** Sisel, Erik M; Tom Giles
**Cc:** Fleming, Douglas W
**Subject:** Re: DST follow-up questions

Erik,

See responses below. Please let me know if you have any further questions.

Bill

---

**From:** "Sisel, Erik M" <EMSisel@dstsystems.com>
**Date:** Wednesday, October 19, 2016 at 2:01 PM
**To:** Bill Guerry <bill@frostdatacapital.com>, Tom Giles <tom@frostdatacapital.com>
**Cc:** Douglas W Fleming <DWFleming@dstsystems.com>
**Subject:** DST follow-up questions

Hi Bill-

In preparation for an upcoming Frost Fund III update meeting we have with Steve Hooley, we are hoping to confirm/answer a couple of items (listed below). Please let me know if you have any questions or feel free to send back your response when you have a chance. Thanks-

- Have there been any other new investors into Fund III? - not at this point.
- Is DST's total ownership % as of 9/30/16 37%? Yes.

Exhibit 50
Page 675

**F 0206871**

- Have there been any new investments made by the Fund (other than investments that were listed in the Q2-16 quarterly report)? Yes. The Fund has made approximately $1.4 million in investments since Q2. The largest of which are: $522,000 in Pinscriptive, Inc., $249,000 in Sentrian, Inc. and $250,000 in Frost Newco25, Inc. (a newly created company focusing on the internet of things). We are currently finalizing our schedule of investments for the third quarter and can provide that when it is complete.
- Any update on status of potential additional investors? We have had ongoing discussions with several high net worth investors who have indicated interest in investing in the fund. We are hopeful of adding them as investors over the next couple of months.

Thanks again-

Erik

Exhibit 50
Page 676

**F 0206872**

# EXHIBIT 51

**Tom Giles**

| | |
|---|---|
| **From:** | Mark Lelinski <mark.lelinski@pinscriptive.com> |
| **Sent:** | Tuesday, September 20, 2016 2:24 PM |
| **To:** | Tom Giles |
| **Subject:** | IRR |
| **Attachments:** | VC IRR table.png |

Tom,

As I was mentioning, see the attached table. We have invested $1.8M of Larry and other LP money into Pinscriptive since inception 18 months ago. If we back out the excess $30K per month paid in inflated incubator fees (assumes $10K is reasonable fee), Then we are under $1.3M burn. If we sell for $15M that's over the 216% IRR on this chart (2 yr invested at 10X return). We would be delivering in 18 months more than 10X return, so this is a very good deal for Larry and the other investors, and they should be pressuring Stuart to not mess this up by getting greedy. Even if DST backs off to a $10M offer, this is still more than a 200% IRR for the investors. They cannot let Stuart mess this up. A normal VC expectation is 5yrs and a 10X return, which gives them a great 58% IRR. We blow that away in any scenario.

Mark

EXHIBIT
795
W. Guerry
7-18-17
G. Kennamer CSR CCRR

17

Exhibit 51
Page 677

**F 0206889**

# EXHIBIT 52

## Tom Giles

| | |
|---|---|
| **From:** | Stuart Frost |
| **Sent:** | Friday, June 10, 2016 10:57 AM |
| **To:** | John Vigouroux; Bill Guerry; Tom Giles; Miles Mahoney; Anthony Howcroft; Doug Lawson; Matt Oberdorfer; Luis Vasquez |
| **Subject:** | Plan |

Hi everyone,

I thought it might be useful to set out my plan for the next few weeks, so we're all on the same page.

**High level overview**

The basic plan is to 'hunker down' and focus on getting a few companies sold. Once we achieve that, it will be much easier to raise funds from individuals and institutional investors. So, we're not abandoning our incubator model, just pivoting from relying on large corporate LP investments. In the meantime, we'll start a few companies using DST and/or angel/direct investments. Any sales will also replenish the funds, which we can then recycle into existing & new companies.

**Incubator**

1. It's critically important to get the incubator to break even ASAP. To achieve this we need to:
    1. Retain as much income as possible from the existing companies. We all need to do whatever we can to sell the value of the incubator's services to the companies that have funding. It's very upsetting when I hear that some of our CEOs are out there telling people that the incubator provides no value – especially when you consider that the companies involved have secured most of their funding and most/all of their customers through our efforts.
    2. Reduce our costs as much as possible without hurting our ability to incubate new ideas and support the (reduced set of) existing companies.
    3. Start a few new companies ASAP.
        1. With DST fund investment
        2. With direct investment from Rockwell/GE/etc.
        3. With local angels and other VCs
    4. Move costs to the newcos by assigning some of our incubator execs as CEO/CTO.

**Fund**

1. Securing DST is obviously critical.
2. We need to continue to try and secure new individual investors for Fund 3, while being very upfront about the likelihood of corporates coming into the fund in the near term.
3. We also need to continue to press on other potential LPs such as Qualcomm, Yokogawa, Mubadala, Wang, etc.

**Companies**

53



EXHIBIT
796
W. Guerry
7-18-17
G. Kennamer CSR CCRR

Exhibit 52
Page 678

F 0206925

1. We need to sell or close the 'deadwood'. I'd include Tellit, Cirro, SourceThought and potentially Exara and Ubix in this category (assuming the latter 2 can't secure funding in the next couple of weeks).
2. We need to raise funding for all of the middle tier and early stage companies ASAP, this includes ThinkIQ, Exara, Ubix, Pinscriptive and NarrativeWave.

54

Exhibit 52
Page 679

F 0206926

# EXHIBIT 53

**From:** Stuart Frost <stuart@frostdatacapital.com>
**Date:** Thursday, March 10, 2016 at 4:05 PM
**To:** John Burke <john@ospreydata.com>, Steven Lund <steven@sourcethought.com>, Brian Murphy <brian@exara.net>, Mark Lelinski <mark.lelinski@pinscriptive.com>, Pete Karanikas <pete@frostdatacapital.com>, Mark Theissen <mtheissen@cirro.com>, Michael Calhoun <michael@mindsharemed.com>, Mark McNally <mark@ubixlabs.com>, Paul Myer <paulm@frostdatacapital.com>
**Cc:** John Vigouroux <john@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>, Anthony Howcroft <anthony@frostdatacapital.com>, Doug Lawson <doug@thinkiq.com>, Miles Mahoney <miles@frostdatacapital.com>, Tom Giles <tom@frostdatacapital.com>, Tom Bennett <tomb@frostdatacapital.com>, Luis Vasquez <luis@frostdatacapital.com>, Bill Davidson <billd@frostdatacapital.com>
**Subject:** Re: Payroll update

Here's the latest:

1. It looks like the next wire into the fund will hit next Wednesday. As a result, payroll will be in everyone's accounts two days late (I.e. Thurs instead of Tues). The good news is that it should be enough to cover everyone.
2. In parallel, we're making good progress on a larger facility that will cover costs for several weeks, if not months. I'll have more news on this front in a few days.
3. DST is delayed until their next board meeting in May. I know this process is incredibly frustrating, but we are now communicating directly with the CEO and he appears to be fully committed to the deal.
4. Rockwell's board meeting is early April. We're making excellent progress on due diligence in the meantime and we don't expect it to take very long after the meeting to get the initial investment.
5. John and I are meeting GE on Monday to discuss a $100m fund investment. Bill Ruh seems very positive on this and we have the support of his CTO.
6. There's a lot of activity on the acquisition side with a few of the companies right now. As ever, it takes longer than we would all like, but we're expecting the first written offer early next week. The returns to the Frost Funds from this transaction can be recycled into further investments in the portfolio.

Thanks for bearing with us through this difficult period. There's a massive opportunity (and a bloody big party!) for all of us once we get out the other side.

*Stuart*

Stuart Frost
Chairman & CEO | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
Mobile: +1 (949) 338-6312
Skype: +1 (949) 391-1077
Skype: stuartfrost62



FR⊕ST
DATA CAPITAL

EXHIBIT
**798**
W. Guerry
7-18-17
G. Kennamer CSR CCRR

**From:** Stuart Frost <stuart@frostdatacapital.com>
**Date:** Wednesday, March 2, 2016 at 9:07 AM
**To:** John Burke <john@ospreydata.com>, Steven Lund <steven@sourcethought.com>, Brian Murphy <brian@exara.net>, Mark Lelinski <mark.lelinski@pinscriptive.com>, Pete Karanikas <pete@frostdatacapital.com>, Mark

72

Exhibit 53
Page 680

**F 0206944**

# EXHIBIT 54



**From:** Stuart Frost <stuart@frostdatacapital.com>
**Date:** Tuesday, March 1, 2016 at 11:52 AM
**To:** John Burke <john@ospreydata.com>, Steven Lund <steven@sourcethought.com>, Brian Murphy <brian@exara.net>, Mark Lelinski <mark.lelinski@pinscriptive.com>, Pete Karanikas <pete@frostdatacapital.com>, Mark Theissen <mtheissen@cirro.com>, Michael Calhoun <michael@mindsharemed.com>, Mark McNally <mark@ubixlabs.com>, Paul Myer <paulm@frostdatacapital.com>
**Cc:** John Vigouroux <john@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>, Anthony Howcroft <anthony@frostdatacapital.com>, Doug Lawson <doug@thinkiq.com>, Miles Mahoney <miles@frostdatacapital.com>, Tom Giles <tom@frostdatacapital.com>, Tom Bennett <tomb@frostdatacapital.com>, Luis Vasquez <luis@frostdatacapital.com>
**Subject:** Re: Payroll update

I've asked Erin to put together a meeting/call for all of us, just to make sure we're all on the same page and have the latest info – not just on payroll, but on everything else that is going on right now. There's a lot of positive progress on multiple fronts.

In the meantime, I'm still waiting for the second transfer. To provide a bit of background, this is money that my kids made on DATAllegro. It's managed by my father-in-law and he's decided to invest it in Fund 3. It's currently held by an investment group in Claremont and there's been a delay releasing the funds due to some kind of compliance issue. I've been assured that this is just a temporary paperwork problem and that the funds will be released very soon – hopefully today. I only learned about this problem yesterday and I've been doing all I can to fix it.

I know this is all very frustrating, but it will get resolved.

We're also making good progress on securing funds to cover the next payroll and beyond.

Also in the meantime, you should all continue to work with your boards to do whatever you can to raise money for your companies. While doing so, please respect the confidentiality of all of the above information. I just want to be clear that John, Bill, Luis and I are the only people authorized to communicate with anyone outside this organization wrt the situation at the incubator and the funds.


*Stuart*

Stuart Frost
Chairman & CEO | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
Mobile: +1 (949) 338-6312
Skype: +1 (949) 391-1077
Skype: stuartfrost62



EXHIBIT
**799**
W. Guerry
7-18-17

G. Kennamer CSR CCRR

74

Exhibit 54
Page 681

F 0206946

# EXHIBIT 55

From:             John Vigouroux (john@frostdatacapital.com)
Sent:             Friday, June 24, 2016 4:19:12 PM
To:               Stuart Frost (stuart@frostdatacapital.com)
Cc:               David Hubb (dave@siliconlaw.com)
Bcc:
Subject:          Mike Colaco proposals
Attachments:      INVESTMENT PROPOSAL (Frost)-1-.docx; Mike Colaco investment
                  proposal.docx

Adding David Hubb for attorney client confidential including attachments.

Stuart, I wrote my attached doc at 3am last night as an email and converted over to a doc so we can edit it. Wanted couple of hours to sleep on it. I don't have anything better to propose. Hope you do. Larry has 2 emails into me from London wanting to talk today. My guess is he might come into this deal or maybe he has better idea or just wants to yell at me. I'm running to several meetings this morning, free up this afternoon after 2pmPT and of course over the weekend. Again, hope you have better idea.

John

EXHIBIT
829
J. Vigouroux
7-27-17
G. Kennamer CSR CCRR

Exhibit 55
Page 682

F 0158478 (Confidential)
F 0158478

# INVESTMENT PROPOSAL

We propose to commit, along with our associates, investment funds in an amount of approximately $2,000,000, on the following terms:

- we would look to make Investments in four specific companies (this list may be added to or subtracted from during discussions) - Pinscriptive, ThinkIQ, NarrativeWave and Ubix;
- the cap table will be re-set so that (i) the equity positions of "Fund 2" and "Fund 3" will be preserved, and (ii) all other equity positions will be wiped out, or reduced significantly;
- valuation terms will be to our satisfaction;
- Stuart will have no equity in these companies going forward
- Stuart will be granted warrants (in an amount to be negotiated) which shall be exercisable upon exit;
- all necessary approvals will have to be obtained by Frost team prior to investment
- we will negotiate to bring in additional institutional investors, on a case by case basis, once the cap table is re-set.

Exhibit 55
Page 683

F 0158479 (Confidential)
F 0158479

Stuart,

I know Vacation always seem to happen at the worst time. Let me briefly recap in no order what's happened since you left.

1 Rockwell news was devastating
2 We let go Jim and Erin. I believe I have found them both jobs, or at least solid interviews. But shock to our little group.
3 Shital quit, off to Maana
4 I have helped negotiate both Babur and Susie around title and comp issues. Bill thinks they will hire her.
5 Choo Quit
6 Most of the in-trouble companies look exhausted
7 Tom's anxiety over incubator crumbling and DST...Even with DST appearing to be moving forward on an investment – what will they do when we lose more people and have to close down a lot of companies?
8 We have spoken to numerous investors to raise more capital for the Fund. Except for the landlord there are no near-term prospects for the Fund. Our reputation in the market with most prospect investors is ugly.
9 Matt just left for Germany for 3 weeks. His second intern just started this week. The first one he hired month ago is son of wealthy OC guy and friends with Rob Wolford.
10    Anthony heading out for UK holiday in the next couple of weeks
11    I'm in France on vaca first 12 days of August.
12    Bill was all set to start with Maana end of month, now as you know, board wants to have a full CFO exec search. 90 days. Babur willing to bring Bill on as a full-time consultant in the meantime. Bill feels odds are down to 50% and is very worried. I agree.
13    Miles in Italy two weeks, he like you and I need to start

Exhibit 55
Page 684

F 0158480 (Confidential)

making some cash. Back today.

14   Every Fucking portfolio CEO is panicked about Frost dissolving.... and we are their problem... Calling, texting, emailing, meeting with many of our own investors and telling outside investors ship is sinking — for the most part acting like a distressed asset, and of course mumbling they are not going to pay, repay or greatly reduce fees going forward etc... including Babur.  There are only a few prosects for funding.  Ubix has some interest but probably not enough to close a round and NarrativeWave has some money verbally committed but needs to get more in order to close a round.  Both are not likely to close by month-end, which will impact all of the companies ability to remain in tact.

15   Many calls from LP's asking what's going on.  Heard you are gone for a month. It's a perception thing and brings back up the year in Italy...

16   Everyone is out looking for a job.

17   I am worried from what I'm hearing that at least a few of these guys wanting to go legal.  Even if it doesn't go anywhere till we have exits...  Not getting that from Larry, but not so sure about Lou.  Larry's big thing is not so much the money, but he feels he brought a number of his friends into this.

I know you have thought about this scenario where Rockwell does not come in.  So have I.  My first conversations with Larry, Lou and others who are being hounded by our guys was around me telling them we need to support the good companies from defaulting to bad deals.  They all declined to put any more money in especially now that Rockwell is out and DST would only be in for $5M in Healthcare.

As I mentioned to you, Mike Colaco has been part of a group our

Exhibit 55
Page 685

F 0158481 (Confidential)
F 0158480

LP's who have been talking. I asked him a week ago to come in to meet with the 5 companies, that at the time, I felt were good companies with good to great traction, but little to no funding prospect for a variety of reasons - and could potentially be big dilution for our funds: ThinkIQ, Pinscriptive, Ubix, NarrativeWave and Exara. He got excited about a few of them and started talking with new and existing LP's.

He sent over the Investment Proposal *attached* yesterday. Ugh... Not to mention he really mostly liked Pinscriptive and ThinkIQ but might be able to do Ubix Note too and the $2M was really soft.

So this is where it gets harry Stuart. I know we need much more money than $2M to protect our interests in most of the companies going forward. $1-2m would only kick the can down the road for our good ones and we'd be in the same place couple months from now. Not to mention we'd lose all control etc... I also know or at least assume unless you tell me otherwise, you are worried about your $2m personal loan, especially if a number of companies go under. All of us are worried about lawsuits showing up

I asked Mike to come in today to discuss his proposal. Bill got Mike to sign an NDA. Bill and I sat down with Mike to see if he and his gang were serious about doing something. I said, his current deal was a non starter and really just kicks the can down the round and wipes us all out. I also told him I'm not interested in any deal that wipes out our investors. Plenty of other groups are trying to do that without my help. Mike feels he's the voice of reason with the investors and was open to a more comprehensive non aggressive idea. I feel we need for at least the top 9 companies, $6-10M to give them 6-12 months of runway to a

Exhibit 55
Page 686

F 0158482 (Confidential)

series A with real investors at much, much better terms than they are scrounging around for now.  Mike was open to making something happen, but doesn't want to move forward without your openness to do something that works for them so he made the proposal attached to see what would be agreeable to you.  So we discussed at a high level what he needed.

He says his investors want :
1 You out of Fund 2 and 3 from a control standpoint and re-brand.
2 No dilution to fund 2 and 3 investors.  Use xx% of your founders stock as incentive and way to protect Fund investors.
3 Obviously he will represent the limited in the operations going forward.  I proposed that Bill and I remain involved, as we are more familiar with the companies and could protect our interests.  He says I'm lumped with you, but he will try to convince others.  I know that's appears self serving, and far from certain, but we'd be better than anyone they'd bring in *and we need jobs*. New:  I spoke with Mike this evening.  He said his investor group was interested and he also spoke with Larry.  I will follow up with Larry tomorrow.
Here were my suggestions, everyone acknowledged I don't speak for you:

1 Would need to assume the $2M personal guarantee
2 Stuart keeps 100% of his Maana and Sentrian stock and board seats
3 Would want a full release from all major investors  (maybe something small to any other investors who signs a release).
4 Stuart keeps all new unfunded to date companies (Thingzbook)
5 Some amount of money would need to start as early as next payroll.  We can work that out.  Remainder of initial $6-10 upon closing of the deal within 60 days into fund 3.

Exhibit 55
Page 687

F 0158483 (Confidential)

This is completely moot if you are not interested in negotiating this concept. I know it sucks. It's just an option Stuart.   It's not been a fun 2 weeks.
John

Exhibit 55
Page 688

F 0158484 (Confidential)
F 0158480

# EXHIBIT 56

**From:**          John Vigouroux (johnvigouroux@gmail.com)
**Sent:**          Tuesday, June 28, 2016 3:42:47 PM
**To:**            Stuart Frost (stuart@frostdatacapital.com)
**Cc:**
**Bcc:**
**Subject:**          Re: write up

Ok I am fine with that Stuart.

Should I shut Mikes conversations down?

Best time to reach me is over next 3 hours.


On Jun 28, 2016, at 2:31 AM, Stuart Frost <stuart@frostdatacapital.com> wrote:

Let's try and stick together on this John.

I'll have a couple of $m myself in 2-3 weeks. With DST, we can survive this.

There's just no way I can justify giving up the bulk of my positions and all the future upside on anything close to this deal.

Let's talk in the morning.

Sent from my mobile

On Jun 28, 2016, at 11:09 AM, John vigouroux <johnvigouroux@gmail.com> wrote:

That's not how it went down. I wasn't engineering anything. Just what it would take for much bigger dollars from Mike and Shiv so we don't crash. Their first demand was leadership change. Just wanted to press them on a draft term sheet with all terms quickly. Rockwell had bailed and DST had still not sent us docs. So I was very worried. But we agreed it went no where if you weren't interested. If I had wanted to take you out, I would have taken a deal straight to Larry and big investors myself. And I can tell you all of them are calling me. I haven't mentioned this deal to any of them. HOLLENCREST asked for discreet meeting tomorrow morning. I won't forward the text I got from them. I pushed Greg and your buddy off to Friday 8:30am. It's mostly generated by all the CEO's panicked looking anywhere for money and all the departures...

In hindsight, you and I probably should have put a contingent deal together in case Rockwell bailed before you left. I would have a better shot of getting a better deal done than Mike and faster.

I agree DST would be better off with you. Especially first year. However, Tom is bringing in heavyweights that DST knows. I pissed off Marc for going over his head,

EXHIBIT
830
J. Vigouroux
7-27-17
G. Kennamer CSR CCRR

Exhibit 56
Page 689

F 0158496 (Confidential)
F 0158496

but I'm pretty sure it would be fine as long as Tom was supportive. Bigger risk to either way is if they get wiff incubator is crumbling. Place is empty compared to when they visited us last summer.

Anyway, see you just called. Thanks. Ringer is off. Everyone sleeping. I'm exhausted. We can talk tomorrow. Ideally write back what works for you or not or if you have a better idea. It was clear to me by end of today, if you and Mike do get to an agreement, I will have to be the one who go sells it to investors.

On Jun 28, 2016, at 12:32 AM, Stuart Frost <stuart@frostdatacapital.com> wrote:

John

What do you expect when you tell other people you are trying to engineer a change of leadership before you tell me? That was a massive breach of trust. I love you like a brother, but I think it's unreasonable of you to expect me to take this lying down.

DST is the main challenge for me. Given how they responded the last time you reached out, I don't see them going with you on this. It would be a massive shame if we lost that at this stage.

Sent from my mobile

On Jun 28, 2016, at 9:19 AM, John Vigouroux <johnvigouroux@gmail.com> wrote:

Stuart,

See attached Bills write up of today's long meeting with Mike.

I heard some of what you are saying about me. I wrote you a very long pissed letter, but decided it wasn't worth sending. I don't even want to talk about it anymore.

As brilliant you can be on many topics, you are equally fucking clueless when it comes to people and relationships.

Mike said he's gone next week through Wednesday. I don't think Larry knows any deal specifics yet.

Sent from my iPhone
Please excuse typos

Begin forwarded message:

**From:** Bill Guerry <bgsync@yahoo.com>
**Date:** June 27, 2016 at 5:14:50 PM PDT
**To:** "Johnvigouroux@gmail.com" <Johnvigouroux@gmail.com>,

Exhibit 56
Page 690

F 0158497 (Confidential)
F 0158496

"MColaco@gemsts.com" <MColaco@gemsts.com>
**Subject: write up**
**Reply-To:** Bill Guerry <bgsync@yahoo.com>

Per the meeting

<Investor proposal.docx>

Exhibit 56
Page 691

F 0158498 (Confidential)
F 0158496

# EXHIBIT 57

Robert B. Wolford

## FROST VP SEED, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this *"Agreement"*) is made effective as of the ___ day of _____, 20__ (the *"Effective Date"*) by and among FROST MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the *"Manager"*), and each person admitted from time to time as a Member of the Company (each a *"Member"* and collectively, the *"Members"*), with respect to the operation of FROST VP SEED, LLC, a Delaware limited liability company (the *"Company"*), and reads as follows:

### ARTICLE I

### NAME, PURPOSE AND OFFICES OF COMPANY

**1.1    Name.** The name of the Company is Frost VP Seed, LLC. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may determine.

**1.2    Purpose.** The purpose of the Company is to buy, sell, hold, and otherwise invest in Securities (directly or indirectly) of every kind and nature and rights and options with respect thereto and received in exchange or with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings necessary, advisable or desirable with respect to Securities held or owned by the Company; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing. The Company shall have the power to make and perform all contracts and to engage in all actions and transactions determined by the Manager to be necessary or advisable to carry out the purposes of the Company, and all other powers available to it as a limited liability company under the laws of Delaware.

**1.3    Principal Office.** The principal office of the Company shall be located at 31920 Del Obispo, Suite 260, San Juan Capistrano, CA 92675, or such other place or places as the Manager may from time to time designate by written notice to the Members.

**1.4    Registered Agent and Office.** The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

### ARTICLE II

### TERM OF COMPANY

**2.1    Term.** The term of the Company shall commence upon the date of the filing of the certificate of formation (the *"Certificate of Formation"*) of the Company with the Office of

1

725167 v5/SD

EXHIBIT
840
PMK-Marcum
8-3-17
G. Kennamer CSR CCRR

Exhibit 57
Page 692

the Secretary of State of the State of Delaware. The term of the Company shall terminate as provided in paragraph 10.1.

**2.2     Events Affecting the Members or the Manager.**   Except as provided in paragraph 10.1(a)(iii) or as required by the Act, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, retirement, resignation, expulsion or dissolution of the Members or the Manager (or any member or partner thereof) shall not dissolve the Company.

## ARTICLE III

### NAMES, ADMISSION, WITHDRAWAL AND QUALIFICATION OF THE MEMBER

**3.1     Name and Address.**   The name and address of the Members and the amount of the Members' Capital Commitments are set forth on the Schedule of Manager and Members attached hereto as EXHIBIT A. The Manager shall cause EXHIBIT A to be amended without the consent of the Members to the extent changes requiring the amendment of EXHIBIT A are made pursuant to the terms of this Agreement from time to time; *provided*, that no Member's Capital Commitments shall be increased without obtaining the prior written consent of the Member. Any such amended EXHIBIT A shall supersede any prior EXHIBIT A and become a part of this Agreement.

**3.2     Admission of Additional Members.**   Additional Members may be admitted with the consent of the Manager, acting alone, until the earlier of July 1, 2012 or the total Capital Commitments of the Members equal at least $10,000,000. Thereafter, additional Members may be admitted to the Company only upon the consent of the Manager and a Majority-in-Interest of the Members.

**3.3     Withdrawal of a Member.**   No Member may withdraw or resign as a Member without the written consent of the Manager.

## ARTICLE IV

### CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS, AND DEFAULT OF A MEMBER

**4.1     Capital Accounts.**   An individual Capital Account shall be maintained for each of the Members.

**4.2     Capital Contributions; Capital Commitment.**

(a)     The Manager shall have no Capital Commitment and no obligation to contribute capital to the Company.

(b)     Each Member shall make capital contributions in cash installments, by wire transfer upon at least ten (10) days' advance written notice, up to the amount of its *"Capital Commitment"*.

2

725167 v5/SD

Exhibit 57
Page 693

(c)     The Manager may at any time, in its sole discretion, return to each Member all or any cash capital contribution intended for a proposed investment which is not consummated, or applied to the payment or reimbursement of expenses pursuant to paragraph 6.1; such returned capital shall be added back to the unfunded Capital Commitments of the Member and be subject to recall by the Manager pursuant to this ARTICLE IV.

**4.3     Default of a Member.** The Company shall be entitled to enforce the obligation of each Member to make contributions of capital to the Company in accordance with paragraph 4.2, and the Company shall have all remedies available at law or in equity in the event any such contribution is not so made. A defaulting Member shall pay all costs and expenses incurred by the Company in connection with the Member's failure to make a capital contribution as required under this Agreement, including, without limitation, attorneys' fees and all fees and expenses incurred in connection with any legal proceeding relating to the failure of the Member to make such a contribution. In the event that a Member fails to contribute capital to the Company as required under this Agreement and such default shall have continued uncured for thirty (30) or more days after delivery of written notice to the defaulting Member, the Manager shall be permitted to either (i) withhold distributions to be made to such defaulting Member pursuant to the terms of this Agreement equal to the amount of such unpaid capital contribution and recover such unpaid contribution thereon by setoff against any such distributions so withheld, or (ii) sell the defaulting Member's interest in the Company in a third party transaction and apply the proceeds towards the satisfaction of any Company expenses or other obligations of the Company.

## ARTICLE V

### COMPANY ALLOCATIONS

**5.1     Allocation of Profit and Loss.** Profit and Loss of the Company shall be allocated among the Members in proportion to their aggregate capital contributions.

**5.2     Allocations for Tax Purposes.** Income, gain, loss and deductions shall be allocated for income tax purposes generally in the manner in which the corresponding Profit and Loss is credited or debited (as the case may be) to their respective Capital Accounts; *provided, however,* that any difference between the Adjusted Asset Value and adjusted tax basis of any asset shall be reconciled, solely for income tax purposes, in accordance with the principles of Code Section 704(c) using any method permitted by the Treasury Regulations and selected by the Manager.

## ARTICLE VI

### COMPANY EXPENSES

**6.1     Company Expenses.**

(a)     The Company shall bear all operating expenses reasonably incurred by the Manager or the Company in connection with the management of the Company and the Manager, including but not limited to, all out-of-pocket costs and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), including, but not by way of limitation, private placement fees, finder's fees, interest on and

3

725167 v5/SD

Exhibit 57
Page 694

fees and expenses arising out of borrowed money, real property or personal property taxes on investments, including documentary, recording, stamp and transfer taxes, brokerage fees or commissions, or other similar charges, travel expenses, legal fees and expenses, expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company or the Manager, including claims by or against a governmental authority, audit and accounting fees, consulting fees relating to investments or proposed investments, taxes applicable to the Company or the Manager on account of their operations, fees incurred in connection with the maintenance of bank or custodian accounts, all expenses incurred in connection with the registration of the Company's Securities under applicable securities laws or regulations. The Company shall also bear all out-of-pocket expenses incurred by the Manager in serving as the tax matters partner, any sales or other taxes or government charges which may be assessed against the Company, the cost of liability and other premiums for insurance protecting the Company, the Manager, and their respective partners, members, stockholders, managers, managing directors, officers, directors, trustees, employees, agents or affiliates in connection with their activities, all out-of-pocket expenses of preparing and distributing reports to their respective Members, all out-of-pocket expenses associated with communications with Members, including preparation and distribution of reports to their respective Members, costs associated with Company meetings, all legal, accounting, tax, consulting and professional services fees and expenses (including tax preparation) relating to the Company or the Manager and their activities, out-of-pocket fees and expenses relating to outsourced finance, accounting, and back-office services (or if the Manager performs the accounting function internally, an amount reimbursable to the Manager equal to the then-current market cost of a qualified third party service provider as determined by the Manager in good faith), all out-of-pocket fees, costs and expenses relating to litigation and threatened litigation involving the Company or the Manager, including the Company's indemnification obligation pursuant to this Agreement, and all other expenses properly chargeable to the activities of the Company or the Manager.

(b)    The Company shall bear all out-of-pocket organizational and syndication costs, fees, and expenses incurred by or on behalf of the Manager in connection with the formation and organization of the Company and the Manager (including the definitive agreements related thereto), including legal and accounting fees and expenses incident thereto.

(c)    The Company shall bear all liquidation costs, fees, and expenses reasonably incurred by the Manager (or its designee) in connection with the liquidation of the Company and Manager at the end of their respective terms, specifically including but not limited to reasonable legal and accounting fees and expenses.

## ARTICLE VII

### WITHDRAWALS BY AND DISTRIBUTIONS TO THE MEMBER AND MANAGER

7.1    **Interest.** No interest shall be paid to a Member on account of its interest in the capital of or on account of its investment in the Company.

7.2    **Withdrawals by a Member.** No Member shall be permitted to withdraw any amount from its Capital Account without the written consent of the Manager.

4

725167 v5/SD

Exhibit 57
Page 695

7.3 **Members' Obligation to Repay or Restore.** Except as required by law, no Member shall be obligated at any time to repay or restore to the Company all or any part of any distribution made to it from the Company in accordance with the terms of this **ARTICLE VII** or **ARTICLE X**, and shall not be obligated at any time to restore or repay any deficit in the Member's Capital Account.

7.4 **Tax Distributions.** Within ninety (90) days after the end of each calendar year during the Company term, the Company will distribute to the Members, as applicable, in cash an amount equal to the excess, if any of (a) the Applicable Tax Rate multiplied by the net taxable income allocated to the Members, as a result of Members' ownership of an interest in the Company for the current and all prior fiscal years, over (b) all prior cash distributions made to the Members pursuant to this paragraph 7.4 or paragraph 7.5. The "*Applicable Tax Rate*" shall mean the combination of the highest marginal Federal and State income tax rates (plus, to the extent applicable, Medicare taxes) payable by individuals resident in the State of California taking into account the character of the net taxable income to which the rate is being applied and taking into account the deductibility of state and local taxes and any limitations on the ability of a Member to deduct any items of expense or loss under United States federal income tax principles, in each case as determined in good faith by the Manager. Distributions made to a Member pursuant to paragraph 7.4 shall be treated as advances of and as such shall reduce the distributions to be made to the Member under paragraph 7.5.

7.5 **Discretionary Distributions.** (a) The Manager may distribute cash, Securities or other Company assets to the Members in its reasonable discretion. All distributions under this paragraph 7.5 shall be among the Members *pro rata* in accordance with their respective capital contributions.

(b) Securities distributed in kind shall be subject to such conditions and restrictions as the Manager reasonably determines are legally required or appropriate.

(c) Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of the Members as Profit or Loss pursuant to **ARTICLE V**.

(d) Notwithstanding anything contained herein to the contrary, the Manager shall make distributions of Marketable Securities or any proceeds or other amounts received by the Company as soon as reasonably practical (other than amounts necessary to provide for sufficient reserves for present and future obligations of the Company (as reasonably determined by the Manager)).

7.6 **Withholding Obligations.**

(a) If and to the extent the Company is required by law (as determined in good faith by the Manager) to make payments ("*Tax Payments*") with respect to the Members in amounts required to discharge any legal obligation of the Company or the Manager to make payments to any governmental authority with respect to any federal, state, local or foreign tax liability of such person arising as a result of such person's interest in the Company, then the amount of any such Tax Payments shall be deemed to be a loan by the Company to such person,

5

725167 v5/SD

Exhibit 57
Page 696

which loan shall:  (i) be secured by such Member's interest in the Company, (ii) bear interest at the prime rate, and (iii) be payable upon demand.  Amounts paid in respect of interest on such loan shall be treated as Profit of the Company and shall not be treated as a capital contribution. The Manager shall promptly notify the Member of any Tax Payments made with respect to such Member.

(b)     If and to the extent the Company is required to make any Tax Payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided that* such person's Capital Account shall be adjusted for such person's full proportionate share of the distribution), or (ii) such Member shall promptly pay to the Company prior to such distribution an amount of cash equal to such Tax Payments.  In the event a portion of a distribution in kind is retained by the Company pursuant to clause (i), such retained Securities may, in the sole discretion of the Manager, either (1) be distributed to the Members in accordance with the terms of this ARTICLE VII including this paragraph 7.6(b), or (2) be sold by the Company to generate the cash necessary to satisfy such Tax Payments.

## ARTICLE VIII

### MANAGEMENT DUTIES AND RESTRICTIONS

8.1     Management.

(a)     Except as otherwise set forth herein, the Manager shall have the sole right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company; *provided that*, the Manager shall not, without obtaining the prior written consent of the Member, change the purpose of the Company as set forth in paragraph 1.2.  The Manager shall make, in its reasonable discretion, all decisions concerning the assets of the Company, including any acquisition and disposition thereof.

(b)     The Members understand that the Manager has formed the Incubator to provide an operating infrastructure to incubate and develop new business.  The Incubator is controlled by the Manager and or its affiliates.  It is anticipated that investment opportunities in one or more businesses formed in the Incubator will be offered to the Company but all decisions as to which, if any, such opportunities will be offered to the Company and the terms of any such investments shall be made in the sole and absolute discretion of the Manager.

8.2     **Designation of Manager.**  The Manager initially shall be the entity listed as such in the preamble to this Agreement.  In the event of a Change of Control of the Manager, a Majority in Interest of the Members shall have the right to remove the Manager as a Manager only and appoint a replacement Manager.  For the avoidance of doubt, the Manager shall continue to be entitled to receive all allocations and distributions to which it would otherwise be entitled to receive had it not been removed as a Manager when, as and if such allocations and distributions are made, in respect of all activities of and investments by the Company.  In the event there are no Managers, a new Manager shall be appointed by a Majority in Interest of the Members.

6

725167 v5/SD

Exhibit 57
Page 697

**8.3    Resignation of Manager.**  A Manager may resign as such at any time by giving written notice to the Members, in which case, in the event that there is no Manager, a Majority in Interest of the Members shall designate a replacement Manager as set forth in paragraph 8.2 above.

**8.4    Restrictions on the Members.**  Except as expressly provided herein or as required by applicable law, no Member (other than a Member acting in its capacity as the Manager) shall:   (a) take any part in the control or management of the Company business, (b) have any power or authority to act for or on behalf of the Company, or (c) have any right to vote on any Company matters.

**8.5    Certain Determinations by the Manager.**  All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by the Manager.  Such determination shall be final and conclusive.

**8.6    Other Activities.**

(a)    The parties hereto acknowledge and agree that (i) in addition to the Incubator, the Manager Parties have formed and may in the future form other investment vehicles, including those which hold the type of assets which the Company may hold, (ii) no Member shall have any interest in any of the foregoing investment vehicles or the assets thereof arising solely by virtue of this Agreement, (iii) the Manager may offer the right to participate in investment opportunities available to the Company (in whole or in part), including opportunities provided by the Incubator to other private investors, groups, partnerships, corporations or other entities, including, without limitation, any investment vehicles managed by some or all of the Manager Parties, whenever the Manager, in its sole discretion, so determines, (iv) the Manager Parties shall be under no obligation to offer any particular investment opportunities which they may identify to the Company, and (v) the Manager Parties may charge fees or carried interests with regard to any investment opportunity which the Manager Parties allocate to persons other than the Company.

(b)    The Members:  (i) acknowledge that the Manager Parties are or may be involved in other financial, investment and professional activities, including but not limited to: management of or participation in the Incubator and other investment funds; venture capital, private equity, public equity and real estate investing; purchases and sales of Securities; investment and management counseling; otherwise making investments or presenting investment opportunities to third parties; and serving as officers, directors, advisors, consultants, and agents of other entities; and (ii) agree that the Manager Parties may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with those of the Company).  Neither the Company nor any Member shall have any right by virtue of this Agreement or the existence of the Company in and to such ventures or activities or to the income or profits derived therefrom, and the Manager Parties shall have no duty or obligation to make any reports to the Member or the Company with respect to any such ventures or activities.

7

725167 v5/SD

Exhibit 57
Page 698

## ARTICLE IX

### INVESTMENT REPRESENTATION AND TRANSFER OF COMPANY INTERESTS

**9.1    Representations of the Members.**  Each Member represents:  (a) that it is an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act, (b) that it is a "qualified purchaser" as defined in Section 2(51)(A) of the U.S. Investment Company Act of 1940, as amended, (c) that it has sufficient knowledge and experience in business and financial matters to evaluate the Company, its proposed activities and the risks and merits of this investment, (d) that it has the ability to accept the high risk and lack of liquidity inherent in this type of investing, (e) that it is acquiring its interest in the Company for its own account for investment purposes only and not with a view to resale or distribution, (f) that it has had access to such information concerning the Company as it deems necessary to enable it to make an informed decision concerning the purchase an interest in the Company, and (g) that it understands that the interests in the Company have not been registered under the Securities Act, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated.

**9.2    Restrictions on Transfers of Company Interests.**

**(a)**    No Member shall (directly or indirectly) sell, assign, pledge, mortgage, hypothecate, give or otherwise dispose of or transfer its interest in the Company or in its capital assets or property (a *"Transfer"*) without the consent of the Manager, where such consent shall not be unreasonably withheld.

**(b)**    A transferee of a Member's interest shall become a substituted Member only with the consent of the Manager, and only if such transferee executes any and all instruments reasonably required by the Manager.

**9.3    Requirements for Transfer.**  Notwithstanding the foregoing, the Transfer of a Member's interest in the Company, or any part thereof, shall not be permitted if such Transfer would (a) result in a violation of any law, rule, or regulation, (b) result in a violation of any agreement in which the Company is a party, (c) require the Company to register as an investment company under the U.S. Investment Company Act of 1940, as amended, (d) require the Company or any of the Manager Parties to register as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, (e) result in the Company's assets being considered, in the opinion of counsel for the Company, as "plan assets" within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended, or any regulations proposed or promulgated thereunder, or (f) result in the Company being classified for United States federal income tax purposes as an association taxable as a corporation.  Prior to effecting any such Transfer, the Manager shall have received an opinion satisfactory to it, or shall have waived the requirement of such an opinion, covering the substance of the immediately previous sentence.  Any Member who requests or otherwise seeks to effect a Transfer hereby agrees to reimburse the Company, at the request of the Manager, for any expenses reasonably incurred by the Company in connection with such Transfer, including the costs of seeking and obtaining any legal opinion required by this paragraph and any other legal, tax, accounting and miscellaneous expenses, whether or not such Transfer is consummated.

8

725167 v5/SD

Exhibit 57
Page 699

## ARTICLE X

### DISSOLUTION AND LIQUIDATION OF THE COMPANY

**10.1    Termination.**

(a)    The Company shall dissolve, and the affairs of the Company shall be wound up upon the earlier of:

(i)    Upon the mutual consent of both the Manager and a Majority-in-Interest of the Members;

(ii)    Upon the election by the Manager in the event that all Company assets have been distributed in accordance with this Agreement;

(iii)    In the event of the resignation, bankruptcy, dissolution, commencement of liquidation proceedings or insolvency of the Manager unless, within ninety (90) days after the Members are provided with written notice of such event, a Majority-in-Interest of the Members agree in writing to continue the business of the Company and to the appointment, effective as of the date of such event, of a new Manager of the Company;

(iv)    Upon the entry of a decree of judicial dissolution pursuant to the Act; or

(v)    On or after the ten year anniversary following the Effective Date, the affirmative vote of a Majority-in-Interest of the Members.

(b)    In the event that the Company is dissolved pursuant to the provisions of clauses (iii) or (iv) of this paragraph 10.1, the Members shall elect one or more liquidators to manage the liquidation of the Company in the manner described in this ARTICLE X. Except as provided in the immediately preceding sentence, the Manager shall carry out the duties of the liquidator hereunder.

**10.2    Winding Up Procedures.**

(a)    Promptly upon final dissolution of the Company, the affairs of the Company shall be wound up and the Company liquidated. Profits and Losses (and items thereof) with respect to the Company realized during the winding up period shall be allocated among the applicable Capital Accounts of the Members pursuant to ARTICLE V.

(b)    Distributions in liquidation may be made in cash or in kind or partly in cash and partly in kind in accordance with the Members' final adjusted Capital Accounts. The Manager or the liquidator shall use its best judgment as to the most advantageous time for the Company to sell investments or to make distributions in kind.

**10.3    Payments in Liquidation.** The assets of the Company shall be distributed in liquidation of the Company in the following order:

9

725167 v5/SD

Exhibit 57
Page 700

(a)    to the creditors of the Company, including the Member if the Member is a creditor, in the order of priority established by law, either by payment or by establishment of reserves; and then

(b)    to the Members in respect of the positive balances in their applicable Capital Accounts in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

## ARTICLE XI

### FINANCIAL ACCOUNTING, TAX MATTERS, REPORTS AND COMMITTEES

**11.1    Financial Accounting; Fiscal Year.** The books and records of the Company shall be kept in accordance with the provisions of this Agreement and otherwise on a tax basis accounting. The Company's fiscal year shall be the calendar year.

**11.2    Valuation of Investments Owned by Company.** For purposes of this Agreement, the value of any Security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the immediately preceding business day) shall be determined as follows:

(a)    a Security which is listed or quoted on a recognized securities exchange or on The NASDAQ National Market ("*NASDAQ*") shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination;

(b)    a Security which is traded over the counter (other than on a recognized securities exchange or NASDAQ) shall be the volume weighted average trading price per share of such Security for the five consecutive trading days immediately preceding the date of determination, or if no sales occurred on any such day, be estimated at fair value and shall be determined by the Manager; and

(c)    for any other Security or other investments or assets of the Company hereunder shall be estimated at fair value and shall be determined by the Manager.

**11.3    Supervision; Inspection of Books.** Proper and complete books of account of the business of the Company, copies of the Company's federal, state and local tax returns for each fiscal year, a current Schedule of Members set forth on each updated EXHIBIT A, this Agreement and the Company's Certificate of Formation shall be kept under the supervision of the Manager at the principal office of the Manager. Such books and records shall be open to inspection by the Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice.

**11.4    Tax Returns and Information.** The Manager shall use reasonable efforts to cause the Company's U.S. federal, state and local tax returns, IRS Form 1065, Schedule K-1 and any other tax information reasonably requested by the Members, to be prepared and delivered to the Member within ninety (90) days after the close of the Company's fiscal year.

10

725167 v5/SD

Exhibit 57
Page 701

**11.5    Tax Matters Partner.** The Manager shall serve as the Company's tax matters partner under the Code and under any comparable provision of state law. The tax matters partner is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members (in their capacity as such). Notwithstanding the foregoing, without a Member's consent, the tax matters partner shall neither (i) choose any forum other than the U.S. Tax Court to litigate any proposed adjustment of, or other dispute concerning, any "partnership item" (within the meaning of Section 6231(a)(3) of the Code) nor (ii) extend, beyond one year, the statute of limitations on adjustment of or assessment of tax on any such item. To the fullest extent permitted by law, the Company agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to (a) all fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the Manager or the Company that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Company, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise or any such claim, action, or demand; *provided* that this indemnity shall not extend to conduct by the tax matters partner adjudged not to have been undertaken in good faith to promote the best interests of the Company.

**11.6    Reports.** The Manager shall deliver or cause to be delivered to each Member (i) within 60 days after each fiscal quarter of the Company commencing with the fiscal quarter ending March 31, 2012, a report containing an unaudited balance sheet, statement of operations and statement of changes in members equity of the Company for such fiscal quarter and a valuation of the Securities owned by the Company as of the end of such fiscal quarter pursuant to paragraph 11.2, and (ii) within 120 days after the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2012, a report containing an audited balance sheet, statement of operations, and statement of changes in members equity of the Company for such Fiscal Year to date.

**11.7    Advisory Committee.** The Manager will appoint an Advisory Committee of no less than three (3) and no more than five (5) members selected by the Manager from time to time in its reasonable judgment (the *"Advisory Committee"*), which members shall consist of representatives of the Members of the Company; *provided, however,* that the Manager shall not appoint an affiliate of the Manager as a representative on the Advisory Committee. The duties of the Advisory Committee will include (a) consideration of any approvals sought by the Manager pursuant to the terms of this Agreement; (b) upon request by the Manager, advising with respect to matters pertaining to conflicts of interest between or among the Manager, any members of the Manager, the Members or the Company, and (c) rendering such advice and counsel as is requested by the Manager. The Advisory Committee may review valuations made by the Manager upon request; *provided, however,* the Manager will retain ultimate responsibility for asset valuations and for making all investment decisions. The Company will reimburse each Advisory Committee member for his or her reasonable out-of-pocket expenses in connection with his or her activities on the Advisory Committee. All actions, consents or approvals of the Advisory Committee shall require a majority of its members serving at the time such action, consent or approval is taken, which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the Manager. To the fullest extent permitted by law, neither the members of the Advisory Committee, nor the Members on behalf of whom such members act as representatives, shall owe any duties

11

725167 v5/SD

Exhibit 57
Page 702

(fiduciary or otherwise) to the Company or any other Member in respect of the activities of the Advisory Committee, except to refrain from bad faith violations of the implied contractual obligation of good faith. Members of the Advisory Committee shall be entitled to the benefits of the exculpation and indemnification provisions of paragraphs 13.3 and 13.4, as provided therein.

**11.8    Investment Committee.** The Manager will appoint an Investment Committee of no more than five (5) persons selected by the Manager from time to time in its reasonable judgment (the "*Investment Committee*"). The initial members of the Investment Committee shall be Cary Breese, Stuart Frost, Dr. Jack Kreindler, Dave Salch and Mark Theissen. Members of the Investment Committee may be removed from the Investment Committee by the Manager, in its sole discretion. The Investment Committee shall be responsible for approving all investments presented to the Investment Committee by the Manager. All actions of the Investment Committee shall require at least a majority of its members serving at the time such action is taken, which actions may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the Manager; *provided, however,* in the event a vote of the Investment Committee results in a tie, the investment decision shall be made by the Manager, in its sole discretion and all members of the Investment Committee will agree to vote in accordance with the determination of the Manager. The Company will reimburse each Investment Committee member for his or her reasonable out-of-pocket expenses in connection with his or her activities on the Investment Committee. The Investment Committee shall take no part in the control or management of the Company's affairs, nor shall the Investment Committee have any power or authority to act for or on behalf of the Company. No member of the Investment Committee shall be liable to any other Member for any action taken or omitted to be taken in good faith by it in connection with his participation on the Investment Committee. Members of the Investment Committee shall be entitled to the benefits of the exculpation and indemnification provisions of paragraphs 13.3 and 13.4, as provided therein.

**ARTICLE XII**

**CERTAIN DEFINITIONS**

**12.1    Accounting Period.** An Accounting Period shall be (a) a calendar year if there are no changes in the parties respective interests in the Profits or Losses of the Company during such calendar year except on the first day thereof, or (b) any other period beginning on the first day of a calendar year, or any other day during a calendar year upon which occurs a change in such respective interests, and ending on the last day of a calendar year, or on the day preceding an earlier day upon which any change in such respective interest shall occur. Notwithstanding the foregoing, the Manager may from time to time cause allocations to be made to the parties' Capital Accounts as if an Accounting Period had ended and a new Accounting Period shall commence on the next subsequent day, it being anticipated that such an allocation may be made in connection with Company distributions or at such other times if, in the Manager's reasonable judgment, circumstances make it reasonable to do so.

**12.2    Adjusted Asset Value.** The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

12

725167 v5/SD

Exhibit 57
Page 703

(a)     The initial Adjusted Asset Value of any asset contributed by the Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the Member and the Manager.

(b)     In the reasonable discretion of the Manager, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member; and (ii) the distribution by the Company to a party of Company assets, unless all parties receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in Company distributions.

(c)     The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, and the resulting unrecognized profit or loss allocated to the applicable Capital Accounts of the parties, as of the termination of the Company by expiration of the Company's term.

12.3    **Capital Account.**  The Capital Account of each party shall consist of its original capital contribution, if any, (a) increased by any additional capital contributions, its share of Profit that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by it or that are secured by any Company property distributed to it, and (b) decreased by the amount of any distributions to or withdrawals by it, its share of Loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Company or that are secured by any property contributed by it to the Company. The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Manager may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable pursuant to ARTICLE VII and ARTICLE X.

12.4    **Change of Control.**  Change of Control shall mean the transfer (whether directly or indirectly) of voting securities of the Manager, in one transaction or in a series of related transactions, through which a person or "group" who does not currently hold such right, acquires (whether directly or indirectly) the right to cast a majority of the total votes entitled to be cast by all equity holders of the Manager.  The death, disability or incapacitation of Stuart Frost, the principal of the Manager, shall be deemed a Change of Control.

12.5    **Code.**  The Code is the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

12.6    **Deemed Gain or Deemed Loss.**  The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2), over the

13

725167 v5/SD

Exhibit 57
Page 704

aggregate Adjusted Asset Value of the Securities distributed. The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued as of the date of distribution in accordance with paragraph 11.2).

**12.7 Incubator.** Incubator shall mean Frost Venture Partners, LLC, a Delaware limited liability company.

**12.8 Majority in Interest.** Majority in Interest shall mean Members representing a majority of the Capital Commitments.

**12.9 Manager Parties.** The Manager Parties shall mean each of the Manager and their respective direct and indirect managers, members, partners, stockholders, officers, directors, trustees, employees, consultants, agents or any affiliate of the foregoing, including Stuart Frost.

**12.10 Marketable Securities.** Marketable Securities shall refer to Securities that are (a) traded on a recognized securities exchange or traded on one or more securities exchanges or quoted on the automated screen-based quotation and trade execution system operated by The NASDAQ OMX Group, Inc., or any successor thereto, and not subject to any underwriter "lock-up" or other contractual restrictions on transferability, or (b) currently the subject of an effective Securities Act registration statement. Notwithstanding the foregoing, a Security shall not be deemed to be a Marketable Security if, in the good faith judgment of the Manager, the market on which such Security trades is not adequate to permit an orderly sale of all shares of such Security held by the Company within a reasonable time period.

**12.11 Profit or Loss.** Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss arising for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any tax-exempt income of the Company described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c) Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for United States federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

14

725167 v5/SD

Exhibit 57
Page 705

(d)    In the event that the Adjusted Asset Value of any asset is adjusted under paragraphs 12.2(b) or (c), the amount of such adjustment shall, if positive, be added or, if negative, be subtracted, from such taxable income or loss;

(e)    The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss.

**12.12  Securities.**  Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**12.13  Securities Act.**  Securities Act is the United States Securities Act of 1933, as amended.

**12.14  Treasury Regulations.**  Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE XIII

### OTHER PROVISIONS

**13.1    Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among the residents of such state made and to be performed entirely within such state.

**13.2    Limitation of Liability of the Members.**  Except as required by law, no Member shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Company in excess of its Capital Commitment to the Company.  Notwithstanding the foregoing, each Member shall be required to pay to the Company, at such times and subject to the conditions set forth herein, all amounts that the Member has agreed to pay in respect of its Capital Commitment.

**13.3    Exculpation.**  Neither the Manager Parties, nor any member of the Advisory Committee, nor any member of the Investment Committee, nor any affiliate of any of the foregoing, nor the tax matters partner (collectively, the *"Covered Persons"*) shall be liable, responsible or accountable in damages or otherwise to the Members or the Company for honest mistakes of judgment, or for action or inaction, taken in good faith and in the reasonable belief that such action or inaction was in, or not opposed to, the best interest of the Company, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any employee, broker, or other agent of the Company, *provided that* such employee, broker, or agent was selected with reasonable care.  To the fullest extent permitted by law, no Covered Person shall be liable to the Company or the Members with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice of legal counsel (as to matters of law), or of accountants (as to matters of accounting), or of investment bankers, accounting firms,

15

725167 v5/SD

Exhibit 57
Page 706

or other appraisers (as to matters of valuation), *provided that* any such professional or firm is selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any Covered Person of any liability by reason of such Covered Person's commission of gross negligence, intentionally wrongful conduct or recklessness or a material breach of this Agreement that has an adverse effect on the Company or the Members, determined by arbitration pursuant to paragraph 13.10; *provided, however,* that such alleged material breach of this Agreement (and any resulting Losses (as defined below)) has not been cured (if curable) within sixty (60) days after such time as it may be demonstrated that the Covered Person had actual knowledge of such alleged material breach (*"Uncured Material Breach"*); *provided further* that any liquidator other than the Manager shall be entitled to the benefit of exculpation under this paragraph 13.3 so long as such person acted in good faith. Notwithstanding any other provision of this Agreement, to the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company, any Manager Party or any other person bound by this Agreement, such Covered Person acting under this Agreement shall not be liable to the Company, the Members or any other person bound by this Agreement for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or limit the duties (including fiduciary duties) and liabilities (by specifying a duty of care or otherwise) of any Covered Person to the Company or the Members otherwise existing at law or in equity or otherwise, are agreed by the Members to replace such duties and liabilities of such Covered Person.

### 13.4    Indemnification.

(a)    The Company agrees to indemnify, out of the assets of the Company only (including the proceeds of liability insurance and any amounts that the Member may be required to contribute pursuant to the terms of this Agreement), the Manager Parties, each member of the Advisory Committee, each member of the Investment Committee, any affiliates of any of the foregoing and the tax matters partner (the *"Indemnified Parties"*) to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, controversy, dispute, judgment or demand against the Indemnified Parties that arise out of or in any way relate to the Company, its properties, business, or affairs and (ii) such claims, actions, controversies, disputes, judgments and demands and any losses, damages or liabilities resulting from such claims, actions, controversies, disputes, judgments and demands, including amounts paid in settlement or compromise of any such claim, action or demand (collectively, *"Losses"*); *provided,* that such Indemnified Party acted in good faith and in the reasonable belief that such Indemnified Party's action or inaction was in, or not opposed to, the best interest of the Company; and *provided further,* that this indemnity shall not extend to any conduct which constitutes gross negligence, intentionally wrongful conduct or recklessness or an Uncured Material Breach.

(b)    At the election of the Manager, expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this paragraph 13.4 may be paid by the Company in advance of the final disposition of such claim or proceeding, *provided* the Indemnified Party undertakes to repay such amount if it is ultimately determined that such

16

Exhibit 57
Page 707

Indemnified Party was not entitled to be indemnified and provided the undertaking shall be in form and substance reasonably acceptable to the Manager.

(c)    The Manager may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Indemnified Party or potential Indemnified Party against any liability incurred in any capacity which results in such person being an Indemnified Party (provided that such person is serving in such capacity at the request of the Company or the Manager), whether or not the Company has the power to indemnify such person against such liability. The Manager may purchase and maintain insurance on behalf of and at the expense of the Company for the protection of any officer, director, manager, employee or other agent of any other organization in which the Company directly or indirectly owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify any person against such liabilities.

(d)    The provisions of this paragraph 13.4 shall remain in effect as to each Indemnified Party whether or not such Indemnified Party continues to serve in the capacity that entitled such person to be indemnified. The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnified Party.

(e)    The rights to indemnification and advancement of expenses conferred in this paragraph 13.4 shall not be exclusive and shall be in addition to any rights to which any Indemnified Party may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.

(f)    The Manager may make, execute, record and file on its own behalf and on behalf of the Company all instruments and other documents (including one or more separate indemnification agreements between the Company and individual Indemnified Parties or Covered Persons) that the Manager deems necessary or appropriate in order to extend the benefit of the provisions of this paragraph 13.4 to the Indemnified Parties and Covered Persons; *provided* that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in this paragraph 13.4 except as otherwise may be required by applicable law.

(g)    Notwithstanding anything contained herein to the contrary, if the unfunded Capital Commitments of the Company are insufficient to cover all fees, costs and expenses relating to litigation and threatened litigation involving the Company, including the Company's indemnification obligations pursuant to this paragraph 13.4, or expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Company, including claims by or against a governmental authority, the Manager (or liquidator) may, in its sole discretion, sell some or all of the Securities held by the Company to pay for such bona fide, documented obligations, fees, costs and expenses.

(h)    Solely for purposes of clarification, and without expanding the scope of indemnification pursuant to this paragraph 13.4, the parties hereto intend that, to the maximum extent provided by law, as between (i) an investment counterparty of the Company, (ii) the

17

725167 v5/SD

Exhibit 57
Page 708

Company, and (iii) the Manager and/or its affiliates, paragraph 13.4 shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, any applicable investment counterparty of the Company shall have primary liability; second, the Company shall have secondary liability; and third, the Manager and/or its affiliates shall be liable only after exhausting all available indemnification and/or insurance resources of the applicable investment counterparty of the Company. The possibility that an Indemnified Party may receive indemnification payments from an investment counterparty of the Company shall not restrict the Company from making indemnification payments to an Indemnified Party that is otherwise eligible for such indemnification payments, but such indemnification payments by the Company are not intended to relieve any investment counterparty of the Company from any liability that it would otherwise have to make indemnification payments to such Indemnified Party. If an Indemnified Party that has received indemnification payments from the Company actually receives indemnification payments from an investment counterparty of the Company or under any insurance policy for the same loss, such Indemnified Party shall repay the Company as soon as practicable to the extent of such duplicative indemnification payments. Indemnification payments (if any) made to an Indemnified Party by the Manager and/or its affiliates in respect of a loss for which (and to the extent) such Indemnified Party is otherwise eligible for indemnification payments from the Company shall not relieve the Company from its obligation to such Indemnified Party and/or the Manager (or any affiliate thereof), as applicable, for such indemnification payments (it being the intention in such case that the Manager and/or its affiliates would be reimbursed by such Indemnified Party or directly by the Company with indemnification payments made by the Company under paragraph 13.4). To the extent that the Company is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the Manager and/or its affiliates (other than the Company), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Company. As used in this paragraph 13.4(h), "indemnification payments" made or to be made by an investment counterparty of the Company shall be deemed to include (x) advancement of expenses with regard to indemnification obligations, (y) payments made or to be made by any successor to the indemnification obligations of such investment counterparty of the Company, and (z) payments made or to be made by or on behalf of such investment counterparty of the Company (or such successor) pursuant to an insurance policy or similar arrangement.

      **13.5    Execution and Filing of Documents.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or by electronic mail in portable document format (PDF) will be effective as delivery of a manually executed signature page of this Agreement.

      **13.6    Other Instruments and Acts.** Each Member agrees to execute any other instruments or perform any other acts that are or may be necessary to effectuate and carry on the limited liability company created by this Agreement.

      **13.7    Binding Agreement.** This Agreement shall be binding upon the Members, the Manager and any of their transferees, successors, assigns, and legal representatives.

18

725167 v5/SD

Exhibit 57
Page 709

**13.8   Notices.**  Any notice or other communication that one party desires to give to another party shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be addressed to the other party at the address shown in the books and records of the Company or at such other address as a party may designate by five (5) days' advance written notice to the other party.

**13.9   Power of Attorney.**  By signing this Agreement, each Member designates and appoints the Manager its true and lawful attorney, in its name, place, and stead to make, execute, sign, and file the Company's Certificate of Formation and any amendment thereto and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state or jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such states or jurisdictions.

**13.10   Arbitration.**

(a)   Any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement (*"Claim"*), shall be resolved by final and binding arbitration (*"Arbitration"*) before a single arbitrator (*"Arbitrator"*) selected from and administered by Judicial Arbitration and Mediation Service Inc. (the *"Administrator"*) in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes.  The arbitration shall be held in San Juan Capistrano, California or vicinity.

(b)   Depositions may be taken and full discovery may be obtained in any arbitration commenced under this provision.

(c)   The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded.  The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed.  The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

19

725167 v5/SD

Exhibit 57
Page 710

(d)     Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* that the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator.  Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.

(e)     By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this paragraph 13.10, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

(f)     This paragraph 13.10 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including, to the extent applicable, the Uniform Arbitration Act (10 Del. C. § 5701 et seq.) (the *"Delaware Arbitration Act"*).  If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this paragraph 13.10 shall be invalid or unenforceable under the Delaware Arbitration Act, to the extent applicable, or other applicable law, such invalidity shall not invalidate all of this paragraph 13.10.  In that case, this paragraph 13.10 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this paragraph 13.10 shall be construed to omit such invalid or unenforceable provision.

### 13.11  Confidentiality of Company Information.

This Agreement and all financial statements, tax reports, valuations, reviews or analyses of potential or actual investments, reports or other materials and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the entities in which the Company has invested (collectively, the *"Confidential Information"*), that each Member may receive pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Manager, and the Company's portfolio investments (the *"Affected Parties"*).  Each Member acknowledges that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy.  Each Member further acknowledges that the Affected Parties believe that the Confidential Information is a trade secret, the disclosure of which may cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.  Each Member shall not reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than a disclosure on a need-to-know basis to the Member's direct and indirect equity owners that are subject to a written confidentiality

20

725167 v5/SD.

Exhibit 57
Page 711

agreement, policy or obligation and each Member's and Member's direct and indirect equity owners' legal, accounting or investment advisers, auditors and representatives (collectively, *"Advisers"*) without the prior consent of the Manager, except to the extent required to do so in accordance with applicable law (in which case the Member shall promptly notify the Manager of its obligation to disclose any Confidential Information) or with respect to Confidential Information which otherwise becomes publicly available other than through breach of this provision by the Member. Notwithstanding the foregoing, each Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing shall have the right to disclose Confidential Information to any regulator or governmental supervisory authority having jurisdiction over the Member, its Affiliates, its direct and indirect equity owners and the Advisers of the foregoing, and the Member shall provide notice to the Manager of any such disclosure unless it is legally prohibited from doing so or if it relates to taxes.

13.12 **Amendment.** This Agreement may be amended only upon the consent of the Manager and a Majority in Interest of the Members.

13.13 **Entire Agreement.** This Agreement constitutes the full, complete, and final agreement of the Members and the Manager and supersedes all prior agreements between the Members and the Manager, if any, with respect to the Company.

13.14 **Liability for Third Party Reports.** In no event shall the Company or the Manager Parties have any liability to the Members with respect to any information disseminated to the Member, where such information originated from any third party, including without limitation, any entity in which the Company has made an investment.

13.15 **Anti-Money Laundering.** Notwithstanding any other provision of this Agreement, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any person, including the Members, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated in any subscription agreement related to the Company.

13.16 **Discretion.** Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the Manager is permitted or required to make a decision (a) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests and those of the Company, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any other interest of or factors affecting the Members or any other person, or (b) in its "good faith" or under another expressed standard, the Manager shall act under such express standard and shall not be subject to any other or different standards.

13.17 **Company Legal Matters.** Each Member hereby agrees and acknowledges that:

(a) Cooley LLP (*"Cooley"*) has been retained as legal counsel by the Manager in connection with the formation of the Company and the offering of Company interests and in such capacity has provided legal services to the Manager and the Company.

21

725167 v5/SD

Exhibit 57
Page 712

The Manager expects to retain Cooley to provide legal services to the Manager and the Company in connection with the management and operation of the Company.

(b) Cooley is not and will not represent any Member in connection with the formation of the Company, the offering of Company interests, the management and operation of the Company, or any dispute that may arise between a Member on the one hand and the Manager and the Company on the other (the "*Company Legal Matters*").

(c) Each Member will, if it wishes counsel on a Company Legal Matter, retain its own independent counsel with respect thereto and, except as otherwise specifically provided by this Agreement, will pay all fees and expenses of such independent counsel.

(d) Each Member hereby agrees that Cooley may represent the Manager and the Company in connection with any and all Company Legal Matters (including any dispute between the Manager or the Company and any Member) and waives any present conflict of interest with Cooley regarding Company Legal Matters arising by virtue of any representation or deemed representation of the Members or the Company on account of Cooley's representation described in paragraph 13.17(a) above; *provided, however,* that the Member is not hereby agreeing to Cooley's representation of (i) the Company in a derivative action on their behalf against the Manager, or (ii) the Manager or any other person in any action against the Company.

13.18  **Tax Classification.** For United States federal and state income tax purposes only, it is intended that the Company's existence as an entity separate from its sole member be disregarded pursuant to Code Section 7701 and the Treasury regulations thereunder and under applicable state law for so long as the Company has only one Member. The Manager will cause the Company to file such elections and information returns and perform such other actions as may be required under such regulations. If one or more Additional Members is admitted to the Company, the Company shall be treated as a partnership for federal and state income tax purposes.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

725167 v5/SD

22

Exhibit 57
Page 713

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement on the date first above written.

MANAGER:                                          MEMBER:

                                                 Robert B. Wolford

FROST MANAGEMENT COMPANY, LLC


By: _____                     _Robert B. Wolford_
        Stuart Frost                             Robert B. Wolford
Its: Manager


THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

## EXHIBIT A

## FROST VP SEED, LLC

## SCHEDULE OF MEMBERS

| NAME AND ADDRESS: | CAPITAL COMMITMENT |
|---|---|
| **MANAGER AND MEMBER:** | |
| FROST MANAGEMENT COMPANY, LLC<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $0 |
| **MEMBER:** | |
| Stuart Frost<br>31920 Del Obispo, Suite 260<br>San Juan Capistrano, CA 92675 | $___ |

725167 v5/SD

Exhibit 57
Page 715

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement on the date first above written.

**MANAGER:**

FROST MANAGEMENT COMPANY, LLC

By: _____
   Stuart Frost
Its: Manager

**MEMBER:**

Robert B. Wolford

Robert B. Wolford

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

SIGNATURE PAGE TO THE FROST VP SEED, LLC
AMENDED AND RESTATED OPERATING AGREEMENT

725167 v5/SD

Exhibit 57
Page 716

Exhibit 57
Page 717

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement on the date first above written.

**MANAGER:**                                    **MEMBER:**

                                                Robert B. Wolford

**FROST MANAGEMENT COMPANY, LLC**

By: _____                    _____

Stuart Frost                                    Robert B. Wolford

Its: Manager

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGER RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGER, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

# EXHIBIT 58

**From:**       Bill Guerry (bill@frostdatacapital.com)

**Sent:**       Undated

**To:**         John Vigouroux (john@frostdatacapital.com)

**Cc:**

**Bcc:**

**Subject:**    Fwd: Sentrian-s uses of Frost Shared Services

**Attachments:**  B823AF16-742D-4775-A928-465C51328F46-50-.png; Frost Logo 80x183-1--50-.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-92-.png; B823AF16-742D-4775-A928-465C51328F46-33-.png; Frost Logo 80x183-1--33-.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-42-.png; B823AF16-742D-4775-A928-465C51328F46-31-.png; Frost Logo 80x183-1--31-.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-176-.png; 48C9929A-ABFE-4B27-84AE-5259C64C437C.png; DE309482-FBF0-4D22-A54C-991262BE54E2.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-92-.png; B823AF16-742D-4775-A928-465C51328F46-33-.png; Frost Logo 80x183-1--33-.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-42-.png; B823AF16-742D-4775-A928-465C51328F46-31-.png; Frost Logo 80x183-1--31-.png; 48C9929A-ABFE-4B27-84AE-5259C64C437C.png; DE309482-FBF0-4D22-A54C-991262BE54E2.png; 35CC0F1E-4859-49B1-B4EC-1949CC28774E-176-.png

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** Stuart Frost <stuart@frostdatacapital.com>
> **Date:** August 7, 2015 at 4:16:17 PM PDT
> **To:** "Dean  Sawyer" <dean@sentrian.com>, Bill Guerry <bill@frostdatacapital.com>
> **Subject: Re: Sentrian's uses of Frost Shared Services**


OK

*Stuart*

Stuart Frost
Chairman & CEO | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
Mobile: +1 (949) 338-6312
Skype: +1 (949) 391-1077
Skype: stuartfrost62



Exhibit 58
Page 719



**From:** Dean Sawyer <dean@sentrian.com>
**Date:** Friday, August 7, 2015 at 4:11 PM
**To:** Stuart Frost <stuart@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>
**Subject:** Re: Sentrian's uses of Frost Shared Services

Hi Stuart. Yes, Bill did mention that it is a prix fixe model although I thought the model might become more flexible over time based on the changing needs of the more mature portfolio companies. Since that is not the case it looks like there are only two options for Sentrian 6 months from now   move to full-time services per our current plan or sign another agreement with the Frost incubator for the prix fixe model.  Since our current thinking is to move to full-time services, please consider this my formal 180 day notice to end our Services Agreement, Dated June 1, 2012. 180 days from today is February 2 but let  s agree to end the agreement January 31, 2016.  Thanks!

Respectfully,

Dean

Dean Sawyer   CEO
Sentrian, Remote Patient Intelligence
www.sentrian.com
120 Vantis, Suite 570, Aliso Viejo, CA 92656
760 402-1657 (mobile)



---

**From:** Stuart Frost <stuart@frostdatacapital.com>
**Date:** Friday, August 7, 2015 at 8:28 AM
**To:** Dean Sawyer <dean@sentrian.com>, Bill Guerry <bill@frostdatacapital.com>
**Subject:** Re: Sentrian's uses of Frost Shared Services

There  s certainly no reason or desire for this to become adversarial.

However, I know that Bill has explained to you that FDC does not offer its services on some kind of a la carte basis. It  s prix fixe only. That will not change just because you  d like it to.

*Stuart*

Stuart Frost
Chairman & CEO | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
Mobile: +1 (949) 338-6312
Skype: +1 (949) 391-1077
Skype: stuartfrost62



---

**From:** Dean Sawyer <dean@sentrian.com>
**Date:** Thursday, August 6, 2015 at 10:32 PM

Exhibit 58
Page 720

**To:** Stuart Frost <stuart@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>
**Subject:** Re: Sentrian's uses of Frost Shared Services

Thanks for the reply Stuart. First, I m open to any alternative structures you might propose and that conversation might be best had in person or over the phone. Second, if we do give the 180 day notice now it doesn t mean we automatically end all incubator services six months from now. Instead, it gives us flexibility. Six months from now, we might determine that it s in the best interest of the company to continue the services under the current services/cost model. Alternatively, we might mutually agree to modify the services/cost or we might move toward more full-time services which is the most likely scenario in my mind today. Again, I would like the flexibility and I m also committed to remain flexible in considering all potential scenarios six months from now. As I stated before, I m happy to talk about this in person or over the phone. I don t want this to turn into an adversarial relationships. The Frost incubator has been instrumental in the success of Sentrian and you personally have helped the company in immeasurable ways and you helped me personally. I m in my dream career running Sentrian and being part of Frost and I would like nothing more than to sell Sentrian and come back and do another company!

Dean

Dean Sawyer  CEO
Sentrian, Remote Patient Intelligence
www.sentrian.com
120 Vantis, Suite 570, Aliso Viejo, CA 92656
760 402-1657 (mobile)



---

**From:** Stuart Frost <stuart@frostdatacapital.com>
**Date:** Thursday, August 6, 2015 at 9:18 PM
**To:** Dean Sawyer <dean@sentrian.com>, Bill Guerry <bill@frostdatacapital.com>
**Subject:** Re: Sentrian's uses of Frost Shared Services

Dean

OK, I guess that s your choice. In response, my choices are as follows:

1. We will no longer pay for a substantial amount of Jack s time, given that the bulk of his time is spent on Sentrian. I presume you ll have to cover that expense.
2. We will no longer pay for any of Marty s time. Ditto.

I think you ll find that the above, in combination with the need for a full-time CFO, IT support, office mgt, etc. and considerably more office space to cover potential growth, will cost more than the incubator fee. Great decision Dean.

I ll also have to consider my position on your board so I can focus on companies that want to stay within the incubator.

*Stuart*

Stuart Frost

Exhibit 58
Page 721

Chairman & CEO | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
Mobile: +1 (949) 338-6312
Skype: +1 (949) 391-1077
Skype: stuartfrost62



---

**From:** Dean Sawyer <dean@sentrian.com>
**Date:** Thursday, August 6, 2015 at 7:09 PM
**To:** Stuart Frost <stuart@frostdatacapital.com>, Bill Guerry <bill@frostdatacapital.com>
**Subject:** Sentrian's uses of Frost Shared Services

Hi Bill and Stuart,

As you know, Sentrian is seeking to close a Series B round by the end of the year. In addition, the Sentrian management team has spent the last month building a bottom up use of funds and resource allocation plan and determined that it is in the company s best interest to end our Services Agreement with the Frost Incubator and move towards full-time rather than shared resources. The only termination clause in the Services Agreement (Section 4) requires 180 days notice   *This Agreement shall become effective on the Effective Date and shall continue in effect until termination by a party to this Agreement with or without cause upon one hundred eighty (180) days  prior written notice* . However, our preference would be to end our Services Agreement 30 days after we close Series B. In other words if we close Series B in four months, the contract would end in five months. If we closed Series B in 8 months the contract would end in 9 months, etc. Please let me know if you prefer the 30 days after Series B terms or the 180 day notice terms. If you prefer the 180 day terms then our services agreement would end January 31, 2016.

Looking back, having the shared Frost resources was immensely valuable and has become even more valuable for the new companies as the incubator added additional services. I highly endorse the model and will be a reference for any new Frost portfolio CEO or Frost investor. I co-founded a company and was the eighth employee of another company and I can tell you that having Frost services is a huge advantage for a startup.

Last, I went back and reviewed the email from Stuart from late last year (see below) and I have taking Stuart s argument into consideration but again, as a team we have concluded that it is in the company s best interest to move toward full-time rather than shared resources.

Respectfully,

Dean


Dean Sawyer   CEO
Sentrian, Remote Patient Intelligence
www.sentrian.com
120 Vantis, Suite 570, Aliso Viejo, CA 92656
760 402-1657 (mobile)



Exhibit 58
Page 722

Dean

I think you re being a bit short-sighted on this.

Predixion received a huge amount of help from me post Series C when their strategy needed a complete revamp (not that they really paid for that or necessarily appreciated it, but those are different problems). Cirro has benefitted from John as an interim CEO, Jim as (effectively) interim VP sales and a LOT of effort from Cliff without paying any extra    all post Series A.

In your case, you are getting my and Tom s time, having some of Marty s costs covered and you don t really have to worry about finding more space (an ongoing pain in the ass for a startup), amongst several other more minor benefits, such as basic book keeping and office management. We ve also recently added a strong exec recruiter and we ll be adding more services such as dedicated HR & IT in the near future.

As Bill states, this should not be looked as as a menu of services, but an ongoing, broad-based support structure that is actually cheaper and better than the alternative of going alone. There might be times when you don t perceive that you re getting  value for money , but there WILL be other times when you get huge value    let s say during an M&A transaction or a Series B. You WILL also need a lot of help as you start to bring on customers and try to establish a repeatable sales process.

If we go to a system where individual companies pay a variable fee based on their perception of the value received, we simply won t be able to build out the infrastructure as we d all like to and everyone will benefit less in the medium to long term. That s never been our plan and it won t be in the future.

*Stuart*

Stuart Frost
Managing Partner | Frost Data Capital
31910 Del Obispo, Ste 100
San Juan Capistrano, CA 92675
M: +1 (949) 338-6312
Skype: stuartfrost62











Exhibit 58
Page 723

☒

☒

☒

☒

☒

Exhibit 58
Page 724

# EXHIBIT 59

## SERVICES AGREEMENT

This SERVICES AGREEMENT ("Agreement") is made and entered into as of September 12, 2012 (the "Effective Date"), between Frost Venture Partners LLC ("Service Provider") and Lineage Software, Inc. ("Company").

1. **Services and Term.** The Service Provider shall, pursuant to the terms and conditions of this Agreement and under the supervision and authority of the Company, provide strategic support, corporate governance support, and financial, operational, management and administrative personnel and services to on behalf of and as directed by the Company. The Service Provider agrees to perform its services hereunder in a commercially reasonable fashion subject to the terms and conditions of this Agreement, as amended from time to time. The Service Provider may also incur certain costs on behalf of and as authorized by the Company, including but not limited to, office rental costs.

2. **Compensation.** The Service Provider shall be solely responsible for providing the personnel and other resources necessary to provide the services hereunder. The Company shall pay the Service Provider for its reasonable costs and out of pocket expenses in providing the personnel and performing the services hereunder. The Service Provider shall invoice the Company monthly in advance for the personnel and services provided hereunder.

3. **Indemnification.** The Company agrees to indemnify the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents, to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses paid in connection with or resulting from any claim, action, or demand against such persons or entities that arise out of or in any way relate to the services provided in good faith by Service Provider or the Company, its properties, businesses, or affairs and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Service Provider) of any such claim, action or demand; *provided, however,* that this indemnity shall not extend to any conduct by Service Provider which constitutes gross negligence, recklessness or intentional wrongdoing. Moreover, to the extent the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents would be eligible for indemnification by the Company pursuant to its articles and bylaws, the Company shall use its best efforts to facilitate any claim for such indemnification.

4. **Term and Termination.** This Agreement shall become effective on the Effective Date and shall continue in effect until termination by a party to this Agreement with or without cause upon one hundred eighty (180) days' prior written notice.

5. **General.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to such state's conflicts of law principles. Except as specifically set forth in this Agreement, all notices shall be in writing and deemed duly given if delivered in person or sent by registered or certified mail, postage prepaid, addressed to the respective party's address as stated on the signature page to this Agreement, or to such other address as may be provided by written notice in accordance with the foregoing. No modification of this Agreement will be binding upon either party unless made in writing and signed by both parties. This Agreement contains the entire agreement and understanding of the

Exhibit 59
Page 725



parties hereto with respect to the subject matter hereof, and merges and supersedes all prior agreements, discussions and writings with respect thereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes. This Agreement may be executed by a party's signature transmitted by facsimile or email and copies of this Agreement executed and delivered by means of such means shall have the same force and effect as copies hereof executed and delivered with original signatures.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date

Frost Venture Partners LLC

Lineage Software, Inc.

By:

By:

Name:    Stuart Frost

Name:    William Guerry

Title:    Managing Partner

Title:    CFO

Exhibit 59
Page 726

# EXHIBIT 60

## AMENDED AND RESTATED SERVICES AGREEMENT

This AMENDED AND RESTATED SERVICES AGREEMENT ("Agreement") is made and entered into as of July 17, 2013 (the "Effective Date"), between Frost Venture Partners LLC ("Service Provider") and Maana, Inc. ("Company"). From and after the date of this Agreement, the Services Agreement between the parties dated June 1, 2012 shall automatically terminate and be of no further force and effect and shall be amended and restated in its entirety as set forth in this Agreement.

1.  **Services and Term**. The Service Provider shall, pursuant to the terms and conditions of this Agreement and under the supervision and authority of the Company, provide strategic support, corporate governance support, and financial, operational, management and administrative personnel and services to on behalf of and as directed by the Company. The Service Provider agrees to perform its services hereunder in a commercially reasonable fashion subject to the terms and conditions of this Agreement, as amended from time to time. The Service Provide may also incur certain costs on behalf of and as authorized by the Company, including but not limited to, office rental costs. Service Provider will ensure that its employees and agents are bound in writing to Service Provider's obligations under this Agreement.

2.  **Compensation**. The Service Provider shall be solely responsible for providing the personnel and other resources necessary to provide the services hereunder. The Company shall pay the Service Provider for its reasonable costs and out of pocket expenses in providing the personnel and performing the services hereunder. The Service Provider shall invoice the Company monthly in advance for the personnel and services provided hereunder.

3.  **Indemnification**. The Company agrees to indemnify the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents, to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses paid in connection with or resulting from any claim, action, or demand against such persons or entities that arise out of or in any way relate to the services provided in good faith by Service Provider or the Company, its properties, businesses, or affairs and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions, and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Service Provider) of any such claim, action or demand; *provided, however*, that this indemnity shall not extend to any conduct by Service Provider which constitutes gross negligence, recklessness or intentional wrongdoing. Moreover, to the extent the Service Provider, its members, managers, officers, directors, stockholders, employees, vendors and affiliates, and their respective agents would be eligible for indemnification by the Company pursuant to its articles and bylaws, the Company shall use its best efforts to facilitate any claim for such indemnification.

Exhibit 60
Page 727



EXHIBIT
855
Frost 8-10-17
PENGAD 800-631-6989

4. **Intellectual Property.** Service Provider agrees that any and all software, designs, processes, improvements, techniques, formulae, procedures, and other work product related to the products and technology of the Company, whether patentable or not, that were or are created, developed, or written by Service Provider for Company, or conveyed by Service Provider to Company, either individually or in collaboration with others, in connection with providing the Services (collectively "Works") are the sole property of Company. All rights in or based on the Works including, without limitation, all patent rights, copyrights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any kind anywhere in the world (collectively, "Proprietary Rights") that currently exist or may exist in the future shall be the sole property of Company. Service Provider hereby irrevocably assigns to Company any and all Proprietary Rights that Service Provider may have or acquire in the Works. Without limiting the foregoing, Service Provider agrees that any Work comprising an original work of authorship shall be deemed to be a "work made for hire" and that the Company shall be deemed the author thereof under the U.S. Copyright Act (Title 17 of the U.S. Code); provided, however, that in the event, and to the extent, any Work is deemed not to be a "work made for hire" as a matter of law, Service Provider hereby irrevocably assigns and transfers to Company all right, title and interest that Service Provider may presently have or acquire, free and clear of all liens and encumbrances, in and to all such Work, and all of Service Provider's right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. Company shall have the exclusive right to register any copyrights, trademarks or patents in any or all Works in its name as owner and author. Service Provider agrees to perform all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing rights in or based on the Works (including Proprietary Rights) and/or Service Provider's assignment as set forth in this Agreement. Such acts may include, without limitation, execution of documents and assistance or cooperation in legal proceedings.

5. **Confidential Information.** Service Provider represents that it has not, and covenants that it will not, use, disclose or reveal to any person or entity any of the Confidential Information (or any information derived therefrom) for any purpose, except for Service Provider's use as necessary in the ordinary course of performing the Services. Service Provider represents that it has not, and covenants that it will not, remove from Company's premises or deliver to any person or entity outside of Company, except for Service Provider's use as necessary in the ordinary course of performing the Services, any document or other media or tangible items that contain or embody Confidential Information in any way, whether or not such materials have been prepared by Service Provider. "Confidential Information" includes all information relating to Company's business (such as drawings, designs, specifications, data, manuals, know-how, formulae, computer software, algorithms, data structures, scripts, application programming interfaces, protocols, processes, ideas, inventions (whether patentable or not), patents, patent applications, trade secrets, schematics and other technical, business, financial, customer and product related plans, forecasts, strategies, and client, customer or vendor lists and information), and all information that is or has been developed, created or discovered by Service Provider, either individually or in

Exhibit 60
Page 728

collaboration with others, in providing the Services. Confidential Information does not include information that Service Provider demonstrates by written evidence, (i) is in the public domain through lawful means that do not directly or indirectly result from any act or omission of Service Provider, (ii) was already properly known to Service Provider (other than in connection with this consulting arrangement or otherwise from the Company) without the restriction on use or disclosure at the time of Company's disclosure to Service Provider (presuming for such purpose that the restrictions on use and disclosure in this Agreement applied at the time of Company's disclosure to Service Provider), except that this exclusion does not cover any Works or Proprietary Rights that belong to the Company pursuant to Section 4 above, or (iii) is independently developed by Service Provider without use of any of the Company's Confidential Information. Service Provider agrees to hold the Confidential Information in strict confidence and to take all reasonable steps to protect the confidentiality of the Confidential Information. Service Provider acknowledges that Company will suffer immediate, irreparable harm in the event Service Provider fails to comply with its obligations under any provision this Agreement, and monetary damages will be inadequate to compensate Company for such breach. Service Provider agrees that, in addition to any other remedies available to it at law or in equity, Company will be entitled to injunctive relief (without the requirement of posting a bond or other form of security) to enforce the terms of this Agreement. In the event that Service Provider or any of its personnel receives a demand or request to disclose all or any part of the Company's Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction or under a civil investigative demand or similar process, (i) Service Provider agrees to promptly notify the Company of the existence, terms and circumstances surrounding such a demand or request and (ii) if Service Provider is, in the opinion of its legal counsel, compelled to disclose all or a portion of the Company's Confidential Information, Service Provider and its personnel may disclose that Confidential Information that counsel advises that it is compelled to disclose and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to the Confidential Information that is being so disclosed. Service Provider recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Service Provider represents that it has, and covenants that it will, hold all such confidential or proprietary information in the strictest confidence and represents that it has not disclosed, and covenants that it will not disclose, it to any person, firm or corporation or to use it except as necessary in carrying out Services consistent with the Company's agreement with the relevant third party.

6. **Term and Termination.** This Agreement is effective as of June 1, 2012 and shall continue in effect in perpetuity, except that (i) the Company may terminate the Service Provider's provision of any particular personnel or services with or without cause upon thirty (30) days' prior written notice, and (ii) either party may terminate the Service Provider's obligation to provide any further personnel or services pursuant to this Agreement with or without cause upon ninety (90) days' prior written notice (the "90-Day Notice Period").

Exhibit 60
Page 729

7. **General.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to such state's conflicts of law principles. Except as specifically set forth in this Agreement, all notices shall be in writing and deemed duly given if delivered in person or sent by registered or certified mail, postage prepaid, addressed to the respective party's address as stated on the signature page to this Agreement, or to such other address as may be provided by written notice in accordance with the foregoing. No modification of this Agreement will be binding upon either party unless made in writing and signed by both parties. This Agreement contains the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and merges and supersedes all prior agreements, discussions and writings with respect thereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes. This Agreement may be executed by a party's signature transmitted by facsimile or email and copies of this Agreement executed and delivered by means of such means shall have the same force and effect as copies hereof executed and delivered with original signatures. Service Provider is an independent contractor and is solely responsible for all taxes, withholdings, and other similar statutory obligations.

8. **Interference with Business; Non-Solicitation of Employees.** Service Provider will not attempt to disrupt, damage, impair or interfere with the Company's business, and will not, on its own behalf or on behalf of any other person, organization, or entity, directly or indirectly, at any time prior to the one (1) year anniversary of the end of the 90-Day Notice Period, approach, solicit, try to entice away, employ, offer employment to or procure the employment of any person employed by or acting as a consultant to the Company.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

Frost Venture Partners LLC.                    Maana, Inc.

By:_____              By:_____

Name:  Stuart Frost                            Name:  William Guerry

Title:  Managing Member                        Title:  Chief Financial Officer

Address: 31910 Del Obispo, Ste 100, San        Address: 31910 Del Obispo, Ste 100, San
Juan Capistrano, CA 92675                       Juan Capistrano, CA 92675

Exhibit 60
Page 730