# EXHIBIT 87

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,   )
a Delaware limited liability     )
company; and FROST VENTURE       )
PARTNERS GP, LLC, a Delaware     )
limited liability company,       )
                                 )
            Claimants,           ) Case No.
        vs.                      ) 1200052341
                                 )
HOLLENCREST BAYVIEW PARTNERS,    )
L.P., a Delaware limited         )
partnership; ROBERT B. WOLFORD,  )
an individual; WOLFORD FAMILY    )
TRUST, dated July 11, 2006,      )
                                 )
            Respondents.         )
                                 )
-----------------------------------
AND RELATED COUNTER-CLAIM.       )
_____)

                 ARBITRATION DAY 10
                  Orange, California
               Friday, January 26, 2018

Reported by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 2801227
Pages 2178 - 2424

                                    Page 2178

I N D E X

WITNESS: ALEXANDER MALEKI

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Wilks | 2190 | | | |
| | | 2210 (Resumed) | 2288 | |
| | | | 2296 (Further) | |
| Mr. Holley | | 2208 (Voir Dire) | | |
| | | 2264 | | |

WITNESS: KEITH PALZER

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Wilks | 2298 | | | |
| Mr. Hodel | | 2402 | | |

Page 2182

Veritext Legal Solutions
866 299-5127

Exhibit 87
Page 991

consistent with incubator industry standards?                        09:48

A.   I was.

Q.   Are those -- Did you reach opinions?

MR. HOLLEY:  Objection.  Objection.  Beyond the

scope.  He's asking about -- specifically about what I   09:48

objected to, the area of whether the fees that Frost Data

Capital charged were within industry standards.  He's

trying to encompass the shared services.  He has no

experience valuing.

MR. WILKS:  It's arbitration.  He's subject to   09:48

full cross-examination.  He can limit the scope of the

witness's testimony on cross-examination.

THE ARBITRATOR:  I'll overrule the objection.

You may proceed.

BY MR. WILKS:                                            09:48

Q.   Are your opinions, looking at Exhibit 1311, are

your opinions reflected in Exhibit 1311?

A.   They are.

Q.   And are you aware that my firm has retained a

forensic accountant in this case?                        09:49

A.   Yes.

Q.   Were you asked to talk to the forensic

accountant we retained regarding the figures they used

regarding the shared services fees?

A.   Yes, I was.                                         09:49

Page 2211

Q.   Is there any base flat fee that Idealab charges?   10:14

A.   No.

Q.   Again, based on your dealings with other incubators, and to the extent you've been exposed to other incubator's models in connection with investments and   10:15 co-investments in portfolio companies, do you believe Idealab's fee structure is consistent with how other incubator model charge for shared services?

A.   I do.

Q.   Have you ever seen one incubator model like   10:15 Frost Data Capital's model?

A.   No.

Q.   What strikes you or stands out as inconsistent with incubator industry standards when you look at the Frost Data Capital model?   10:15

A.   The sheer amount of money that is being charged to the companies, given the early stage of these companies.

Q.   Your outline, Paragraph 5, 5A --

A.   Yes.   10:16

Q.   -- says the incubator fees are too high?

A.   Yes.

Q.   That's a simple sentence?

A.   It is.

Q.   But can you just elaborate on why it is you   10:16

Page 2231

it on cross-examination if you'd like.                    10:17

        MR. HOLLEY:  Thank you.

        MR. WILKS:  I would just comment if they are

going to start talking about Sanchez, that we know every

day up until now everyone has been trying to get us not to  10:17

read more depo transcripts, and our experts have reviewed

them.

        THE ARBITRATOR:  I think we can move on.

        MR. WILKS:  Okay.  But this isn't going to be

the first time you heard a --                             10:18

        THE ARBITRATOR:  Off the record.

      (A discussion is held off the record.)

        THE ARBITRATOR:  Back on the record.

  BY MR. WILKS:

    Q.  I'm not sure where I left off, but I'll just in  10:19
the interest of time, ask it again if I haven't already.
    Are you aware of any other incubators who impose
mandatory fixed rates on their portfolio companies?
    A.  No, I am not.
    Q.  So, I'm sorry, if I am repetitive.              10:19
    Is Frost Data Capital's practice of imposing
mandatory fixed shared services fees on its portfolio
companies consistent with industry standards?
    A.  No, it is not.
    Q.  Let's look at Exhibit 870.                      10:19

                            Page 2233

then.                                                    10:41

     (A recess is taken.)

          THE ARBITRATOR:  We're back from break.  Back on
the record.

     Mr. Wilks, you may continue.                       10:58

   BY MR. WILKS:

     Q.   Okay.  Mr. Maleki, I'd like you to look again at
Exhibit 1311, which is the outline of your testimony.

     A.   Yes.

     Q.   Paragraph 7 starts with "My conclusion is:"     10:58
Do you see that?

     A.   I do.

     Q.   Can you -- I'll read it, but can you elaborate
on what you said here and explain it in your own words?

     A.   Sure.                                          10:59

     The conclusion I was trying to convey was that
incubator fees, in my opinion, were very high, which makes
it very difficult for companies to put themself in a
position to raise additional financing and ultimately have
a liquidity event which is the stated goal of most        10:59
incubators that I have come across.  You want those
companies to succeed.  You want them to have a liquidity
event so you can, not only be the beneficiary of that, but
so can your shareholders.  And by having high incubator
fees, you have a shorter runway, and it also raises red   10:59

                                            Page 2250

flags from an investor point of view.  For example, if I   10:59

saw that $40,000 a month was going out the door in an

early stage start-up, it would be reason enough for me to

pass on the investment opportunity.

Q.   When you say "red flags," what do you mean by   11:00

that?

A.   So as an early stage investor, again it's all

about risk mitigation, you are trying to figure out is the

risk worth the potential reward; and seeing a company that

is burning money at that rate at that stage would be an   11:00

immediately -- immediate sign of something is amiss or not

being run according to how a successful company would be

run, and it would be again, in my opinion, a reason to

immediately pass on the opportunity.

Q.   Suppose a company manages to pay $40,000 a month   11:00

in incubation fees over a period of time, yet, it's able

to raise money, it's still an ongoing concern, maybe it

raises money again.  Do you have any views -- So assume it

still hasn't had a modicum of success.  It's still a

viable company, and it's raising money.  Do you have any   11:01

views as to how the incubator fees impact the initial

value -- the initial seed the shareholders value even in

that fact pattern?

A.   Yeah.  I'm sure it's possible that companies

could raise money and be successful at it; but again, as   11:01

Page 2251

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 4, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 2424

# EXHIBIT 88

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,    )
a Delaware limited liability      )
company; and FROST VENTURE        )
PARTNERS GP, LLC, a Delaware      )
limited liability company,        )
                                  )
          Claimants,              ) Case No.
       vs.                        ) 1200052341
                                  )
HOLLENCREST BAYVIEW PARTNERS,     )
L.P., a Delaware limited          )
partnership; ROBERT B. WOLFORD,   )
an individual; WOLFORD FAMILY     )
TRUST, dated July 11, 2006,       )
                                  )
          Respondents.            )
                                  )
-----------------------------------
AND RELATED COUNTER-CLAIM.         )
_____)

ARBITRATION DAY 4

Orange, California

Thursday, January 18, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2778653

Pages 779 - 1068

Page 779

I N D E X

WITNESS: CARY BREESE

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Hodel | 785 | | | |
| | | | 1038 | |
| | | | 1061(Further) | |
| Mr. Holley | | 961 | | 1058 |

Page 783

Exhibit 88
Page 999

you; isn't that true?                                                  10:06

        MR. HOLLEY:  Objection.  Misstates the

documents.

    BY MR. HODEL:

        Q.    To your understanding.                                  10:06

        A.    Yes, that's my understanding.

        Q.    Did Mr. Frost tell you how well Maana was doing

in that call?

        A.    No.  Not in that call.

        Q.    In some other call or at the meeting about the    10:07

boat, he told you how well Maana was doing?

        A.    Yes.  It did come up, now that you mention that.

That did come up during the meeting at his house when we

talked about the boat.

        Q.    Okay.  How does the boat relate to Maana?          10:07

        MR. HOLLEY:  Object to the form.  Argumentative.

        THE ARBITRATOR:  Sustained.

    BY MR. HODEL:

        Q.    All right.  In your deposition, look at page 55,

line 6 through 15.  I don't want to quarrel with you, but    10:07

you do see -- Go ahead and read that and let me know when

you're done.

        A.    (Indicating.)

        Okay.  I've read it.

        Q.    You -- It is true that in your role as the          10:08

                                                    Page 826

Exhibit 88
Page 1000

CFO/COO, you had done an analysis of what you thought would be a reasonable incubator fee; correct?

A.    Yes.   Yes.   That's correct.   I used the word analysis.   I just want to clarify for the proceedings here what that really means --

Q.    Okay.

A.    -- in my mind.

Q.    And you presented that analysis to Stuart Frost and to Bill Guerry; correct?

A.    Yes.

Q.    And that analysis, the number that you came up with is a reasonable incubator fee was $12,000 a month; correct?

A.    Yes.

Q.    That analysis was in writing, that was on an Excel spreadsheet that you prepared; correct?

A.    Yes.

Q.    And you showed that, and you gave that Excel spreadsheet to Mr. Frost?

A.    Yes.

Q.    And when you left the company, as far as you know, that Excel spreadsheet was still there?

A.    I haven't thought about it.   I suppose.   Yes.

Q.    Did you ever destroy the Excel spreadsheet?

A.    I destroyed a lot of stuff over the years.

10:08
10:08
10:08
10:08
10:09
10:09

Page 827

Did your spreadsheet have a salary for him on it?          10:11

THE WITNESS:  Yes.

THE ARBITRATOR:  And he looked at that number

and said, "That number should be higher"?

THE WITNESS:  Yes.                                         10:12

THE ARBITRATOR:  Thank you.

BY MR. HODEL:

Q.   At the time you prepared those calculations, you

were the CFO in charge; correct?  You were in charge of

the chief financial officer function of the incubator at   10:12

the time you prepared that calculation?

A.   Yes.

Q.   And when you -- Then you went on to become --

become the CEO of GenieDB; and when you went to GenieDB,

was the incubator fee $12,000 a month?                     10:12

A.   No.

Q.   What was it when you first became the CEO of

GenieDB?

A.   I remember it being something in the 20s, 22,

24, something like that.                                   10:13

Q.   And when you first saw that fee, whatever it

was, you were quite surprised, you thought it was too

much; isn't that true?

A.   I thought it was high, yes.

Q.   You were quite surprised, that was your          10:13

Page 830

Exhibit 88
Page 1002

Metallum, and it is true to say I was functioning as CEO    11:00

for both those companies, but there wasn't a whole lot

there for GenieDB at that point.

Q.    Let's look at Exhibit 803.  This is something

that Bill Guerry testified in his deposition that he    11:01

prepared.  I showed this to you at your deposition as

well.  If you scroll down to his write-up about Metallum,

that would be page 5 of 8.

Do you see that?

A.    Yes.    11:01

Q.    He identifies employees, and this states, "Cary

Breese CEO, 7-1-14."

Does that refresh your recollection that you started

as the CEO of Metallum on July 1, 2014?

A.    Yes.  That refreshes my memory.    11:01

Q.    Okay.  Is GenieDB -- The offer falls apart, and

it's dissolved, and the decision is made to dissolve it in

2014.

Are we correct in understanding that you are

functioning as the CEO of both Metallum and GenieDB for    11:02

July, August, September, and October of 2014 at least?

A.    Yes.  Again, understanding that the CEO duties

for GenieDB were pretty minimal at that point, yes.  That

is true.

Q.    But do you see where he says, "With respect to    11:02

Page 853

knowledge as to incubator fee charging was as to GenieDB    11:16

and Metallum.  Now he's trying to get him to testify as to

what other companies were charged for incubator fees.

        MR. HODEL:  That's a completely different point.

That was the amount that other companies were charged.    11:16

This is the question of when they started to be charged.

        MR. HOLLEY:  I ask he establish that foundation.

        MR. HODEL:  He's mischaracterizing what is in

the record.  The witness testified that he only heard from

other portfolio companies, CEOs about the amount that they    11:16

had been charged.  This question is just as to the timing.

And he was a member of the investment committee.  The

question is: Did they start charging fees immediately?

        THE ARBITRATOR:  I'll allow the question.

  BY MR. HODEL:                                            11:16

    Q.   Does that refresh your recollection that the

charging of the incubator fees started pretty much right

around the time that the investment committee approved the

investment?

    A.   (Indicating.)                                     11:16

    Yes.  That's my understanding, generally speaking.

    Q.   All right.  In fact, while you were the CEO of

GenieDB, you voiced your concern directly to Mr. Frost

that you thought the fees were too high; isn't that true?

    A.   Yes.                                              11:17

                                                    Page 863

THE ARBITRATOR:  I think the issue he's having    11:26

is with "bitterly."

MR. HOLLEY:  Yes.

BY MR. HODEL:

Q.    Isn't it true that you heard other CEOs complain    11:26
about the portfolio -- about the incubator charges, and
you characterize it at your deposition that they were --
that they were bitterly complaining?

A.    Yes.   That is true.

Q.    And you heard that all the time.  That was your    11:26
testimony at your deposition; correct?

A.    It was a very common complaint from other CEOs,
yes.

Q.    And you remember that one CEO complained to
Mr. Vigouroux about the fees, and Mr. Vigouroux vigorously    11:26
rebuked him?

A.    To be clear, I was not at that meeting.  There
were several CEOs that were at that meeting.  They all
reported the same thing, that the issue about fees being
too high was brought up, and Mr. Vigouroux vehemently    11:27
discouraged any further complaints about the fee
structure.

Q.    You heard that some of the CEOs said the
incubator fee was affecting their fundraising?

A.    Yes, I did hear that.    11:27

Page 870

A.    Correct.                                          11:44

Q.    Mr. Frost called -- Did he call some kind of an all-hands senior team meeting to announce that Mr. Stojanovic had left -- had left the company?

A.    Yeah.  There was a meeting.  I don't know if it   11:45 was all hands.  You know, there were several meetings, I think, now that my memory is coming back, where Stuart talked about Alexander leaving.

Q.    And was this a meeting where there were other senior team members present, including other CFOs and --   11:45 excuse me -- other CEOs of the portfolio companies?

A.    Yes.  That's my memory.

Q.    And what did Mr. Frost say in that meeting as to why Mr. Stojanovic had left?

A.    I remember some derogatory comments, disparaging   11:45 Alexander, and that we shouldn't really have any further dealings with him.  Sort of suggested he was unstable.

Q.    And did he say anything like, "You should refrain from contacting him"?  Do you remember Mr. Frost saying that?                                          11:46

A.    Yeah.  That's my recollection, yes.

Q.    Did you share those opinions of Mr. Frost saying that he's unstable?  Did you share that opinion that Mr. Stojanovic was unstable?

A.    No.  I never saw Alexander to be unstable.  I   11:46

Page 884

allow it.  Overruled.                                    12:07

   BY MR. HODEL:

       Q.    Go ahead.

       A.    Over the years, you know, Mark had relayed to me various ups and downs of Cirro.  I was also an investor in   12:07 Cirro, so I had some information flowed there.  Seemed to me, in my opinion, that Cirro had enough struggles that it didn't appear to me that it was going to be a success.

       Q.    Did Mark Theissen -- What opinions did Mark Theissen share with you about the incubator fees?          12:08

       A.    He thought they were too high.

       Q.    What is Mark Theissen doing now?  Do you know?

       A.    He's running another start-up company outside of Frost.

       Q.    Do you know if he's associated with Mr. Frost at   12:08 all?

       A.    I don't know.

       Q.    I think I asked you.  We tried to figure out at your deposition what Cirro -- if you look at the -- if you make certain assumptions about how much each fund was      12:08 holding percentage-wise of Cirro, in looking at these values, that it seemed to suggest that there was a value of Cirro around $10 million or something like that.  I think that's at least what we were talking about in your deposition.                                              12:09

                                                      Page 899

through a handful of companies on that report.   13:51

I tried to talk about, you know, which companies I thought had good business plans and where I could help out in terms of describing that to him.

And then he did ask me about one or two valuations,   13:51 and I gave him my opinion of those valuations.

And then he asked me why did I come.

And I told him.

And then we wrapped up the meeting.

Q.   All right.  Let me walk through some of that.   13:51

You expressed to Rob Wolford and Greg Pellizzon that you thought the incubator fees were somewhat high?

A.   I don't remember the exact words.  I know incubator fees came up.  I know it was a bone of contention.  I have already stated I think the fees were   13:51 high.  I think they were in agreement.

Q.   But you definitely expressed that opinion to Rob Wolford and Greg Pellizzon at that meeting?

A.   Yes.

Q.   You also said there was a company that was   13:52 discussed that had been in existence for a long time without a CEO or a CTO, and that was not a good decision. Which company was that?

A.   I think SegOne went for quite a long time without a CEO/CTO.  Certainly not a steady CEO/CTO.  I   13:52

Page 947

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 23, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1068

# EXHIBIT 89

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

----------------------------------

FROST MANAGEMENT COMPANY, LLC,    )
a Delaware limited liability      )
company; and FROST VENTURE        )
PARTNERS GP, LLC, a Delaware      )
limited liability company,        )
                                  )
           Claimants,             ) Case No.
        vs.                       ) 1200052341
                                  )
HOLLENCREST BAYVIEW PARTNERS,     )
L.P., a Delaware limited          )
partnership; ROBERT B. WOLFORD,   )
an individual; WOLFORD FAMILY     )
TRUST, dated July 11, 2006,       )
                                  )
           Respondents.           )
                                  )
----------------------------------

AND RELATED COUNTER-CLAIM.        )
_____)

ARBITRATION DAY 11

Orange, California

Monday, January 29, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2807152

Pages 2425 - 2674

Page 2425

I N D E X

WITNESS: DAVID B. WEEKLY

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Hodel | 2431 | | 2611 | |
| Mr. Holley | | 2543 | | |

(CLAIMANTS REST)

WITNESS: STUART FROST

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Holley | 2623 | | | |

Page 2429

being a public company, and we started four new entities   09:18

during that process.

I have been involved in numerous disputes involving

early-stage development companies or start-up companies,

many of them around the Y2K time period when we had a lot   09:18

of failed companies that were involved in going through

that process and in some other instances since that time.

Q.   Let's see if we can identify your report.

Please locate 1327.

A.   I do that through this?   09:18

Q.   Or you can --

A.   Or I can use my binders?

Q.   Use your binders.  For the record, you brought,

I see, four white binders to your left.

A.   Five.   09:19

Q.   Five.  What are these white binders?

A.   These are the working papers that support the

direct evidence that supports these findings in my expert

report that was issued in October, and we produced all of

these.  I think there is about 1900 pages of documentation   09:19

here.

Q.   You have 1900 pages of work papers in connection

with your work on this project?

A.   That's correct.

MR. HODEL:  All right.  And for the record,   09:19

Page 2437

Exhibit 1327 is his report.  He's going to use the copy of  09:19
the report that's in his -- that's in his binder, Your
Honor.

            MR. HOLLEY:  I'd like to note for the record we
do have objections to portions of the report, the          09:19
testimony in the report and to the extent they are
incorporating the PowerPoint as well.

        I assume, Your Honor, you want us to proceed as we
did with Mr. Palzer in terms of reserving those objections
and handling them across?                                   09:20

            THE ARBITRATOR:  Yes.

     BY MR. HODEL:

        Q.  Also, Mr. Weekly, look at on the iPad.  Look at
Exhibit 1365 which His Honor is familiar with.  It's
something I got from your idea if you can identify that,     09:20
please.

        A.  13- --

        Q.  1365.

        A.  (Indicating.)

        Q.  It's going to take 45 seconds to --             09:20

        A.  I got it.

        Q.  What is 1365?

        A.  (Indicating.)

        Q.  I got --

        A.  Yes.  This is a schedule that we prepared at     09:20

                                                    Page 2438

capital?                                                          10:07

A.   I think there was a small amount.  I cite that in my report, but it was insignificant.  It wouldn't be what you would expect when you start an entity.  You capitalize it with money that allows you to have working capital and paid compensation.                          10:07

But in FDC's case, not just FDC, FMC the manager of The Seed Fund had no capital.  FVP GP had very limited capital.  It had a payment of $6 million from an individual who ended up having no voting, and all 6 million was used to make investments into Fund II.   10:08

Q.   In other words --

A.   It's not capital.

Q.   It's not capital?

A.   It's not capital.  There is virtually no capital.                                                        10:08

Q.   You are referring to Mike Colaco; right?

A.   I am.  I am.

Q.   What about -- I know we're getting ahead, but if you are starting a company, an incubator that is going to work with these funds and work with portfolio companies, and you have basically zero capital, and you're undercapitalized, how -- when you start a company, you are supposed to have capital so you can pay for the costs of the company, aren't you?                                10:08

Page 2470

A.   That's normally the way it works.                    10:08

In this case, the fees collected from the portfolio companies were the source of their capital.

Q.   Thank you.

What about from a forensic standpoint is related   10:09 parties -- is related-party transactions evidence of alter ego?

A.   It certainly can be, and it is a major component here.  There is a lot of transactions between the entities.  That's what that chart shows.  Actually, FDC is   10:09 kind of the bank.  Everything gets paid through FDC because there's no money in the other two entities, and they only get paid their management fees from the Funds, and then that money gets used to fund FDC.  The money just keeps moving around in that pivot position.          10:09

Q.   Let me ask you: Were there any intercompany accounts?

A.   There were in some cases, but in other cases they didn't record intercompany transactions, and when they did, they didn't agree.                          10:10

Q.   In other words, they didn't reconcile them?

A.   Correct.

Q.   And what about loans?  Mr. Frost has asserted that he made loans to the incubator.  Did you see that those loans were actually documented in the form of      10:10

Page 2471

Q.    I think you're going to see some pop-ups.    10:24

A.    Yeah, I call them pop-ups.

Q.    Let's do the first.

Pop-ups are great we got on slide -- Is that Slide 14?  Some pop-ups.  Adaptive Well and SegOne and Syntego    10:24 are now popping up.  Tell us how does that data support your conclusion that the incubator fees were arbitrary?

A.    I chose these three because they all have about -- they certainly all have less than one full-time employee over the life, Point 9, Point 8, Point 4.  They    10:25 all were charged fees about the same in number of months, 19, 20, 22.  You can see the average fee for Adaptive Well was $41,000 for all 19 months.  Whereas, SegOne was 22,400; and Syntego was 29,400.  So you get the sense that there is an arbitrary nature to this because even though    10:25 they don't provide detail of how the fees are determined, there is big differences.  None of these companies, for instance, had any revenue; or if they did, it was very insignificant.  Almost no employees, no revenues, most cases no financing transactions, and yet you got big    10:25 discrepancies --

Q.    And --

A.    -- on the fee.

Q.    Do you remember if you observed Adaptive Well was charged rent during the period of time during which it    10:26

Page 2482

of books and records that are kept for those companies.    14:52

Q.    Separate QuickBooks is what you're talking about?

A.    Yes, sir.

Q.    In your reports and discussion of loans that    14:52 were provided from the incubator to the portfolio companies, do you know what those loans are used for by the portfolio companies?

A.    Trying to remember if I talked about loans to the portfolio.  Companies from FDC you are saying?    14:53

Q.    Look at page 7 of your report.

A.    I know they have receivables, and they built the things that didn't get paid; and if that's a loan, if that's what you're talking about.

Q.    Page 7 of your report.    14:53

A.    All right.

Q.    Page 8 of the PDF.  We got Paragraph 23 with subsections through J.

A.    Yes, I see.

Q.    And it appears in that subsection you're stating    14:53 either an opinion or an observation that the incubator providing loans to the portfolio companies had a negative impact on the portfolio companies.

Is that what you're saying there?

A.    I'm saying in this paragraph that the practice    14:54

Page 2606

of overcharging the incubator fees contributed to the 14:54 operating losses and caused them to become undercapitalized, and that FDC's extension of loans to them, which is really in the form of giving them the ability to carry their interest -- excuse me -- carry 14:54 their receivable on unpaid fees, all serves to create a situation where the portfolio companies are in jeopardy financially.  They keep them alive without having any cash.

Q.    Okay.  And do you know what the loans -- again, 14:55 do you know what the loans are used for?  Was it used for payroll by a portfolio company primarily?

A.    In some cases, they were.  I know there were loans to Maana, for instance, and some others where they needed bridge financing between financing, and they wanted 14:55 to keep the company going, so there were some loans.

Q.    Okay.  Did you analyze whether some of the portfolio companies would have gone under without the loans?

A.    I didn't look at that specifically.  My -- I 14:55 certainly think that's true, but I didn't do a separate analysis.

Q.    Does your -- Do your opinions regarding writeoffs of -- You gave some opinions around valuations of some of the portfolio companies and write-downs of 14:56

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 5, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 2674

# EXHIBIT 90

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,   )
a Delaware limited liability     )
company; and FROST VENTURE       )
PARTNERS GP, LLC, a Delaware     )
limited liability company,       )
                                 )
          Claimants,             ) Case No.
       vs.                       ) 1200052341
                                 )
HOLLENCREST BAYVIEW PARTNERS,    )
L.P., a Delaware limited         )
partnership; ROBERT B. WOLFORD,  )
an individual; WOLFORD FAMILY    )
TRUST, dated July 11, 2006,      )
                                 )
          Respondents.           )
                                 )
-----------------------------------
AND RELATED COUNTER-CLAIM.       )
_____)

ARBITRATION DAY 8

Orange, California

Wednesday, January 24, 2018

Reported by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 2801224
Pages 1726 - 1925

Page 1726

                          I N D E X


WITNESS: JOHN BURKE

        (Deposition testimony read - Not reported.)




WITNESS:  DOUG LAWSON

        (Deposition testimony read - Not reported.)


WITNESS: STUART FROST - Pursuant to 776 Evidence Code

EXAMINED BY      DIRECT     CROSS       REDIRECT      RECROSS

Mr. Hodel        1745 (776 Examination)

                                                    Page 1730

to --                                                          11:09

   MR. HODEL:  Can you remind people what the date of this deposition was?  Can you look at the front?

   THE ARBITRATOR:  June 19, 2017.

   MR. WILKS:  Now we're going to jump and skip      11:09
over some of that testimony.  Jump to page 34, line 17 to page 35, line 12.

   (Testimony read - not reported.)

   MR. WILKS:  Let's go to page 40, line 11 to page 41, line 8.                                          11:10

   (Testimony read - not reported.)

   MR. WILKS:  Let's go to page 44, line 16 to 24.

   (Testimony read - not reported.)

   MR. WILKS:  Page 49, line 21 through 52, line 2.

   (Testimony read - not reported.)                 11:13

   MR. WILKS:  Page 54, line 4 through page 55, line 2.

   (Testimony read - not reported.)

   MR. WILKS:  Let's get to page 62, line 1 through 18.                                                       11:17

   (Testimony read - not reported.)

   MR. WILKS:  63, line 20 to page 66, line 12.

   (Testimony read - not reported.)

   MR. WILKS:  Page 72, line 12 through page 75, line 14.                                                   11:22

Page 1741

.

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 28, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1925

# EXHIBIT 91

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

----------------------------------

FROST MANAGEMENT COMPANY, LLC,   )
a Delaware limited liability     )
company; and FROST VENTURE       )
PARTNERS GP, LLC, a Delaware     )
limited liability company,       )
                                 )
         Claimants,              ) Case No.
     vs.                         ) 1200052341
                                 )
HOLLENCREST BAYVIEW PARTNERS,    )
L.P., a Delaware limited         )
partnership; ROBERT B. WOLFORD,  )
an individual; WOLFORD FAMILY    )
TRUST, dated July 11, 2006,      )
                                 )
         Respondents.            )
                                 )
----------------------------------
AND RELATED COUNTER-CLAIM.       )
_____)

                ARBITRATION DAY 8

                Orange, California

            Wednesday, January 24, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2801224

Pages 1726 - 1925

                                    Page 1726

I N D E X


WITNESS: JOHN BURKE

        (Deposition testimony read - Not reported.)




WITNESS:  DOUG LAWSON

        (Deposition testimony read - Not reported.)


WITNESS: STUART FROST - Pursuant to 776 Evidence Code

EXAMINED BY      DIRECT     CROSS       REDIRECT       RECROSS

Mr. Hodel        1745 (776 Examination)

Page 1730

MR. WILKS: Go to page 9, line 5 through page 10, line 7.                                                    09:01

(Testimony read - not reported.)

MR. WILKS: Go to page 13, line 6 through 10.

(Testimony read - not reported.)                    09:03

MR. WILKS: Let's go to page 35, line 16 through page 37, line 22.

(Testimony read - not reported.)

MR. WILKS: Page 39, line 12 through 42, line 13.                                                            09:06

(Testimony read - not reported.)

MR. WILKS: Let's go to page -- just further down that page, page 42, line 21 to page 43, 10.

(Testimony read - not reported.)

MR. WILKS: Go to page 43, line 24, to 45, line    09:11
10.

(Testimony read - not reported.)

MR. WILKS: Go to page 53, line 20 to 54 -- page 54, line 14.

(Testimony read - not reported.)                    09:13

MR. WILKS: Page 55, line 21 through 57, line 8.

(Testimony read - not reported.)

MR. WILKS: Page 71. Actually, this is one I meant to cut out. It's interesting, but we're trying to cut this short.                                                      09:16

Page 1732

Let's go to page 74, line 17 to page 76, line 21.          09:16

(Testimony read - not reported.)

MR. WILKS:  Go to page 77, line 17 to page 78, line 25.

(Testimony read - not reported.)          09:18

MR. WILKS:  Page 80, line 11 through 82, line 2.

(Testimony read - not reported.)

MR. WILKS:  Page 83, line 20 to page 85, line 13.

Page 85, line 19 through 86, line 17.          09:27

(Testimony read - not reported.)

MR. WILKS:  Page 97, line 5 to page 101, line 19.

(Testimony read - not reported.)

MR. WILKS:  Page 108, line 5 through 24.          09:34

(Testimony read - not reported.)

MR. WILKS:  Page 111, line 18 -- Wait a minute. I skipped one.  Page 109, line 8 to 109, line 15.

We can skip that one.  Page 111, line 18 to page 113, line 3.          09:36

(Testimony read - not reported.)

MR. WILKS:  Back to page 45, a few questions about SegOne.  Page 45, line 25 through page 50, line 24.

(Testimony read - not reported.)

MR. WILKS:  Page 51, line 16 to 53, line 2.          09:42

Page 1733

.

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 28, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1925

# EXHIBIT 92

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

------------------------------------

FROST MANAGEMENT COMPANY, LLC,    )
a Delaware limited liability      )
company; and FROST VENTURE        )
PARTNERS GP, LLC, a Delaware      )
limited liability company,        )
                                  )
          Claimants,              ) Case No.
     vs.                          ) 1200052341
                                  )
HOLLENCREST BAYVIEW PARTNERS,     )
L.P., a Delaware limited          )
partnership; ROBERT B. WOLFORD,   )
an individual; WOLFORD FAMILY     )
TRUST, dated July 11, 2006,       )
                                  )
          Respondents.            )
                                  )
------------------------------------
AND RELATED COUNTER-CLAIM.        )
_____)

ARBITRATION DAY 10

Orange, California

Friday, January 26, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2801227

Pages 2178 - 2424

Page 2178

I N D E X

WITNESS: ALEXANDER MALEKI

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Wilks | 2190 | | | |
| | | 2210 (Resumed) | 2288 | |
| | | | 2296 (Further) | |
| Mr. Holley | | 2208 (Voir Dire) | | |
| | | 2264 | | |

WITNESS: KEITH PALZER

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Wilks | 2298 | | | |
| Mr. Hodel | | 2402 | | |

Page 2182

KEITH PALZER,

a witness herein, having been administered an oath, was

examined, and testified as follows:

12:50

THE WITNESS:  I do.

THE ARBITRATOR:  Please state your name and

spell it for the record.

THE WITNESS:  My name is Keith Palzer.

K-e-i-t-h.  P-a-l-z-e-r.                                    12:51

THE ARBITRATOR:  Thank you.


-DIRECT EXAMINATION-


BY MR. WILKS:                                              12:51

Q.   Good morning, Mr. Palzer.

Can you tell us --

A.   Good afternoon.

Q.   Good afternoon.  Sorry.

Can you tell us what you do for a living?         12:51

A.   I'm a consultant with Navigant Consulting, Inc.

Q.   And can you tell me what your title is at

Navigant Consulting, Inc.?

A.   Yes.  I'm a director of financial services

advisory segment and the global disputes and economics    12:51

Page 2298

Exhibit 92
Page 1031

became more familiar with fiduciary standards in that job.    13:00

Q.    Okay.    In your career, have you negotiated and managed investment advisory agreements, including private equity funds?

A.    Yes.    Both as a lawyer and a business person, I    13:00 have negotiated and managed many investment management agreements.

Q.    Okay.    Let's look at -- I was going to say look at Exhibit 1052, but that's the outline of your testimony. Looks like you have your own copy of it there.    13:01

A.    This is the October 13th document.

Q.    Right.    It says, "Outline of expert testimony of Keith Palzer, October 13, 2017."

A.    Yes.    I have a copy of that in front of me.

Q.    Which the rest of us will know as Exhibit 1052.    13:01

MR. HOLLEY:    Will this be offered at this point?

MR. WILKS:    Yes, it is.

MR. HOLLEY:    We object to -- I don't know how you want to do this, Your Honor, but I object to large parts of this document as asserting legal conclusions and    13:01 asserting remedies that the arbitrator should impose in this case as being outside the proper scope of an expert opinion.

MR. WILKS:    Well, that's a little broad, Your Honor.    I don't know how to address it unless I know which    13:02

Page 2305

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 4, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 2424

# EXHIBIT 93

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

----------------------------------

FROST MANAGEMENT COMPANY, LLC,     )
a Delaware limited liability       )
company; and FROST VENTURE         )
PARTNERS GP, LLC, a Delaware       )
limited liability company,         )
                                   )
          Claimants,               ) Case No.
        vs.                        ) 1200052341
                                   )
HOLLENCREST BAYVIEW PARTNERS,      )
L.P., a Delaware limited           )
partnership; ROBERT B. WOLFORD,    )
an individual; WOLFORD FAMILY      )
TRUST, dated July 11, 2006,        )
                                   )
          Respondents.             )
                                   )
----------------------------------
AND RELATED COUNTER-CLAIM.         )
_____)

ARBITRATION DAY 5

Orange, California

Friday, January 19, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2778657

Pages 1069 - 1195

Page 1069

                          I N D E X


WITNESS: MARK LELINSKI - Via Video Conference

EXAMINED BY       DIRECT    CROSS     REDIRECT      RECROSS

Mr. Wilks          1075

Mr. Holley                   1133


WITNESS: ALEXANDER STOJANOVIC

(Deposition testimony read - Not reported.)


WITNESS:  MICHAEL DOLBEC

(Deposition testimony read  - Not reported.)


WITNESS:  Sam Cates

(Deposition testimony read  - Not reported.)

                                          Page  1073

A.    Excuse me.                                              09:09

Q.    I interrupted you.  I'm sorry.  Go ahead and finish.

A.    At least for the month of February and maybe even some in January is what I was told that there was    09:09 work that was done on the company before, and so they charged -- they charged -- So when I got my first look, you know, at financials, it already had money taken out for the prior month, at least maybe two months.

Q.    How does $60,000 sound?  Does that sound about    09:10 right?

A.    About right.

Q.    Do you recall how much in capital Pinscriptive had to start with?

A.    I was told coming in, that it would be 500,000;    09:10 but then when I got it, I heard that we do it in 250K chunks, so 250-.

Q.    Do you feel like you ever got a real answer regarding what the $60,000 in incubator fees were charged before you came in was used for?    09:11

A.    No.  Just a very high level for research about the concept and, no.

Q.    But was that a question you asked when you joined Pinscriptive?

A.    Yes.  Yeah.  Because I -- I knew when I joined    09:11

Page 1079

and already there -- you know, when you are a CEO of a    09:11

start-up, and you have a certain amount of funding and

only 250K of that is guarantied, the rest depends on the

performance and progress you make to get more investment

into the company, when you see 60- of the 250- already    09:11

gone, that's concerning.  So I asked about what that was,

and why.

Q.   But you never really got --

A.   As I said --

Q.   Go ahead.                                            09:11

A.   It was really -- I didn't get a sense that the

amount of money related to the amount of work that was

done, but I didn't have a way to dispute that either.

Q.   Okay.  Did Pinscriptive have any employees

working at the Frost Data Capital office space in         09:12

San Juan Capistrano?

A.   In the beginning I commuted, which actually was

a good thing because there were other CEOs that are

working there, and at the time we had a fully functioning

healthcare group so to have other Health-Tech CEOs working 09:12

out of there and some CTOs, it made sense to go.  So I

went every week, Monday through Thursday, but then started

to back-off of that, and eventually stopped going to

the -- to the office.

Q.   And you're in Austin, Texas?                         09:12

Page 1080

It's an email from you to Tom Giles dated September 20, 2016.                                                                                   09:22

Is that the document you have in front of you?

A.   I do.

Q.   Is this an email you sent on the date indicated?   09:23

A.   Yes.

Q.   There's a sentence there I want to focus you on. It's the second line down.  It says, "If we back out the excess 30K per month paid in a" --

THE REPORTER:  I'm sorry.  I can't hear you.   09:23

BY MR. WILKS:

Q.   I was reading the sentence.  I'm directing you to a sentence that says, "If we back out the excess 30K per month inflated incubator fees, (assumes 10K is reasonable fee), then we are under 1.3 million burn."   09:23

Do you see that?

A.   I do.

Q.   Is it true that you believed the incubator fee was excessive by $30,000?

A.   I did roughly, yep.   09:24

Q.   Do you consider $10,000 still to be a high figure?

A.   I thought that that was at least a reasonable figure, meaning when I thought about the services that were provided, some had -- had significant value.  But if   09:24

Page 1088

I were to go on the open market and get those services, it    09:24 would -- it probably wouldn't cost me in total more than 10K, and I thought it was generous, meaning if you are going to charge a flat fee, let's not argue about it.  It should be something that I'm willing to pay because I see    09:24 enough value; and otherwise, you should charge based upon the service you use.  Right.  And that's not -- that was not an option.  So if I had to value it, my rough estimate was 10K.

As an example of that, we kept an office in Sparta,    09:25 New Jersey, a similar kind of incubator, but not -- not with a VC attached or anything.  It was more open space for freelancers and others to work in, and that for multiple desk space cost us $500 a month.  So, and I had less than that for $2,000 a month, you know.  And so    09:25 that's the kind of thing that, you know, was running through my mind.

The services in the 10K that certainly were worth it were the financial services.  We didn't have to hire a CFO or bookkeeper of any kind.  We used the financial people    09:25 who did the monthly -- the monthly books.  That was probably the most consistent service.

But 10K seemed like a fee that was probably a little bit high, but it seemed like a fee that is reasonable for the services that were provided.  Certainly wasn't zero,    09:26

Veritext Legal Solutions
866 299-5127

Exhibit 93
Page 1039

but I didn't think it was 40 either.                    09:26

Q.   Do you feel you could -- you talked about the services that you did receive, the financial services.  Do you feel that you could hire somebody to replace those services full time for $120,000?                    09:26

A.   Yeah.  Because I didn't use them full time.  So, you know, those services for a financial, they certainly weren't doing on our books more than, I don't know, seven hours a month, ten hours a month max because you had one person dealing with 24 companies.  So they weren't -- they   09:26 weren't spending a lot of time on our books.

Q.   So when I said 120,000, I think you understood it, but I meant 120,000 a year, full-time person?

A.   Yeah.

Q.   120,000 a year, is that what you understood?     09:26

A.   Right.  What I'm saying to you is that the 10,000 is a bunch of smaller part-time people doing some -- some different things.  But I could buy those services as I need it probably for less than 120K a year.

Q.   Okay.  So getting back to Exhibit 795, your     09:27 email, September 20, 2016, we can all read it, but can you just give us sort of an overview of what you were trying to communicate here to Tom Giles?

A.   Yes.  So Pinscriptive was a -- you know, a valued company by -- by some in the outside world, and we   09:27

Page 1090

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 24, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1195

# EXHIBIT 94

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,       )
a Delaware limited liability         )
company; and FROST VENTURE           )
PARTNERS GP, LLC, a Delaware         )
limited liability company,           )
                                     )
              Claimants,             ) Case No.
         vs.                         ) 1200052341
                                     )
HOLLENCREST BAYVIEW PARTNERS,        )
L.P., a Delaware limited             )
partnership; ROBERT B. WOLFORD,      )
an individual; WOLFORD FAMILY        )
TRUST, dated July 11, 2006,          )
                                     )
              Respondents.           )
                                     )
-----------------------------------
AND RELATED COUNTER-CLAIM.           )
_____)


                    ARBITRATION DAY 8

                    Orange, California

              Wednesday, January 24, 2018






Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2801224

Pages 1726 - 1925

                                        Page 1726

                                    I N D E X


  WITNESS: JOHN BURKE

        (Deposition testimony read - Not reported.)




  WITNESS:  DOUG LAWSON

        (Deposition testimony read - Not reported.)


  WITNESS: STUART FROST - Pursuant to 776 Evidence Code

  EXAMINED BY      DIRECT     CROSS       REDIRECT       RECROSS

  Mr. Hodel        1745 (776 Examination)


                                                      Page 1730

monthly basis?                                                    12:43

A.   I think I just answered that.  Zero.  It's a start-up.

Q.   The other one you left out is your housekeeper was -- was an employee of the incubator the last time I asked you in December.                                       12:44

A.   Sure.  Sorry.  I forgot that one.  Yes, she is.

Q.   Okay.  And, then, what is her name?

A.   Marcia Enriques.

Q.   Does she work for you full time?                             12:44

A.   Yes.

Q.   She has no duties other than being a housekeeper; correct?

A.   Well, I'm working from home at the moment, so she's certainly cleaning my office.                            12:44

Q.   Does she live with you at your home?

A.   No.

Q.   How long has she been an employee of the incubator?

A.   Couple of years, from my recollection.                      12:44

Q.   Always paid directly by the incubator; correct?

A.   Yes.

Q.   We've heard in this arbitration about the fact that portfolio companies have accrued incubator fees.

Are there portfolio companies out there who have on   12:45

Page 1750

as per the percentages below.                                    12:50

Q.   I'll come back to that.

You see where it's being allocated as salary.  The only -- You have seen these documents before; correct?

A.   I don't recall seeing this particular one.     12:50

Q.   Did you ever ask to see this document?

A.   I think it's the first time I have seen this particular document.

Q.   Well, Mr. --

A.   I wasn't aware of it, so I can't really ask    12:51
about it.

Q.   You are claiming you were not aware that there was a document that Bill Guerry prepared which is a -- which is this document essentially here?

MR. HOLLEY:  Object to the form.              12:51

BY MR. HODEL:

Q.   These are the financial statements of the Fund Manager for Fund II?

THE ARBITRATOR:  Overruled.

THE WITNESS:  I recall seeing similar documents.  12:51
I just can't say for certain whether it was this one or not.

BY MR. HODEL:

Q.   But Luis Vasquez was working for the Fund?

A.   As part of his role, yes.                      12:51

Page 1755

Q.    And Mr. -- Mr. Guerry testified at a certain point in time, you had a shortfall in your allocation of this fee, and that you then, in order to be able to meet certain expenses, particularly associated with Italy, you took -- you took money out of the share from John Vigouroux and Jack Kreindler in order to pay those expenses; isn't that true?

A.    Actually, that's not the way I recollect it.

Q.    But you know what Mr. Guerry testified to?

A.    Yes.  My recollection is that Bill actually did that first, and then notified me of what he had done.

Q.    Okay.  He did it first.  That's not his testimony.  But you are saying that you were aware of it; correct?

A.    He made me aware of it after the fact.

Q.    Did you object to it?

A.    Well --

Q.    Mr. Frost, listen to my question.  I'm going to break it down.

Upon hearing, that did you say to Mr. Guerry, "You need to reverse that transaction"? "Yes" or "No," please.

A.    My understanding at the time is that I said there is probably some mistakes where too much is being allocated to me, and we'll need to address that at some point.  I don't recall any further conversation on that.

Page 1756

Q.    You said -- You're claiming you said that to Mr. Guerry?

A.    That's my recollection.

Q.    "My understanding at that time is I said, probably some mistakes."  Well, you're saying that.

And did Mr. Guerry say, "Oops, what I did was a mistake"; is that your testimony?

A.    As I just said, I really don't recall much more of the conversation.

Q.    Well, let's just break it down, Mr. Frost.

Did you ever say to Bill Guerry, "I want you to return that money to Jack Kreindler or John Vigouroux"?

A.    I don't recall saying that, no.

Q.    Mr. Frost, we have been litigating this for quite some time.  Do you have any regrets at all over the salary that you -- that you took from the incubator?

A.    No.

MR. HOLLEY:  Object to the form.

BY MR. HODEL:

Q.    Do you have any regrets at all over the fact that you have two cars that were paid for out of either the GP money or from the incubator?  Do you have any regrets about that?

MR. HOLLEY:  Objection to form.  Argumentative. Relevance.

Page 1757

California.  In fact, most of those were in Orange County;   13:09
isn't that true?

A.   Yes.  I guess that's true.

Q.   Yet, we got $1.6 million of travel expenses?

A.   Where their headquarters are is irrelevant to   13:09
that question.  Because they travel all over the place to
customers and partners and so on.  So did the incubator
staff to set up those relationships and so on.  So where
the headquarters is completely irrelevant.

Q.   We're just focusing on the 1.6 million because   13:09
you said you never drilled down on that to understand what
that was.

MR. HOLLEY:  No question pending.

BY MR. HODEL:

Q.   Did you ever drill down on that 1.6 million to   13:09
understand what it was?

A.   No.

Q.   Did that 1.6 million include the CEO travel?

A.   I don't think so.

Q.   So what we know is the 1.6 million is just   13:09
travel of you and the incubator staff; correct?

A.   That should be true based on the allocation in
the accounts, yes.

Q.   Do you know what it means to have a fiduciary
duty, Mr. Frost?   13:10

Page 1769

A.   In general, yes.                                          13:10

Q.   Do you believe that you had fiduciary duties with respect to The Seed Fund and Fund II?

A.   Yes.

Q.   Did you understand that that meant that you were     13:10 to fundamentally act in the best interests of the investors of those Funds?

A.   In that sense, yes.

Q.   This also meant that when you made a decision, you were to put their interests above your own interests;     13:10 correct?

A.   In general, yes.

Q.   This also means, therefore, that you were not to put the interests of the incubator in front of the investors in those two Funds; true?                         13:11

A.   I think in both agreements, there are clauses that modify that slightly; but in general, that's true.

Q.   I'll read from your deposition.   This would be page 333, line 17 through 22.

MR. HOLLEY:   Okay.                                           13:12

BY MR. HODEL:

Q.   "Question: You believe the fact that your fiduciary duties required you not to put the interests of" The Seed Fund -- excuse me -- "of the incubator in front of those other investors in The Seed Fund I and Roman     13:12

Page 1770

Numeral II; correct?"                                    13:12

And your answer was: "Yes."

This also means that you were not to put the interests of the general partner or member or management of the Fund Managers in front of the interests of the       13:12 investors of both Funds; correct?

A.    Yes.

Q.    And tell us this: Did you have any prior experience running any kind of a Fund before you started work -- before you started running these Funds?       13:12

A.    No.

Q.    Had you ever managed any kind of investment Fund before?

A.    No.

Q.    With respect to all the people who were involved   13:13 in the management of The Seed Fund and Fund II, did any of them have any prior experience in manage -- in managing an investment fund?

A.    Well, George Ugras was involved for a while.  He certainly did.       13:13

I don't believe the rest of the team did.

Q.    George Ugras.  I'm just going to read from your deposition.  This will be Volume III, lines -- page 738, lines 12 through 16.

MR. HOLLEY:  Okay.       13:14

Page 1771

BY MR. HODEL:                                               13:14

Q.    "Question: With respect to all of the other people who were involved in the management of The Seed Fund or Fund II, did any of them have any prior experience in managing an investment fund?                  13:14

"Answer: Not to my knowledge."

Did you have any prior experience running an incubator, Mr. Frost?

A.    No.

Q.    Did you ever get any professional advice on the     13:15 following subjects: On the question of the allocation of the management fees, in other words, this program where you're paying expenses through the allocation of the management fee, did you ever receive any legal advice on that question?                                            13:15

A.    Yes, I believe I did.

Q.    Let me read from your deposition now.  This will be page 181, lines 6 through 13, and I will skip the objection.

MR. HOLLEY:  Six through 13.  Okay.        13:16

MR. HODEL:  May I?

MR. HOLLEY:  Yes.

BY MR. HODEL:

Q.    "Did you ever get any legal advice from anybody about the allocation of management expenses, a program     13:16

Page 1772

fees, a particular level," was that blessed by any lawyer, 13:17 Mr. Frost?

MR. HOLLEY:  Objection.  Unless the answer is "You never met with a lawyer about that," that would be invading the attorney-client privilege. 13:17

MR. HODEL:  I'm just going to ask whether or not he ever received advice on that precise subject matter.

MR. HOLLEY:  I think that's okay.

THE ARBITRATOR:  That is okay.

THE WITNESS:  Certainly had conversations with 13:18 the Cooley lawyers and the Stradling attorneys around this topic.  I wasn't involved in all of those conversations.

I'm trying to answer your question.  It's years ago.

So as I say, it's hard to remember specifically whether we talked about the magnitude of the fees.  It was 13:18 certainly part of the overall conversation.

BY MR. HODEL:

Q.   I'm going to read.  Let us know when you're done, Mr. Frost.

A.   Sure. 13:18

Q.   I'm going to read from your deposition, Volume I, page 205 through -- Volume I, 205, line 3, through page 206, line 3.

MR. HOLLEY:  Fine.

BY MR. HODEL: 13:19

Page 1774

Q.    "Question: Did you ever get any legal advice    13:19
from anyone as to whether it was proper to charge these
types of fees to the portfolio companies?

"MR. HOLLEY: It's a 'Yes' or 'No' question.

"THE WITNESS: Proper to charge that?  Can you clarify    13:19
the question for me?

"Question: Fees in that -- in that magnitude, $35,000
a month.  Did you ever get any legal advice from anyone as
to whether that was an appropriate fee under the law?"

Then the witness says: "As to whether it was proper    13:19
or appropriate, so Cooley advised us when they put these
documents together and when" --

THE ARBITRATOR:  Stop for one second.

(Interruption in proceedings.)

BY MR. HODEL:    13:20

Q.    By the way, just so His Honor understands, do
you remember the $35,000 number was -- well, I want to put
the rest of it in.  Connects the text.

MR. HOLLEY:  He was in the middle of reading.

BY MR. HODEL:    13:20

Q.    I will finish.

The witness then says, "as to whether it was proper
or appropriate.  So Cooley advised us when we put these
documents together, and when the fees were disclosed in
the two documents, and the basic business structure was    13:20

Page 1775

Case 8:19-cv-01559-SPG-JDE   Document 44-9   Filed 03/26/21   Page 73 of 321   Page ID #:1715

Q.   Well, Mr. Frost, so let me try -- make it easier   14:19
on you, then.

Was a dollar number discussed with them?

A.   I don't remember a specific dollar number being
discussed.   14:19

Q.   But you are contending that a concept called --
what was the term you used?  Fully loaded executive?

A.   That's generally how I would describe it, yeah.

Q.   Okay.  Let me ask you: In the marketing
materials that we have seen here today, does the term   14:19
fully loaded executive appear anywhere in those documents?

A.   I haven't sat here and read them all.  I don't
think so.

Q.   And do you actually recall using that term in a
conversation with anyone from Hollencrest or Mr. Wolford   14:20
before they or any of their clients invested in The Seed
Fund?

A.   I'm pretty sure I did.  I don't recall that
exactly.  As I say, there was a pretty lengthy
conversation around that aspect of the business model.   14:20
They asked a lot of questions about it, and that was
certainly the way I was describing it at the time and, you
know, I would imagine that is how I described it.

Q.   Well, I think you agreed with me you don't think
it was in the marketing materials.   14:20

Page 1811

Veritext Legal Solutions
866 299-5127
Exhibit 94
Page 1054

And let me try it like this: What was the amount of the fully loaded executive?  Wasn't it $35,000?    14:20

A.    Yes.   That's one of the numbers that we used.

Q.    That's eventually, you said.   Okay.   So what number was used during -- so I think you have agreed that    14:21 no number was used in the discussions with the Hollencrest people before the investment in The Seed Fund, to the best of your recollection?

A.    I said I don't recall using a specific number.

Q.    And was -- When you say "Oh, it's going to be    14:21 the cost of a fully loaded executive," did you say to them, and "This is" -- "This is the order of magnitude that I expect it will be"?

A.    I didn't say that specifically.   That's to my recollection.    14:21

Q.    And you were here when Cary Breese testified; correct?

A.    Yes, most of it.

Q.    He testified about the calculation he did at $12,000 a month.   Were you there for that testimony?    14:21

A.    Yes.

Q.    Was there such a conversation between you and him?

A.    You know, I don't recall that specifically.   We had a lot of conversations around the business model when    14:22

Page 1812

we were putting everything together.  He certainly, to my 14:22
recollection, never gave me a spreadsheet.  Might have
shown me one.  I don't know.  I don't remember it.  And I
certainly don't remember the 12,000 number.  It's not part
of -- 14:22

Q.    Did you begin -- Did you begin your answer "I
don't recall"?  Is that your testimony that you don't
recall that ever happening or is your testimony that you
have some recollection of that happening?

A.    Of what happening?  I'm sorry. 14:22

Q.    Mr. Breese presenting something to you.  His
testimony was he was your CFO at the time; right?

A.    CFO/COO, yes.

Q.    Right.  He said he sat down, and he came up with
the calculation of what he thought a reasonable incubator 14:22
fee would be.  So let's see if you and I can agree.

Do you remember that happening?

A.    I already testified that I remember us having a
lot of conversations around the business model at the
time.  I don't remember him ever coming to me and saying, 14:22
"I think it should be $12,000."  That's just not something
I remember.

Q.    And his testimony was he presented that to you,
and then you said, "It ought to be, I think, 18,000 is
more in line."  Did that happen? 14:23

Page 1813

A.    I don't recall that conversation.    14:23

Q.    So you don't recall -- Do you recall discussing any specific number with Cary Breese?  Is that your testimony?

A.    Eventually, we settled on a specific number, but    14:23 I don't recall.  You know, it's seven years ago, so I don't recall a specific conversation, no.

Q.    Are you -- You said, "We settled on a number." Are you saying that you and Cary Breese agreed on what number would be that the incubator be charging the    14:23 portfolio companies?

A.    That's how I remember it, yes.

Q.    Do you recall his testimony that when he came to GenieDB, he discovered for the first time what the fee was, and he was surprised?  Were you here for that    14:23 testimony?

A.    Yes.

Q.    And so you're claiming otherwise.  You are claiming that you actually had agreed on the fee with him; is that your testimony?    14:24

A.    I think you are mixing up the timeframes.

Q.    Mr. Frost, so...

I'll come back to that further in my outline.

But you did know -- Did you -- You did have discussions with the Hollencrest people concerning the    14:24

Page 1814

A.    That would make sense.                                    14:26

Q.    He says, "Remember our clients are HNW, not institutional.  If there haven't been liquidity events and no marks to market, then nothing happened in their eyes."

Does that refresh -- refresh your recollection what    14:26 you learned from the Hollencrest people about the profile of their clients?

A.    Well, I believe you asked me how they defined the profile of their clients back in 2011, not in 2013.

Q.    He says, "Remember our clients are HNW," and he    14:26 says, did -- Well, let me ask you this: Did you write him back and say, "Rob, you have just changed the profile of the client that you previously described for me.  You are telling me about a different profile."

Did you ever write Mr. Wolford back and say that?    14:27

A.    No, I didn't write him back.  I think we had some discussions around this topic.

Q.    Look also at exhibit -- Let's see if I can cull it up for you first.

All right.  Was the pitch -- I wanted to ask you    14:27 briefly about -- hopefully briefly -- about the pitch on Fund II.

Was the -- Was the pitch that was made to my clients on Fund II any different in any material way than the pitch that was made on The Seed Fund that you can recall?    14:28

Page 1816

A.   Yes.                                              14:28

Q.   How was it different?

A.   Well, in multiple ways.  I mean, for one thing, the Fund II was designed as kind of follow-on funds to The Seed Fund, so it would be investing both in the existing 14:28 portfolio that we created and seeded out of The Seed Fund.

And also in new companies, it had a formal management fee and carry.

It was designed to be bigger.  You know, the whole organization was much more mature at that point, so the 14:28 pitch was -- I think it evolved.  We certainly learned a lot more about the corporate partners that we were working with at that point, so it was different in multiple --

Q.   I made my question more precise where there are management fees.  You were specifically telling them there 14:29 was a management fee on Fund -- on Fund II; correct?

A.   Correct.

Q.   And the -- My question is: In terms of describing the incubator model and describing what it might be charging the portfolio companies, was the pitch 14:29 the same on Fund II as it was on The Seed Fund?  Do you remember it being any different?

A.   I don't remember any specifics in terms of how it was different.  You know, I mean, fundamentally it was the same model, and that we followed and follows the exec 14:29

Page 1817

summary you have shown me as well.                          14:29

Q.   Thank you.

And was there any -- In terms of likelihood of an --
of exit events, was it basically the same?

A.   I think it was fundamentally the same.  Two to     14:29
five years from start-up of a given company.

Q.   All right.  I want to ask -- talk now about
Fund II, and I want to ask you about Mike Colaco and the
$6 million.  Let me see if I -- I will let you know when
I'm ready to do that.                                       14:30

Okay.  There's been testimony in here about in
Fund II, we all know what a Fund Manager is, we heard all
of that, and there is reference in the -- in the Operating
Agreement that went to the investors that says that the
general partner is going to be putting in $6.1 million.     14:30

Do you remember that provision?

A.   Yes.

Q.   Focusing in on that provision, was it a selling
point to investors in that Fund for them to know that the
general partner, who would be managing the Fund, would be   14:30
putting in money into the Fund was that a selling point to
those investors?

A.   You know, I don't recall having many discussions
around that topic, quite honestly.  Most of the
conversations were around the corporate partners and what   14:31

Page 1818

we were doing with the Fund.  I don't recall a lot of questions around that.

Q.    Did I ask whether -- I got lost, depo transcript.

Was that a selling point to the -- could that have been a selling point to the Hollencrest people, i.e., they are learning the general partner who will be managing the Fund will be putting its own money into the Fund?

A.    You said Hollencrest people.  Can you be more precise?

Q.    Mr. Wolford and the investors that came along with them into the Fund II.

A.    But what I was told at that time by Mr. Wolford was that Hollencrest was not going to invest in the Fund, that the investment committee led by Mr. Pellizzon had refused to invest anymore, that he was making a personal investment, and that some of his friends were going to invest.  There was never any expectation on my part that they were Hollencrest clients.

Q.    Wow, that's -- Do you remember my question?

A.    Well, I needed clarification because you didn't ask it very clearly.

Q.    Okay.  I am just going to read from your deposition.  Let me find it.

I found the page.

Page 1819

Would you agree with me that could be one of the selling points to the investors, people like Hollencrest --

MR. HOLLEY:  Where are we reading from?

MR. HODEL:  I'm not reading from anything yet. Okay.  Just going to set it up.  Okay.

Q.  Would you agree with me that is a selling point to someone who is going to invest in one of these funds, to know that the general partner who is managing the Fund was going to be putting its own -- its own money in the Fund to the tune of $6.1 million, would you agree that that's something that investor could see, and that would be a positive for them?

A.  Yes.

Q.  All right.  And did you put the $6.1 million in yourself?

A.  No.

Q.  Do you recall telling anyone at Hollencrest that the $6.1 million, that of that he had only put $50,000 of your own money into it, and the vast majority of that was coming from another source?

A.  I don't remember them asking about it; and again, I think it is mischaracterizing it was Hollencrest people.  Rob Wolford invested as an individual, not anything to do with Hollencrest.  The Hollencrest

Page 1820

investment committee turned down a Fund II investment.    14:34

Q.   We know that.  I apologize, Mr. Frost.  When I said, "the Hollencrest people," I meant Mr. Wolford.

A.   Okay.

Q.   You do remember making a pitch on Fund II to    14:34 more than Mr. Wolford over at Hollencrest; right?

See if I can make it easy on you.

Did you or did you not pitch Fund II to Greg Pellizzon?

A.   Most of my interactions at that time were with    14:34 Rob Wolford and may have had one meeting with Greg Pellizzon about it.  I'm not sure.

Q.   Do you or do you not recall making efforts to try to encourage Hollencrest to invest in Fund II?  Are you saying you don't recall?  If you don't recall, that's    14:35 fine.  I will just move on, Mr. Frost.

A.   Oh, no.  I'm not saying that.

Q.   Okay.

A.   That's not what you asked me.

Q.   So you do -- So you do recall making such    14:35 efforts; correct?

A.   To Hollencrest in general, yes.

Q.   All right.  All right.

A.   You asked me before about Greg Pellizzon.

Q.   Thank you.    14:35

Page 1821

Q.   Did he have any technical background in the analytics field or the big data field, Mr. Frost?          14:51

A.   As I just said, he's not a technologist and wouldn't portray himself as such.

Q.   Do you know anything about his educational background?          14:52

A.   No.

Q.   With respect to your $50,000, did you actually yourself put $50,000 cash into it?

A.   I think it was split between, just from recollection, it was allocation of the management fees which is pretty normal practice for a venture fund of this type, and I think a small amount of cash.  About 10-, $15,000, something like that.          14:52

Q.   I will read from page 65, line 24 through page 66, line 15.          14:53

MR. HOLLEY:  No objection.

BY MR. HODEL:

Q.   "Question: So -- So you actually did not put $50,000 cash into Fund II.  Instead, you just -- There's a decision made that in lieu of taking $50,000 in management fee, you would be credited with $50,000 in terms of a contribution; correct?          14:53

"Answer: Yes.

"Okay.  As outlined in Section 4.3?          14:54

Page 1834

Exhibit 94
Page 1064

"Answer: As outlined in Section 4.3 of the Limited     14:54

Partnership Agreement.

"Question: Okay.  I understand.  In terms of actual

money actually leaving your pocket, the amount that you

actually put into Fund II is zero; isn't that true?  True?   14:54

"Answer: Yes."

A.    Question.  Could you remind me of the date of

that deposition?

THE ARBITRATOR:  It's not a question.

THE WITNESS:  Okay.                                14:54

BY MR. HODEL:

Q.    Well, I will give you a chance, Mr. Frost.  Are

you saying after your deposition you discovered that that

answer was in error?

A.    Well, I --                                        14:55

Q.    Can you answer that, please?

A.    I'm trying.

Q.    You know what, I'll let your lawyer ask you his

questions when the time comes around.  You know what, I'm

sorry.  Go ahead.                                           14:55

THE ARBITRATOR:  I think he already answered the

question.

Your best recollection, as you sit here today, is

that you put $35- or $40,000 of your accrued management

fee percentage into the GP, and then $10- or $15,000 in     14:55

Page 1835

actual cash?                                                   14:55

THE WITNESS:  That's correct, Your Honor.  Yes.
Just, I think, in between the two, I saw some -- with all
the discovery flying around, I think I saw something that
showed that.  That's all.                                      14:55

But you are absolutely correct, that is my
recollection today.

BY MR. HODEL:

Q.   So in general -- I want to make a statement.
You can tell me whether it's true or not.                      14:55

Regarding the Frost Data Capital, the incubator, it
basically had a policy where it tried to avoid disclosing
to investors information concerning the magnitude of the
incubator fees that were being charged to the portfolio
companies; true or false?                                      14:56

A.   False.

Q.   Okay.  So let's walk through it.

If I look at the quarterly reports that come to me,
does that disclose to me the magnitude of the incubator
fees?                                                          14:56

A.   No.

Q.   If I look at the audit reports that came from
Marcum, do they disclose the magnitude of the incubator
fees?

A.   I don't believe so.                                       14:56

Page 1836

Q.    And you remember somebody named Michael Kramer?    14:56

A.    Yes.

Q.    You talked to him on the phone; right?

A.    Yes.

Q.    That was quite unpleasant; right?    14:57

A.    Yes.

Q.    You were in Italy at the time; correct?

A.    No, I don't believe so.

Q.    Do you remember Mr. Kramer complaining that it was hard to reach you in Italy?  Do you remember that    14:57
occurring?

A.    No.

Q.    Okay.  That's just you're testifying that that never happened?

A.    Well, I think he complained about me being hard    14:57
to reach.  I just don't think I was in Italy at the time.

Q.    Don't you --

A.    I don't believe so.  I think I was in the U.S.

Q.    Do you remember him saying, "Look, you haven't responded to me in a couple weeks, and you said, "I'm in    14:57
Italy.  There's patchy connectivity here."  Do you remember that email?  Have I helped you now remember?

A.    That was one of the times, but I don't remember the timeframe of that or anything else, so --

Q.    Bill Guerry testified that Mr. Kramer was    14:57

Page 1837

inquiring about incubator fees.                                          14:57

A.    That is not something that he discussed with me by my recollection.

Q.    But you remember that the Kramers were asking to be able to view certain information.                          14:58

Do you remember that?

A.    Yes.

Q.    Was the information actually provided to them?

A.    No.  Because we followed the letter of the Operating Agreements.  We provided the information that     14:58 the Operating Agreements allowed for.

Q.    They asked for -- They also asked for a list of investors; correct?  Did you provide them -- Yes, do you remember that?

A.    I'm sorry.  What was the question?                     14:58

Q.    They asked for a list of investors because they said we want to contact other investors.

Do you remember that occurring?

A.    Yes.

Q.    And you refused to allow that to happen;            14:58 correct?

A.    That's right.  Because it's not provided for under the agreements that I signed.

Q.    And they also asked for a list of the members of the advisory committee, and you also refused to provide     14:58

Page 1838

Q.   You see Mr. Guerry is forwarding to you what is    15:01
originally an email discuss between Luis Vasquez and Paul
Cate.

We know who Mr. Vasquez is?

A.   Sorry.  Where are you?                             15:01

Q.   Exhibit 1111.

A.   I may have the wrong one.

Q.   Okay.

A.   1111 isn't about Paul Cate.  It's about GE.

Q.   Exhibit 1111.  Exhibit 1111.                       15:02

A.   Oh, I'm sorry.

THE ARBITRATOR:  It's not the first time that
mistakes have happened.

MR. HODEL:  I do it during this examination,
Mr. Frost.  It's not --                                 15:02

THE WITNESS:  I have it now.  I apologize.

BY MR. HODEL:

Q.   All right.  So you see Mr. Guerry is forwarding
you an email where Luis Vasquez had been discussing
something with Paul Cate, talking about Cirro, and       15:02
Mr. Vasquez writes Mr. Guerry, "I believe at some point
you will need to discuss the incubator fee with Paul or at
least tell him that you're not providing the information."

Do you see that?

A.   Yes, I see that.                                    15:02

Page 1841

When you got this email, did you respond to it?   15:04

A.   Not to my recollection, no.

Q.   Did you contact Mr. Guerry and go, "I think you ought to let this investor know how much the incubator fee is," did you do that?   15:04

A.   I don't recall it.

Q.   Okay.   And you remember now that during the summer of 2016, you received a demand letter from my law firm?

A.   Oh, yeah.   15:04

Q.   Okay.   Look at Exhibit 408, please.

A.   Sorry.   I need to switch files.

Q.   Do you remember this letter?

A.   Yes.

Q.   Did you read the letter?   15:05

A.   Yes.

Q.   Did you remember that one of the things we asked for is we asked for access to the incubator financial records; correct?

A.   Correct.   15:05

Q.   We asked for access to the portfolio company financials -- financial statements; correct?

A.   Yes.

Q.   We said we wanted to learn about the detail of the incubator fees; correct?   15:05

Page 1843

A.    I think that's part of the letter, yes.    15:05

Q.    And you refused to provide those documents to us; isn't that true?

A.    Yes.   At that time, yes.

Q.    In fact, we never got access to those records    15:05 until after this arbitration was filed, and then we only got it through the discovery process; isn't that true?

A.    I believe that to be the case.

Q.    Would it have caused any harm to the investors to put into the quarterly reports or the audited financial    15:06 statements, "Here's the amount that the incubator is charging each of these portfolio companies"?  Would that have been harmful to them in any way?

A.    I can't see how it would have been, no.

Q.    I'd like to look at Exhibit 420, please.  This    15:06 is a letter you wrote to Greg Pellizzon and Rob Wolford on October 17, 2016.  Excuse me.  It's an email, that date; correct?

A.    Yes.

Q.    All the words in this email are yours; true?    15:07

A.    Yes.

Q.    At the time you sent this, you referred to, "Seems to me the consequences of any of this going public are much worse."  You said, "After all, what will the following parties think when they hear my side of the    15:07

Page 1844

objection.                                                    15:35

        Sustained.

    BY MR. HODEL:

        Q.   Do you remember --

              THE ARBITRATOR:  Good objection, actually.      15:35

              MR. HOLLEY:  First time you said that.  In Day

7., that's not good.

              MR. HODEL:  Said, I suppose it's a valid -- it's

a valid objection.

              THE ARBITRATOR:  Yeah, I never thought about it.  15:35

              MR. HODEL:  You had some doubt at first.

              THE ARBITRATOR:  Yeah, I did.

    BY MR. HODEL:

        Q.   Mr. Frost, do you remember that Marcum came in

and started to do work in connection -- in 2017 in            15:35

connection with auditing the financial statements of the

Funds for the year 2016?

        A.   I actually don't recall that.

        Q.   Well, Mr. Guerry testified that they -- they

began preparatory work, and there was a discussion between    15:35

him and Marcum about whether incubator fees need to be

disclosed for the first time in the audited financial

statements.  Mr. Guerry testified to that.

        Are you saying this is news to you?

        A.   Yes.  I wasn't aware that Marcum had actually     15:36

                                                    Page 1858

Q.    But you are aware that Marcum, who had been the    15:37
auditors in the Fund for several years, did not go forward
with that audit; correct?

A.    Correct.

Q.    And you are aware that that audit -- that those    15:37
financial statements remain unaudited; correct?

A.    Yes.

Q.    And have you inquired as to why?

A.    Well, I know why.

Q.    Did you inquire of Bill Guerry?    15:37

A.    Well, the Fund is unable --

Q.    Did you inquire of Bill Guerry as to why?

A.    My understanding is that Marcum would not go
ahead with the audit because the Fund was unable to pay
them to do the work.  That's my sum total of understanding    15:37
of why it hasn't gone ahead.

Q.    I just want to make it clear.

You have no -- You don't have an inkling at all,
there was a discussion between Mr. Guerry and Marcum,
which is an email, where they were disagreeing about    15:38
whether the incubator fees ought to be disclosed?

A.    I don't recall that being brought to my
attention.

Q.    All right.  Have the -- Let me talk with you
briefly about the status of the Funds.    15:38

Page 1860

Have there been any exit events from these two Funds?   15:38

A.   Only quite small ones so far where we've just been kind of closing a company down and sold off a few of the assets for various sums, tipping in the few hundred thousand dollars range.   15:38

Q.   Have there been exit events where there has been any return to any investors?

A.   Not yet.

Q.   Just so we're also clear on Fund III, which we discussed a lot, has Fund III had any exit events?   15:39

A.   No.

Q.   And isn't it true that Fund III is completely out of money?

A.   I think it has a small amount left, but fundamentally it's out of investable funds, yeah.   15:39

Q.   Is there any cash left in The Seed Fund or Fund II?

A.   No.

Q.   Haven't some assets recently been sold?

A.   As I said, a few are being kind of disposed of   15:39 end of life for a few hundred thousand dollars, hundred thousand dollars --

Q.   Which ones?

A.   -- et cetera, here and there.

Q.   Which ones are those?  Sorry.  Which ones are   15:39

Page 1861

.

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 28, 2021.

_____

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1925

# EXHIBIT 95

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,    )
a Delaware limited liability      )
company; and FROST VENTURE        )
PARTNERS GP, LLC, a Delaware      )
limited liability company,        )
                                  )
            Claimants,            ) Case No.
        vs.                       ) 1200052341
                                  )
HOLLENCREST BAYVIEW PARTNERS,     )
L.P., a Delaware limited          )
partnership; ROBERT B. WOLFORD,   )
an individual; WOLFORD FAMILY     )
TRUST, dated July 11, 2006,       )
                                  )
            Respondents.          )
                                  )
-----------------------------------
AND RELATED COUNTER-CLAIM.        )
_____)

ARBITRATION DAY 9

Orange, California

Thursday, January 25, 2018

Reported by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 2801226
Pages 1926 - 2177

Page 1926

Exhibit 95
Page 1076

```
                         I N D E X


WITNESS: STUART FROST - Pursuant to Evidence Code 776

EXAMINED BY      DIRECT   CROSS    REDIRECT      RECROSS

Mr. Hodel        1931 (Resumed)      2171

Mr. Holley                 2164
```

Page 1930

describe the pitch you made.                                      09:58

Do you see his description?

A.   Yes.

Q.   When you wrote back, you did not write back to Mr. Wolford and say, "You misunderstood our pitch.  You    09:58 misunderstood our model."  You didn't use those words, did you?  In fact, you told him the model was still the same?

A.   Yeah.  Fundamentally, yes.

Q.   And you went on to say, "Why do you think partners such as GE and Symantec are signing up with us";    09:58 correct?

A.   Correct.

Q.   You're referring -- Just so we're clear, this is July 17, 2015, you're referring to the Memorandum of Understanding with GE?                                         09:58

A.   Partly.

Q.   And with Symantec, you are referring to the -- to the press release?

A.   The pending relationship that they announced on their paper, yeah.                                          09:59

Q.   The pending relationship?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   Was there ever a legal document signed with       09:59

Page 1966

Exhibit 95
Page 1078

Symantec?  Was there?  Like a binding legal document?    09:59

A.    I don't believe so.

Q.    When you were -- When you used words like, "Why do you think partners such as GE and Symantec are signing up with us," are you saying that you are not suggesting to    09:59 the reader that you want them to believe that GE and Symantec are signing binding commitments?  You aren't suggesting that; is that what your testimony is?

A.    GE did, some aspects of the MoU are actually binding, and Symantec was certainly planning to.    10:00

Q.    Okay.  To go back to the GE MoU one more time, you do agree that that document, the MoU, did not bind GE to invest any particular amount of money at all; correct?

A.    That's correct.

Q.    All right.  We're going to go on to a different    10:00 subject, Mr. Frost.

You have within the incubator space, you've got incubator employees who are incubating portfolio companies; correct?  They are working on those tasks; correct?    10:00

A.    Yes.

Q.    They are working on Fund-related activities, working for the Funds; correct?

A.    To varying degrees, yes.

Q.    They are working on some tasks that are purely    10:01

Page 1967

for the purposes of the incubator?    10:01

A.    The incubator didn't have any other business other than incubating the companies and itself, so I don't know what tasks would be just for the incubator, so --

Q.    Just recording the payroll of the employees.    10:01 Doing any administrative tasks that are just there simply because you have a company, but are not directly servicing any particular client, were people performing tasks like that?

A.    Okay.  Yes, of course, they had to do    10:01 administration for those tasks, yes.

Q.    Okay.  So when people in the incubator are performing one of those three tasks, they are working for the Fund, working to assist the portfolio companies or working purely for the purposes of the incubator, did you    10:01 ever -- did any of them ever keep track of their time?  In other words, today I'm performing a task to support the Fund during this time period whatever, and, likewise, for a portfolio company or, likewise, for Frost, did anyone ever keep track of their time?    10:02

A.    Not that I'm aware of.

Q.    Did any of the general partners or managers of the Fund ever keep track of their time for any purpose? In other words, today I'm working for the Fund, today I'm assisting in the portfolio company, today I'm just working    10:02

Page 1968

with me that the -- that the incubation fees that the    10:06

incubator charged to the portfolio companies, that they --

see if we can agree -- that they should have been

reasonable charges only?  Would you agree with that?

    A.    This is not at all referring to the incubation    10:07

fees, so I'm a little confused about the context that you

are putting this in.

    Q.    You can put that document down.

    A.    Okay.

    Q.    I'm not asking about 6.1.  Because 6.1 doesn't    10:07

refer to incubator fees, does it?

    A.    That's not what it's talking about.

    Q.    In fact, is there anywhere in The Seed Fund

agreement that would -- that would -- when someone reads

through The Seed Fund agreement, do they see any language    10:07

in there anywhere that refers to incubator fees?

    A.    I think there's a section that refers to

services provided by the incubator to the portfolio

companies.

    Q.    Show us the section that refers to -- to    10:07

incubator fees.  Show us the one you think you are

referring to, please?

    MR. HOLLEY:  Best evidence rule, Your Honor.

Waste of time.

    THE ARBITRATOR:  See if we can do it quickly.    10:07

Page 1972

the incubator" --                                        10:08

              MR. HOLLEY:   Hold on for the court reporter.

              THE WITNESS:   "All decisions as to which, if

any, such opportunities will be offered to the company and

the terms of any such investments shall be made in sole     10:09

and absolute discretion of the manager."

  BY MR. HODEL:

       Q.   Do you think that refers to incubator fees,

Mr. Frost?

       A.   I think in the context of the marketing         10:09

materials and everything where we talked about that, it's

a reasonable expectation.

       Q.   Well, if one hadn't read the marketing

materials, do you think they would conclude from reading

that section, that that's putting them on notice that the   10:09

incubator is going to be charging fees?

       A.   Who are we talking about here?

       Q.   Okay.  Mr. Frost, let me see if I can make this
even more simple for you.

       We began this line of questioning where I asked you:  10:09
Is there any language in The Seed Fund agreement that
informs the reader that the incubator is going to be
charging incubation fees to the portfolio companies?
       And just for the record, is your answer yes, you
believe there is such language?                             10:09

                                                Page 1974

A.    I don't think I actually said that.          10:09

I think I said it establishes there is a business relationship between the incubator and the Fund and the portfolio companies.

Q.    Okay.  Is your testimony now that there is no          10:10
specific language in this agreement that informs the reader that the incubator is going to be charging incubation fees to the portfolio companies?

A.    That's correct.

Q.    Thank you.          10:10

I guess if they wanted to understand what might go on, they need to go read your marketing materials; right?

A.    Yes.  Just like your clients did, as I testified to yesterday.

Q.    Or they could ask you?          10:10

A.    Yes.

Q.    And you'd explain to them about -- what was it? The fully loaded or fully burdened executive?

A.    Words to that effect.

Q.    Let's go back to the incubation fees that were          10:10
charged by the incubator to the portfolio companies.

Roughly, how much did the incubator charge to the portfolio companies that were invested in by The Seed Fund and Fund II?  Tell us what you think the number is.

A.    I would have to look at the records.  I think          10:11

Page 1975

THE ARBITRATOR:  I think he sort of said "No,"  10:12
he doesn't have any idea what it is.

BY MR. HODEL:

Q.  Is that right, Mr. Frost?

A.  I would be speculating to answer that question  10:12
at this point in time.

Q.  Mr. Frost, do you agree with us though if I told
you the number was over $20 million, would that sound
about right?

MR. HOLLEY:  Same objections.  10:12

THE ARBITRATOR:  Overruled.

THE WITNESS:  It could be.

BY MR. HODEL:

Q.  Okay.  When the incubator charged the portfolio
companies' incubation fees, do you believe that the  10:12
incubator was required to charge only reasonable fees?  In
other words, in a reasonable amount?

A.  Yes.

Q.  In other words, it had to conform to some kind
of market rate?  10:12

A.  It's not the same thing, conforming to a market
rate.  There has to be a market rate for it to conform to
that.  It's not the same as saying it's reasonable.

Q.  So let's ask about -- Are you saying that there
could be a reasonable rate that's different than the  10:13

Page 1977

market rate?                                                          10:13

A.   I'm saying that sometimes there just isn't a
market rate because there aren't directly comparable
incubators and services out there.  So they are not the
same thing.                                                          10:13

Q.   Are you -- Is it your assertion, Mr. Frost, that
there is no market rate for incubation fees that one could
seek to establish?

A.   I think it's, given the nature of our business
model, it's very hard to find direct parallels.                      10:13

Q.   But is there or is there not a market rate, in
other words, we could take whatever Frost charged, and we
could compare it to the market rate for comparable
services, is that at all possible, Mr. Frost?

A.   I think I just said it's very difficult because    10:14
I'm not aware of anything that is directly comparable.

Q.   In fact, are you aware of any incubator in the
world that ever charged fees of the magnitude that your
company did to these portfolio companies?

A.   There are many, many incubators around the         10:14
world, literally thousands with all different kinds of
business models.  I don't have access to all their
business models.  I can't answer that question.

Q.   Are you done with your answer?

A.   Yes.                                                            10:14

Page 1978

Q.   You have given us your best answer here today?   10:14

A.   Yes.

Q.   Did you ever conduct any study or analysis to attempt to determine what other incubators were charging? Did you?  Did you?                              10:14

        MR. HOLLEY:  Your Honor, he's badgering the witness.  Ask the question and stop.

        THE ARBITRATOR:  I think at this point it's vigorous cross-examination.  Probably hasn't quite got to badgering yet.  We will give you an opportunity though.   10:15

        THE WITNESS:  Sorry.  Could you repeat the question?

  BY MR. HODEL:

Q.   Did you ever conduct any study or analysis to determine what -- what other incubators were charging?   10:15

A.   No.

Q.   Was that of any interest to you whatsoever, Mr. Frost?

A.   I already said, you know, incubators don't generally publish a lot of information on their business   10:15 models.  It's very difficult to establish that.

Q.   Was that of any interest to you, Mr. Frost?

A.   No.

Q.   Did you ever do any analysis at all to determine whether the fees charged by the incubator to the portfolio   10:15

                                          Page 1979

companies conformed to reasonable market rates?                    10:15

MR. HOLLEY:  Objection.  Asked and answered several times.

MR. HODEL:  Let me just rephrase the question.

Q.    Did you ever do any study or analysis to              10:15
determine whether the fees charged by the incubator to the
portfolio companies were reasonable rates?

MR. HOLLEY:  Objection.  Asked -- 350, Your
Honor.  We've done it twice -- three times.

THE ARBITRATOR:  Overruled.  I think there is a      10:16
slight difference.

THE WITNESS:  Certainly it's my contention that
the incubator fees are in accordance with everything that
we told people and the agreements that we had in place;
so, therefore, reasonable in that context.                  10:16

BY MR. HODEL:

Q.    Mr. Frost, did you ever do any study or analysis
to determine whether the fees charged by the incubator to
any of the portfolio companies were, in fact, quote
unquote, "reasonable"?  Did you do that?                     10:16

A.    Only in the context of what I just said.

Q.    I have no idea what that means.

Let's just try it like this: Do you know what a value
accounting study is?

A.    No.  You asked me that many times in my            10:16

asked that question.    10:18

MR. HODEL:  I will read from his deposition on precisely this question, Your Honor.

THE ARBITRATOR:  All right.  Go ahead and read it.    10:18

MR. HODEL:  This is page -- this is Volume III, page 742, starting with line 22.  In fact, I'm going to read all the way down through 742, line 19.  I think it will speed things up.

MR. HOLLEY:  Okay.    10:18

BY MR. HODEL:

Q.   Actually, I will read at the bottom of page 742. All right.

"Question: Did you understand that in accordance with your agreements, that the fees charged by the incubator to    10:19 the portfolio companies had to be at reasonable market rates?

"Answer: I think that's what we always said.

"Question: Okay.  And do you remember -- Well, what analysis have you ever done to determine that the fees    10:19 charged by the incubator to a portfolio company were reasonable market rates?

"Answer: I mean, nothing specific that I recall.

"Question: Are you done with your answer?

"Answer: Yes.    10:19

Page 1982

"Question. Did you consult with any experts or rely    10:19

upon them to determine the reasonableness of the incubator

fees as charged to the portfolio companies?

"Answer: Not that I recall.

"Question: Did you seek the advice of any auditors?    10:19

"Answer: Not that I recall.

"Question: Did you seek the advice of any attorneys?

"Answer: Not that I recall.

"Question: Is there anything that we could look at in

writing where we could see the thought process or    10:20

calculation that was engaged in to determine the

reasonableness of the fees that were charged by the

incubator to the portfolio companies?

"Answer: Not that I recall."

And did you ever consult with any source at all to    10:20

see what other incubator -- what other incubators were

charging for their fees?  Did you ever consult with any

source at all?

A.    Not to my recollection.

Q.    Do you know of any incubator anywhere in the    10:20

world that charges its portfolio companies anywhere near

approaching $35,000 a month?

        MR. HOLLEY:  Objection.  Asked and answered.

        THE ARBITRATOR:  It may have been.

You can answer.    10:21

Page 1983

BY MR. HODEL:                                                    10:30

Q.   "Question: Okay.  And why was it that Predixion was able to negotiate down to portfolio company fees?

"Answer: They were always somewhat separate because that was actually founded before we started the incubator.   10:30

"Question: Who founded Predixion?

"Answer: Me.

"Question: And was it part of -- Was it there at the -- Was it there on Del Obispo or was it somewhere else?                                                        10:30

"Answer: It was somewhere else.

"Question: Where was it?

"Answer: They started out in South Laguna Beach, and then moved to San Juan Capistrano, and then they were in Aliso Viejo for a while."                                   10:30

And I think you went on to say by 2012, they had outside funding; correct?

A.   I think they had outside funding before that.

Q.   Right.

So by -- Right.  As of 2012, they had already            10:30 achieved outside funding; correct?

A.   Yes.

Q.   But my question to you is that in Predixion, your controlling interest in Predixion was diluted down even before the outside funding came in 2012; true?      10:31

Page 1990

A.    My controlling interest, I'm not sure that I --   10:31
I'm not sure that I ever had a controlling interest.
Maybe from Day One, the investors came in pretty quickly
and -- I'm sorry.

THE REPORTER:  Repeat, please.   10:31

THE WITNESS:  I'm sorry.  The founding team.  So
Simon Arkell and Steve DeSantis that I hired in took a
decent amount of stock, so I'm just not sure if I can
characterize it as something very long as a controlling
interest.   10:31

But go ahead.

BY MR. HODEL:

Q.    But am I correct that by 2013, you no longer had
any controlling interest in Predixion?

A.    I think that's true.   10:31

Q.    In fact, that's true by 2012; correct?

A.    Almost certainly.

Q.    Right.

And Predixion had a full board of directors and
outside investors by 2012; correct?   10:32

A.    Seems like a reasonable statement.  Yes, I think
so.

Q.    Let me ask you whether this is true or false: Do
you recall any of the portfolio companies' CEOs
negotiating down the incubator fees prior to January 1st,   10:32

Page 1991

2016 other than Predixion?    10:32

A.    I don't know.  I would have to check.  I mean, certainly there was some changed around that time. Whether they were just before that or just afterwards, I don't know.    10:32

MR. HODEL:  I'm going to read from his deposition, and then maybe take the morning break, Your Honor.

THE ARBITRATOR:  Okay.

MR. HODEL:  Page 801, line 21 through page 802,    10:33 line 25.

Let me know when you're ready, Counsel.

MR. HOLLEY:  Go ahead.

MR. HODEL:  "Question: Do you remember any -- any portfolio company successfully negotiating down any of    10:33 the incubator fees in 2012?  Do you remember?

"Answer: Predixion paid us less.

"Question: Anyone other than Predixion?

"Answer: I don't recall anybody doing that.  No.

"Question: Do you recall any portfolio company's CEO    10:33 successfully negotiating down the incubator fees in 2013?

"Answer: Again, I have to look at the records specific years and so on.  I don't recall.

"Question: But do you recall?

"Answer no.    10:33

Page 1992

"Question: Same question as to 2014.                    10:33

"Answer: I don't recall the specific dates.

"Question: Do you recall any portfolio company CEO

successfully getting the portfolio, getting the incubator

fees reduced during 2014?                              10:34

"Answer: No.

"Question?   Do you recall.

"Answer: No.

"Question: How about 2015?

"Answer: Well, during that period of 2014 to the       10:34

date, there has been a whole series" -- let me read over

again.

This says, "Well, during that period of 2014 and to

date, there has been a whole series of some of them

negotiating down.  I don't recall the specific times and   10:34

dates of each one.

"Question: But do you remember any of them occurring

at all prior to, let's say, January 1st, 2016 other than

Predixion.

"Answer: I don't recall."                              10:34

That is the end, Your Honor.

THE ARBITRATOR:  All right.  Take our recess.

(A recess is taken.)

THE ARBITRATOR:  Back on the record.

BY MR. HODEL:                                          10:52

Page 1993

MR. HODEL:  Just a few questions about the     10:52
Service Agreements.  His Honor has seen some of those, and
we moved a whole series of them into evidence.

MR. HOLLEY:  It appears to be some amount of
stuff.  That's fine.     10:53

THE ARBITRATOR:  Off the record.

(A discussion is held off the record.)

THE ARBITRATOR:  Back on the record.

BY MR. HODEL:

Q.   Mr. Frost, you do know what the shared Services     10:54
Agreements are, correct, between the incubator and the
portfolio companies?

A.   Yes.

Q.   Just a few questions about that.

Do you know why those Service Agreements do not     10:54
specify any particular amount for the fees?

A.   Because the fees, I guess, varied over time, and
I was going to say that was Mr. Guerry's general
responsibility to put those in place, so --

Q.   Well, again --     10:54

A.   I don't know why specifically.

Q.   So your answer is that you do not have any -- Am
I correct that you do not have any explanation why those
agreements failed to specify any particular amount?

A.   I suppose so, yes.     10:54

Page 1994

Q.    And are you aware of any portfolio company's CEO    10:54
ever being able to change the wording of any of the
Services Agreements?  Talking about those particular
documents.  Are you aware of that ever happening?

A.    No.    10:55

Q.    At the time -- We have seen this where
Mr. Guerry signs one side of the agreement, and you sign
the other.

You have seen that phenomenon going on; correct?

A.    During my depositions, yeah.    10:55

Q.    And you observed that, I think, every time I
showed you one of those, it was your electronic signature
that had been appended to it?  Do you remember that?

A.    Not specifically.

Q.    Does it sound familiar?  Just --    10:55

A.    Sorry?

THE ARBITRATOR:  Are those routinely signed
before the CEO was even chosen?

THE WITNESS:  Yes.

THE ARBITRATOR:  Thank you.    10:55

BY MR. HODEL:

Q.    At the time Mr. Guerry signs this document,
signs those types of documents, he's getting all of his
compensation is coming from whom?  From which entity?

A.    Either the incubator or sometimes from the --    10:56

Page 1995

one of the GP entities because he was a partner in, I    10:56
think, Fund III for a while -- Fund II for a while.

Q.    You are referring to the Fund Manager on
Fund III; correct?

A.    Yes.    10:56

Q.    Okay.  And did he actually collect any kind of
form of compensation as in connection with Fund III being
part of whatever -- whoever the manager was?  Do you
recall?

A.    I believe so, yeah.    10:56

Q.    How much?

A.    I'd have to look at the records.  I don't know.

Q.    How much of a management fee did you collect on
Fund III?

A.    On the order of $150,000, maybe.  I'm    10:57
speculating to a certain extent.  I would have to look at
the records.

Q.    Okay.  But he would have collected less than
that?

A.    Yes.    10:57

Q.    But whenever there is a Services Agreement being
signed for portfolio companies in which The Seed Fund
investor or Fund II investor, am I correct in
understanding that when Mr. Guerry signs those documents,
he's getting his paycheck from Frost Data Capital?    10:57

Page 1996

A.    As I just said, sometimes he was also getting    10:57
remuneration from the GP entities.  Certainly most of his
remuneration was coming from Frost Data Capital.

        MR. HODEL:   I'm going to read from your
deposition.  This is Volume III.  Volume III, starting at    10:58
page 814 through lines -- page 814, lines 13 through 24.

    Are you ready?

        MR. HOLLEY:   I'm there.

  BY MR. HODEL:

    Q.   "Question: Mr. Guerry, during the time he was    10:58
the -- during all the times that he worked at the
portfolio -- at the incubator, even though he's the CFO of
some of the portfolio companies, he actually does report
directly to you?

    "Answer: Depends on the context.    10:59

    "Question: He gets his paycheck from Frost Data
Capital; right?

    "Answer: Well, yes.

    "And with respect to anything he's doing for the
incubator, he reports directly to you?    10:59

    "Answer: Anything he's doing for the incubator, yes."

    And I guess your answer suggests that I just read in
your deposition that he also reports to the -- to the
portfolio company because he's the CFO of the portfolio
company?    10:59

Page 1997

A.    In that context, yes.    10:59

Q.    Okay.   When you and Mr. Guerry, before you signed any of these shared Services Agreements, do you remember actually sitting down and quote, unquote negotiating between the two of you?   Were there any    10:59 negotiations between the two of you concerning these documents before the two of you -- before the two of you signed them?

A.    That was a completely standard document.

Q.    That's not my question.    11:00

A.    Didn't even include the amount of the fees that you, as you just stated, so I'm not sure what there would be to negotiate at that point, so no.

Q.    Thank you.

Do you actually ever remember physically signing in    11:00 your own hand any of the shared services agreements versus Mr. Guerry putting an electronic signature on them?   Do you remember that ever occurring, Mr. Frost?

A.    I don't remember either way.

Q.    Okay.   Just talking about some of the    11:00 portfolio -- some of the people who we have seen here. Let's look at Exhibit 110 -- 1101.   Mr. Gotz testified to that.

A.    (Indicating.)

Okay.    11:01

Page 1998

of instructions to wind down Metallum.  His testimony was  12:03

that he told -- he told -- at a Metallum board meeting, he

was the CEO at the time, he gave instructions to shut

Metallum down in about December of 2014.

Do you recall that happening?  12:03

A.  Do I recall what happening?  Asking for it or it

actually happening afterwards?

Q.  Him actually, as the CEO of Metallum, in or

about December of 2014, giving instructions that it should

be shut down and dissolved?  12:03

A.  I was unaware of that at the time.  I think his

instruction was to Bill Guerry, according to his

testimony.  So the first I heard of that, I think, was

when he stated it in his testimony.

Q.  Did you hear from anyone that he had given such  12:03

instructions ever?

A.  Not specifically.  There was a board discussion

about it.

Q.  Okay.

A.  Of course, he's just one member of the board,  12:04

not the whole board.

Q.  But he was the CEO?

A.  Yes.

Q.  Yes?

A.  Yes.  12:04

Page 2045

Q.   You're just flat out denying there was such a     12:07
conversation?

A.   Yes.

Q.   Mr. Breese just has it all wrong; is that your
testimony?                                                      12:07

A.   Yes.

Q.   And I -- Mr. Breese was there for some of the
pitches to Hollencrest; correct?

A.   Correct.

Q.   And it's your testimony that during those          12:07
pitches, the term fully -- fully burdened or fully loaded
executive was used?

A.   I don't think I testified that I definitely said
that.  I said it was a term that I used a lot throughout
the history of this.  It would be fairly remarkable if I     12:07
didn't use it in those meetings, but that's all I can say
about it.

Q.   Well, let me try to be precise.

Do you remember that term being used at all in a
meeting with Hollencrest ever at any time, including         12:08
Mr. Wolford?  Do you recall?

A.   As I have said, I don't recall it being used
specifically.

Q.   But I want to read from Mr. Breese's deposition,
ask you if this refreshes your recollection.  This is from   12:08

Page 2049

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 1, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 2177

# EXHIBIT 96

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,      )
a Delaware limited liability        )
company; and FROST VENTURE          )
PARTNERS GP, LLC, a Delaware        )
limited liability company,          )
                                    )
          Claimants,                ) Case No.
          vs.                       ) 1200052341
                                    )
HOLLENCREST BAYVIEW PARTNERS,       )
L.P., a Delaware limited            )
partnership; ROBERT B. WOLFORD,     )
an individual; WOLFORD FAMILY       )
TRUST, dated July 11, 2006,         )
                                    )
          Respondents.              )
                                    )
-----------------------------------
AND RELATED COUNTER-CLAIM.          )
_____)

ARBITRATION DAY 12

Orange, California

Tuesday, January 30, 2018

Reported by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 2807154
Pages 2675 - 2928

Page 2675

Exhibit 96
Page 1102

I N D E X

WITNESS: STUART FROST

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Holley | 2680 (Resumed) | | | |
| Mr. Hodel | | 2845 | | |

Page 2679

testified on Facetime?                                          15:14

A.    No.

Q.    Did anyone tell you that he said one of the
problems with DST is that we're talking about companies;
but when NewCo 26 and 27 were not the companies that we      15:14
were talking about?  Do you remember that?

A.    Yeah.  That is just not true though.

Q.    They were ranked lower than other companies.
Are you -- Are you just denying that, Mr. Frost?

A.    As I already stated, there were four ideas that    15:15
came out of it where I repeatedly stated to DST, it's time
to start the start-ups.  It was kind of a mantra we talked
about.  It's in the slide decks we presented to them.

Q.    Was -- Was that in the workshops?

MR. HOLLEY:  Can he finish his answer?                    15:15

THE ARBITRATOR:  Let him finish.

THE WITNESS:  So coming out of that second
workshop, there were four ideas.  There were a couple -- I
don't remember the exact ranking of them -- but there were
a couple that in further discussions, both us and DST        15:15
realized the scope was pretty broad.  Like Uber Care is
the kind of online nursing application.  It wasn't really
a great fit for us.  I forget what the other one is.  And
the two that were a very strong fit for us that we decided
to go ahead with coming out of that meeting was the PBM       15:15

Page 2863

Q.   Let's look at 1231.                                    15:36

MR. GIMINO:  This is also, I don't have as in yet.

THE ARBITRATOR:  That's not in either.

MR. HOLLEY:  Let me see.                                    15:36

MR. HODEL:  Did I get this in through Bill Guerry?

THE ARBITRATOR:  No.

MR. HODEL:  Is there an objection to it?

MR. HOLLEY:  This isn't with the DST people at    15:37 all.

MR. HODEL:  This goes to the status of NewCo 26 and 27.  It's Vasquez, Guerry.  Vasquez is going to testify.  This fits right into the flow of what we have been asking this witness about right now.         15:37

MR. HOLLEY:  This is a status of the two new companies in the spring of 2017.

MR. HODEL:  Yes.

MR. HOLLEY:  What's the offer of proof on relevance?                                                 15:37

MR. HODEL:  Mr. Frost said those companies were ready to go, and they were started five months prior to this, and here Mr. Vasquez is reporting.

THE ARBITRATOR:  I'll allow it.

BY MR. HODEL:                                               15:37

Page 2878

Q.    So let's go over these facts.    15:37

The second sentence, "To be clear, and to avoid propagation of any misunderstanding, Bill Guerry and I said we have identified a CEO for Frost NewCo 26.  He starts on May 1."    15:38

So can we conclude from that, that as of April 30, 2017, Frost NewCo 26 did not have a CEO yet; correct?

A.    We were actively recruiting through that whole period.

Q.    It did not have a CEO until May 1st, 2017;    15:38
correct?

A.    That's correct.  Takes a while sometimes.

Q.    It's paying $40,000 a month in incubation fees; yes?

A.    Yes.    15:38

Q.    Frost NewCo 27 is being validated and managed, by the FDC Healthcare GM with some assistance from the FDC incubation team.  I take it from that, that as of April 20th, 2017, Frost NewCo 27 had absolutely no employees; correct?    15:39

A.    That's true.

Q.    So who is the FDC Healthcare GM at that time?

A.    I think at this point, Tom Giles was still there.  I think.  I'm not sure.  It's not an email from me.  I don't know exactly who it's referring to, but    15:39

Page 2879

He says, "Even with DST appearing to be moving                16:14
forward on investment, what will they do when we lose more
people and have to close a lot of companies?"

That's what Mr. Vigouroux told you before DST
invested; right?  Yes, sir?                                   16:14

A.   That's what he says here.

Q.   Number 8, "We have spoken to numerous investors
to raise more capital for the Fund.  Our reputation in the
market with most prospect investors is ugly."

You know a lot about funds and how investors react to  16:15
requests for Fund -- to invest in Funds; correct,
Mr. Frost?

A.   I'm not sure what you mean by that.

Q.   It's not a trick question, Mr. Frost.  You --

A.   I'm not sure what you mean by it.  Can you        16:15
repeat it, please?

Q.   You have managed three Funds?  Yes, sir?

A.   Yes.

Q.   They have taken in about $63 million; correct?

A.   Correct.                                          16:15

Q.   All three funds at this point basically don't
have any cash left; correct?

MR. HOLLEY:  Today?

BY MR. HODEL:

Q.   Today.                                            16:15

Page 2894

A.    Today, yes.    16:15

Q.    And none of the Funds have had an -- an exit event that has resulted in any return to any investors; correct?

A.    That's correct.    16:15

Q.    And so if you're going to go out and pitch on Fund IV now, people would say to you, "What's your record on exits from your prior three Funds?"; right?

A.    That's part of what they would ask for perhaps, yeah.    16:16

Q.    That's what people ask when you go ask them for money to invest in your Funds.  They want to know whether you had an exit event.  That's always a topic; right?

A.    Sometimes.  Not always.

Q.    Number 12, "Bill was all set to start with Maana    16:16 at the end of the month.  Now does he know the board wants to have a full CFO executive search?"

You knew Mr. Guerry was trying to move over to Maana; right?

A.    There was a discussion of that.  He proposed    16:16 that at one point, wanted to move full time to Maana.  In the end, the board decided, as it says here, to have a full CFO search, and we ended up recruiting someone else.

Q.    My point is you knew your CFO was trying to leave the incubator and to go to Maana; right?    16:16

Page 2895

.

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 7, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 2928

# EXHIBIT 97

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

------------------------------------

FROST MANAGEMENT COMPANY, LLC,     )
a Delaware limited liability       )
company; and FROST VENTURE         )
PARTNERS GP, LLC, a Delaware       )
limited liability company,         )
                                   )
            Claimants,             ) Case No.
        vs.                        ) 1200052341
                                   )
HOLLENCREST BAYVIEW PARTNERS,      )
L.P., a Delaware limited           )
partnership; ROBERT B. WOLFORD,    )
an individual; WOLFORD FAMILY      )
TRUST, dated July 11, 2006,        )
                                   )
            Respondents.           )
                                   )
------------------------------------
AND RELATED COUNTER-CLAIM.         )
_____)

ARBITRATION DAY 13

Orange, California

Wednesday, January 31, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 2807157

Pages 2929 - 3235

Page 2929

```
                              I N D E X


   WITNESS: STUART FROST

   EXAMINED BY      DIRECT   CROSS     REDIRECT      RECROSS

   Mr. Hodel                  2934(Resumed)           3040

   Mr. Holley                            3021


   WITNESS: MILES MAHONEY

   EXAMINED BY      DIRECT   CROSS     REDIRECT      RECROSS

   Mr. Holley      3054                 3165

   Mr. Hodel                  3104                    3170



   WITNESS:  ANTHONY HOWCROFT

   EXAMINED BY    DIRECT     CROSS      REDIRECT     RECROSS

   Mr. Holley     3171

   Mr. Wilks                 3191
```

Page 2933

Veritext Legal Solutions
866 299-5127

Exhibit 97
Page 1111

Q.   Well, let's look at Exhibit 232.  Let me know   09:12
when you have that.

A.   Yes, I have it.

Q.   Go to page 3 of 18.

A.   Okay.   09:12

Q.   Second paragraph from the bottom, "Our approach
is to ensure that each company is highly capital
efficient, especially in the early stages."

Do you see that?

A.   Actually, don't see that.  In the second   09:12
paragraph?

Q.   Page on -- I'm sorry.  Second from the bottom.

A.   Okay.

Q.   The penultimate paragraph.

A.   Yes.  Okay.   09:12

Q.   "Our approach is to ensure that each company is
highly capital efficient, especially in the early stages."

A.   Yes.

Q.   Those were your words; right?

A.   Yes.   09:12

Q.   Then you also testified that you had discussed
regarding founder's stock with the Hollencrest people.

Did I understand you correctly, Mr. Frost?

A.   I recall there being a discussion around the
slide deck, and what it says in there.   09:13

Page 2938

Q.   Just around when you say "the slide deck," you    09:14
are talking about the PowerPoint?

A.   Yes.

Q.   All right.  Also, I heard you testify that
you -- that you claim that the term fully loaded executive    09:14
was used in the presentations to Hollencrest and to other
investors?

A.   It was used in the conversation with
Hollencrest, yeah.

Q.   So the presentation that was made to Hollencrest    09:14
was similar to the presentation that you made to other
investors; correct?

A.   In general, yes.

Q.   Okay.  Now, remember we had this testimony about
this the other day.  If you remember, your testimony was    09:14
that you -- you claim that term was used, but at no time
did you tell them what that number meant in terms of a
magnitude for a -- for a number; true?  In other words,
you didn't put a dollar sign next to that number; correct?

A.   No, they didn't ask.    09:15

Q.   Okay.  And again, your testimony is still that
we can't see that term fully loaded executive anywhere in
the marketing materials that were presented to any of the
investors in The Seed Fund or Fund II to the best of your
recollection?    09:15

Page 2939

A.    Not to my recollection.                                  09:15

Q.    And also, those terms do not appear in either one of the Operating Agreements; correct?

A.    Correct.

Q.    They don't appear in the subscription language   09:15
either; correct?

A.    That's correct.

Q.    And the term fully loaded executive, I think you testified in your deposition, represented how much money per year?                                                        09:15

A.    Well, there's a range, but certainly would be well in the $300-, $400,000 a year range.

Q.    So you're -- $400,000 a year?

A.    It could be, yes.

Q.    For an executive in a brand new -- brand-new   09:16
start-up, $400,000 a year?

A.    Well, first of all, I didn't say brand-new start-up.  I just said a fully loaded executive.

Q.    When I -- When I took your deposition, do you remember telling me that you thought that number was   09:16
around $35,000 a month for each portfolio company which was roughly the cost of a fully loaded executive?  Does that sound right?

A.    Sounds about right.

Q.    Okay.  And "fully loaded" means salary plus   09:16

Page 2940

BY MR. HODEL:                                           09:21

Q.  It's a fully loaded executive in what type of company did you tell people when you claim you told them this?

A.  What I was talking about was the incubator, the     09:21
kind of people that we would have to hire to provide the services that we needed to do.

Q.  So what you claim is that you're saying "The monthly costs will be the equivalent of one of our senior executives here"?                                        09:21

A.  Sounds reasonable.

Q.  Mr. Frost, tell us what you claim you told investors.

A.  I have told you very precisely what I told investors.  I said the cost of a fully loaded executive.  09:22
It was in the context of the incubator and the people that we were hiring.

Q.  And I think you testified that those were -- those were important discussions; right?

A.  Yes.                                                09:22

Q.  And --

A.  Part of the overall discussion.

Q.  And yet, we can't find anywhere in the marketing documents, in the emails to and from our clients, in the Fund agreements, or the subscription agreements where    09:22

Page 2944

those words were used; correct?                                  09:22

A.    I think I already answered that question.  I don't believe that's in there specifically, no.

MR. HOLLEY:  What time period are you talking about?                                                      09:22

THE ARBITRATOR:  I think he's talking about at this point in time, looking back at the mountain of materials, that that phrase is not in there anywhere.

MR. HODEL:  Mountain of materials.  So I heard counsel say that I misstated the evidence.  Do you want to  09:22 point to something that --

MR. HOLLEY:  That's not my time.

MR. HODEL:  Point to something, Counsel.

MR. HOLLEY:  It's not my time.

MR. HODEL:  When you say on the record that I    09:23 am -- when someone says on the record, Your Honor, that I am misrepresenting the evidence, I don't think it's quote, unquote "a driveby."

THE ARBITRATOR:  I didn't hear him say that, so --                                                           09:23

MR. HOLLEY:  We'll get there.

THE ARBITRATOR:  I think we'll get there, hopefully.

MR. HODEL:  I just heard the witness say it too, by the way.                                                   09:23

Page 2945

A.    I think they did pay that June invoice.    12:03

Q.    But it wasn't three months, was it?

A.    It ended up being two months or something like that.

Q.    Now I am going to finish up by asking you about    12:03 Exhibit 1446 which does have the language, December 2015, and let's go look at it closely.  It does have the language as your counsel pointed out.  Where is it? Sorry.  Where is it?

THE ARBITRATOR:  Page 3, the top.    12:03

MR. HOLLEY:  Above executive chairman?

BY MR. HODEL:

Q.    Fully burdened cost of an executive.

A.    Yes.

Q.    All right.  I take it you don't have any    12:04 documents that predate December of 2015 that have language like this that consists of marketing materials, Mr. Frost?

A.    I'm not aware of any.

Q.    Okay.  What I noticed, under executive chairman, I was trying to figure out who this presentation was going    12:04 to.  Under executive chairman, third sentence, "This role will work hand in hand with Rockwell automation, the board of directors, and the Rockwell business units."

A.    Okay.

Q.    This was part -- Exhibit 1446 was part of the    12:04

Page 3042

A.   I don't -- I don't know.                              14:56

Q.   You don't know?

A.   No.

Q.   You were the CEO?

A.   Well, I'd say when we started the company would    14:56
be the answer.

Q.   Okay.  Well, when you started the company, did
you sit down and negotiate incubator fees?

A.   No.  I --

Q.   Did you even know incubator fees were being        14:57
charged?

A.   I did.

Q.   Did you -- Well, let's look at a couple
documents.  Because I think I should tell you,
Mr. Mahoney, that the incubator started paying fees in  14:57
August 2013.

A.   The incubator?

Q.   Excuse me.  OspreyData started paying incubator
fees August 2013 of $17,000, and then it went to $33,000
in September.                                            14:57

Then it went to $34,000 thereafter and it kept --
kept increasing.  So you're saying that you were still
working on validation during -- during August, and the
company is already paying incubator fees.

Were you aware of that fact?                        14:57

Page 3122

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 11, 2021.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 3235

# EXHIBIT 98

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

------------------------------------

FROST MANAGEMENT COMPANY, LLC,    )
a Delaware limited liability      )
company; and FROST VENTURE        )
PARTNERS GP, LLC, a Delaware      )
limited liability company,        )
                                  )
          Claimants,              ) Case No.
      vs.                         ) 1200052341
                                  )
HOLLENCREST BAYVIEW PARTNERS,     )
L.P., a Delaware limited          )
partnership; ROBERT B. WOLFORD,   )
an individual; WOLFORD FAMILY     )
TRUST, dated July 11, 2006,       )
                                  )
          Respondents.            )
                                  )
------------------------------------
AND RELATED COUNTER-CLAIM.         )
_____)

ARBITRATION DAY 3

Orange, California

Wednesday, January 17, 2018

Reported by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 2778646
Pages 513 - 778

Page 513

I N D E X

WITNESS: MICHAEL ASHLEY SCHULMAN

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Hodel | 518 (Resumed) | | 588 | |
| Mr. Holley | | 551 | | 598 |

WITNESS: BILL GUERRY

| EXAMINED BY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Hodel | 602 | | | |

Page 517

Exhibit 98
Page 1121

there previously and after were possibly Holly Self and then Choo Kim-Isgitt.

Q.    They were both incubator employees before they were with Snow Data Capital; is that right?

A.    I believe Holley is for sure.

I don't remember if Choo was or not.  Might have been.

Q.    Okay.  Now to the question that was raised by His Honor.

Isn't it true that once Snow Data Capital was started, that the fees that the incubator was already charging to portfolio companies did not reduce?

A.    That is true.

Q.    In other words, they go up by $5,100?

A.    Yes.

Q.    Let's go back to Exhibit 785.

A.    Is that the same email?

Q.    I should ask you about Snow Data Capital.  Isn't it true that portfolio companies' CEOs complained about the services of Snow Data Capital?

A.    In a broad stroke, that would be -- that would be accurate.

Q.    In fact, didn't they complain specifically about the competency of Anthony Howcroft?

A.    I have heard several instances of that

Page 712

Exhibit 98
Page 1122

happening.                                                     15:18

Q.   Let's ask a few more questions about Anthony Howcroft.

At some point in time, did he become the CEO of a newly started portfolio company?                              15:18

A.   Yes.

Q.   Would that be Swarm Technology?

A.   It would be.

Q.   That's a Fund III company; correct?

A.   Yes.                                                      15:19

Q.   When did that occur?

A.   About the time Swarm was created in August/September 2016.

Q.   All right.  And to set this straight, when did the -- and Swarm starts collecting incubator fees right    15:19 away; correct?

A.   Swarm --

Q.   Excuse me.

Swarm, once it's formed, it's funded by Fund III; correct?                                                       15:19

A.   Yes.

Q.   And it starts paying incubator fees almost immediately?

A.   Yes.

Q.   How much?                                                 15:19

Page 713

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 17, 2021.

_____

GAIL E. KENNAMER, CSR 4583, CCRR

Page 778

IN THE MATTER OF ARBITRATION BEFORE

THE JUDICIAL ARBITRATION AND MEDIATION SERVICES

-----------------------------------

FROST MANAGEMENT COMPANY, LLC,    )

a Delaware limited liability      )

company; and FROST VENTURE        )

PARTNERS GP, LLC, a Delaware      )

limited liability company,        )

           Claimants,             ) Case No.

        vs.                      ) 1200052341

HOLLENCREST BAYVIEW PARTNERS,     )

L.P., a Delaware limited          )

partnership; ROBERT B. WOLFORD,   )

an individual; WOLFORD FAMILY     )

TRUST, dated July 11, 2006,       )

          Respondents.           )

-----------------------------------

AND RELATED COUNTER-CLAIM.        )

_____)

ARBITRATION DAY 6

Orange, California

Monday, January 22, 2018

Reported by:

Gail E. Kennamer, CSR 4583, CCRR

JOB No. 2801189

PAGES 1194 - 1479

Page 1194

Exhibit 98
Page 1125

Q.   That's on the premises of the incubator; correct?

A.   It's on -- It's in a facility rented by the incubator.

Q.   Who paid for that wine?  Do you know?

A.   I assume Mr. Frost.

Q.   How do you know?

A.   I guess I don't.

Q.   But that wine locker was in the same area where the archery range was located; correct?

A.   It is.

Q.   How large was the area where the wine locker and the archery range were located?

A.   I think the archery range was something like, I am guessing, 15-, 1800 square feet.

Q.   Okay.

A.   And the wine locker was maybe 8x6, 40, 50 square feet.

Q.   The portfolio companies were charged rent; correct?

A.   Yes.

Q.   And is it true that the rent that the portfolio companies paid included the space for the archery range and where the wine locker was located?

A.   I don't know if we ever identified any of that

Page 1291

specific to that or not, so --

Q.   Well --

A.   The portfolio companies were allocated a charge partly identified as rent.  I don't know if we ever did an analysis to break out, you know, the piece that's related to the storage space.

Q.   I think we can simplify it, which is: All the rent that you were charged by your landlords was 100 percent passed on to the portfolio companies; isn't that true?

A.   I would say generally, that's the case.

Q.   And that rent included whatever you paid for the archery range and wine locker area; correct?

A.   Again, I don't know if I were to -- There was never analysis to look at what was charged as rent versus what was being paid as rent.  The rent allocation was a general allocation to show that there was space being provided to the portfolio companies as part of their charge.

Q.   Well, Mr. -- Mr. Guerry, your -- your belief and understanding is that all rent that the incubator was charged by any landlord was basically passed on 100 percent to the portfolio companies; is that true? Yes?

A.   Again, I would say the general approach would be

Page 1292

yes, that would be the goal, but we never did an analysis to say this is how much rent was being charged. Rent was just a line item for purposes of reporting what the portfolio companies would show.

Q. I get what you're saying about what goes into it. You are talking about the line item that goes into the -- into the portfolio company financial statements.

A. Correct.

Q. There is going to be a line item for rent; correct?

A. Correct.

Q. That's not what I'm asking you. I'm just asking you about the rent that was charged.

THE ARBITRATOR: How much was the monthly rent, approximately, at any given time?

THE WITNESS: Maybe 35,000.

THE ARBITRATOR: A month?

THE WITNESS: Yeah.

Then there was additional costs related to the facilities, like internet which was another 5,000 a month, telephone, et cetera. There were utilities that were on top of that.

THE ARBITRATOR: I presume it was a triple net kind of lease?

THE WITNESS: It was.

Page 1293

THE ARBITRATOR:  At a given time, approximately $35,000 a month was the rent?

THE WITNESS:  That's my gut estimate at the moment.  I'd have to go through the numbers.

THE ARBITRATOR:  If you sat down at the peak month of the incubator fees, could you go through each of the portfolio companies and find out what the line item for rent was and add those up?

THE WITNESS:  You could.  But again, it wasn't an approach to, say, "Okay.  We are charging -- We are spending this much in rent and, therefore, we should charge the same amount to portfolio companies, rent.

THE ARBITRATOR:  By not doing that, don't you run the risk that at the end of a given month, you have collected 50,000 or 80,000 in rent from the portfolio companies when the actual rent paid to the landlord is only 35-, and all of a sudden now becomes a profit for the incubator?

THE WITNESS:  That risk does exist, but -- or did exist -- but the overall cost of the incubator was covered.  So we know that from an overall perspective, including all headcount and all costs of the incubator, we ran pretty close to a break-even number.  So my focus wasn't -- I never focused on how much rent was being charged versus what was being -- what we were spending.

Page 1294

It was more on the overall kind of total bucket and making sure that the incubator was being -- was recovering or was charging its full cost.

BY MR. HODEL:

Q.   So those full costs include all -- include all rent; correct?

A.   That's true, yes.

Q.   The $35,000 includes the archery range space as well; correct?

A.   Yeah.   Like I said, I'm guessing on that number. That's a ballpark number.

Q.   Okay.   I want to ask you a few questions about Michelle Bassett.

If you look at Exhibit 745.

A.   (Indicating.)

Q.   Let me know when you have that up.

A.   (Indicating.)

Q.   I think it was through, perhaps, another witness we established Michelle Bassett is Mr. Frost's sister-in-law; correct?

A.   Correct.

Q.   Here she's being paid $3,600 by the incubator; is that correct?

A.   Yes.

Q.   She's being paid a consulting fee; correct?

Page 1295

THE WITNESS:  No.  That's a separate stock option plan that the company hosted.

THE ARBITRATOR:  Gotcha.

THE WITNESS:  The funding from the Funds would come in at a set valuation.  Initial Seed Funding we typically did at the start.  We were doing them at two-and-a-half-million dollars pre-money valuation.  So 200 -- two-and-a-half-million dollars pre-money valuation on 500,000 shares.  I am blanking on the math, but essentially the preferred shares would be purchased at that price.  I think it was 60 cents or something like that.

BY MR. HODEL:

Q.  Let me understand this.

A.  Fifty cents.  Sorry.

So if you did a two-and-a-half-million dollars pre-money valuation, you have 5 million shares for diluted; you have 50 credit per share price.

Q.  Let me understand what's happened.

The investment committee approves the starting of a company or the funding of a company?

A.  Correct.

Q.  Is it pretty much true that the way it worked is the investment committee votes, the service agreement is signed right around the same time, and the portfolio

Page 1336

company pretty much starts paying incubator fees immediately; correct?

A.    Generally.

Q.    All right.  And at that time, let's say in this -- taking the example here of whatever company it is -- By the way, on this approval here on October 5, there is no name for the company as best I can tell.

A.    It's DSI company.  So it was what it ended up being Frost Edge.

Q.    Frost Edge?

A.    (Witness nods head.)

Q.    Okay.  But they approved it.  So what happens is $250,000 goes into Frost Edge; correct?

A.    Yes.

Q.    And what percentage of the stock of Frost Edge does $250,000 acquire?

A.    So it's two-and-a-half-million prefund would be buying 250-.  So the post is 275-.  You are getting ten -- eight-and-a-half -- eight-and-a-half percent, eight-and-a-quarter percent.

Q.    Eight-and-a-quarter percent.  So I'm going to conclude that the other 91-and-three-quarters percent is owned by whom at that point?

A.    So it's going to be split.  So 80 percent of the 91 percent, so 70-some percent is going to be in the hands

Page 1337

Exhibit 98
Page 1132

Q.    Whatever the records show.

A.    Whatever the records show.

Q.    Our experts have --

A.    I just don't remember exactly.

MR. HODEL:  Our experts have drilled down on that, and they have a specific number for that.

Q.    Did the incubator still pay his salary?

MR. HOLLEY:  Objection.  Vague as to time.

BY MR. HODEL:

Q.    Well, during this time period where this money is being paid by The Seed Fund, isn't the incubator also paying him a salary anyway?

A.    Yes.

Q.    Okay.  I thought so.

A.    But The Seed Fund is reimbursing the incubator essentially for that salary.

Q.    There is no way for investors to know that he's -- he's collecting a management fee from -- from The Seed Fund; isn't that right?

A.    I don't remember how it was disclosed in the financials.  I believe there was a disclosure, a line item.

Q.    No.  Management fees.

Disclosure to investors that management fees, in fact, were paid under The Seed Fund.

Page 1443

going to be compensated which is completely inconsistent.

THE ARBITRATOR:  I appreciate all that.  I don't think his commenting whether it's consistent or inconsistent, that is a question of fact or law.  That's probably my job.

MR. HODEL:  Okay.  Okay.

THE ARBITRATOR:  I'm trying to move things along.

MR. HODEL:  I get that.  May I ask the witness to look at one paragraph?

THE ARBITRATOR:  All right.

BY MR. HODEL:

Q.   Go to page 5.  Under the last sentence that begins, "Note the Seed and early stage funds," do you see that?  It says, "Note the Seed and early stage funds will not be expected to cover expenses and salaries incurred by Frost VP which is a completely separate corporate entity."

Do you see that sentence?

A.   I see that.

Q.   And again, what happened was that a salary, the salary of Mr. Frost, in fact, was covered by The Seed Fund; correct?

A.   Yes.

Q.   And now I'm about to go into a lengthy discussion with you about incubator fees, but I'd like you

Page 1446

to read the sentence that says, "Expect that the services provided from the incubator to the start-up companies will be agreed to between the boards of each individual company and Frost VP on a case-by-case basis and are expected to be adjusted based on the individual needs of each company as their business matures."

Do you see that sentence?

A.   I do.

THE ARBITRATOR:   I'm sorry.   That's page 4?

MR. HODEL:   That's page number 5.

THE WITNESS:   Five.

BY MR. HODEL:

Q.   Based on your experience at the incubator, that's not at all true as to what the actual practice was; isn't that true?   Is what I just said true?   I just tangled my syntax.

A.   I don't believe that's consistent with how --

Q.   Right.

A.   -- the model --

THE ARBITRATOR:   That sounds like an á la carte system; right?

THE WITNESS:   That's -- That would sound more like an á la carte system than --

BY MR. HODEL:

Q.   This sentence I just read into the record, that

Page 1447

is not how the model actually functioned; right?

A.   No.

        MR. HOLLEY:   Objection.   Document speaks for itself.

   BY MR. HODEL:

        Q.   Is my question is correct?

             THE ARBITRATOR:   Overruled.

   BY MR. HODEL:

        Q.   Correct?

        A.   Correct.

        Q.   Also it says, "Frost VP policy will be to only charge for services that start-up companies would require in the normal course of their business."

        It's true that every start-up -- every portfolio company when they were started, was charged the same amount as every other company that was started at the same time?

        A.   Yes.

        Q.   They were -- And each portfolio company had to pay for the services?   I mean, they were not allowed to just pick and choose what services they wanted to pay for and only pay for those services; correct?

        A.   Correct.

             MR. WILKS:   The next page.

   BY MR. HODEL:

                                        Page 1448

A.    Not as a general incubator charge.  There were some instances, I think in one of the other exhibits you just named, there was a charge for some register agent services that got charged to the company.

In cases where there were specific expenses for a company, then those got passed through even if the incubator may have paid them on behalf of the company.

Q.    I'd like to see that.

Did you agree with me that the invoices, they really don't contain any -- typically, they do not contain any other detail other than what we see here on Exhibit 739?

A.    That's correct.

Q.    Okay.  Now, with respect to controlling the bank accounts, for each of the portfolio companies, you were the signatory on the portfolio company bank accounts when those -- when a portfolio company was being established?

A.    Generally, me and the CEOs were, whoever the CEOs were.

And then possibly, Jim Ward for a time when he was director of operations.

Q.    Particularly when a portfolio bank account is set up, the incubator people who work under you set up the bank account; correct?

A.    Yes.

Q.    And so let's understand the incubator invoice

Page 1456

process.

The controller who works for you prepares an invoice; correct?

A.   Yes.

Q.   Sometimes they would give that invoice to the CEO; but in most cases, they probably just put that invoice in the records of the company; correct?

A.   Correct.

Q.   Then the controller would just institute a interbank transfer -- interbank transfer.  In other words, the controller who works for the incubator, in order to pay one of these invoices, just withdraws money from the portfolio company bank account; correct?

A.   Yes.

Q.   And again, in most cases, the -- in most cases -- those are the operative words -- the invoices are not even sent to the portfolio company CEO?

A.   If they ask for it; but generally, most of them didn't ask for it.  They knew they were going to be charged on a monthly basis approximately, the approximate amount, so there was no need to do that.

Q.   The incubator fees were non-negotiable, isn't that true, as a general matter?

A.   I think several of the CEOs tried to negotiate it, but generally non-negotiable.

Page 1457

Q.    When there were across-the-board increases in the incubator fees, do you recall informing any of the portfolio companies that those increases were going to occur before they were put in place?

A.    No.

MR. HODEL:  These service agreements, we saw a form of the service agreements.  I'd like to put -- I don't want to dwell on those.  They are what they are. But I would like to put the following service agreements into evidence: 596.  These are in chronological order. That is why I'm reading them like this.  That is how I know them.

596.

858.

THE ARBITRATOR:  How many are there?

MR. HODEL:  There are about 15 of them.  853.

THE ARBITRATOR:  Hold on.

MR. HODEL:  854.  In fact, 854 through 856.

THE ARBITRATOR:  856 is in.

MR. HODEL:  Okay.  855.

858.

THE ARBITRATOR:  It's in.

MR. HODEL:  597.  I'll go back to the 800s.

THE ARBITRATOR:  Hold on.  All right.

MR. HODEL:  Don't you wish you had a clerk

Page 1458

again?

THE ARBITRATOR:  Yeah, I do.

MR. HODEL:  859.

861.

And then 8- --

THE ARBITRATOR:  861 is in.

MR. HODEL:  Okay.  Then 862 all the way through 866 -- 867.  Excuse me.

THE ARBITRATOR:  866 is in.

MR. HODEL:  So 862 through 867, 868, 869, 870, and 871.

THE ARBITRATOR:  -71 is in.  Is that it for those?

MR. HODEL:  Yeah.  I do want to -- I can't recall if I pointed it out with respect to Exhibit 868. Did you just enter 868 or have we talked about that previously?

THE ARBITRATOR:  I can't --

MR. HODEL:  I want to point out the date of Exhibit 868.  Another one of these.  This is dated August 4, 2014.  It's NewCo 21.

Q.  Do you recall what NewCo 21 was?

A.  No.

Q.  In any event, that's August 4, 2014.  Now look at Exhibit 164, if I'm right.

Page 1459

MR. HOLLEY:  He wants you to look, Mr. Guerry.

THE WITNESS:  I'm sorry.  Which one?

BY MR. HODEL:

Q.  Exhibit 164.

A.  164.

Q.  NewCo 21 is approved on that date.  Do you see that?  That is September 10th; yes?

A.  Yes.

Q.  And yet, the service agreement for NewCo 21 is dated August 4, 2014; correct?

A.  I am assuming you are correct.  I don't have it in front of me.

Q.  That's in the record.

With respect -- Okay.  Further to the --

A.  Sorry.  Just to clarify, so NewCo 21, the investment was approved on --

Q.  September 10th?

A.  Correct.

Q.  But the service agreement is signed August 4th?

A.  Probably corresponds with the creation of the company.

Q.  Okay.  But we can stand down on the investment committee reports -- I may never go back again -- and also the service agreements.

The quarterly reports that go to the investors did

Page 1460

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: July 2, 2018

GAIL E. KENNAMER, CSR 4583, CCRR

Page 1479

# EXHIBIT 99

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


SECURITIES AND EXCHANGE     )
COMMISSION,                 )
                            )
              Plaintiff,    )
                            )
        vs.                 ) No.  8:19-cv-01559-JLS-JDE
                            )
STUART FROST AND FROST      )
MANAGEMENT COMPANY, LLC,    )
                            )
              Defendants.   )
_____)



REMOTE VIDEO DEPOSITION OF STUART FROST

MARCH 11, 2021

CONDUCTED VIA VIDEOCONFERENCE












Reported by
Cynthia J. Vega, RMR,
RDR, CSR 6640, CCRR 95
Job No. 210311CJV

1

MS. EAVES:  Melissa Eaves for defendants.

MR. GUITE:  Robert Guite for the defendants.

MR. KWON:  Benedict Kwon for the defendants.

MR. GUITE:  And also present is our paralegal, Tiffany Johnson, for the defense.

STUART FROST,

Witness herein, being first duly sworn, testifies as follows:

EXAMINATION

BY MR. SEARLES:

Q.   Good morning, Mr. Frost.  I'm Donald Searles. Pleasure to meet you.

A.   Good morning.

Q.   Is there any reason you cannot give your best testimony here today?

A.   No.

Q.   The only ground rule I'd ask you follow is that we don't speak at the same time so the court reporter can get down a clear record, and that you audibly answer all of my questions rather than a nod of the head or something to that effect.  Do you understand?

A.   Yes.

11

Q.   So your sole source of income over the past two years has been through Geminos?

A.   Yes.

Q.   Do you have any other business plans other than continuing to work for Geminos?

A.   Not at the moment.

Q.   So with respect to the arbitration, on October 16, 2016, Frost Management Company and Frost Venture Partners GP filed an arbitration demand; correct?

A.   Yes.

Q.   And then the respondents in that case, Hollencrest Bayview Partners and Robert Wolford, filed counterclaims against Frost Management Company, which I'll refer to as FMC, Frost Venture Partners GP, Frost Data Capital, and against you personally; correct?

A.   Yes.

Q.   The respondents in that case alleged the following claims:  The breach of fiduciary duty, the breach of the operating agreements of the seed fund, the breach of the partnership agreement of Fund II, and fraud; is that correct?

A.   I believe so.

Q.   35 depositions were taken in connection with that arbitration; is that correct?

17

A.   I haven't counted them all, but it sounds about right.

Q.   Okay.  A lot; correct?

A.   Yes.

Q.   And those depositions were taken over the course of approximately ten months; correct?

A.   That sounds right.

Q.   You were free to take whatever discovery you wanted in that case; correct?

MR. MARSHALL:  Objection.  Calls for a legal conclusion.  He's not counsel in terms of the rights to take discovery.

BY MR. SEARLES:

Q.   All right.  When -- unless your counsel directs you not to answer, you're free to answer the question.

So, again, you were free to take whatever discovery you wanted in that case; correct?

A.   Yeah, so I just paused.  That's what I understand, but obviously that would be on advice of counsel.

Q.   And you were assisted by counsel in connection with that case; correct?

A.   Yes.

Q.   That was the HamptonHolley firm in Orange

18

County?

A.   Correct.

Q.   Did you select that firm?

A.   Yes.

Q.   Did you, through your counsel -- I believe it's Mr. Holley, correct, at Hampton & Holley?

A.   Yes.

Q.   Was he the personal attorney you had in that case?

A.   Yes.

Q.   How big a firm is Hampton & Holley?

A.   I think at the time it was two principal partners, Hampton and Holley, and two or three other people were involved at various times, plus I think a paralegal or two.

Q.   All right.  Did you exercise your right to notice up individuals in the arbitration for depositions?

A.   As far as I'm aware, yes.

Q.   And the arbitration itself took place over the course of 14 days in January and February of 2018; correct?

A.   Yes.

Q.   And since you initiated the arbitration, were you concerned prior to initiating the arbitration that

19

the respondents, the Hollencrest and Wolford parties, would be suing you in some other different forum, in district court, federal district court, or in state court?

A.    I don't recall that being a specific concern at the time.

Q.    All right.  But since you initiated the arbitration, you selected the forum for that proceeding; correct?

A.    Yes, I think that would be correct.

Q.    And the counterclaims against you, breaches of fiduciary duty, breaches of the operating agreements, breaches of the partnership agreement, and the allegation of fraud, you would consider those serious allegations against you; correct?

A.    Yes.

Q.    Is it fair to say that your professional reputation was at stake in that proceeding?

A.    Yes.

Q.    Was it fair to say that your ability to make a living in your chosen profession was at stake in that proceeding?

A.    So to a significant extent, yes.

Q.    And you understood that at the time of the proceeding; correct?

20

A.    Yes.

Q.    And your personal assets were also at stake in that proceeding; correct?

A.    I think I would have to comment on advice from counsel at the time.  Based on that, I would need to take advice as to whether to answer that question, I think.

Q.    Your current counsel or Mr. Holley?

A.    Well, Mr. Holley advised me at the time as to the potential impact on my personal assets.

Q.    All right.

A.    I guess --

MR. MARSHALL:  I'm going to instruct the witness not to answer any questions with regards to advice from counsel --

MR. SEARLES:  Okay.  That's fine.

MR. MARSHALL:  -- or any discussions with counsel.

MR. SEARLES:  Okay.

BY MR. SEARLES:

Q.    Ultimately, in that proceeding, your personal assets did become at issue, correct --

A.    Yes.

Q.    -- in settling that matter?

A.    Yes.

21

Q.   And you understood that at the time that the proceeding was initiated -- well, when the respondents filed counterclaims against you, they were seeking not only damages, but punitive damages; correct?

A.   Actually my understanding is that punitive damages only came in and were brought up right at the end of the arbitration proceeding after Judge Sundvold had verbally given his findings.  I don't believe they were seeking punitive damages at the beginning.

Q.   All right.  Punitive damages were assessed against you by Judge Sundvold; correct?

A.   Yes.

Q.   All right.  Is it fair to say at least in the arbitration proceeding, you understood that the financial stakes to you personally were high?

A.   Again, that's a difficult question to answer.  Actually, my understanding during the proceeding was no.

Q.   But you did testify earlier that your professional reputation was at stake in that proceeding; correct?

A.   Correct.

Q.   And that your ability to make a living in your chosen profession was at stake in that proceeding; correct?

22

A.    To a certain extent.

Q.    All right.

A.    My reputation would lead into that.

Q.    All right.  So at least with respect to those two aspects, the financial stakes were high to you in that proceeding; correct?

A.    Going forwards, yes.

Q.    And the arbitration focused on the seed fund in Fund II.  You know what funds I'm talking about when I call them that?

A.    Yes.

Q.    And those are two of the funds that are at issue in this case; correct?

A.    Correct.

Q.    Your defenses in the arbitration -- I'm not sure if these were all of them, but one of them was that you disclosed all material information; is that correct?

A.    Yes.

Q.    That you acted in good faith?

A.    Yes.

Q.    Those are the same defenses that you're asserting in this case; is that correct?

A.    Fundamentally.  But, you know, I think that's asking me, again, for a legal opinion, isn't it?

23

Q.   That's all right.  I can do that.

A.   You can, but I can't really give one, can I?

Q.   Well, what are your defenses then?  Do you have an understanding of what defenses you're asserting in this case?

A.   I think you're fundamentally correct.

MR. MARSHALL:  Objection.  Objection.  Again, to the extent that his understanding of our defenses reveals attorney-client privileged material, I would instruct not to answer.

If you want to put forth a document in front of him which lays out those defenses, he can respond as to whether he has knowledge.

BY MR. SEARLES:

Q.   You said, Mr. Frost, in preparation for the deposition here today, you reviewed the SEC's complaint against you; correct?

A.   Yes.

Q.   Did you also review your answer to the SEC's complaint?

A.   On a high level, yes.

Q.   All right.  And when that answer was filed, whenever -- I don't recall the exact date it was filed in this case -- but did you review it prior to its filing?

24

A.   Yes.

Q.   All right.  And did you recall it asserting certain defenses at the end of the complaint?

A.   I recall there was a section asserting defenses.

Q.   All right.

A.   I don't recall the detail of it right now.

Q.   All right.  And you understand the standard of proof in our action is by a -- we have to prove our case by a preponderance of the evidence, i.e., more probable than not.  Do you understand that?

A.   In general terms, yes.

Q.   All right.  And do you have an understanding that that was the same standard of proof in the arbitration proceeding?

A.   On the whole, yes.

Q.   How much did Hampton & Holley charge in legal fees in connection with the arbitration, approximately?

A.   Yeah.  I did not see all the invoices, because they billed the insured the bulk of it directly.  My understanding is that it was on the order of $1.3 million.

Q.   And the billing of the insurance, is this -- did you -- is this in the nature of D&O, director and

25

officer, insurance that you had with an insurance company?

A. Essentially a VCAP policy, which is, I think, similar to D&O, but it's specific to venture funds.

Q. What type of policy is it called? I'm not familiar with that.

A. VCAP, V-C-A-P.

Q. All right. And you retained or your counsel retained experts to testify on your behalf in connection with the arbitration; correct?

A. Yes.

Q. And those charges were paid for by the insurance policy in place?

A. That's my understanding, although there was a dispute over -- in the run-up to the arbitration, dispute over payment of the expert fees.

And my understanding is that Liberty delayed payment quite a lot, which disrupted the expert's work. And there was quite a difficult time now preparing for the arbitration when Liberty was disputing some of the payments, specifically to the expert, but also to Mr. Holley.

Q. Ultimately, the experts were able to testify at the arbitration?

A. Correct.

26

Q.  And they were able to prepare reports in connection with the arbitration?

A.  Yes.  So I think it's fair to say that they didn't have the time that they would really have liked to prepare those reports because of Liberty's challenges with payment, let's say.

Q.  And with respect to the arbitration itself, the 14 days of testimony, you had the power to subpoena witnesses to testify at that proceeding?

A.  Yes.

Q.  All right.  And you had the right to cross-examine the witnesses that testified against you or in support of the respondents' case in that proceeding; correct?

A.  Well, my counsel did so, yeah.

Q.  All right.  It's fair to say, given the fact that your reputation -- professional reputation and ability to make a living in your chosen profession was at stake in that proceeding, that you were fully incentivized to litigate --

A.  Yes.

Q.  -- that proceeding?  Yes?

And you had a full and fair opportunity to do that; correct?

A.  I'm not sure I agree with that statement.

27

Q.   All right.  Are you familiar with it's a common practice of judges to impose time limits on both sides to present their case?

A.   Not specifically under these circumstances. It did seem very rushed, I have to say.

Q.   All right.

A.   I don't think my counsel was very happy about it.

Q.   I see.  And this arbitration took place over 14 days, from January 15th through February 1st of 2018.  That's -- you don't dispute that; correct?

A.   Right.

Q.   And did you appeal the arbitrator's final award?

A.   Well, it's -- as I think you probably know, it's extremely hard to appeal an arbitration.

Q.   That's not my question.  Did you do so?

A.   No, I did not, because it's extremely difficult to do that and extremely expensive.  I was not in a financial condition to do so.

Q.   I see.  And what are the CEOs that -- these are the CEOs of the portfolio companies, correct, that were incubated by Frost Data Capital?  That's who you're talking about, the CEOs?

A.   Correct.

30

counsel's advice to you that you refuse to answer my question as to what CEOs you were prevented from calling at the arbitration; is that correct?

A.   Yes.

Q.   Is there any documentary evidence that you were prevented from introducing in the arbitration?

A.   I think any evidence to that effect would be attorney-client privileged as well.

Q.   Well, okay.  You refuse to answer that question then as to whether you can identify any documents that you were prevented from introducing at the arbitration; is that correct?

MR. MARSHALL:  Same objection.  Same instruction to the extent his knowledge is based upon advice of counsel.

THE WITNESS:  I would say also that you changed the nature of your question.  You were asking me about witnesses and now you just asked me about documents.

BY MR. SEARLES:

Q.   That's correct.  So the question -- so that we're clear, let me reask the question, or perhaps rephrase it.

Is there any documentary evidence that you were prevented from introducing at the arbitration?

32

A.   Not that I'm aware of.

Q.   Did you review the arbitrator's final award in preparation for your deposition here today?

A.   No.

Q.   All right.  You did, of course, review the arbitrator's final award at some point; correct?

A.   Yes, of course.

Q.   Presumably at or around the time it was issued?

A.   Yes.

Q.   I'd like to go through several points in the arbitrator's final award and see if you dispute those factual findings.

Do you agree that you had no prior experience as a fund manager when you were managing the seed fund in Fund II?

A.   Yes.  Well, the seed fund only obviously.

Q.   Right.  When you then had Fund II, you had the experience of managing the seed fund?

A.   Correct.

Q.   All right.  Do you agree that the incubator was financially dependent on the fees charged to the portfolio companies to sustain itself?

A.   Well, that plus my own investments and loans.

Q.   All right.  But you don't dispute that the

33

list, so it's hard to know for certain.  I'm not sure if they've already given you a complete set.

Q.   All right.  The -- is it fair to say the financial condition of the incubator became more precarious in 2016?

A.   Certainly -- well, precarious.  At the end of the day, you know, I was covering shortfalls.  So to the extent that I could continue to do that, the incubator could continue to operate.  So I guess it depends on your definition of "precarious."

Q.   All right.  Well, I guess what I'm trying to do here is to isolate the time that you were extending loans to the incubator.  Approximately when were you doing that?

A.   I think the first one that I guaranteed was late 2015 or early 2016.

Q.   Okay.  So then prior to that period of time, late 2015/2016, the preceding four or five years of the existence of the incubator, would you agree that the incubator was financially dependent on the fees charged to sustain itself?

A.   Yes.  That was its business model.

Q.   Would you also agree that as the number of incubator employees and their salaries went up, the need to increase the amounts coming in to the

36

incubator increased?

A.    I think that's a bit of a loaded question, isn't it?

Q.    No.  It's just a finding from the arbitrator's award.

A.    Well, I --

Q.    I'm just asking if you agree with that.

A.    We were generally bouncing the two, so it's not that we increased staff and then had to increase the income.  I think that's the wrong way around, generally.

Q.    Is it fair to say the two went hand in hand?

A.    To a certain extent.  The incubator was designed to support the portfolio companies, so as we added more portfolio companies, raised more money, in general, we needed to increase incubator staff just for those companies.

Q.    And the way that those staff would be paid for was through incubator fees charged to the portfolio companies; correct?

A.    Yes.

Q.    Would you also agree that incubator fees were imposed on the portfolio companies from the moment of their creation?

A.    I think that varied a little, but...

37

Exhibit 99
Page 1160

Q.   I'm sorry?

A.   I think that varied a little.  I'm not necessarily certain it was every time right from day one.  But on the whole, the business model was that the incubator would come up with the idea, would start to develop that idea.  Its own -- the incubator staff, when we started a company, would start to develop that company in various dimensions, talking to prospects, assessing the market for it, in some cases doing product development.  And obviously that needed to be paid for.

So, you know, I think this concept that we were just starting companies and charging incubator fees from day one, while on the face of it true, it's justifiable when you understand the business model that we were following.

Q.   And my question -- with respect to the moment of creation of the company, is it true that incubator fees were imposed on the portfolio companies from the moment that they were incorporated?

A.   I think I already answered that.

Q.   Well, it's a question of -- the incorporation of the company may be different in the way we're speaking than the creation of the company, if it's legally created versus it's an idea in your head, it's

38

on my answer as well?

So I'm not aware of any instances where fees would have been charged before the company was formally incorporated.

BY MR. SEARLES:

Q.   Thank you.  Okay.

A.   Equally, though, I'm not certain, because I wasn't personally controlling the timing, that fees were charged immediately upon incorporation in every case.  I think that would depend on, you know, the specific idea and the work that needed to be done and so on.  So there may have been a delay in some cases.

But obviously without looking at the specific records for each portfolio company, it's difficult to answer that precisely.

Q.   All right.  And these -- the company -- the incubator company, Frost Data Capital, would then, once a company was legally incorporated, enter into a service agreement with the portfolio company; correct?

A.   Yes.

Q.   And those -- in most instances, those service agreements were signed by you on behalf of the incubator company and by Mr. Guerry on behalf of the portfolio company; correct?

A.   Correct.

40

Exhibit 99
Page 1162

Q.   And Mr. Guerry, he was a salaried employee of the incubator company; correct?

A.   Correct.

Q.   He was a CFO of the incubator?

A.   Correct.

Q.   And he was wearing that hat at the time he signed the service agreements on behalf of the portfolio company; correct?

A.   No.

Q.   He was wearing what hat at that time?

A.   He would have been wearing the hat of the CFO of the specific portfolio company --

Q.   I see.

A.   -- the hat that he signed the document.

Q.   All right.  And at the time he's signing the document, is there a CEO of the portfolio company directing him to do that?

A.   That would be extremely rare.

Q.   Thank you.

And you and Mr. Guerry, regardless of what hat he is wearing, did not negotiate as -- in an arm's-length fashion the amount of the service fee to be charged to the portfolio company; correct?

A.   We had a standard business model for every company.  And to a great extent to avoid conflicts of

41

interest, we followed that business model.

Q.   I see.  Could you answer my question.  Did you negotiate with Mr. Guerry, regardless of what hat he was wearing, the amount of the incubator fees to be charged to the portfolio company at the time that you and he are signing these service agreements?

A.   No.

Q.   Would you also agree that fees were imposed on the portfolio companies even if no chief executive officer had been hired?

A.   I think that's a bit of a pejorative statement.

Q.   I'm just reading a finding from the arbitrator's award.

A.   Yes, and I think it's a pejorative statement.

Q.   All right.  But would you agree that fees were imposed by the incubator on the portfolio companies even before a CEO was hired?

A.   Fees were charged because we were doing all of the work up to that point.  And prior to there being a CEO hired, we were actually partly doing -- well, part of the job that the incubator was doing was hiring the CEO.  We were also developing the concept. We were developing the, in some cases, early versions of the product.

42

So I think to say that they were imposed before a CEO was hired is a misunderstanding of the model. We were effectively operating the company at that point and looking to hire an appropriate team for that company. And in the run-up to hiring that -- and also actually on an ongoing basis, we were doing a lot of the work that was required to develop that company.

Q. Would you agree that fees were charged to the portfolio companies even before a CEO had been hired?

A. Well, again, I think, you know, your question is a little pejorative, "even before."

Q. I don't mean it to be pejorative. I'm attempting to ask it in a simple way that allows for a yes or no answer.

A. So in some cases, that was true.

Q. And in some cases, not only were incubator fees charged, but they were collected from the portfolio company even before a CEO had been hired; correct?

A. Again, "even before," I think, is somewhat pejorative. The whole business model was that we were effectively operating the company before the CEO was hired.

And operating the company included recruiting the CEO, which is obviously -- you know, that's a lot

43

Exhibit 99
Page 1165

A.   Yes.

Q.   Do you recall any pitch materials contemplating the creation of two to four companies per year?

A.   My recollection is that the initial pitch materials for the seed fund contemplated that range.

Q.   Do you recall any pitch materials subsequent to the seed fund that were contemplating the creation of more than two to four companies per year?

A.   Depends what you mean by "pitch materials," I guess.

Q.   No.  You seemed to have a common understanding of that word when I was using it with you before.  Do you have an understanding what I -- what I'm using when I'm talking about pitch materials?

A.   In the broad sense, but, you know --

Q.   Okay.

A.   -- obviously they would take various forms at various times over the whole life of fundraising.

Q.   All right.  When you were answering my question and had a common understanding of pitch materials, what documents did you have in mind?

A.   So there were PowerPoints and an executive summary for the seed fund and then obviously various conversations and so on in which they would have been

53

used, those executive summaries as well.  So, you know, I believe that reference to two to four companies was in that -- those documents.  I don't recall that being in the pitch materials for Fund II.

And also by, I would say, spring 2014, as we were negotiating the GE relationship, we had various communications with investors around that time about the GE relationship and that they wanted us to start a more significant number of companies.  We communicated that to investors, and I don't recall any of them objecting to it.

Q.   And during the period -- another point made by the arbitrator in the final award.  12 companies were created from the period of April 2014 to February 2015.  Do you agree with that?

A.   Sounds right.

Q.   Is this the time period of the GE relationship?

A.   Yes.

Q.   Ultimately, GE did not invest any moneys; correct?

A.   Not correct.

Q.   Not correct?

There were fees related to Snow Data -- another finding of the arbitrator -- the fees related

54

which would have, by definition, almost certainly preexisted Snow Data Capital.

Q. With the companies that were created after Snow Data Capital, were each of them charged for fees associated with Snow Data Capital?

A. Well, as I said, Snow Data Capital was at that point starting to do a lot of the early positioning work as well. It was a great strength of that team, particularly Anthony Howcroft. So it would make sense.

Q. So then did -- were all of the portfolio companies charged fees by Snow Data Capital then, both those that preceded the creation of Snow Data Capital as well as those that were created after the creation of Snow Data Capital?

A. I think I've already answered that. And not all of them, no.

Q. Do you recall which ones were not?

A. No. I would have to look at the specific records.

Q. Do you recall that most of them were charged such fees?

MR. MARSHALL: Asked and answered.

BY MR. SEARLES:

Q. Do you recall any negotiation between Snow

58

Data Capital and the CEOs of the respective portfolio companies as to whether those CEOs wanted the services of Snow Data Capital?

A.   I'm not aware of any.  I wouldn't necessarily have been party to those.

Q.   All right.  So you don't know whether the portfolio companies were asked if they wanted or needed the additional marketing services from Snow Data Capital; correct?

MR. MARSHALL:  Just asked and answered.

BY MR. SEARLES:

Q.   You can go ahead and answer.

A.   The same.  I've given you an answer.

Q.   Was the -- was part of the purpose of creating Snow Data Capital to provide immigration benefits to Anthony Howcroft?

A.   Not really.  I understand that was the arbitrator's opinion, but it didn't make a great deal of sense to me.

Q.   When you say "not really," maybe a little bit?

A.   I'll give you a more complete answer save of us going around the loop here.

Anthony Howcroft had worked for me for -- since about 1995 as a very senior sales and marketing

59

resource. That was back in the day of Select Software Tools. He then joined me at DATAllegro and was vice president of sales and marketing for a significant period of that company's life.

At the time of the Microsoft acquisition, he joined Microsoft in a very senior role and developed a lot of their kind of go-to-market services for what was the DATAllegro product and worked for Microsoft in a senior role in Europe for several years very successfully.

I then asked him if he would rejoin me, because I felt at that time of development the incubator needed more depth in sales and marketing. Obviously, knowing Anthony so well and knowing that he had those skills, it made a great deal of sense to rehire him.

He agreed to do that, but he had trouble getting a visa. I think he applied for H-1B. But because he doesn't have a degree -- he had to leave college because of his family issues, so he never actually graduated college, but he's extremely experienced and very capable -- he couldn't get an H-1B visa.

So he then suggested that he get an entrepreneurial visa by setting up Snow Data Capital.

60

And he invested an appropriate amount to qualify for that entrepreneurial visa and set up Snow Data Capital to work as part of the incubator. So I think the arbitrator had that a little bit upside-down.

Q. But then Snow Data Capital did provide him with the opportunity to obtain an entrepreneurial visa?

A. That's my understanding.

Q. And that was the purpose of the creation of Snow Data Capital?

A. I suppose formally in terms of the creation of the company, but the reality is we were adding those services irrespective of whether that had been formed. We'd made a decision, using our best business judgment at the time, the portfolio needed additional services. So it was a mechanism to make that happen, but it wasn't the reason for it.

Q. Going back to the findings of the arbitrator. Do you agree that you charged the seed fund $16,000 per month for your salary?

MR. MARSHALL: Objection as to time frame.

BY MR. SEARLES:

Q. This would be in the time frame of 2012 and 2013, five months in the time -- I believe it said -- well, hold on. Yeah, in the time frame of 2012, 2013,

61

before the formation of the Fund II.

A.   I don't believe that's quite correct, but I would have to review the accounts specifically to answer that question.

Q.   Okay.  What is incorrect about that?  Do you recall charging the seed fund $16,000 per month for your salary?

A.   No.

Q.   Do you recall the time period of which you charged the seed fund some amount of money for your salary?

A.   I think in the time frame, I think through 2012 and maybe a little into 2013, there was -- a portion of my salary was charged to the seed fund in accordance with the operating agreement, but it varied, and I don't recall it being as much as 16,000.

Q.   Do you recall that -- and when we're talking about your salary, this is a salary at the incubator level; correct?

A.   Correct, in this case.

Q.   Do you recall what your salary was at the incubator during the -- during the -- before Fund II was created?

A.   My recollection is that it was initially zero, and then about 250 as we started to grow,

62

Exhibit 99
Page 1172

$250,000 per annum.

Q.    And who determined the amount of your salary?

A.    I did.    It was a single-member LLC.

Q.    The seed fund -- the arbitrator also found the seed fund also had charged $122,333 in management fees in 2012.   Is that correct?   Do you agree with that?

A.    I'm sorry.   Do I agree with the fact that he found that or do I agree that he was correct in finding that?

Q.    The latter.

A.    No, I do not agree with that.

Q.    And why do you disagree with that?

A.    So this comes to the confusion in the arbitrator's mind, in my view, my humble opinion, about the different fees that were charged and the categorization of them.

        (Reporter clarification.)

A.    The different fees that were charged and the different categories of those fees.

        So the seed fund was not charged management fees in the normal understanding of management fees in the venture capital industry.

Q.    But do you -- you're aware, are you not, of invoices charged to the seed fund with the notation

63

Q.   And how much of those fees were associated simply with your time?

A.   I think it was a total of -- over the time period, over, you know, the running of the seed fund, it was $182,000, is my understanding.

Q.   $182,000?

A.   Yes.

Q.   And ordinarily a management fee, had one been allowed for the seed fund, that would be the source of moneys paid to compensate you for your time in managing the fund; correct?

A.   When you say "allowed," allowed by whom?

Q.   Well, the seed fund didn't allow for a management fee, unlike the Fund II; correct?

A.   That's correct.

Q.   All right.  So ordinarily had the seed fund allowed for a management fee, that would be the source of moneys used to compensate you for your time in managing the seed fund; correct?

A.   That's correct.

Q.   All right.  So you're saying now that even though there was no allowance for a management fee, that the time that you were -- used or expended in connection with managing the seed fund, you're entitled to be compensated for that --

65

Kreindler, and I believe Bill Guerry had a share at various times.

Q.   So you would agree then you were entitled to receive 62.5 percent of the net 2 percent fees after expenses?

A.   Yes.

Q.   And that would arguably be income to you?

A.   Yes.

Q.   Do you agree with the arbitrator's finding that rather than receiving this income, that you instructed the CFO, Mr. Guerry, to pay hundreds of thousands of dollars of personal expenses from the -- your 62.5 percent share of the management fee profits?

A.   No.

Q.   But those expenses include villas in Italy, private schools in Italy for your children?

A.   I answered no to your first question, so I don't think you just carry on.

Q.   No.  I'm just asking.

A.   Okay.

Q.   The expenses incurred -- let me ask you this question:  The arbitrator finds that those expenses included villas in Italy, private schools in Italy for your children, chartered air travel, and vacation expenses.  Were those expenses paid for?

71

A.    They were paid out of my share of the management fee.

Q.    Were those expenses personal in nature?

A.    Yes.

Q.    Do those expenses total hundreds of thousands of dollars?

A.    Probably.  I haven't got the number in front of me.

Q.    All right.

A.    But they were still part of my overall compensation from the GP.

Q.    All right.  Agreeing then that these personal expenses that were paid for out of your fee approximated some hundreds of thousands of dollars, could you -- can you explain why your K-1s for 2014 showed reportable partnership income of only $3,303 and that your K-1s for the period of 2013 through 2014 totaled $24,385?

A.    They were prepared --

MR. MARSHALL:  Objection.  Objection as to any responses that would require disclosure of discussions with any counsel or tax counsel that you would have received during the relevant time with regards to the preparations of your tax records.  And on that basis, I'm going to instruct you not to answer

72

incubator billed the seed fund for operating expenses.

Some portion of that was used towards my salary.

It's -- what I haven't been able to do yet is really understand how much.  I have an estimate of $182,000.  It may be less than that, but I haven't had time to go through the detail of that as yet.

Q.  All right.  And so then the salary that we're talking about is an operating expense of the incubator; is that correct?

A.  No.

Q.  The salary then that is being charged to the seed fund, what are you being -- is it for your work at the incubator level?

A.  No.

Q.  Do you have a salary that you gave yourself at the seed fund level?

A.  No.

Q.  Why is the -- I'm confused as to the -- what you're being -- what you're being compensated for when the incubator is charging the seed fund for your salary.

A.  Well, to be clear, it's not charging for my salary.  The incubator was, in effect, operating the fund, so it charged a certain amount -- I think very little -- per month to cover those operating expenses

76

for the fund.  Some of that was used then to cover part of my salary from the incubator, because I was actually performing those services.

Q.   Okay.

A.   Does that clearly answer your question?

Q.   I guess so.  It's a little unclear to me as to the salary.

You said that the incubator, in effect, is operating the fund.  Is that your testimony?

A.   In effect, yes.  You know, under the terms of the operating agreement, I think initially it was actually FMC that was billing, and then it switched to FDC.  But either way, I think the money and the actual services, because FMC had no employees, the actual services were being done by FDC, the incubator.

Q.   All right.

A.   I was contributing some of those services. Not all of them, but some of them.

Q.   To the incubator?

A.   Which then was performing services for the fund.

Q.   Because the fund -- because the incubator effectively ran the fund.

A.   Well, it provided operating services to the fund.

77

formalization of that company by incorporating it; correct?

A.   Eventually, yes, but there is an intermediate step of the fund deciding, through its investment committee, whether to invest or not.

Q.   Right.  And my question to you is:  Once at the incubator level you have created/incorporated a company.  You now have it as a formal existing company.  You have entered into a service agreement with Mr. Guerry to provide services to that company. With respect to those companies, can you think of a single instance where you then did not have the fund, or whichever fund that you managed at the time, seed fund, Fund II, the international feeder fund, Fund III, invest in that company?

A.   We wouldn't have formed the company if the fund didn't take the decision to invest.

Q.   I see.  So the answer to my question is?

A.   No.

Q.   Well, the answer --

A.   I'm a little bit confused by your question, I have to say.  It's a long question and it has a fundamental misunderstanding of the sequence of events --

Q.   All right.

82

extensive ideation around that.  It could take months.

Right?  But at that point that's just within the

incubator, and that's the hat I'm wearing.

Then once we feel like it's a solid idea

worth considering by the fund, we would go to the fund

investment committee and say, "We think this is a good

idea.  What do you guys think?"

At that point to the extent I'm an investment

committee member, I would change my hat and say,

"Okay," and there would be a vote on it.  I would have

one vote.

If the investment committee decided to make

that initial investment, then chances are that company

would then be formed and would then have a service

agreement with the incubator.  But there were

absolutely cases where the investment committee said

no.  They were separate decisions.

So the premise of your question that the

incubator formed a company, incorporated it, and then

effectively got the fund to invest in it is just

wrong.  That's what I've been trying to get across to

you.

Q.   And the members of the investment committee

for the seed fund were also all members or employees

of the incubator; correct?

84

A.    Yeah, they were involved with the incubator to some degree.  It varied.

Q.    Were they compensated by the incubator?

A.    I think in general they were, but again, you know, they understood that they were wearing a separate hat.  It was a separate decision.

Q.    And then how do you allocate your time between charging the fund for a portion of your salary as an operational expense of the fund versus a salary that is solely an expense of the incubator?  When you're wearing these different hats, how do you determine how much time to allocate to the fund versus the incubator so that one can be assured that this is an operational expense of the fund as opposed to an operational expense of the incubator?  How do you -- is there any method by which you figure that out, and is it in writing?

A.    So you're asking about the seed fund here?

Q.    Yes.

A.    You were unclear in your question.

You know, based on our experience, based on specifically Mr. Guerry's experience of being a long-time CFO, he made that determination.

Q.    So if he made the determination in his testimony that he was charging the seed fund for your

85

this is one of the areas that we reviewed together --
and we both agreed that it was logical that this
wasn't all my time, that there would have been other
people included in this.

Q. What other people would be included in it?

A. People like Cary Breese, Luis Vasquez, some
of Bill Guerry's time, et cetera.

Q. So these are all portions of people's time
incurred in, what, working for the incubator?

A. No, as I've already said. Right? So this
would have been specifically time billed to cover the
operating needs of the seed fund. Those people were
paid salaries by the incubator, so the incubator was
billing for a portion of their time to the seed fund.

Q. Do you agree that you owed a duty of care and
loyalty to investors in the seed fund?

A. Yes.

Q. Do you agree that you owed a duty of care and
loyalty to investors in Fund II?

A. Yes.

Q. Same question with respect to Fund III.

A. Yes.

Q. Same question with respect to the
international feeder fund.

A. Yes.

88

Q. Same question with respect to the feeder fund.

A. I --

Q. I may have the name wrong. Apologies.

A. You just asked me the same thing. I think you meant the international seed fund.

Q. International seed fund, right. There you go. There are too many funds here.

You agree that you also had a duty of loyalty and care to the international seed fund investors?

A. Yes, of course.

Q. Do you agree that those duties of loyalty and care were not contracted away by the operating agreements of those entities?

A. Yes.

Q. Do you agree that AdaptiveWell was dissolved in April of 2016?

A. Sounds about right, but I don't have the specifics in front of me.

(Reporter clarification.)

Q. The arbitrator found that the year-end statements given to investors in the funds in 2016, December of 2016, showed that AdaptiveWell had a value of $1.3 million. Do you agree with that?

A. I would have to say I don't.

89

MR. MARSHALL:  I'm going --

MR. SEARLES:  Yes, Ray.

MR. MARSHALL:  Don, for clarity's sake, when you say "do you agree," are you asking whether he agrees with the finding or whether he agrees that that's what the arbitrator found?  Because the record is confusing when you ask him "do you agree."

MR. SEARLES:  I'm sorry.

BY MR. SEARLES:

Q.    The arbitrator found that the year-end statements in December of 2016 given to investors in the fund showed that AdaptiveWell had a value of $1.3 million.  Do you agree that the year-end statements showed that amount?

A.    I would have to review them.

Q.    Hold on.  Let's see.  Do you see this Exhibit 87?

MR. MARSHALL:  Yes.  On the screen, screen share?

MR. SEARLES:  Yeah.

MR. MARSHALL:  Yes, I do.

BY MR. SEARLES:

Q.    And, Mr. Frost, do you see Exhibit 87?

A.    Yes.

Q.    This is a quarterly report provided to the

90

Stage II -- excuse me -- the Fund II investors, quarterly report as of December 31, 2016. I'm trying to scroll to the page that has the valuations of the various companies.

So if you look at page 19 of this document. The page number is at the bottom. Are you with me on this page?

A. Yes.

Q. You see the first portfolio company listed is AdaptiveWell Technologies?

A. Yes.

Q. And it has a fair value as of December 31, 2016, of $1,089,820?

A. Yes. Well, that's both of those numbers added together. Right?

Q. No. There's shares, cost, and then fair value. So -- oh, I'm sorry. Right. And then the other series. So it's $1,289,000, approximately?

A. Yes.

Q. And did you review these quarterly statements before they went out to investors?

A. I don't recall reviewing this specific one.

Q. In your ordinary course would you do so, though?

A. Generally, yes.

91

Exhibit 99
Page 1185

Q.   These are important communications to investors, aren't they?

A.   Correct.

Q.   So I guess then the question is:  Do you then agree with the arbitrator's finding that the year-end statement for December of 2016 showed that AdaptiveWell had a value of approximately $1.3 million?

A.   That seems correct.

Q.   All right.  If AdaptiveWell was dissolved eight months earlier, can you explain why AdaptiveWell would have a fair value reflected in this quarterly report of $1.3 million?

A.   I'm not sure when it was actually dissolved.

Q.   I thought you agreed with me earlier that it was dissolved in April of 2016.

A.   I said it sounded about right.  I didn't say yes or no because I wasn't sure.

Q.   Okay.  Well, assuming that's about right, that it was at least at some point prior to the time of this quarterly report, do you have an explanation of why the fair value of this company is reflected at $1.3 million when, in fact, it had been dissolved?

A.   I'm sorry.  You're making an assumption that it was dissolved before.  I cannot confirm that based

92

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 99
Page 1186

on the information.

Q.   All right.   If, in fact, it was dissolved prior to the dissemination of this information, would it be appropriate to attribute a fair value of $1.3 million to it?

A.   You know, without looking at the details of it, it's hard for me to say.

Q.   Do you think it might be, even though the company is dissolved?

A.   It certainly would be unusual.   I'd want to understand why.   I'd want to understand the reasoning for it.   But as I say, at this point in time, I don't recall exactly when it was dissolved.   So I'm just going on what you're saying and putting into the record.   So I'm -- and I'm not agreeing with that at this point.

Q.   And do you recall the meeting with investors -- with the Hollencrest investors on March 17th of 2016?

A.   I had many meetings with them.   Can you be more specific in terms of the content of that meeting?

Q.   This is where a whiteboard showing ten large corporate investors and the prospect of $718 million of investments were displayed at a meeting where the Hollencrest investors were present and took a

93

want to ask him, by all means, no objection there. But as to his understanding of the legal defense, I think it's inappropriate to ask the client.

MR. SEARLES:  Can we go off the record for a moment so I can have a conversation with Mr. Marshall.

MR. MARSHALL:  Sure.

MR. SEARLES:  I don't mind doing it in front of all of you, but I'd prefer not to have this on the transcript.

THE VIDEOGRAPHER:  And we're going off the record at 11:19 a.m.

(Discussion held off the record.)

THE VIDEOGRAPHER:  And we're back on the record at 11:23 a.m.

BY MR. SEARLES:

Q.   Mr. Frost, I'm going to ask you a series of questions as to whether you relied on the advice of counsel with respect to certain facts in this case, which I would expect --

MR. MARSHALL:  I thought we just said off record that we would not make reference to a series of questions going to what advice he may or may not have received from counsel.

I think if you were wanting to establish that he talked to counsel with regards to the fund

95

used the phrase "at all relevant times," which I referred to as 2011 up to 2017.

So with that understanding, at all relevant times, were you the sole owner and member of Frost Management Capital?

A.   You mean Frost Management Company.

Q.   I'm sorry.  Frost Management Company.

A.   Yes.

Q.   Let's just call it FMC and then we'll have a better understanding of what we're talking about.

A.   That's fine.

Q.   At all relevant times, did you control FMC?

A.   Yes.

Q.   At all relevant times, were you the CEO of FMC?

A.   I think I was the managing member, strictly speaking, but I used the title CEO from time to time.

Q.   Okay.  But more technically accurate would be managing member?

A.   I believe so.

Q.   And you were the sole managing member?

A.   Yes.

Q.   And was FMC an investment advisor to the funds?

A.   I believe so, yes.  Formally, yes.

104

(Reporter clarification.)

Q. So you're saying formally it was an investment advisor to the funds?

A. Yes.

Q. Is there a reason you're qualifying "formally"? Or are you using "formally" as a qualifier?

A. If you want to take it that way. I -- the reality is it was really only used for Fund II and Fund III, I think, with respect to the SEC filings. It had no formal role in the day-to-day operation of the funds. So that's why I'm just...

Q. All right. Would you agree that you were an investment advisor to the funds?

A. Me personally?

Q. Yes.

A. I think FMC was the investment advisor to the funds. I was one of the GPs to those funds. I'm not sure of the legal distinction.

Q. But you controlled FMC; correct?

A. Yes.

Q. All right. And do you agree that the membership interests in the seed funds -- in the seed fund were securities?

A. In the seed fund. I think you're asking me

105

for a legal opinion there.

Q.    Well, the operating agreements talk about securities.  I'm just -- it's not really a legal opinion entirely.  It's a -- you're operating this business.

Without communications with Mr. Marshall, did you have an understanding that -- as an investor in the seed fund, one would acquire a membership interest in that fund; correct?

A.    Correct.

Q.    And they would expect to realize the profits through that membership through the efforts of yourself; correct?

A.    Me and others.

Q.    Okay.  So would you acknowledge -- would you agree that those membership interests in the seed fund that are acquired by investors are securities?

MR. MARSHALL:  Objection.  That does call for a legal conclusion.  Instruct the witness not to answer.

MR. SEARLES:  That's not an appropriate basis for instructing the witness not to answer.  It may call for a legal conclusion, but he can answer the question.

///

106

(Recess, 11:42 a.m. to 12:01 p.m.)

THE VIDEOGRAPHER:  And we're back on the record at 12:01 p.m.

BY MR. SEARLES:

Q.  Mr. Frost, I wanted to direct your attention to Exhibit 1 that's on the screen, the operating agreement for the seed fund.  You're familiar with this document; correct?

A.  Yes.

Q.  And would you have reviewed it back in -- back around the time it was created?

A.  Yes.

Q.  And you had an understanding of its contents; correct?

A.  Yes.

Q.  All right.  Turning to the -- I believe it's the very last page of this document.  Not quite the last page.

The second-to-last page is a signature -- do you see the signature page where you're signing as the manager of Frost Management Company and also the member of Frost Management Company?

A.  Yes.

Q.  And then do you see in bold type just beneath that, "The securities evidenced by this operating

111

agreement have not been registered under the Securities Act"?

A.   Yes.

Q.   And it goes on from there.

A.   Yes.

Q.   Getting back to my question then.  Did you have an understanding that the membership agreements being offered through this operating agreement to investors in the seed fund were securities?

MR. MARSHALL:  Asked and answered.  Asked and answered.

BY MR. SEARLES:

Q.   You can answer.

A.   It seems self-evident from this document.

Q.   All right.  It wasn't self-evident before in your testimony, but you now agree that these were securities?

A.   This was ten years ago, so, you know --

Q.   Fair enough.

A.   Based on the reading of the agreements, it does appear they were.

Q.   All right.  And if I were to show you -- would you agree then that -- I can show you the agreements, but would you agree that the limited partnership interests in the Fund II and Fund III and

112

the other two funds were also securities?

A.    All I can really go on is the one you have in front of me.  But if they have a similar statement, then I would agree that the agreement indicates that they were.

Q.    All right.  All right.  Well, we'll get to the Fund II agreement momentarily.

And would you agree that in your role as the sole owner and member of FMC, that you were engaged in the business of advising others as to the advisability of investing in securities?

A.    As to the advisability of investing in securities?

Q.    Namely, the advisability of investing into the securities offered by the seed fund operating agreement, Fund II, Fund III.

A.    Again, I'm not clear on the legal distinction between Frost Management Company, which was the advisor, and my role as the manager of that company and whether that makes me specifically and personally an investment advisor.

Q.    All right.

A.    I don't know.

Q.    In exchange -- you received compensation in connection with each of these funds, correct, either

113

Q.   Okay.  What portion of that laundry list would you say yes to?

A.   I received some portion of management fees --

Q.   All right.

A.   -- from it.

Q.   All right.  And you were -- you received a management fee with respect to both Fund II and Fund III, correct, and their associated -- affiliated funds; correct?

A.   Correct.

Q.   And then with respect to the seed fund, you also received compensation in connection with your soliciting investors into that fund; correct?

A.   No.

Q.   No?  No salary?  No compensation?

A.   That was in connection with operating the fund, not with raising funds --

(Reporter clarification.)

A.   So the salary that I received indirectly from the seed fund was part of the operating expenses of the seed fund, not from raising the seed fund.

Q.   But it was compensating you for your time in connection with the management of the fund; correct?

A.   Yeah, making the distinction between time spent fundraising and time spent managing the fund in

124

general.

Q.   All right.  So however you define it, you've received compensation at the fund level?

A.   Well, for -- as part of the operating expenses.  I'm defining it in a different way than you are, I think.

Q.   All right.  And you see with respect to this seed -- with respect to the ADV, Form ADV -- I'm not sure if you're on the same page, but the Frost VP Seed International, LLC, fund is listed as a -- one of the funds that FMC is an advisor to.  Do you see that?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   All right.  Do you agree that in soliciting actual and prospective investors into the five funds that are at issue in this case, that you used the mails and other means of interstate commerce?

A.   I'm not quite sure what comes under interstate commerce.

Q.   Wire communications, Internet, telephone.

A.   Yes.

Q.   All right.  And the US mails as well?

A.   I'm not sure about that.  I never thought that we were using mail.

125

Q.   All right.

A.   But I didn't handle that part of sending documents out, et cetera, so I'm not sure if I can properly answer that question.

(Reporter clarification.)

A.   Sorry.  I think it's because I'm thinking about it as I'm speaking, so I will try and direct my mouth to the microphone better.

Q.   All right.  Turning to a different topic.

The arbitrator's award, you agreed with one of his findings that you had no prior experience as a fund manager.  Do you recall that?

A.   With respect to the seed fund, yes.

Q.   Right.  Let me ask you a slightly different question.  Prior to creating the incubator, which I'm calling Frost Data Capital.  It was previously called -- what was it? -- Frost Venture Partners?

A.   Correct.

Q.   Prior to creating Frost Venture Partners, you had no prior experience in operating an incubator company; correct?

A.   Correct.

Q.   And you reviewed -- you said you reviewed your prior -- well, did you review your prior testimony in the arbitration, both at the arbitration

126

Exhibit 99
Page 1197

think you mentioned Kreindler.  Who else were the other members again?

A.    When it was formed, you mean right back at the early days, kind of --

Q.    Right.  When you're coming up with this notion of how much the incubator fee should be.  Who are the members that are -- you're determining that initial question with?

A.    Myself, Bill Guerry, Cary Breese, you know, and then other people as the organization grew.

Q.    So initially, it was just you and Mr. Cary and Mr. Breese?

A.    Mr. Guerry and Mr. Breese.

Q.    Just the three of you?

A.    From my recollection, that makes sense back in early 2012.

Q.    All right.  And had Mr. Guerry had any prior experience in operating an incubator company?

A.    Not that I know of, but he had pretty extensive experience of early-stage companies as a CFO.

Q.    And did Mr. Breese have any prior experience with operating an incubator company?

A.    Not of an incubator probably because very few existed.  So -- but he, again, had his own start-up

135

experience as a CEO.  So he had a pretty good knowledge, like Mr. Guerry and myself, of what it cost to run one of these start-ups in the early days and on an ongoing basis.

MR. SEARLES:  All right.  I'm not sure with respect to Exhibit 2 -- let me see.  After this exhibit, I suppose we can break for lunch.

(Reporter clarification.)

(Discussion held off the record.)

THE WITNESS:  Obviously, while I'm kind of thinking, it's difficult.  The microphone is quite directional.  I can try and change the settings on it so it's less directional.  I'll try that over lunch and maybe test it and see.  I think it's just a setting.

THE REPORTER:  We're still on the record.

THE WITNESS:  Sorry.  Yeah.

MR. SEARLES:  All right.  I've brought up Exhibit 2 from the arbitration previously marked, which is the Frost VP Early Stage Fund II, LP, Limited Partnership Agreement.

THE REPORTER:  Excuse me, Counsel.  I'm going to need to take a break.  I'm sorry.

MR. SEARLES:  Oh, I'm sorry.  That's fine. I'm sorry.  Okay.  Let's do that then.  40 minutes

136

THURSDAY, MARCH 11, 2021, 9:01 A.M. PST

THE VIDEOGRAPHER:  And we're back on the record at 1:36 p.m.

BY MR. SEARLES:

Q.   Mr. Frost, I'm showing you what's been previously marked as Exhibit 2, the Frost VP Early Stage Fund II, LP, limited partnership agreement.  Do you recognize this document?

MR. MARSHALL:  You want to pull it back up on the screen?  You want to pull it back up, the document?

MR. SEARLES:  I'm sorry.  I thought I had.  I pulled it up.  Is it present for everyone?

MS. EAVES:  Well, not yet.

MR. MARSHALL:  It's coming.

MR. SEARLES:  Okay.

THE WITNESS:  Okay.  I can see the first page at least.

BY MR. SEARLES:

Q.   All right.  You're familiar with this document; correct?

A.   Yes.

Q.   And did you -- do you recall reviewing and approving it prior to its dissemination to investors?

138

A.   Yes.

Q.   I want to direct your attention -- the signature page, I think, if you -- if you're with me at page 49 and 57 of this document.  Again, it has that same bold language that we saw with the seed fund agreement.  "The securities evidenced by this partnership agreement have not been registered under the Securities Act."  Do you see that language?

A.   Yes.

Q.   So it's your understanding that these limited partnership interests were securities?

MR. MARSHALL:   Asked and answered.

BY MR. SEARLES:

Q.   I'm sorry.  You can answer.

A.   That's what the document says.

Q.   All right.  So there is a section, article 6, management fee; partnership expenses.  Do you see that page?

A.   Yes.

Q.   And then directing your attention to paragraph (d), it reads that "Each limited partner hereby agrees and acknowledges that the incubator may receive a monthly fee from the companies in which the partnership hold an investment (each, a portfolio company) in exchange for certain shared advisory and

139

A.   Not specifically, but it was disclosed to investors.

Q.   All right.   Is it your position that the amount of the service fees paid to the portfolio companies to the incubator FDC was disclosed to all investors in the portfolio companies?

A.   I didn't speak to all of them, so it's impossible for me to say that it was disclosed to all of them.   Certainly I remember a significant number of conversations about it.   And we -- I think we were all fairly consistent in conversations saying that it was going to be approximately the cost of the fully burdened executive and that we used that really throughout the history of the organization.

Q.   With respect to the investors in the funds as opposed to investors invested directly into the portfolio companies, was the amount of the incubator fees disclosed to the investors in the funds?

MR. MARSHALL:   Can you be more specific, Don, before answering?   Because there are five funds, different investors.   Are you asking for all investors or seed fund, Fund II?   Which funds are you talking about, which investors?

MR. SEARLES:   All of them, but let me walk it through each one then.

145

Exhibit 99
Page 1202

BY MR. SEARLES:

Q. Was the amount of the incubator fees disclosed to the investors in the seed fund?

A. So I can certainly recall some conversations with some of them where I disclosed it in that general terms describing it as roughly the cost of the fully burdened executive and it -- you know, and having conversations around that with people.

As I say, I didn't speak to all of the investors and, in fact, a significant number of the investors in the seed fund were only spoken to and communicated with by Hollencrest. And Hollencrest drew a very clear line there that they were going to be responsible for communications to clients of theirs that they were recommending this to.

Q. All right. With respect to the --

(Crosstalk.)

Q. Was the dollar amount of incubator fees disclosed to investors in the seed fund?

A. Well, at that time this was very early in the model. So when people asked about the dollar amount, I think the pretty consistent answer was I've said that it would be roughly the cost of the fully burdened executive.

I think the reality is that it was quite a

146

Exhibit 99
Page 1203

A.    So the quarterly reports wouldn't.  No.  I think that would have been communicated separately, but I would have to check.

Q.    All right.  But with respect to the quarterly reports provided to the investors in the funds, was the amount of the incubator fees charged to the portfolio companies disclosed in those quarterly reports?

A.    The quarterly report is for the fund, not for individual kind of finances of the portfolio companies.  So I -- so quarterly reports didn't include that.

Q.    Thank you.

A.    Because at the end of the day, the portfolio companies are independent entities and subject to the share purchase agreements.  We would have some confidentiality agreements to follow.

Q.    Including the amount of service fees the incubator fund would charge to them?

A.    That would be part of their -- as a private company, their P&L, so that would be, in my view, confidential.

Q.    And was the amount of the incubator fees paid to the -- paid by the portfolio company to the incubator disclosed in the audited financial

149

statements of the funds that were provided to investors?

A.    I think you would have the same issue, right, because there are confidentiality clauses in all those agreements, so I doubt that they would be disclosed.

Q.    So if I'm an investor in the fund and I ask you how much is the portfolio company, whatever one it is, paying to the incubator, you would reply to me, "I can't tell you that because it's confidential information"?

A.    Hypothetical question, because no one that I recall actually asked that in that context.

Q.    All right.  Well, the Hollencrest respondents asked for that information and ultimately had to sue you in order to get it; isn't that true?

A.    Well, they asked for a very broad range of information that went way beyond what they were entitled to under the LPA.

Q.    So in terms of communicating with the Hollencrest respondents with whom you had a fiduciary duty of care and loyalty, you took a strict construction of the documents they were entitled to inspect under the operating agreement and told them that they are not entitled to inspect the books and records of the portfolio companies to determine how

150

much the portfolio companies are paying the incubator in fees; isn't that true?

A.   That is what we told them, but again, I think this is going into privileged communications around that kind of thing.

Q.   Right.   But it's not privileged with respect to what you communicated to Hollencrest; correct? That's what you told them?

A.   We told them that we would give them the information that they would -- to under the agreements that they had with us.

Q.   Right.   Which did not include information regarding how much the portfolio companies were paying to the incubator; correct?

A.   In terms of specific portfolio companies and what they were paying to the incubator, that's correct, because they weren't entitled to that information.

Q.   So then you would agree that the amount of the service fees paid by the portfolio companies to the incubator was not disclosed to all investors in the portfolio companies?

A.   That's a different matter.

MR. MARSHALL:   Let me object.

MR. SEARLES:   It's not -- let me clarify.

151

Exhibit 99
Page 1206

evidence of that happening, more specifically, you know, a lot of the corporate investors that we were talking to, including GE knew full well what the -- those rates were that we were charging specific companies because they were on the boards of those companies. And they went ahead and made their investment. And, you know -- so, you know, that's the way it was relevant. We certainly disclosed it more specifically, but in most cases people were satisfied by the explanation that we gave.

Q. Did you have a fiduciary obligation to GE?

A. Only with respect to, I guess, companies that I was on the board of that they'd invested directly in.

Q. Well, vis-a-vis -- between the -- you acknowledge having a fiduciary duty to the investors in the funds; correct?

A. Yes.

Q. Did you have a higher duty to anyone else -- higher fiduciary duty to anyone else other than the investors in the funds?

A. No.

Q. And you're investing fund money into various portfolio companies that you in your position as a member of the investment committee of the funds are

154

making the determination to invest moneys into;
correct?

A.   Wearing the hat of an investment committee member at that point, that is correct.

Q.   And you reported back to the funds generally on how each of the portfolio companies were doing in your quarterly reports; correct?

A.   Yes.

Q.   Whether they were making money, whether they were not?

A.   I don't think any of them actually made money through that period --

Q.   No.

A.   -- but I don't recall anything --

Q.   But you're reporting on the performance of the companies?

A.   In general terms.

Q.   Various internal confidential information about how the companies were doing?

A.   I think that would be an individual judgment on each company.  A lot of what they were doing was obviously public in terms of the progress, customers, et cetera.  I think we were pretty careful generally to avoid anything that wasn't in the public domain.

Q.   Are you telling me that there was a

155

nondisclosure agreement between the incubator company and the portfolio company that prevented you from disseminating relevant information to the fund investors about the companies in which you had caused those funds to invest in?

A.    You said the incubator and portfolio companies.

Q.    Well, you talked about some sort of confidentiality or nondisclosure agreement.  Who are the parties to that agreement?

A.    So as an investor, the fund would have -- having signed the share purchase agreement specific to a given company, there would be generally confidentiality clauses within that share purchase agreement.  And then at another level there is the general rights to information of limited partners in the fund.

Q.    I'm sorry.  So the fund -- the funds when they invest into a portfolio company do so in exchange for shares.  Is that what you're saying?

A.    Yes.

Q.    And as part of that share purchase agreement, there is a confidentiality provision?

A.    In general, yes.

Q.    And you're saying that that confidentiality

156

Exhibit 99
Page 1209

provision then prevents the portfolio company from telling the shareholder how much they're paying in fees to the incubator?

MR. MARSHALL:  Objection to the extent it calls for him to interpret an agreement.  I think it's fair, Don, to ask his understanding which he's expressed, so it's asked and answered.

But you can go ahead and answer again as to your understanding with regards to what financial information can be disseminated and what would be appropriate.  I'm fine with that.

THE WITNESS:  So there is also multiple parties involved here.  Right?  You just said it can't disclose to its shareholder.

Well, first of all, a minority shareholder generally has limited rights, correct, and that would vary depending on the level of share ownership and so on.  So that would vary depending on the specifics of the share purchase and the circumstances of it.

Then, though, beyond that, while the fund is a shareholder, a limited partner, hence the name, doesn't necessarily have full access to all of the information disclosed to the fund.  It's the limited partners.  The general partners would generally have, because they might serve on boards or whatever, have

157

access to more detailed information, but the limited
partners' access to that is limited.

BY MR. SEARLES:

Q.   So you disclosed this confidential
information that couldn't be disclosed to minority
shareholders or to limited partners; you disclosed it
to other outside investors such as GE; correct?

A.   When you say I disclosed it to them, I don't
know what you're referring to.

Q.   With respect to the portfolio companies'
service fees that were paid by the portfolio companies
to the incubator.  My understanding from your
testimony is that that information was you could not
disclose to the fund investors, either because they
were minority shareholders or because they were
limited partners.

A.   You're taking what I said out of context.

Q.   I'm trying not to.  I'm just trying to
understand your testimony as to why you thought this
information was -- could not be disclosed.

Isn't it a fact that it could be disclosed
but you simply chose not to?  Because when you did
disclose it to outside investors they routinely told
you that the amount of these fees are excessive,
unreasonable, and we won't invest unless they're

158

A.   Not that I recall.

Q.   The service fee that was charged to the incubators -- before I leave this subject, the -- no.

The service fees that were charged to the portfolio companies, were those service fees only for services rendered to those companies?

A.   Yes.

Q.   With respect to some companies -- some ideas considered within the incubator, you say some of those companies, those ideas were rejected by the investment committee of the funds; correct?

A.   Yes.

Q.   Did the incubator attempt to recapture some costs in connection with considering these ideas for portfolio companies that were rejected by the investment committees in the service fees charged to the portfolio companies?

A.   No.

MR. MARSHALL:  Objection.  Vague.  Ambiguous.

BY MR. SEARLES:

Q.   You understand my question?

You answered quickly.  Do you understand my question?

A.   I thought so at the time, but can you repeat it just to make sure?

162

these ideas and developing companies is because we hope that the founders shares will be worth something down the line. And they certainly can be.

I mean, you know, Select and DATAllegro both generated substantial amounts of money.

(Reporter clarification.)

THE WITNESS: Select and DATAllegro. It's kind of all one word. D-a-t-a-l-l-e-g-r-o.

Which were two companies that I started when I was a lot younger and less gray. And first one did an IPO and the second one I sold to Microsoft.

BY MR. SEARLES:

Q. And what is carried interest?

A. So carried interest is on the fund, so as a GP typically it's 20 percent. So the common model is 2 percent management fee, 20 percent carry. So the GPs would basically get 20 percent of the profit that the fund generates to investors and share that between them.

So in addition to the management fee, there is an equity component of running the fund, which is the carry, but it's only if the fund makes a profit overall.

Q. And that would be another form of compensation to the GEP if there were a profit?

189

Exhibit 99
Page 1213

A.    Yes, and not to the incubator.

Q.    So we've talked about what you do wearing your hat as the -- at the incubator level, at the preformation stage.  What is it you're doing at the GP level in exchange for your management fee?

A.    Managing fund and its investments.  So when I'm sitting on the board, typically I'm representing the fund's investment.

Q.    Sitting on the board of what?

A.    Sitting on the board of a portfolio company.

Q.    I see.

A.    That would be in my role as a GP, but, of course, then you've also got the concept of being a director of that company and representing all the shareholders of that company and not just one.  So, you know, as part of the incubator, I wouldn't take board seats.  That would be as the GP of the fund.

Q.    All right.  In the preformation stage before you're sitting on the board of a portfolio company, what, if anything, are you doing to earn your management fee with respect to a company that has yet to be formed?  It's possible you're doing nothing and it's all at the incubator level, but I'm trying to understand what portion of your management fee, if any, in your mind is being devoted towards

190

preformation activity.

MR. MARSHALL:  Objection.

THE WITNESS:  It's not something that the GP was doing.

(Crosstalk.)

(Reporter clarification.)

MR. MARSHALL:  Objection was argumentative as to "doing nothing."

BY MR. SEARLES:

Q.   I didn't mean to be argumentative.  I'm just trying to find out what you were doing, if anything, for your -- in exchange for your management fee at the preformation stage of companies.

A.   The GP played no role in the ideation or formation of the company.  Right?  So at that point I'm wearing my hat as the GP of the fund.  So my role as a GP of the fund is managing the fund's investments, sitting on boards on behalf of the GPs, because the fund is only involved in a company once it's making an investment, not before that.

Q.   Okay.  I think you misspoke, but let me clarify.  So prior for the formation of the company, you, in your role as a GP of the fund, are doing nothing?

A.   For that company, because it doesn't exist

191

and we haven't made an investment in it yet.

Q.   Okay.  Fair enough.  And then when you're making the decision to invest in that company at the investment committee level, are you -- is your management fee being implemented -- are you incurring fees at that level making that decision?

A.   Yes, because that's part of managing the fund's investments.  Right?  Obviously a critical part of it.  Deciding which investment to make is a critical part of the GP for all.

Q.   All right.  And what due diligence are you doing wearing your hat as a GP in deciding whether to invest in a fund that you have not already done wearing your hat as the head of the incubator in determining whether to form a company?

A.   That's a different role.

Q.   I know, but I'm wondering, what's the different due diligence that's happening?

A.   Bear in mind that there was a whole set of people at the incubator doing the initial kind of, "Hey, is this idea worth pursuing?"  And they would typically be the ones pitching to the investment committee, not just me.

So at that point I've got to wear a different hat.  I've got to decide, is this something that is

192

Exhibit 99
Page 1216

worth investing in?  And there were certainly occasions when we said no.

There were occasions when I, as the investment committee and which I was a part, said, you know, "This is interesting, but it's not quite ready for investment yet.  Do some more work in these areas."

So I view it as a different role with a different hat.  And I think I was very careful to separate those two things out.

So I think it's important to note that it wasn't just me saying, "Hey, here is an idea.  I validated it," and then changing my hat and saying, "Let's invest in this."  It's just not how it worked.

There was a team of people that typically took an idea -- sorry, Cindy, I'll slow down -- took an idea that, you know, I might have come up with, typically I would have come up with.  And then they would do the work after of reaching out to customers, partners, et cetera, to validate that concept.

And at the incubator level then we're assessing that as a team including those, you know, the VP level people, et cetera, that were doing that work and pushing them and having meetings on it and assessing the idea and then collectively might decide

193

to make a proposal to the investment committee.

At that point I would change my hat.  And certainly there were cases where we said no at that point.  And it might seem a -- you know, I understand perhaps that that seems a little strange, but the reality is it was a different view of the concept at that point.  And, you know, I'm looking at it from a point of view of, does it make sense to invest in this company, create this company?  Based on this idea, is it far enough along to justify that investment?  And some cases it wasn't.

Q.   And in 27 cases it was?

A.   Yes.

Q.   Is it your position that the CEOs of the portfolio companies were free to cancel the services agreement?

A.   Yes.

Q.   Isn't it a fact that the services agreement provided for a six-month -- minimum six-month notice period so that they were not free for at least a six-month period of time to cancel the service agreement?

A.   So while that was strictly speaking the contract, there were certainly cases where they canceled with less notice than that and we accepted

194

Exhibit 99
Page 1218

I'd be representing the incubator and I'd be really clear about which hat I was wearing.

Q.    And do you recall instances where CEOs of the portfolio companies came to you requesting a reduction in the fees and that request was refused?

A.    There were certainly negotiations where we said, "Look, you know, I think you're mistaken in terms of the services that you're using and here is why the fee is justified."

As I said, at the end of the day, wearing that hat as the CEO of the incubator, I would negotiate hard.  That was my job.

Q.    And in some --

(Crosstalk.)

(Reporter clarification.)

A.    So I would negotiate hard as wearing my hat as the CEO of the incubator.  And the CEO would play his role of wearing his hat there and negotiating on behalf of the company.  And in the end we would resolve that negotiation to some -- you know, in some way.  Some cases I convinced them that the fee should stay where it was.  Many other cases it was reduced, depending on the circumstances.

Q.    And the instances where it was reduced, it would be instances where the portfolio companies had

196

Q.   He started with Frost Data Capital in 2011?

A.   Yes.  I think so.  '11 or '12.

Q.   All right.  And you found him to be an honest person?

A.   On the whole.

Q.   Do you recall any instances of him being dishonest?

A.   No.  Not directly.

Q.   Well, unfortunately, I'll keep persisting on this then.

     Indirectly, what instances of dishonesty are you aware of regarding Mr. Guerry?

A.   I don't think it's anything specific.  It's really just I think he can be quite self-serving, to just being frank about it, but whether that reaches to the level of being dishonest is another matter.

Q.   How is he being self-serving?

A.   It's more recent times, not really connected with this.

Q.   Have you read his Wells submission?

A.   I've read some aspects of it, not all of it.

Q.   Do you feel he's being self-serving in his Wells submission?

A.   No.

Q.   In paragraph 3 of this email from Mr. Guerry

201

Exhibit 99
Page 1220

companies may use the services less in some months,

they may use them more in other months; thus we

believe the flat charge is reasonable and provides

both the companies and the incubator the

predictability necessary to manage their business."

Is that a true statement?

    A.   Yes.

    Q.   Then it goes on to the fourth paragraph.  "In certain circumstances, we have agreed to reduce the cost to the respective companies who have raised outside funding and such outside investor has required this as a condition of funding."  Is that also a true statement?

    A.   It's -- I think in your earlier question you were trying to make that into a general statement. It's very clear here he says in certain circumstances.

    Q.   All right.  I'm asking you:  Is that statement that I just read to you from Mr. Guerry's email true?

    A.   It is true.  In some certain circumstances that happened.  It is not true that that was the only situation that happened that you were trying to imply in your earlier questions.

    Q.   All right.  Then he goes on to say, "Further, at some point, some companies graduate the incubator

203

A.   So in terms of Fund II and Fund III now?

Q.   Or with the seed fund, any other communications with the investors in any of the funds, was there a list maintained, to your knowledge, of what was provided to each investor in terms of disclosures communications?

A.   I don't know if a formal list was kept.  As I say, everyone would generally, I think pretty much exclusively, communicate over email.  So there would have been a pretty straightforward search to -- I would think, to find everything that was sent.  I -- maybe for the later funds Luis Vasquez might have kept a more kind of formal list, but I don't recall seeing that.

Q.   All right.  With respect to the salary that you were paid by the seed fund that we went over earlier this morning, approximately $180,000, I believe you characterized that as an expense of the seed fund and, therefore, appropriate to be paid by the seed fund?

A.   Under the terms of the operating agreement, yes.

Q.   All right.  At page 5 of this executive summary, there is a final paragraph that reads, "Note that the seed and early stage funds" -- the early

209

break. And after we're off the record, I have a question for the videographer.

THE VIDEOGRAPHER: And we're going off the record at 3:50 p.m.

(Recess, 3:50 p.m. to 4:15 p.m.)

THE VIDEOGRAPHER: And we're back on the record at 4:15 p.m.

BY MR. SEARLES:

Q. Mr. Frost, the salary that you were paid by the incubator during this seed fund era, 2012, 2013, you said it earlier was approximately 250,000 a year; is that correct?

A. That's my recollection.

Q. And how did -- and you determined that amount of salary to pay yourself; correct?

A. Yes.

Q. And how did you determine that that was a reasonable salary to pay you?

A. Well, it was at the very low end of where -- if I start a new company or something -- it was certainly a lot less than I was making at Microsoft just prior to that. But obviously in the early days, you know, it's reasonable enough to -- I think I took zero for a while and then built up to it as we developed the organization.

227

Q.   And in the absence of angel investors and other investors, assuming that the only source of funds for the portfolio companies were the amounts invested by the seed fund, the source of your salary payments would come from those moneys; correct?

A.   Yes.   But you're making an assumption there that there were no other investors.   Each of the companies generally had other investors quite quickly.

Q.   And you did not explicitly disclose to the seed fund investors that you were receiving a salary of approximately $250,000 a year at the incubator level; correct?

A.   Not explicitly, but I think they all knew that I had to be paid at some level.

Q.   With respect to the Fund II, we see when that fund is created that your salary at the incubator level jumped significantly to $1.2 million, approximately, I believe in 2014 and again in 2015.

A.   For a period, yeah.

Q.   And again, were you the determiner of the amount of your salary?

A.   Yes, fundamentally, but remember at that time, we'd grown the organization quite a bit.   We were hiring in people like John Vigouroux that wanted quite a higher salary to be a part of it.   And I think

228

everyone felt it was fair that I earned the most given that I was coming up with most of the ideas and driving all the companies.

Q. When you say everyone thought it was fair, are you talking about the other members of the incubator company?

A. The other executives of the incubator company.

Q. All right. When you're saying you thought everyone -- you thought everyone thought it was fair, you're not referring to the investors in this Fund II, are you?

A. No.

Q. And did you disclose to the investors in Fund II that you had quintupled your salary from one year to the next, from 250,000 to 1.2 million?

A. No. But you have to bear in mind that my salary package at Microsoft was up to around a million overall while I was there. So I talked about that to them. So to a certain extent those couple of years were kind of a bit of catch-up on the previous years where I'd been, in my view, relatively underpaid. And of course, in the latter stage of the incubator, I was paid very little, 24, 25K. So I think on average it was still less than I could have continued to make at

229

Microsoft.

Q.   All right.  And then the later years when you were only paid 25K or whatever the amounts were, that was because there were no funds by which to pay your $1.2 million salary; correct?

A.   Well, I mean, at the end of the day, I was putting in most of the money to support the organization, so certainly substantial amounts of money.  Didn't make a whole lot of sense for me to put money into the incubator and then pay myself back a sizeable salary.  So, you know, it changed.  The situation was different.

Q.   And again, in the absence of outside moneys being invested into the portfolio companies, the sources of moneys to pay your $1.2 million salary in 2014 and 2015 would be -- I guess, first of all, the source of the moneys to pay your salary of 1.2 million in those years was from the service fees charged to the portfolio companies; correct?

A.   Correct.  But obviously your extremely hypothetical question in terms of if they were the only source of funds, well, they just weren't the only source of funds.  They were a small fraction of the overall funding across the portfolio, the Frost funds were.

230

Q.   Let me show you -- just put another document. I'm bringing up -- I think this is an exhibit we've seen before, which is Exhibit 1, the operating agreement for the seed fund.

Are you able to see what I see?

A.   Not yet.

MR. MARSHALL:  It's coming.  It's here.

THE WITNESS:  Yes.

BY MR. SEARLES:

Q.   All right.  Directing your attention to the company expenses, Article VI of this document, company expenses (a), it reads, "The company" -- and the company is referring to the seed fund; correct?

A.   Yes.

Q.   "Shall bear all operating expenses reasonably incurred by the manager."  That's referring to the GP of the fund; correct?

A.   Yes.

Q.   The incubator, that's referring to the Frost Data Capital, correct, or Frost Venture Partners at the time; correct?

A.   It is, but I think this is not the final version of this document because I think 6.1(a) was corrected to not have the incubator in here because obviously that makes no sense.  That's not what we

231

were intending to do at all.

Q.    All right.  So Exhibit 1 then is not the --
what your understanding to be the operative agreement,
the operative final agreement that was provided to
investors?

A.    Doesn't look like it based on that wording in
6.1.

Q.    All right.  And the wording "the incubator"
should not be there; correct?

A.    I think that's correct.

Q.    How is that correction made?  Do you have an
understanding of why we have different versions of
this document?

A.    I don't.  I know you highlighted in your
mediation brief.  It looks like the one that we
actually sent to investors to sign was the updated,
corrected one.  Obviously in sending all these
documents through attorneys to the arbitration, it may
be that they picked up an older version at one point,
but I haven't been able to track down the gestation of
this particular version.

Q.    All right.  Assuming that this document that
we're looking at had been the operative agreement and
the company would bear the operating expenses
reasonably incurred by the incubator, would that then

232

include your salary at the incubator?

A. That would have been a reasonable --

MR. MARSHALL: Objection. Calls for speculation.

BY MR. SEARLES:

Q. I'm sorry. You said that would be reasonable?

A. Based on this wording, that would have been reasonable, but I don't believe that it was a version that anyone signed. So it's speculative, isn't it?

Q. Okay. Hold on. Sorry. I almost exited this whole program.

I want to stop share of that document. I think this is the one I want to show you. Hold on.

I'm showing you what's been previously -- I'm not sure if this has been previously marked. Very slow. Bear with me for a second here.

I'll mark this -- well, this is -- this was -- this was marked as Exhibit 48 in the arbitration proceedings.

Madam Court Reporter, could I rename this at the conclusion of this deposition rather than try to struggle through that at this point?

THE REPORTER: Yes. What is it named?

MR. SEARLES: It's Exhibit 48. And at page

233

Bates number F0052555 is a Frost VP, LLC, amended and restated operating agreement of an agreement signed by Robert Wolford. The front page of this document at page 1 is entitled "Frost VP Seed, Subscription Agreement and Investor Questionnaire."

BY MR. SEARLES:

Q. And do you see what I see, Mr. Frost?

A. Yes.

(Reporter clarification.)

MR. SEARLES: First page of the document is "Frost VP Seed, LLC, Subscription Agreement and Investor Questionnaire," previously marked as Exhibit 48 in the arbitration.

BY MR. SEARLES:

Q. And then turning to page 30. So you see the page that I have, Mr. Frost, that's the amended and restated operating agreement?

A. Yes.

Q. And then turning to exhibit -- section 6.1, Article I -- Article VI, company expenses. Section (a) now reads, "The company shall bear all operating expenses reasonably incurred by the manager or the company in connection with the management of the company." Do you see that language?

A. Yes.

234

Q.   And this is a document that you understand to have been signed by Mr. Wolford; correct?

A.   That's what I understand.

Q.   All right.  And you understand this to be the operative agreement that was provided to investors?

A.   That would make sense.

Q.   All right.  So by not including the language of "the incubator," is it fair to say that the company then would not be responsible for the expenses of the incubator?

A.   Well, not directly.  The statement before was that it would bear all operating expenses reasonably incurred by the manager or the company or the incubator.

Q.   That's right.

A.   Clearly, we did not expect it to bear directly all approaching expenses incurred by the incubator.

MR. MILLER:  Hey, Don, you have some stuff showing on the screen that you may not want displayed.

MR. SEARLES:  My coming week of everything overdue.

MR. MILLER:  I just wanted to point it out.

MR. SEARLES:  Thank you, because I wasn't aware that everybody could see it.

235

Q.    And you're saying Mr. Guerry in his role as the CFO of the company had that -- he exercised that authority in determining what services to be provided?

A.    He would have been a part of that, not necessarily exclusively.

Q.    In the absence of any other officers or employees of the company, he would be the exclusive person to make that determination?

A.    That would make sense, but, you know, as I said, there was times different companies, he wasn't the only officer provided by the incubator.  Sometimes there would be an acting CEO, sometimes the CTO.  They would all play a role in engaging with the incubator services, as would the directors of the company, so the people who were appointed to the board.  It could have been me in some cases.  It might have been other people like John Vigouroux or Miles Mahoney at different times.  They would all play that role on behalf of the company.

Q.    I'm going to ask you a series of questions. It will be reminiscent of the series of questions that I asked you with respect to your reliance on counsel.

Would you agree that you did not disclose to the members of the seed fund, the international seed fund, the limited partners of Fund II, the

247

existence?

A.   That's not really what we were referring to. We were talking about an executive that would have been hired by one of the start-up companies.

Q.   But if a start-up company doesn't have any funds to pay an executive, how is one to understand in a conversation with you that a fully -- amount of the fully burdened executive refers to some specific dollar amount, whether it be 1.2 million, which is the salary that you paid yourself at Fund II, whether it was $40,000 times 12 or $480,000 a year, or whether it was $250,000 a year that you obtained as the time the seed fund was operating?  How does a fully burdened executive translate into a dollar amount that any reasonable person could possibly understand?

A.   So first of all, I wasn't referring to any amounts.  None of us were referring to amounts paid to me personally.  As I said, this would have been referring to an executive that would have been hired by a start-up company.

And I didn't understand part of your question.  You said, how does anyone determine for a company that hasn't got any funding.  By definition, if the funds have invested, they have funding.

Q.   All right.  Let's turn to the fully funded

250

executives. Actually the proxy for that would be the CEO of the portfolio company. Wouldn't that be correct?

A.    That would be reasonable, yes.

Q.    And how much were the CEOs of each of the portfolio companies paid at the time of the inception of those companies?

A.    So the salary would typically be around $250,000, give or take, but, of course, that's not the fully burdened cost of that executive.

Q.    All right. And so I see --

A.    There are costs that would be taken into account. Anybody who is familiar with accounting terms, start-ups, et cetera, in my view would have a pretty good understanding of what we meant by the fully burdened cost of an executive.

Q.    All right. And then when the portfolio company was created and had a CEO in place, was that company responsible for paying the CEO's salary?

A.    Yes.

Q.    So the portfolio company then, having had a CEO in place now and then there are benefits involved in connection with that person as well, health insurance or -- what becomes a fully burdened executive? Is it salary plus benefits?

251

A. No. It's the overall cost of hiring and maintaining that executive, so it includes reasonable travel budget, office budget, perhaps a share of an assistant or something. There are various ways of calculating it, but I think most figures end up at about a $40,000 number.

Q. I see. Or $480,000 a year, approximately $500,000 a year?

A. Yes. It's not unreasonable.

Q. All right. So when a portfolio company has its own CEO in place, it's responsible for paying for that CEO; correct?

A. Yes.

Q. As well as the travel expenses, the other benefits and things of that nature; right?

A. Correct.

Q. So once it has its own fully burdened executive in place, why does the incubator company continue to charge for a fully burdened executive? Aren't those fees now duplicative to the services being provided by the CEO?

A. No, not at all. The incubator, irrespective of whether there is a CEO in place, continue to provide extensive services to each company. All we were saying is that the cost of those services overall

252

would be equivalent to the cost of a fully burdened executive.  Just because the company hires one person doesn't remove the need for all those incubator services.  Like change in nature as the company develops, doesn't remove them.  It's not duplicative.

Q.   Did you disclose to investors that the incubator, FDC, would charge incubator fees as soon as the company was legally formed?

A.   We've been around this a couple times already.

Q.   No.  We did this before, I think, with respect to the reliance on counsel.  I'm just asking you now with respect to the specific disclosures you've made to the investors in the fund.  Was it disclosed to the investors in the fund as opposed to anyone else, the investors in the fund, either by you or anyone affiliated with your enterprises, that it was -- that the incubator would charge incubator fees as soon as the company was legally formed?

A.   So as we discussed extensively, the whole point of the incubator was to source companies that the fund would then invest in.  So once the fund was decided to invest, and then the company that is investing in its form so it can accept that investment, it makes sense for the company to make

253

progress as quickly as possible so we can assess whether it's worthwhile investing more or whether it's worthwhile securing external investors, et cetera.

So it's -- I would argue that it's common sense for the investors to expect that the incubator would start to provide services from day one. It's kind of the whole point of the model.

Q. All right. So then was it disclosed, though? There are instances in this case of where CEOs come on board and are surprised to see that service fees have already been charged against the company that they are now theoretically in charge of. They're being surprised by this practice.

And so my question to you is: Was it disclosed -- I understand you have this global understanding of what this model permits, but I'm asking for specific disclosures. And did you specifically disclose to the investors in the fund that incubator fees would be charged to the portfolio companies as soon as the company was legally created?

A. Not specifically, but I --

MR. MARSHALL: Asked and answered.

BY MR. SEARLES:

Q. All right. That's fine.

Did you then disclose to investors in the

254

mean, the means -- let me restate that question.

Did you disclose to investors in the funds that the incubator FDC would create portfolio companies as a means of financing the operation of the incubator?

MR. MARSHALL:  Asked and answered.

THE WITNESS:  It's also not what really happened.  So, you know, we came up with ideas, proposed those to the fund.  The fund decided whether to invest in those.  That then gave us generally a budget to operate the incubator within that we had to work out.  We had to work within that.

BY MR. SEARLES:

Q.  You don't dispute that the service fees charged to the portfolio companies was a means of financing the operation of the incubator, do you?

A.  No.  I mean, that was the whole point of the business model.

Q.  All right.  And that the -- then do you dispute that the incubator would create portfolio companies as a means of financing the operation of the incubator?

MR. MARSHALL:  Objection.  Argumentative.

THE WITNESS:  I dispute the implication of your question.

257

that the service agreements executed between the

incubator and the portfolio companies were signed by

you and Mr. Guerry?

MR. MARSHALL:  Ask the question again.

BY MR. SEARLES:

Q.   Did you disclose to the investors in the

funds that the service agreements between the

incubator and the portfolio companies were signed by

you and Mr. Guerry?

A.   I don't recall making a disclosure of that

kind, but to a certain extent, given the nature of the

service agreement and given the different roles we

were playing, I think the service agreement was

appropriate.  It was necessary for the model to work

to some degree.  So I'm not sure that --

Q.   I simply am asking you whether you disclosed

the fact that the service agreements were executed

between you and Mr. Guerry.

A.   I don't recall that happening, but as I say,

it's not like we were signing it on behalf of the

incubator.  He was signing it on behalf of the

company, as formally the CFO of the company.  Everyone

understood that we were having to wear different hats

at different times.  Understood that as part of the

model.  It's kind of intrinsic to it.  So I feel

262

that's acceptable.

Q.   Did you disclose to investors to the funds that the amount of the incubator fees were not negotiated at the time the service agreements were signed between you and Mr. Guerry?

MR. MARSHALL:   Asked and answered.

You can answer.

THE WITNESS:   Again, we had a model that said, look, we're going to charge the cost of the fully loaded executive to each company and we're going to be providing services from very early days because that's the nature of what we're doing.   We're creating companies from scratch.   It would -- as I say, any experienced investor would understand that.   It makes sense.   So making specific disclosures of that I didn't feel was necessary.

BY MR. SEARLES:

Q.   All right.  Well, my question to you is with respect to that specific disclosure and I think it probably calls for a yes or no answer.

Did you specifically disclose to investors in the funds that the amount of incubator fees were not negotiated at the time the service agreements were signed by you and Mr. Guerry?

MR. MARSHALL:   Objection.  Asked and

263

move on.

BY MR. SEARLES:

    Q.  Mr. Frost --

        MR. MARSHALL:  Let me --

        (Reporter clarification.)

        MR. MARSHALL:  I will be brief.  I don't want to -- I want a clean record.

        That mischaracterizes Mr. Frost's testimony. We have a transcript, so it will speak for itself.  I will allow the same questions again.  I'll make the objections.  And perhaps we can just move forward in the time allotted.

BY MR. SEARLES:

    Q.  Mr. Frost --

        MR. MARSHALL:  Go ahead.

        MR. SEARLES:  Thank you.

BY MR. SEARLES:

    Q.  Mr. Frost, did you or anyone associated with the -- your entities disclose to investors in the funds that the incubator was paying for the salary of your personal chef?

        MR. MARSHALL:  Asked and answered.

BY MR. SEARLES:

    Q.  You may answer the question.

    A.  No.  But also it's worth bearing in mind that

266

my personal salary was reduced by the same amount to cover that. And at the end of the day, I put more money into the incubator than I ever took out.

Q. All right. And the amount of the salary you claim was reduced by -- for your personal chef, you're saying that you would have paid yourself -- awarded yourself a higher salary had you not had the incubator pay for your personal chef?

A. No. My salary was reduced when he came on board. That's my understanding. That was my instruction to Mr. Guerry. I understand that's what happened.

Q. Your salary of $1.2 million was reduced to pay for your personal chef?

A. That's my understanding.

Q. I see. And this is your personal chef, not an expense of the company; correct?

A. Correct.

Q. Was this a means of tax avoidance?

A. No. He paid tax on his --

MR. MARSHALL: Objection.

BY MR. SEARLES:

Q. I mean your taxes.

(Crosstalk.)

MR. MARSHALL: Let me make the objection

267

THE WITNESS: Okay. My recollection is that he was asking for like benefits and so on and it made sense to do that within the incubator. So that was the reason. It wasn't, in my mind, about tax avoidance at all. It's just not a factor.

THE REPORTER: Counsel, can we just take a few minutes, please?

MR. SEARLES: Yes.

THE VIDEOGRAPHER: And we're going off the record at 5:19 p.m.

(Recess, 5:19 p.m. to 5:32 p.m.)

THE VIDEOGRAPHER: And we're back on the record at 5:32 p.m.

BY MR. SEARLES:

Q. Mr. Frost, in your position as the person in charge of the incubator, is it fair to say that you were concerned about meeting the expenses of the incubator?

A. Yes. When I was wearing that hat, of course, constantly balancing that, running the business.

Q. All right.

A. Part of the job.

Q. And the incubator itself was dependent on the service fees it charged to the portfolio company for its financial wherewithal; correct?

270

A.    Yes, plus the money that I put in which was substantial.

Q.    All right.  So is it fair to say that as a means of meeting the financial needs of the incubator companies, one of the means of doing that would be to create a company that the -- one of the funds would invest in from which the incubator could then charge service fees?  Again, I'm talking about when you're wearing your hat as the incubator.

A.    Yes.  And, of course, you've also got to take into account that like, for example, in the example of DST and their investment in Fund III, the whole point of their investment was to work with the incubator to start companies that the fund could invest in.  So, you know, it's not like we were just going out and starting companies just to fund the incubator.

We were -- it was part of the program that we were looking for partners like DST, et cetera.  They were investing in the fund and the purpose in investing in the fund was to have some interesting start-ups created and incubated.

So, you know, it's not like we were doing just -- doing anything in isolation.  If we had an agreement with a particular investor or set of investors, we were looking for ideas, but that's very

271

different to assert that we were just starting
companies just to cover the costs of the incubator.

Q.   No.   But you would agree that at least the
consequence of starting a new company is that it would
be -- the incubator would be able to charge fees
against it provided the company had the means to pay
them?

A.   As part of the way it worked and the business
model, but as I say, it's, I think, a
mischaracterization and unfair to say that we were
just creating companies just to pay incubation fees.
That's not what was happening.

Q.   Okay.  I'm not saying that.  I'm just asking
the question.  It was a foreseeable consequence of
creating a company that the incubator would be able to
charge fees to that company; correct?

A.   Yes.

Q.   And was a -- when you were wearing the hat as
an incubator, at the incubator, presenting a company
for consideration at the investment committee level at
the fund, should it be approved, you would then be
able -- the investment would be approved, the
incubator would be able to charge fees for it;
correct?

A.   Well, bear in mind that I -- I don't recall

272

any situations where I presented an idea to one of the investment committees personally.

Q.   All right.  Well, whoever is presenting them.

A.    The incubator might have done that.  Right? And then I, you know, might have -- if it's me presenting -- and I don't remember too many instances of that -- I would have recused myself on the investment committee anyway, but, you know, if it's someone else, then I would vote with the investment committee hat on.

Q.    How many instances do you recall recusing yourself from votes on the investment committee?

A.    As I say, I actually don't remember specific examples of me presenting to the investment committee. I was speculating to a certain extent that if that had occurred, it would have made sense to recuse myself, but I don't have specific examples.

Q.   All right.  And would one of the purposes then of presenting an investment proposal to the investment committee when you're wearing the hat as -- at the incubator level would be the hope to be able to -- at the end of the day, be able to charge the portfolio company service fees by which the incubator would be able to maintain its financial condition?

A.   No, not really.  You know, we have a job that

273

to maintain the current level of staffing we need to start three or four companies this year, we would need to put the effort in to come up with sufficient, good ideas to be considered by the funds and by other investors, such as first-time GE Ventures --

THE REPORTER:  I'm sorry?

THE WITNESS:  First-time people like GE Ventures and so on invested in some of the early stage companies.  So that was our control mechanism.

Remember, as per my earlier testimony, we weren't just creating companies by ourselves.  We only could create a company when the investment committee of one of the funds or another investor said, "Yeah, this is a good idea.  It makes sense to invest in this."

So I think you've got to understand that dating mechanism in the middle of it all.  So while we could plan for it, we couldn't control it.  I think that's the kind of ruse of your question.

So while it was an element -- cash flow of the incubator was an element in our efforts to come up with new ideas and maybe talk to corporate partners about making investments and so on, at the end of the day, we weren't in control of the decision as to whether to go ahead or not.

277

Exhibit 99
Page 1247

BY MR. SEARLES:

Q.   And that decision was made at least in terms of the investment of the funds at the investment committee level; correct?

A.   Correct.

Q.   And you were the chairman of that committee; correct?

A.   I don't know if I was formally the chairman. I was certainly a member of it, but other people involved.

Q.   Right.  And the other members -- excuse me. I don't want to interrupt.

A.   I was very careful to think about the different hats I wore and we didn't approve every deal, that's for sure.

Q.   And the other members of the investment committee were other members of the incubator; correct?

A.   Well, again, they were performing their roles at that stage as GPs, as part of the incubator --

Q.   Okay.

A.   -- and took into consideration and wore different hats just the same.

Q.   All right.  But then the ultimate decision-makers to recommend to the investment

278

committee to create a company are the same people at the incubator level who are forming the -- or who are ideating the company; correct?

A.    That was a mixture.

Q.    All right.

A.    To get through this, you know, the whole team.

Q.    All right.

A.    If it was my idea to begin with, that would be a rough shape of an idea.  There was a team that went ahead and knocked the rough edges off the --

THE REPORTER:  I'm sorry.

THE WITNESS:  There was a team of people that took an idea, if that came from me or someone else, and they would knock the rough edges off it, talk to people in the market, generally do some validation, and then typically they would propose it to the investment committee.

BY MR. SEARLES:

Q.    All right.

A.    I wasn't day to day making that decision.

Q.    When you say when you're wearing your hat at the incubator level that you don't control the decision of whether the fund will invest in the company -- I believe that was your testimony earlier;

279

correct?

A.   Correct.

Q.   When you're not sitting on the investment committee and you and the other members of the investment committee, it's fair to say that those -- you and those other members of the investment committee do control the decision of whether to invest in the portfolio company; correct?

A.   Wearing those different hats, yes.

Q.   Okay.  Same people, though, just different hats?

A.   Well, no.  As I've already testified, there were different groups on each side.  So, you know, no people on the investment committee that hadn't played any role at all in gestating an idea.

Q.   But they were all members of the incubator; correct?

A.   In various roles sometimes, I think in some cases.

Q.   All right.

A.   Yeah.  I mean, but again, we were all very careful to wear different hats.

Q.   All right.  I'm showing you what I'll soon share as Exhibit 152.

     Do you see this document?

280

Madam Court Reporter, I'm going to have to mark this one as well.

A. What we're seeing at the moment is an SEC logo.

Q. I'm sorry. That's clearly not what I want to share.

MR. MILLER: Go down to your -- the Window explorer at the bottom.

MR. SEARLES: I think I have what I want now.

BY MR. SEARLES:

Q. Do you see what I see now, this investment committee minutes?

A. Yes.

Q. From April 17 of 2014?

A. Yes.

Q. You -- the committee members here are Mr. Frost and Mr. Vigouroux. The other two, Mr. Kreindler and Mr. Colaco, are both absent. And you're in charge of the incubator, correct, at that time?

A. Right.

Q. John Vigouroux was a member of the incubator as well; correct?

A. Correct.

Q. And the recording secretary, Mr. Guerry, he's

281

not a voting member of the committee, is he?

A.    No.

Q.    All right.  So Mr. Shackleton, he's a member of the incubator; correct?

A.    Correct.

Q.    And he's proposing the creation of five new companies; correct?

A.    That's correct.

Q.    And you and Mr. Vigouroux, based on whatever information Mr. Shackleton provided, committed to invest $250,000 in each of those five companies; correct?

A.    That's what it says here.

Q.    And that's money from the seed fund -- from Fund II; correct?

A.    This is for the investment committee of early stage Fund II, so yes.

Q.    Right.  So these five companies at $40,000 per in terms of the incubator fees would result in $200,000 a month coming in to the incubator; correct?

A.    It sounds right.

Q.    All right.

A.    But, you know, again, this has to be understood in context.  At this time we were working pretty extensively with GE.  We were working with GE

282

services in and around the portfolio. So it was more of a -- I will say a systems integrator than it was a product company.

You know, in terms of the exit strategy that you asked me about, the exit strategy for a services company is still the same. You would ultimately expect perhaps an acquisition or whatever, but typically the revenue curve and revenue multiples is different. It's often easier to build revenue at a services company in the early days rather than a product company. The sales cycle can be shorter.

But at the end of the day, you don't get as high a multiple on revenue and exit. So it has a different dynamic. But, you know, we felt at the time, using our best business judgment, that it made sense to kind of centralize that in one company and see if we could build a meaningful services company. The fact is it didn't work.

Q.   With Snow Data Capital, we went over briefly that it charged approximately, I think it was, $5100 a month to the various portfolio companies it was servicing. Do you recall that being approximately correct?

A.   Yes.

Q.   All right. And in turn, Snow Data Capital

300

was invoiced by the incubator company for approximately $2,700 a month beginning in April of 2014 for shared services, rent, and supplies; correct?

A.   I don't know without reviewing the specific accounts.  It's possible.

Q.   All right.  Then in August of 2014, the amounts being invoiced by the incubator were $4,000 a month to Snow Data Capital?

A.   Again, I don't know.  That's a detail of one of 30 entities involved.  So without looking at the specific records, I can't answer that question.

Q.   I see.  So at least Snow Data Capital served in part as a source of additional funds coming back to the incubator, correct, through the invoicing by Frost Data Capital of that entity?

A.   I would imagine that that was because it was in the same office.  It had a lot of the same -- FDC was on the lease and everything else.  So it makes sense for some costs to be shared that way.

Q.   All right.

A.   But the specifics of what those expenses were and so on, I can't answer.

Q.   In certain instances the -- I guess with respect to SourceThought, Exara, Ubix, the incubator continued to accrue incubator fees against those

301

BY MR. SEARLES:

Q.   With respect to the companies that were being invoiced that could no longer pay in amounts being accrued on their books as a liability to Frost Data Capital, during those periods of time, what records would we look to to see what services were, in fact, being rendered?

A.   I think, as we've already discussed ad infinitum, the incubator didn't provide services on a kind of al a carte basis, but clearly and I think pretty obviously a company that is going through a cash crunch like that would need a lot of help to get it through.  So the incubator was, I think, doing a good thing there that we were, at our risk, you know, supporting --

Q.   All right.

A.   -- the company through that difficult period.

Q.   All right.

A.   And if they got through it, sometimes they paid us, sometimes they didn't.  A lot of the time they didn't get through it and they didn't pay us, so we lost money on that.

Q.   All right.  But my question is:  What records, what documents would we look to?

A.   Again, I've answered your question.

304

Q. No, you haven't. I'm just wondering what documents, if any, and you said in answer to that you did not provide services on an a la carte basis.

I want to know whether there are any documents from which we can determine whether services were, in fact, rendered, yes or no. If yes, what are those documents?

MR. MARSHALL: Again, now -- go ahead and finish -- I'm sorry, Don. Did you finish your question?

THE WITNESS: That was me trying to answer, but I'm stopping so you can object again.

MR. MARSHALL: My objection was going to be asked and answered.

To the extent I understand the question to be documents which reflect services rendered, he has answered multiple times with regards to those types of services. And there were records on those which are the contract documents in terms of providing and setting forth what those services are.

You may answer further. I'm sorry. You may answer further.

THE WITNESS: So based on the overall business model and, as we've been through several times already, the incubator simply didn't document

305

specific services. It did not do things in a la carte basis. It provided a whole range of services to different companies at different times in their lives.

And specifically at a time when a company was struggling, we would actually put a lot of effort in, probably go above and beyond, especially given that we had a lot of cases, very little chance of being paid.

BY MR. SEARLES:

Q. What were you doing on behalf of Ubix in 2017 when it was not unable to pay invoices?

A. There was a lot of activity around Ubix. We were trying to help it raise more money. We were helping it try and find a buyer. We were advising it on repositioning the product so that it might have more success in those endeavors. It's a whole range of things.

Q. And when you charged these accrued fees, to the extent that any of these incubator companies were able to sell any of its assets, those -- the proceeds from those sales would first be used to pay off the liabilities of the company including the liability to the incubator before any moneys would be returned to investors; is that correct?

A. I mean, you know, yes, in theory, but in reality, we were often not paid. So, you know, I

306

Q.    I'm not sure.   I think maybe we're dealing with privileged documents.   I'm not quite sure.   Maybe if you don't refer to my mediation brief, the record will be clear.

A.    Okay.   That's fine.   I apologize.

You know, PingThings, my understanding is that Fund II sold its shares --

(Reporter clarification.)

A.    PingThings, P-i-n-g, T-h-i-n-g-s.

So the Fund II sold its shares in PingThings for what I would regard as a pittance based on what I understand is a progress of the company, but I'm not on the board or anything so I have a very limited view.

But, you know, that to my mind is not an exit by the company.   It's still operating.   My shares are still there.   My shares are still subject to the lien under the settlement payment obligation.   But that 42,500, I don't know what happens internally about that, but the shares were sold.

Q.    All right.   With respect to Fund III, have any investors in Fund III received a return on their investments?

A.    Not yet.

Q.    With respect to the seed fund in Fund II, the

308

06:26:30    items you just described, during the period of time when you were in control of those funds, did the investors receive any return on their investments?

A.    No.    They haven't yet, but obviously there is 06:26:41 still some chance of that.

MR. SEARLES:  Thank you.  I have nothing further.

Okay.  Are we done?

THE VIDEOGRAPHER:  Would you like to go off 06:27:03 the record?

MR. SEARLES:  Yes.

THE VIDEOGRAPHER:  Okay.  And this concludes today's videotaped deposition of Stuart Frost.  We're going off the record at 6:27 p.m.

(Deposition adjourned at 6:27 p.m.)

*  *  *  *  *

309

REPORTER'S CERTIFICATE

I, Cynthia J. Vega, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing remote deposition was by me duly sworn remotely; that the remote deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported by me stenographically and were transcribed through computerized transcription under my direction; and the foregoing is a true and correct record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

IN WITNESS WHEREOF, I have subscribed my name this 16th day of March, 2021.

Reading and Signing was requested.

_____
Cynthia J. Vega, CSR No. 6640

311

Exhibit 99
Page 1260

# EXHIBIT 100

# Testimony of
# David B. Weekly

**Frost Management Company, LLC and Frost Venture Partners GP, LLC**

**Claimants**

**v.**

**Hollencrest Bayview Partners, LP;  Robert B. Wolford; Wolford Family Trust**

**Respondents**

**In the Matter of Arbitration Before JAMS**
**Case No. 1200052341**



Exhibit 100
Page 1261

# David B. Weekly Credentials

**2**

- **U.S. Navy Vietnam Veteran (1970 – 1974)**

- **Accounting Degree, Arizona State University (ASU)**

- **Certified Public Accountant (since 1979)**

- **Certified Fraud Examiner (since 1993)**

- **Certified Insolvency and Restructuring Advisor (since 1992)**

- **Certified Internal Controls Auditor (since 2009)**

- **Certified in Financial Forensics**

- **Chartered Global Management Accountant**

- **Over 40 years experience including leadership positions with International Accounting Firms (Andersen, KPMG) and FTI Consulting**

- **Professional Advisory Board – ASU School of Accountancy**



Exhibit 100
Page 1262

# Summary of Work Performed – Expert Report

**3**

1. Relied on the documents listed in Exhibit A of F3 Expert Report dated October 13, 2017 (including over 1,900 pages of documents produced with F3 working papers);

2. Analyzed numerous documents including native files of financial performance for the Seed Fund, Fund II, FMC, FVP GP, FDC and Portfolio Companies;

3. Reviewed deposition transcripts and exhibits of numerous witnesses including Stuart Frost, William Guerry, John Vigouroux, Cary Breese, and various Portfolio Company CEOs;

4. Research related to incubator fees. Discussions with Alex Maleki (Idealab) and Keith Palzer (Navigant);

5. Prepared calculations of excess incubator fees and other damages;

6. Prepared Expert Report, Exhibits, and supporting workpapers.



Exhibit 100
Page 1263

# Work Related to Additional Discovery

**4**

1. **Reviewed Respondents' expert reports:**

   - **Alex Maleki dated October 12, 2017**
   - **Keith Palzer dated October 13, 2017**

2. **Reviewed/Analyzed Claimants' expert reports:**

   - **Christian Tregillis dated October 17, 2017**
   - **Tregillis Rebuttal dated November 13, 2017**
   - **Jesse Reyes dated November 13, 2017;**

3. **Reviewed depositions of Claimants' experts and other deponents including Dolbec, Ozden, and Frost**

4. **Analyzed additional productions including Maana**



Exhibit 100
Page 1264

# Opinion #1 as Stated in F3 Expert Report

**5**

1. **As a result of the actions and decisions by Mr. Frost or the entities he controlled, the investors in the Seed Fund and Fund II have lost a substantial portion of their investment in the Portfolio Companies, including significant losses resulting from excessive fees and costs charged to the Portfolio Companies by the Incubator.**



Exhibit 100
Page 1265

# Opinion #2 as Stated in F3 Expert Report

**6**

2. **Actual incubator fees and costs charged to the Portfolio Companies through December 31, 2016 exceeded reasonable incubator fees and costs by approximately $14.8 million.  The combined Seed Fund and Fund II pro-rata share of damages from the excessive fees and costs is least $11.8 million. If the Seed Fund is entitled to a refund of all incubator fees, the $11.8 million of damages would increase to approximately $12.7 million. There are also additional damages of at least $509,000 related to fees charged to the Seed Fund and Fund II.**

Exhibit 100
Page 1266

# Opinion #3 as Stated in F3 Expert Report

**7**

3. **Alternatively, if the investors of the Seed Fund and Fund II are entitled to rescission damages, they would receive their original investment of $48,659,547 plus statutory interest of $17,763,619 through the date of this report. (10/13/17)**



Exhibit 100
Page 1267

# F3 Detailed Findings in Support of Opinion #1

**8**

**Summary of Opinion #1**

Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies (PCs), including significant losses from excessive incubator fees and costs .

✓ **Mr. Frost was in a position to control actions and decisions related to the Frost Entities, the Funds, and the PCs .**

✓ **Mr. Frost's actions exhibit many characteristics of an alter ego relationship (using financial expert criteria).**

✓ **Fund investors have lost a substantial portion of their investments in the PCs.**

✓ **Arbitrary and excessive incubator fees and costs significantly reduced the value of the Funds' investment in the PCs.**

F3

Exhibit 100
Page 1268

# F3 Detailed Findings in Support of Opinion #1

**9**

### Summary of Opinion #1

Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies, including significant losses from excessive incubator fees and costs.

*Source*: Chart 1, Ex C, F3 Expert Report

✓ **Mr. Frost was in a position to control actions and decisions related to the Frost Entities, the Funds, and the PCs.**



Exhibit 100
Page 1269

# F3 Detailed Findings in Support of Opinion #1

**10**

### Summary of Opinion #1

Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies, including significant losses from excessive incubator fees and costs.

*Source*: Litigation Services Handbook

✓ Mr. Frost's actions exhibit many characteristics of an alter ego relationship.

### Characteristics
➢ Financial Dependence
➢ Confusion of Corporate Identity
➢ Domination and Control
➢ Lack of Separateness

### Examples of Characteristics
➢ Undercapitalization
➢ Related-Party Transactions
➢ Lack of Corporate Formalities
➢ Sameness



Exhibit 100
Page 1270

# F3 Detailed Findings in Support of Opinion #1

**11**

✓ **Fund investors have lost a substantial portion of their investments in the Portfolio Companies.**

### Summary of Opinion #1

Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies, including significant losses from excessive incubator fees and costs.

### Seed Fund *(12/31/16)*

- Only $708 cash available of $7.5 million raised
- Realized losses of $3.6 million (53% of investment)
- Unrealized loss adjustment in Q4 of $483,000
- $396,000 of disputed management fees/salaries
- No audit of Fund since 2015; no funds to pay for audits

### Fund II *(12/31/16)*

- Only $947 cash available of $41.1 million raised
- Realized losses of $9.9 million (25% of investment)
- Unrealized loss adjustment in Q4 of $5.4 million
- $112,000 of disputed shared services fees
- Questionable Writedowns
- No audit of Fund since 2015

**_Note_**: *No quarterly reports produced since 3/31/17. Values continue to be downgraded during 2017 (e.g., Sentrian, Tellit Health, Veracity).*



Exhibit 100
Page 1271

# F3 Detailed Findings in Support of Opinion #1

**12**

| **Summary of Opinion #1** | **Arbitrary** | **Excessive** |
|---|---|---|
| Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies, including significant losses from excessive incubator fees and costs. | • Similar fee charged to PCs regardless of differences<br>• No itemization or detail explanation of fees<br>• No support of time or costs incurred for each PC<br>• Rent charges allocated by Guerry subjectively<br>• PC CEOs unable to negotiate fees without 3rd party investor insistence | • Full fee charged from startup of PCs regardless of headcount, revenue generation, or other factors<br>• Fees also charged for PCs that were inactive or not operating<br>• Numerous PC CEOs stated fees were excessive<br>• Third party investors stated fees were excessive or "above-market rate" |



**Arbitrary and excessive incubator fees and costs significantly reduced the value of the Funds' investment in the Portfolio Companies.**



Exhibit 100
Page 1272

# Opinion #1 – Average Monthly Incubator Fees
## *Source: Table 5, F3 Expert Report*

**13**

| Name | Avg People | # Mos | Avg Fees / Mo | Name | Avg People | # Mos | Avg Fees / Mo |
|---|---|---|---|---|---|---|---|
| Adaptive Well | 0.9 | 19 | $41,000 | Penzata | 1.5 | 18 | $39,000 |
| Cirro | 11.5 | 53 | $30,900 | Ping Things | 2.8 | 24 | $40,400 |
| Exara | 3.9 | 40 | $29,000 | Pinscriptive | 1.7 | 23 | $32,800 |
| Frost Edge | 1.1 | 20 | $30,400 | Predixion | N/A | 23 | $12,000 |
| Frost NewCo22 | 0.5 | 6 | $38,000 | SegOne | 0.8 | 20 | $22,400 |
| GenieDB | 6.6 | 32 | $31,400 | Sentrian | 9.7 | 56 | $30,000 |
| Maana | 6.9 | 56 | $33,900 | Source Thought | 4.0 | 50 | $29,400 |
| Metallum | 2.3 | 7 | $41,600 | Syntego | 0.4 | 22 | $29,400 |
| Mindshare | 2.1 | 24 | $38,800 | Tellit Health | 1.4 | 28 | $27,400 |
| Narrative Wave | 2.6 | 29 | $28,500 | ThinkIQ | 4.0 | 24 | $26,900 |
| NeedleHawk | 0.7 | 9 | $38,000 | Ubix Labs | 4.9 | 48 | $28,400 |
| OspreyData | 8.5 | 40 | $32,400 | Veracity | 2.3 | 32 | $30,200 |

✓ **Arbitrary and excessive incubator fees and costs significantly reduced the Funds' investment in the Portfolio Companies.**



Exhibit 100
Page 1273

# Opinion #1 – Average Monthly Incubator Fees
## *Source: Table 5, F3 Expert Report*

**14**

| Name | Avg People | # Mos | Avg Fees / Mo | Name | Avg People | # Mos | Avg Fees / Mo |
|---|---|---|---|---|---|---|---|
| Adaptive Well | 0.9 | 19 | $41,000 | Penzata | 1.5 | 18 | $39,000 |
| AdaptiveWell | 0.9 | 19 | $41,000 | Things | 2.8 | 24 | $40,400 |
|  |  |  |  | riptive | 1.7 | 23 | $32,800 |
| Frost Edge | 1.1 | 20 | $30,400 | Predixion | N/A | 23 | $12,000 |
| Frost NewCo22 | 0.5 | 6 | $38,000 | SegOne | 0.8 | 20 | $22,400 |
| GenieDB |  |  |  | SegOne 0.8 20 $22,400 | 9.7 | 56 | $30,000 |
| Maana |  |  |  | Source Thought | 4.0 | 50 | $29,400 |
| Metallum | 2.3 | 7 | $41,600 | Syntego | 0.4 | 22 | $29,400 |
| Mindshare | 2.1 | 24 | $38,8 | Syntego 0.4 22 $29,400 |  |  | ,400 |
| Narrative Wave | 2.6 | 29 | $28,5 |  |  |  | ,900 |
| NeedleHawk | 0.7 | 9 | $38,000 | Ubix Labs | 4.9 | 48 | $28,400 |
| OspreyData | 8.5 | 40 | $32,400 | Veracity | 2.3 | 32 | $30,200 |

✓ **Arbitrary and excessive incubator fees and costs significantly reduced the Funds' investment in the Portfolio Companies.**



Exhibit 100
Page 1274

# Opinion #1 – Average Monthly Incubator Fees
## *Source: Table 5, F3 Expert Report*

**15**

| Name | Avg People | # Mos | Avg Fees / Mo | Name | Avg People | # Mos | Avg Fees / Mo |
|---|---|---|---|---|---|---|---|
| Adaptive Well | 0.9 | 19 | $41,000 | Penzata | 1.5 | 18 | $39,000 |
| Cirro | 11.5 | 53 | $30,900 | Ping Things | 2.8 | 24 | $40,400 |
| Exara | 3.9 | 40 | $29,000 | **Ping Things** | **2.8** | **24** | **$40,400** |
| Frost Edge | 1.1 | 20 | $30,400 | | | | |
| Frost NewCo22 | 0.5 | 6 | $38,000 | SegOne | 0.8 | 20 | $22,400 |
| GenieDB | 6.6 | 32 | $31,400 | Sentrian | 9.7 | 56 | $30,000 |
| Maana | 6.9 | 56 | $33,900 | Source Thought | 4.0 | 50 | $29,400 |
| **NarrativeWave** | **2.6** | **29** | **$28,500** | ntego | 0.4 | 22 | $29,400 |
| Mindshare | 2.1 | 24 | | ellit Health | 1.4 | 28 | $27,400 |
| Narrative Wave | 2.6 | 29 | $28,500 | **Veracity** | **2.3** | **32** | **$30,200** |
| NeedleHawk | 0.7 | 9 | $38,000 | | | | |
| OspreyData | 8.5 | 40 | $32,400 | Veracity | 2.3 | 32 | $30,200 |

✓ **Arbitrary and excessive incubator fees and costs significantly reduced the Funds' investment in the Portfolio Companies.**



Exhibit 100
Page 1275

# Summary of Findings for F3 Opinion #1

**16**

**Summary of Opinion #1**

Frost's actions caused Fund investors to lose a substantial portion of their investments in Portfolio Companies (PCs), including significant losses from excessive incubator fees and costs .

- Mr. Frost's control and influence over the Frost Entities, the Funds, and the PCs allowed him to take actions and make decisions to the detriment of the investors.

- Fund investors lost a substantial portion of their investments in the PCs, in part because of excessive incubator fees and costs.



Exhibit 100
Page 1276

# F3 Detailed Findings in Support of Opinion #2

**17**

**Summary of Opinion #2**

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

✓ **Actual FDC operating costs were $23.4 million as of 3/31/17.** *(The PCs paid $21.7 million to FDC and SDC through 2016)*

✓ **Mr. Frost received compensation and personal benefits totaling more than $5 million from 2012 through early 2017**

✓ **F3 computed damages from excessive fees by determining reasonable fees compared to actual fees charged**

✓ **The Funds' damages for excess fees is $11.8 million to $12.7 million**



Exhibit 100
Page 1277

# Opinion #2 – FDC Incubator Operating Costs

**18**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | Jan-Mar 2017 | Total |
|---|---|---|---|---|---|---|---|
| **Operating Expense** | | | | | | | |
| Gross Wages/Bonus | $ 566,005 | $2,238,482 | $4,079,345 | $4,546,080 | $1,706,155 | $ 189,233 | $13,325,301 |
| Other Payroll | 106,509 | 268,630 | 515,000 | 669,874 | 388,861 | 115,364 | 2,064,239 |
| **Total Payroll** | **672,514** | **2,507,112** | **4,594,345** | **5,215,955** | **2,095,016** | **304,597** | **15,389,540** |
| Consulting | 77,296 | 120,597 | 445,579 | 400,875 | 125,667 | 45,235 | 1,215,249 |
| Rent | 150,977 | 234,511 | 425,612 | 650,935 | 631,781 | 171,170 | 2,264,986 |
| Travel/Meals & Ent | 74,920 | 302,077 | 855,482 | 659,636 | 239,844 | 29,627 | 2,161,586 |
| Other Operating Exp | 153,736 | 340,587 | 545,670 | 585,655 | 586,792 | 124,889 | 2,337,330 |
| **Total Operating Expenses** | **$1,129,442** | **$3,504,884** | **$6,866,688** | **$7,513,056** | **$3,679,101** | **$ 675,518** | **$23,368,690** |

✓**Actual incubator operating costs incurred by FDC was
$23.4 million as of 3/31/17 –** *Source: Table 1, F3 Report*



Exhibit 100
Page 1278

# Opinion #2 – FDC Incubator Balance Sheet

**19**

|  | Dec-12 | Dec-13 | Dec-14 | Dec-15 | Dec-16 | Mar-17 |
|---|---|---|---|---|---|---|
| Cash | $ 7,712 | $ (11,288) | $ 13,105 | $ (12,832) | $ 86,378 | $ 223,064 |
| Accounts Receivable | 2,047 | 14,561 | 32,705 | 92,119 | 2,092,434 | 2,518,592 |
| Loan Advance/Receivable | - | - | - | 47,400 | 1,213,448 | 1,170,109 |
| Other Assets | - | 24,285 | 140,388 | 130,623 | 201,445 | 199,445 |
| **Total Assets** | **$ 9,759** | **$ 27,559** | **$ 186,197** | **$ 257,310** | **$ 3,593,705** | **$ 4,111,209** |
|  |  |  |  |  |  |  |
| Accounts Payable | $ 26,691 | $ 4,026 | $ 20,543 | $ 103,569 | $ 76,501 | $ 152,409 |
| Debt |  |  |  |  |  |  |
|   Credit Card | - | 6,543 | 51,404 | 123,197 | 119,040 | 110,514 |
|   Loan (Personal) | - | - | - | - | 1,306,935 | 1,366,855 |
|   Loan (Bank) | - | - | 131,500 | 335,000 | 2,261,500 | 2,227,000 |
|   Loan (Fund III) | - | - | - | - | 269,671 | 269,671 |
| Other Liabilities | 3,550 | 2,000 | - | 2,187 | (429) | (2,222) |
| **Total Liabilities** | **$ 30,241** | **$ 12,569** | **$ 203,447** | **$ 563,954** | **$ 4,033,218** | **$ 4,124,227** |
| Total Equity | (20,482) | 14,990 | (17,250) | (306,644) | (439,514) | (13,017) |
| **Total Liabilities and Equity** | **$ 9,759** | **$ 27,559** | **$ 186,197** | **$ 257,310** | **$ 3,593,705** | **$ 4,111,209** |

**FDC took on significant debt in 2016 to fund its operations and PCs**
*Source: FDC Quickbooks File*



Exhibit 100
Page 1279

# F3 Detailed Findings in Support of Opinion #2

**20**

### Guerry Comments to Frost *(Source: F3 Expert Report, ¶62)*

- "Right now we need 2 more companies to cover ou[r] costs" (2014)
- "We are still a bit stretched in the incubator.  We need one more company in order to cover the plan for the rest of the year" (2015)

### Frost Comments to FDC Management *(Source: F3 Expert Report, ¶62)*

- "critically important to get the incubator to break even ASAP" (2016)
- "Retain as much income as possible from the existing companies" (2016)
- "Start a few new companies ASAP" (2016)
- "Move costs to the newcos by assigning some of our incubator execs as CEO/CTO" (2016)

### John Vigouroux Testimony *(Source: Vigouroux Deposition pp. 152-153)*

- "There was no question that everyone in the incubator questioned: 'A' why we started some of these companies; and 'B' were even purportedly still there" (2016)

 **FDC's costs determined fees charged to PCs and new companies were added to cover FDC's increased costs**

F3

Exhibit 100
Page 1280

# F3 Detailed Findings in Support of Opinion #2

**21**

**Summary of Opinion #2**

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

✓ Mr. Frost received compensation and personal benefits totaling more than $5 million during 2012 to early 2017

**Personal Benefits**

- Travel (Family, Private Jet)
- Credit Card Charges
- Luxury Autos
- Boat
- Archery Range
- Employment Taxes and Benefits
- Tax Savings [1]

**Compensation [1]**

- FDC Salary
- FDC Salary for Personal Chef
- FDC Salary for Personal Housekeeper
- Unreimbursed Personal Expenses paid by FDC (Examples at Left)
- FVP GP Income

*[1]: Frost received economic benefit of not paying taxes on personal expenses which otherwise would have been reportable income by FVP GP*



Exhibit 100
Page 1281

# Opinion #2 – Frost Personal Expenses Paid by FDC

**22**

| Item | Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Air Partner, Inc. | Travel - Private Jet | $ - | $ - | $225,700 | $ - | $ - | $ - | $ 225,700 | |
| American Express - Frost | Credit Card Charges | - | 559 | 179,977 | 233,961 | 117,310 | 1,229 | 533,035 | |
| Barclays CC - Stuart Frost | Credit Card Charges | - | 71,063 | 106,868 | 17,636 | 35,035 | 7,293 | 237,895 | |
| Boat Expenses | Firenze (Not FDC's) | N/A | N/A | N/A | N/A | N/A | N/A | 55,504 | [1] |
| Debentures, Ltd. | Travel | - | 5,871 | 45,431 | - | - | - | 51,302 | |
| Exclusive S.a.S | Italy Villa Rental | - | - | 66,103 | 58,400 | - | - | 124,502 | |
| Ferrari | Ferrari 458 Spider | - | - | 42,149 | 50,579 | 50,579 | 8,410 | 151,717 | |
| Ferrari Financial Services | Ferrari 458 Spider | - | - | 4,215 | - | - | - | 4,215 | |
| Int'l School of Florence | Tuition - Children | - | - | 14,026 | - | - | - | 14,026 | |
| Italian Moving Company | Moving Expense | - | - | 7,275 | 9,959 | - | - | 17,234 | |
| Mbfs Com Auto | Mercedes GL 63 | - | - | - | 6,974 | 28,047 | 6,958 | 41,980 | |
| Monarch Beach Resort | Private Club | - | - | - | - | 978 | - | 978 | |
| Ozturhan Ltd. | Travel - Yacht | - | - | 61,714 | - | - | - | 61,714 | |
| Monarch Bay Club | Private Club | | 17,988 | 15,242 | | | | 33,230 | |
| Corporate House | Housing PC CEOS | - | - | - | 23,769 | - | - | 23,769 | |
| Sycamore Plaza | Archery Range | 19,316 | 31,036 | 34,566 | 35,256 | 35,958 | 6,052 | 162,184 | |
| **Total** | | **$ 19,316** | **$126,517** | **$803,264** | **$436,534** | **$267,907** | **$ 29,942** | **$1,738,984** | |

[1] Estimated as 33% of $166,512 in total expenses paid by FDC.

✓ Frost personal expenses 2012 to early 2017
*Source: Table 2, F3 Expert Report*

F3

Exhibit 100
Page 1282

# Value of Mr. Frost's Earnings

**23**

| Description | 2012 | 2013 | 2014 | 2015 | 2016 | Jan-Mar 2017 | Total |
|---|---|---|---|---|---|---|---|
| Frost FDC Gross Wages | $192,175 | $836,859 | $1,200,000 | $1,118,299 | $ 24,693 | $ 6,250 | $3,378,276 |
| Allen FDC Gross Wages (Frost Personal Chef) | - | - | - | 46,837 | 10,820 | - | 57,656 |
| Enriquez FDC Gross Wages (Frost Housekeeper) | - | - | - | 31,986 | 84,890 | 21,250 | 138,126 |
| **Subtotal FDC Gross Wages** | **$192,175** | **$836,859** | **$1,200,000** | **$1,197,121** | **$120,403** | **$27,500** | **$3,574,058** |
| FVP GP - Allocated Fee Income | - | - | 441,257 | 375,528 | 194,752 | - | 1,011,537 |
| Expenses Paid by FDC Not Reimbursed by FVP GP | - | - | - | - | 203,877 | - | 203,877 |
| **Total** | **$192,175** | **$836,859** | **$1,641,257** | **$1,572,649** | **$519,032** | **$27,500** | **$4,789,472** |

✓ Frost compensation 2012 to early 2017
*Source: Table 3, F3 Expert Report*



Exhibit 100
Page 1283

# Mr. Frost's Compensation and Personal Benefits

**24**

**Summary of Opinion #2**

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

✓ **Mr. Frost received compensation and personal benefits totaling more than $5 million from 2012 through early 2017**

| | In Millions | |
|---|---|---|
| FDC Gross Wages | $ | 3.6 |
| FVP GP Fee Income | | 1.0 |
| Personal Expenses Not Reimbursed | | 0.2 |
| **Subtotal** | **$** | **4.8** |
| **Other Benefits:** | | |
| Employer Taxes/Benefits (15.9% of FDC Wages) | | 0.6 |
| Estimate of Tax Benefit from Unreported Income (35%) | | 0.4 |
| **Total** | **$** | **5.7** |

**The $5.7 million does not include:**
- **Non-business benefits of family travel, private jet, archery range, exotic autos, etc.**
- **Value of Frost equity ownership in Portfolio Companies**



Exhibit 100
Page 1284

# F3 Detailed Findings in Support of Opinion #2

**25**

✓ **F3 computed damages from excessive fees by determining reasonable fees compared to actual fees charged**

## Summary of Opinion #2

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

## F3 Calculations of Reasonable Fees

- FDC had no support or method for determining fees charged to PCs
- PCs books only recorded subjective allocations from the fixed incubator fee (Guerry)
- Frost made final decisions of fixed fee amounts for each PC and insisted on bundled charges
- Monthly fees changed over time based on different factors (PC cash flow, negotiation, etc.)

F3

Exhibit 100
Page 1285

# F3 Detailed Findings in Support of Opinion #2

**26**

### Summary of Opinion #2

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

### Methodology for Calculations

- Detail review of FDC and PC books and records and deposition testimony by various witnesses
- Research and discussions with incubator experts
- Establish categories of costs for services provided
- Compared categories of costs to ensure all FDC stated services were included
- Determined basis of allocation for each discrete cost category (e.g., employees, revenues, financing events, etc.)
- Validated allocations with Mr. Maleki

✓ **F3 computed damages from excessive fees by determining reasonable fees compared to actual fees charged**

Exhibit 100
Page 1286

# Categories of Costs and Basis of Allocation
## *Source: Exhibit E (Page 3 of 52), F3 Expert Report*

**27**

| # | Expense Description | Expense Type | Basis for Allocation | Amt or Range |
|---|---|---|---|---|
| 1a | Finance & Acctg (No Revenue) | Step-Variable | # of employees | $500-$5,000 |
| 1b | Finance & Acctg (Revenue) | Step-Variable | # of employees | $1,000-$7,500 |
| 2 | Human Resource | Variable | $200/emp/month | $200 |
| 3 | Technology | Variable | $250/emp/month | $250 |
| 4 | PR/Marketing | Fixed | Increases based on avg revenue/mo; starts 3 mos prior | $0-$5,000 |
| 5 | Rent | Variable | $525/emp/month | $525 |
| 6 | Legal | Fixed | Startup; financing activity | $500-$1,000 |
| 7 | Other | Variable | $500/emp/month | $500 |



Exhibit 100
Page 1287

# Opinion #2 – Comparison of FDC Services to F3 Categories
## *Source: Exhibit E (Page 4 of 52), F3 Expert Report*

**28**

| FDC Category | FDC Description (Summarized) | F3 Category [1] |
|---|---|---|
| Early Stage Validation - Incubation | Pre-company validation; assessment of market needs; assessment of potential tech solutions; evaluation of market, etc. | Other/Equity |
| Technology and Product Support | Using FDC CTO and team; assist with due diligence prep and fundraising, etc. | Technology |
| Business Development | Understand technology/product landscape; facilitate development of relationships with customers/partners, etc. | Other/Equity |
| Sales/Marketing Strategy | Feedback/assistance on strategic message; assist website development; guidance on pricing; creation of strategy, etc. | PR/Marketing |
| Infrastructure | Real Estate/Facility | Rent |
| Infrastructure | Commodity Level IT Support (platform, visualization) | Technology |
| Infrastructure | Accounting/Finance; CFO level support | Fin & Acctg |
| Infrastructure | Executive Recruiting | HR/Other |
| Infrastructure | Office facilities (rented space, improvements, copier, supplies) | Rent |
| Infrastructure | Corporate recordkeeping | Legal/Fin & Acctg |
| Infrastructure | Legal matter coordination | Legal/Fin & Acctg |
| Infrastructure | Industry organization membership; technology analyst programs | Other |
| Executive Mentoring | Mentoring and guidance from FDC team | Other/Equity |

*[1]: Based on discussions with Mr. Maleki, "Equity" indicates intangible services (mentoring, business relationships, etc.) compensated with equity in the Portfolio Companies (p. 22, F3 Expert Report). In addition, Mr. Reyes indicated Idealab and FDC are the best available market examples of incubator fees.*



Exhibit 100
Page 1288

# Opinion #2 – F3 Calculation of Total Excessive Fees
## (Slide 1 of 2) – *Source: Exhibit E (Pages 1-2 of 52), F3 Expert Report*

**29**

| Portfolio Company | Avg People | Total Revenue | Avg Rev/Mo | Mos with Fees | Estimated Fee | Actual Fee | Funds Excessive Fees |
|---|---|---|---|---|---|---|---|
| Syntego / App Layer | 0.36 | $0 | $0 | 22 | $1,900 | $29,400 | $591,876 |
| NeedleHawk | 0.67 | $0 | $0 | 9 | $2,500 | $38,000 | $318,828 |
| SegOne | 0.75 | $0 | $0 | 20 | $2,700 | $22,400 | $383,903 |
| Adaptive Well/Frost NewCo 18 | 0.95 | $0 | $0 | 19 | $3,000 | $41,000 | $684,740 |
| Frost Edge/NextLog Analytics | 1.10 | $0 | $0 | 20 | $3,200 | $30,400 | $530,621 |
| Frost NewCo 22 | 0.50 | $0 | $0 | 6 | $3,800 | $38,000 | $195,668 |
| Penzata | 1.50 | $0 | $0 | 18 | $4,000 | $39,000 | $562,709 |
| Tellit Health | 1.39 | $0 | $0 | 28 | $4,000 | $27,400 | $625,061 |
| Pinscriptive | 1.74 | $25,000 | $1,087 | 23 | $4,800 | $32,800 | $463,272 |
| Mindshare Medical | 2.08 | $0 | $0 | 24 | $5,000 | $38,800 | $771,886 |
| Metallum | 2.29 | $0 | $0 | 7 | $5,200 | $41,600 | $254,885 |
| Veracity | 2.30 | $83,200 | $2,600 | 32 | $5,600 | $30,200 | $504,093 |
| Subtotal (See Slide 2 for Total) | | | | | | | $5,887,542 |

Exhibit 100
Page 1289

# Opinion #2 – F3 Calculation of Total Excessive Fees
## (Slide 2 of 2) – *Source: Exhibit E (Pages 1-2 of 52), F3 Expert Report*

**30**

| Portfolio Company | Avg People | Total Revenue | Avg Rev/Mo | Mos with Fees | Estimated Fee | Actual Fee | Funds Excessive Fees |
|---|---|---|---|---|---|---|---|
| Narrative Wave | 2.59 | $0 | $0 | 29 | $5,700 | $28,500 | $584,137 |
| Ping Things | 2.75 | $0 | $0 | 24 | $5,700 | $40,400 | $703,345 |
| Exara | 3.93 | $33,897 | $847 | 40 | $8,200 | $29,000 | $671,762 |
| ThinkIQ | 4.04 | $210,000 | $8,750 | 24 | $9,400 | $26,900 | $368,312 |
| Source Thought | 3.96 | $199,153 | $3,983 | 50 | $9,600 | $29,400 | $829,192 |
| Ubix Labs (fka Kumo Analytics) | 4.85 | $0 | $0 | 48 | $9,600 | $28,400 | $762,626 |
| Maana | 6.91 | $1,181,503 | $21,098 | 56 | $10,600 | $33,900 | $558,819 |
| Predixion Software | N/A | N/A | N/A | 23 | $12,000 | $12,000 | $0 |
| Genie DB | 6.59 | $57,789 | $1,806 | 32 | $14,400 | $31,400 | $285,455 |
| OspreyData | 8.49 | $0 | $0 | 40 | $15,000 | $32,400 | $523,485 |
| Sentrian/Jointly | 9.73 | $717,226 | $12,808 | 56 | $18,800 | $30,000 | $530,871 |
| Cirro | 11.54 | $977,309 | $18,440 | 53 | $23,200 | $30,900 | $141,030 |
| **Subtotal Slide 2** | | | | | | | **$5,959,033** |
| **Total All PCs** | | | | | | | **$11,846,575** |

Exhibit 100
Page 1290

# Opinion #2 – Other Opinions and Testimony Related to Incubator Fees

**31**

1. **Testimony and statements by FDC personnel, PC CEOs and others:**

| Company | CEO | Fee Stated |
|---|---|---|
| GenieDB | Cary Breese | $12,000 |
| Metallum | Cary Breese | $12,000 |
| ThinkIQ | Doug Lawson | $10,000 |
| Veracity | Paul Myer | $6,000-$7,000 |
| OspreyData | John Burke | $15,000 |
| Pinscriptive | Mark Lelinski | $10,000 |
| Predixion | [Actual Amount] | $12,000 |

| Name | Position | Summary of Statements |
|---|---|---|
| Bill Guerry | FDC CFO | Frost set fees; other CEOs complained about value of fees |
| Tom Giles | Healthcare Lead FDC | CEOs of Healthcare complained about fees (Depo pp. 147-148) |
| Alexander Stojanovic | FDC GP; Maana Co-Founder/ BOD; Ubix BOD | Assumed fees were "a few thousand dollars a month"; Re: Frost VP's model, "...something fundamentally wrong with the FVP model"; "I question the fairness of this model" (Exhibit 941) |
| Mike Dolbec | GE Digital | Fees "above market rate" |

2. **Mr. Maleki states, "I've reviewed F3's Damages Calculation and they are consistent with my opinion." (Maleki Report, p. 2)**

3. **Mr. Palzer's states "...fees would be excessive based on the size of the Frost Portfolio Companies." (Palzer Report, p. 14)**

Exhibit 100
Page 1291

# F3 Damage Calculation for Opinion #2

## *Source: Table 6, F3 Expert Report*

**32**

| Description | Amount |
|---|---|
| Total Actual Incubator Expense Paid | $ 21,690,382 |
| Less Estimated Reasonable Incubator Expense | (6,898,381) |
| **Total Excess Incubator Expense** | **$ 14,792,001** |
| | |
| Seed Fund Investment % | **17%** |
| Fund II Investment % | **63%** |
| | |
| Allocated Excess Incubator Expense - Seed Fund | 2,491,532 |
| Allocated Excess Incubator Expense - Fund II | 9,355,042 |
| **Total Allocated Excess Incubator Expense - Funds** | **$ 11,846,575** |
| **Additional Seed Fund Incubator Fees** | **900,720** |
| **Total Excess Incubator Expense - Funds** | **$ 12,747,294** |

**Summary of Opinion #2**

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund 100% refunded). Additional damages at least $509,000.





**The Funds' damages for excess fees is $11.8 million to $12.7 million**

Exhibit 100
Page 1292

# F3 Damage Calculation for  Opinion #2

**33**

**Summary of Opinion #2**

Combined Funds share of damages from excessive fees and costs is at least $11.8 million ($12.7 million if Seed Fund fees refunded). Additional damages at least $509,000.

✓ **Additional damages of $509,000**

| Item | Amount |
|---|---|
| Seed Fund 2012 Management Fee Expense | $122,330 |
| Seed Fund 2013-2016 Incubator Cost Allocation | $273,482 |
| Fund II 2013-2017 Shared Services Expense | $114,000 |
| **Total Additional Damages** | **$509,812** |

*Refer to Outline of Expert Testimony of Keith Palzer*



Exhibit 100
Page 1293

# F3 Detailed Findings in Support of Opinion #3

*Source: Table 7, F3 Expert Report*

**34**

## F3 Calculation of Rescission Damages

**Summary of Opinion #3**

If Funds are entitled to rescission damages, they would receive original investment of $48.6 million plus statutory interest of $17.8 million ($66.4 million total) as of October 13, 2017

| | Total Fund | | |
|---|---|---|---|
| | Invested | Interest | Total |
| Seed Fund | $ 7,550,025 | $ 3,799,213 | $ 11,349,238 |
| Fund II | 41,109,522 | 13,964,406 | 55,073,927 |
| | $ 48,659,547 | $ 17,763,619 | $ 66,423,166 |

*__Note__: Assumes Funds would relinquish ownership in Portfolio Companies.*

IF3

Exhibit 100
Page 1294

# Observations Based on Additional Discovery

**35**

## 1. Maana Observations

- ☐ Maana's financial history, recent "going concern" opinion, continuing failure to meet projections, and extended anticipated future losses are negative factors;

- ☐ Given these factors, and continuing dilution, any assumption that the Funds will recover their investment or receive any return on their investment in Maana in the foreseeable future is highly speculative;

- ☐ Mr. Ozden's statements related to the value of incubator fees paid to FDC are contradicted by statements made by Alexander Stojanovic and Michael Dolbec.  In addition, Maana terminated its Service Agreement with FDC in 2017.



Exhibit 100
Page 1295

**36**

# Testimony of David B. Weekly

**Frost Management Company, LLC and Frost Venture Partners GP, LLC**

**Claimants**

**v.**

**Hollencrest Bayview Partners, LP;  Robert B. Wolford; Wolford Family Trust**

**Respondents**

**In the Matter of Arbitration Before JAMS**
**Case No. 1200052341**



Exhibit 100
Page 1296