DONALD W. SEARLES (Cal. Bar. No. 135705)
Email: searlesd@sec.gov
DOUGLAS M. MILLER (Cal. Bar. No. 240398)
Email: millerdou@sec.gov
CHARLES E. CANTER (Cal. Bar. No. 263197)
Email: canterc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Counsel
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>STUART FROST AND FROST MANAGEMENT COMPANY, LLC,<br><br>Defendants. | Case No. 8:19-cv-01559-JLS-JDE<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE OR LIMIT TESTIMONY OF ANDREW ACKERMAN AND KERRY JORDAN** |

Case No. 8:19-cv-01559-JLS-JDE

## I. INTRODUCTION

Plaintiff Securities and Exchange Commission ("SEC") has moved *in limine* to exclude or otherwise limit the purported "expert" testimony of Andrew Ackerman and Kerry Jordan on the grounds they have no specialized knowledge that will help the trier of fact understand the evidence or determine a fact in issue; their hastily constructed opinions simply regurgitate arguments taken from Frost's mediation brief and are otherwise devoid of any evidentiary support or would be better left to fact witnesses; and their true purpose is simply to offer a factual narrative, suffused with baseless superlatives, exonerating Frost from all wrongdoing. Dkt. No. 61.

In opposition to the SEC's motion, Defendants provide scant defense of their experts and instead hastily retreat to the position that their experts' myriad deficiencies are more appropriately addressed by cross-examination, rather than by exclusion. Dkt. No. 116 at 6, 12, 13, 16, 19, 21. While cross-examination is no doubt a useful tool for exposing the fact that Defendants' experts offer no real expertise to help the jury understand the facts, there is no reason for this Court to abandon its gatekeeping function and permit Defendants to waste the jury's time with such testimony.

## II. STANDARDS FOR ADMISSIBILTY OF EXPERT TESTIMONY

Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if it is based on "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also*, *Moses v. Payne*, 555 F. 3d 742, 756 (9th Cir. 2009) ("Under Rule 702, expert testimony is helpful to the jury if it contains matters beyond the common knowledge of the average layperson and is not misleading."); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (same). To the extent an expert simply rehashes "otherwise admissible evidence about which he has no personal knowledge, such evidence–taken as whole–is inadmissible. *Johns v. Bayer Corp.*, Case No. 09CV1935 AJB DHB, 2013 U.S. Dist. LEXIS 51823, at *96 (S.D. Cal.

Apr. 10, 2016) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) ("an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on record evidence.")). Such material, to the extent it is permissible, is properly presented through percipient witnesses and documentary evidence. *Johns v. Bayer Corp.*, 2013 U.S. Dist. LEXIS 51823, at *97 (citing *In Re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)); accord *Fujifilm Corp. v. Motorola Mobility LLC*, Case No. 12-cv-03587-WHO, 2015 U.S. Dist. LEXIS 21413. at *XX (N.D. Cal. Feb. 20, 2015) (excluding expert testimony that was no more than simple inferences drawn from uncomplicated facts). Furthermore, courts routinely exclude expert testimony about the parties' intent, motive or state of mind. *Lanard Toys v. Anker Play Prods.*, Case No. CV 19-4350-RSWL-AFMx, 2020 U.S. Dist. LEXIS 221783, at *19-20 (C. D. Cal. Nov. 12, 2020); *In Re Rezulin*, 309 F. Supp. 2d at 547.

### III. THE CHALLENGED OPINIONS AND TESTIMONY OF DEFENDANTS' "EXPERTS"

Both Mr. Ackerman and Ms. Jordan purport to opine on the same issues: "matters relating to fees, disclosures and incubator models." Dkt No. 61-2, Ex. 1 (Ackerman Report); Ex. 3 (Jordan Report). Defendants assert that both Mr. Ackerman and Ms. Jordan reviewed "an[] extensive evidentiary record and, after a thorough examination of those documents, produced their expert reports in April 2021." Dkt. No. 116 at 8. The short list of documents considered that are described in each of their reports belies that claim. And the haste in which they prepared their reports is reflected in their time records, which show they were both retained just one week before their expert reports were due. Dkt. No. 61-2, Ex. 5 (Ackerman 03/2021 time records) Ex. 6 (Jordan 03/3021 time records).

#### A. Andrew Ackerman

Defendants spend considerable effort trying to embellish Mr. Ackerman's professional background, claiming that his experience at Dreamit, and in launching

Dreamit's "verticals," Edtech and Urbantech, allows him to "clarify and elaborate on the differences between the Frost incubator model and other incubator models and to show that, while Frost's model was unique, Defendants acted properly in establishing, disclosing and operating that model." Dkt. No. 116 at 11. Dreamit, Edtech and Urbantech, however, were not incubators, did not form their own companies, and did not charge monthly service fees to those companies. Rather, Dreamit simply provided a $25,000 "stipend" to companies that already existed in exchange for a small equity interest in the company. The founders of those companies could then use that stipend to participate in a three-month mentoring program designed to help the founders raise outside capital. Edtech and Urbantech were slight modifications of the Dreamit approach, in that, instead of taking an equity interest upfront, they had a contractual right to invest in the company's subsequent rounds of financing. *See* Dkt. No. 61-2, Ex. 7 (Ackerman Depo. Tr.) at 83:18-87:14. In short, Mr. Ackerman's professional experience provides scant foundation for his opinion that Frost acted properly in establishing, disclosing and operating Frost's model.

Nor is Mr. Ackerman's proposed testimony, as reflected in his expert report, helpful to the trier of fact, as it simply parrots points made in Frost's mediation brief, makes observations that are equally obvious to the trier of fact, or attempts to create justifications for Frost's model that do not fit the facts and impermissibly opines on Frost's motives.

For example, Mr. Ackerman opines that it was appropriate for Frost's incubator, Frost Data Capital ("FDC") to charge fees as soon as a company was created, and before it had a CEO or any employees, as FDC needed to recoup its costs. Dkt. No. 61-2, Ex. 1 at p. 4. Mr. Ackerman's opinion does not fit the facts, as Mr. Frost clearly testified that the incubator fees FDC charged to its portfolio companies were not designed to recoup pre-formational costs. Dkt. 61-2, Ex. 9 (Frost Tr.) at 163:1-165:4). *See Daubert v. Merrell Dow Pharms.*, Inc. 509 U.S. 579, 591

(1993) (expert testimony that is not sufficiently tied to the facts of the case is not relevant, and therefore not helpful).

Mr. Ackerman also purports to speak for Frost's intent and motive in forming new portfolio companies, claiming that Frost did not create new companies for the purpose of charging fees, but rather for legitimate reasons. Dkt. No. 61-2, Ex. 1 at p. 8. Such expert testimony is clearly improper. The reason why portfolio companies were created is best left to Frost or other fact witnesses to explain. *Lanard Toys v. Anker Play Prods.*, 2020 U.S. Dist. LEXIS 221783, at *19-20.

Mr. Ackerman also purports to offer his expert opinion that the $30,000 to $40,000 in monthly fees the portfolio companies paid to FDC were reasonable, as the portfolio companies continued to pay them. Dkt. No. 61-2, Ex. 1 at p. 5. Such tautological reasoning is both irrelevant and misleading, as Mr. Ackerman ignores the evidence (assuming he was aware of it), that those monthly fees were reduced upon the demands of outside investors who found them grossly excessive. Based on his misunderstanding of the facts, Mr. Ackerman also opines that had Frost negotiated FDC's fees, "it would open the floodgates to protracted negotiations." *Id.* His "floodgate" observation requires no expertise, is not based on his professional experience, and is contradicted by the fact that Frost negotiated FDC's fees with outside investors as a condition of their investment.

Mr. Ackerman also opines that the Funds' initial investments in the portfolio companies were designed to provide the minimum amount of capital needed to achieve a fundable milestone. *Id.* His opinion has no evidentiary support in the record. More importantly, Frost's motives, purposes and designs in making any particular investment in a portfolio company are for Frost to explain; such testimony is not the proper domain of an expert. *Johns v. Bayer Corp.*, 2013 U.S. Dist. LEXIS 51823, at *97.

Mr. Ackerman also opines that what he characterizes as Frost's "all you can eat" model is particularly advantageous as it encourages portfolio companies to

consume all of FDC's services without concern for cost. Dkt. No. 61-2, Ex. 1 at p. 4. In a related vein, Mr. Ackerman claims that it would be impossible, from an accounting perspective, to keep track of the discrete services the portfolio companies may have decided to use. Dkt. No. 61-2, Ex. 2 (Ackerman rebuttal report) at 25 of 710. While Mr. Ackerman's "all you can eat" metaphor may be an apt description of FDC's appetite for charging voracious fees to its portfolio companies, his observation that flat, fixed-rate fees were beneficial to the portfolio companies is based on nothing more than speculation, as he has no idea what services, if any, FDC actually provided to its portfolio companies. The CEOs of the portfolio companies (many of whom complained about the fixed nature of the fees), and the outside investors (who demanded those fees be reduced), are in a far better position to testify on what, if any, benefits the portfolio companies derived from FDC's fixed fees.

  Mr. Ackerman, who is not a lawyer and has no professed professional or educational experience with limited partnership agreements or corporate operating agreements, also opines that Fund reporting was appropriate, as Frost was not legally permitted to disclose to fund investors the amount of the fees FDC charged to its portfolio companies. Dkt. No. 61-2, Ex. 1 at p. 9. Mr. Ackerman is simply parroting Frost's deposition testimony. Mr. Ackerman's opinion is not based on any of the contractual agreements at issue, which, had he reviewed them, speak for themselves. Nor can Mr. Ackerman's observation be reconciled with Frost's practice of disclosing the amount of FDC's fees to outside investors.

  In his rebuttal report, Mr. Ackerman continues to express opinions that lack any expert basis. For example, Mr. Ackerman opines that Frost was able to work effectively from Italy, notwithstanding the nine-hour time difference. Dkt. No. 61-2, Ex. 2 at 31 of 710. Such testimony is best left to Frost and those who worked with him.

  Mr. Ackerman also opines that FDC's fees were adequately disclosed to investors through Frost's use of the phrase "a fully burdened executive" in describing

those fees. As Mr. Ackerman concedes, that phrase is not a term of art, is not founded on any custom or practice, and has no specialized meaning. Dkt. No. 61-2, Ex. 2 at p. 8. Moreover, Mr. Ackerman ignores the evidence that Frost could not identify any marketing materials that pre-dated December 2015 where that phrase was used. Dkt. 44-2, ¶¶ 148, 153. In any event, to the extent that phrase was used with investors, the investors can best explain their understanding of its meaning.

Mr. Ackerman also opines that Frost's limited use of advisory committees was consistent with industry norms. Dkt. No. 61-2, Ex. 2 at p. 9. Mr. Ackerman provides no support for his conclusory opinion, nor is it based on his professional experience.

Finally, Mr. Ackerman opines that Frost's salary, in excess of $1million per year, was not excessive, because it included deferred compensation, evidently referring to the days Frost was underpaid while charging a lower salary to the Seed Fund. Dkt. No. 61-2, Ex. 2 at p. 10. Apart from the fact that Frost was not permitted to charge any salary to the Seed Fund and never disclosed the amount of his salary at FDC to fund investors, Mr. Ackerman's opinion on the reasonableness of Frost's salary (which Frost set for himself) is not based on his professional experience or on any industry surveys.

In short, all of Mr. Ackerman's opinions should be excluded as they are not based on any specialized knowledge or the facts of this case, and are not helpful to the trier of fact.

**B.   Kerry Jordan**

Ms. Jordan's expert opinions are equally conclusory, are not based on her professional experience, and misstate both the facts and the law.

Defendants contend that based on Ms. Jordan's "extensive experience working with startups and incubators," she is more than qualified to opine on the nature of FDC's operating costs. Dkt. No. 116 at p. 16. Like Mr. Ackerman, she has no experience working for an incubator even remotely similar to FDC. Since 2017, she has been the managing partner of Supercritical LLC, an entity that provides

consulting services to companies engaged in marijuana cultivation. Dkt. 61-2, Ex. 8 (Jordan Tr.) at 60:22-62:13). Prior to that time, she worked for a variety of companies, none of which used the services of an accelerator-incubator or a venture-studio incubator. While she is an advisor to Newchip Accelerator, an online tuition-based program that provides online classes to startup executives on how to raise funds from investors, she has no familiarity with Frost's so-called "model" and, indeed, asserts Frost's model is "unique." Dkt. No. 61-2 Ex. 3 at p. 3); *see also* Dkt. No. 61-2, Ex. 8 (Jordan Tr. 69:12-70:4) (acknowledging she is not familiar with any other incubator that ideates its own portfolio companies and then charges fees to those companies). Accordingly, she has no experiential or educational basis to opine that FDC's fees or operating costs were "industry standard" or that the Funds' disclosures and communications with investors were adequate and consistent with "industry standards."

In expressing her opinion that the FDC's fees and expenses were adequately disclosed, Ms. Jordan also relies upon on an inoperative version of the Seed Fund operating agreement. *Id*. at 6. In making this claim, Ms. Jordan is quoting from a version of the Seed Fund operating agreement that even Frost acknowledges is not the operative agreement that was presented to investors, which made no mention of FDC's fees and expenses. Dkt. No. 61-2, Ex. 9 (Frost Tr. 230:1-232:21); *compare* Dkt. No. 61-2. Ex 11 (Arb. Ex. 1, § 6.1 (non-operative agreement)) *with* Ex. 12 (Arb. Ex. 48, § 6.1 (operative agreement)). In addition, neither version of the Seed Fund operating agreement discloses the amount of the incubator fees FDC charged to the portfolio companies, or that the Seed Fund, through its investments, would ultimately be paying those fees. As such, Ms. Jordan's opinion lacks evidentiary support and is entirely irrelevant.

Defendants also claim that Ms. Jordan's opinions regarding Frost's motivation in creating new portfolio companies is the proper subject of expert testimony, as her observations are "objectively, not subjectively, justified." Dkt. No. 116 at p. 21. It is

unclear what Defendants mean by suggesting Ms. Jordan's opinions are "objectively justified" as Ms. Jordan's opinion simply parrots Frost' mediation brief. Specifically, in attempting to rebut the SEC's claim that FDC created new portfolio companies for the purpose of charging fees, Mr. Jordan offers the following narrative: "[a]s conversations advanced with General Electric ("GE") surrounding its potential collaboration with FDC, the Incubator accelerated its ideation process. The effort purposely was designed to launch more companies to develop more actionable ideas for GE rather than to generate additional fee income." Dkt. No. 61-2, Ex.3 at 10. Such testimony, delving into Frost's intent in forming new portfolio companies, is plainly improper. *Lanard Toys v. Anker Play Prods.*, 2020 U.S. Dist. LEXIS 221783, at *19-20.

Furthermore, Ms. Jordan's general overview of management fees, and her discussion of carried interest and various valuation methods, are all irrelevant, as it does address any of the conduct at issue. For example, the SEC is not contending that the 2% management charged by Fund II was not disclosed; rather, it claims that the fee should have been offset by FDC's excessive incubator fees and not at market rate. As such, Ms. Jordan's observations about that a 2% management fee and a 20% carried interest are "standard" is not relevant. *See* Dkt. 61-1 at 17.

Lastly, Defendants argue that Ms. Jordan's discussion of the duties an investor owes to a fund manager is appropriate as it is based on the CFA Institute's investment guidance. Dkt. No. 116 at 19; *see* Dkt. No. 61-2, Ex. 3 at p. 8 (expressing opinion that investors owe a duty to the beneficial owner of the capital to ask questions about any terms or conditions in the offering documents). There are two fundamental problems with Ms. Jordan's proffered opinion. First, it thoroughly misconstrues the fiduciary relationship between an investment adviser and its clients, which imposes an affirmative duty *on the adviser* to act with the utmost good faith and to disclose all material facts, as well an affirmative obligation *on the adviser* to employ reasonable care to avoid misleading clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375

U.S. 180, 194 (1963).  Since Ms. Jordan's opinion regarding an investor's duties to an investment adviser has no basis in the law, it will only serve to confuse the jury. Second, the CFA guidance that Ms. Jordan cites in her report says nothing about an investor's duty of inquiry; hence, her opinion is not based on any industry standard and is little more than an *ad hominem* attack on the credibility of the Funds' investors.  Dkt. No. 61-2, Ex. 3 at 7-9 ("[a]necdotally, my experience shows that survivor bias persists.  When an investor exits from an investment with a profit, s/he appears to have understood the transaction very well.  When an investor exits from an investment with a loss, however, it is usually the fault of someone else other than the investment decision maker.  My experience shows that such deflection most often is an effort to reduce career risk.").

## IV. CONCLUSION

For the foregoing reasons, and for the reasons stated in the SEC's motion *in limine* to exclude the testimony of Mr. Ackerman and Ms. Jordan, which fully sets forth the SEC's position, the SEC respectfully requests that its motion be granted.

Dated: October 15, 2021

                                              */s/ Donald W. Searles*
                                              DONALD W. SEARLES
                                              Attorney for Plaintiff
                                              Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On October 15, 2021, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE OR LIMIT TESTIMONY OF ANDREW ACKERMAN AND KERRY JORDAN** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October 15, 2021                    */s/ Donald W. Searles*
                                          Donald W. Searles

1

*SEC v. Stuart Frost, et al.*
United States District Court—Central District of California
Case No. 8:19-cv-01559-JLS-JDE

## SERVICE LIST

Andrew C. Callari
34197 Pacific Coast Highway, Suite 100
Dana Point, CA 92629
ac@callarisummers.com
*Attorney for Defendant Frost Management Company, LLC*

Marc J. Schneider
mschneider@stradlinglaw.com
Jason De Bretteville
jdebretteville@stradlinglaw.com
Kathleen M. Marcus
kmarcus@stradlinglaw.com
Sean T. Lobb
stlobb@stradlinglaw.com
Lisa M. Northrup
lnorthrup@stradlinglaw.com
Straddling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Telephone: (949) 725-4000
*Attorneys for Defendant Stuart Frost*