1   **UNITED STATES DISTRICT COURT**

2   **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3   **HONORABLE JOSEPHINE L. STATON, U.S. DISTRICT JUDGE**

4

SECURITIES AND EXCHANGE                    )
5   COMMISSION,                            )
                                           )   **Certified Transcript**
6                   Plaintiff,             )
                                           )   Case No.
7          vs.                             )   8:19-cv-01559-JLS-JDE
                                           )
8   STUART FROST and FROST MANAGEMENT       )
    COMPANY, LLC,                          )
9                                          )
                    Defendants.            )
10  _____   )

11

12

13

                REPORTER'S TRANSCRIPT OF PROCEEDINGS
14                  FINAL PRETRIAL CONFERENCE
            REPORTED VIA ZOOM VIDEOCONFERENCE
15              FRIDAY, JANUARY 28, 2022
                      10:33 A.M.
16              SANTA ANA, CALIFORNIA

17

18

19

20

21

22  _____

23          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
24          411 WEST 4TH STREET, ROOM 1-053
                SANTA ANA, CA 92701
25              dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF:

 3            U.S. SECURITIES AND EXCHANGE COMMISSION
              BY:  DONALD W. SEARLES, ESQ.
 4            444 South Flower Street
              Suite 900
 5            Los Angeles, California  90071
              323-965-3998
 6            searlesd@sec.gov

 7            U.S. SECURITIES AND EXCHANGE COMMISSION
              BY:  CHARLES E. CANTER, ESQ.
 8            444 South Flower Street
              Suite 900
 9            Los Angeles, California 90071
              323-965-3998
10            canterc@sec.gov


11


12    FOR DEFENDANT STUART FROST:

13            STRADLING YOCCA CARLSON & RAUTH PC
              BY:  MARC J. SCHNEIDER, ESQ.
14            660 Newport Center Drive
              Suite 1600
15            Newport Beach, California 92660
              949-725-4000
16            mschneider@stradlinglaw.com

17            STRADLING YOCCA CARLSON & RAUTH PC
              BY:  JASON de BRETTEVILLE, ESQ.
18            660 Newport Center Drive
              Suite 1600
19            Newport Beach, California 92660
              949-725-4000
20            jdebretteville@stradlinglaw.com

21            STRADLING YOCCA CARLSON & RAUTH PC
              BY:  LISA M. NORTHRUP, ATTORNEY AT LAW
22            660 Newport Center Drive
              Suite 1600
23            Newport Beach, California 92660
              949-725-4000
24            lnorthrup@stradlinglaw.com


25
```

1          **APPEARANCES OF COUNSEL:**
                    **(Continued)**
2

3   **FOR DEFENDANT FROST MANAGEMENT COMPANY, LLC:**

4           CALLARI & SUMMERS
            BY:  ANDREW C. CALLARI, ESQ.
5           34197 Pacific Coast Highway
            Suite 100
6           Dana Point, California 92629
            714-371-4110
7           ac@callarisummers.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **SANTA ANA, CALIFORNIA; FRIDAY, JANUARY 28, 2022**

2                            **10:33 A.M.**

3                            **- - -**

4              THE COURTROOM DEPUTY:  Calling Item 3, SACV 19-1559,

10:33AM  5   *Securities and Exchange Commission v. Stuart Frost, et al.*

6              Counsel, please state your appearances for the

7     record, beginning with the plaintiffs.

8              MR. SEARLES:  Good morning, Your Honor.  Donald

9     Searles on behalf of the SEC.

10:33AM 10             MR. CANTER:  Charles Canter on behalf of the SEC.

11             THE COURT:  Good morning.

12             For defendants?

13             MR. SCHNEIDER:  For Mr. Frost we have the Stradling

14    firm, Marc Schneider, that's me.  And you can't see them,

10:33AM 15   they're off screen at the moment, but also Jason de Bretteville

16    and Lisa Northrup.

17             THE COURT:  You are on mute.

18             MR. SEARLES:  You can't hear us, Your Honor?

19             THE COURT:  No.  It was -- I couldn't hear you, but

10:33AM 20   I was looking at -- is it Mr. Callari?  Is that how you

21    pronounce --

22             MR. CALLARI:  Yes, it's Callari.  Good morning,

23    Your Honor.  Andrew Callari for Frost Management Company.

24             THE COURT:  All right.  I don't know if you intend

10:33AM 25   to be speaking too much today, Mr. Callari, but if you do,

1  you're -- you're not very loud.  So it might be difficult for

2  my court reporter to hear you.

3          MR. CALLARI:  I'll try to be louder, but I don't

4  anticipate, unless the Court has questions.  I joined these

10:34AM  5  motions.

6          THE COURT:  All right.  And with that, let me --

7  we're here on the final pretrial conference as well as six

8  motions in limine.  I'm not going to hear argument on all

9  motions because I don't need it on all the motions.  I've read

10:34AM 10  all of your papers.

11          I will say it's not -- it's -- it was not always

12  helpful for me when you did omnibus oppositions to a single

13  motion.  I found that sometimes, then, the substance on

14  particular issues may have been lacking a little bit.  So I may

10:34AM 15  have questions, I think, on just a couple of the motions.  So

16  I'm going to start with my questions.

17          On the motion to exclude reference to the prior

18  arbitration -- exclude evidence and testimony regarding the

19  prior arbitration proceeding, it was captioned that way, but it

10:35AM 20  was a little bit --

21          Did I lose someone?  Oh, there.  All right.  When

22  you go off screen, I'm not sure if that means you're gone

23  entirely or if I've just lost you.  And my apologies.  I have

24  too much sunlight in this area; so my visuals are not so good.

10:35AM 25  But -- I should go from chambers out to the courtroom, but I

```
 1   can't see everybody as well from there.
 2              So in the motion to -- regarding prior arbitration
 3   proceedings, it was a little broader.  It was really a motion
 4   essentially relating to experts, et cetera, that I addressed in
10:36AM 5   part.  But as to the arbitration itself, I clearly -- the SEC
 6   understands -- so my question is to the defendant.
 7              The SEC understands it cannot introduce evidence of
 8   the award.  And I think that it also has to be very careful in
 9   not introducing necessarily that, when they are referencing
10:36AM 10  testimony, it was testimony from an arbitration proceeding or
11  something along those lines.  But they can use it for
12  impeachment and in the context of, you know, referencing prior
13  testimony when necessary.
14              But let me ask the defendant.  Why would it not be
10:36AM 15  proper for the expert to rely on facts that were elicited
16  during the prior arbitration proceeding?  I mean, if Mr. Frost,
17  for example, testified to certain facts and it happened to be
18  in the arbitration proceeding, why couldn't an expert rely on
19  that?
10:37AM 20              MR. De BRETTEVILLE:  Your Honor, we have no
21  objection to an expert relying upon testimony.  The concern is
22  rather with reference just to findings by the arbitrator as
23  facts or explicit references to an arbitration proceeding.
24              I don't understand why there would be a need to use
10:37AM 25  the word "arbitration" in any way when the SEC's witnesses
```

simply say -- you know, reference a fact or testimony as such. I don't know why the actual word of an "award" or "arbitration" needs to be added to any sentence to reference any such fact or testimony.

10:37AM        THE COURT:  Then I don't think we're in disagreement.  The SEC, I think, can reference, you know, "In a prior proceeding you testified," or "previously when you were under oath you testified as follows," and the expert can rely on facts that, you know, somebody testified to.  It doesn't 10:38AM need to be referenced to an arbitration.

So I think that my tentative ruling on that is aligned with what you just indicated.  So -- all right.  So I'm going to move on from that motion.

MR. SEARLES:  Your Honor, before you do so, there 10:38AM are two discrete factual scenarios that may implicate some reference to at least some prior proceeding, namely, the investors -- the Hollencrest investors that countersued Frost in the arbitration in order to discover and learn the amount of the incubator fees that Mr. Frost was charging to the portfolio 10:38AM companies.  Mr. Frost took the position that he could not disclose that information.  And so the investors ended up suing in order to obtain that information.

And I could -- there's some possibility of that type of scenario coming at "How did" -- "Did you know of the 10:39AM incubator fees?"

|     |     |
| --- | --- |
| 1 | "No." |
| 2 | "How did you learn?" |
| 3 | "Frost refused to tell me.  I had to hire counsel. |
| 4 | I had to sue him.  And then, ultimately, I found out what those |
| 10:39AM 5 | fees were." |
| 6 | "Were those fees material to your decision?" |
| 7 | "Yes.  Had I known, I would not have invested." |
| 8 | So there's that scenario -- |
| 9 | THE COURT:  But so far you haven't said anything |
| 10:39AM 10 | relating to prior arbitration or an award in a prior |
| 11 | arbitration. |
| 12 | MR. SEARLES:  Okay. |
| 13 | THE COURT:  You know, the motion doesn't go further |
| 14 | than the motion goes. |
| 10:39AM 15 | MR. SEARLES:  Okay.  All right. |
| 16 | THE COURT:  And we can't predict everything that's |
| 17 | going to come out.  If you think that there's something that's |
| 18 | going to potentially violate the Court's order on this, |
| 19 | obviously, do what you just did, which is alert the Court to it |
| 10:39AM 20 | in advance.  I can then make a ruling on it.  But I don't think |
| 21 | that -- I don't think that would violate anything that I'm |
| 22 | going to issue. |
| 23 | It's essentially that we don't want to usurp the |
| 24 | fact-finder's role here by having them think that somebody else |
| 10:40AM 25 | already decided something and then they're now trying to |

1  either -- either they're being told what that was or they're

2  trying to figure out what it was that somebody else decided

3  before them.  That's very different from facts being uncovered

4  in a prior proceeding or testimony under oath in a prior

10:40AM 5  proceeding.  That happens -- that happens all the time in

6  various forms, and that's permissible.

7           MR. SEARLES:  All right.  Clearly understood,

8  Your Honor.

9           The other scenario is the defendants have disclosed

10:40AM 10  a number of new witnesses on their witness list that were not

11  mentioned in their Rule 26 disclosures including Mr. Frost's

12  wife, Julie Frost, who defendants say is going to be expected

13  to testify about Mr. Frost's sale of personal assets.

14           Now, in the arbitration award, as part of -- there

10:41AM 15  was punitive damages awarded as well as regular damages.

16  Mr. Frost sold his house in order to discharge some of those

17  obligations.  If the defense tries to assert some -- elicit

18  some sympathy with the jury that Mr. Frost had to sell his

19  personal assets, the context of why he was forced to do so, I

10:41AM 20  think, becomes relevant, and they may be introducing or opening

21  the door to the arbitration award.

22           THE COURT:  Maybe an opening of the door.  So I

23  would suggest, if that comes up, you meet and confer over that.

24  Let me know before she testifies so that you can -- if that

10:41AM 25  happens to be what she's going to testify to, the defense can

1    make a strategic decision about whether to have her testify or

2    not.

3              MR. SEARLES:  Thank you, Your Honor.

4              MR. De BRETTEVILLE:  I can represent to the Court

10:41AM 5    that we have no current intention of any such testimony.  It's

6    an interesting idea and I thank Mr. Searles for it, but I don't

7    think we're going to go down that path.

8              THE COURT:  Well, that's what motions in limine are

9    all about, isn't it?  We all sit -- each side sits in their own

10:42AM 10   offices and tries to think about what the other side might do,

11   and then "How can I prevent that from happening?"  File a

12   motion.  But, hopefully, you meet and confer before you file

13   it.  That's why I don't let you file motions without meeting

14   and conferring because I spend a lot of time listening to

10:42AM 15   things that I don't need to listen to because it's nobody's

16   intent to introduce it.

17             Okay.  So let me move to the defendants' motion to

18   exclude evidence regarding the defendants' owing a fiduciary

19   duty to the investors because that seems to be a significant

10:42AM 20   motion and --

21             Okay.  Changing of the guard on camera.

22             -- and I do have some questions about that.

23             So my questions first are to the SEC.  First, I

24   don't -- I'm not sure if you're conceding that it's not

10:43AM 25   relevant to your first claim.  Because it looks like you are,

1    but then you sort of take back in one sentence which you give

2    in other sentences.

3            And so what is the SEC's position as to the

4    relevance of a fiduciary duty in the first claim when it has to

10:43AM 5    do with the fiduciary duty to the Funds?

6            MR. SEARLES:  I think that the defense accuses the

7    SEC of belatedly recognizing that it has no claim under 206(1)

8    and (2) because of the defense position that the Funds were

9    aware of all the pertinent characteristics of the incubator

10:43AM 10   fees as a result of the membership of the investment committee.

11   And they're suggesting that we're scrambling for some new basis

12   for a case, and that's entirely inaccurate.

13           We allege in the Complaint specific allegations

14   about the investment committee; that they were populated by

10:44AM 15   members of the Frost Data Capital, the "incubator," that --

16   we're anticipating their imputation of knowledge argument and

17   addressing it in our Complaint.  We address it, also, in

18   Mr. Palzer's report with respect to where he opines about the

19   conflicted nature of the members of the Frost Data Capital

10:44AM 20   being members of the investment committee as well.  So,

21   basically, because of that conflict of interest, there can be

22   no imputation of knowledge to the Funds.

23           THE COURT:  So what you're saying is, just to sort

24   of use very general terms, "We have" -- "We are asserting a

10:45AM 25   claim of a breach of fiduciary duty to the Funds.  And so

1   that's why fiduciary duty, as it pertains to the Funds, is

2   still very much at issue."  Am I --

3              MR. SEARLES:  Exactly.

4              THE COURT:  Okay.  So your argument is "We are not

10:45AM  5   just claiming" -- "We understand that our first claim cannot be

6   reliant on a fiduciary duty to the investors"; right?  You

7   understand that?

8              MR. SEARLES:  Understood.

9              THE COURT:  But that's not what you're claiming.

10:45AM 10   And you still think you have a first claim based on fiduciary

11   duty to the Funds and why it is that fiduciary duty is still at

12   play?

13              MR. SEARLES:  Absolutely, Your Honor.  And then to

14   go on, we then allege -- with respect to the individual

10:45AM 15   investors, they're suggesting that we've come up with a new

16   legal theory of a fiduciary duty that Frost owes to the

17   individual investors, to the Funds.

18              Again, that is not a new legal theory.  As the

19   Court's well aware, this case grew out of the arbitration.

10:46AM 20   Where that arbitration was -- the fundamental issue with that

21   case was to breach by Frost of its fiduciary duties both as a

22   general partner as well as a director of the limited liability

23   corporation under Delaware law to disclose material facts to

24   the individual investors.

10:46AM 25              THE COURT:  But that was based on Delaware law.  And

 1  this is under the Advisers Act.  And so --

 2       MR. SEARLES:  That's true.

 3       THE COURT:  What I didn't see in your brief, and

 4  this is because your opposition was more omnibus, was a strong

10:46AM  5  explanation as to how you tie together the fiduciary duty under

 6  Delaware law to what you need to show under the Investment

 7  Advisers Act, you know, the fraudulent, deceptive, or

 8  manipulative conduct.

 9       I see that your link is "Well, if they had a

10:47AM 10  fiduciary duty under state law, then that is going to dictate

11  whether it was fraudulent, deceptive, or manipulative under

12  federal law."  So, for example, the Investment Advisers Act

13  would mean different things about what's fraudulent, deceptive,

14  or manipulative depending upon what state.

10:47AM 15       MR. SEARLES:  No, I don't believe that's our

16  argument.  I don't believe that -- with respect to the second

17  claim under 206(4), directed to the fraud on the investors,

18  it's really a case of -- well, two things.  One, Mr. Frost

19  making material misrepresentations and admissions to investors.

10:47AM 20  And, then, secondly, under 206(4), engaging in a fraudulent

21  course of business conduct.

22       The only relevance to establishing a fiduciary duty

23  to the Fund investors -- which, by the way, Frost -- Mr. Frost,

24  in his deposition, clearly stated that he owed such a duty to

10:48AM 25  the investors.  And this is one of the facts that we mentioned

1    in our summary judgment motion, which is Docket 44 --

2             THE COURT:  Is that a fact, or is that a statement

3    of law?

4             MR. SEARLES:  That's a -- I think it's both.  I

10:48AM 5    think he recognizes that he has a fiduciary duty, as a matter

6    of fact, which is --

7             THE COURT:  Yeah, I don't think so.  I think that if

8    there is -- if there is a legal -- a fiduciary duty is a legal

9    duty.  If such a duty exists, then his acknowledgment of it --

10:48AM 10   if it separately exists, his acknowledgment of it may be

11   relevant to state of mind, that sort of thing.  It may be

12   relevant, but it can't -- but his statement can't create a duty

13   that doesn't exist.

14             So you can only get so far with his statement.

10:48AM 15   But --

16             MR. SEARLES:  True.

17             But I think our claim under 206(4) in adopting that

18   release, and we cited to the SEC pronouncements -- is that

19   206(4) doesn't create a fiduciary duty, but nor does it

10:49AM 20   eliminate preexisting fiduciary duties that may exist under

21   state law or as a matter of partnership law.

22             The only relevance of a fiduciary duty in this case

23   is akin to an obligation, a duty to disclose.  If you have a

24   fiduciary duty, you have a duty to disclose, and that makes a

10:49AM 25   pure omission actionable as opposed to a statement that is

1   misleading by omission.

2          THE COURT:  Well, I guess that's what I'm saying.

3   It seems to me the only link that you're making is that if --

4   that somehow state law can create a greater duty than one would

10:50AM  5   otherwise find under fraudulent, deceptive, or manipulative.

6   If you didn't have a state law fiduciary duty -- if it wasn't

7   Delaware, it was someplace else -- then what is fraudulent,

8   deceptive, or manipulative under federal law would differ in

9   terms of whether an omission is actionable or not?

10:50AM 10          MR. SEARLES:  Again, I think what we're using this

11   doctrine for is to -- to the extent there is a true omission in

12   this case, and I'm not sure if there is, in terms of whatever

13   Frost is speaking about the incubator fees or that they'll be

14   at market rates or that they'll be negotiated, they're all

10:50AM 15   misleading by omission in the sense that he doesn't disclose

16   the amount of the fees that they're negotiating before their

17   company exists, that they're not arm's length negotiations.

18   But the Advisers Act -- bringing a claim under the Advisers Act

19   doesn't eliminate otherwise existing fiduciary duties under

10:51AM 20   state law.

21          THE COURT:  Well, no.  I'm not saying it eliminates

22   them, but how does it make them a violation of the Investment

23   Advisers Act?  You didn't allege a violation of state law.

24   You're alleging a violation of the Investment Advisers Act.  So

10:51AM 25   do you have any law, for example -- just this narrow question.

         1    Do you have any law that says whether an omission of a material

         2    fact is fraudulent, deceptive, or manipulative under the

         3    Investment Advisers Act?  Or do you have to get that from

         4    looking at what Delaware law applies?

10:51AM  5                MR. SEARLES:  Well, I think there's -- a

         6    manipulative or deceptive act under the Advisers Act is --

         7    whether the defendant is making, at least under 206(4), a

         8    material misstatement or omission.  And so a pure omission

         9    becomes actionable by a duty to disclose the information that's

10:52AM 10    omitted.  And that duty is animated, created by a fiduciary

        11    duty.  So to the extent we are alleging pure omissions, he has

        12    a duty to disclose that information.

        13                THE COURT:  If he didn't have a fiduciary duty under

        14    Delaware law, you wouldn't otherwise have a claim for an

10:52AM 15    omission, a material omission under the Investment Advisers

        16    Act?

        17                MR. SEARLES:  I don't believe so if it were a pure

        18    omission.  Whether we have such a pure omission in this case

        19    versus a material misstatement that is materially -- that the

10:52AM 20    statement itself being made is materially misleading by omitted

        21    information, it's a different question.

        22                But I think the defense is trying to create a --

        23    what they contend to be this very significant legal issue in

        24    this case, and that it's very important they're suggesting

10:53AM 25    that, as part of their motion in limine, that every time the

                         UNITED STATES DISTRICT COURT

SEC elicits information from investors or elicits information

concerning misrepresentations to investors, that the Court

deliver a limiting instruction to the jury that it is only

relevant to the 206(4) claim and not the 206(1) claim.

10:53AM          And the reason that they are arguing that is that

they contend that a finding of liability under the 206(1) claim

would have dramatically different and harsher consequences to

Frost, namely the triggering of the bad actor disqualification.

And the bad actor disqualification would be triggered in this

10:53AM case by the Court entering an injunction under either of our

claims.  So that the foundational argument that the defendant

has for why they need this limiting instruction, why this issue

is so important is based on a fundamental misunderstanding of

what triggers the bad actor provision.  There is no reason for

10:54AM this.

          Secondly, to have a limiting instruction when the

evidence in this case all revolves around the incubator fee or

the incubator model -- how it was structured, how the fees were

charged, when they were charged, why they were charged, what

10:54AM services were rendered for them, how the money was spent as a

result of it -- it's all -- it's all intertwined.  The Court

would be delivering a limiting instruction with virtually every

single question.  Because the Fund doesn't speak for itself.

The Fund speaks through individuals.  The Funds speaks through

10:54AM the investors who invested in them, the other -- the companies

1    that invested in these portfolio companies.

2           THE COURT:  So where -- where in the briefs -- let

3    me just ask this.  I mean, I get where you're headed now.

4    Where in the briefs did you address the issue of how the

10:55AM 5    fiduciary duty -- how they owe a fiduciary duty to the Fund and

6    how you're alleging breach of that?  "Here are the facts that

7    we're alleging to show a breach of fiduciary duty to the Fund.

8    That's why it's relevant for that first claim."  Because if

9    it's relevant for the first claim, I think the argument of

10:55AM 10   spillover is more difficult to make because they've argued that

11   the first claim is the more egregious one or has the harsher

12   penalties anyway.  So if it's relevant to the first claim, then

13   I'm not sure a limiting instruction is necessary.

14          But what I didn't see is any kind of full-throated

10:55AM 15   opposition on that point.  If you can just point me maybe to

16   where in the briefs that might be so I can look at this.

17   Because I usually come into this -- I always come into these

18   hearings having read what you've written.  And that's where --

19   that's why I said I thought that you essentially acknowledged

10:55AM 20   that you -- this wasn't really relevant to your first claim.

21   Because I searched the brief to find out where you were going

22   to show me that.

23          MR. SEARLES:  Well, I apologize for using that sort

24   of omnibus reply.  The argument they were making with respect

10:56AM 25   to the fiduciary duty and to whom it's owed was also a

```
 1   launching-off point for their motion in limine to strike
 2   Mr. Palzer, one of our experts.  And so I discussed their
 3   argument regarding fiduciary duty in the context of the
 4   opposition to the motion in limine to exclude Mr. Palzer.
 5   THE COURT:  Right.  I see what it is.  It's
 6   Document 114, and it's the in limine to exclude opposition to
 7   the -- to their in limine to exclude the testimony of Palzer;
 8   to exclude other expert testimony; and regarding fiduciary duty
 9   to the investors; and the testimony regarding prior arbitration
10   proceeding.
11   So I found the section on motion to exclude -- I
12   mean I read their brief separately because they have separate
13   briefs.  And then I put yours behind it and I look to "Okay.
14   Where are they going to talk about this?"  Unless you wanted me
15   to read your whole opposition to every -- each time I read
16   their opening brief.  And it starts out with Frost -- you know,
17   essentially, "Frost owed fiduciary duties to investors under
18   Delaware law, and evidence regarding those duties and how
19   Frost's conduct breached them is relevant to the SEC's claims
20   that defendant employed a scheme," then you say "to defraud the
21   Funds themselves."
22   That's the only sentence that I saw that addressed
23   the Funds, fiduciary duty to the Funds.  And you just said,
24   "Owing fiduciary duties to the investors is relevant to
25   defrauding the Funds."  That was it.  Nothing else.  There is
```

1    nothing else in that section.

2          So I don't know what you wanted me to glean from

3    that.  That's the bottom of 16, top of page 17, in that

4    section.

10:58AM 5          And I went back -- you said, "As the preceding

6    discussion demonstrates," but I didn't see you demonstrating.

7    Or if you were, I'm not sure where.  "The argument that the

8    fiduciary duty to the Funds' investors is relevant to

9    fraudulent" -- "fraud against the Funds themselves and the

10:58AM 10   fiduciary duty to the Funds themselves."  So I just didn't hear

11   argument.

12          MR. SEARLES:  I apologize, Your Honor.  In the final

13   pretrial conference order that we submitted, Docket Number 141,

14   at page 11 of 141-1, we lay out with respect to Claims 1 and 2

10:59AM 15   that half dozen or more failures to disclose both to the Funds

16   as well as to the individual investors in the Funds.  So

17   failing to disclose --

18          THE COURT:  I would -- and we'll get to that.  So,

19   you know, I'll look at that.  I will tell you that that's

10:59AM 20   another concern I had is that Exhibit A to our Local Rules

21   tells you exactly how you're supposed to lay out what your

22   evidence is.  And it's claim by claim, element by element.  And

23   you did exactly what you just said, which is once you went

24   through the elements, then when you went to the evidence, you

10:59AM 25   just lumped everything together and didn't separate it out by

```
 1    claim and by element.  And so it's hard for me to tell what you
 2    think goes to what element, what facts go to what element
 3    because you didn't follow the Exhibit A Local Rules
 4    requirement.
 5         So I'm going to need you to redo that.  We were
 6    going to get to that point.
 7         MR. SEARLES:  Okay.  All right.
 8         THE COURT:  But I'm not sure that pointing to what I
 9    found to be deficient in the final pretrial conference order is
10    going to help you with what I found to be deficient in the
11    opposition to the motion in limine.
12         And, you know, I -- this is a significant issue.  So
13    I'm searching for this because I'm not exactly sure what your
14    argument is.  And you can tell me now.  And I'm supposed to,
15    you know, remember what's not in writing anywhere?  I'll look
16    back at this and see if I can figure it out.  But I can't
17    really, very well, from the briefs.
18         Let me turn to the -- just one moment here.  So
19    let's say that, if he's a member-manager of the LLC and a
20    general partner, that then he has a fiduciary duty.  I think
21    the defendants argued that he wasn't, that he didn't.  As I
22    read the operating agreement, at the very least, it looks like
23    Frost Management Company, LLC, was identified as the member
24    manager/general partner.  So I'm not sure of the defendants'
25    argument there.  But is there anything further?  Because that
```

10:59AM (line 5)
11:00AM (line 10)
11:00AM (line 15)
11:00AM (line 20)
11:01AM (line 25)

```
 1    was raised in the reply by the defendants.

 2              So does the SEC have any position on that, that you

 3    can't show a breach of fiduciary duty under Delaware law

 4    because he doesn't hold the position that is required to have a

 5    fiduciary duty?

 6              MR. SEARLES:  Well, the question is who speaks for

 7    the Frost Management Company other than its manager is

 8    Mr. Frost.  The two are one and the same.  So if anyone is

 9    going to be speaking on behalf of Frost Management Company and

10    discharging the fiduciary duty, it's going to be Mr. Frost

11    himself.

12              THE COURT:  And Frost Management Company, LLC, is a

13    defendant in this case as well.

14              MR. SEARLES:  True.

15              THE COURT:  All right.  Let me see.  Let me turn to

16    the defendant on this particular motion in limine regarding

17    fiduciary duties because what -- what the SEC says is that

18    they're going to show that he breached his fiduciary duty to

19    the Funds based on conflicts of interest, et cetera -- at least

20    that's what I'm hearing now -- and that -- so that's going to

21    come in in that regard anyway.

22              You want to explain that to me first.

23              THE REPORTER:  Your Honor, I'm sorry.  There were

24    two attorneys in the one screen, in Mr. Stradling's screen, and

25    so I'm not sure -- and this is the court reporter.  I'm not
```

1    sure who is who, who is Mr. Stradling and who the other

2    attorney is.

3           THE COURT:  Well, Mr. De Bretteville is not on the

4    screen.  He was there before.  So when you saw "Stradling"

5    there, that's not -- that's the firm name.

6           So announce yourselves each time, please.

7           MR. SCHNEIDER:  Marc Schneider.

8           THE REPORTER:  Thank you.

9           MR. SCHNEIDER:  So to jump straight to the question

11:03AM 10   that you asked, going back to some of the arguments that I

11    heard, there are, as you recognized, two very different claims

12    here.  The first claim is about supposed fraud with scienter

13    against the Fund.  All that matters for that claim is what the

14    Funds knew; not what the investors knew, what the Funds knew.

11:03AM 15   And that claim, as you mentioned, is -- as the SEC said, is

16    very important.

17           The SEC suggested that we had some confusion about

18    the bad actor designation issue.  And that really is the only

19    thing driving this case forward is my client cannot be deemed

11:04AM 20   to be a bad actor because that would end his career.  And he

21    has no intention of ever being an investment adviser again, but

22    he has had significant success in leading companies.  He led

23    two of them to nine-figure exits with substantial returns to

24    investors.  He has another one he's already launched with

11:04AM 25   substantial interest.  But a bad actor designation would put an

1    end to it.  So that's what is driving us forward.

2         The first claim, because it is a scienter claim,

3    automatically -- if my client agrees to it or loses at trial on

4    that claim, automatically results in a bad actor designation.

11:04AM 5    Separately, the second claim does not lead to a bad actor

6    designation.  It is only for negligence, which does not trigger

7    the statute unless Your Honor issues injunctive relief in the

8    relief portion of trial before you.  We'd be happy to go

9    straight to the trial for injunctive relief before you today

11:04AM 10   and save everybody a lot of time, because that is all we care

11   about is the bad actor designation.

12         Now, the injunctive relief, frankly, again, our

13   client has no interest and no intention of ever being an

14   investment adviser again.  There's no reason for injunctive

11:05AM 15   relief.  And, in fact, in our research we never found a single

16   decision where injunctive relief was issued based upon

17   negligence as opposed to scienter.  So it is critical to us

18   because the big risk here for our client is that the jury,

19   either from confusion or bias or what have you, polls against

11:05AM 20   our client on the first claim because the evidence only relates

21   to the second claim.

22         Now, to backtrack to that, you mentioned, what is

23   the evidence that concerns us and why do we need this limiting

24   instruction?  Well, the first claim, again, only has to do with

11:05AM 25   what the Funds know.  We had a number of senior executives,

|   | |
|---|---|
| 1 | very experienced executives, on the investment committee, more |
| 2 | than a half dozen people.  I guess they can argue that none of |
| 3 | their knowledge somehow counts, and the jury instructions, |
| 4 | which also has to be decided at some point, but -- |
| 11:05AM 5 | THE COURT:  Slow down just a little bit. |
| 6 | MR. SCHNEIDER:  Yeah.  The first claim only involves |
| 7 | what do the Funds know, has nothing to do with the investors. |
| 8 | The second claim has to do with fraud against the investors, |
| 9 | only negligence, does not trigger bad actor designation.  And |
| 11:06AM 10 | that was the one that involves "What did the investors know?" |
| 11 | And the SEC currently on their witness list of their |
| 12 | 50-something witnesses, I think, has 10 investors lined up to |
| 13 | testify what they knew, and all that testimony -- all that |
| 14 | investor testimony is entirely irrelevant to the first claim, |
| 11:06AM 15 | has nothing to do with what the Funds knew or did not know. |
| 16 | That, obviously, can be confusing for the jury and can bias a |
| 17 | jury. |
| 18 | So every time an investor is called, there should be |
| 19 | a limiting instruction explaining to the jury that "The |
| 11:06AM 20 | testimony you're about to hear from this investor has nothing |
| 21 | to do with the Claim 1.  It only has to do with Claim 2." |
| 22 | So I think that answers your question as directly as |
| 23 | I can.  I'm happy to answer further if I haven't really hit the |
| 24 | point that you're trying to ask about. |
| 11:06AM 25 | THE COURT:  I'm not sure if it hits the point.  So |

I'm going to ask what I thought I asked.  And maybe it is

different question.

          The SEC has indicated that the breach of fiduciary

duty to the Fund is still at issue because, even though the

11:07AM 5  defendant is arguing that the Funds had knowledge of all of

this, the SEC's position, I think -- and I'll be corrected if

I'm mistaken -- is that, because of various conflicts of

interest of members of the committees -- presumably the

investment committees -- is that it? -- of the Funds -- that

11:07AM 10 you can't essentially say that the Funds knew.  I'm not sure

how they're going to link that up.

          That's what I was looking for in their briefs.  But

I think their argument is breach of fiduciary duty to the Funds

is still relevant and they're going to try to prove that.

11:08AM 15          Are you saying they can't prove that by showing

breach of fiduciary duty to the investors?

          MR. SCHNEIDER:  Yes.

          THE COURT:  So that's -- so even if they can -- even

if they are trying to show breach of fiduciary duty to the

11:08AM 20 Funds, that's a different set of evidence?

          MR. SCHNEIDER:  Exactly, Your Honor.  All this

investor testimony has nothing to do with Claim 1, but it can

make the jury, through bias or confusion, rule against my

client on Claim 1 when the evidence had nothing to do with

11:08AM 25 Claim 1.  What the investors knew or did not know has nothing

to do with Claim 1.

Really, they're conflating two separate issues.
Their first claim is for fraud against the Funds, and there is
a fiduciary duty that can support that fraud claim.  Now, the
conflict issue they're raising has to do with whether the
knowledge of the Funds counts or not.  And that's the
imputation jury instruction issue that, at some point, will
have to be decided by Your Honor.

Essentially, they're saying that, although a half
dozen people on the investment committee and the CFO, they knew
everything, somehow -- although they're not being pursued, only
our client is being pursued, somehow all of their knowledge
doesn't count, and, therefore, the Funds didn't know when they
were defrauded by my client because the knowledge doesn't
count.

Now, for that they need to show that the adverse
interest exception applies so that knowledge of all of those
people, somehow every single one of them, somehow does not
count as Fund knowledge.  And that's the imputation of jury
instructions which is entirely separate from the motion that
they're deciding right now, which is the motion about the
motion in limine with respect to fiduciary duty.

For that what we had argued is that, number one,
they should not be able to say that there's a fiduciary duty to
the investors -- and there is not, and we can return to that --

and, number two, there is a fiduciary duty to the Funds.
That's fine.  But the evidence that relates only to Claim 2,
there should be a limiting instruction explaining that.

When an investor gets up to testify about what he
knew or didn't know, there should be a limiting instruction
saying that that investor's testimony has nothing to do with
Claim 1.  Only the Funds' knowledge has to do with Claim 1.

THE COURT:  All right.  So I'm reading -- let's
leave the motions in limine for just a moment because we're
talking about things beyond just the motions in limine.  We're
talking about the structure of the trial, et cetera.  It's all
related.  It's all related.

But we're talking about the impact of the jury
finding against your client on one claim versus the other
claim.  And if I were reading between the lines, what I would
say is that -- you know, nobody has to answer this.  Nobody's
communicated with me about this, of course -- is that the first
claim is what's driving this trial, not the second claim.

And so I look at a final pretrial conference order
that tells me you want 25 days of trial, I believe it was,
which, in a four-day-a-week trial means you want at least six
weeks or more of the Court's time, which means that of my
400-whatever civil cases I have, you get to take -- you just
figure out the proportion of the 365 days a year or whatever
that is.  Okay.

```
 1              So -- and for cases that need it, you get that.  You

 2   get that time.  Again, in criminal cases, probably won't give

 3   you six weeks here.  I just can't see that.  But it's in the

 4   interest of efficiency.  It's in the interest of justice, given

 5   everybody's access to justice nowadays, our limited access, for

 6   me to resolve things in a way that makes sense.  So I'm not

 7   going to make a specific proposal at this point.

 8              But my question is, is there some way in which we

 9   can decide perhaps the first claim with the idea that the

10   second claim can follow in some fashion -- I don't know if it's

11   by agreement or otherwise -- that we can bifurcate?  I'm not

12   going to tell you -- I mean, I always try -- my first thought

13   is please go try to settle this again.

14              Have you had a mediation already?  Of course.

15   Because you wouldn't be here if you hadn't.  So that's correct;

16   right?

17              MR. SCHNEIDER:  Yes, Your Honor.

18              THE COURT:  Okay.  So you've had that; it didn't

19   work.  You used -- who did you use as a mediator, private

20   mediator?

21              MR. SEARLES:  A member of the panel, Peter Rosen.

22              THE COURT:  A member of the panel.  Because it's the

23   government, do you not have the ability to -- I should have

24   asked -- go out and use a third-party mediator?

25              MR. SEARLES:  No.  He's on the list of the Court's
```

```
 1   panel mediators.  So he's an individual with JAMS, Peter Rosen.

 2          THE COURT:  Oh, okay.  Yeah, I recognize him.

 3          MR. SEARLES:  We had a mediation a year ago with the

 4   Sheppard Mullin attorneys.  And, again, the issue there was,

 5   again, the bad actor provision.

 6          THE COURT:  Well, I think maybe you need to go back

 7   before we have a trial.  Because, as you know, we've suspended

 8   jury trials right now anyway.  So I had several go away that I

 9   thought I was going to have.  Those are cases that are all

10   older than your cases that are champing at the bit to get a

11   trial, and theirs will come before you.

12          I know you contacted my CRD and asked should we pick

13   a date 90 days out or maybe 120 days out, and my thought was

14   pick whatever date you want because you're probably not getting

15   it.  I'm so sorry.  I apologize in advance, but there's one of

16   me that can sit on the bench and do this, and I wish I could

17   designate others.

18          But my question is -- so I'm going to have you maybe

19   go back to Mr. Rosen.  Or if you need a magistrate judge now or

20   something like that, I have some very experienced, you know,

21   civil litigators who are now magistrate judges and can do an

22   excellent job with this.

23          But, also, I -- I'm thinking if you don't resolve

24   it, I may want to do something that streamlines it a little

25   bit.  And maybe you can come up -- even if you can't resolve it
```

1   in full, maybe you can resolve it in part.  Maybe -- I'm not

2   sure.

3            But what I'm thinking is it sounds like one claim is

4   driving everything.  And whenever I hear that, it tells me we

11:14AM 5   need to focus on something that's going to, you know, jog

6   things loose a bit or give some clarity or something along

7   those lines.

8            MR. SEARLES:  We've engaged over the past several

9   months in continued discussions with the Stradling firm.  And

11:15AM 10  it's a very -- fashioning an outcome where that would avoid the

11  bad actor provision, it's exceedingly difficult if not

12  impossible.  One, the notion of the 206(1) claim is driving

13  this case as opposed to the 206(4) claim -- there's two things

14  with respect to that.  As the Complaint alleges, under the

11:15AM 15  206(4) claim, the defendant acted knowingly, recklessly, or

16  negligently.

17           There's no establishment that is simply a negligence

18  claim.  So there could be a finding of scienter that is

19  supporting the 206(4) claim.

11:16AM 20           Secondly, the defense has suggested we could settle

21  the case and just have a trial on an injunction, but that is

22  really no -- it doesn't streamline anything in the sense of

23  having to present the same amount of evidence as to whether an

24  injunction is appropriate and how egregious the conduct is.

11:16AM 25  And one of the routine things that we ask for in any settlement

 1    is that the defendant consent to an injunction to not violate

 2    the law in the future.  It's not a bitter pill to swallow.

 3    They have no right to violate the law in any event.  But the

 4    injunction then triggers the bad actor provision.

11:16AM  5         So that under either of our claims -- I'm very

 6    sympathetic to trying to streamline this case or potentially

 7    settle this case.  But Mr. Frost is insistent on avoiding the

 8    bad actor position.  He considers this a career-ending event,

 9    which it is not.  Mr. Frost can conduct offerings through a

11:17AM 10    registration process.  All that the bad actor provision says is

11    that the issuer is not allowed to have an exempt -- an offering

12    that's exempt from registration.

13         So Mr. Frost has two alternatives.  One, to have a

14    registered offering or to conduct a nonpublic offering where he

11:17AM 15    can contact his preexisting relationships and see if people are

16    interested in investing.  Secondly, if an injunction were to be

17    imposed, his bar would last for five years.  It's not

18    permanent.

19         So Mr. Frost, undoubtedly, is a clever man.  I'm

11:17AM 20    sure he can find other ways of making money other than taking

21    other people's money and losing it as he did in this case.

22         THE COURT:  Well, I'm going to leave the facts of

23    the case out of this.

24         What I was looking at simply was whether or not

11:17AM 25    there was a way that -- if nothing else, leaving aside any

resolution, which I highlighted that as one possibility,

whether or not the Court can streamline this in a way that

might address an issue by having a jury -- or the Court, but

sounds like a jury -- decide the one claim before it decides

11:18AM 5   the other.  And I don't normally like to do that because it

often doesn't streamline.  It often ends up expanding

everything.  So I'm not a big fan of that.  It has to be a

particular case that would warrant it, and I don't know about

that here.

11:18AM 10           So I'm going to decide the motions as I see them.

I'm having a little bit of trouble, again, with this fiduciary

duty motion because I don't think it was fully briefed.  I just

don't think it was fully briefed.  And I can't decide based on

a -- so I may ask for supplemental briefing -- I'll just tell

11:19AM 15  you that right now -- before we go forward.  And you'll have

time for it because you're not getting a trial day after

tomorrow.  I don't have any more questions on that.

            MR. SCHNEIDER:  Your Honor, if I may respond?

            THE COURT:  Yes, you may.

11:19AM 20           MR. SCHNEIDER:  There were things that were said

there, including that my client has lost a lot of money and, of

course, he's also made people a lot of money with two

companies, one --

            THE COURT:  I read -- I read that.

11:19AM 25           MR. SCHNEIDER:  And he would like to move forward

with these companies, not being an investment adviser.  And my

client, I think he knows better than anybody the impact of a

bad actor designation on the ability to raise venture capital

funding and things like that.

11:19AM  But there are ways to settle this.  One is on the

second claim for negligence, which does not trigger a bad actor

designation.  Another one is for a cease and desist order,

which is also not unusual -- in fact, that is typical for the

SEC in a prelitigation context -- and that does not trigger a

11:20AM bad actor designation.  So there are ways to settle, but we

haven't been able to achieve that here.

But what you said, Your Honor, about bifurcation,

we've been suggesting a number of ways to try to shorten this

trial, whether it's agreeing to a trial before you, Your Honor,

11:20AM or whether it's to change the trial in some way, whether we go

through injunctive relief and try that issue.  But bifurcation

can make a lot of sense --

THE REPORTER:  I'm sorry, Your Honor.  Counsel is

talking too --

THE COURT:  Wait just a second.  My court reporter

is jumping in, probably saying you're going too fast.

THE REPORTER:  Yes.

MR. SCHNEIDER:  My apologies.  And I know this

happened at the summary judgment hearing as well.  I'm from

11:20AM New York and I tend to talk quickly, though I lived in

1    California for 20-plus years now.

2            So bifurcation could make a lot of sense since it is

3    the first claim that is most material here.  And the evidence

4    is very different.  It's a very short trial for the investment

11:20AM  5    committee members to explain what they do and what they didn't

6    know and for the SEC to try to suggest that somehow they're all

7    cahoots and, therefore, shouldn't count.  That's the short

8    trial.

9            The long trial is the investors -- allowing dozens

11:21AM 10    of investors talking about what they knew or didn't know.  So

11    that might make a lot of sense.

12            To return to the fiduciary duty issue, Your Honor, I

13    would like to address that just briefly.  Your Honor asked

14    about the difference between two issues.  One is between my

11:21AM 15    client and the entity.  The entity does owe a -- would,

16    depending on the operating agreement, owe a fiduciary duty to

17    the Fund because it's managing the Fund.  The individual,

18    however, is separated by another layer.

19            And there's a Delaware case directly on point that

11:21AM 20    says the individual does not owe full fiduciary duty in that

21    context, which then goes back to, as you properly stated, Your

22    Honor, you should not be layering state court fiduciary duties

23    onto a federal statutory framework, particularly when *Goldstein*

24    is very clear about what fiduciary duties should exist under

11:21AM 25    the statute, because otherwise you're creating conflicts of

```
 1    interest -- or conflicting fiduciary duties.

 2              So -- but the Bay Center Apartments in their case

 3    addresses exactly what fiduciary duties an individual owes when

 4    he is part of a manager that, in turn, manages the Fund.  And

 5    that's 2009 Delaware Chancery Lexis 54 -- it's cited in our

 6    brief -- at pages 32 through 39.  And it says that the

 7    individual in that circumstance, their fiduciary duty is

 8    limited to, and I quote:

 9              "The duty not to use control over the

10         partnership's property to advantage the affiliate

11         at the expense of the partnership."

12              But, second of all, the SEC concedes that, in

13    Delaware, the fiduciary duty that is owed is defined by the

14    operator agreement, and that is what this is about.  And that

15    was done here.  Here, fiduciary duties were disclaimed in the

16    operating agreement itself.  And we refer you to Document 106

17    at Exhibit 5, Section 15.3, that's the Fund II operating

18    agreement.

19              And you can also look at the one that's attached to

20    the motion in limine.  It's Exhibit 1.  That's the C Fund,

21    paragraph 13.3.

22              THE COURT:  I have that in front of me.  Just a

23    moment.

24              MR. SCHNEIDER:  It's titled "Exculpation" and it

25    expressly disavows those fiduciary duties and limits them and
```

```
 1   says you cannot create additional duties beyond what the
 2   agreement already provides.  And the agreement expressly
 3   provides what disclosures the Fund will make to the investors.
 4   They cannot now argue that additional disclosures must be made
11:23AM 5   beyond what's required by the operating agreement under a
 6   fiduciary duty because the exculpation clause says no such
 7   fiduciary duty exists.
 8          That's the end of the matter.  It's a factual
 9   matter.  They simply do not have a fiduciary duty here.  They
11:23AM 10   are trying to suggest somehow "Should we layer it on top of the
11   statute."
12          And by the way, Your Honor, they have not alleged
13   that fiduciary duty as well.  If you look at their Complaint,
14   and I can cite you to a particular paragraph, they say that a
11:24AM 15   fiduciary duty is owed to the Funds.  And you can look at
16   paragraph 122 of their Complaint where they say, and I quote,
17   "Frost and FMC made material misstatements and omissions and
18   breached their fiduciary duties to the Funds."  It does not go
19   on to say "the Funds' investors."  They do not allege a
11:24AM 20   fiduciary duty to the investors in the Funds.  That is not in
21   their Complaint.
22          THE COURT:  All right.  Thank you.
23          So I'm going to move on from the motions in limine.
24   We also have the final pretrial conference today.  And one of
11:24AM 25   the things that I noted earlier that I'm going to want you to
```

fix is when you go through the evidence that you rely upon, you need to do it element by element, claim by claim so I can tell what you think what evidence is relevant to different elements of different claims.  And you did a very good job of -- I mean I know you looked at the appendix because it tracks it in other ways, but it doesn't track it when it comes to what evidence supports each claim.

So I'm going to have you redo that because I think here it's important because there's a lot of -- any sloppiness will be dangerous when it comes to admission of evidence.  So that would be helpful.

The other is you have a lot of witnesses and a lot of time with each witness.  And, you know, you've tried these cases to a jury.  You don't need that much time with each witness, I don't think.  You don't need as many witnesses, likely, as what you have listed.

You should not anticipate getting 25 days of trial. But before we get here, I am going to -- even if you've had discussions with each other, I'm going to send you to mediation because a third party can often be helpful.

Now, what I want you to do is meet and confer with each other, and, within the next five days, tell me whether you want to go back to Mr. Rosen.  I know that after a certain point, you pay for that, and I don't know what the parties' positions are on that and -- or whether you want the Court to

1   assign a magistrate judge on this one.  I probably -- and I --

2   you know, if you think there's somebody who has particular

3   expertise, you can let me know, but I might otherwise just

4   assign someone.  It may not be the person that's been involved

11:27AM 5   in discovery disputes or it may be, just depending -- you know,

6   the magistrate judge assigned to the case, Judge Early.

7           So within five days tell me how you want to go about

8   that mediation, which way.  And then we will make sure -- if

9   it's someone who's a third party, like Mr. Rosen, you need to

11:27AM 10   schedule that and tell me what the schedule is, and the trial

11   will take place after that.

12          Also, I want you to think about what I said with

13   regard to streamlining the trial and make a proposal.  It can

14   be a joint report to the Court with each side's positions on

11:27AM 15   it.  I can -- I mean, I'm anticipating that the SEC would say,

16   "Try it all at once," and that the defense might say, "Try the

17   one claim before the other."  I can't try only injunctive

18   relief without the agreement of the parties because that --

19   that's the cart before the horse unless there's a stipulation

11:28AM 20   to that.  So that wouldn't fly without agreement.

21          But there may be other things that the Court can do

22   to streamline it a little bit so it positions you better going

23   forward, or you see the writing on the wall, either way, and

24   then take it from there.  I'll give you 14 days to do that.

11:28AM 25          And in that same amount of time, tell me if you need

more time to revise the final pretrial conference.  I can
actually even give you until after the mediation to give me a
revised pretrial conference order because I'd rather you focus
on that than focus on revising the order itself or the proposed
11:29AM order.

So just -- here's what I'll say, is within 14 days
of any mediation, you need to file a revised final pretrial
conference report that corrects the deficiencies that I just
noted on the record that exist in the current one.

11:29AM I don't think I have anything else for you.
Normally, at the final pretrial conference, that's when I tell
you all the details about how we -- how I pick a jury and when
your trial is going to be and all of that.  I'm going to hold
off and issue that in an order after I hear about your
11:29AM mediation, after I get all these other things straightened out.

And just to put you on alert, I also have a ten-week
criminal trial that's this year.  And I have some other trials
all around that criminal trial and older civil cases.  So you
are facing that as well.  And every case is important.  This is
11:30AM an important case, I understand that.  But I just don't have
the space on the calendar right now.  So I'll find a space for
you and let you know that either with another status conference
or in a written order from the Court.

Any further questions?  I don't need further
11:30AM argument, but any questions by either side?

|   |   |
|---|---|
| 1 | MR. SEARLES:  Just so that I'm clear, Your Honor, so |
| 2 | within five days, the parties are to sort of agree on who we |
| 3 | will mediate in front of, whether Mr. Rosen or a magistrate, |
| 4 | and then get back to you within that time, within those five |
| 11:30AM  5 | days? |
| 6 | THE COURT:  Yes.  And if it's with Mr. Rosen, give |
| 7 | me the date on which you can mediate with him so that I have |
| 8 | that information.  If it's a magistrate judge, then I would |
| 9 | refer you to someone and have you contact that judge and then |
| 11:31AM 10 | set the schedule according to what -- you know, have the judge |
| 11 | set the schedule for you.  So that -- yes. |
| 12 | MR. SEARLES:  Okay.  Thank you for the |
| 13 | clarification. |
| 14 | THE COURT:  All right.  Anything else? |
| 11:31AM 15 | All right.  Mr. Stradling -- Mr. Stradling.  I'm |
| 16 | looking at your name.  Mr. Schneider? |
| 17 | MR. SCHNEIDER:  I said "No.  Thank you, Your Honor." |
| 18 | THE COURT:  All right.  And that's it, then.  Thank |
| 19 | you all for your very good arguments today.  I appreciate them. |
| 11:31AM 20 | MR. SEARLES:  Thank you, Your Honor. |
| 21 | THE COURTROOM DEPUTY:  Court is adjourned. |
| 22 | **(Proceedings concluded at 11:31 a.m.)** |
| 23 | **--oOo--** |
| 24 | |
| 25 | |

**UNITED STATES DISTRICT COURT**

```
1                      CERTIFICATE OF OFFICIAL REPORTER

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5               I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  February 9, 2022

16

17

18

19                                  /S/ DEBBIE HINO-SPAAN

20                                  Debbie Hino-Spaan, CSR No. 7953
                                    Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**