DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
CHARLES E. CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Counsel
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> STUART FROST AND FROST MANAGEMENT COMPANY, LLC, <br><br> Defendants. | Case No. 8:19-cv-01559-JLS-JDE <br><br> **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS STUART FROST AND FROST MANAGEMENT COMPANY, LLC** <br><br> Date: March 29, 2023 <br> Time: 1;30 p.m. <br> Ctrm: 5C <br> Judge: Hon. Sherilyn Peace Garnett |

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS ...................................................................3

      A.    FMC and Frost Data Capital ...................................................3

      B.    The Funds' Investment Committees Provided No Meaningful
            Protection to Fund Investors ...................................................4

      C.    The Funds' Illusory Advisory Committees................................5

      D.    Frost's Solicitation of Investors and Prospective Investors.............6

            a.    FDC's Practices Regarding Incubator Fees Were
                  Not Disclosed  .................................................................8

            b.    The Dollar Amount of FDC's Incubator Fees Were Not
                  Disclosed to Fund Investors and Were Excessive ...................8

      E.    Undisclosed and Excessive Management Fees ........................12

      F.    Snow Data Capital..................................................................13

      G.    Frost's Undisclosed Compensation at FDC and Payment of Frost's
            Personal Expenses, Including a One-Year Holiday in Italy ..............14

      H.    The Creation of Portfolio Companies "To Make Ends Meet"...........16

      I.    Defendants' Admission of Having Engaged in Fraudulent
            Conduct...................................................................................19

III.  AN INJUNCTION SHOULD BE ENTERED AGAINST
      DEFENDANTS ..................................................................................19

      A.    Standard for Issuance of an Injunction...............................19

      B.    The Bad Actor Provision.......................................................24

      C.    Follow-On Administrative Relief........................................25

IV.   CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

## CASES

*SEC v. RMR Asset Mgmt. Co.*,
    553 F. Supp. 3d 820 (S.D. Cal. 2021) ..............................................22, 23

*In re Washington Public Power Supply System Sec. Litigation*,
    823 F.2d 1349 (9th Cir. 1987)...........................................................23

*SEC v. Alexander*,
    115 F. Supp. 3d 1071 (N.D. Cal. 2015)...............................................24

*SEC v. Alliance Transcription Servs.*,
    No. CV 08-1464-PHX,
    2009 U.S. Dist. LEXIS 11840 (D. Az. Dec. 18, 2009) ......................23

*SEC v. Blazon Corp.*,
    609 F.2d 960 (9th Cir. 1979) ............................................................22

*SEC v. Capital Cove Bancorp*,
    No. 8:15-cv-980-JLS-JCx,
    2018 U.S. Dist. LEXIS 245380 (C.D. Cal. Jan. 17, 2018)..................23

*SEC v. Capital Gains Research Bureau Inc.*,
    375 U.S. 180 (1963)...........................................................................22

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ......................................................20, 23

*SEC v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) .............................................................20

*SEC v. Moran*,
    944 F. Supp. 286 (WS.D.N.Y. 1996) .................................................23

*SEC v. Murphy*,
    50 F. 4th 832, 851 (9th Cir. 2022)...........................................20, 22, 23

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ...................................................20, 22, 24

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953)...........................................................................24

*SEC v. Smith*,
    No. 93-CV-74410-Dt,
    1995 U.S. Dist. LEXIS 22352 (E.D. Mich. Jan. 6, 1995) ..................23

*Siris v. SEC*,
    773 F.3d 89 (D.C. Cir. 2014)...............................................................25

## STATUTES

### Securities Act of 1933

Section 17(a)(2)
[15 U.S.C. § 77q(a)(2)]....................................................................22, 23

Section 17(a)(3)
[15 U.S.C. § 77q(a)(3)]............................................................................23

Section 4(a)(2)
[15 U.S.C. § 77d(a)(2)]............................................................................24

Section 5
[15 U.S.C. § 77e]....................................................................................23

Section 6(b)
[15 U.S.C. § 77f(b)]................................................................................25

### Securities Exchange of 1934

Section 15(a)
[15 U.S.C. § 78o(a)]...............................................................................23

Section 15(a)(1)
[15 U.S.C. § 78o]....................................................................................23

### Investment Advisors Act of 1940

Section 202(11)
15 U.S.C. §§ 80b-2(11).........................................................................25

Section 203(e)
[15. U.S.C. §§ 80b-3(e)].........................................................................25

Section 203(f)
[15. U.S.C. §§ 80b-3(f)].........................................................................25

Section 206(2)
[15 U.S.C. §§ 80b-6(2)]..........................................................................23

Section 206(4)
[15 U.S.C. § 80b-6(4)].............................................1, 2, 19, 20, 23, 25

Section 209(d)
[15 U.S.C § 80b-9(d)]........................................................................2, 19

## REGULATIONS

Rule 204(4)-8
[17 C.F.R. § 275.204(4)-8].......................................................................2

Rule 206(4)-8
[17 C.F.R. § 275.206(4)-8].......................................................1, 2, 20, 26

Rule 206(4)-8(a)(1)
      [17 C.F.R. § 275.206(4)-8(a)(1)] ..................................................... 19

Rule 206(4)-8(a)(2)
      [17 C.F.R. § 275.206(4)-8(a)(2)] ..................................................... 19

Rule 506(d)
      [17 C.F.R. § 230.506(d)] .............................................................. 24

Rule 506(d)(1)(ii)(A) & (C)
      17 C.F.R. § 230.506(d)(1)(ii)(A) & (C) .......................................... 24

**COMMISSION RELEASES**

SEC Release No. 33-4552 (Nov. 6, 1962) ................................................. 25

*In re Peter Siris*,
      Exchange Act Release No. 71068,
      2013 SEC LEXIS 3924 (Dec. 12, 2103) ........................................... 25

# I.   __INTRODUCTION__

From 2011 to 2017, Defendants Stuart Frost ("Frost") and his company, Frost Management Company, LLC ("FMC") (collectively "Defendants"), operated and managed five venture capital funds, which raised over $60 million from investors for the ostensible purpose of creating and "incubating" high-tech start-up companies that would result in handsome, quick term, profits to investors.  Those funds have been a complete bust: investors have not received a dime on their investments and all of their money is now gone.  The only person to have benefited from Defendants' offerings was Frost, who became an instant millionaire with all the usual beacons of conspicuous consumption, moving to Italy for a year with his family at a critical juncture in the life of the funds, and leading a life of indolent luxury funded by unwitting investors. Defendants' scheme was based on Frost's creation of an independent incubator company, Frost Data Capital ("FDC"), which did not appear in the funds' financial statements and whose inner workings were kept secret from fund investors.  FDC quickly stripped the capital of the newly created start-up companies in which the funds had invested by charging excessive and unreasonable monthly "incubator" fees for services that were not rendered and regardless of the needs of the individual portfolio companies.  All of this created a Charybdis of undisclosed conflicts of interests, in which portfolio companies were created, and then charged fees, not for the benefit of fund investors, but to feed the voracious appetite of FDC for more and more fees to "make ends meet" so as to cover its expenses, the most prominent of which were Frost's undisclosed salary and exorbitant personal expenses.

Based on their fraudulent course of business, Frost and FMC admit to having defrauded investors and potential investors in five pooled investment vehicles that they managed, in violation of Section 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(4) and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.  Defendants' Admitted Facts and Admission of Liability Under Claim Two ("Admitted Facts," citations to which are denoted with the prefix "AF"), Dkt. No.

157-1.  Specifically, Defendants admit, based on various admitted facts, that they each violated Section 206(4) and Rule 204(4)-8 "by failing to act with reasonable care, in accordance with applicable industry standards, in communicating with investors and prospective investors in the Funds, and conducting the business of the Funds."  AF 5, 74.  In admitting liability under Section 206(4) and Rule 204(4)-8, Defendants admit all the essential elements of those violations: that the limited partnership and membership interests in the Funds, as well as the shares of stock of the portfolio companies in which the Funds invested, were securities; that each of the funds were pooled investment vehicles within the meaning of Rule 206(4)-8; that Defendants were investment advisers to each of the funds; and that they used the mails and other means of interstate commerce in defrauding investors in the Funds.  AF 6, 27, 33, 36, 74.  Most importantly, Defendants, through their admission of liability, necessarily concede that their statements to investors and prospective investors in the Funds were materially misleading and that they otherwise engaged in fraudulent, deceptive and manipulative acts with respect to investors or prospective investors in the Funds.

On October 31, 2022, the Court found that Defendants violated Section 206(4) and Rule 206(4)-8 as set forth in the Admitted Facts.  Dkt. No. 159.  Defendants' violations now established, the Commission seeks injunctive relief under Section 209(d) of the Advisers Act, which provides that "upon a showing" by the Commission that a person "has engaged, is engaged, or is about to engage" in any act or practice in violation of the Advisers Act, an injunction "shall be granted."  15 U.S.C § 80b-9(d).

Injunctive relief is clearly warranted.  Defendants admit to past violations of Section 206(4) and Rule 206(4)-8 through their wanton, reckless and conflict-laden business practices, all of which give rise to a presumption of future violations.  In light of that presumption, and considering the totality of the circumstances surrounding Defendants' past conduct, and Frost's current and future plans to continue to raise money from investors, there is a reasonable likelihood of future violations of the securities laws, thus making an injunction appropriate.

2                                          Case No. 8:19-cv-01559-SPG-JDE

## II.    STATEMENT OF FACTS[1]

### A.    FMC and Frost Data Capital

Frost formed both FMC and Frost Data Capital ("FDC") in 2011.  AF 1.  FMC, a Delaware limited liability company, was a California-registered exempt reporting investment adviser to the Funds.  AF 2.  FDC was a Delaware limited liability company. AF 3.  Frost, who had no prior experience as an investment adviser or a fund manager, owned, controlled, and was the sole manager of both FMC and FDC. AF 4.

From 2011 through 2016, FMC raised more than $63 million from high net worth individuals and trusts, who invested in the Funds as follows: the Seed Fund raised approximately $7,570,000 from roughly 30 investors in 2012; the International Seed Fund raised approximately £412,750 ($636,798) from roughly 45 investors in 2012; Fund II raised approximately $41,189,521 from roughly 74 investors in 2013-2014; the International Feeder Fund raised approximately $5,250,000 from roughly two investors in 2013-2015, which was then invested in Fund II; and Fund III raised approximately $13,440,000 from roughly 11 investors in 2015-2016. AF 5; *see also* Dkt. No. 82-1, ¶¶ 4-8.  FMC had no advisory clients aside from the Funds.  AF 7.

The Funds invested in portfolio companies created by FDC that had a purported emphasis on big data analytics and cloud computing and later, the "internet of things."

---

[1] The statement of facts is based on the Admitted Facts and the facts admitted in Defendants' Answer to the SEC's complaint, Dkt. No. 16, (denoted with the prefix "ANS."). Additional facts, necessary to provide context to the admitted facts, include references to the SEC's statement of undisputed facts in support of its motion for partial summary judgement against Defendants (Dkt. No. 44-2), the supporting declaration of Donald W. Searles and the exhibits attached thereto (Dkt. No. 44-3) ("Searles Decl."), Frost's statement of genuine disputes of material fact (Dkt. No. 82-1), and the supporting declarations of Charles E. Canter ("Canter Decl."), David B. Weekly ("Weekly Decl."), Alexander Maleki ("Maleki Decl."), and Keith Palzer ("Palzer Decl.") and the exhibits attached thereto, all of which are filed contemporaneously herewith. With the Admitted Facts, Defendants stipulated that the Court may decide the SEC's motion for injunctive relief "on the basis of affidavits, declarations, excerpts of sworn deposition testimony taken in this action, the Admitted Facts, and documentary evidence, and may draw such inferences and find such facts as the Court deems appropriate, with or without a hearing." Stipulation ¶ 4(c), Dkt. No. 157.

AF 8.  FDC started 24 portfolio companies between 2012 and 2016.  AF 9.[2]  In addition to the Funds, other investors in the portfolio companies included high net worth individuals, trusts, non-Frost funds, and affiliates of public companies.  AF 10.

FDC started, incubated, and provided support and services to the portfolio companies.  AF 11.  The portfolio companies, in turn, paid FDC monthly fees, known as "incubator fees," for those services.  AF 12.  FDC charged the portfolio companies over $19,000,000 in incubator fees.  AF 13.  Frost operated FDC on a break-even basis and was financially dependent upon the incubator fees paid by the portfolio companies because these fees were FDC's only source of revenue.  AF 14, 15.  In turn, the portfolio companies were dependent upon the Funds and other investors for the capital needed to pay their incubator fees to FDC.  AF 15.

FDC was unsuccessful.  There have been no returns to the Funds or their respective investors.  As of early 2018, only a few of the portfolio companies remained active.  AF 16.  In fact, 14 of the 24 portfolio companies never generated any revenue, the remaining ones generated only minimal revenues.  Weekly Decl., Ex. 1 (Ex. B, ¶ 14); Searles Decl., Ex. 71 (JAMS Ex. 1101) (email dated June 30, 2015 from Steve Gotz, an employee of FDC, to Frost, noting there had been 15 companies founded since 2014, 67% of which "are exhibiting/have exhibited exceptionally poor execution" and recommending the need to "right size/stratify the monthly [incubator] fee, to more accurately reflect the value we are capable of delivering for our companies.").

**B.    The Funds' Investment Committees Provided No Meaningful Protection to Fund Investors**

Once Frost and his team decided to start a new portfolio company, the matter

---

[2]  Although Frost disclosed to potential investors that he contemplated starting only two to four portfolio companies per year, in fact, Frost created 12 of the 24 portfolio companies between April 2014 and February 2015, when Frost and his family moved to Italy for a year and during which time he incurred enormous personal expenses.  *See* ANS ¶ 93; Searles Decl., Exs 11 (JAMS Ex. 28 at HOL0015092), Ex. 21 (JAMS Ex. 223 at HOL0015028); Ex. 18 (JAMS Ex. 152); Weekly Decl., Ex. 1 (Ex. B, Table 4).

would be submitted to a fund's investment committee, which determined how many portfolio companies would be created and how much a fund would invest in each newly created company.  AF 59.  The Seed Fund's operating agreement provided for the creation of an investment committee, which generally consisted of no more than five persons, selected by Frost in his capacity as manager of FMC.  AF 19.  The Seed Fund's investment committee was responsible for approving all investments presented to it by Frost, in his capacity as manager of FMC.  AF 20.

But as one of the SEC's expert noted, "[t]he Portfolio Company origination process at the Frost Funds—due to the arbitrary approach used by Frost to impose Incubator Fees—was fraught with self-dealing conflicts because the members of the Investment Committees constituted Frost himself and employees of the Incubator, for all Funds."  Palzer Decl., Ex. 1, ¶¶ 153-160.  Members of the Seed Fund's investment committee could be removed by Frost, in his capacity as manager of FMC, at his sole discretion.  AF 22.  All actions of the Seed Fund's investment committee required at least a majority vote of its members, provided, however, in the event of a tie vote, the investment decision would be made by Frost, in his capacity as manager of FMC, in his sole discretion, and all members of the investment committee would be required to vote in accordance with the determination of the manager, *i.e.*, Frost.  AF 23.  The Seed Fund's investment committee membership varied over time, and Fund II and Fund III's investment committee consisted exclusively of FDC insiders, and always included Frost.  AF 21.  Frost was the only member of Fund III's investment committee in late 2016, and was thus solely responsible for approving the fund's investment in the last two newly formed portfolio companies.  AF 60.

## C.    The Funds' Illusory Advisory Committees

The governing documents for each fund also provided for the creation of an advisory committee, generally consisting of three to five members, appointed by Frost, in his capacity as manager of FMC, which was the manager of the Seed Fund, the International Seed Fund, and the general partner of the International Feeder Fund and in

his capacity as the majority owner of the general partner of Fund II.  The governing document for Fund III provided that the limited partners, representing a majority interest, may appoint an advisory committee.  AF 24.

According to the Funds' governing documents, the duties of each of the advisory committees were substantially the same, and included: (a) consideration of any approvals sought by the manager or general partner; (b) advice regarding matters pertaining to conflicts of interest between or among the manager or general partner, any members of the manager or general partner; and (c) rendering such other advice and counsel as requested by the manager or general partner.  AF 25.

While each of the Funds' governing documents called for the establishment of advisory committees, Defendants established an advisory committee for Fund II only.  AF 26.  Even then, the advisory committee met on only two or three occasions, and no conflicts of interest were presented.  AF 26.  Frost's failure to use limited partner advisory committees was inconsistent with industry best practices.  Palzer Decl., Ex. 1, ¶¶ 177-181.

### D.    Frost's Solicitation of Investors and Prospective Investors

Frost solicited investors and prospective investors through the use of the Internet, wire and other electronic means of communication, and at in-person and group presentations.  AF 27.  Frost also made and used PowerPoint marketing presentations in soliciting investors and prospective investors.  AF 28.  Frost's PowerPoint presentation for the Seed Fund touted the "no fee" "no carry" opportunity to invest in "big data" analytics, and specifically in start-up ideas and start-up companies, approved by a majority of a fund's investment committee, and then incubated by FDC, with exits projected from 2-5 years from startup by way of an acquisition by a "major player" in the computer industry.  AF 28.

Frost provided executive summaries to investors and prospective investors, which provided a high level summary of the Frost incubator model, the investment focus of the particular fund, the deal structure, Frost's background and qualifications, and a short

description of some of the companies then being incubated.  AF 30.  Frost also provided Fund investors with quarterly status reports that generally described that quarter's acquisitions, the status or activities of the portfolio companies in which the Fund had invested, and a valuation of the investments then held.  AF 31.  Investors in the Funds also signed operating and partnership agreements that were countersigned by Frost, on behalf of the Funds' manager or general partner.  AF 29.

Frost represented to investors and prospective investors that he envisioned a highly-focused incubator model in which he would come up with ideas or identify the needs of big data companies and pass them through FDC, the incubator.  FDC would then write up a business plan and pass that plan onto a newly created portfolio company, which would obtain seed investments from the Funds or other investors.  The portfolio company would then incubate ideas into software that, ideally, would eventually lead to an "exit," either through sale of the software or the company.  AF 32.

### a.  FDC's Practices Regarding Incubator Fees Were Not Disclosed

Before December 2015 none of the PowerPoint marketing presentations to investors and prospective investors in the Funds disclosed that the portfolio companies would pay a monthly fee to FDC.  AF 38; *see also* ANS ¶¶ 64, 66.[3]  The governing documents for the Seed Fund were silent on and failed to disclose the existence of FDC incubator fees.  AF 63.  Frost's application of incubator fees to the Seed Fund's

---

[3]  While JAMS Exhibits 245 and 1446 refer to costs borne by the portfolio companies, both  are irrelevant. *See* Canter Decl., Ex. 1 (JAMS Ex. 245), Ex. 2 (JAMS Ex. 1446).  JAMS Ex. 245 is an email dated December 8, 2015, from Miles Mahoney to Bill Guerry (CFO of FDC), attaching a slide deck entitled "Frost Data Capital Accelerated Time to Market/Revenue December 2015."  At Bates No. F0126034, the document states "In the end, the FDC incubator resources are brought to bear for each of our portfolio companies.  The monthly cost to each individual company approximates the fully burdened cost of one senior executive for which the companies receive support (as needed)…"). JAMS Ex. 1446 appears to be an identical copy of the slide deck in JAMS Ex. 245.  Both are dated December 2015, well after the vast majority of investor monies were raised.  *See* AF 5.  There is no evidence these slide decks were presented to any investors or prospective investors.  And, even if they had been, the dollar amount of FDC's incubator fees are not disclosed, and the phrase "fully burdened cost of one senior executive" has no common industry meaning.  *See* Palzer Decl., Ex. 1, ¶ 124.

portfolio companies, without proper disclosure to investors, breached industry standards and practices. Palzer Decl., Ex. 1, ¶¶ 80, 82, 96-98.

The Funds' quarterly reports distributed to investors did not disclose the incubator fees paid by the portfolio companies or their amounts. AF 62. The Fund II advisory committee, the only fund that had an advisory committee, did not receive disclosures about the incubator fees paid by the portfolio companies or their amounts. AF 64.

### b. The Dollar Amount of FDC's Incubator Fees Were Not Disclosed to Fund Investors and Were Excessive

The incubator fees paid by the portfolio companies were initially fixed at a flat rate per month. AF 67. In most instances, the initial fees that FDC charged to portfolio companies were fixed at $30,000 to $40,000 per month and generally would not change unless the company could no longer pay the fee, or received outside funding where the outside investor could provide leverage for the portfolio company to negotiate a lower fee. Weekly, Ex. 1 (Ex. B, ¶ 66. Table 5); Searles Decl., Ex. 44 (JAMS Ex. 766) (email dated February 7, 2017, from Guerry, CFO of FDC, to Marcum, the Funds' outside auditor). Unless a portfolio company successfully renegotiated its fees, portfolio companies that moved out of FDC's offices paid the same as portfolio companies that used FDC's space and incubator fees were not adjusted based on the number of employees at a portfolio company. AF 68; Weekly Decl., Ex. 1 (Ex B, ¶ 69). Frost and FDC did not conduct any analysis, accounting, market studies, or seek the advice of experts in determining the reasonableness of the incubator fees FDC charged portfolio companies and whether such fees were at or below "market rate." AF 65.

FDC charged incubator fees from the moment a portfolio company was formed, even if the company had no CEO or employees. Searles Decl., Ex. 99 (Frost SEC Depo. Tr. at 37:22-38:11; 42:16-43:15) (Frost admitted that incubator fees were imposed on portfolio companies from the moment of their creation). This conduct, too, violated industry standards. Maleki Decl., Ex. 1, ¶ 21. Worse, however, Frost, through FDC, imposed the fees upon portfolio companies at the moment their creation, not for the

benefit of the companies or the Funds and their investors, but for the benefit of FDC. Searles Decl., Ex. 70 (JAMS Ex. 1097) (email dated January 25, 2015, from Guerry to Frost, where Guerry states he advised Miles Mahoney, a FDC insider who challenged how FDC charges incubator fees, that "starting the companies with an incubator allocation is required for us to meet our expenses."). The Funds' governing documents, pitch materials and quarterly statements did not disclose to investors or prospective investors in the Funds that FDC charged incubator fees from the moment a portfolio company was formed, even if the company had no CEO or employees. AF 66.

Not only was Frost's practice of charging portfolio companies incubator fees regardless of need not disclosed, Frost led investors to believe just the opposite: that any costs to the portfolio companies for FDC's services would be determined on a case-by-case basis or allocated proportionally based on the services actually received by each company from FDC. Indeed, prevailing industry practice in relation to allocation of shared services is to document a methodology for allocating costs between different funds and portfolio companies. Palzer Decl., Ex. 1, ¶ 151. The governing documents for Fund II disclosed that FDC "may" receive a monthly service fee from the companies in which the partnership holds an investment in exchange for certain shared advisory and support services provided by FDC. AF 39; Searles Decl., Ex. 7 (JAMS Ex. 2) (Fund II Limited Partnership Agreement ("LPA"), § 6.1(c)). The governing documents for Fund II further disclosed that the service fee would not reduce the 2% management fee payable to the general partner so long as the fee does not exceed reasonable market rates. AF 42; Searles Decl., Ex. 7 (JAMS Ex. 2) (Fund II LPA, § 6.1(c)). The executive summary for Fund III was silent on incubator fees. AF 42. The governing documents for Fund III disclosed that the portfolio companies in which the fund invested would enter into agreements with FDC pursuant to which each of the companies would reimburse FDC a monthly amount for its share of the cost of resources provided by FDC [to the Portfolio Company] for shared facilities, shared personnel, and other shared resources. AF 40. The plain reading of Fund II and Fund III investment contracts

required incubator fees to be proportional to the services rendered.  Palzer Decl., Ex. 1,
¶ 113.

Frost provided Hollencrest Bayview Partners, L.P. ("Hollencrest"), one of the
investors who brought counterclaims against Frost and FMC in the JAMS arbitration
proceedings, an executive summary before it invested in the Seed Fund and Fund II.
That summary stated that the two funds "will *not* be expected to cover expenses and
salaries incurred by FDC, which is a completely separate corporate entity."  Dkt. No.
44-2, ¶ 36; Searles Decl., Ex 112 (JAMS Ex. 1078).  It further stated that any fees
would be determined "on a case-by-case basis" and would be "adjusted based on the
individual needs of each company as their business matures."  *Id.* The summary also
claimed that "FDC's policy will be to only charge for services that the startup
companies would require in the normal course of business," which "should mean that
the startups receive higher quality services at a lower price than they would otherwise
be able to afford (due to Frost VP's ability to provide economies of scale)." *Id.*

In reality, the fees charged to the portfolio companies were not based on the
company's share of the cost of resources provided by FDC to the portfolio company for
shared facilities, shared personnel and other shared resources, and no effort was made to
allocate the time FDC's staff spent working on tasks for the different portfolio
companies.  AF 41, 69; Maleki Decl., Ex. 1, ¶¶ 16, 20 (FDC disclosed to at least some
investors that fees would be determined on a case-by-case basis, consistent with
industry standards; however, FDC charged portfolio companies a fixed monthly fee of
roughly $40,000 regardless of whether services were provided, and failed to keep track
of, or itemize, services provided).

In many instances, the service agreements providing for the payment of the
incubator fees were signed by Frost, as CEO of the portfolio company, and by Bill
Guerry, FDC's CFO, before the portfolio company was officially formed.  In those
instances, the fees were not negotiated on a case-by-case basis. AF 71; *see also* Weekly
Decl., Ex 1 (Ex. B, ¶ 23(a) (Frost or Guerry signed service agreement on behalf of the

portfolio companies on at least 18 out of 24 occasions; Searles Decl., Ex. 59 (JAMS Ex. 853) (example of services agreement signed by Frost and Guerry), Ex. 60 (JAMS Ex. 855) (same). Frost did not disclose to fund investors that the service agreements were signed by Frost and Guerry or that the amount of the incubator fees had not been negotiated at the time the service agreements were signed. Searles Decl., Ex. 99 (Frost SEC Depo. Tr. at 263:2-16); Maleki Decl., Ex. 1 ¶ 19 (service agreements signed by Frost and Guerry cannot be characterized as an "arms' length" transaction and violated standard industry practice).

Frost's conduct with respect to the fees went beyond mere non-disclosure to active concealment. Internal emails confirm as much. An email dated March 4, 2016, from Guerry to Frost reported that "we have been giving [an investor] information he has requested but not in enough detail for him to be able to separate out the related party payments (incubator fee)." Canter Decl., Ex. 3 (JAMS Ex. 1111). Indeed, Frost admitted, both in his JAMS arbitration testimony and in his deposition in this action, that when fund investors wanted to know the amount of FDC's incubator fees, Frost refused to provide the requested information. Searles Decl., Ex. 94 (excerpts of Frost Arbitration Tr. Day 8) at 1837:1-1838:11; 1843:7-1844:8; Ex. 99 (Frost SEC Depo. Tr. at 149:13-22, 154:23-157:3, 157:12-158:1).

Finally, the fees Frost and FDC charged weakened the financial conduction of the portfolio companies and negatively impacted their ability to raise capital. AF 46; *see also* Maleki Decl., Ex. 1, ¶ 8; Weekly Decl., Ex. 1 (Ex. B, ¶ 80). Several CEOs of the portfolio companies voiced their concern to Frost and other members of FDC's management over the incubator fees. AF 43. Some of the CEOs of the portfolio companies attempted to negotiate the amount of the incubator fees. Frost told at least one CEO that the incubator fees were "prix fixe," not "a la carte." AF 45. Moreover, cancellation of the service agreements required 180 days' notice. As a result, once a CEO was hired for a new portfolio company, the company was burdened with a non-negotiable, non-cancellable fee for at least six months. AF 72; *see also* Maleki Decl.,

Ex. 1, ¶ 25 (non-cancelable service agreements are inconsistent with industry practices and would require portfolio companies to incur roughly $200,000 to $240,000 in incubator fees while in the process of cancelling such fees and, presumably, receiving no services during the 180-day notice period).

### E.    Undisclosed and Excessive Management Fees

The governing documents for the Seed Fund or the International Seed Fund did not disclose or authorize the payment of management fees.  AF 18, 53.

The executive summary for the Seed Fund stated:

*Note that the [Seed Fund] will not be expected to cover expenses and salaries incurred by FDC, which is a completely separate corporate entity. It is expected that services provided from the incubator to the startup companies will be agreed to between the boards of each individual company and FDC on a case-by-case basis and expected to be adjusted based on the individual needs of each company as their business matures. FDC's policy will be to only charge for services that the startup companies would require in the normal course of business. In general, this should mean that the startups receive higher quality services at a lower price than they would otherwise be able to afford (due to Frost VP's ability to provide economies of scale).*

AF 52; Canter Decl., Ex. 4 (JAMS Ex. 818 at F0090721) (FVP Executive Summary);

From 2012-2014, FMC charged the Seed Fund $324,280 and the International Seed Fund $24,875.  AF 54.  Although the executive summary of the Seed Fund informed investors that the fund would not be expected to cover expenses and salaries incurred by FDC, in fact, Frost charged the Seed Fund $16,000 per month for his salary at FDC, which was called "management services" in FMC's books from June 2011 through September 2013.  *See*, *e.g.*, Searles Decl., Ex. 42 (JAMS Ex. 748); Searles Ex. 99 (Frost SEC Depo. Tr. at 76:18-77:3 (Frost admitted that he charged part of his salary at FDC to the Seed Fund, as an operating expense of the fund); Canter Decl., Ex. 5(JAMS Ex. 747); Ex. 6 (Guerry JAMS Depo. Tr. at 501:16-504:16) (admitting that, at

Frost's direction, he charged $16,000 month to the Seed Fund as a management fee to cover a portion of Frost's salary at FDC)).  This charge stopped only when Frost began receiving a 2% management fee from Fund II in October 2013.  Canter Decl., Ex. 6 (Guerry JAMS Arb. Tr. at 1438:5-1439:11) (practice of charging a portion of Frost's salary at FDC to the Seed Fund stopped when Fund II started)); Weekly Decl., Ex. 1 (Ex. B, ¶ 19, n. 12 ($256,000 charged to Seed Fund for Frost's FDC salary during 2012-2014).

Fund II and Fund III cumulatively paid management fees totaling over $1.7 million.  AF 47.  In addition to the fact that Frost and FDC did not conduct any analysis, accounting, market studies, or seek the advice of experts in determining the reasonableness of the incubator fees FDC charged portfolio companies and whether such fees were at or below "reasonable market rates," AF 65, FDC's incubator fees were, in fact, excessive, and therefore should have reduced Fund II's 2% management fee to zero pursuant to the language of Fund II's governing documents.  Weekly Decl., Ex. 1, ¶ 15 (concluding that the Funds paid $12,798,195 in excessive incubator fees to FDC through December 31, 2017, including $9,413,262 in excessive fees paid by Fund II which should have been deducted from Fund II's management fees); Maleki, Ex. 1, ¶¶ 13, 16 17 (FDC's practice of charging flat rate incubator fees regardless of company need violated industry standards and resulted in payment of excessive fees by portfolio companies to FDC); Palzer Decl., Ex. 1, ¶¶149-152, 169-170 (lack of procedures for determining reasonable market rates for services constituted material breach of duty of care).

## F.    Snow Data Capital

Frost also was part owner of a second incubator-related company, Snow Data Capital ("SDC").  ANS ¶ 83.  SDC was created in 2014 to provide marketing services to the portfolio companies.  AF 48.  FDC's overall incubator fees included SDC's marketing fees.  AF 50.  SDC was created, in part, to provide employment to one of Frost's long-term former employees who needed to be associated with SDC for

immigration purposes.  Rather than making his former colleague an employee of FDC, which already provided certain marketing services, Frost created SDC and separately charged certain portfolio companies additional fees for services provided by SDC. Some of the portfolio companies were charged an additional $5,100 per month for SDC's services.  AF 49.[4]  Frost never disclosed to the Funds' investors the existence of SDC or its fees.  AF 51.

### G.    Frost's Undisclosed Compensation at FDC and Payment of Frost's Personal Expenses, Including a One-Year Holiday in Italy

Frost set his own compensation, and his compensation from 2012-2016 was at least $3.4 million.  AF 55.  The amount of Frost's salary at FDC was not disclosed to investors or prospective investors in the Funds.  AF 55; *see also* Searles Decl., Ex. 99 (Frost SEC Depo. TR at 227:9-19; 228:9-14; 228:15-230:1) (Frost's salary at FDC in 2012 and 2013 was approximately $250,000 per year, which he did not disclose to Seed Fund investors; once Fund II was created Frost increased his salary to approximately $1.2 million in 2014 and 2015, which was not disclosed to Fund II investors)); Palzer Decl., Ex. 1, ¶ 134 (manager salary paid out of portfolio company expenses must be specifically authorized in investment contracts, or specifically disclosed in writing to investors), ¶¶ 140-143 (opining that Frost's FDC salary of approximately $3.35 million from mid-2012 until 2015 was excessive).

Through March 2017, the Funds, through their investments in the portfolio companies, paid Frost at least $2,983,685 of Frost's gross wages at FDC.  Weekly Decl., Ex. 1, (Ex. B ¶ 24).  In all, Frost's compensation from FDC and Funds through March 2017 was $4,761,972.  *Id.*, ¶ 55,

FDC paid over $867,000 for a number of expenses including a wine locker, an

---

[4] Those fees were charged regardless of whether the portfolio companies needed or utilized SDC's services.  Palzer Decl., Ex. 1, ¶ 144, n. 162.  In return, SDC paid $4,000 per month for rent and bookkeeping to FDC. *Id.*, n. 163; *see also* Canter Decl., Ex. 8 (Cary Breese JAMS Depo. TR at 220;23-222:6); Ex. 9 (John Burke JAMS Depo. TR 29:10-31:19); Ex. 10 (Doug Lawson JAMS Depo. TR 34:9-35:9).

archery range, boat payments, and a beach club membership, as well as Frost's personal chef, housekeeper, lease payments on luxury cars and payments for charges (averaging a total of $18,000 a month) made on personal credit cards.  AF 56.  After FDC paid for the personal chef, housekeeper, automotive lease payments, and payments for charges made on personal credit cards, FDC reduced the compensation paid to Mr. Frost to cover the expenditures.  AF 56.

In addition, Frost deducted hundreds of thousands of dollars in personal expenses from his portion of the 2% management fee chargeable to Fund II (including payments for villas in Italy, private school for his children in Florence, Italy, lease payment on a Ferrari and Mercedes, and chartered airfare for himself and his family while vacationing in Italy for a year) reducing his otherwise taxable partnership income in 2014 to just $3,303, and to just $24,385 for the years 2013 through 2015.  Searles Decl., Ex. 43 (JAMS Ex. 754); Weekly Decl., Ex. 1 (Ex. B , ¶¶ 54, 57]; Palzer Decl., Ex. 1, ¶ 147 (opining that Frost's expenses do not appear to have been reasonable and necessary for management of the Funds or the portfolio companies, and are thus likely personal expenses).

Because FDC's incubator fees were not at "reasonable market rates" and were excessive, they should have been deducted from Fund II's management fee, thereby reducing the management fee to zero, and thus providing no basis for Frost to deduct his various personal expenses from Fund II's management fee.  *See* Weekly Decl., Ex. 1, ¶¶ 22-23.

In June 2014, shortly after starting five new portfolio companies, Frost moved his family to Italy for a year.  Being physically, and nine time zones, away for one year made it difficult, if not impossible, for Frost to mentor any of FDC's portfolio companies.  Palzer Decl., Ex. 1, ¶¶ 182-184 (Frost's failure to devote necessary and appropriate time to the Funds while on his year-long trip to Italy should have triggered a "Suspension Event Notice" under 8.3(a) of Fund II limited partnership agreement).  Frost's own retained expert testified that Frost's move to Italy was less than ideal.

Canter Decl., Ex. 11 (Andrew Ackerman SEC Depo. TR. at 274:1-275:7 ("My personal opinion based on the start-ups I've worked for is that I prefer to be in the same room.  I find that communications are faster and more effective that way.").  Frost also lied to an investor, when asked, two weeks before his departure, about a rumor that Frost was moving to Italy.  Frost denied the move and indicated that his family was "spending time in Florence this summer."  By that time, Frost has already paid the enrollment fees for his children to be schooled in Italy for the following year.  Searles Decl., Ex. 77 (JAMS Ex. 1135), Ex. 41 (JAMS Ex. 653), Ex. 39 (JAMS Ex. 525); *see also* Canter Decl., Ex. 12 (JAMS EX. 525) (investor complaining about Frost's lack of communication while in Italy, "[u]nequivocally you could add more value being on the ground rather than a continent away.").

## H.    The Creation of Portfolio Companies "To Make Ends Meet"

Frost created portfolio companies, in part, to generate cash flow for FDC.  Searles Decl., Ex. 99 (Frost SEC Depo. Tr. at 277:5-25, 279:22-282:21).  Emails show that Frost and FDC's CFO [Bill Guerry], discussed that new companies and the resultant incubator fees were needed to make ends meet.  AF 58.  For example, in an email dated June 10, 2016, Frost told FDC's CFO that it was "critically important to get the incubator to break even ASAP."  Frost also told FDC's CFO that "to achieve this we need to … start a few new companies ASAP" and also "move costs to the newcos [new portfolio companies] by assigning some of our incubator execs as CEO/CTO."  AF 58; Searles Decl., Ex. 52 (JAMS Ex. 796).[5]  These motives were never disclosed to

---

[5] This was not an isolated instance.  *See* Searles Decl., Ex. 45 (JAMS Ex. 773) (email dated April 9, 2014, where Frost asks Guerry, "Just for kicks – Can you do a refresh of the fund cash flow assuming 12 new companies between now and July?"); Eight days later, the Fund II investment committee approved  $250,000 investment in each of five new portfolio companies.  Canter Decl., Ex.13 (JAMS Ex. 152).  *See also* Searles Decl., Ex. 46 (JAMS Ex. 774) (email dated May 20, 2014 from Guerry to Frost, "Right now we need 2 more companies to cover out [sic] costs (with Genie coming out in June"); Ex. 49 (JAMS Ex. 780) (email dated March 29, 2015 from Guerry to Frost, "We need one more company to cover the plan for the rest of the year…"); Ex. 69 (JAMS Ex. 1090) (email dated July 14, 2014 from Guerry to Frost, "As of my last budget forecast, we were running a bit tight given the lack of a second

investors in the Funds.  *See* Palzer Decl., Ex. 1, ¶¶ 158-160; Weekly Decl., Ex. 1 (Ex. B, ¶¶ 45, 60) (instead of the incubator's staffing and related cost structure being determined based on the services provided to the portfolio companies according to their needs at market-based rates, the incubator started portfolio companies and charged them varying, judgmentally-approved amounts necessary to recover its costs).

One the last investors in the Funds was DST, who invested $5 million in Fund III in the second half of 2016, and intended to invest additional sums, on the understanding that Frost and DST would work together to identify and create a new companies designed to address DST's business interests.  Instead, Frost used some of DST's monies to create and fund three new companies that DST was not aware of and had not approved, and FDC immediately began to charge them incubator fees.  Frost, as the sole member of Fund III's investment committee, was solely responsible for the decision to

new company in the latest batch."); Ex. 73 (JAMS Ex. 1103) (email dated September 24, 2015 from Guerry to Frost, "That will leave $40-50K available. We really need to start a couple of companies."); Ex. 79 (JAMS Ex. 1203) (email dated June 8, 2016 from Frost to Guerry, "New companies would be incredibly helpful in terms of incubator cash flow."); Numerous exhibits also demonstrate that new portfolio companies were started and new investments were made in existing companies shortly after the dates of these "need to make ends meet" emails and, in several cases, were funded in order to cover Frost's expenses in Italy.  *See* Canter Decl., Ex.14 (JAMS Ex. 157) (IC minutes dated June 14, 2014 approving $1.45 million in new investments in six companies); Ex. 15, (JAMS Ex. 1091) (July 22, 2014 email from Guerry to Frost, noting cash at incubator was low, partially due to $78,000 in Frost's "black card" expenses while Frost was in Italy), Ex. 16 (JAMS Ex, 161) (IC minutes dated July 22, 2014  approving $125,000 investments in each of three recently created companies); Ex. 17 (JAMS Ex. 775) (email dated July 25, 2014, from Guerry to Frost, advising  Frost that he had already used his allocation of the GP management fee allocation for the year with the deposit of $125,000 "for the airplane," "may need to cover some of the expenses with the incubator" and hoping that travel expenses won't be recurring "as we won't have enough in the incubator to cover that level of expense"); Ex. 18 (JAMS Ex. 162) (IC minutes dated July 31, 2014, approving $250,000 investments in each of two newly formed portfolio companies); Ex. 19 (JAMS Ex. 776) (email dated July 25, 2014, tallying Frost's expenses in Italy at over $370,000, exceeding his portion of the GP management fee by over $80,000); Ex. 19 (JAMS Ex. 1092) (email dated July 30, 2014, Frost asking Guerry if the incubator was in a position to make a $100,000 payment to cover his chartered air travel in Italy); Ex. 21 (JAMS Ex. 777) (email dated August 26, 2014, from Shital Patel to Guerry reporting that the incubator "doesn't have more cash" because it picked up Frost's $100,000 chartered airfare expense);, Ex. 22 (JAMS Ex, 779) (email dated December 9, 2014 from Guerry to Frost, stating FDC's operating expenses have increased, partly due to "the Europe costs."); Ex. 23 (JAMS Ex.174) (IC minutes dated December 22, 2014, approving new investments) to

create and fund those new companies. AF 60; Weekly Decl., Ex. 1, ¶ 17 (FDC founded three new companies in the fourth quarter of 2016 (NewCo 25, aka Swarm Engineering, Inc., Frost NewCo 26 and Frost NewCo 27), and collectively charged them $1,554,000 in fees, of which $565,000 was paid, using funds from Fund III, in which DST had invested). *See also* Searles Decl., Ex. 38 (JAMS Ex. 514) (email dated November 4, 2016 from Tom Giles (a FDC employee) to Frost, stating that DST was "upset" and "worried that we are spending their money on companies they know nothing about"); Ex. 50 (JAMS Ex. 794) (email dated February 17, 2017 email from Tom Giles to Frost: "[DST] [v]ery pissed about investing and starting 2 Newco's without their knowledge feels very sneaky to them…[l]ots of money spent and do not have a clear picture on what."); Ex. 52 (JAMS Ex. 796) (email dated June 10, 2016 from Frost to FDC management: "[i]t's critically important to get the incubator to break even ASAP. To achieve this we need to: …Start a few new companies ASAP…with DST investment"); Canter Decl., Ex. 24 (JAMS Ex. 836) (email dated February 27, 2017, from Tom Giles to Frost: "Dst is still not understanding the approval of 2 new co's without any approval process beyond stuart and what fees are being used for if no employees in companies."); Ex. 28 (JAMS Ex. 1088)  (letter dated March 22, 2017 from DST to Frost: "DST is shocked about the size and frequency of the 'management fee' being charged by your management company in relation to the limited, if any value, being added to the process."); *also* Weekly Decl., Ex. 1, ¶ 17 (concluding that of the $565,000 in fees paid by the three new companies, $540,000 was excessive, noting, in part, that NewCo 27 had no revenues and no employees; and NewCo 26 had no revenues and only one employee).[6]

---

[6] Following receipt of DST's funds, Fund III also invested $522,000 in Pinscriptive, at least $83,000 of which was used by Pinscriptive to pay down loans it owned to FDC, another $36,000 was used to pay incubator fees invoiced on April 15, 2016, and another $5,100 was used to pay SDC fees. Weekly Decl., ¶ 9.  Those payments caused Mark Lelinski, the CEO of Pinscriptive, to write an email to Frost on July 27, 2016, telling Frost "DST will be PISSED if they find out you gave us $500k and within days we used $200k to pay Frost for "phantom past debt."  Searles Decl., Ex.

### I.    Defendants' Admission of Having Engaged in Fraudulent Conduct

In admitting liability, Frost and FMC necessarily admit that their communications with Fund investors and prospective investors were materially misleading and that they otherwise engaged in fraudulent course of business with respect to investors and prospective investors in the Funds.[7]

### III.    AN INJUNCTION SHOULD BE ENTERED AGAINST DEFENDANTS

In violation of Section 206(4) and Rule 206(4)-8(a)(1), Frost and FMC repeatedly defrauded investors in the Funds by failing to disclose the existence of and/or the amount of FDC's incubator fees, thus making the Funds' governing agreements, pitch materials, annual financial statements, and quarterly reports materially misleading. Additionally, in violation of Section 206(4) and Rule 206(4)-8(a)(2), Frost and FMC engaged in deceptive conduct by charging undisclosed and improper incubator and management fees, starting new portfolio companies motivated, at least in part, if not exclusively, for the purpose of generating additional incubator fees "in order to make ends meet," and by failing to disclose the amount of Frost's exorbitant salary at FDC (which was largely paid by Fund investors), or his use of the Funds and FDC's resources to pay his personal expenses, including his exorbitant expenses while he was Italy for a year.  Based on Defendants' years long fraudulent course of conduct an injunction is clearly warranted.

### A.    Standard for Issuance of an Injunction

Section 209(d) of the Advisers Act provides that upon a showing by the Commission that a person has engaged, is engaged, or is about to engage in any act or

---

62 (JAMS Ex. 936); Canter Decl., Ex. 11 (Lelinski JAMS Depo Tr. 51:2-58:18) ("phantom debt" referred to accrued, uppaid incubator fees when Pinscriptive was "hibernating").

[7] *See also* Searles Decl., Ex. 101 (JAMS Respondents' Compendium of Declarations and Exhibits In Support of Request for Punitive Damages) (Fund investors were not informed of the incubator fees and would not have invested if they had known of the incubator fees or their magnitude, or that Frost would draw a salary through, and charge expenses to, FDC).

practice in violation of the Advisers Act, a permanent or temporary injunction shall be granted.  15 U.S.C § 80b-9(d).  To obtain an injunction, the SEC has the burden of showing that there is a reasonable likelihood of future violations of the securities laws. *SEC v. Murphy,* 50 F. 4th 832, 851 (9th Cir. 2022); *SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996).  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  "The existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Murphy*, 50 F. 4th at 851; *Murphy*, 626 F.2d at 655.  In predicting the likelihood of future violations a court must assess the totality of the circumstances, considering such factors as degree of scienter involved, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of the conduct, the likelihood, because of defendant's professional occupation, that future violations might occur, and the sincerity of assurances against future violations.  *Id*.  Here, the application of each of those factors demonstrate that injunctive relief is appropriate.[8]

First, there is no question about the culpability of the Defendants as they expressly admit that they violated Section 206(4) of the Advisers Act and Rule 206(4)-8 by making untrue statements of material fact and otherwise engaging in fraudulent, deceptive and manipulative acts with respect to Fund investors and prospective investors.

While Defendants admit that they negligently defrauded investors in the Funds, the Court need not conclude that Defendants' conduct was merely negligent.  Dkt. No. 157 ("Court . . . may draw such inferences and find such facts as the Court deems appropriate"); *see also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781–82 (5th Cir. 2017) ("At the remedies stage, trial judges may make factual findings . . . ."); *Murphy*, 50 4th at 851 (affirming district court's decision to discredit defendant's

---

[8] The SEC will seek monetary relief, in the form of disgorgement, prejudgment interest, and civil penalties, by subsequent motion.  *See* Order, Dkt. No. 159.

assurances against future wrongdoing in imposition of injunction).

Indeed, Frost's conduct was both deliberate and deliberately deceptive. Frost charged a portion of his salary at FDC to the Seed Fund, in direct contravention of the Seed Fund's governing documents. Following the launch of Fund II, which raised over $41 million from investors, Frost arbitrarily increased his salary at FDC from $250,000 per year to $1.2 million, which was in addition to his portion of the 2% management fee Fund II charged investors. Frost never disclosed his FDC salary to Fund investors, even though his salary was paid through the incubator fees FDC charged to its portfolio companies, which fees, in turn, were funded, either exclusively or in large part by investments by the Funds.

Defendants also charged FDC's portfolio companies $30,000 to $40,000 in monthly incubator fees without any determination whether such fees were market rate, and regardless of the needs or development stage of the portfolio companies. Nor were those fees negotiated on a case-by-case basis, as Frost represented they would be; rather, in most instances, service agreements were signed by Frost and Guerry (FDC's CFO) immediately upon fund investment committee approval and before the portfolio company had a CEO or any operations. As Guerry explained to Marcum, the Funds' outside auditors, FDC's flat rate fees were adjusted downward only when outside investors (other than the Funds) demanded they be reduced as a condition of investing. *See also* Canter Decl., Ex. 6 (Guerry JAMS Depo. Tr. at 982:4-19), Ex. 27 (JAMS Ex. 1112) (outside investor in Veracity, one of the portfolio companies, demanded FDC fees be eliminated as condition of investing).

In addition, in order to make ends meet at the incubator, Defendants created additional portfolio companies, motivated—at least in part, if not exclusively—for the purpose of charging incubator fees, thus placing the interests of the incubator ahead of the interests of the Funds or the Funds' investors. None of these practices were disclosed to Fund investors. In fact, when investors in the Funds demanded to know the amount of the incubator fees FDC charged its portfolio companies, Frost knowingly and

intentionally refused to provide that information, even though such information was routinely provided to outside investors (other than investors in the Funds), in considering whether to invest in one or more of the portfolio companies.

Nor can this deliberate course of conduct be dismissed as an innocent part and parcel of Frost's "unique incubator model."  Rather than being an incubator of lucrative new ideas, that so-called "model" was simply an incubator of both securities fraud and tax fraud.  *See* Palzer Decl., Ex. 1. ¶ 122 ("the 'unique Frost model' contorts two adequate industry models (VC incubation and investment management industry), into one conflict-ridden structure, with no cost allocation process or documentation services. This yielded—without justification or disclosure—excessive prices for services.").

Frost's fraudulent course of conduct went on for years, from 2011 through 2016, during which time Frost used investor monies to pay for his and his family's year-long sojourn in Italy, complete with luxury Tuscan villas, chartered air travel, and private school for his children in Florence, as well as more domestic amenities back home, such as a Ferrari, an archery range, a yacht, a beach club membership, and a personal housekeeper. *Cf. SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 830-31 (S.D. Cal. 2021) (noting that defendant's violations extended to multiple transactions of a period of six years), *aff'd sub nom. SEC v. Murphy*, 50 F.4th at 851.

Furthermore, even if Defendants' conduct were simply negligent, an injunction remains warranted.  As the Ninth Circuit has explained, "considering the purposes of injunction, to assure compliance with the Act, and to protect the public against future noncompliance, … [there] is no reason to require a finding of specific intent to defraud as a predicate for an injunction under Section 17(a)(2)."  *SEC v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979) (collecting cases); *see also SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 195 (1963) ("Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure and actual injury to the client."); s*ee also Murphy*, 626 F.2d at 656 ("The fact that [defendant] violated the requirements once when he did not intend to

do so is sufficient to justify the conclusion that he might do so again, even if the court believed he was sincere in his protestations to the contrary."); *In re Washington Public Power Supply System Sec. Litigation*, 823 F.2d 1349, 1352 (9th Cir. 1987) ("negligence—and not scienter—suffices to support a SEC injunction action under sections 17(a)(2) and (a)(3)"). Indeed, courts also routinely impose permanent injunctions under Section 206(4) of the Advisers Act, which is the basis for Frost's admission of liability. *See, e.g.*, *SEC v. Smith*, No. 93-CV-74410-Dt, 1995 U.S. Dist. LEXIS 22352 at *20 (E.D. Mich. Jan. 6, 1995); *see also SEC v. Moran*, 944 F. Supp. 286 (WS.D.N.Y. 1996) (imposing injunction under Section 206(2), based on defendant's negligence, noting defendant's conduct "demonstrate a business practice lacking diligence.").[9]

More importantly, Frost has an expressed interest in engaging in securities offerings in the future, thereby creating a clear risk of future violations. *RMR Asset Mgmt.*, 553 F.Supp. 3d at 828 & 830 (defendants' continued involvement in securities business indicated a likelihood of future violations), *aff'd*, *Murphy*, 50 F.4th at 851; *see also SEC v. Fehn*. 97 F.3d 1276. 1296 (9th Cir. 1996) (upholding injunction where defendant engaged in single securities act violation, did not intend to violate the securities law, and gave "sincere assurances of an intent to refrain" from future violations, but whose professional occupation "tend[ed] to suggest a risk of future violations"); *SEC v. Capital Cove Bancorp*, No. 8:15-cv-980-JLS-JCx, 2018 U.S. Dist. LEXIS 245380, at *10 (C.D. Cal. Jan. 17, 2018) (defendant's occupation helps to "point to [a] strong likelihood of future violations"); *SEC v. Alexander*, 115 F. Supp. 3d 1071

---

[9] Courts also routinely impose permanent injunctions enjoining future violations of the registration provisions of Section 5 of the Securities Act [15 U.S.C. § 77e], and the broker registration provisions of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o], both of which are strict liability statutes. *See, e.g., RMR Asset Mgmt.*, 553 F. Fupp. 3d at 827-29 (acknowledging that a Section 15(a) violation does no require proof of scienter but imposing injunction against future Section 15(a) violations), *aff'd*. 50 F.4th at 851; *SEC v. Alliance Transcription Servs.*, No. CV 08-1464-PHX, 2009 U.S. Dist. LEXIS 11840, at * 19 (D. Az. Dec. 18, 2009) (imposing injunctions against violations of Section 5).

(N.D. Cal. 2015) (in predicting the likelihood of future violations, the Court considers the likelihood that future offenses might occur due to defendants' occupations).

For all these reasons, the SEC submits that Defendants should be enjoined.

## B.     The Bad Actor Provision

Rule 506(d) provides, in relevant part, that no exemption from registration shall be available for a sale of securities if the issuer, or any director, executive officer, or other officer participating in the offering is "subject to any order, judgment, or decree of any court of competent jurisdiction, entered within five years before such sale, that at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice … [i]n connection with the purchase or sale of any security …or…[a]rising out of the conduct of the business of … an investment adviser." 17 C.F.R. § 230.506(d)(1)(ii)(A) & (C).

It is the SEC's understanding that Frost seeks to avoid an injunction solely to avoid triggering Rule 506(d)'s bad actor provision.  In other words, he has every intention of engaging in the offer and sale of unregistered securities, if given the opportunity to do so.  As previously discussed, this is a strong reason for why an injunction should issue.

Nor is the "bad actor" provision a death knell to Frost's ability to raise money from investors, or would otherwise prevent Frost from engaging in his line of work. Should he choose to associate himself with an issuer as a director, officer, general partner, managing member, or 20% shareholder, that issuer would be free to offer securities in transactions not involving a public offering pursuant to Section 4(a)(2) of the Securities Act.  15 U.S.C. § 77d(a)(2).  Section 4(a)(2), also known as the "private placement" exemption, allows an issuer to raise an unlimited amount of capital in private transactions from sophisticated investors who are able to fend for themselves. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953); *SEC v. Murphy*, 626 F.2d 633;

SEC Release No. 33-4552 (Nov. 6, 1962).[10]

**C.     Follow-On Administrative Relief**

The issuance of injunction will also enable the SEC's Division of Enforcement to initiate an administrative proceeding against Frost, to be adjudicated before an administrative law judge, in which the Division of Enforcement would seek to bar Frost from associating with an investment adviser, as well as other market participants, pursuant to Sections 203(e) and (f) of the Advisers Act, and where Frost would have a panoply of discovery and procedural rights to contest that proceeding.  Such administrative relief is in the public interest, and is important for the protection of investors, should Frost attempt to engage the business of advising others as to the value of securities, or as to the advisability of investing, in, purchasing, or selling securities. [11] The Commission considers conduct involving fraud to be particularly serious, which weighs in favor of barring Frost from participation in the securities industry to the fullest extent possible.  *See*, *e.g.*, *Peter Siris*, Exchange Act Release No. 71068, 2013 SEC LEXIS 3924, at *23 (Dec. 12, 2103), *pet. denied*, 773 F.3d 89 (D.C. Cir. 2014) (the Commission has "repeatedly held that 'conduct that violates the antifraud provisions of the securities laws is especially serious and subject to the severest sanctions under the securities laws.'") (citation omitted).

**IV.     CONCLUSION**

For all the foregoing reasons, the SEC respectfully requests that Frost and FMC be enjoined from future violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

---

[10] Alternatively, in transactions involving public offerings, any issuer that Frost may be associated with in a covered capacity would be free to offer securities provided those securities are registered.  In that event, the issuer would have to pay a nominal registration fee pursuant to Section 6(b) of the Securities Act (currently $110.20 per $1,000,000 of the maximum aggregate price at which the securities are proposed to be offered), and file a registration statement with the Commission.  Typically, the type of registration statement used for an initial public offering will be a Form S-1 registration statement.

[11] *See* 15 U.S.C. §§ 80b-2(11) (defining "investment adviser"), (17) (defining term "person associated with an investment adviser").

Dated:  January 25, 2023

　　　　　　　　　　　　　　　　　　　　　*/s/ Donald W. Searles*
　　　　　　　　　　　　　　　　　　　　　DONALD W. SEARLES
　　　　　　　　　　　　　　　　　　　　　DOUGLAS M. MILLER
　　　　　　　　　　　　　　　　　　　　　CHARLES E. CANTER
　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　　　　Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On January 25, 2023, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS STUART FROST AND FROST MANAGEMENT COMPANY, LLC** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  January 25, 2023              */s/Donald W. Searles*
                                     Donald W. Searles

1

***SEC v. Stuart Frost, et al.***
**United States District Court—Central District of California**
**Case No. 8:19-cv-01559-JLS-JDE**

## <u>SERVICE LIST</u>

Andrew C. Callari
34197 Pacific Coast Highway, Suite 100
Dana Point, CA 92629
ac@callarisummers.com
***Attorney for Defendant Frost Management Company, LLC***

Marc J. Schneider
mschneider@stradlinglaw.com
Jason De Bretteville
jdebretteville@stradlinglaw.com
Kathleen M. Marcus
kmarcus@stradlinglaw.com
Sean T. Lobb
stlobb@stradlinglaw.com
Lisa M. Northrup
lnorthrup@stradlinglaw.com
Straddling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Telephone: (949) 725-4000
***Attorneys for Defendant Stuart Frost***

2