1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        v.<br><br>STUART FROST,<br><br>                    Defendant. | Case No. 8:19-cv-01559-SPG-JDE<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF AND DENYING PLAINTIFF'S MOTION TO STRIKE [ECF NOS. 160, 177]** |

Before the Court is the Securities and Exchange Commission's ("SEC") motion for injunctive relief under Section 209(d) of the Advisers Act ("Motion") against Defendant Stuart Frost ("Frost"). (ECF No. 160, 160-1 ("Mot.")). Having considered the submissions of the parties, the relevant law, the record in this case, and the arguments of counsel during the series of hearings on the Motion, the Court hereby **GRANTS** the SEC's Motion.

# I.    BACKGROUND

## A.    Procedural Background

The SEC's complaint against Frost and Frost Management Company, LLC ("FMC"), filed on August 13, 2019, alleges violations of the federal securities laws in connection with five venture capital funds.  (ECF No. 1 ("Compl.")).  Claim One of the Complaint asserts Fraud by an Investment Adviser, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act (hereinafter, "Advisers Act" or "Act"), 15 U.S.C. §§ 80b-6(1) & (2), and Claim Two asserts Fraud Involving a Pooled Investment Vehicle, in violation of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8(a)(1)–(a)(2), 17 C.F.R. § 275.206(4)-8.  On February 21, 2020, Frost and FMC answered the Complaint, admitting some allegations, denying others, and denying liability on both claims.  (ECF No. 16 ("Ans.")).

On March 26, 2021, the SEC moved for partial summary judgment as to liability and injunctive relief against Frost, arguing that nonmutual offensive collateral estoppel precluded Frost from relitigating issues that had previously been determined against Frost in an arbitration proceeding, *Matter of Frost Mgmt. Co. v. Hollencrest Bayview Partners*, JAMS No. 1200052341 ("Arbitration").  The Arbitration resulted from FMC's demand, filed on October 17, 2016, for arbitration against investors in two funds managed by Frost entities, FMC and Frost Venture Partners, GP, LLC.  (ECF No. 44-2 ¶ 61).  On October 12, 2021, Judge Staton, who then presided over this case, denied the SEC's summary judgment motion.  (ECF No. 118).

In October 2022, after the matter was reassigned to this Court, the parties filed a Stipulation pursuant to which Frost and FMC, in lieu of proceeding to trial on both claims, agreed to admit negligent liability on Claim Two.  (ECF No. 157 ("Stip.")).  The Stipulation incorporates a separately filed document entitled "Admitted Facts and Admission of Liability Under Claim Two" ("Admitted Facts").  *See* (ECF No. 157-1 ("AF") at 2).  As part of the Admitted Facts, Frost and FMC have admitted that they negligently violated section 206(4) of the Advisers Act and Rule 206(4)-(8)(a)(1)–(a)(2) "by failing to act with

reasonable care, in accordance with applicable industry standards, in communicating with investors and prospective investors in the Funds, and in conducting the business of the Funds." (AF 73–75).

The Stipulation provides the SEC, in its discretion, may file the instant Motion seeking injunctive relief and, in so doing, may argue that Frost's and FMC's conduct for Claim Two exceeded negligence. (Stip. ¶ 2). In opposing the Motion, Frost and FMC have agreed pursuant to the Stipulation that they are "precluded from arguing that they did not violate Section 206(4) of the Advisory Act and Rule 206(4)-8" and cannot "dispute or withdraw any of the Admitted Facts." (*Id.* ¶ 4). Further, the Stipulation provides that "the Court may determine the Motion based on affidavits, declarations, excerpts of sworn deposition testimony taken in this action, the Admitted Facts, and documentary evidence, and may draw such inferences and find such facts as the Court deems appropriate, with or without a hearing." (*Id.*).

By order dated October 31, 2022, this Court granted the parties' Stipulation and found that Frost and FMC have "violated Section 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8, as set forth in the Admitted Facts." (ECF No. 159). Thereafter, the SEC filed the following documents: a Motion for injunctive relief on Claim Two and declarations in support of the Motion, (ECF Nos. 160-2 to 160-5), which incorporated the filings and records in this action, including the SEC's statement of undisputed facts in support of its previous motion for partial summary judgment and exhibits, (ECF No. 44-2); the supporting declaration of Donald Searles, (ECF No. 44-3 ("Searles Decl.")); and exhibits attached thereto, (ECF Nos. 44-4 to 44-11). In response, Frost filed an Opposition to the Motion, (ECF No. 162 ("Opp.")), in which FMC joined, (ECF No. 163). In support of the Opposition, Frost also filed a declaration, (ECF No. 162-1 ("Frost Decl.")), and exhibits (ECF Nos. 162-2 to 162-76); the declaration of Marc Schneider, (ECF No. 162-77 ("Schneider Decl.")), and exhibits, (ECF Nos, 162-78 to 162-96); the declaration of William Guerry, (ECF No. 162-97 ("Guerry Decl.")), and exhibits, (ECF Nos. 162-98 to 162-106); and evidentiary

objections, (ECF No. 162-107 ("Frost Obj.")).  The SEC then filed a reply in support of
the Motion, (ECF No. 165 ("Reply")); the supplemental declaration of Donald Searles,
(ECF No. 165-1 ("Supp. Searles Decl.")); and a response to Frost's objections, (ECF No.
165-2 ("Obj. Response")).[1]

Following the filing of the Motion, the Court held a series of status conferences and
received supplemental briefing on several issues raised by the parties' filings.  *See* (ECF
Nos. 173, 176,[2] 177, 182-183).  In particular, the Court pointed out that the Admitted Facts
amount to a high-level summary of evidence in the record without citation to the specific
documents, reports, deposition testimony, or other evidence upon which they are based,
asked what specific evidence served as the factual foundation for Frost's admission of
negligence liability, and questioned whether the matter should simply proceed to trial
where a jury could make factual determinations, assess the credibility of witnesses, and
weigh the evidence.  (ECF No. 173).  The Parties, however, reiterated their desire to
proceed with the Motion, to have the Court determine the specific factual bases underlying
Frost's negligence liability, and to have the Court determine whether Frost's culpability
for Claim Two exceeded negligence.  (*Id.*).  Defense counsel argued that the parties had
"jointly provided extensive stipulated facts to the Court" and had "identified, from those
stipulated facts, the conduct [Frost] concedes was negligent."  (ECF No. 176 at 2).
Additionally, defense counsel noted that "[t]he SEC, in support of its request for injunctive
relief, presented additional argument and evidence as a putative basis for the Court to go
beyond Frost's admission of negligence and find scienter, and Frost submitted contrary
evidence."  (*Id.* at 2-3).  Further, defense counsel argued having a jury decide the factual
issue was not necessary because, when determining whether an injunction should issue, the

---

[1] On March 28, 2023, the parties stipulated pursuant to Rule 41(a)(1)(A)(ii) to the SEC's
voluntary dismissal of FMC from this action.  (ECF No. 167).

[2] The SEC has moved to strike Frost's status conference statement at ECF No. 176, arguing
it is an unauthorized and uninvited sur-reply.  *See* (ECF No. 177).  The Court has
considered and denies that request.

evidence in the record was "more than the Court would have based upon a jury's general verdict form finding Frost liable for a negligent violation of Section 206(4)." (*Id.* at 3).

The SEC similarly argued that both parties had "presented the Court with evidence beyond the [A]dmitted [F]acts" and that both parties "explicitly contemplated that the Court was not tied to the [A]dmitted [F]acts, and could 'find such facts as the Court deems appropriate, with or without a hearing.'" (ECF No. 177 at 3). Overall, the parties agreed that, when determining the Motion and considering the evidence in the record, the Court would make factual findings, draw all reasonable inferences, weigh evidence, and assess credibility like a bench trial with or without an actual hearing. With that backdrop, the Court turns to the issues presented by the Motion.

### B.     Frost's Evidentiary Objections

Frost raises several objections to evidence submitted by the SEC in support of the Motion.

#### 1.     Objection to Arbitration Evidence

Frost objects to the admission of the following evidence from the Arbitration proceeding as being outside of the parties' Stipulation and inadmissible hearsay:[3] (1) Transcripts of his testimony during day 8 of the Arbitration, (ECF No. 44-9 at 60-94); (2) the "JAMS Respondents' Compendium of Declarations and Exhibits in Support of Requests for Punitive Damages," which consists of declarations from investors in certain of Frost's funds and exhibits, (ECF No. 44-10 at 1-88); and (3) the Arbitration deposition testimonies of William Guerry ("Guerry") (ECF No. 160-2 at 49-54), Cary Breese ("Breese") (ECF No. 160-2 at 65-69), John Burke (ECF No. 160-2 at 71-76), Doug Lawson (ECF No. 44-10 at 78-82), and Mark Lelinski (ECF Nos. 160-2 at 184-88) (collectively, "Arbitration Evidence.").

---

[3] The relevant facts and findings underlying the Arbitration were set forth in Judge Staton's order denying the SEC's motion for summary judgment, (ECF No. 118), which the Court incorporates by reference in this order. Approximately thirty-five (35) depositions were taken in the Arbitration over the course of approximately ten (10) months. *See* (ECF 44-2 ¶ 70).

1              a.    *Objection Based on Stipulation*

2       Frost asserts that the parties agreed pursuant to the Stipulation that Arbitration

3  Evidence would not be used for the Motion and represents he added the phrase "taken in

4  this action" to the Stipulation to specifically exclude from this Court's consideration

5  Arbitration Evidence, including the above hearing transcripts, declarations, and deposition

6  testimony.  (Schneider Decl. ¶ 21; Frost Obj. at 6).[4]

7       The SEC responds that it never agreed "it would only use excerpts of 'sworn

8  deposition testimony taken in this action' in support of" the Motion and points out that

9  Frost has submitted deposition testimony from the Arbitration, including offering excerpts

10  from the testimony of Doug Lawson while objecting to the excerpts of Lawson's testimony

11  offered by the SEC.  (Obj. Response at 2 and n.1).  Additionally, the SEC argues that the

12  parties merely agreed that, if the SEC were to cite to any Arbitration Evidence, Frost would

13  be free to make evidentiary objections to such evidence.  (*Id.*); *see also* (ECF No. 170 at

14  13).  Further, argues the SEC, the Court should consider Arbitration Evidence because the

15  record in this case largely consists of or is derived from Arbitration Evidence.

16       The Court, aside from the exceptions discussed below, sustains Frost's objection to

17  introduction of Arbitration deposition testimony insofar as it is based on the terms of the

18  Stipulation.  The Stipulation provides that the Court may determine the issues raised in the

19  Motion based on ". . . excerpts of sworn deposition testimony taken in this action . . . ."

20  (Stip. ¶ 4).  A purely textual construction of this language demonstrates that the parties

21  agreed to exclude from the Court's consideration deposition testimony that was taken in

22  connection with the Arbitration and belies the SEC's contrary position that it never agreed

23  "it would only use excerpts of 'sworn deposition testimony taken in this action' in support

24  of" the Motion.  *See* (Obj. Response at 2).  Accordingly, the Court will not consider such

25  Arbitration deposition testimony in deciding the Motion, except where Frost has "opened

26  the door" to consideration of that evidence, as discussed next.

27  
_____

28  [4] Page numbers cited throughout this Order reference the relevant CM/ECF page number
unless otherwise specified.

Parties, by mutual agreement, may agree to exclude consideration of certain evidence. *See, e.g.*, *United States v. Spikes*, 158 F.3d 913, 928 (6th Cir. 1998). "Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988). This doctrine may similarly apply where parties have agreed to exclude evidence by mutual agreement, but then one party "opens the door" on an issue by offering prejudicial or inadmissible evidence on the issue that may create a false or misleading impression if the previously excluded evidence is not admitted. *See, e.g.*, *Spikes*, 158 F.3d at 928. Under such circumstances, the court may exercise its discretion to allow the other party to introduce previously excluded evidence on the same issue to rebut the false or misleading impression. *Id.*

Here, as the SEC points out, in support of his Opposition to the Motion, Frost submitted Arbitration deposition testimony for the Court's consideration. *See* (Obj. Response at 2). Although Frost contends that he submitted Arbitration deposition testimony only "in the event that [his] objection is overruled," (Opp. at 9 n.1), Frost has made several arguments in opposition to the Motion that rely on such evidence and/or ask the Court to draw inferences favorable to Frost from that evidence. Additionally, Frost, in support of his Opposition, has submitted declarations from himself and other witnesses and made arguments for the Court's consideration that state facts that are inconsistent with Arbitration deposition testimony or are otherwise misleading in light of that testimony. The Court thus finds Frost's arguments and submission of certain evidence on the topics of reasonable Incubator fees, when Frost disclosed the amount of Incubator fees to prospective investors and investors,[5] and what information was provided to Frost's accountants, among other topics, have "opened the door" to the Court's consideration of

---

[5] For ease of reference, the Court's references to investors hereinafter includes prospective investors where applicable.

Arbitration deposition testimony on those topics. *See, e.g., Aguilar v. City of Los Angeles*, 853 F. App'x 92, 96-97 (9th Cir. 2021) (defendants opened the door to previously excluded contrary evidence being introduced by permitting their experts to opine on topics discussed in the excluded evidence). Without limited consideration of the specific Arbitration deposition testimony discussed in this opinion, Frost's arguments and evidence would be materially misleading as to those topics. Accordingly, insofar as Frost has "opened the door" to the introduction of contrary evidence on these issues, Frost's objection to the Court's consideration of the specific Arbitration deposition testimony discussed in this opinion is overruled.

As to Frost's objection to other Arbitration evidence based on the Stipulation, the Court rejects Frost's effort to read the reference in the Stipulation to "taken in this action" as precluding the Court's consideration of non-deposition evidence developed in connection with the Arbitration, including Frost's hearing transcripts, the declarations of investors, and other Arbitration evidence. *See* (Frost Obj. at 5-6). The text of the Stipulation alone, including comma placement, does not support such a broad construction. And, as argued by the SEC, the record in this case largely consists of or is derived from Arbitration Evidence. As stated previously, the Admitted Facts are a high-level summary of facts and opinions mostly extracted from documents, communications, declarations, reports, and testimony developed and/or considered in connection with the Arbitration.[6]

---

[6] For example, Admitted Fact Nos. 45, 68, and 71 discuss the monthly fees a Frost entity, Frost Data Capital, charged to portfolio companies being fixed at a flat rate, instead of them being offered as an "a la carte" selection of adjustable services provided on a "case-by-case basis," as Frost represented to investors in marketing materials. The factual foundation for these Admitted Facts appears to include a series of email communications between Frost, Guerry, and Dean Sawyer, CEO of Sentrian, from August 6, 2015, to August 7, 2015, regarding the "prix fixe" nature of FDC's fees, as well as deposition testimony from Guerry during the Arbitration regarding the fees not being "a la carte," *see* Searles Decl. ¶ 100; ECF No. 44-9 at 157-159), and Frost's deposition testimony in this case regarding the same, *see* (Searles Decl. ¶ 101; ECF No. 44-9 at 279-281). *See, e.g.*, (ECF No. 162-85 ¶ 11). Additional examples include the following. *See* (AF 5, 16 (collectively stating that Frost raised $63 million, FDC has not been successful, and that

Further, witnesses deposed in this case, at times, reviewed, discussed, and referred to evidence admitted during the Arbitration and gave responses based on the Arbitrator's findings in the final award. *See, e.g.*, (ECF No. 44-9 at 167-284). Frost also relies on Arbitration Evidence to minimize the import of some of the Admitted Facts.[7] The Court's consideration of the record in this case thus necessarily requires the Court to consider some Arbitration Evidence. *See* Mot. at 3 n.1.

Moreover, the parties agreed pursuant to the Stipulation that, in determining the Motion, the Court could weigh evidence, make credibility findings, and decide the Motion based on evidence in the record, which includes Arbitration Evidence, with or without a hearing. *See* (ECF No. 157 ¶ 4; ECF No. 176 at 3). Thus, based on the parties' Stipulation and the Admitted Facts, the Court's factual findings are necessarily derived from some Arbitration Evidence, as discussed in this opinion,[8] except for the Arbitration evidence the Court has deemed otherwise inadmissible.

---

"[t]here have been no returns to the Fund or their respective investors."), *cf.* ECF No. 44-9 at 128 (Frost's Arbitration deposition testimony that the funds raised $63 million, have no cash left, and none has had an exit event that has resulted in any return to investors)); (AF 66 (Frost and other FDC executives did not conduct any analysis, accounting, or market studies, or seek the advice of experts in the field in determining the reasonableness of the fees being charged to portfolio companies and whether such fees were at or below "market rate"), *cf.* ECF No. 44-9 at 108-109 (Frost's Arbitration deposition testimony that, to his recollection, he did not conduct any analysis, consult any experts, or consult any sources to determine the reasonableness of the fees being charged by FDC or whether they were set at reasonable market rates)); (AF 15 (FDC was financially dependent on the Incubator fees), *cf.* ECF No. 44-9 at 183 (Frost testifies that FDC was financially dependent on the fees to sustain itself)).

[7] For example, Frost explains in his declaration that his representations in marketing materials that fees charged would be agreed to on a "case-by-case basis" accurately reflected that portfolio companies could negotiate the fees they paid as each company matured, and then he points to the above-referenced email communications between him, Guerry, and Sawyer to argue his intent was always for everyone to understand that these fees would be set at a flat monthly rate. *See* (Frost Decl. ¶ 38); *see also* (AF 17, 53).

[8] To the extent that this Order discusses other evidence generated by or considered in connection with the Arbitration, such as email correspondence involving Paul Cate and

b.    *Objection Based on Hearsay*

Frost objects to the admission of his Arbitration deposition testimony as inadmissible hearsay under Federal Rule of Evidence 802, contending that it does not fall within any exception to the hearsay rule.  (Frost Obj. at 6-8).  Frost also argues that other witnesses' Arbitration deposition testimony, as well as investor declarations, should not be admitted under Federal Rule of Evidence 804(b)(1) because the SEC has not shown the witnesses are unavailable, Frost did not have a full opportunity to develop the testimony of these witnesses, and his motives in the Arbitration proceeding were different than they are in the present proceeding.  (*Id.*).

As to Frost's Arbitration testimony, the SEC responds that the testimony is admissible as an opposing party's statement under Rule 801(d)(2).  As to the deposition testimony of witnesses other than Frost and the declarations of investors, the SEC argues Frost's position that the SEC must show these witnesses' unavailability is inconsistent with the parties' Stipulation.  Additionally, the SEC argues that the proffered testimony is not hearsay, as it is not being admitted for the truth of the matter asserted; instead, "it is simply lay opinion testimony about the reasonableness of [Frost Data Capital's] [I]ncubator fees, and the importance of other information that Frost failed to disclose to investors in the Funds . . ." (Obj. Response at 2-4).  Further, the SEC asserts Frost had ample opportunity

---

DST, the Court does so either because Frost has placed such communications at issue by relying on them in declarations filed in support of his Opposition or because the communication serves as part of the factual foundation for an Admitted Fact, is an admission by Frost, or is referenced to provide context for such an admission.  In the latter context, the Court has endeavored to generally omit reference to other recipients of the email and their communications in email threads, when possible.  The Court notes that, even if it sustained Frost's objection to the admissibility of such evidence, the outcome of the Motion would be the same based on the Admitted Facts, Frost Declaration, the record, and applicable case law.

and similar motives in both proceedings to develop the testimony of these witnesses.  (Obj. Response at 2-4).

The Court overrules Frost's hearsay objection to his Arbitration deposition testimony.  The Court agrees that Frost's Arbitration testimony is admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2).  The Court also overrules on hearsay grounds Frost's objections to admission of the deposition testimony of Guerry and Breese, insofar as the Court finds that their testimony is inconsistent with their declarations submitted in support of Frost's Opposition.  *See also* Fed. R. Evid. 801(d)(1)(A).

As to the remaining challenged Arbitration deposition testimony and investor declarations, as discussed above, except for evidence contrary to arguments and evidence submitted by Frost that the Court, in its discretion, considers to prevent the evidence submitted by Frost from being misleading, the Court sustains Frost's objection to such testimony on hearsay grounds.  *See* (Frost Obj. at 6).  The Court agrees that the SEC, as the proponent of such evidence, has not sufficiently satisfied its burden of demonstrating the testimony is admissible under Federal Rule of Evidence 804(b)(1).[9]  *See* Fed. R. Evid. 804(b)(1) (allowing for the use of prior deposition testimony of an unavailable witness if the party against whom the testimony is offered had a similar opportunity and motive to develop the testimony); *see also* Fed. R. Civ. P. 32(a).

### 2. Objection to SEC's Experts' Reports

Frost next objects to the expert reports of Alex Maleki and Keith Palzer.  (Frost Obj. at 9).  However, Frost already moved *in limine* to exclude both experts, raising virtually identical arguments before Judge Staton, who denied Frost's motion.  *See* (ECF Nos. 94, 95, 131).  In doing so, Judge Staton found that "Maleki has identified industry standard

---

[9] The Court notes Judge Staton similarly concluded on summary judgment that Frost's different incentives and inability to develop certain deposition testimony precluded application of the collateral estoppel doctrine to the Arbitrator's findings.  *See* (ECF No. 118).

practices in his report" and just because "Frost disagrees there are industry standards does not provide grounds for exclusion." (ECF No. 131 at 12). Judge Staton also found that "Maleki supplied no improper legal conclusions in ¶ 16 of his report." (*Id.* at 13). As for Palzer, Judge Staton found that some of his opinions include improper legal conclusions, such as opining that Defendants breached their fiduciary duties. (*Id.* at 10). However, "like much of Palzer's report, his expected testimony properly addresses industry standards regarding [I]ncubator fees, disclosure to investors, management fees, and governance norms." (*Id.*). Judge Staton concluded that "Palzer may opine regarding industry standards and whether or not Frost's actions deviated from those standards." (*Id.*).

Frost offers no basis under the Federal Rules of Civil Procedure or the Central District of California's Local Rules for this Court to reconsider Judge Staton's prior order. Accordingly, the Court overrules Frost's objection to exclude either of the SEC's experts' reports.

### 3.   Objection to the Canter and Searles Declarations

Finally, Frost objects to the declarations of Charles E. Canter and Donald W. Searles, both of whom are counsel for the SEC in this case, arguing neither Canter nor Searles can properly authenticate the exhibits attached to their declarations. (Frost Obj. at 13). The SEC responds that these exhibits were produced by Frost and therefore are deemed authentic. (Obj. Response at 5–6). The Court agrees with the SEC. *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir.1996) (documents produced by a party in discovery were deemed authentic when offered by the party-opponent); 31 Wright & Miller, *Federal Practice & Procedure: Evidence* § 7105, at 39 (2d ed. 2025) ("Authentication also can be accomplished through judicial admissions such as . . . production of items in response to… [a] discovery request."); *AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1069 (C.D. Cal. 2015) ("[M]ost of the objected-to exhibits were produced by Defendants in discovery and are deemed authentic when offered by [the opposing party].")."). The Court thus overrules this objection.

Accordingly, based on its evidentiary rulings, the Court makes the following findings of fact and conclusions of law, which incorporate by reference the parties' Stipulation and Admitted Facts in their entirety, are based on the record in this case, and on the Court's determinations as to the relevance, credibility, weight of the evidence, and burden of proof.

## II.    Factual Findings

### A.    Frost's Creation of FDC as the Incubator and FMC

Before 2011, Frost founded and successfully managed two start-up, high tech companies that, through a public offering for one company and the strategic acquisition of the second by Microsoft in 2008, realized substantial financial returns to the companies' investors.  (Frost Decl. ¶¶ 3-4).

Hoping to repeat these successes on a larger scale, in 2011, Frost founded Frost Data Capital ("FDC" or the "Incubator"),[10] which Frost owned, controlled, and served as its sole manager and Chief Executive Officer ("CEO").  (AF 1, 4; Frost Decl. ¶¶ 6, 8).  Frost marketed to investors the concept of using FDC in his "Incubator Model."  The Incubator Model entailed FDC internally identifying the technological needs of Fortune 500 companies; FDC creating startup portfolio companies to develop products and solutions to meet those technological needs; and FDC providing to each startup company shared executive and other services, as well as seed investments from funds created by Frost, to assist each startup in developing its software and products.  (AF 32; Frost Decl. ¶ 20; ECF No. 162-5 at 3-5; ECF No. 162-26 at 4).  These efforts, Frost represented to investors, would lead to strategic "exits" by each startup company within two to five years by either the startup or its products being acquired by a "major player" in the computer industry or a Fortune 500 company, resulting in financial returns to investors.  (AF 28, 32; Frost Decl. ¶ 20; ECF No. 162-5 at 3-5; ECF No. 162-26 at 4).

---

[10] FDC was formally known as Frost Venture Partners, LLC, until 2014.  For ease of reference, FDC in this Order refers to both FDC and, where applicable, its predecessor Frost Venture Partners, LLC.

Frost purposely designed FDC to offer an "all you can eat buffet" that, in exchange for receiving a flat monthly fee from each portfolio company, would provide shared services, access to FDC's executives and employee staffing, and access to critical physical resources," including office space, internet, utilities, computer hardware and software, phones, and other office supplies.  (Frost Decl. ¶¶ 19, 21, 23, 25).  Frost represented to investors that this Incubator Model would allow each startup to begin and continue product development until the company became attractive enough to hire an experienced internal CEO.  (*Id.* ¶ 25).  In the meantime, the startup could delay hiring additional executives and employees.  (*Id.* ¶ 26).  Frost claims he anticipated that, as a portfolio company matured, it would require less of FDC's services and could negotiate for lower fees or terminate FDC's services completely.  (*Id.* ¶ 27).

In 2011, Frost also formed FMC to serve as a manager for pooled venture capital funds created by Frost to invest in FDC's startup portfolio companies.  (AF 1; Frost Decl. ¶¶ 9-10).  Frost owned, controlled, and was the sole manager of FMC and served as its CEO.  (AF 4; Frost Decl. ¶ 11).  FMC, with Frost at the helm, ultimately served as an investment adviser for five pooled investment funds—namely, Frost VP Seed, LLC (the "Seed Fund"), Frost VP Seed International, LLC (the "International Seed Fund"), Frost VP Early Stage Fund II, L.P. ("Fund II"), FVP International Feeder Fund L.P. (the "International Feeder Fund"), and Frost Fund III, L.P. ("Fund III") (hereinafter referred to collectively as, the "Funds").[11]  (Frost Decl. ¶¶ 10–16).  Before FMC, Frost had no prior

---

[11] The parties have stipulated that each Fund is a "pooled investment vehicle" within the meaning of Rule 206(4)-8 of the Advisers Act [17 C.F.R. § 275.206(4)-8], *see* (AF 6), and that the limited partnership and membership interests in the Funds, as well as the shares of stock of the portfolio in which the Funds invested, are securities, (AF 36).  Further, at all times relevant to the Motion, both Frost and FMC were investment advisers for the Funds, within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), received compensation for advising the Funds, (AF 33, 35), and were engaged in the business of advising others, either directly or through publications and writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities for compensation, (AF 33).  At all relevant times, both Frost and FMC were also exempt

experience as an investment fund manager or investment adviser and, aside from the Funds, FMC had no other investment advisory clients.  (AF 4, 7).

**B.    Frost's Creation of the Funds and Solicitation of Fund Investors**

Along with the formation of FDC and FMC, Frost created the five Funds over the course of approximately four years.  (Frost Decl. ¶ 10).  Frost solicited investors for each Fund using the internet, wire, and other electronic means, as well as in-person and group presentations.  (AF 27; ECF No. 44-9 at 220).  To market each Fund, Frost made and used PowerPoint presentations that highlighted Frost's Incubator Model and the benefits of investing in each Fund.  (AF 28).  Frost also utilized pitchbooks and executive summaries that provided a high-level summary of Frost's Incubator Model, described the investment focus and deal structure for each Fund, highlighted Frost's relevant experience, and provided a brief description of example startup portfolio companies already being incubated by FDC at the time the presentations were made.  (AF 30).  With limited exception, none of these marketing materials or marketing presentations to investors before December 2015 discussed or disclosed that the portfolio companies would pay a monthly fee to FDC for its "Incubator" services.  (AF 38, 67).

Each investor that decided to invest in a Fund memorialized the investment by signing an operating and limited partnership agreement for that Fund, which was countersigned by Frost on behalf of the particular Fund's manager or general partner, and which designated the investor as a limited partner in the Fund.  (AF 29).  The investor also signed a subscription agreement confirming the investor's eligibility and commitment to invest in the Fund.  *See, e.g.*, (Frost Decl. ¶ 37; ECF No. 162-21).  The operating and subscription agreements signed by Frost and each investor (collectively, the "governing documents") governed the relationship between the Fund's general partner and the limited

---

reporting investment advisers pursuant to Section 203(*l*) of the Advisers Act, 15 U.S.C. § 80b-3(*l*), which provides for exemption from registration to investment advisers who act solely as an adviser to venture capital funds, (AF 2).  FMC provided investment advice for compensation and filed reports with the SEC as an exempt reporting advisor for Funds II and III.  (AF 34).

partner investors, (AF 29), and, together with the marketing materials, contained Frost's representations to each investor regarding the material terms of the Fund's purpose, management, operations, capital contributions, and investments. As set forth below, the provisions contained in the governing documents for each Fund were similar, but Frost's representations to investors evolved over time.

### 1. The Seed Fund

In 2011, Frost created the Seed Fund with FMC serving as its manager. (Frost Decl. ¶ 12; ECF Nos. 162-8). Frost reviewed the terms of the Amended and Restated Operating Agreement for the Seed Fund ("Seed Operating Agreement") and signed it on behalf of FMC.[12] (Frost Decl. ¶ 12; ECF No. 162-8 at 26; Searles Decl. ¶ 101; ECF No. 44-9 at 216, 254-255). Paragraph 8.1 of the Seed Operating Agreement states that the role of FDC as the Incubator is to "incubate and develop new business" and that "[i]t is anticipated that investment opportunities in one or more businesses formed in the Incubator will be offered to the [Seed Fund] . . . ." (ECF No. 162-8 at 7). The Seed Operating Agreement neither discloses nor authorizes the use of its investment funds to pay fees to FDC for its Incubator services. (AF 64). The Seed Operating Agreement also does not disclose to investors or authorize the payment of management fees to FDC. (AF 54). Instead, Paragraph 6.1 of

---

[12] The Admitted Facts and the parties' briefs reference the Seed Fund's "operating agreement" or "governing documents." The SEC has not attached as an exhibit a copy of the operating agreement for the Seed Fund; instead, it points the Court for its exhibits in support of the Motion to its "statement of undisputed facts in support of its motion for partial summary judgement against Defendants (Dkt. No. 44-2), the supporting declaration of Donald W. Searles, and the exhibits attached thereto (Dkt. No. 44-3)." *See* Mot. at 3 n.1. The Searles declaration, however, contains only what the SEC describes as a non-operative "draft" of the operating agreement for the Seed Fund. *See* (ECF Nos. 44-4 ¶ 8; 44-4 at 279-300). In support of his Opposition, Frost has provided an Amended and Restated Operating Agreement. *See* (Frost Decl. ¶ 12; ECF No. 162-8). Both parties treat the Amended and Restated Operating Agreement as the operative Seed Fund Agreement. In fact, Frost admits in his Arbitration deposition that it is the version of the Seed Fund operating agreement provided to Seed Fund investors. *See* (Frost Decl. ¶ 12; ECF No. 162-8; ECF No. 44-9 at 216, 254-255; ECF No. 63-1 at 92). The Court thus refers to and has considered the document at ECF No. 162-8 as the operative Seed Operating Agreement.

the Seed Operating Agreement provides the Seed Fund "shall bear all operating expenses reasonably incurred by [FMC] or the [Seed Fund] in connection with the management of the [Seed Fund] and [FMC] . . . ."  (ECF No. 162-8 at 4).

Section 11.7 of the Seed Operating Agreement provides FMC "will appoint an Advisory Committee of no less than three (3) and no more than five (5) members selected by [FMC]." (*Id.* at 12).  Per the Seed Operating Agreement, the duties of the Advisory Committee include ". . . (b) upon request by [FMC], advising with respect to matters pertaining to conflicts of interest between or among [FMC], any members of [FMC], . . . or the [Seed Fund], and (c) rendering such advice and counsel as is requested by [FMC]." (*Id.*; AF 24-25).  Frost, in his capacity as manager of FMC, was responsible for selecting members of the Advisory Committee.  (AF 24; ECF No. 162-8 at 12-13).

Paragraph 11.8 of the Seed Operating Agreement provided for the creation of an Investment Committee consisting of no more than five members selected by Frost in his capacity as manager of FMC.  (AF 19; ECF No. 162-8 at 13).  Members of the Investment Committee were responsible for approving, by a simple majority vote, all investments presented to it by Frost in his capacity as manager of FMC, and could be removed by Frost, acting as FMC manager, at his sole discretion.  (AF 20, 22-23; ECF No. 162-8 at 13).  In the event of a tie Investment Committee vote, the investment decision could be made by Frost in his sole discretion, as manager of FMC, and all members of the Investment Committee were required to vote in accordance with the determination of FMC/Frost.  (AF 23; ECF No. 162-8 at 13).[13]

---

[13] In approximately April 2012, Frost, in his capacity as manager of FMC, created the International Seed Fund for investors outside the U.S. with FMC as its Manager.  (Frost Decl. ¶ 13; ECF No. 162-9 at 9).  Although the partnership agreement for the International Seed Fund discloses the existence of FDC as the Incubator, it does not disclose or provide for any fees to be paid to FDC.  *See* (ECF No. 162-9).  Similar to the terms of the Seed Operating Agreement, the governing documents provide that the Managing Partner "will" create an Advisory Committee, generally consisting of three to five members appointed by Frost, in his capacity as manager of FMC.  The Advisory Committee would have similar duties as those set forth in the Seed Operating Agreement, including "advising with respect

1    The executive summary for the Seed Fund represents to investors that FDC was
2    "formed with the expectation of starting 2-4 innovative companies per year in the big data
3    and related spaces" to bring innovative products and solutions to market. (ECF No. 162-5
4    at 4). Further, it represents that the Seed Fund would be entirely focused on investing in
5    these portfolio companies. (*Id.* at 5). The executive summary also represents the
6    following: "Note that the Seed [] Fund will not be expected to cover expenses and salaries
7    incurred by [FDC], which is a completely separate corporate entity. It is expected that
8    services provided from the [I]ncubator to the startup companies will be agreed to between
9    the Boards of each individual company and [FDC] on a case-by-case basis, and are
10   expected to be adjusted based on the individual needs of each company as their business
11   matures." (*Id.* at 6; AF 17). Additionally, the executive summary represents that the basic
12   model for each startup company would employ several basic principles, including
13   "[k]eep[ing] expense levels for each company relatively low in order to minimize the
14   investment required through the life of the company. This approach generally maximizes
15   investor returns." (ECF No. 162-5 at 7). Similar to the Seed Operating Agreement, the
16   executive summary for the Seed Fund represents that the Advisory Committee would be
17   nominated from the investors in each Fund. (*Id.* at 5).

18       Frost's PowerPoint presentation for the Seed Fund also touted to investors that
19   investing in the Seed Fund was a "no fee" "no carry" opportunity to invest in "big data"
20   analytics and specifically in startup companies approved by a majority of a Fund's
21   investment committee. (AF 28.). These startup companies would be incubated by FDC
22   for a period while the companies developed their products and solutions with the goal of
23   the companies being acquired within 2-5 years from their startup by "major players" in the

---

26   to matters pertaining to conflicts of interest between or among [FMC], any members of
     [FMC], . . . or [the International Seed Fund]. (AF 24-25; ECF No. 162-9 at 13). It also
27   similarly provides for the creation of an Investment Committee. (ECF No. 162-9 at 13-
     14). The International Seed Fund raised approximately $636,798 from roughly 45
28   investors. (AF 5).

computer industry or Fortune 500 companies, resulting in financial returns to the investors in the Funds.  (AF 28; Frost Decl. ¶ 20).

In 2012, the Seed Fund raised from roughly 30 investors a total of approximately $7,570,000, all of which ultimately was used to invest in portfolio companies and pay expenses of the Seed Fund and FDC, including Frost's salary.  (AF 5; ECF No. 160-5 ("Palzer Report") at 25-26).

        2.    <u>Fund II</u>

In approximately May 2013, Frost, through Frost Venture Partners GP, LLC ("FVP GP"), formed Fund II with Frost entity FVP GP serving as its General Partner.  (Frost Decl. ¶ 14; ECF No. 162-10).  At the time the Limited Partnership Agreement for Fund II ("Fund II Agreement") was signed, Frost was a 62.5% member of FVP GP.  (Ans. ¶ 16); *see also* (ECF No. 162-10 at 50).  By October 21, 2016, Frost was the sole member.  (Ans. ¶ 16).  Frost reviewed and approved the Fund II Agreement before it was disseminated to investors.  (Searles Decl. ¶ 101; ECF No. 44-9 at 224-225).

The Fund II Agreement represented to investors that "the primary purpose of [Fund II] is to provide a limited number of select investors with the opportunity to realize long term appreciation, generally from venture capital investments in early-stage and emerging private companies . . . that are founded and incubated by, and receive support and services" from the Incubator.  (ECF No. 162-10 at 2).  Paragraph 6.1 of the Fund II Agreement provides for the Fund to pay a 2% management fee to its General Partner, FVP GP.  Unlike the Seed Operating Agreement, the Fund II Agreement discloses, in paragraph 6.1(d), that FDC as the Incubator "may" receive a monthly fee from each start-up or portfolio company "in exchange for certain shared advisory and support services provided to the [p]ortfolio [c]ompany."  (*Id.* at 15; AF 39).  The Fund II Agreement, however, does not disclose any methodology for calculating the Incubator fees or propose a fee amount or range.  Paragraph 6.1(d) represents that any Incubator fee paid by a portfolio company will "not reduce the [2%] management fee payable to the [FVP GP] . . . so long as such [Incubator f]ee does not exceed reasonable market rates."  (ECF No. 162-10 at 15)

Also, unlike the Seed Fund and International Seed Fund, the Fund II Agreement provides that the General Partner, FVP GP, "may" appoint an Advisory Committee, whose duties include "advi[sing] regarding matters pertaining to conflicts of interest by the [Fund II], [FVP GP] or any of the members of [FVP GP]." (*Id.* at 31; AF 24-26).[14] Although an Advisory Committee was established, it met on only two or three occasions, and no conflicts of interest were ever presented to it. The Fund II Agreement did not expressly provide for the appointment of an investment committee. *See* (ECF No. 162-10). Between 2013 and 2014, Fund II raised approximately $41,189,521 from roughly 74 investors, (AF 5), and used all its commitments. *See* (Palzer Report at 27).

### 3.    Fund III

In August 2015, Frost formed Fund III with Frost Fund III GP, LLC serving as its General Partner and FMC as a limited partner and manager. (Frost Decl. ¶ 15; ECF No. 162-11 at 9). The Limited Partnership Agreement ("Fund III Agreement") stated that the Fund's "primary purpose . . . is to provide investors with the opportunity to realize long-term appreciation, generally from venture capital investments" in the partnership's portfolio companies. (*Id.*). At the time of Fund III's creation, Frost was an 81% member of the general partner and, as of December 31, 2016, Frost was the sole member. (Ans. ¶ 18).

---

[14] In July 2013, Frost, in his capacity as manager of FMC, created the International Feeder Fund, with FMC serving as the general partner. (Frost Decl. ¶ 16; ECF No. 162-12). Like Fund II, the partnership agreement states its primary purpose is to provide a limited number of select investors with the opportunity to invest in the Incubator's portfolio companies. (ECF No. 162-12 at 9). Also, like Fund II, the partnership agreement discloses that the Incubator is controlled by one or more Managing Directors, including Frost, and that the Managing Directors may also hold board seats, founder positions, and/or an equity interest in one or more portfolio company. (*Id.* at 22, 34). The agreement also provides that the General Partner "may" appoint an Advisory Committee with essentially the same duties as set forth in other Fund agreements. (*Id.* at 29; AF 24-25). Between 2013 and 2015, the International Feeder Fund raised approximately $5,250,000 from roughly two investors. Those funds where then invested in Fund II. (AF 5).

Paragraph 6.1 of the Fund III Agreement provides Fund III will pay a management fee to FMC that amounts to 2% per annum, which is not subject to any contractual reduction based on reasonable market rates. *See* (ECF No. 162-11). It further discloses that each portfolio company had or would enter into agreements with the Incubator pursuant to which "each [p]ortfolio [c]ompany [would] reimburse the Incubator a monthly amount for its share of the cost of resources provided by the Incubator to the [p]ortfolio [c]ompany . . . for shared facilities, shared personnel and other shared resources." (*Id.* at 14; AF 40). As with the previous Funds, the Fund III Agreement does not disclose the methodology for calculating the Incubator fee or estimate the monthly amount of Incubator fees that would be charged to the portfolio companies, and the executive summary for Fund III is completely silent on the existence of Incubator fees. *See* (ECF No. 162-11; AF 42).

The partnership agreement provides that the limited partners representing a majority in interest may appoint an Advisory Committee consisting of a minimum of three investor representatives, whose duties would include advising regarding matters pertaining to conflicts of interest by Fund III, the General Partner, or any of the members of the General Partner. (AF 25; ECF No. 162-11 at 26; Frost Decl. ¶ 59). Between 2015 and 2016, Fund III raised approximately $23,440,000, from roughly 11 investors and used approximately $13,440,000.[15]

Again, before December 2015, none of the PowerPoint presentations to investors in the Funds disclosed that the portfolio companies would pay a monthly Incubator fee to FDC. (AF 38). When soliciting investors for the Funds, Frost repeatedly represented in marketing materials that his expectation was for FDC to create up to "2-4 innovative [startup] companies per year" whose purpose would be to develop products to meet the technological needs of big data and Fortune 500 companies with the goal of each startup

---

[15] AF 5 states that Fund III raised $13,440,000, but the Palzer Report, which references the financial documents for Fund III, states that Fund III raised $23,440,000 and spent $13,440,000. (Palzer Report at 28). This discrepancy, however, is not material to the Court's analysis.

portfolio company or its products being ultimately acquired by a big data or Fortune 500 company, resulting in financial returns to investors. *See, e.g.*, (ECF No. 162-5 at 4; Frost Decl. ¶ 42; ECF No. 162-26 at 4).

The solicitation of investors from 2012 to 2016 resulted in Frost, through FMC, raising a total of nearly $63 million from investors. (AF 5). The investors included high-net-worth individuals, trusts, and other "accredited" or "qualified" investors. (*Id.); see also* (Frost Decl. ¶ 37; ECF No. 162-21).

After investing in the Funds, Frost, as called for by the governing documents for each Fund, provided Fund investors with quarterly status reports regarding the Funds that generally described that quarter's acquisitions, the status or activities of the portfolio companies in which the Funds had invested, and a valuation of the investments then held. (AF 29, 31). The quarterly reports distributed to investors did not disclose the Incubator fees paid by portfolio companies to FDC or the amount of Incubator fees charged to these Funds. (AF 63).

### C.    Creation of Startup Portfolio Companies and Collection of Incubator Fees

In approximately late 2011 or early 2012, Frost and two other executives of FDC—Chief Financial Officer ("CFO") Guerry and early FDC CFO/Chief Operating Officer Breese—discussed the amount portfolio companies should be charged by FDC for its Incubator services. (ECF No. 44-9 at 222-223; ECF No. 162-79 at 4). Both Guerry and Breese, like Frost, had extensive prior experience operating start-up companies as a CFO and CEO, respectively, and thus, according to Frost, had "good knowledge . . . of what it cost to run one of these start-ups in the early days and on an ongoing basis." (ECF No. 44-9 at 223). Breese conducted an analysis of what he thought a reasonable Incubator fee would be, determined that amount was $12,000 per month, and presented the analysis in Excel spreadsheet format to Frost and Guerry. (Searles Decl. ¶¶ 90, 96; ECF No. 44-9 at

13-15, 75; ECF No. 162-78 ("Breese Decl.") ¶¶ 9, 10).[16]  Yet, according to Guerry, the Incubator fees started out around $25,000 per month in the earlier years and rose to around $35,000 or $40,000 per month as the services offered by the Incubator expanded.  (Guerry Decl. ¶ 11).  Frost and other FDC executives did not conduct any analysis, accounting, or market studies, or seek the advice of experts in the field in determining the reasonableness of the Incubator fees and whether such fees were at or below "market rate" when charged. (AF 66; Searles Decl. ¶ 97; ECF No. 44-9 at 108-109).

Further, in many instances, from the moment a portfolio company was legally formed, an Incubator service agreement would be signed by Frost, as CEO of FDC and by FDC's CFO, Guerry.  (AF 71; ECF No. 44-9 at 186-188).  Although Guerry received his executive salary from FDC and reported directly to Frost, Guerry would sign the service agreement on behalf of the startup portfolio company "wearing the hat of the CFO of the specific portfolio company."  (Searles Decl. ¶¶ 97, 101; ECF Nos. 44-9 at 116-118, 187); *see, e.g.*, (Searles Decl. ¶¶ 61-62; ECF No. 44-7 at 122-128 (portfolio companies Lineage Software, Inc. and Maana, Inc. service agreements with FDC, respectively)).  At the time the service agreements were signed, it was "extremely rare" to have a CEO of the portfolio company in place directing a service agreement to be signed.  (ECF No. 44-9 at 186-187). Further, there were no negotiations of any of the agreements' terms, either on a case-by-case basis or at arms-length.  (AF 71; ECF No. 44-9 at 118, 187-188).  The service agreements allowed FDC to immediately begin assessing Incubator fees before the portfolio company hired any executives or employees.  (AF 71; ECF No. 44-9 at 115, 154-155, 186-189, 261, 264; ECF No. 162-85 ¶ 10).

---

[16] In his declaration submitted in support of Frost's Opposition to the Motion, however, Breese now represents that the number he "calculated [as] a potential starting point for the monthly [i]ncubator fees" charged by FDC to portfolio companies was $18,000 per month. (Breese Decl. ¶ 9).  Frost testified during the Arbitration proceedings that he did not remember the conversation with Breese occurring and that he and Breese had many conversations.  (Searles Decl. ¶ 90; ECF No. 44-9 at 75).

Per the service agreements, each portfolio company paid $25,000 to $40,000 per month in Incubator fees for FDC's services, including some companies paying fees charged by another entity, Snow Data Capital, through FDC. (AF 12, 50-51; Frost Decl. ¶ 24; ECF No. 44-9 at 186-187). During the life of the service agreement, with few exceptions, the Incubator fees were generally nonnegotiable. (Searles Decl. ¶ 100; ECF No. 44-9 at 161).

The fees charged to the portfolio companies were not based on each company's use of FDC's shared facilities and personnel; instead, they were generally charged similarly across companies regardless of the needs and stage of development of the company. (AF 41, 68; Frost Decl. ¶ 19; Searles Decl. ¶ 100; ECF No. 44-9 at 159). No effort was made to track or allocate the time FDC's staff spent working on tasks for each startup portfolio company. (AF 70). Additionally, unless a portfolio company successfully negotiated their fees, portfolio companies that moved out of FDC's offices paid the same fees as portfolio companies that used FDC's space, and Incubator fees were not adjusted based on the number of employees at a portfolio company. (AF 69). Further, once portfolio companies hired an executive, the shared costs typically did not decrease. (Searles Decl. ¶ 101; ECF No. 44-9 at 259-260). Finally, termination of the service agreement generally required 180 days' prior written notice. *See, e.g.*, (Searles Decl. ¶ 42; ECF No. 44-7 at 22).

### D.    Frost's Creation of Snow Data Capital

In 2014, Frost created and became part owner of a second Incubator-related company, Snow Data Capital ("SDC"). (AF 48, 50; Ans. ¶ 83). Per Frost, SDC was created to provide marketing services to the startup portfolio companies, *see* (AF 48, 50), but Frost also admits that it was created to provide employment to one of Frost's long-term former employees, Anthony Howcroft, who needed to be associated with SDC for immigration purposes, (AF 49; ECF No. 44-9 at 193-195). According to Frost, Howcroft was having difficulty obtaining an H-1B visa because he did not have a college degree. (ECF No. 44-9 at 194). Instead of becoming an employee of FDC, which already provided certain marketing services, Howcroft suggested to Frost "that [Howcroft] get an entrepreneurial visa by setting up Snow Data Capital," "invest[ ] an appropriate amount to qualify for that

24

entrepreneurial visa[,] and set up Snow Data Capital to work as part of the [I]ncubator." (*Id.* at 194-195; AF 49).

Although FDC had generally been charging the portfolio companies for sales and marketing, beginning in approximately April 2014, SDC began charging certain portfolio companies $5,100 per month through FDC for marketing services, in addition to the marketing fees already being charged by FDC. (ECF No. 44-9 at 145-146, 277; AF 49, 51). Frost admits he never disclosed to the Funds' investors the existence of SDC or that it was charging fees. (AF 52). Frost acknowledged that CEOs complained of the fees being charged by Snow Data Capital, including complaining, in some instances, about the competence of Anthony Howcroft. (ECF No. 44-9 at 145-146).

### E. Frost's Management of the Frost Entities and Funds and His Compensation

Frost's management of the various Frost entities and the Funds created inherent conflicts. As previously described, Frost owned, controlled, and was the sole manager of both FMC and FDC and held an ownership interest in SDC. (AF 4, 50). FMC was the manager of the Seed Fund, the International Seed Fund, and the general partner of the International Feeder Fund. (AF 24). At its inception, Frost was the majority owner of FVP GP, which was the General Partner of Fund II, and, in 2016, Frost became the sole owner of FVP GP. (Frost Decl. ¶ 14; ECF No. 162-10; AF 24). FMC was the limited partner of Fund III, with Frost Fund III, GP, LLC serving as its General Partner, of which Frost was an 81% member at its inception and by 2016 became the sole member. (Frost Decl. ¶ 15; ECF No. 162-11 at 9; Ans. ¶ 18).

Frost, as a controlling owner of the managing members/partners of the Seed Fund and Fund II and member of the Funds' investment committees determined how much these Funds invested in each portfolio company. (AF 19-23). The Funds for which Frost and FMC served as investment advisors invested substantial sums of money into FDC's portfolio companies. (AF 7-8, 33-34). The portfolio companies were dependent upon the Funds and other investors for the capital needed to pay their Incubator fees to FDC. (AF

15). FDC, in turn, was financially dependent upon the Incubator fees paid by the portfolio companies because these fees were FDC's only source of revenue. (AF 15). From 2012 to 2016, Frost drew a salary of at least $3.4 million. (AF 56; Searles Decl. ¶ 101; ECF No. 44-9 at 197). A portion of Frost's salary was being drawn from the Seed Fund as management services fees. (AF 55; ECF No. 44-9 at 157; Searles Decl. ¶ 44; ECF No, 44-7 at 28-29). Frost also received compensation, in part, from investments from other Funds in portfolio companies, which were used to pay Incubator fees to FDC from which Frost, in turn, drew a salary and was entitled to share in FDC's profits. (AF 56). As discussed below, Frost also received compensation in the form of FDC paying for certain of his personal expenses. (AF 57). These compensation arrangements, among others, resulted in inherent conflicts of interest between Frost, FDC, FMC, and the Funds.

Although in his capacity as manager of FMC and in his capacity as majority owner of Fund II, Frost had the ability to appoint an Advisory Committee to advise the Seed Fund and Fund II on conflicts, only Fund II established an Advisory Committee. (AF 24-26; ECF No. 162-5 at 5). The Advisory Committee only met on two or three occasions, and no conflicts of interest were presented. (AF 26).

The governing documents for the Seed Fund, Fund II, and Fund III each also contain a provision for the creation of an Investment Committee, the responsibility of which would be to approve all investments presented by Frost in his capacity as manager of FMC. *See* (Frost Decl. ¶¶ 20, 45). According to Frost, once Frost and his team decided to start a new portfolio company, the matter would be submitted to a Fund's Investment Committee, which determined how many portfolio companies would be created and how much a Fund would invest in each newly created company. (AF 60; Frost Decl. ¶ 49). When voting on funding for new portfolio companies, Frost contends the Investment Committees took the process seriously, actively debated on the worth of the potential investment, rejected or postponed some investments, and declined to approve some investments. (Frost Decl. ¶¶ 53-55); *see also* (ECF Nos. 162-79 at 4-6; 162-81 at 3-5; 162-83 at 4-6). However, the Seed Fund's Investment Committee membership were all employees of and paid by FDC—

though the membership varied over time—and Fund II and Fund III's investment committee consisted exclusively of FDC insiders and always included Frost. (AF 21); *see* also (Frost Decl. ¶ 47; ECF No. 44-9 at 204-205). Further, Frost was the only member of Fund III's Investment Committee in late 2016 and was thus solely responsible for approving the Fund's investment in the last two newly formed portfolio companies. (AF 61). Also, members of the Seed Fund's Investment Committee could be removed by Frost, in his capacity as manager of FMC, at his sole discretion. (AF 22). Additionally, although all actions of the Seed Fund's Investment Committee required at least a majority vote of its members, in the event of a tie vote, the investment decision would be made by Frost in his sole discretion, as manager of FMC, and all members of the Investment Committee would be required to vote in accordance with the determination of the manager, i.e., Frost. (AF 23; Frost Decl. ¶ 56).

According to Frost, he addressed actual and potential conflicts of interests created by his management of the Funds and interests in the various Frost entities, in part, by wearing different metaphorical hats. During the ideation phase, Frost wore his hat as head of the Incubator deciding whether to form a portfolio company. (Searles Decl. ¶ 101; ECF No. 44-9 at 240). As he explained, "[FMC] played no role in the ideation or formation of the company . . . So at that point I'm wearing my hat as the [General Partner ("GP")] of the fund. So my role as a GP of the fund is managing the fund's investments, sitting on boards on behalf of the GPs, because the fund is only involved in a company once it's making an investment, not before that." (Searles Decl. ¶ 101; ECF No. 44-9 at 239). Per Frost, in his role as General Partner of the Funds, Frost would also sit on the board of portfolio companies representing the Fund's investment. (Searles Decl. ¶ 101; ECF No. 44-9 at 238). In his position as an investment committee member of the Funds, Frost made the determination to invest Fund money into various portfolio companies "[w]earing the hat of an investment committee member . . . ." (Searles Decl. ¶ 101; ECF No. 44-9 at 232). Members of the Investment Committee for the Seed Fund were also members or employees of FDC and received compensation from FDC. (Searles Decl. ¶ 101, ECF No. 44-9 at 204-

205, 274).  Frost testified, "I was very careful to think about the different hats I wore and we didn't approve every deal, that's for sure," and that other members of the investment committees that also worked for FDC "were performing their roles at that stage as GPs, as part of the [I]ncubator . . . and took into consideration and wore different hats just the same."  (Searles Decl. ¶ 101; ECF No. 44-9 at 272).

### F.    Management Fees and Frost's Personal Expenses

#### 1.    *Frost's Management Fees*

The governing documents for the Seed Fund and the International Seed Fund did not disclose or authorize the payment of management fees.  (AF 54).  The executive summary of the Seed Fund also represented to investors that the Seed Fund would not be expected to cover "expenses and salaries incurred by FDC . . . ."  (AF 52).  Yet, from 2012-2014, FMC charged the Seed Fund $324,280 and the International Seed Fund $24,875.  (AF 55).[17] From June 2012 through September 2013, Frost charged the Seed Fund $16,000 per month, totaling $256,000, for his salary at FDC, which was listed in FMC's books as "management services."  *See, e.g.*, (Searles Decl. ¶ 44; ECF No. 44-7 at 28-29); *see also* (Searles Decl. ¶ 100; ECF No. 44-9 at 157 (Guerry testifying that Frost's salary was, in fact, covered by the Seed Fund)).  These facts were not disclosed to investors in the Seed Fund and International Seed Fund.

---

[17] The context of the Admitted Facts suggests, but does not make clear, whether these amounts constituted "management fees" paid from the Seed Fund and International Seed Fund.  The Admitted Facts also do not make clear whether Frost's $16,000 was included in the amounts set forth in Admitted Fact 55 or in addition to those amounts.  However, the Expert Report of David Weekly dated October 13, 2017, suggests Frost's total salary amount of $256,000 for the period of June 2012 to September 2013 was part of the $324,280 paid by the Seed Fund, although the Seed Fund "Management fund expenses" number in the Weekly report differs from the Admitted Facts number.  *See* (ECF No. 160-4 ("Weekly Decl.") at 32).  Further, according to the 2017 Weekly Expert Report, "Frost stopped charging the Seed Fund for his salary in October 2013, because he was able to collect management fees from Fund II."  (*Id.*).

1    Frost reasoned that, because FDC was, in effect, operating the Seed Fund at the time,

2    FDC could charge for operating expenses, some of which were used to cover Frost's salary

3    because he was performing those services. (Searles Decl. ¶¶ 100-101; ECF No. 44-9 at

4    201-202, 246); *see also* (ECF No. 160-2 ("Cantor Decl.") ¶ 8; *id.* at 52-53 (William Guerry

5    testified that Frost stated that $16,000 a month should be charged to the Seed Fund as

6    Frost's compensation, which Guerry classified as a management fee being paid by the Seed

7    Fund, instead of being paid by FDC)).

8    The governing documents for Fund II stated that FDC "may" receive a monthly

9    service fee from portfolio companies and stated that the service fee would not reduce the

10   2% management fee paid to FDC, so long as the fee did not exceed "reasonable market

11   rates." (AF 39). During the period that Frost managed Fund II, Frost received an allocated

12   portion of the 2% management fee. (Frost Decl. ¶ 86). Further, at the time Fund II was

13   created, Frost's salary at FDC jumped from $250,000 to $1.2 million, which was not

14   disclosed to investors of Fund II. (Searles Decl. ¶ 101; ECF No. 44-9 at 248-249).

15   The governing documents for Fund III stated that the portfolio companies would

16   reimburse FDC a monthly amount for its share of the costs of resources provided by FDC

17   for shared facilities, shared personnel, and other shared resources. (AF 40). Fund II and

18   Fund III cumulatively paid management fees totaling over $1.7 million. (AF 47).

19   According to the Weekly Declaration, the Incubator fees were not set at market rate, were,

20   in fact, excessive, and therefore should have reduced Fund II's 2% management fee to zero

21   pursuant to the language of Fund II's governing documents. (Weekly Decl. at 12

22   (concluding that the Funds paid $12,798,195 in excessive Incubator fees to FDC through

23   December 31, 2017, including $9,413,262 in excessive fees paid by Fund II which should

24   have been deducted from Fund II's management fees); ECF No. 160-3 ("Maleki Decl.") at

25   11-14 (FDC's practice of charging flat rate Incubator fees regardless of company need

26   violated industry standards and resulted in payment of excessive fees by portfolio

27   companies to FDC)).

28

1

### 2. *Frost's Personal Expenses*

2        Although not entirely clear, it appears that FDC paid for certain costs incurred by

3   Frost that likely amount to personal expenses. Specifically, FDC paid over $867,000 for

4   several of Frost's expenses including a wine locker, archery range, boat payments, and a

5   beach club membership, as well as Frost's personal chef, housekeeper, lease payments on

6   luxury cars, and payments for charges (averaging a total of $18,000 a month) made on

7   personal credit cards. (AF 57). After FDC paid for the personal chef, housekeeper,

8   automotive lease payments, and payments for charges made on personal credit cards, it

9   reduced the compensation paid to Frost to cover the expenditures. (AF 57). According to

10   Frost, his housekeeper was an employee of FDC because Frost, for a time, was working

11   from home and the housekeeper certainly cleaned his home office. (Searles Decl. ¶ 96;

12   ECF No. 44-9 at 63). According to Guerry, the rent charged to each portfolio company at

13   some point also included charging for Frost's personal archery range rent. (Searles Decl.

14   ¶ 101; ECF No. 44-9 at 149-153).

15        Frost did not disclose to investors in the Funds that FDC was paying for the salary

16   of Frost's personal chef, but Frost claimed his salary was reduced as a result. (Searles

17   Decl. ¶ 101; ECF No. 44-9 at 265-266). Also, certain of Frost's expenses paid by FDC,

18   including expenses for his Ferrari, Yacht, and Black Card, were reimbursed by FVP GP

19   and deducted from Frost's allocation of management fees paid to FVP GP by Fund II.

20   (Searles Decl. ¶ 45; ECF No. 44-7 at 31); *see also* (Searles Decl. ¶ 49; ECF No. 44-7 at 44

21   (email from Guerry to Frost summarizing Frost's personal expenses deducted from Frost's

22   share of net management fees, including lease of a Ferrari, bungalow deposit, yacht deposit,

23   and $125K for Air Partners, a private chartered jet)).

24        At times, however, there appeared to be a lag in reimbursement of those fees from

25   FVP GP, resulting in FDC carrying the expense at least for a time. For example, in a series

26   of emails starting August 21, 2014, Shital Patel, Controller of FDC, and Guerry discussed

27   the forecast for FDC. (Searles Decl. ¶ 50; ECF No. 44-7 at 44). In response to Guerry's

28   inquiry regarding whether certain cash had been moved, Patel wrote in an August 25, 2014,

email that "[t]he GP owed the [I]ncubator $148K of expenses (there was a wire for the yacht that I had missed when we spoke)." (Searles Decl. ¶ 50; ECF No. 44-7 at 52). In an email dated August 26, 2014, Guerry responded to Patel, "[a] few questions, I thought with the transfer of $60K from the GP to the [I]ncubator we would have had more cash in the [I]ncubator. Why isn't that the case?" (Searles Decl. ¶ 50; ECF No. 44-7 at 51). The same day, Patel responded via email to Guerry, stating. "[t]he [I]ncubator doesn't have more cash because we picked up the $100K expense for air partners. This expense was not reflected in the forecast previously. Cash balance is $49K . . . . I updated the spreadsheet to show the formula . . . . The spreadsheet is considering . . . [Frost's] $15K September villa in payment . . . ." (Searles Decl. ¶ 50; ECF No. 44-7 at 51).

Moreover, certain emails between Frost and Guerry suggest Frost simply allocated how his expenses should be paid, resulting in those expenses being paid by FDC from its Incubator fee proceeds. For example, on July 25, 2014, Frost sent an email to Guerry stating, "We need to pay the balance for the boat. This should be split equally between John and me." (Searles Decl. ¶ 49; ECF No. 44-7 at 44). The same day, Guerry responded via email to Frost, "I will have this paid today. Note that currently you have already used up your GP fee allocation for the year with the $125K deposit last month for the airplane. . . . Did you see my email re: blackcard? I assume there was some one-time travel costs and that level of expense won't be recurring as we won't have enough in the [I]ncubator to cover." (Searles Decl. ¶ 49; ECF No. 44-7 at 44).

## G.    Frost's Undisclosed Motivation for Creating Portfolio Companies

As stated previously, Frost represented in the Seed Fund governing documents and marketing materials that FDC would start only "2-4" big data software portfolio companies per year to develop products and solutions to meet the technological needs of big data and Fortune 500 companies with the goal of strategic acquisition of each portfolio company or its products. *See* (ECF No. 162-5 at 4; Ans. ¶ 93). Yet, between 2012 and 2016, FDC founded 24 portfolio companies, 12 of which were created between April 2014 and February 2015. (AF 9, 11; Ans. ¶ 93; Searles Decl. ¶ 101; ECF No. 44-9 at 191). The

portfolio companies were funded by the Funds, along with other high net worth individuals, trusts, and affiliates of public companies. (AF 10). Contrary to Frost's representations to the Funds' investors, email communications between Frost and other executives at FDC demonstrate that Frost's motivation for creating more portfolio companies was not solely to develop products and solutions to meet the technological needs of big data and Fortune 500 companies for strategic acquisition, but, instead, to generate more Incubator fees and cashflow and reduce costs incurred by FDC, which Frost operated on a break-even basis. (AF 14, 58; Ans. ¶ 93). For example, on April 8, 2014, Frost wrote to Guerry regarding Fund II's cashflow, stating, "[j]ust for kicks – Can you do a refresh of the fund cashflow assuming 12 new companies between now and July?" (Searles Decl. ¶ 47; ECF No. 44-7 at 39). In response, on April 9, 2014, Guerry stated, "[g]iven the current expect closing, I would be hesitant in doing more than 6-8 companies at this time. I think 12 would be a big stretch for us." (Searles Decl. ¶ 47; ECF No. 44-7 at 39).

On May 20, 2014, Guerry sent an email to Frost providing him the recent forecasts for the Funds and FDC. As to FDC, Guerry informed Frost, "[r]ight now we need 2 more companies to cover out [sic] costs (with Genie coming out in June)." (Searles Decl. ¶ 48; ECF No. 44-7 at 42). In an email dated July 11, 2014, Guerry wrote, "[a]s of my last budget forecast, we were running a bit tight given the lack of a second new company in the latest batch. We might make up for that with others, but haven't yet . . . . I am ok with doing it, assuming we get 2 more companies providing [I]ncubator fees, can rely on GE funding, and believe we will still get another $10 million of funding." (Searles Decl. ¶ 71; ECF No. 44-8 at 131). Similarly, in an email to Frost dated March 29, 2015, regarding FDC and fund forecasts, Guerry wrote, "[w]e are still a bit stretched in the [I]ncubator. We need one more company in order to cover the plan for the rest of the year . . . . The split between the [I]ncubator and Snow [Data Capital] has the [I]ncubator making enough to cover the shortfall in Snow . . . ." (Searles Decl. ¶ 51; ECF No. 44-7 at 55). Additionally, in an email dated September 24, 2015, from Guerry to Frost, with a subject line "Incubator Forecast," Guerry wrote, "[h]ere is the updated forecast thru 9/30. We will draw $20-30K

on the LOC this month to make it.  That will leave $40-50K available.  We really need to start a couple of companies."  (Searles Decl. ¶ 75; ECF No. 44-8 at 145).

On June 8, 2016, in an email to Guerry, John Vigouroux, and Miles Mahoney, with a subject line of "plan," Frost wrote as to FDC, "we need to urgently secure as much funding as possible across the portfolio while retaining as much cash flow as possible for the [I]ncubator.  If we can find funding, starting a few new companies is still possible . . . . New companies would be incredibly helpful in terms of [I]ncubator cash flow.  Also, they would create opportunities for [I]ncubator staff and execs."  (Searles Decl. ¶ 81; ECF No. 44-8 at 166).  Similarly, in an email dated June 10, 2016, Frost told Guerry: "It's critically important to get the [I]ncubator to break even ASAP.  To achieve this we need to 1. Retain as much income as possible from the existing companies.  We all need to do whatever we can to sell the value of the [I]ncubator's services to the companies that have funding. . .  3. Start a few new companies ASAP . . . with DST fund investment . . . 4. Move costs to the newcos [new portfolio companies] by assigning some of our [I]ncubator execs as CEO/CTO."  (AF 58; Searles Decl., ¶ 54; ECF No. 44-7 at 68; Ans. ¶ 98).

### H.    Reaction to Incubator Fees

#### 1.    *Fund Investors*

Frost stated both in his Arbitration testimony and in his deposition in this action that when Fund investors inquired about the amount of FDC's Incubator fees, Frost generally would not disclose the requested information.  *See* (ECF No. 44-9 at 86-89, 228, 230).  According to Frost, however, he and other executives at FDC did describe to some investors the Incubator fees in general terms as being roughly the cost of a "fully burdened executive" or "fully loaded executive" that would be hired by a start-up company, *see* (Frost Decl. ¶ 41); *see also* (Guerry Decl. ¶ 17; Searles Decl. ¶ 97; ECF No. 44-9 at 120, 226-227, 257), without providing a specific number for the charged fees, (ECF No. 44-9 at 135-136).  Neither Frost's nor Guerry's declaration states when they began making such references to investors, but Frost acknowledged in his deposition testimony he did not

33

recall or was unaware of any such language being used in the operation agreements for the Seed Fund, Fund II, in subscription agreements, or marketing materials for these two Funds; nor did he recall them being included in any other documents that were provided to investors before December 2015.[18]  *See* (ECF No. 44-9 at 135-136, 139).  Moreover, the phrase "fully burdened cost of one senior executive," or similar phrase according to SEC industry standards expert, Keith Palzer, has no common industry meaning.  (Palzer Report at 67-68).

At other times, says Frost, he and other executives communicated the approximate costs in dollars to investors, but he does not pinpoint the approximate date such disclosures began.[19]  (Frost Decl. ¶ 42).  The Court notes, however, that the evidence Frost points to in the record of a dollar amount disclosure is dated December 2015, *see* (Frost Decl. ¶ 42; ECF No. 162-26 at 9; Guerry Decl. ¶ 19; ECF No. 162-100), and it does not provide any methodology for calculating the amount of the Incubator fees noted.  Moreover, as the SEC points out, a disclosure in December of 2015 would have been well after "the vast majority of investor monies were raised."  *See* Mot. at 12 n.3.

The specific amount of shared Incubator fees being paid by the portfolio companies was, in Frost's view, confidential, and limited partner investors were not entitled to that

---

[18] In support of his Opposition, Frost submitted the declaration of Luis A. Vasquez, the former Vice President of Investor Relations for FDC, who claims he was present at many investor meetings with Frost, John Vigouroux, and others where the fact that Incubator fees would be charged and the amount of Incubator fees to be charged at the rate of a fully burdened executive, approximately $35,000-$40,000 per month, was disclosed to investors.  (ECF No. 162-94 ¶ 5).  Vasquez does not, however, provide a timeframe for when such meetings took place, nor does he specify which Fund had the investor meetings, which investors were present, or what specific representations were made, among other details.

[19] Frost attaches to his declaration a prospective investor PowerPoint presentation he represents was made to DST that lists on slide 8 "Shared Services Allocation ($40k/mo.*)." (Frost Decl. ¶ 42; ECF No. 162-26).  The annotation for the asterisk states "[a]mount shall decline as the number of companies in the portfolio increases," *see* (*id.*).  Notably, Frost has not pointed to any evidence in the record demonstrating the monthly amount charged to each portfolio company decreased based on the number of companies in the portfolio.

1    information.  *See* (Searles Decl. ¶ 101, ECF No. 44-9 at 149-151, 157-158).  At the same

2    time, Frost and FDC executives took the position that Fund investors were "sophisticated,"

3    institutional investors, some of whom had reviewed and commented on marketing

4    presentations before they were given, and that these investors thus understood that the

5    portfolio companies would be paying Incubator fees.  (Frost Decl. ¶¶ 37, 39; Guerry Decl.

6    ¶ 13); *see also* (ECF No. 162-87 ("Jordan Decl.") at 13 ("In order to subscribe to a private

7    fund offering, an investor must affirm that s/he has sufficient investment sophistication,

8    financial resources, and understanding of the terms and conditions of the investment

9    opportunity as specified in the offering documents.")).  Moreover, claims Frost, if these

10   investors wanted to know about the fees and specific amounts charged for FDC's services,

11   they could look at the marketing materials or just ask for more information.  (Opp. at 11;

12   Frost Decl. ¶ 37; Guerry Decl. ¶ 16).

13         As an example of additional information being provided to an investor who

14   requested it, Frost submits an email thread beginning in November 2014 in which Paul

15   Cate, an investor, asked for more detailed financials, as well as an explanation for a line

16   entry in a portfolio company's financials that listed "Frost Expense" next to the amount of

17   $36k per month paid by the portfolio company to FDC.  (Guerry Decl. ¶ 21; ECF No. 162-

18   102 at 2).  On March 2, 2015, in a follow-up email to Guerry, Cate stated, "I never got an

19   answer to [the November 20, 2014] e-mail." (ECF No. 162-102 at 2).  On March 3, 2015,

20   Guerry apologized for the delay and responded, in part, that "the cost is a share of Incubator

21   resources that are shared by all of the Frost portfolio companies . . . ."  (*Id.*).  Although,

22   Guerry provided examples of the services provided by FDC, he did not provide a break-

23   down of the amounts charged for each service or methodology used to calculate the fees.

24   *See* (*id.*).  After subsequently receiving another request in 2016 from Cate for financials

25   and details as to "all amounts paid to related parties," Luis Vasquez, who at the time was

26   Vice President of Investor Relations for FDC and was responsible for responding to

27   investor inquiries, wrote an email dated March 1, 2016, to Guerry stating, "FYI - I believe

28   that at some point, you will need to discuss the [I]ncubator fee with [Cate].  Or at least tell

him that you're not providing the information." (ECF No. 162-94 ¶ 4; Searles Decl. ¶¶ 76, 96; ECF Nos. 44-8 at 147-148).   On March 4, 2016, Guerry wrote an email to Frost "bringing [Frost] in the loop" regarding Cate's inquiries.  Guerry stated, "We have giving [sic] him information he has requested but not in enough detail for him to be able to separate out the related party payments ([I]ncubator fee)." (ECF No. 44-8 at 147-148).

Further, when some Fund investors learned about the actual amount of Incubator fees being charged to startup portfolio companies, they voiced their concern to Frost.  DST invested in Fund III and, following receipt of DST's funds, Fund III invested $522,000 in startup portfolio company Pinscriptive.   At least $83,000 of the funds was used by Pinscriptive to pay down loans it owed to FDC for Incubator fees, another $36,000 was used to pay Incubator fees invoiced on April 15, 2016, and another $5,100 was used to pay SDC fees. (Weekly Decl. ¶ 7).  Mark Lelinski, the CEO of Pinscriptive, wrote an email to Frost on July 27, 2016, telling Frost "DST will be PISSED if they find out you gave us $500k and within days we used $200k to pay Frost for 'phantom past debt.'" (Searles Decl. ¶ 64; ECF No. 44-8 at 17; Canter Decl. at 185-87 ("phantom debt" referred to accrued, unpaid Incubator fees when Pinscriptive was "hibernating")).  Subsequently, in an email dated February 27, 2017, from Tom Giles to Frost, Giles wrote, "Dst is still not understanding the approval of 2 new co's without any approval process beyond [Frost] and what fees are being used for if no employees in companies." (Canter Decl. at 180).  Then, by letter dated March 22, 2017, from Randall Young, Senior Vice President, General Counsel, and Secretary of DST,  Young requested to have a meaningful in person discussion with Frost and stated that it was first necessary to set forth in the letter DST's "genuine concerns and what changes need to occur in order for the Fund [III] to have a chance to be successful in meeting the objectives for which it was created." (Searles Decl. ¶ 69; ECF No. 44-8 at 122).  Young also wrote, "DST is shocked about the size and frequency of the 'management fee' being charged by your management company in relation to the limited, if any, value being added to the process.  Until such time as the cash required for activities of the Fund are not stressing the prospects for success, the

1   'management fees' charged and collected by your organization should be either waived all

2   together or, at the very least, held in arrears. As you should know, ideation companies such

3   as this cannot take on the burden of excessive expenses, such as your management fees,

4   and still be successful . . . ." (*Id.*).

5                    2.    *Portfolio Company Executives*

6            Although some portfolio company executives believed they received good value for

7   the services received from FDC, at least as to certain stages of their development, *see* (Frost

8   Decl. ¶ 31; ECF No. 162-82 at 3-4), several CEOs of the startup portfolio companies voiced

9   their concern to Frost and other FDC executives over Incubator fees, (AF 43). According

10  to Breese, FDC's CFO until approximately March 2012, Incubator fees being too high

11  "was a very common complaint from other CEOs" and some voiced concern that the fees

12  were affecting their ability to fundraise. (Searles Decl. ¶ 90; ECF No. 44-9 at 18); *see, e.g.*,

13  (ECF No. 44-9 at 54-55 (Mark Lelinski testifying that when he became the CEO of

14  portfolio company Prinscriptive, he obtained the company's financials and learned

15  approximately $60,000 of an initial $250,000 Fund investment had already been paid out

16  during two prior months for Incubator fees and was concerned that the loss of these funds

17  would impact the company's progress); ECF No. 162-85 ¶ 11 (John Burke, Chairman and

18  CEO of portfolio company UBIX, communicated with "Frost and Guerry about reducing

19  [I]ncubator fees charged to UBIX" and  "requested more transparency in the [I]ncubator

20  fees," but was told by Frost the Incubator model was "not set up with a list of services from

21  which a company could pick and choose which ones they wanted to take advantage of in

22  any given month");[20] ECF No. 44-8 at 150 (in an email dated April 22, 2016, from Richard

23  Sootkoos of portfolio company Pingthings to Guerry, which Guerry forwarded to Frost,

24  Sootkoos wrote, "[o]n March 2nd, you wired $42k to the [I]ncubator at the expense of our

25  operations knowing that we had only weeks of runway left.  I told you twice to wire the

26  money back immediately after, the same day.  You responded that Frost would work with

27  ─────────────────

28  [20] Nor has the Court been provided with any such information concerning how fees were calculated or service costs shared among the Portfolio companies.

us if and when we ran out of cash.  That time is now. . . . Wiring back the $42K to our account is what needs to happen at this point")).

In August 2015, Dean Sawyer, the CEO of portfolio company Sentrian, emailed Frost requesting that a requisite 180 days' notice for discontinuing Incubator fees be reduced to 30 days' notice so that Sentrian could move toward full-time rather than shared resources.  Frost responded, "I know that Bill [Guerry] has explained to you that FDC does not offer its services on some kind of a la carte basis.  It's prix fixe only.  That will not change just because you'd like it to."  (Searles Decl. ¶ 60; ECF No. 44-7 at 116; AF 45).  Sawyer responded, in part, that he thought the prix fixe model might become more flexible over time based on the changing needs of the more mature portfolio companies, but since that was not the case, he was giving formal 180 days' notice to end the service agreement.  (Searles Decl. ¶ 60; ECF No. 44-7 at 116).

Although a few of the portfolio companies' CEOs were able to renegotiate the terms of their service agreements, *see* (ECF No. 162-85 ¶ 12; AF 44; Frost Decl. ¶ 28), it was not without great difficulty and such successful negotiations appear to have been the exception, not the rule.  Of the few portfolio companies that were able to renegotiate the amount of fees being paid to FDC, the reason typically was either because the company could not make payroll or because an outside investor insisted on a reduction.  During his Arbitration deposition testimony, Frost discussed his position on reducing fees as follows, "[a]s I said, at the end of the day, wearing that hat as the CEO of the [I]ncubator, I would negotiate hard.  That was my job. . . .  And the CEO would play his role of wearing his hat there and negotiating on behalf of the company.  And in the end we would resolve that negotiation to some -- you know, in some way.  Some cases I convinced them that the fee should stay where it was.  Many other cases it was reduced, depending on the circumstances."  (Searles Decl. ¶ 101; ECF No. 44-9 at 243).

## I.    Incubator Fees' Impact on Portfolio Companies

Over the course of its business, FDC charged the portfolio companies more than $19,000,000 in fees.  (AF 13).  The portfolio companies depended on the Funds and other

investors for the capital needed to pay their requisite Incubator fees. (AF 15). Frost admits the Incubator fees indisputably weakened the financial condition of the FDC's portfolio companies and negatively impacted their ability to raise capital. (AF 15, 46). Notwithstanding its charging of Incubator fees, FDC was ultimately unsuccessful; the Funds and their respective investors received no financial returns on their investments. (AF 16). As of early 2018, only a few of the portfolio companies remained active. (AF 16). Of the 24 portfolio companies associated with FDC, 14 never generated revenue and the few remaining companies have generated minimal revenue. (Weekly Decl. at 26; Searles Decl. ¶ 73; ECF No. 44-8 at 137-39 (email dated June 30, 2015, from Steve Gotz, an employee of FDC, to Frost, noting there had been 15 companies founded since 2014, 67% of which "are exhibiting/have exhibited exceptionally poor execution," reflecting "unacceptably high failure rates and instances of poor execution" and recommending to "[r]ight-size/stratify the monthly [Incubator] fee, to more accurately reflect the value we are capable of delivering for our companies")). In short, contrary to the representations of Frost to Funds investors, Funds investors generally did not receive financial returns on their investments in the startup portfolio companies incubated by FDC.

## III.    LEGAL STANDARD

### A.    Nature of Proceedings

Generally, a district court may grant injunctive relief on a summary judgment record, but "cannot resolve any genuine factual issue, including credibility and must resolve all factual inferences against the moving party and in favor of the opposing party." *SEC v. Husain*, 70 F.4th 1173, 1180 (9th Cir. 2023) (internal quotations and alterations omitted).

Here, however, the Court is not presented with a summary judgment record. Instead, the parties have agreed to the Admitted Facts and stipulated that Frost is liable for a negligent violation of Section 206(4) of the Act and Rule 206(4)-8. (AF; ECF No. 159). The Parties also agreed the SEC, in seeking an injunction, can argue, consistent with the allegations in Claim Two of the Complaint, that Frost's admission of negligence is merely the floor of his liability. *See* (Complaint ¶¶ 126-130). Additionally, the Parties agreed that

Frost is free to argue that his liability does not exceed negligence and that injunctive relief is not appropriate. (ECF No. 170 at 31-32). Further, the Parties have stipulated the Court "may determine the issues raised in the [M]otion on the basis of affidavits, declarations, excerpts of sworn deposition testimony taken in this action, the Admitted Facts, and documentary evidence, and may draw such inferences and find such facts as the Court deems appropriate, with or without a hearing." (ECF No. 157 ¶ 4). Finally, since executing the Stipulation, the Parties have repeatedly reiterated that the Court may determine factual disputes presented by the Motion without resort to an evidentiary hearing or full trial. *See* (ECF Nos. 170 at 31-32; 176 at 3; 179 at 2; 182 at 8; 183). Thus, the rule announced in *Husain* presents no obstacle to the Court's resolution of the SEC's pending motion for injunctive relief.[21]

Indeed, neither party disputes that the Court, in determining the issues in the Motion, is not required to review the facts in a light most favorable to Frost, as the non-moving party. *See, e.g.*, (Opp. at 18–19 (discussing applicable legal standard)); *cf. Husain*, 70 F.4th at 1180 (holding that, to determine whether to issue injunctive relief on a summary

---

[21] Even if the Court were deciding this matter on a summary judgment record, this would not preclude the Court from making findings of fact, drawing inferences, and weighing the credibility of witnesses without the requisite summary judgment presumptions, so long as the parties agreed to that procedure, as is the case here. *See, e.g.*, *Gillespie v. Norris*, 231 F.2d 881, 883-84 (9th Cir. 1956) (holding, on summary judgment, that where "plaintiff made many admissions, but also made qualified denials which raised questions of fact," but parties acquiesced in the procedure of submitting documents, affidavits, and admissions to the court for factual determination on the evidence, the parties waived jury trial regarding the questions of fact); *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975) (although the parties had filed cross-motions for summary judgment, "the parties in fact agreed that all of the underlying material facts were those reflected by the written record before the court" and, "[g]iven the unique procedural history of litigation, . . . the court was justified in concluding that the parties had in effect and in substance agreed to a trial of the [ ] claim on the written record"); *accord Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142-43 (2d Cir.1998) ("We today adopt the position of our sister circuits that a district court may decide a case by summary bench trial upon stipulation of the parties as long as the parties have willingly foregone their right to a full trial.")

judgment record, a district court must determine whether genuine issues of material fact exist and must resolve any uncertainty in favor of the non-moving party).  Nor do the parties argue that any of the genuine disputes of fact that apparently exist concerning scienter, good faith, and Frost's contrition preclude the Court from deciding the SEC's Motion without an evidentiary hearing or trial per the parties' Stipulation.  Accordingly, while it may be inappropriate at summary judgment for a court to question a party's good faith conduct to determine whether the party's violation of the act demonstrates scienter, *see Husain,* 70 F.4th at 1184-85, the Parties in this case have repeatedly affirmed their mutual desire for the Court to make that assessment on the record before it.

## B.   The Advisers Act

Section 206(4) of the Advisers Act prohibits investment advisers from directly or indirectly engaging in "any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4).  Rule 206(4)-8(a) provides:

> It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the Act . . . for any investment advisor to a pooled investment vehicle to:
>
> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or
>
> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8(a).

"A fundamental purpose" of Congress passing the Advisers Act "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."  *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963).  The Advisers Act is "to be construed like other securities

1   legislation enacted for the purpose of avoiding frauds, not technically and restrictively, but
2   flexibly to effectuate its remedial purposes." *Id.* at 195 (internal quotations omitted).

3       To effectuate its purposes, the Advisers Act authorizes the SEC to seek penalties and
4   injunctive relief for violations. 15 U.S.C. § 80b-9(d). The Act provides that a court "shall"
5   grant a permanent or temporary injunction "[u]pon a showing that such person has
6   engaged, is engaged, or is about to engage in any such act or practice" constituting a
7   violation of the Act. 15 U.S.C. § 80b-9(d).

8       To obtain an injunction, the SEC must establish that there is a reasonable likelihood
9   of future violations of the securities laws. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.
10  1980) ("*Murphy I*"). "The existence of past violations may give rise to an inference that
11  there will be future violations; and the fact that the defendant is currently complying with
12  the securities laws does not preclude an injunction." *Id.*

13      In "predicting the likelihood of future violations," the court must assess "the totality
14  of the circumstances surrounding the defendant and his violations." *Id.* To do so, the court
15  weighs and considers the following five factors: (1) the degree of scienter involved; (2) the
16  isolated or recurrent nature of the infraction; (3) the defendant's recognition of the
17  wrongful nature of his conduct; (4) the likelihood, because of defendant's professional
18  occupation, that future violations might occur; and (5) the sincerity of his assurances
19  against future violations. *Id.* (citation omitted). "No single factor is determinative; instead,
20  the district court should determine the propensity for future violations based on the totality
21  of the circumstances." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1228 (D.C. Cir.
22  1989). The "purpose of injunctive relief against violators of the securities laws is to deter
23  future violations, not to punish the violators." *SEC v. Randolph*, 736 F.2d 525, 529 (9th
24  Cir. 1984) (citation omitted). Ultimately, "[t]he granting or denying of injunctive relief
25  rests within the sound discretion of the trial court." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th
26  Cir. 1996) (internal quotations and citation omitted).

27
28

42

## IV.  DISCUSSION

The Court has considered evidence relevant to its determination of the likelihood of future violations and, in accordance with the parties' Stipulation and where appropriate, has resolved some factual disputes to do so.  Based on the Court's assessment of the evidence submitted, as relevant to the following five factors, and the reasonable inferences it has drawn from that evidence, the Court finds that the totality of the circumstances in this case demonstrates an injunction is warranted.

### A.    First Factor: The Degree of Scienter Involved

To establish a violation of Section 206(4), the SEC need only prove the defendant acted with negligence.  *See SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992) (holding scienter not required for Section 206(4)); *SEC v. Alar*, No. 1:19-CV-03265-JPB, 2022 WL 953310, at *9 (N.D. Ga. Mar. 30, 2022) ("Sections 206(2) and 206(4) do not require scienter; 'a showing of negligence is sufficient.'" (quoting *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1247 (11th Cir. 2017)).  "Negligence is the failure to exercise ordinary care."  *SEC v. Duncan*, No. 3:19-cv-11735-KAR, 2021 WL 4197386, at *8 (D. Mass. Sept. 15, 2021).

Pursuant to the parties' Stipulation and the Admitted Facts, Frost admits that he violated Section 206(4) and Rule 204(4)-8 by acting negligently while serving as an investment advisor to the Funds.  Thus, Frost admits that he "engaged in an act, practice, or course of business that was fraudulent, deceptive, or manipulative" by making a statement of material fact that was not true and/or was misleading due to the omission of a material fact, to an investor or prospector of the Funds.  (AF 74; *see also* ECF No. 159).

Frost, however, argues an injunction may not issue based only on a showing of negligence.  *See* (Opp. at 19–20 ("Frost's lack of scienter alone defeats an injunction")).  The Court disagrees.  Federal courts may issue an injunction upon the showing of a violation of the securities laws.  *See, e.g.*, 15 U.S.C. §§ 77t(b), 78u(d), 80b-9(d).  Indeed, the Supreme Court has instructed that "a district court may consider scienter *or lack of it* as one of the aggravating or mitigating factors to be taken into account in exercising its

43

equitable discretion in deciding whether or not to grant injunctive relief." *Aaron v. SEC*, 446 U.S. 683, 701 (1980) (emphasis added). Moreover, the Ninth Circuit has upheld injunctions where the SEC did "not allege" intent to defraud because the "degree of scienter" was "not necessary to prove" the type of past violation alleged in the case. *Fehn*, 97 F.3d at 1296; *see SEC v. Gault*, 751 F. App'x. 974, 980 (9th Cir. 2018) (rejecting argument that "negligence is 'not enough' to support an injunction" against future negligent violations of Section 17(a)(3) and explaining that, "[a]lthough scienter must be proved before an injunction may issue 'when scienter is an element of the substantive provision sought to be enjoined,' the SEC is not required to establish scienter to enjoin violations of provisions 'such as § 17(a)(2) and § 17(a)(3), which may be violated even in the absence of scienter'" (quoting *Aaron*, 446 U.S. at 701)). As such, this Court is not precluded from enjoining a negligent violation of the Advisory Act.[22]

Regardless, the issue of whether a negligence finding is sufficient to issue an injunction is of no moment because, as discussed below, the Court finds that Frost's statements and actions in violating Section 206(4) and Rule 204(4)-8(a)(1) and (a)(2)[23] were not merely negligent, as he admits, but rose, at a minimum, to the level of recklessness.

---

[22] Frost cites *Steadman*, 967 F.2d at 648, as an example where the D.C. Circuit overturned imposition of an injunction in part because it reversed the scienter-based claims despite affirming defendants' violations of Section 206(4). (Opp. at 20). However, the misconduct at issue in *Steadman* was far less deliberate than Frost's actions here. In Steadman, the court denied a permanent injunction where the violators were merely "negligent in failing to add a single footnote about potential liability." *Steadman*, 967 F.2d at 648. As discussed in this Order, the extent, duration, and deliberate nature of Frost's conduct goes beyond mere negligence.

[23] Frost relies on the fact that he stipulated to an admission of liability for a negligent violation of Section 206(4) of the Advisers Act. According to Frost, the SEC could have but did not insist upon an admission of scienter and instead settled for an admission of negligence, thereby suggesting that the SEC recognizes it cannot prove scienter. (Opp. at 19–20). However, as the SEC points out, the SEC did not stipulate that Frost's conduct was *only* negligent; "rather, negligence is all that Frost must admit for purposes of establishing his liability under Section 206(4) and Rule 206(4)-8." (Reply at 3 n.2).

1.   <u>Untrue and Misleading Statements and Fraudulent, Deceptive, and Manipulative Acts</u>

Aside from Frost's admissions in the Stipulation and Admitted Facts, the Court finds that Frost made untrue and misleading statements to investors and otherwise engaged in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative, including, but not limited to, the following. First, as to the Seed Fund, Frost made several statements that he knew or should have known were untrue or misleading. For example, in marketing presentations, Frost represented to investors that the Seed Fund was a "no-fee, no-carry" fund. (AF 28; ECF No. 162-5 at 5). And the Seed Fund's governing documents represented to investors only that the Fund would bear the operating expenses reasonably incurred by it and FMC in connection with the management of the Fund and FMC. (ECF No. 162-8 at 4). These documents and presentations did not disclose that investment funds would be used to pay FDC's or Frost's management fees or expenses. (AF 54; ECF No. 162-5 at 6). Yet, because Frost was drawing his salary from FDC—approximately $192,000 in 2012 alone, *see* (Frost Decl. ¶ 82)—and the Incubator fees were the only source of FDC's revenue, FDC's management fees, and the salaries and expenses incurred by FDC personnel, were being paid, at least in part, from investments in the Seed Fund.[24] (AF 54, 64; ECF No. 162-5 at 6); *see also* (AF 55 (stating that from 2012-2014, FMC charged the Seed Fund $324,280 and the International Seed Fund $24,875); Searles Decl. ¶ 44, ECF No. 44-7 at 28-29; Searles Decl. ¶ 100, ECF No. 44-9 at 157 (Guerry testified that Frost salary was, in fact, covered by the Seed Fund)).[25]

---

[24] Although Frost attaches a Seed Fund executive summary transmitted to Mike Schulman of Hollencrest, which references portfolio companies being charged on a case-by-case basis for services from the Incubator, the summary does not disclose the amount of fees, and Frost admits such fees were not negotiated on a case-by-case basis or through arm's length transactions. *See* (AF 71). Further, it is unclear whether all investors received the executive summary, and the fees were still not disclosed in the governing documents for the Seed Fund. *See* (Palzer Report at 51).

[25] Frost explained that, because the Incubator was, in effect, operating the Seed Fund at the time, it charged for operating expenses, some of which were used to cover Frost's salary

Second, although the Seed Operating Agreement and an executive summary represented that Frost, through FMC, would establish an Advisory Committee nominated from the investors in the Seed Fund to, among other tasks, render advice "with respect to matters pertaining to conflicts of interest between or among [FMC], any members of [FMC], . . . or the [Seed Fund] . . . ," (ECF Nos. 162-8 at 12; 162-5 at 5; AF 24-25), Frost never established an Advisory Committee for the Seed Fund.  As previously found, inherent conflicts of interest existed between Frost and the Funds based on Frost's management of FDC and the various Frost entities, his role in creating portfolio companies, his role in making investment decisions through the Fund's Investment Committee, and his role serving as an investment advisor to the Funds, as well as based on his compensation arrangements paid at least in part from FDC's receipt of Incubator fee payments from portfolio companies.  *See* (Frost Decl. ¶ 87 (Frost admits he "did not effectively manage the conflicting economic pressures of operating the Incubator while acting as an advisor to the Funds")).  As such, Frost's representation to investors in the governing documents for the Seed Fund that an Advisory Committee would be established to assess and advise the Fund regarding conflicts such as his was not true or, at the very least, was misleading.

Third, as to Fund II, the governing documents for Fund II disclosed to investors that FDC "may" receive a monthly service fee from the companies in which the partnership holds an investment in exchange for certain shared advisory and support services provided by FDC.  *See* (AF 39).  Frost did not disclose in the governing documents that Incubator fees were, in fact, being and would continue to be charged by FDC to the portfolio companies.  Indeed, the record reveals that Incubator fees generally were charged from the moment a portfolio company was formed, even if the newly created company had no CEO or employees.  *See* (AF 67).  And Frost has not pointed to any evidence in the record where

---

because he was performing those services.  (Searles Decl. ¶¶ 100-101, ECF NO. 44-9 at 201-202, 246); *see also* (Cantor Decl. ¶ 8; *id.* at 52-53 (William Guerry testified that, Frost stated that $16,000 a month should be charged to the Seed Fund as Frost's compensation, which Guerry classified as a management fee being paid by the Seed Fund, instead of being paid by FDC)).

FDC refrained from executing a service agreement assessing a monthly service fee to a newly formed portfolio company as a going concern. As such, Fund II's use of the term "may" in its governing documents was deceptive. *See Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 475-76 (D.C. Cir. 2019) (holding under Sections 206(1) and 206(2) a disclosure that a fee "may" be collected is inadequate when the adviser knows fees are in fact collected); *SEC v. Blavin*, 760 F. 2d 706, 708-09, 711 (6th Cir. 1985) (concluding that "a disclaimer that the investment advisor 'may' trade in recommended securities for its own account is itself a material misstatement").

Fourth, although the governing documents for Fund II disclosed FDC may receive a monthly service fee, they did not disclose that the execution of the service agreements imposing such fees typically were not negotiated, let alone at arm's length, or that the agreements obligated the portfolio companies to typically pay between $25,000 to $40,000 a month in Incubator fees to FDC using Fund II's investments. *See* (AF 15). Paragraph 6.1(d) of the Fund II Agreement represented to investors that any Incubator fee paid by a portfolio company would "not reduce the [2%] management fee payable to the [FVP GP] . . . so long as such [Incubator f]ee [did] not exceed reasonable market rates." (ECF No. 162-10 at 15; AF 39). It did not disclose, however, that no periodic calculation or market studies would be conducted or industry standards or experts in the field consulted to determine whether the monthly $25,000 to $40,000 Incubator fees being charged to portfolio companies were at reasonable market rates, *see* (AF 66; Frost Decl. ¶ 24), and thus Frost and FDC also could not determine whether the 2% management fee being charged to Fund II at any given time should be reduced.[26]

---

[26] The parties heavily dispute whether the Incubator fees exceeded "reasonable market rates," warranting a reduction in the management fee. Each has submitted its own series of expert reports on the issue. According to the Weekly Report, the Incubator fees were not at market rate, were, in fact, excessive, and therefore should have reduced Fund II's 2% management fee to zero pursuant to the language of Fund II's governing documents. (Weekly Decl. at 12 (concluding that the Funds paid $12,798,195 in excessive Incubator fees to FDC through December 31, 2017, including $9,413,262 in excessive fees paid by Fund II, which should have been deducted from Fund II's management fees); *see also*

Nor did Frost disclose to investors his conflicts of interest, as set forth above, or his acts, practices, and course of business of self-dealing.  Further, although Frost did establish an Advisory Committee for Fund II, the committee did not operate as the governing documents represented it would because it did not receive any disclosures about the Incubator fees paid by the portfolio companies or their amounts, (AF 65), let alone address the self-dealing nature and conflicts of interests regarding such fees.

Fifth, the governing documents for Fund III, formed in approximately August of 2015, represented to investors that the portfolio companies in which the Fund invested would reimburse FDC a monthly amount for its share of the cost of resources provided by FDC for shared facilities, shared personnel, and other shared resources.  (AF 40; Frost Decl. ¶¶ 14-15, ECF Nos. 162-10, 162-11).  When making the representations in the governing documents for Fund III, Frost did not disclose to investors that such fees were fixed and not based on each portfolio company's allocation of shared services.  Nor did Frost disclose to investors the precise methodology FDC used to calculate the monthly, fixed fee.  *See* (Searles Decl. ¶ 101, ECF No. 44-9 at 149-151).  However, when communicating with the portfolio companies around the same time frame, Frost maintained that Incubator fees were fixed and would not change.  For example, in a series of email

---

(Maleki Decl. at 11-14 (FDC's practice of charging flat rate Incubator fees regardless of company need violated industry standards and resulted in payment of excessive fees by portfolio companies to FDC)); *but see* (Jordan Decl. at 23-30 (opining that Incubator fees were not excessive)).  Whether Frost is able in hindsight to demonstrate that the monthly Incubator fees of approximately $25,000 to $40,000 were set at reasonable market rates does not change the fact that he has admitted he "failed to act with reasonable care, in accordance with industry standards" in communicating with investors in the Funds and had not consulted industry experts or conducted any marketing studies to determine reasonable market rates before setting the Incubator fees.  Thus, he could not legitimately assess whether the 2% management fee being charged to Fund II should be reduced based on the Incubator fee rates being charged by FDC.  The Court finds that knowing Frost lacked the requisite information to determine both whether the 2% fee should be reduced and whether the Incubator fees were set at reasonable market rates is information that would have been material to a reasonable investor in Fund II.

communications between Frost, Guerry, and Dean Sawyer, CEO of portfolio company Sentrian, from August 6, 2015, to August 7, 2015, Frost stated to Sawyer, "I know that [Guerry] has explained to you that FDC does not offer its services on some kind of a la carte basis. It's prix fixe only. That will not change just because you'd like it to." (Searles Decl. ¶¶ 60, 100; ECF No. 44-7 at 116-119; ECF No. 44-9 at 157-159, 279-281; AF 45). Thus, Frost's representations to investors of Fund III regarding FDC's fees being allocated based on each portfolio company's allocation of shared services were false or misleading.

Sixth, the governing documents and marketing materials for the Seed Fund, Fund II, and Fund III represented to investors that the reason portfolio companies in which the Funds invested would be created and incubated would be to develop their technological products with the goal of attracting major players for strategic acquisition of the startups, resulting in financial returns to the Funds' investors. *See* (AF 32; ECF Nos. 162-5 at 3-5; 162-10 at 2; 162-11 at 9; 162-26 at 4; Ans. ¶ 45). From 2012 through 2016, Frost was also representing in marketing materials to investors that the goal of FDC was to launch "up to 2-4 [I]ncubator companies per year" for that purpose. (ECF No. 162-26 at 4); *see also* (ECF No. 162-5 at 4 (stating, in 2012, "Frost VP has been formed with the expectation of starting 2-4 innovative companies per year in the big data and related spaces.")). However, contrary to his representations, Frost created 12 of the 24 portfolio companies between April 2014 and February 2015. (Ans. ¶ 93; Searles Decl. ¶ 101, ECF No. 44-9 at 191). Further, from Frost's communications with other executives at FDC and his admissions, it appears Frost's motivation for doing so was not solely to attract major players for strategic acquisition to increase returns to Fund investors but, instead, primarily to generate more Incubator fees, cashflow, and reduced costs for FDC. (AF 14, 58; Searles Decl. ¶¶ 48, 51, 71, 75; ECF No. 44-7 at 42, 55; ECF No. 44-8 at 131, 145). As such, Frost's representations to investors regarding the Incubator Model's purpose were deceptive.

Seventh, Frost also failed to disclose to investors in the Funds the existence of SDC and that it was also charging fees to the portfolio companies. Frost created SDC in 2014, in part, to provide employment to one of Frost's long-term former employees, Anthony

Howcroft, who needed to be associated with SDC for immigration purposes. (AF 49). Although FDC had generally been charging the portfolio companies for sales and marketing, beginning in approximately April 2014, SDC began charging certain portfolio companies $5,100 per month through FDC for marketing services, in addition to the marketing fees being charged by FDC. (Searles Decl. ¶ 100; ECF No. 44-9 at 145-146, 277; AF 49, 51). Frost admits he never disclosed to the Funds' investors the existence of SDC or its fees. (AF 52). As discussed below, this failure alone demonstrates recklessness, at a minimum.

Finally, as Frost admits, the Funds' quarterly reports distributed to investors did not disclose the Incubator fees paid by the portfolio companies or their amounts. (AF 63).

### 2. Materiality

Frost's statements and omissions of fact were material. A statement or omitted fact is material if there is a "substantial likelihood" that a reasonable investor would have considered the untrue statements and omitted facts important in his or her decision making, and disclosure of the omitted facts would have "significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, (1976)). "[T]he 'reasonable investor' test is an objective standard," and thus the reactions of the actual investors are not dispositive. *SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1061 (S.D. Cal. 2021).

The Court finds a reasonable investor would have wanted to know before investing in the Seed Fund and Fund II that a good portion of the investor's investment would be used to pay monthly Incubator fees to FDC and, by extension, a portion of Frost's salary and would have wanted to know the extent of such fees. A reasonable investor, before deciding to invest in Fund II, would also have wanted to know that a portion of the investor's investment would, in fact, be used to pay an average monthly Incubator fee of $25,000 to $40,000 month to FDC and, by extension, a portion of Frost's salary, instead of being told by the governing documents that the fees "may" be imposed. A reasonable investor also would have wanted to know that inherent conflicts of interest existed due to

Frost's decision-making authority over Fund II's investments through FMC and his self-interest in FDC and that an Advisory Committee would not be used to safeguard against such conflicts. Additionally, a reasonable investor would have wanted to know that no independent body would be put in place to safeguard Fund investments by overseeing and addressing any such conflicts and that, in the case of Fund II, the committee established would not be used to consider any conflicts. *See SEC v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 952 (C D. Cal. 2022) ("actual and potential conflicts of interests are indisputably material facts" that section 206 requires an investment advisor to disclose to investors and prospective investors (internal quotations, citations, and alterations omitted)).

In sum, on this record, the Court is persuaded that a reasonable investor, even one that is sophisticated, would have considered Frost's untrue statements and omissions regarding the nature and extent of Incubator fees being charged by FDC and SDC, as well as Frost's conflicts of interests and self-dealing, to be material. Frost's failure to disclose these material facts, among others, was therefore fraudulent, manipulative, and deceptive within the meaning of the Act. *See Cap. Gains Rsch. Bureau*, 375 U.S. at 200.

### 3. Scienter

The Ninth Circuit has held for purposes of the federal securities laws generally that a finding of recklessness is sufficient to support a finding that a defendant acted with scienter. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (citing *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568–69 (9th Cir. 1990) (en banc)); *see also Ponce v. SEC*, 345 F.3d 722 (9th Cir. 2003) ("In the Ninth Circuit, scienter may be established by demonstrating that the defendant acted recklessly."). Similarly, "scienter" under the Advisory Act also refers to "knowing or reckless conduct." *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003) (applying the same standard for scienter under the Advisory Act as under both section 10(b) of the Exchange Act of 1934 and section 17(a)(1) of the Securities Act of 1933). "Whether a defendant acted with scienter is a 'subjective inquiry,' which ultimately 'turns on the defendant's actual state of mind.'" *Husain*, 70

F.4th at 1185 (citing *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010)).  However, "[p]roof of scienter is often based on inference from circumstantial evidence." *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987); *see also Gebhart*, 595 F.3d at 1041 ("Scienter can be established by direct or circumstantial evidence." (citation omitted)).

Based on the Court's review of the record, the Court finds that Frost acted with recklessness when he: made the untrue and misleading representations to investors of the Seed Fund and International Seed Fund that no Incubator fees would be paid with investor funds; falsely represented to investors of Fund II only that Incubator fees "may" be paid and would be based on the portfolio companies' shared costs and at reasonable market rates; utterly failed to disclose to investors the existence of SDC and that a portion of Funds' investments would be used to pay SDC's fees; failed to fully and accurately disclose to investors in all Funds the extent of his conflicts of interest and motivations for creating portfolio companies; and failed to disclose to investors in all Funds that no safeguards would actually be implemented to protect their investment or safeguard Frost's and FMC's investment decisions.

As to the Seed Fund, Frost knew or should have known at the time the governing documents were disclosed to investors that they represented an Advisory Committee would be established to review conflicts of interest between FMC, any members of FMC, and the Seed Fund.  (AF 24-25, 29; ECF No. 162-8 at 12-13).  As to Fund II, which was established in approximately 2013, Frost reviewed and approved the Fund II Agreement before it was disseminated to investors.  (Searles Decl. ¶ 101; ECF No. 44-9 at 224-225).  By then, Frost, through FDC, had already started portfolio companies and was collecting Incubator fees and therefore knew or should have known that FDC was, in fact, charging Incubator fees to portfolio companies generally from the moment a portfolio company was formed, contrary to the optional language used in Fund II's governing documents.  *See* (AF 67).  As to Fund III, Frost's communications with portfolio companies regarding the fees being fixed were contemporaneous with, and directly contradicted, the representations being made to investors that the fees were negotiable and apportioned.  As such, Frost knew or

should have known that the statement in Fund III's governing documents were not true, were deceptive, and were misleading.  Indeed, Frost admits that the fees initially collected by FDC from portfolio companies were fixed at a flat rate per month, (AF 68), and were not, in fact, based on the portfolio company's shares of the cost of resources provided by FDC for shared facilities, shared personnel, and other shared resources, (AF 41).  As to SDC, the evidence in the record demonstrates FDC was already charging portfolio companies for marketing services and that Frost's primary motive for creating SDC and not disclosing it was to address Howcroft's immigration issues.  From, among other evidence in the record, Frost's review of the government documents for the various Frost entities, as well as his statements regarding wearing different metaphorical hats, Frost was also aware of his conflicts of interest due to his management of FMC, FDC, the various Frost entities, and the Funds and his compensation arrangements with these entities, yet the extent of these conflicts was either not disclosed to the Funds' investors or was not sufficiently disclosed.  Nor did Frost establish an independent body to advise the Funds regarding his conflicts of interest.  Any one of the aforementioned examples is sufficient to create an inference of recklessness.  *See Vernazza*, 327 F.3d at 860.  Taken together, the Court has no reservation in finding Frost acted with recklessness.

### 4.  Lack of Good Faith

#### a.  *Advice of Counsel*

Frost's suggestion in his Opposition and declaration in support that he relied on the advice-of-counsel in failing to make the requisite disclosures to investors is unavailing. *See* (Frost Decl. ¶ 34 ("We engaged a well-regarded law firm in the venture capital space, Cooley LLP ("Cooley") to advise the Fund regarding, and to draft, disclosures and agreements."); Opp. at 11 ("Frost engaged a respected law firm, Cooley . . . to ensure that all legal disclosures to investors were complete and accurate.")).  As Judge Staton found, Frost invoked the attorney-client privilege during his deposition in this case when questioned about, among other topics, what, if any, information he and others provided to and received from Cooley concerning making proper disclosures in the governing

documents; charging portfolio companies Incubator fees; setting the rate of such fees; and assessing management fees. (Supp. Searles Decl. ¶ 3; *id.* at 8-13). Consequently, Judge Staton granted the SEC's motion *in limine* to exclude evidence or argument by Frost regarding the advice or presence of counsel. (ECF No. 148). In particular, Judge Staton explained that Frost is asserting he "should be allowed to present evidence that demonstrates [he] engaged in a 'good faith effort to provide adequate disclosures to investors through consultation with counsel,' and [he] also seek[s] 'to offer evidence concerning the participation of attorneys in reviewing and preparing the documents at issue.'" (*Id.* at 1-2). Judge Staton found Frost was essentially asserting a "back door" advice of or presence of counsel defense and declined to permit such evidence. Specifically, she held that, given Frost's repeated refusal to disclose the content of communications with Cooley regarding the disclosures at issue, if Frost were allowed to suggest that Cooley had explicitly or implicitly "blessed" the offerings and level of disclosures without Frost waiving the attorney-client privilege, it would give Frost all the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense. Judge Staton thus precluded Frost from offering any evidence or argument at trial regarding the advice, involvement, or presence of counsel. (*Id.* at 8); *see also SEC v. Lek Sec. Corp.*, No. 17CV1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("The intimation that counsel has blessed a transaction or practice without waiver of the attorney-client privilege 'would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.'" (quoting *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013)).

The circumstances have not changed for purposes of the present Motion. Nor is reconsideration of Judge Staton's order warranted. Accordingly, Frost has not shown his purported reliance on any advice from Cooley provides a good faith basis for him making the untrue and misleading statements to investors or otherwise engaging in his fraudulent, deceptive, or manipulative acts.

####### b.    *Reliance on Auditors*

Frost also claims that, in making disclosures, he relied in good faith on the Seed Fund, International Seed Fund, and Fund II's outside auditor, Marcum, LLP ("Marcum"), which Frost claims opined the amount of FDC's Incubator fees did not need to be disclosed in those Funds' financial statements.  (Opp. at 11, 13, 29); *see also* (Frost Decl. ¶¶ 34-36; Supp. Searles Decl. at 129).  The SEC responds that whether the Incubator fees should have been disclosed by the Funds in their financial statements is irrelevant to whether Frost should have disclosed the existence of and amount of FDC's Incubator fees to investors.  (Reply at 11).

The Court agrees that whether Marcum opined favorably from an accounting perspective on the Funds' nondisclosure of the indirect payment of Incubator fees *in their financial statements* is not determinative of whether Frost's nondisclosures to investors in the Funds violated the Act.  Moreover, Frost cannot establish good faith reliance on Marcum's opinions regarding nondisclosure of Incubator fees in the Funds' financial statements if he knew all material information regarding the Fund's financial transactions during the relevant period was not properly disclosed to Marcum.  *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 467 (9th Cir. 1985) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." (citation omitted)).

Here, there is sufficient evidence in the record for the Court to conclude that Frost and others with Frost's knowledge did not disclose all material information regarding the Incubator fees to Marcum, notwithstanding Frost's assurances to Marcum of full and fair disclosure.  *See, e.g.*, (Searles Decl. ¶¶ 17-18, ECF No. 44-6 at 26, 34 (2013 correspondence from Frost on behalf of the International Seed Fund to Marcum assuring Marcum that all relevant and material information had been disclosed to Marcum, including "related party transactions or other transactions with affiliates")).  First, Marcum

55

senior manager, Kellen McConnell, testified in his deposition that Marcum's initial nondisclosure opinion, upon which Frost relies, was limited to its narrow scope of work on the Funds' financial statements and did not include a general opinion of whether Frost or FMC had made proper disclosures under the Act to investors regarding the amount of Incubator fees being paid by portfolio companies. *See* (Schneider Decl. ¶ 12; ECF No. 162-88 at 4). McConnell further testified that, before Marcum issued its initial opinion, Frost did not disclose to Marcum FDC's general policy and methodology of when it would begin charging portfolio companies Incubator fees, the amount of fees FDC would charge, and how long such fees would be charged. (*Id.*).

Second, although Guerry now asserts in his declaration in support of the Opposition that he "completely and accurately disclosed the inner workings of the Incubator Model to Marcum, including information about the Incubator fees," *see* (Guerry Decl. ¶ 29), Guerry does not identify in his declaration what specific information he provided to Marcum before 2017 or when such information was provided. Guerry's assertion also appears to be inconsistent with his 2017 testimony in post Arbitration proceedings that, before approximately 2017, neither he nor anyone from FDC had ever given Marcum any information about the fees charged by FDC to the portfolio companies. (Supp. Searles Decl. at 124). Further, even after Marcum was notified in 2017 that investor Hollencrest was challenging Frost's failure to disclose FDC's imposition of Incubator fees on portfolio companies, Guerry testified that he and Frost deflected Marcum's requests to receive a schedule of fees FDC had received since inception from portfolio companies by year and portfolio company, the methodology for setting such fees, and documentation demonstrating that such fees were set at "market-rate." *See* (ECF Nos. 162-105 at 2; 162-106). Guerry also testified that, when he finally did transmit to Marcum summaries of the fees via a February 11, 2017, email, it was the first time the requested schedule of fees had been provided to Marcum and the first time that FDC had given Marcum any specific information about the fees charged by FDC to the portfolio companies. (Supp. Searles Decl. at 20-21, 33-97, 124).

Finally, although Frost now suggests that he was not involved in Guerry's nondisclosure decisions because his focus was "on building companies, while delegating financial matters to Guerry," (Opp. at 11), Guerry testified the reason he pushed back in a 2017 letter he wrote to Marcum regarding a Marcum executive's "strong opinion" that information regarding the fees being paid by portfolio companies to FDC should be disclosed in the Funds' financials was because, "[a]t the time, Mr. Frost didn't want to disclose them, so I was working on a solution that I am trying to see if that would be acceptable or not." (Supp. Searles Decl. at 22). Guerry's testimony is consistent with Frost's deposition testimony stating it was Frost's general position that the nature, extent, and methodology behind the Incubator fees should not be disclosed to investors, *see* (ECF No. 44-9 at 86-89, 228, 230), though Frost asserted he did not recall the disagreement between Guerry and Marcum on whether the Incubator fees should be disclosed, (ECF No. 44-9 at 92). Accordingly, the Court rejects Frost's reliance on the initial nondisclosure opinion of Marcum to show good faith in failing to sufficiently disclose the Incubator fees in documents provided to Funds' investors.

Based on the foregoing, the Court finds that the first factor weighs in favor of issuing an injunction.[27]

## B.    Second Factor: The Isolated or Recurrent Nature of the Infraction

Under the second factor, the question for the court's consideration is whether the "violative acts were part of an ongoing pattern of conduct rather than isolated incidents." *SEC v. Jasper*, 883 F. Supp. 2d 915, 929 (N.D. Cal. 2010). "Decisions on this factor usually turn on the length of the scheme to defraud, the number of insider transactions, and the number of companies the transactions involved." *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 908 (N.D. Cal. 2017).

---

[27] Frost also argues that Frost's loan of nearly five million to FDC between February 2016 and January 2019 to keep it afloat demonstrates his good faith. *See* (Opp. at 30). However, as the SEC points out, the terms of those loans only created additional, undisclosed conflicts, as they provided Frost with preferential treatment ahead of the Fund's investors. (Reply at 17 (citing ECF No. 44-3 at 97-109; Supp. Searles Decl. at 99-120)).

1    The SEC contends that Frost's fraudulent course of conduct continued for years,

2    from 2012 through 2016, and involved multiple instances of fraudulent conduct. (Mot. at

3    22). Frost responds that his conduct was an "isolated occurrence occasioned by Frost

4    venturing for the first and only time into managing a fund in combination with an

5    [I]ncubator." (Opp. at 22). The record demonstrates, however, that Frost's violations were

6    part of an ongoing pattern of conduct and not an isolated incident as he claims. Frost's

7    violations of the Act spanned from 2012 to at least 2016, involved fraudulent, deceptive,

8    and manipulative conduct occurring throughout that period, and were not mere technical

9    violations of the Act. As such, the nature of Frost's violative acts weighs in favor of an

10   injunction. *See SEC v. Analytica Bio-Energy Corp.*, 317 F. Supp. 3d 574, 579 (D.D.C.

11   2018) (issuing injunction where the defendant filed false statements with the SEC in "18

12   separate reports over the course of more than a year"); *SEC v. Alexander*, 115 F. Supp. 3d

13   1071, 1086 (N.D. Cal. 2015) (finding "a scheme that spanned nearly two years and

14   impacted dozens of investors" weighed in favor of entering an injunction); *SEC v. Hansen*,

15   No. 13-CV-1403 (VSB), 2017 WL 1298022, at *7 (S.D.N.Y. Mar. 31, 2017) ("[B]ecause

16   the scheme lasted for five years, it can hardly be described as an 'isolated occurrence.'"),

17   *aff'd*, 712 F. App'x 99 (2d Cir. 2018); *SEC v. Loren*, 76 F.3d 458, 461 (2d Cir. 1996)

18   ("When the violation has been founded on systematic wrongdoing, rather than an isolated

19   occurrence, a court should be more willing to enjoin future misconduct." (citation and

20   alterations omitted)).

21   The Court is mindful that roughly nine years have elapsed since the end of the period

22   of the relevant violations of the Advisory Act were alleged to have occurred. Such passage

23   of time generally weighs heavily against imposing an injunction. *See, e.g.*, *SEC v. Jones*,

24   476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (noting that "several years ha[d] passed since

25   [d]efendants' alleged misconduct apparently without incident" and stating "[t]his fact

26   further undercuts the Commission's assertion that [d]efendants pose a continuing risk to

27   the public"); *SEC* v. *Dibella*, No. 04 Civ. 1342 (EBB), 2008 WL 6965807, at *13 (D. Conn.

28   Mar. 13, 2008) ("[T]he passage of nearly 10 years without another violation weighs heavily

against an injunction."), *aff'd*, 587 F.3d 553 (2d Cir. 2009). However, the passage of time "is just one factor among several to be weighed" by this Court. *Lorin*, 76 F.3d at 461 (citing *SEC* v. *Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied*, 434 U.S. 834 (1977)). The Court notes that Frost spent much of the time litigating the Arbitration proceeding and this case. "But just because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again." *SEC v. Murphy*, 50 F.4th 832, 851 (9th Cir. 2022) ("*Murphy II*"). Indeed, as discussed below, even after admitting negligence, Frost has continued to advance arguments in opposition to the Motion that undermine the factual basis for his admission of liability. Thus, notwithstanding the passage of time, the Court finds this factor weighs slightly in favor of an injunction. *SEC v. Mattessich*, No. 18 Civ. 5884 (KPF), 2022 WL 16948236, at *8 (S.D.N.Y. Nov. 15, 2022) (enjoining conduct even though nine years had elapsed since the defendant's violations had occurred); *SEC v. Rashid*, No. 17-CV-8223 (PKC), 2020 WL 5658665, at *26 (S.D.N.Y. Sept. 23, 2020) (finding the defendant's violative conduct, which was repeated over a period of years and was unaltered even after discovery of his false statements, warranted imposition of an injunction), *rev'd on other grounds*, 96 F.4th 233 (2d Cir. 2024).

## C.    Third Factor: Frost's Recognition of the Wrongful Nature of his Conduct

Third, the Court considers the degree to which Frost has recognized the wrongful nature of his conduct. *See Fehn*, 97 F.3d at 1295. A person's "lack of remorse" can be "apparent in" the person's "continued insistence on the validity of his" conduct that has been found to be a violation of the Advisers Act. *See id*. at 1296; *cf. First City Fin. Corp.*, 890 F.2d at 1229 (explaining that securities defendants are "not to be punished because they vigorously contest the government's accusations").

Frost maintains his violations were due to his ignorance of the requirements of being an investment advisor, as well as his playing a passive role in making disclosures. *See* (Frost Decl. ¶ 111 ("In retrospect, I would certainly do things differently, and I recognize that I did not understand the full scope of what it meant to serve an investment adviser.");

59

*id.* ¶ 112 (stating he should have "(i) taken a more active role in the process of preparing the disclosures to investors; (ii) obtained a third party analysis regarding the amount of the Incubator fees to ensure the fees did not exceed a reasonable market rate; (iii) install processes to separate my personal and business expenses; and (iv) create systems to manage conflicts between the interests of Funds, the Incubator, and FMC")).  While the Court credits Frost for admitting he committed negligent violations of the Act, Frost acknowledging that he should have "taken a more active role" in preparing the disclosures to investors is not the same as acknowledging which of his disclosures were false, misleading, or deceptive.

Further, based on Frost's declaration in support of his Opposition and the broader record, the Court does not conclude that Frost has meaningfully recognized the wrongful nature of his conduct.  Instead, Frost's submissions to the Court reflect an effort to avoid and deflect responsibility and his continued minimization of his conduct.  At times, he directly repudiates the very facts he agreed in the Admitted Facts are true.  For example, AF 25 states, in pertinent part, that in the event of a tie investment decision, the decision would be made by Frost as manager of FMC, and ". . . all members of the investment committee would be required to vote in accordance with the determination of the fund manager, i.e., Frost."  However, in his Opposition, Frost argues, "[c]ontrary to the SEC's assertion that 'all members of the investment committee would be required to vote in accordance with the determination of . . . Frost,' (Mot. at 5) many ideas, including Frost's were rejected." (Opp. at 14).  And, throughout his opposition, Frost continues to dispute the impropriety of his disclosures to investors regarding FDC's charging of monthly Incubator fees to its portfolio companies.

Further, Frost's Opposition and Declaration still deflect blame for his conduct to Guerry, Marcum, and Cooley.  *See* (Frost Decl. ¶ 33 ("I focused on running the Incubator and developing ideas for companies, while delegating responsibility for the finances to William Guerry, who served as the CFO for the Incubator, FMC, and other entities in the

enterprise"); *id.* ¶ 34 ("We engaged a well-regarded law firm in the venture capital space . . . to advice the Fund regarding, and to draft, disclosures and agreements.")).

On this record, the Court thus finds Frost has failed to adequately recognize the wrongfulness of his conduct. *See* (Opp. at 27–28, 29–30); *see also SEC v. Thomas*, No. 2:19-cv-01515-APG-VCF, 2021 WL 5826279, at \*11 (D. Nev. Aug. 24, 2021) (finding a permanent injunction was warranted despite the defendant's declaration that he would not sell securities again and that he did not knowingly violate the law because his statements failed to "adequately recognize the wrongful nature of his conduct"); *cf. Husain*, 70 F.4th at 1184–85 (defendant admitted in a declaration that specific SEC filings contained material misrepresentations and omissions). This factor therefore weighs in favor of an injunction.

### D.    Fourth Factor: Likelihood of Future Violations

Under the fourth *Murphy* factor, courts consider "the likelihood, because of a defendant's professional occupation, that future violations might occur." *Murphy I*, 626 F.2d at 655. Here the parties disagree whether Frost's current work increases the risk of future violations. The SEC argues that Frost has "expressed interest in engaging in securities offerings in the future," so Frost poses a risk of future violations. Frost, however, represents in his declaration, "[g]oing forward, I only intend to run Geminos [his present company] and may serve on the board of other companies. I hope to build a profitable company for the Geminos investors." (Frost Decl. ¶ 114). "I have no interest in and will never again act as an investment adviser."[28] (*Id.* ¶ 115). Yet he states, "[w]hile I do not intend to ever again serve as an investment adviser (and thus do not foresee any potential applicability of the Investment Advisers Act moving forward), I intend to comply with whatever state and federal securities laws are applicable to my current and future business ventures and will do the diligence required to ensure I am in compliance with these laws." (*Id.* ¶ 117)

---

[28] The Court notes that, to date, no updates have been filed by either party notifying the Court whether the nature of Frost's business ventures have changed.

1    Frost's representations leave open the possibility of him once again becoming
2    involved in some capacity in the securities industry, and his continued goal of pursuing
3    what he describes as "business ventures" could put him in a position of having to solicit
4    investors and thereby increase the likelihood of future violations of federal securities laws.
5    *Fehn*, 97 F.3d at 1296 (upholding injunction where defendant engaged in single securities
6    act violation, did not intend to violate the securities law, and gave "sincere assurances of
7    an intent to refrain" from future violations, but whose professional occupation "tend[ed] to
8    suggest a risk of future violations"); *SEC v. Cap. Cove Bancorp*, No. 8:15-cv-980-JLS-
9    JCx, 2018 WL 11370008, at *3 (C.D. Cal. Jan. 17, 2018) (defendant's occupation helps to
10   "point to [a] strong likelihood of future violations"); *Hansen*, 2017 WL 1298022, at *7
11   ("While Hansen does not appear to be in a position to participate in future violations of the
12   securities laws, due in part to his current period of incarceration and other measures put in
13   place through supervised release or the SEC, it is not outside the realm of possibility.").
14   The Court thus finds this factor weighs in favor of imposing a permanent injunction.

15   **E.      Fifth Factor: Sincerity of Assurances Against Future Violations**

16        The fifth Murphy factor considers a defendant's contrition.  The Ninth Circuit has
17   held that "sincere assurances of an intent to refrain from aiding and abetting future
18   violations are insufficient, without more, to militate against an injunction." *Fehn*, 97 F.3d
19   at 1296; *see also Murphy I*, 626 F.2d at 656 ("The fact that [defendant] violated the
20   requirements once when he did not intend to do so is sufficient to justify the conclusion
21   that he might do so again, even if the court believed he was sincere in his protestations to
22   the contrary.").

23        Here, Frost has declared that he "never again will serve as an investment advisor or
24   work for a complicated fund structure."  (Frost Decl. ¶ 114).  And as of December 31,
25   2018, FMC has not renewed its status as an exempt reporting adviser.  (Ans. ¶ 12).
26   However, as discussed previously, Frost's deflection of responsibility and failure to
27   recognize the extent of his fraudulent, manipulative, and deceptive behavior cuts against
28   his assurances of future violations. *See e.g.*, *SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp.

3d 820, 827 (S.D. Cal. 2021) ("[T]he sincerity of their assurances, however, are weakened in part by their failure to completely recognize the wrongfulness of their past conduct."); *Sabrdaran*, 252 F. Supp. 3d at 909 ("Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur." (quoting *SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004)); *Murphy I*, 626 F.2d at 656 ("The fact that he violated the requirements once when he [claims] he did not intend to do so is sufficient to justify the conclusion that he might do so again, even if the court believed he was sincere in his protestations to the contrary."); *Murphy II*, 50 F.4th at 852 (holding the district court "acted within its discretion by imposing injunctive relief" where defendants' assurances were "contradicted by their current involvement in the securities industry and apparent failure to appreciate the wrongfulness of their past conduct"); *SEC v. Koracorp Indus. Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("Promises of reformation and acts of contrition" are not "conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught"). Because Frost does not appear to have recognized the extent of the unlawful nature of his conduct, this factor weighs in favor of an injunction.[29]

## F.    Collateral Consequences

Frost argues that the negative collateral consequences an injunction would have on Frost's livelihood weigh against an injunction. Specifically, Frost claims that, because an injunction would have the effect of "effectively barring him from acting as an entrepreneurial CEO in the same lawful manner as he has done successfully for decades, and the events involving the Frost entities have already had a detrimental impact on Frost

---

[29] By making this finding, the Court does not hold Frost's decision to defend against this suit or assertion of legal defenses against him. Further, the Court credits Frost's decision to admit negligence liability on Claim Two. Nevertheless, Frost's declaration and other filings in opposition to the Motion reflect that he continues to deflect blame to other individuals and minimize his conduct, notwithstanding his active role in the decision making, representations, and conduct that form the basis of the Court's recklessness finding.

1    personally, financially, and professionally, these consequences strongly support denying
2    an injunction." (Opp. at 31). The SEC responds that Frost overstates the collateral
3    consequences of an injunction because a "Bad Actor" designation, if issued under
4    paragraphs (d) and (e) of Rule 506 of the Securities Act, would only disqualify Frost from
5    availing himself of the exemptions under Rule 506(b) and (c) for a period of five years,
6    would not prevent Frost from raising funds through a non-public offering or through a
7    registered offering, and the SEC could elect to waive bad actor designation altogether.
8    (Reply at 19-20).

9         The Court agrees with the SEC. Contrary to Frost's assertion, the SEC is not seeking
10   an officer and director bar against Frost, so he would remain free to act as a CEO for his
11   current company and whatever other company he chooses. (Reply at 7). In particular,
12   Section 5 of the Securities Act requires the registration of all securities offerings, subject
13   to certain exemptions and safe harbors. 15 U.S.C. §§ 77e(a), (c). Rule 506(d) provides, in
14   relevant part, that no exemption from registration shall be available for a sale of securities
15   if the issuer, or any director, executive officer, or other officer participating in the offering
16   is "subject to any order, judgment, or decree of any court of competent jurisdiction, entered
17   within five years before such sale, that at the time of such sale, restrains or enjoins such
18   person from engaging or continuing to engage in any conduct or practice … [i]n connection
19   with the purchase or sale of any security …or…[a]rising out of the conduct of the business
20   of [an] . . . investment adviser." 17 C.F.R. § 230.506(d)(1)(ii)(A), (C). Thus, a permanent
21   injunction against Frost could result in him being deemed a "bad actor" who could not
22   serve as a "covered person" with an entity that raises capital under Rule 506 for a five-year
23   period.

24        However, as the SEC points out, the SEC, under certain circumstances, is authorized
25   to waive Frost's bad actor disqualification if it determines that Frost has shown "good
26   cause" that it is not necessary. *See* 17 C.F.R. § 230.506(d)(2)(ii). The SEC administers a
27   comprehensive process for an applicant to seek a waiver from disqualification under Rule
28   506(d)(2)(ii), including requiring the party seeking a waiver to submit a written application

to the SEC for consideration and analysis. *See* Statement on Waivers of Disqualification under Regulation A and Rules 505 and 506 of Regulation D (Mar. 13, 2015) (available at https://www.sec.gov/divisions/corpfin/guidance/disqualification-waivers.shtml).

Frost offers no justification for why the Court should wade into the bad actor question when the SEC has a waiver process. Indeed, Frost points to no instance in which a court has refused to issue an injunction to avoid triggering the Regulation D bad actor provision. Instead, courts have declined to issue an injunction where it would have a detrimental impact on an individual's ability to earn a living. For example, in *SEC v. Ambassador Advisors, LLC*, No. 5:20-CV-02274-JMG, 2022 WL 4097327, at *5 (E.D. Pa. Sept. 7, 2022), the court declined to enter an injunction as it would have resulted in an administrative associational bar that would have prevented the defendants from continuing to earn a living in their chosen profession. *See also SEC v. Westport Cap. Mkts., LLC*, 547 F. Supp. 3d 157, 168 (D. Conn. 2021) (district court denied injunctive relief, in part, because it "would very likely end [the defendant's] career."); *SEC v. McDermott*, No. 189-4229-KSM, 2022 WL 16533556, at *7 (E. D. Pa. Oct. 28, 2022) (court declined to enter an injunction, as it would be career ending for the defendant, and would negatively affect defendant's 314 advisory clients, who would be forced to retain a new adviser or manage their own accounts). Here, Frost has not shown that such consequence would flow from Frost being designated a "bad actor" under Rule 506(d).

Frost also cites *Sabrdaran*, 252 F. Supp. 3d at 911, as an example where the court declined to issue an injunction despite finding the defendants acted with scienter. However, a key reason the court refrained from enjoining the defendants was its "imposition of a permanent director and officer bar as to [defendant] based on the [c]ourt's finding that he is unfit for office in a public company. It is in part because of this bar that the further remedy of injunction is not necessary." *Id.* No such facts exist here.

Finally, the Court notes that by imposing the permanent injunction, the Court is not seeking to punish Frost for his conduct; the Court is simply imposing a prophylactic measure to protect the investing public. Throughout this Order, the Court has discussed a

non-exhaustive list of examples of Frost's fraudulent, manipulative, and deceptive conduct and has carefully weighed the required *Murphy* factors to determine whether there is a "reasonable likelihood of future violations of the securities laws." Although the Court acknowledges the amount of time that has elapsed in this case since the relevant violation period, the Court nevertheless concludes, on balance, that the *Murphy* factors still weigh in favor of a permanent injunction. The Court has assessed, as it is required to do, the seriousness, extent, and duration of Frost's violative conduct, his minimal level of contrition reflected in the record, and the likelihood of him repeating similar conduct, given that he expresses a desire to be involved with business ventures in the future—the very conduct that resulted in his violation of the Act. Based on that assessment, the Court finds that an injunction is appropriate and is not punitive.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS the SEC's Motion to permanently restrain and enjoin Frost from any violation of Section 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 adopted thereunder, 17 C.F.R. § 275.206(4)-8. Specifically, the Court enjoins Frost, while acting as an investment adviser to a pooled investment vehicle, from (i) making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading to any investor or prospective investor in the pooled investment vehicle; or (ii) otherwise engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

**IT IS SO ORDERED.**

DATED:  September 12, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

66